**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

---

COMMONWEALTH OF MASSACHUSETTS, STATE OF CALIFORNIA, STATE OF NEW JERSEY, STATE OF ARIZONA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF HAWAI'I, STATE OF ILLINOIS, OFFICE OF THE GOVERNOR ex rel. Andy Beshear, in his official capacity as Governor of the COMMONWEALTH OF KENTUCKY, STATE OF MAINE, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NEVADA, STATE OF NORTH CAROLINA, STATE OF OREGON, JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, STATE OF WISCONSIN,

      Plaintiffs,

        v.

MEHMET OZ, M.D., in his official capacity as Director of the Centers for Medicare & Medicaid Services; CENTERS FOR MEDICARE & MEDICAID SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health & Human Services; U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES,

      Defendants.

Case No. 26-12962

---

**INTRODUCTION**

1. When Congress enacted the One Big Beautiful Bill Act (OBBBA, also known as

H.R. 1) in 2025, it made structural changes to Medicaid, the nation's safety net healthcare program

1

for low-income Americans. Among its provisions is a new requirement that selected applicants and enrollees engage in work or other activities to qualify for coverage. Defendants, the U.S. Department of Health and Human Services (HHS) and Centers for Medicare & Medicaid Services (CMS), claim that their implementation of the work requirements provision, Section 71119, will help "prioritiz[e] coverage for Medicaid's most vulnerable." Yet the rule the federal government issued implementing Section 71119 does the opposite: it creates new requirements that constrain who is exempt due to their medically frail status and force medically frail individuals in need of healthcare to jump through unnecessary administrative hoops to get and retain life-saving healthcare coverage.

2.      The Interim Final Rule (IFR), "Community Engagement Requirement for Certain Individuals," 91 Fed. Reg. 33348 (June 3, 2026), took Medicaid agencies in the Plaintiff States by surprise. Contrary to months of regular communications with CMS and preliminary guidance materials upon which Plaintiff States based their implementation plans, CMS adopted a rule that dramatically narrowed the Congressionally established categorical exclusions from the work requirement for some of the most vulnerable Medicaid members. Under the rule, individuals with significant health conditions must *also* be found to be "significantly impair[ed]" in their ability to meet work requirements. But H.R. 1's broad statutory exclusions exist for good reason. People with disabilities, patients in the middle of cancer treatment, or those struggling with another serious or complex health condition, shouldn't be at risk of losing the care that helps maintain their health. Nowhere in H.R. 1 does Congress state that individuals' ability to work must be impaired in order to be "medically frail or otherwise have special medical needs," or to have a "serious or complex medical condition."

3.      The IFR makes numerous other changes that will create unnecessary bureaucracy and lead people who are either already working or eligible for an exclusion to lose or be denied coverage. These changes fly in the face of substantial evidence that was or should have been considered by the agency in its decisionmaking, without adequately considering reasonable alternatives or significant downsides, and without making clear what is being asked of Plaintiff States. These types of changes violate both the Administrative Procedure Act (APA) and the United States Constitution's limits on federal spending authority.

4.      Extensive evidence from past experiments with Medicaid work requirements makes clear what the real-life consequences of the IFR will be—consequences that Defendants were required to consider but did not. Added administrative burdens will cause individuals who are eligible for Medicaid to lose or be denied coverage. It will disproportionately hurt people who are *already* at risk, such as older adults who are not yet eligible for Medicare and people with serious chronic conditions. Defendants' action will cause immediate and irreparable harms to Plaintiff States' operation of their state Medicaid programs. It will further strain safety net providers, lead to more uncompensated emergency care, and raise other costs associated with newly uninsured, medically frail residents. And it will cause rural hospitals to be even more likely to shutter.

5.      CMS's final rule will cause harm and chaos for the Plaintiff States. The work that State Medicaid agencies need to do in order to implement H.R. 1's provisions is complex, expensive, and takes substantial time and attention to perform correctly. Plaintiff States had already made substantial investments in system modifications and business workflows in reliance on the plain language of the statute and CMS's prior guidance. Plaintiff States will face harsh penalties if the federal government later determines that they have violated the terms of the IFR. Plaintiffs face

3

an August 31, 2026 statutory deadline for communication with Medicaid members regarding the requirements including changes occasioned by the IFR and must prepare those communications well in advance. Therefore, Plaintiffs cannot wait to see whether CMS fixes the clear deficiencies in its decision-making process before seeking legal protection for State Medicaid programs and State residents who depend upon them.

6.      Because the IFR is contrary to law, arbitrary and capricious, an unlawful use of Congress' power of the purse, and profoundly harmful to Plaintiff States and their residents, the Plaintiff States Massachusetts, California, New Jersey, Arizona, Colorado, Connecticut, Delaware, District of Columbia, Hawai'i, Illinois, the governor of Kentucky, Maine, Maryland, Michigan, Minnesota, Nevada, New Mexico, New York, North Carolina, Oregon, the governor of Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and Wisconsin bring this suit to have it preliminarily enjoined and ultimately vacated—protecting access to affordable health care for Plaintiff States' residents.

**JURISDICTION AND VENUE**

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Jurisdiction is also proper under the judicial review provisions of the APA. 5 U.S.C. §§ 702, 704. An actual controversy exists between the parties within the meaning of 28 U.S.C. § 2201(a), and this Court may grant declaratory relief, injunctive relief, and other relief pursuant to 28 U.S.C. §§ 2201, 2202 and 5 U.S.C. §§ 705, 706.

8.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff Commonwealth of Massachusetts is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continue to occur within the District of Massachusetts.

**PARTIES**

I.    **Plaintiffs**

9.    Plaintiff Commonwealth of Massachusetts is a sovereign state of the United States of America. Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief legal officer.

10.    Plaintiff the State of California, represented by and through their Attorney General, Rob Bonta, brings this action on behalf of the sovereignty of the State of California. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the People in this matter.

11.    Plaintiff the State of New Jersey is a sovereign state of the United States of America, and is represented by Attorney General Jennifer Davenport, who is the State's chief legal adviser and is authorized to act in federal court on behalf of the State on matters of public concern.

12.    Plaintiff the State of Arizona is a sovereign State of the United States. Arizona is represented by Attorney General Kristin K. Mayes, who is the State's Chief Law Officer.

13.    Plaintiff the State of Colorado is a sovereign state in the United States of America. Colorado is represented by Philip J. Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the State and is authorized by Colo. Rev. Stat. § 24-31-101 to pursue this action.

14.    Plaintiff the State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

15.    Plaintiff the State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403

5

(Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

16.    Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

17.    Plaintiff the State of Hawai'i, represented by and through its Attorney General Anne Lopez, is a sovereign state of the United States. The Attorney General is Hawai'i's chief legal officer and chief law enforcement officer and is authorized by Hawai'i Revised Statues § 28-1 to pursue this action.

18.    Plaintiff the State of Illinois is a sovereign state in the United States of America. Illinois is represented by Kwame Raoul, the Attorney General of Illinois, who is the chief law enforcement officer of Illinois and authorized to sue on the State's behalf. The Attorney General is authorized to represent the State's interests by the Illinois Constitution, article V, § 15. *See* 15 ILC 205-4.

19.    Plaintiff the Office of the Governor, *ex rel.* Andy Beshear, brings this suit in his official capacity as the Governor of the Commonwealth of Kentucky. The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to

"take care that the laws be faithfully executed," Ky. Const. § 81. In fulfilling his constitutional duties, the Governor has authority to bring this action.

20.     Plaintiff the State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

21.     Plaintiff the State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown.

22.     Plaintiff the State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

23.     Plaintiff the State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01.

24.     Plaintiff the State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

25.     Plaintiff the State of New Mexico is a sovereign State of the United States. New Mexico is represented by Attorney General Raúl Torrez, who is the State's Chief Legal Officer.

26.     Plaintiff the State of New York, represented by and through its Attorney General, Letitia James, is a sovereign State of the United States. The Attorney General is New York State's

chief law enforcement officer and is authorized under N.Y. Executive Law § 63 to pursue this action.

27.    Plaintiff the State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson who is the chief law enforcement officer of North Carolina.

28.    Plaintiff the State of Oregon, represented by and through its Attorney General Dan Rayfield, is a sovereign State of the United States of America. As the State's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter.

29.    Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania, including the Pennsylvania Department of State, and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6).

30.    Plaintiff the State of Rhode Island is a sovereign State of the United States. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

31.    Plaintiff the State of Vermont is a sovereign state of the United States of America. Vermont is represented by its Attorney General, Charity R. Clark, who is the chief legal officer of Vermont and has authority to represent the State in this matter.

32.    Plaintiff the Commonwealth of Virginia is a sovereign State of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the

Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2-513.

33.     Plaintiff the State of Washington, represented by and through its Attorney General, is a sovereign state of the United States of America. Attorney General Nick Brown is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030(1) to pursue this action.

34.     Plaintiff the State of Wisconsin is a sovereign State of the United States. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to pursue this action.

## II.     Defendants

35.     Defendant Mehmet Oz is the Administrator for the U.S. Centers for Medicare & Medicaid Services. He is sued in his official capacity.

36.     Defendant U.S. Centers for Medicare & Medicaid Services is a federal agency within the U.S. Department of Health and Human Services that administers the Medicare program and works in partnership with state governments to administer Medicaid and the Children's Health Insurance Program (CHIP).

37.     Defendant Robert F. Kennedy, Jr., is the Secretary of U.S. Department of Health and Human Services. He is sued in his official capacity.

38.     Defendant U.S. Department of Health and Human Services is a federal cabinet department within the executive branch of the United States government. 20 U.S.C. § 3411.

9

**LEGAL AND FACTUAL ALLEGATIONS**

I.    THE MEDICAID PROGRAM AND APPLICABLE FEDERAL LAWS

A.    **Medicaid Generally**

39.    Medicaid is a cooperative federal-state program that provides medical services to low-income individuals and individuals with disabilities. *See* 42 U.S.C. §§ 1396 *et seq*, *Harris v. McRae*, 448 U.S. 297, 308 (1980). Since Medicaid's creation in 1965, Congress has repeatedly expanded eligibility for the program, adding new coverage for persons with disabilities, low-income children, pregnant and post-partum individuals, and more.

40.    The purpose of Medicaid is to enable States "to furnish [] medical assistance" to individuals "whose income and resources are insufficient to meet the costs of necessary medical services" and to provide "rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." 42 U.S.C. § 1396-1.

41.    States and the federal government jointly fund Medicaid, with the federal government providing at least fifty percent of the cost of services. 42 U.S.C. §§ 1396b(a)(1), 1396d(b).

42.    State agencies administer the Medicaid program pursuant to State Medicaid plans, which are reviewed and approved by CMS. Congress has directed that these State Medicaid plans must "provide such safeguards as may be necessary to assure that eligibility […] and such care and services will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." 42 U.S.C. § 1396a(a)(19).

43.    Within specified federal guidelines, States have historically enjoyed significant flexibility in how they set eligibility policy for Medicaid and other public healthcare programs. States can set their own income limits for different eligibility categories, choose to disregard

certain income or assets, and decide whether and how to use eligibility findings from other programs to streamline enrollment in Medicaid.

44. CMS is responsible for overseeing state compliance with federal rules and regulations relating to Medicaid. The federal government has authority to impose severe financial penalties if states are found to be out of compliance with State Medicaid plans and federal regulations.

### B. The ACA and Medicaid Expansion

45. Congress enacted its largest expansion of Medicaid coverage in the 2010 Affordable Care Act (ACA), a landmark law aimed at reducing the number of Americans without health insurance by both making private insurance more accessible and expanding access to Medicaid for adults ages 19-65.

46. In enacting the ACA, Congress found that uninsured individuals experience poorer health and shorter lifespans, leading to substantial economic costs nationwide. 42 U.S.C. § 18091(2)(E). The ACA was thus designed to "increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) (*NFIB*).

47. To achieve this goal, the ACA expanded access to Medicaid to low-income, working age individuals (Expansion Population), and adopted new methods for determining financial eligibility that allow for greater automation of such determinations and align with ACA marketplace coverage. 42 U.S.C. §§ 1396a(a)(10)(A)(i)(VIII), 1396a(e)(14). While Congress established Medicaid as a federal mandate, applicable to all states, the Supreme Court in *NFIB* held that States could choose whether or not to extend Medicaid coverage to the Expansion Population. 567 U.S. at 585.

48.     The ACA requires States to use a single, streamlined application for most Medicaid enrollees, and to process those applications within 45 days. 42 U.S.C. §§ 18083(a), 1396w-3.

49.     The ACA forbids the HHS Secretary from promulgating "any regulation" that "creates any unreasonable barriers to the ability of individuals to obtain appropriate medical care." 42 U.S.C. § 18114. Consistent with this requirement—as well as Congress's longstanding directions for eligibility systems to prioritize "simplicity of administration and the best interests of recipients," *id.* § 1396a(a)(19)—upon redetermination and application, Medicaid regulations require States in the first instance to conduct *ex parte* renewals for all Medicaid members, based on reliable information that is available to the State Medicaid agency, without requiring information of the individual. 42 C.F.R. §§ 435.916(a)(2) and (b), § 457.380(h). This includes, but is not limited to, information accessed through electronic data sources available to the state. *See, e.g.*, 42 C.F.R. §§ 435.948, 435.949, 457.380.

50.     According to CMS's most recent enrollment data, almost 75 million Americans were covered by Medicaid and CHIP. The Expansion Population accounts for about a quarter of those enrollees, about 20 million Americans across 41 states.

51.     States that expanded access to Medicaid—including most of the Plaintiff States— have enjoyed reduced rates of uninsurance, increased healthcare affordability, improvements in health access and outcomes, and economic benefits for both states and their medical providers. Medicaid expansion has been shown to be associated with increased early-stage cancer diagnosis, improved disease management, and lower mortality rates for many chronic conditions. With coverage intact, the expansion has also allowed people with chronic health conditions to work.

### C.    State Experiments with Work Requirements

52.     In the past, CMS permitted individual states to experiment with waiving federal Medicaid rules to allow work requirements as a condition of Medicaid eligibility. *See, e.g.*, Letter

from Seema Verma, Admin., CMS. to Cindy Gillespie, Dir. Ark. Dep't of Human Servs. (Mar. 5, 2018) (approving Arkansas amendment to waiver allowing imposition of work requirements).

53.    Those experiments demonstrated that Medicaid work requirements can lead to coverage loss for individuals who are otherwise eligible. Administrative barriers and red tape caused both people who are working as well as people who should have been exempt because of caretaking responsibilities, disabilities, or illnesses to lose coverage.

54.    One survey-based, peer-reviewed study published in the New England Journal of Medicine showed that the uninsured rate among low-income, working-age individuals in Arkansas rose significantly when that state was permitted to impose work and community engagement requirements.[1]

55.    This coverage loss, in turn, had serious consequences for former Medicaid enrollees. They experienced significantly higher medical debt and financial barriers to care, including serious problems paying off medical bills; delays in seeking health care because of cost; and delays in taking medications because of cost.[2]

56.    CMS ultimately revoked most of the previously approved Medicaid waivers allowing work requirements, citing, among other factors, the agency's "serious concerns" that such policies would "create a risk of substantial loss of health care coverage and harm to beneficiaries."[3]

---

[1] Benjamin Sommers, *et al.*, *Medicaid Work Requirements — Results from the First Year in Arkansas*, New England J. of Med., Vol. 381, No. 11, June 19, 2019, https://www.nejm.org/doi/full/10.1056/NEJMsr1901772.

[2] Benjamin Sommers, *et al.*, *Medicaid Work Requirements in Arkansas: Two-Year Impacts on Coverage, Employment, and Affordability of Care.*, Health Affairs, Vo. 39, No. 9, Sept. 8, 2020, https://www.healthaffairs.org/doi/full/10.1377/hlthaff.2020.00538; Lucy Chen & Benjamin Sommers, *Work Requirements and Medicaid Disenrollment in Arkansas, Kentucky, Louisiana, and Texas*, Am. J. of Public Health, 110, no. 8, pp. 1208-1210, July 8, 2020, https://doi.org/10.2105/AJPH.2020.305697.

[3] Letter from CMS to Arkansas (Mar. 17, 2021), https://perma.cc/K6QL-AXP9.

**D.    H.R. 1's New Requirements for Medicaid Expansion Enrollees**

57.    In 2025, Congress enacted H.R. 1. Pub. L. No. 119-21, 139 Stat. 172 (2025). H.R. 1 contained substantial changes directly focused on the Expansion Population.

58.    Apart from certain provisions reducing eligibility for certain lawfully residing noncitizens, Congress in H.R. 1 did *not* eliminate the Medicaid expansion. Indeed, proponents of the measure repeatedly claimed that the legislation was "not cutting Medicaid."[4]

59.    Section 71119(a) of H.R. 1 requires all States to impose new requirements for work or "community engagement" for some Expansion Population members. 42 U.S.C. § 1396a(xx). States are also required to apply these changes at application and renewals. H.R. 1 also doubles the frequency with which states redetermine eligibility for this entire population of enrollees, from once a year to every six months. 42 U.S.C. § 1396a(e)(14)(L). As is generally true for the entire Medicaid population, expansion enrollees also must report changes in circumstances that could affect their eligibility in between renewal periods.

60.    The new work requirement provision applies to "applicable individuals" in the Expansion Group. 42 U.S.C. § 1396a(xx). Congress defined the term "applicable individual" to mean "an individual (other than a specified excluded individual)" who is eligible for or enrolled in a state Medicaid plan's coverage (or under a waiver of a state plan) for the ACA Expansion Population who is between the ages of 19 and 64, is not pregnant, not entitled to or enrolled in Medicare Part A or B, and not otherwise eligible to enroll in mandatory coverage under a Medicaid state plan. *Id*. § 1396a(xx)(9)(A)(i).

61.    The statute identifies seven ways in which an "applicable individual" can demonstrate compliance with work requirements. 42 U.S.C. § 1396a(xx)(2). For example, an

---

[4] *See, e.g.*, Rep. Tom Cole, *Fact Check: Republicans are Strengthening Medicaid* (May 20, 2025), https://perma.cc/TM5D-NHS7.

individual may demonstrate compliance with the work requirements if they "work[] not less than 80 hours" per month, 42 U.S.C. § 1396a(xx)(2)(A), or are "enrolled in an education program at least half-time," 42 U.S.C. § 1396a(xx)(2)(D); or if they earn equivalent monthly or seasonal minimum wages. 42 U.S.C. § 1396a(xx)(2)(F-G).

62.     States are permitted to elect to offer "applicable individuals" short-term hardship exceptions from work requirements, including for individuals who receive inpatient hospital services; for individuals when they or their dependents must "travel outside of their community for an extended period of time to receive medical services necessary to treat a serious or complex medical condition"; and for those living in counties with a declared disaster or emergency or where the unemployment rate is at or above the lesser of 8% or 1.5 times the national unemployment rate. 42 U.S.C. § 1396a(xx)(3)(B)(i-ii).

63.     In addition to new work requirements and exceptions for "applicable individuals," Congress separately and expressly set forth nine categories of individuals who are "specifi[cally] excluded" from the definition of "applicable individual." 42 U.S.C. § 1396a(xx)(9)(A)(i-ii). Those "specifi[cally] excluded" categories of individuals include (but are not limited to) American Indians; parents, guardians, caretaker relatives, and family caregivers of dependent children 13 years of age and under and disabled individuals; individuals participating in drug addiction or alcoholic treatment and rehabilitation programs; and individuals who are pregnant or receiving postpartum medical assistance. *Id*.

64.     Among those Congress specifically excluded from the work requirement are individuals:

> who [are] medically frail or otherwise ha[ve] special medical needs (as defined by the Secretary), ***including*** an individual—(aa) who is blind or disabled (as defined in [42 U.S.C § 1382c, the standard for eligibility for Supplemental Security Income]); (bb) with a substance use disorder; (cc) with a disabling mental disorder; (dd) with a physical,

intellectual or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living; or (ee) with a serious or complex medical condition."

42 U.S.C. § 1396a(xx)(9)(A)(ii)(V) (emphasis added).

65.    Except for a few specific instances (e.g., individuals meeting the definition of disabled for purposes of the Supplemental Security Income (SSI) program), Congress defined the categories of individuals who must be "specifi[cally] excluded" from H.R. 1's new work requirements based on the existence of a demographic characteristic or medical condition, without reference to the individual's ability to work—including the subcategories of individuals who must be included because they are "medically frail or otherwise have special medical needs." In the case of medically frail individuals with special medical needs, the exclusion is specifically defined by reference to a medical condition only. *Nowhere* in the statute does Congress state that individuals are "specifi[cally] excluded" as "medically frail or otherwise have special medical needs" only if they also establish that their condition impairs their ability to work.

66.    Congress' categorical exclusions represent a crucial vehicle for protecting individuals who would otherwise be disproportionately burdened by new work requirements. Compared to others in the Expansion Population, people with disabilities and people with serious or complex healthcare conditions are far more likely to require steady access to healthcare services to avoid significant consequences for their health and wellbeing. For these individuals, the denial or loss of healthcare coverage is likely to exacerbate underlying health difficulties.

67.    Congress further protected Medicaid applicants and enrollees by requiring "*ex parte* verifications" for determining individuals' compliance with work requirements at application and redetermination and whether an individual is "specifi[cally] excluded" from those requirements. 42 U.S.C. § 1396a(xx)(5). This "ex parte verification" provision requires that States "establish processes and use reliable information available to the State […] without requiring,

16

where possible, the applicable individual to submit additional information." *Id.* In other words, where possible, States are supposed to make decisions about eligibility without demanding more information from the Medicaid member or applicant.

68.    While States are required to verify through data-based sources, such as medical history or health services claims, in some cases such data may not be available to the State (e.g., when an individual is newly applying for Medicaid). Congress addressed this issue by allowing States to "elect to not require an individual to verify information" through documentation if they meet various criteria, including to determine eligibility for the categorical specific exclusions. 42 U.S.C. § 1396a(xx)(3)(A). As such, when data is unavailable, Congress established an option for states to accept self-attestation under penalty of perjury.

69.    States may be granted time limited extensions from the January 1, 2027 effective date if a State submits a request and HHS determines that a State is "demonstrating a good faith effort to comply with the requirements." 42 U.S.C. § 1396a(xx)(11). These extensions shall expire no later than December 31, 2028.

70.    Unless States choose to implement earlier or obtain a good faith waiver of the deadline, the work requirement provision applies to all States with Expansion Populations no later than January 1, 2027. *Id.* § 1396a(xx)(1). Congress also required the States to send notices outlining how enrollees can demonstrate compliance with the new requirements beginning no later than August 31, 2026, which effectively requires States to finalize the design, if not implementation, of their compliance regime before that date for the States' internal processes and communication vendors requirements to be finalized and to make production of notices possible.

71.    Congress directed CMS to promulgate "an interim final rule for purposes of implementing" Section 71119 of H.R. 1 "not later than June 1, 2026." Pub. L. 119-121, 139 Stat. 313.

## II.    CMS IMPLEMENTING GUIDANCE AND THE INTERIM FINAL RULE

### A.    CMS Implementing Guidance

72.    Recognizing that "[i]mplementation of community engagement requirements [would] necessitate system, policy, and operational changes to state programs," and that States needed to begin planning for these extensive changes well in advance of the June 1, 2026 IFR, CMS began providing subregulatory guidance to State Medicaid agencies in late 2025.[5]

#### 1.    November 2025 Slide Deck

73.    On November 19, 2025, CMS presented to the State Medicaid agencies a slide deck titled "Implementing Section 71119 of the Working Families Tax Cut Legislation: Key Requirements and Preliminary Policy Direction from CMS." Exhibit 1 ("CMS Slide Deck"). Though the CMS Slide Deck contained disclaimers that the information provided therein was preliminary and subject to change, it also stated that "states and vendors are strongly encouraged to review this deck to inform planning." *Id.* at 5. CMS also encouraged "readers to refer to the applicable statutory language for complete information." *Id.*

74.    On a slide titled "CMS Vision for C-E [Community Engagement] Implementation," CMS shared its goals for implementation of H.R. 1's work requirements. Among these goals were: (a) "Start on time by **retaining state flexibility**. Balance the benefits of flexibility with the

---

[5] *E.g.,* Dan Brillman, Deputy Administrator CMS, *Section 71119 of the "Working Families Tax Cut" Legislation, Public Law 119-21: Requirements for States to Establish Medicaid Community Engagement Requirements for Certain Individuals*, CMCS Information Bulletin, Dec. 8, 2025, https://perma.cc/HJ39-HEXP.

potential costs of options, including systems and operational costs; and (b) **Promote alignment**. Anywhere possible align new policies with existing statutory and regulatory requirements, including existing requirements for Medicaid, SNAP, TANF, IRS, and the Marketplace. This will help defray operational costs and streamline business flows." CMS Slide Deck, 6 (emphasis in original).

75.     Concerning what CMS refers to as the "Medical Frailty Exclusion," CMS confirmed that it "intend[ed] to require states to use a definition of medical frailty similar to that described in regulations at 42 C.F.R. § 440.315(f)." CMS Slide Deck, 11. This regulation, which was promulgated in 2013 as part of implementation of the ACA, requires States to define "medically frail or otherwise […] with special medical needs" to at least include:

> [T]hose individuals described in § 438.50(d)(3) [certain children under the age of 19], individuals with disabling mental disorders (including children with serious emotional disturbances and adults with serious mental illness), individuals with chronic substance use disorders, individuals with serious and complex medical conditions, individuals with a physical, intellectual, or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living, or individuals with a disability determination based on Social Security criteria or in States that apply more restrictive criteria than the Supplemental Security Income program, the State plan criteria.

42 C.F.R. § 440.315(f).

76.     CMS also informed the States that their approach to "verify[ing] medical frailty" must be auditable and provided the following examples: "medical claims data review or provider documentation, or completion of a screening tool." CMS Slide Deck, 11. With respect to new applicants without a claims history, CMS suggested States could require them to "complete a screening tool to verify medical frailty, but CMS expects to require states to confirm that determination via claims data/documentation within 6 months post enrollment." *Id.*

19

77.    Neither the CMS Slide Deck nor the regulations referenced therein define an individual who is "medically frail or otherwise has special medical needs" in relation to that individual's ability to engage in work or community engagement requirements.

78.    CMS further highlighted its expectation that State Medicaid agencies would use reliable data sources and minimize requests for information from applicants and members, consistent with existing Medicaid regulations. CMS Slide Deck, 15.

79.    Recognizing the breadth of the changes needed at the State level to implement work requirements, CMS stated "[f]ull implementation of C-E includes multiple, interdependent elements that extend beyond system updates" and "States will need to address policy, process, and operational capacity to meet compliance." CMS Slide Deck, 25. The CMS Slide Deck included the following non-exhaustive example of the changes required for implementation:



*Id*.

80.    Though CMS expressed an intent to "require that states maximize use of data sources and other auditable information to verify exclusions and exceptions and to limit states' use of self-declaration to the greatest extent possible," CMS Slide Deck, 16, it provided no indication that it intended to place specific limits on States' ability to rely on self-attestation when such data was unavailable. In a slide addressing States' "Minimum Viable Product," CMS specifically stated that "[a]uditable individual declarations" would be allowed in 2027—"year 1"—for "Community Service and Job Program Enrollment" and did not include any comparable "year 1" only limits for declarations regarding other community engagement criteria. *Id.* at 29. On the same slide, CMS did not mention any limits on use of auditable declarations for determining "Mandatory Exceptions & Exclusions." *Id.*

2.    December 8, 2025 CMCS Informational Bulletin

81.    On December 8, 2025, CMS publicly released an Informational Bulletin with the subject "Section 71119 of the 'Working Families Tax Cut' Legislation, Public Law 119-21: Requirements for States to Establish Medicaid Community Engagement Requirements for Certain Individuals" ("December 2025 Bulletin").[6] In it, CMS stated, "we recognize that planning must begin now, as states enter budget and legislative sessions and begin procurement of new systems and services to support implementation of the Medicaid provisions in the WFTC legislation." *Id.* The Bulletin provided an overview of several provisions of H.R. 1 along with CMS's interpretation of certain of those provisions.

82.    The December 2025 bulletin listed among the "persons" who are "specified excluded individuals," "[a]n individual who is medically frail or otherwise has special medical

---

[6] Brillman, *Section 71119 of the "Working Families Tax Cut" Legislation, Public Law 119-21: Requirements for States to Establish Medicaid Community Engagement Requirements for Certain Individuals*, *supra* n. 5.

needs (as defined by the Secretary), including an individual: who is blind or disabled (as defined in section 1614 of the Act); with a substance use disorder; with a disabling mental disorder; with a physical, mental, or developmental disability that significantly impairs their ability to perform one or more activities of daily living; or with a serious or complex medical condition." *Id.* at 5–6 (citing 42 U.S.C. § 1396a(xx)(9)(A)(ii)). It added no other qualification or test to this categorical exclusion.

83.    The December 2025 Bulletin also echoed H.R. 1 and the Medicaid Act's general requirement that the States avoid seeking additional documentation or information from individuals at application and renewal where possible. It affirmed that "[t]he state may not request additional information or documentation unless it is unable to establish that the individual met community engagement requirements (or was not required to do so) using reliable information available to it." *Id.* at 8. Though it described procedures to apply if a state "cannot establish that someone met the community engagement requirements or was not required to do so," it did not suggest any limits on self-attestation, consistent with established Medicaid regulations which permit States' use of self-attestation except where otherwise required by law. *See* 42 C.F.R. § 435.945(a).

3.    Workgroup Calls Between the States and CMS

84.    Beginning on December 5, 2025, CMS began a series of workgroup calls with the States. The purpose of these calls was to allow CMS to provide guidance and hold question-and-answer sessions with State Medicaid agencies on the topic of implementing H.R. 1's work requirements. The workgroup calls continued on a biweekly basis from December 2025 through April 2026, at which point they continued on a weekly basis. The calls are consistent with CMS' practice of providing subregulatory guidance to State Medicaid agencies on compliance with urgent and significant changes, separate from formal rulemaking. CMS began this practice in

March of 2020 "to bring the latest information available to support states and territories as they respond to the COVID-19 public health emergency and prepare for unwinding of COVID-19 flexibilities."[7]

85.    During these calls, CMS continued to inform State Medicaid agencies that it intended to define the exclusion for individuals who are "medically frail or otherwise ha[ve] special medical needs" consistent with 42 C.F.R. § 440.315(f). CMS also continued to indicate the viability of using claims data and screener tools for evaluating applicability of the exception.

86.    In a call, CMS also pointed to Louisiana as an example for implementing the "medically frail" exclusion. There, State Medicaid officials had proposed using available data from claims and encounters, including certain medical billing codes, to identify members who are categorically specifically excluded from the work requirements as "medically frail." CMS also recommended strategies to the State Medicaid agencies for identifying individuals with chronic conditions using CMS's Chronic Conditions Data Warehouse, suggesting those individuals would categorically qualify as "medically frail" based on their diagnoses. The use of such data suggested that diagnoses alone could be sufficient to verify an individual as "medically frail."

87.    Through these regular calls, CMS also informed the State Medicaid agencies that use of auditable self-declarations would be acceptable when data was not available. In a February 2026 call, CMS explained that where data is unavailable or there is a need to verify an inconsistency, States have two options: requesting documentation from the individual or seeking auditable self-declaration. In a call the following month, CMS reiterated that States could use auditable self-declarations in the absence of claims data or to confirm an ongoing condition to qualify as medically frail or otherwise having special medical needs. At no point did CMS indicate

---

[7] *All State Calls*, CMS, Medicaid & CHIP, https://perma.cc/PV6N-AWLT.

that members and applicants would be limited to one self-attestation per enrollment period. In fact, between November 2025 and May 2026, CMS exhibited to the States an increasing willingness to allow self-attestation in the absence of available data.

### 4. Early Implementation in Nebraska

88. During the time when CMS was providing subregulatory guidance to the State Medicaid agencies, Nebraska announced, in partnership with CMS, that it would implement work requirements early on May 1, 2026.[8]

89. Nebraska's Department of Health and Human Services (DHHS) directed applicants and enrollees seeking renewal to report "job-skills or training program hours," "volunteer hours," "school or an apprenticeship," and certain exemptions through an "individual declaration form."[9]

90. Consistent with CMS preliminary guidance, in state guidance addressing the "Medically Frail and [Substance Use Disorder] SUD Treatment Program Exceptions," Nebraska's Department of Health and Human Services provided a nearly-300-page list of diagnosis and procedure codes identifying qualifying medical conditions.[10]

91. The Nebraska DHHS guidance stated that, for existing enrollees, "[i]f qualifying medical conditions or treatment indicators are identified" based on those codes, "the individual will be treated as exempt without needing to take additional action."[11] It permitted new applicants

---

[8] Amaya Diana & Anna Mudumala, *A Closer Look at Nebraska, the First State Planning to Implement a Medicaid Work Requirement*, KFF, Jan. 30, 2026, https://www.kff.org/medicaid/a-closer-look-at-nebraska-the-first-state-planning-to-implement-a-medicaid-work-requirement/.

[9] *Nebraska Medicaid Work Requirements Frequently Asked Questions*, Medicaid Work Requirements, Department of Health and Human Services Nebraska, April 2026, https://perma.cc/AV74-PYQJ.

[10] *Nebraska Medicaid Work Requirements, Medically Frail and SUD Treatment Program Exemptions*, Nebraska Dept. of Health & Human Servs., May 1, 2026, https://perma.cc/2U9C-FF93.

[11] *Id.* at 1.

to "self-declare that they are medically frail or enrolled in an SUD treatment program," and required no additional documentation.[12]

92.   Though Nebraska's DHHS previewed a future "move from self-declaration to more automated verification methods consistent with federal guidance," in the context of its guidance on the "medically frail" exception, it did not preview future categorical prohibitions on self-attestation.[13] It also did not link its determination of whether an individual is "medically frail" or has "special medical needs" to a consideration of that individual's ability to comply with the work requirements.

93.   At no point between the passage of H.R. 1 in July 2025 and the promulgation of the IFR on June 1, 2026, did CMS inform the State Medicaid agencies that it intended to depart from H.R. 1 and its preliminary guidance in two significant ways. First, CMS did not tell the states that it would add an extra-statutory test to the "medically frail" exclusion, requiring the States to determine that an individual's condition significantly impaired that individual's ability to comply with work requirements, a requirement found nowhere in H.R. 1. Second, CMS failed to inform the States as they were developing their rules, systems, and processes that it would incorrectly prohibit them from accepting auditable self-declarations for the "medically frail" exclusion beyond one self-attestation per enrollment period.

**B.   Communication from the States to CMS**

94.   During the months between November 2025 and June 1, 2026, the States also communicated their needs to CMS. Concerned about the financial and administrative burden of implementing work requirements, the short time frame in which they would be required to operationalize implementation, and the risk of disenrollment and disqualification to members of

---

[12] *Id.*
[13] *Id.* at 3.

State Medicaid programs, multiple Plaintiff States warned CMS of their need for clear and timely guidance, consistent with H.R. 1, and continued State flexibility.

95. Consistent with CMS' direction that States begin preparing to implement work requirements so that they could begin providing member notices by the August 31, 2026 date, and could be operational by the January 1, 2027 implementation date, and in line with past practice, State Medicaid agencies necessarily relied on the prior subregulatory guidance CMS provided to guide their choices and investments.

96. Further, consistent with CMS's earlier acknowledgement that the States should "refer to the applicable statutory language for complete information," Plaintiff States also relied on H.R. 1 itself to inform their implementation efforts. *See* CMS Slide Deck, 5.

97. Before June 1, 2026, Plaintiff States worked with third-party vendors to make the necessary changes to their eligibility systems and allow for use of new data sources; prepared notices and other outreach materials and campaigns for members; initiated processes to hire and train new staff; entered into new contracts and expanded existing contracts to account for increased call volume and new processes; and worked extensively with clinical and systems personnel to build processes to identify "medically frail" individuals, including by identifying specific diagnostic and procedure codes to confirm eligibility for the exclusion. Plaintiff States took these steps to be ready for implementation consistent with the statutory requirements, investing significant money and resources, in reliance on the language of H.R. 1 and CMS's subregulatory guidance.

98. CMS was aware of the Plaintiff States' reliance on the statute and its subregulatory guidance. In weekly calls with CMS representatives, the State Medicaid agencies informed CMS of the states' efforts to operationalize the work requirements. At CMS's direction, State Medicaid

agencies also communicated directly with CMS staff to communicate their implementation efforts, ask questions, and seek additional guidance and clarification. *See* CMS Slide Deck, 5 (directing states to "contact CMS for additional guidance and direction"). States also met on a regular basis with CMS IT system leads to report on their progress in building their IT systems to implement a minimum viable product workplan.

99.     On or around May 6, 2026, CMS abruptly directed the State Medicaid agencies to disregard prior preliminary guidance CMS had issued just a few days earlier during a May 1, 2026 call, as that guidance was subject to change. The guidance had included references to the definition of the "medically frail" exclusion, and it had not mentioned requiring states to also determine that an individual's condition impairs their ability to comply with work requirements. CMS informed the State Medicaid agencies that they should not act on the preliminary guidance given on May 1, 2026.  In discussions between CMS and the States between May 6, 2026 and June 1, 2026, CMS did not further address the "medically frail" exclusion or the issue of self-attestation.

100.     Fearing a disruptive last-minute change in policy direction, several Plaintiff States contacted CMS to express concerns and reiterate their reliance on the statute as well as earlier subregulatory and preliminary guidance.

101.     On May 29, 2026, the Governors of Oregon, Maine, Michigan, New York, New Mexico, and Washington sent a letter to Secretary Kennedy.[14] In the letter, the governors reiterated the challenge their states faced in implementing work requirements on a compressed timeline. They noted the continued absence of official guidance and reminded CMS that their states had made good-faith decisions to revise their operations and State systems, consistent with verbal

---

[14] *Letter from Governors of Oregon, Maine, Michigan, New York, New Mexico, and Washington,* May 29, 2026, https://drive.google.com/file/d/1HvqFvP-rSBAO0vMogWjuRFXDCw5xi9Up/view.

assurances and policy direction from CMS. They further requested that the final guidance align as closely as possible with States' working assumptions, which were based on policy direction from CMS prior to May 29 to date and they asked that States not be required to make significant changes at this stage of implementation.

102.    The governors highlighted the administrative complexity and resource-intensive nature of their implementation efforts, specifically reminding CMS of the structural reality of Medicaid administration that the States must work with third-party vendors to update their IT systems. They explained that every change must be specified in writing, scoped and contracted with the vendor, reviewed for compliance with federal certification standards, independently tested, and validated before it is implemented.  And they added that vendors typically need between six and twelve months, and sometimes more, to make significant modifications to the systems.

103.    The governors also reiterated that their States had built IT systems, drafted communications to members, and developed the guidance and policies required to implement the requirements. They added that states may need to revise significant portions of their work toward implementation if the IFR contains policy guidance that is materially different from the choices States made, either in reliance on the pre-IFR guidance from CMS or in the absence of CMS guidance.

104.    Certain State Medicaid agencies also contacted CMS to express their need for consistency with the statute and earlier CMS subregulatory guidance, and to emphasize their reliance thereon.

105.    On May 29, 2026, MassHealth—Plaintiff Commonwealth of Massachusetts' Medicaid agency—sent a letter to Dan Brillman, Deputy Administrator and Director of the Center for Medicaid & CHIP Services. MassHealth wrote, in part, to share concerns about the possible

impact of any significant deviation in the IFR from the statute and the pre-IFR guidance, noting that Massachusetts was well into the development process and had limited time for implementation before the January 1, 2027 effective date. MassHealth reminded CMS that any material shift in policy could lead to significant increases in both implementation costs and disruptions to Massachusetts.

106.    With respect to the "medically frail" exclusion, MassHealth expressed its belief, consistent with prior guidance from CMS, that leveraging clinical data from claims and encounters and accepting self-reported information from applicants without available claims history would allow Massachusetts to comply with federal rules in an auditable manner, would minimize the burden on members and providers impacted by the requirements, and would allow eligible Medicaid members to maintain coverage.

107.    Addressing self-attestation, MassHealth further reminded CMS that self-attestation has been historically permitted in the Medicaid program and added that accepting self-attestation is a critical tool in facilitating enrollment of new members, keeping eligible members covered, and reducing administrative churn where eligible members have coverage gaps because of issues with paperwork.

108.    The California Department of Health Care Services (DHCS), California's Medicaid agency, similarly contacted CMS to express California's significant concerns if the IFR materially alters CMS's prior guidance on Medicaid work requirements. DHCS explained that it had relied extensively on that prior guidance over months to design, build, and operationalize major changes to programs, systems, and staffing in order to comply with H.R. 1 by January 1, 2027.

109.    DHCS flagged particularly the risk that narrowing the statutory "medically frail" categorical exclusion and eliminating flexibility with respect to acceptance of self-attestation

would create significant implementation risks for California, which could jeopardize Medi-Cal's ability to meet the 2027 deadline despite its significant, good-faith efforts to do so.

110.    DHCS warned CMS that significant, late-stage policy shifts would increase coverage losses for eligible individuals, especially eligible individuals with disabilities and chronic or complex medical needs. DHCS also warned that such policy shifts would introduce avoidable administrative barriers through new documentation requirements and create operational instability during a major programmatic transition, which affects millions of Californians.

C.    **Communications From Other Stakeholders to CMS**

111.    Since H.R. 1 was signed, stakeholders other than the states have also communicated their views on implementation, often providing evidence in support of those views. These stakeholders have included health policy experts, industry groups, and advocacy organizations.

112.    One nonprofit organization, the National Health Law Program (NHeLP), sent a detailed letter to Secretary Kennedy and Administrator Oz dated November 19, 2025. In that letter, NHeLP submitted comments for CMS's consideration in developing preliminary guidance and the IFR. On the topic of the exclusion for individuals who are "medically frail or otherwise ha[v]e special medical needs," NHeLP implored CMS to make clear to states that H.R. 1's plain language prohibits policies that require an individual who falls within one or more of the listed excluded categories to show that they are also unable to work.

113.    NHeLP also addressed the use of self-attestation, which it described as the least burdensome verification method available. It pointed CMS to research demonstrating that administrative barriers lead to deterrence and reduced coverage and reminded CMS that, in earlier state implementations of work requirements through Section 1115 demonstrations, many individuals who faced requirements to submit evidence from providers to verify their medical conditions struggled to find willing providers in a timely manner. NHeLP also commented that

30

Medicaid members, whose access to providers is limited to those who accept Medicaid or to in-network providers if subject to managed care models, can have a more difficult time finding a provider than other patient populations, and uninsured individuals newly applying to Medicaid are unlikely to have access to a provider at all.

114. Consistent with Executive Order 12866, the Office of Information and Regulatory Affairs (OIRA) also held meetings in which stakeholders had the opportunity to share their views on the draft regulations. Staff from HHS, CMS, or both, participated in the meetings, and documents provided by the stakeholders or discussed at those meetings are available on OIRA's website.[15]

115. Many of those stakeholders, including the National Organization for Rare Disorders, the Children's Hospital Association, and the Association for Behavioral Health and Wellness, urged CMS to issue regulations that would allow and encourage States to broadly accept self-attestation and to reduce the burden of demonstrating eligibility for the "medically frail" exception.

116. For example, the Association for Behavioral Health informed CMS in a comment letter that "[a]ttestation and community-based verification mechanisms should be key components of the medically frail determination process" given that "[m]any individuals with serious behavioral health conditions lack recent claims data or formal diagnoses."[16] The National

---

[15] *EO 12866 Meetings Search Results*, OIRA, Office of Management and Budget, https://www.reginfo.gov/public/do/eom12866SearchResults?pubId=&rin=0938-AV98&viewRule=true.

[16] *Establishing State Community Engagement Requirements for Certain Individuals Under Section 1902(xx) of the Social Security Act (CMS-2454)*, Association for Behavioral Health and Wellness, May 15, 2026, https://www.reginfo.gov/public/do/viewEO12866Meeting?viewRule=true&rin=0938-AV98&meetingId=1391823&acronym=0938-HHS/CMS.

Organization for Rare Disorders emphasized that "administrative burdens can cause coverage loss," including for rare disease patients and their families whose symptoms and need for treatment fluctuate[17]

### D. CMS Issues the Interim Final Rule with Myriad Unlawful and Problematic Provisions.

117.    On June 1, 2026, CMS released the IFR, entitled *Medicaid Program; Community Engagement Requirement for Certain Individuals.* The IFR was published in the Federal Register on June 3, 2026. 91 Fed. Reg. 33348.

118.    In its preliminary guidance, CMS stated that its goals in implementing the work requirements included retaining State flexibility and promoting alignment with existing statutory and regulatory requirements. *See* CMS Slide Deck, 6. CMS's IFR does not meet these goals. Instead, CMS has imposed stringent and complex requirements and verification processes that limit State flexibility, contravene the language of H.R. 1, run counter to existing Medicaid regulations, *e.g.*, 42 C.F.R. §§ 435.945(a), 435.952(c), and are unlikely to serve CMS's stated purpose.

119.    The IFR departs significantly from the language of H.R. 1 and from CMS's subregulatory guidance. These last-minute changes leave States to interpret new compliance regimes in mere months in order to ensure compliance with the August 31, 2026 statutory member notice date, and only four months thereafter to design and operationalize their systems in time to comply with the January 1, 2027 implementation date.

---

[17] *Establishing State Community Engagement Requirements for Certain Individuals Under Section 1902(xx) of the Social Security Act (CMS-2454)*, National Organization for Rare Disorders, May 8, 2026, https://www.reginfo.gov/public/do/viewEO12866Meeting?viewRule=true&rin=0938-AV98&meetingId=1389124&acronym=0938-HHS/CMS.

120.    As set forth below, the IFR, and CMS's pre-IFR guidance and the language of H.R. 1 differ from each other and contradict themselves in ways that render the States' obligations unclear. But making a mistake in the face of these unclear obligations carries high stakes for States—errors expose them to the risk of corrective action under the Payment Error Rate Management (PERM) regulations. *See generally* 42 C.F.R. §§ 431.958-431.1010.

121.    A June 1, 2026 press release that accompanied the IFR purporting to address its purpose stated, "[t]he rule establishes a nationwide operational framework designed to promote economic stability, self-sufficiency, and independence." It also quoted Administrator Oz, who said "[t]his rule helps Americans build skills and independence through work, education, job training, or community service, creating new opportunities for themselves and their families."[18]

122.    At a June 2, 2026 press conference, and in subsequent press statements, Administrator Oz further discussed the purpose of the IFR. He described the work requirements as "a path to prosperity" and added, "[w]e are put here to make a difference, but if you're sitting at home, which is true for the millions of people who are on—who are able-bodied on Medicaid. On average, you're spending 6.1 hours watching television or just hanging around. That's not why you're here."[19] Neither Administrator Oz in his press statements, nor CMS in its rulemaking gave plausible support for these assertions or explained why they believed such assertions justified their approach to implementation. Nor did they address well-documented evidence that the majority of

---

[18] Centers for Medicare & Medicaid Servs., *CMS Launches Nationwide Framework to Implement Medicaid Work Requirements*, June 1, 2026, https://perma.cc/C8MA-JLDV.
[19] Administrator Oz, White House Press Briefing, June 2, 2026, https://youtu.be/BjZVRUfkGUM?t=1605.

Medicaid members who will be subject to work requirements are already engaged in their communities or in the workforce.[20]

123.   In the preamble to the IFR, CMS asserted that the "community engagement requirement" of H.R. 1 "has the potential to empower Medicaid beneficiaries through employment, education, or volunteer service so they can escape isolation and dependency, build confidence, and achieve self-sufficiency and independence." 91 Fed. Reg. 33450. CMS claimed that implementing work requirements through the IFR "will assist in prioritizing coverage for Medicaid's most vulnerable populations such as seniors, individuals with disabilities, pregnant women, and children while empowering able-bodied individuals through community engagement." *Id*. at 33350.

1.   The IFR impermissibly limits the "Medically Frail" exclusion.

124.   The IFR adds stringent restrictions and requirements to the "medically frail" exclusion that are not contained anywhere in either the language of H.R. 1 or CMS's prior preliminary guidance. CMS has implemented the exclusion in a manner that is both contrary to the statute and unworkable in the context of the IFR read as a whole.

125.   As described above, H.R. 1 categorically excludes from the work requirements individuals who are "medically frail or otherwise ha[ve] a special medical need," which Congress defined to include, at a minimum, five enumerated conditions, only one of which is based on ability to work.

126.   Although Congress did not incorporate the concept of significant impairment into either the "medically frail" categorical exception, or the majority of the subcategories, the IFR limits the entire "medically frail" exclusion to cover only those individuals whose "physical,

---

[20] *See, e.g.,* Benjamin Sommers *et al*., "Medicaid Work Requirements — Results from the First Year in Arkansas," *supra* n. 1.

mental, or other behavioral health condition significantly impairs the individuals' ability to comply with the community engagement requirement." 91 Fed. Reg. 33472.

127.    Attempting to justify this interpretation, CMS asserts in the preamble that it "interpret[s] the statute to require consideration of the severity of an individual's condition as relevant to whether that individual is capable of meeting the community engagement requirement and claims that the "best reading" of H.R. 1's "medically frail" exclusion considers "not only the presence of a particular diagnosis or condition, but also the extent to which the condition impairs an individual's ability to engage in community engagement activities." 91 Fed. Reg. 33373. But the IFR does not explain why CMS interprets the statute that way—*i.e.*, why it has read into the "medically frail" exclusion a requirement which Congress could have included, and indeed did include in only one discrete subcategory of the exclusion, but chose not to. Nor does CMS explain why it disregards CMS's earlier guidance addressing the "medically frail" exclusion.

128.    Similarly, the IFR departs from the language of H.R. 1's "medically frail" exclusion with respect to the subcategory for individuals "with a substance use disorder." 42 U.S.C. § 1396a(xx)(9)(A)(ii)(V)(bb). H.R. 1 categorically excludes from work requirements individuals "with a substance use disorder," without qualification or limitation. *Id.* The IFR, however, imposes an extra-statutory limitation on this exclusion by carving out individuals "in stable recovery," which it defines as individuals "in recovery for 5 or more years." 91 Fed. Reg. 33374. Congress imposed no such temporal limitation; CMS invented the five-year threshold with no basis in the statute's language and attempted to justify it by citing to recurrence risk data. *Id*. CMS reasoned that for individuals in stable recovery, "their [substance use disorder] SUDs are unlikely to significantly impair their ability to comply with the community engagement requirement," ignoring that H.R. 1 excludes these individuals from any need to comply with the work

requirements. *Id.* Applying CMS's invented and stringent criteria, which were likewise not included in CMS's preliminary guidance, the States are directed to "develop a list" of conditions to identify individuals who meet the "medically frail" exception, which they must revise regularly. *Id.* at 33472.

2. The IFR guidance lacks workable verification methods or guidance for determining medical frailty and impairment of ability.

129. The IFR lacks real guidance regarding how States should determine whether individuals meet CMS's new, non-statutory "significantly impairs the individuals' ability to comply" condition, and what guidance it does contain is contradictory and unworkable.

130. The IFR creates a two-step process for State Medicaid agencies to determine whether an individual meets the "medically frail" exclusion. First, a State Medicaid agency must determine whether an individual's condition appears on the list the State has created. 91 Fed. Reg. 33472. For individuals whose condition does not appear on the list, the State must create a separate process and establish criteria for that individual to "request consideration for" the "medically frail" exclusion. *Id.* Second, if an individual's condition appears on the State's list, or is otherwise accepted under the "medically frail" exclusion, the State must somehow further evaluate, in a manner not contemplated by the statute, whether that individual's experience with the condition "significantly impairs" their ability to comply with the work requirements. *Id.*

131. Despite its length and complexity, the IFR does not provide the Plaintiff States with *any* guidance addressing how they must evaluate whether an individual's experience of a given condition "significantly impairs" their ability to comply. CMS has not explained what constitutes significant impairment for purposes of complying with work requirements—it has not provided guidelines or a standard of proof for making this determination and it has not explained, to name but a few examples, whether the determination changes based on the jobs available to a particular

individual, the physical and mental capabilities a job requires, or the individual's location or issues with access to work via reliable and appropriate transportation. Nor has CMS explained whether or how evaluating significant impairment changes depending on which of the means of complying with "community engagement"—work, community service, or education, for example---a state is evaluating.

132. Though it has failed to provide the States with essential details as to what constitutes significant impairment of an individual's ability to comply with work requirements, CMS has emphasized that the stakes are high for these determinations. The IFR states, "[i]f, through Payment Error Rate Measurement Program (PERM) audits and reporting, or any other CMS audits, we determine that States determined that an individual is medically frail in a manner inconsistent with § 435.554(c)(5)(i) (meaning there is frequent approval of individuals as medically frail with little to no support for the conclusion that their physical, mental, or other behavioral health condition significantly impairs their ability to comply with the community engagement requirement), States would not be in compliance with the regulation." 91 Fed. Reg. 33377.

133. Consistent with the statute (42 U.S.C. § 1396a(xx)(5)), the IFR instructs that when determining an individual's eligibility for coverage—either through compliance with the work requirements or through application of an "exception or exclusion"—the States are directed to first look to data or information from sources other than the member or applicant. *See* 91 Fed. Reg. 33474. The IFR refers to this data or information as "reliable information available to the State," which it defines to include information: from electronic data sources; from other state or local agencies; related to community engagement from Federal agencies and other data sources; in the State's eligibility system; in the individual's case record; in payroll data; in claims relevant to the

individual "that have been adjudicated in the preceding 12 months"; or encounter data, relevant to the individual, also for the preceding 12 months. *Id.* This reduces the burden on both the individuals—individuals who may lack the resources to obtain extensive documentation—and the States. If the States did not rely on *ex parte* verification, they would, in effect, need to do as much work semi-annually to continue an individual's enrollment as they do to initially enroll that person upon application. That burden cannot be sustained without a vastly greater amount of administrative expenditure than States make at present.

134.    For many members or applicants, it is likely that reliable sources of data reflecting whether an individual's medical condition "significantly impairs" their abilities will be limited. One potential reliable source of data available to the States is diagnosis and condition codes. Yet in the IFR, CMS says that States *cannot* rely "solely on diagnosis or condition" because to do so might "risk sweeping individuals whose conditions do not significantly impair their functional capacity." 91 Fed. Reg. 33373.

135.    Despite directing States to follow a data-driven path to verify the "medically frail" exclusion, CMS has not provided the States with the necessary details to implement data-driven processes or determine what portion of members will be verifiable based on any such data. Instead, the determination of whether an individual's condition "significantly impairs" their ability to comply with work requirements will likely require additional data for many members and may vary over time. An individual with a serious or complex medical condition may potentially be able to comply with the community engagement requirements one month and unable to do so the next due to the flare up of a condition or fluctuation in symptom expression, for example. Other individuals, like those undergoing cancer treatment and those with uncontrolled diabetes, may be

unable to work consistently. For these individuals, losing Medicaid coverage is likely to cause their health to worsen and decrease their ability to comply with work requirements even further.

136.    Indeed, in other circumstances where states are required to make determinations regarding an individual's ability to work (e.g., for those applying for Medicaid eligibility on the basis of disability), the criteria for disability determinations are narrow and require a complex system to determine whether a specific individual's disabilities are severe enough in relation to job opportunities to substantially impair the disabled individual's ability to work. In each such instance, Congress itself specified the applicable criteria by cross-reference to a detailed statutory framework set out in the disability definition for purposes of SSI, 42 U.S.C. § 1382c. Congress could have included this cross-reference in the categorical "medically frail" exclusion—and indeed did so for *one* of its subcategories—but chose not to refer to disability otherwise.

137.    Individualized determinations about ability to work, like those made for SSI disability eligibility, are initially made by a network of local Social Security administration field offices and State agencies that specialize in such disability determinations. They rely on expansive guidance from the Social Security Administration with extensive details about what constitutes a disability and relevant factors for adjudicators to consider, including functional limitations and residual functional abilities, relative to prior job experience. The IFR provides nothing comparable.

138.    The IFR thus puts Plaintiff States in an untenable position. With limited data available to them for many members and applicants that reliably captures an individual's ability to comply with work requirements, and with their ability to accept self-attestation severely limited by the IFR beginning in 2028, as discussed below, States are left to seek "additional information from the individual[s] to verify" that they meet the "medically frail" exception. 91 Fed. Reg. 33474. Evaluating any such documentation requires either (a) that the State Medicaid agencies

take on the role of occupational medicine experts to determine a condition's severity in relation to ability to work, or (b) that physicians, who are already overburdened and not necessarily trained in occupational medicine, evaluate and document their patient's ability to comply with work or community engagement requirements.[21] The State Medicaid agencies must then reach a determination as to whether an individual's ability to comply with work requirements is "significantly impair[ed]," a standard for which CMS has not explained. 91 Fed. Reg. 33472.

### 3. The IFR impermissibly limits the availability of self-attestation.

139. Further burdening the State Medicaid agencies and deviating from the statute, CMS's prior preliminary guidance, and historical practice within the Medicaid program, the IFR imposes limits on members' and applicants' ability to self-attest to their compliance with the work requirements or their eligibility for an exception.

140. As discussed above, H.R. 1 explicitly preserves the States' option to elect not to seek documentation verifying that enrollees meet certain "mandatory exceptions" to the work requirements, instead permitting States to "elect to not require an individual to verify information resulting" in the State applying exceptions specified in the statute, including for "specified excluded individuals," which includes those who are "medically frail." 42 U.S.C. 1396a(xx)(3)(A).

141. In contravention of the statute and inconsistently with other Medicaid regulations, CMS has instead hamstrung Plaintiff States' future ability to use auditable self-attestation to verify eligibility for coverage.

---

[21] *See* Sara Rosenbaum, et al., *Medical Frailty Rule Contravenes HR 1, Burdens The Health Care System, And Threatens Public Health*, Health Affairs, June 12, 2026, https://www.healthaffairs.org/content/forefront/medical-frailty-rule-contravenes-hr-1-burdens-health-care-system-and-threatens-public.

142.    The IFR takes two distinct approaches to self-attestation: one for the "medically frail or otherwise ha[ving] special medical needs" exclusion, and one for compliance with the work requirements and for all other exceptions.

143.    With respect to the "medically frail" categorial exclusion, the IFR requires that a state first attempt to use "reliable information available to the state" to verify that an individual qualifies for the exception. If such information is not available—as it is unlikely to be with respect to determining whether a condition "significantly impairs" an individual's ability to comply—a State "may require documentation or accept a statement or other information under penalty of perjury" to verify eligibility for the exception *only in 2027*. 91 Fed. Reg. 33476 (emphasis added).

144.    In 2028, the States must again significantly change their approach. Beginning on January 1, 2028, the States may accept "a statement or other information provided under penalty of perjury" only once during a member's period of enrollment. *Id.* The "once-per-enrollment" cap, like the "period of enrollment," are concepts introduced for the first time in the IFR. "Period of enrollment" is defined to mean "a continuous period of enrollment" without an individual being disenrolled. *Id.* at 33474. It is not time-limited and could extend as long as an individual successfully navigates their eligibility redeterminations. *Id.* But applicability of the "medically frail" exclusion must be redetermined at least every 12 months; a state that accepts self-attestation from an individual after January 1, 2028 to verify that they qualify as "medically frail" would then be foreclosed from accepting self-attestations from that individual as to their continuing condition or any new conditions in the future, even if that individual maintains enrollment for years.

145.    For example, a 50-year-old Medicaid recipient who self-attests on January 1, 2028 that she has a malignant melanoma that impairs her ability to comply with the work requirements could not on January 1, 2033 self-attest at age 55 that she has just developed breast cancer that

impairs her ability to comply with the work requirements, if she has been continuously enrolled between ages 50 and 55. Nor could she self- attest on January 1, 2029, that the same malignant melanoma continues to impair her ability to comply with the work requirements.

146. The IFR thus creates an arbitrary loophole for enrollees seeking a "medically frail" exclusion. It provides no lockout period or other prohibition on reapplying for Medicaid after an individual has been disenrolled for failure to verify compliance with or exception or exclusion from the work requirements. An individual who is prohibited from self-attesting to qualifying as "medically frail" for a second time in a period of enrollment and is subsequently terminated, can reapply after being disenrolled and again submit a self-declaration at the start of a new period of enrollment. The IFR has the potential to create unnecessary churn in the Medicaid population, which can increase administrative costs and complexity and disrupt an individual's continuity of healthcare.

147. For compliance with work requirements or eligibility for exclusions other than the "medically frail" exclusion, the IFR also permits self-attestation in 2027. But beginning January 1, 2028, when a state is not able to verify eligibility using available data, it must require documentation from an individual, "whenever documentation is reasonably available." *Id.* Only when such documentation is not "reasonably available" can a state accept self-attestation. *Id.* at 33475. States risk penalties if CMS determines that the State accepted a self-attestation when CMS later determines documentation was "reasonably available."

148. The IFR thus irrationally permits self-attestation in some instances, but bars it in others, and otherwise significantly limits States' abilities to conduct verifications using auditable self-declarations, limiting flexibility that H.R. 1 explicitly preserved for the States.

4.    The IFR imposes an unworkable limitation on States' use of claims data.

149.    The State Medicaid agencies had expected that the IFR would provide much-needed clarity to inform the final months of preparing to provide notices consistent with the August 31, 2026 deadline and to implement work requirements before the January 1, 2027 implementation date. Instead, CMS has created further confusion and hardship for the State Medicaid agencies through the timelines, limitations, and lookback periods it prescribes in the IFR.

150.    As discussed above, the IFR requires State Medicaid agencies to "establish processes to use reliable information available to the State" to verify compliance with or exclusion from the community engagement requirements, and to look to that "reliable information" first when determining eligibility for coverage. 91 Fed. Reg. 33474. The IFR defines "reliable information available to the State" to include adjudicated claims, but it arbitrarily limits the lookback period to claims adjudicated in the preceding 12 months. *Id.* at 33475.

151.    This limitation ignores an important issue: the realities of Medicaid claims processing. For many States, there may be a significant lag between the time a given service is provided to a patient, the time when a provider submits a claim for payment, and the time a State Medicaid agency processes and pays a claim for that service. Further, other individuals may have permanent disabling conditions, such as quadriplegia, for which they do not require ongoing treatment, meaning claims data for the preceding 12 months may not reflect their condition. When a State Medicaid agency seeks to redetermine eligibility for a member under the IFR, despite best efforts, it is possible that adjudicated claims data from the preceding 12 months will fail to fully reflect both the services that the member received during that time and their condition.

152.    CMS acknowledged this reality in the preamble to the IFR. It stated, "reliable information available to the State includes, but is not limited to, adjudicated claims and encounter data as relevant to the individual for the preceding 12 months (as applicable). However, States may

43

not have these data available, or there may be a lag in receipt of such data." 91 Fed. Reg. 33409. But CMS failed to grapple with this issue, simply basing its limitation on the incomplete view that "older information may not reflect the individual's current condition." *Id.* at 33405.

153.    In the context of CMS's own Transformed Medicaid Statistical Information System—a national database in which CMS collects detailed monthly data on eligibility, enrollment, claims, and provider networks for Medicaid and CHIP—CMS has treated "the full set of service use records that were submitted" to CMS through March 2020 "as the benchmark of complete claims for services delivered in March 2018," 24 months earlier. Likewise, CMS's Chronic Conditions Warehouse, which "provides researchers with Medicare and Medicaid beneficiary, claims, and assessment data linked by beneficiary across the continuum of care, includes algorithms with 2-year reference periods for many chronic conditions."[22]

154.    Limiting the review period for adjudicated claims data to 12 months, with little explanation and no meaningful consideration of the drawbacks, renders this category of data substantially less effective for verifying compliance with or exclusion from the work requirements.

5.    The IFR imposes an illogical gap for short-term hardship exceptions.

155.    The IFR, read as a whole, also creates an illogical waiting period for new applicants experiencing certain short-term hardship exceptions.

156.    Beyond requiring states to apply mandatory exceptions to the work requirements, H.R. 1 allows states to apply optional exceptions for certain short-term hardship events. These short-term hardship events include receiving inpatient medical services, residing in a county where an emergency or disaster has been declared by the President or where there is high unemployment,

---

[22] Ctrs. For Medicare & Medicaid Servs., *Chronic Conditions Data Warehouse: Chronic Conditions*, https://perma.cc/UV3N-BG5V (last visited Jun. 29, 2026).

or traveling outside one's community for necessary medical services for oneself or a dependent. *See* 42 U.S.C. § 1396a(xx)(3)(B).

157.    The IFR provides that, in order to be "deemed to demonstrate community engagement" under one of these short-term hardship exceptions, a new applicant must demonstrate the exception "for at least one, but not more than 3 consecutive months, as specified in the State plan, *immediately preceding the month of application*." 91 Fed. Reg. 33473 (emphasis added). Thus, even if an applicant can demonstrate qualification for the exception for the same month in which they apply to Medicaid, it will do them no good: under the IFR, only hardships experienced in the month *before* application count. For example, an applicant who applies in February 2027 and receives inpatient medical services in February 2027 for serious injuries sustained in an automobile accident on February 1, 2027, will be unable to qualify for the exception because they cannot demonstrate that they received inpatient medical services in *January* 2027.

158.    Nothing in H.R. 1 requires Plaintiff States to determine that an individual satisfied a short-term hardship exception, or otherwise complied with work requirements, during a prior month before applying a short-term hardship exception. Instead. H.R. 1 directs states to "deem" certain individuals to have "demonstrated community engagement" "during a month" if "for part or all of such month," the individual meets the specified short-term hardship exceptions. 42 U.S.C § 1396a(xx)(3).

159.    The short-term hardship exceptions relieve individuals of the need to comply with the work requirement, based on significant events. By requiring a new applicant to show that they qualified for a hardship exception in the month preceding the month of application, the IFR ensures that applications from newly eligible individuals experiencing hardship events will be delayed, which could also delay necessary care.

6.     The IFR improperly limits the short-term hardship exception for declared emergencies.

160.    As with the "medically frail" exception, CMS has ignored the language of H.R. 1 and created a new test to apply to the short-term hardship exception for declared emergencies.

161.    H.R. 1 provides for a categorical short-term hardship exception from work requirements for individuals residing in a county, or similar governmental unit, "in which there exists an emergency or disaster declared by the President" pursuant to certain laws. 42 U.S.C. § 1396(a)(xx)(3)(B)(ii)(II)(aa). With no basis in the statute, and ignoring that the short-term hardship exceptions exist to enable continued access to care for those who particularly need it, the IFR provides that a short-term hardship exception based on an emergency declaration "exists when the emergency affects the ability of applicable individuals to demonstrate community engagement in a particular county or other equivalent unit of local government, or multiple counties, or statewide." 91 Fed. Reg. 33473.

162.    The IFR thus imposes an obligation on State Medicaid agencies, which does not exist in H.R. 1, to determine whether a given emergency affects large groups of individuals' ability to comply with work requirements while providing no guidance on how to do so. State Medicaid agencies lack the training and expertise in disaster management to make these determinations.

163.    For example, the residents of western Ashe County, North Carolina were devastated by cataclysmic flooding and wind damage from Hurricane Helene on the evening of September 26 and the morning of September 27, 2024, while the residents of portions of eastern Ashe County were largely spared from the most devastating effects. It is entirely unclear under the IFR when and whether the residents of Ashe County would have been exempt from the work requirements in the aftermath of Hurricane Helene, had the IFR been in effect at the time of its landfall.

46

7.     The IFR contemplates an unworkable renewal process.

164.    The IFR dictates procedures State Medicaid agencies must follow to evaluate compliance with work requirements. The effect of the procedures CMS has outlined will be to deny members the full period of time they are granted by H.R. 1 to demonstrate their compliance. *See* 91 Fed. Reg. 33476.

165.    H.R. 1 provides that an individual already enrolled in Medicaid need only demonstrate their compliance with work requirements for "1 or more (as specified by the State)" months "between such individual's most recent determination . . . of eligibility and such individual's next regularly scheduled redetermination of eligibility." 42 U.S.C. § 1396a(xx)(1)(B)(i). The IFR interprets this provision to require a member to demonstrate compliance with community engagement requirements "[d]uring the period between the effective date of such individual's most recent determination . . . and the date the individual's renewal is due." 91 Fed. Reg. 33474.

166.    In earlier public guidance, CMS made clear to Plaintiff States that they "may not dictate specific months during which an applicable individual must demonstrate community engagement" between renewals. December 2025 Bulletin, 7. But the process CMS has laid out for renewal denies members the opportunity to demonstrate compliance during each month since their last renewal and before their next renewal is due.

167.    As standard practice, when a State Medicaid agency cannot verify a member's eligibility on an *ex parte* basis, the State Medicaid agency sends to the member a pre-populated renewal form to complete. As the IFR notes, States typically begin their renewal process and send this form, as needed, approximately 60 to 90 days before a member's renewal is due. *See* 91 Fed. Reg. 33390.

168.    In the IFR, CMS explains that, when a State cannot certify compliance with work requirements on an *ex parte* basis, the State may either send a "notice of noncompliance" with the renewal form or as a follow-up to a completed renewal form if the State still cannot verify compliance. 91 Fed. Reg. 33411–12. H.R. 1 mandates that this "notice of compliance" must allow members only 30 days to respond, after which the State must disenroll an individual no later than "the end of the month following the month in which" the 30-day period ends, if the state cannot verify compliance. 42 U.S.C. § 1396a(xx)(6).

169.    This structure requires that Plaintiff States evaluate members for compliance with work requirements up to several months *before* the end of the time period in which they are entitled to show compliance. For example, a State that starts a renewal process 90 days before a member's renewal period expires will send a renewal form and notice of noncompliance at that time. The member then has only 30 days to demonstrate compliance, depriving the member of two months during which they could demonstrate their compliance under H.R. 1's framework. For example, a member whose eligibility period began on January 1 and ends on June 30 and who is asked on April 1 whether they have met the requirements would be required to respond by May 1, before May and June have passed. Thus, that member would be considered noncompliant if they did not fulfill the work requirement in the months of January through April, even though the member may have secured seasonal work during May and June and thus would be fully compliant under the regime set by Congress in H.R. 1.

170.    Though States have some flexibility to send a notice of noncompliance later in the renewal process, CMS explained that States must "complete the entire renewal process, including the noncompliance procedures, by the end of the beneficiary's eligibility period." 91 Fed. Reg. 33412. This means that, at a minimum, States must send the notice of noncompliance early enough

that they can receive and process the response, and provide the member with notice and hearing rights, before the end of the member's eligibility period. As a result, members will necessarily be asked to report on how they have complied with work requirements *before* the time period for them to comply with the work requirements has expired.

171.    CMS acknowledges this reality but does not offer Plaintiff States a meaningful solution or explain how it has reached its interpretation despite these issues. 91 Fed. Reg. 33390. Instead, CMS directs the States to "consider [their] abilit[ies] to access timely data to verify compliance with community engagement and otherwise renew eligibility" when "electing the number of months during the review period for which a beneficiary must demonstrate community engagement at renewal." *Id.* CMS also requires that States "act on" any information received "after the timeframe provided by the State, but prior to the end of an individual's eligibility period" by "promptly redetermining eligibility." *Id.* at 33412. In effect, CMS thus arbitrarily requires the States to both require members to report on compliant activities before the 30-day time period expires *and* act on any information provided after such expiration. *See* 91 Fed. Reg. 33412.

### E.    In promulgating these provisions of the IFR, CMS failed to consider relevant evidence and ignored important issues.

172.    Overall, CMS's purported justification for its interpretation of H.R. 1 and implementation of the work requirements ignores important evidence and cherry picks assertions supportive of its chosen approach.

173.    With respect to the "medically frail" exception, the IFR does not explain why CMS has replaced the approach contemplated in its prior preliminary guidance with a highly limiting test never previewed to or discussed with the states, and inconsistent with the language of H.R. 1. In fact, it does not acknowledge that its position has changed at all. Nor does it acknowledge the significant financial and operational consequences for states that had spent months designing and

implementing systems in reliance on CMS's assurances and the statutory framework set out in H.R. 1.

174.    The IFR also fails to address the massive burden that its addition of a new extra-statutory standard to the "medically frail" exclusion will place on State Medicaid agencies, which operate to provide health care coverage, not to conduct assessments of an individual's capacity to comply with each possible way to comply with work requirements. Ascertaining the severity of an individual's condition in relation to that individual's ability to comply with work requirements requires specialized expertise and training.[23] CMS does not say whether it intends for community health care providers to conduct the significant impairment evaluations it now requires in connection with the "medically frail" exception for any members whose qualification is not verifiable using data. But to the extent that is CMS's intent, it has not explained why it believes it is feasible to place this requirement on already overburdened community health care providers, many of whom are likewise not expert in occupational medicine or job readiness evaluations.

175.    Nor has CMS explained why it believes providers will be willing to participate in evaluating their patients' ability to comply with work requirements, particularly given their reluctance to do so when New Hampshire recently attempted to impose a similar requirement. In New Hampshire, Medicaid members struggled when applying for exemptions, often because "primary care providers resisted signing forms declaring that their patients were unable to work" or were confused or unwilling to participate in the program.[24] CMS also leaves unexamined the costs and challenges of determining whether a condition impairs an individual's ability to comply

---

[23] *See* Rosenbaum et al., *supra* n. 21.

[24] Ian Hill et al., *New Hampshire's Experience with Medicaid Work Requirements*, viii, Urban Institute, Feb. 2020, https://www.urban.org/sites/default/files/publication/101657/new_hampshires_experience_with_medicaid_work_requirements_v2_0_7.pdf.

with the work requirements. Otherwise serious and complex medical conditions can appear to be less serious when they are well-managed because an affected individual has access to regular health care. But should that individual lose health care coverage—for example, due to the administrative burden of complying with work requirements—a condition can become significantly more serious. This reality also confronts enrollees with an agonizing choice: pursue every viable treatment and potentially lose health coverage if their condition improves; or forgo needed care in the short-term in order not to lose their eligibility to receive care at all in the long-term.

176.    Concerning the "medically frail" exclusion in H.R. 1, CMS has provided only conclusory justifications for its interpretation of the statutory language. CMS explains that the phrase "medically frail or who otherwise has special medical needs" "connotes diminished functional capacity that significantly impairs an individual's ability to meet ordinary demands." 91 Fed. Reg. 33373. Considering that, in the context of the IFR, the "relevant demand" is meeting work requirements, CMS "interpret[s] the statute to require consideration of the severity of an individual's condition as relevant to whether that individual is capable of meeting the community engagement requirement." *Id.* Relying wholly on H.R. 1's parenthetical allowing the Secretary to define "who is medically frail or otherwise has special medical needs," the IFR neglects to address that Congress explicitly limited only one subcategory of the "medically frail" exception to conditions that "significantly impair[]" individual's ability to perform activities of daily living, but opted not to do so for other subcategories and for the categorical "medically frail" exclusion.

177.    The IFR further fails to meaningfully address the results of States' earlier efforts to implement work requirements or to explain whether or how it has designed the IFR to implement the H.R. 1 in a way that avoids those results. As discussed above, efforts by states like Arkansas

to implement work requirements resulted in significant numbers of members improperly losing coverage for administrative reasons, while failing to increase employment.

178.    The preamble to the IFR addresses the pre-H.R. 1 State attempts at implementing work requirements only briefly, noting that the earlier work requirements demonstrations were "intended to test and evaluate approaches that required work or community engagement as a condition of eligibility, coverage, additional or enhanced benefits, or reduced premiums or cost sharing." 91 Fed. Reg. 33350. CMS mentions the litigation and the Biden Administration's reversal of approvals but does not discuss the results of earlier implementation attempts, or CMS's own factual findings regarding the risks of loss of coverage for eligible individuals. It concludes that "[the] early implementation experience [in Arkansas and Georgia] provides insight into operational considerations, indicating that beneficiary awareness, clarity of requirements, and the accessibility of reporting mechanisms, as well as overall administrative complexity, can influence participation and compliance." *Id.*

179.    Though the IFR's implementation of Section 71119 is purportedly premised on lessons from these earlier implementations, CMS has failed to explain what those lessons are or how it has taken them into account. In fact, CMS's decision to deviate from its prior preliminary guidance leaves the State Medicaid agencies with even less time to try to ensure "beneficiary awareness" and thoughtfully reduce "administrative complexity" in an effort to avoid the disastrous consequences of earlier efforts at state implementation.

180.    Similarly, in the context of earlier state implementation of work requirements, the IFR does not meaningfully address or consider the high likelihood that otherwise eligible individuals will be disenrolled due to the administrative burden the IFR creates. Instead of engaging with the evidence from those earlier implementations, the IFR's Regulatory Impact

Analysis ("RIA") states "[w]e have not relied on these previous demonstrations for data or assumptions used in this analysis." 91 Fed. Reg. 33456. To justify this willful ignorance, CMS makes the conclusory assertion, again without explanation, that "the limited 1115 demonstration experience that exists involved different implementation patterns, including reinstatements following terminations of eligibility and self-selected enrollment populations, that are not directly applicable to estimating the impact of mandatory requirements applied to an existing State plan enrollment." CMS purports to justify the IFR's burdensome and unlawful requirements on the grounds that they will lead to a reduction in poverty, but this conclusion is inconsistent with the available evidence about the impact of work requirements in the Medicaid context.

181.    In conjunction with the release of the IFR, the Office of the Assistant Secretary for Planning and Evaluation in the Department of Health and Human Services (ASPE) released an issue brief entitled *Medicaid Work Requirements Should Incentivize Employment and Reduce Poverty.*[25] The brief presents a series of simulations, based on which ASPE claims the work requirements could reduce poverty by between 1.6 and 2.9 million people.

182.    The issue brief begins with a literature review of the effects of work requirements. *Id.* at 1-2. Tellingly, it focuses on studies of SNAP, TANF and its predecessor, and work requirements set by the Charlotte Housing Authority, but ignores altogether more relevant studies of earlier efforts by states to implement work requirements in the Medicaid program itself, which found no impact on employment. *Id.* It concludes that "work requirements appear most likely to increase employment when they combine clear expectations with supports that reduce the cost of finding and maintaining work." *Id.* at 2. It then presents a simulation of the potential effects of

---

[25] Danielle Berman et al., *Medicaid Work Requirements Incentivize Employment and Are Estimated to Reduce Poverty*, Ass't Sec'y for Planning & Evaluation, Office of Human Servs. Policy, June 2026, https://perma.cc/4XZR-HZHS.

work requirements on poverty, which rests on employment effects that are inconsistent with even the incomplete literature the brief summarized.[26] The issue brief explicitly states that its method does not capture offsetting effects from administrative burden or barriers to employment.[27]

183.    But CMS has not drafted an IFR that provides clear expectations. Nor has CMS explained how the IFR supports individuals in reducing costs of finding and maintaining work.

184.    CMS has instead drafted an IFR that increases the administrative burden of work requirements beyond what is contemplated by H.R. 1, despite its awareness of the increased disenrollment likely to result. In the regulatory impact analysis for the IFR, CMS concedes that its implementation of the work requirements will result in loss of coverage for millions of people. 91 Fed. Reg. 33449–69.

185.    In Fiscal Year 2027, CMS "project[s] that enrollment would be reduced by 2.3 million individuals." *Id.* at 33461. In subsequent years, CMS expects enrollment to be reduced by between 3.1 and 3.3 million individuals by Fiscal Year 2036. *Id.*

186.    CMS defines the "estimated enrollment impact" to include not only the estimated number of enrollees who would "be subject to the community engagement requirement and not meet the requirement," but also individuals who "would meet the requirement or qualify for an exception and would not successfully demonstrate their compliance or exception." *Id.* CMS "estimate[s] that 7 percent of applicable individuals who may be working, enrolled in school, or otherwise performing activities in line with community engagement requirement" or qualify for exceptions that "deem[] them as demonstrating community engagement, would lose coverage due

---

[26] Richard G. Frank & Sherry Glied, *ASPE's Analysis of Medicaid Work Requirements: Argument By Assumption*, Health Affairs Forefront, June 12, 2026, https://healthaffairs.org/content/forefront/aspe-s-analysis-medicaid-work-requirements-argument-assumptionRichard.

[27] Berman et al., *supra* n. 25, at 4.

to administrative or procedural reasons." *Id.* at 33460. But CMS does not weigh the purported benefits of its approaches to implementation against its estimated procedural disenrollment.

III.  **THE INTERIM FINAL RULE HARMS PLAINTIFF STATES**

187.  The challenged regulations cause harm to the Plaintiff States by (1) imposing significant administrative costs as Plaintiff States, and their political subdivisions, must rush to create and implement new compliance systems based on vague and contradictory guidelines whose procedures must be communicated to applicants beginning on August 31, 2026, (2) requiring state health agencies, given the expansion of required monitoring, to devote more resources and staff to processing claims and ensuring compliance, (3) increasing burdens on state-funded safety nets, uncompensated care funds, and state hospital emergency departments as the newly uninsured become the newly critically ill, (4) forcing Plaintiff States to comply with vague and conflicting provisions and potentially subjecting Plaintiff States to penalties even if Plaintiff States are in compliance with the statute and earlier CMS guidance, and (5) diminishing public trust in State Medicaid agencies which are forced to issue unclear or conflicting guidance to enrollees.

188.  As described above, Plaintiff States have relied upon prior subregulatory guidance from CMS, as well as the language of H.R. 1 itself, to prepare for compliance with the new law. Plaintiff States relied on those representations and expected to use the existing data available to them—like diagnostic codes and claims data—to determine key questions, like whether an enrollee qualified as medically frail. And the statutory deadlines are fast-approaching: no later than August 31, 2026, every state Medicaid agency must begin sending to its own enrollees a notice about the changes in the law, including a section on "how to report to the State any change in the individual's status that could result in the individual qualifying as [medically frail]." 42 U.S.C. § 1396a(xx)(8)(A)(iii). Then, on January 1, 2027, the work requirements must go live.

189.    CMS's publication of an IFR which contradicts both the statutory language of H.R. 1 and CMS's prior clear and consistent instructions on how to interpret H.R. 1 will, if applied, cause myriad harms to Plaintiff States.

190.    As sovereigns within our federal system, Plaintiff States have an interest in ensuring that their actions follow both applicable state and federal laws. Because compliance with the IFR requires Plaintiff States to enact unlawful policies, in contravention of the relevant statute, the IFR harms the sovereignty and integrity of Plaintiff States.

191.    Compliance would also harm the public fisc. Plaintiff States must call upon their vendors to re-design a process for ascertaining any number of required showings under the statute as interpreted by the IFR, including whether a particular health condition significantly impairs one's ability to comply with the work requirements, whether and how an enrollee can use self-attestation, when and how to apply for a short-term hardship exception, and the appropriate age of the data for claim consideration, among others. These rules and processes must be sufficiently final to be communicated to the public by August 31, 2026. Then, by January 1, 2027, just four months later, Plaintiff States must actually implement that system. And, if Plaintiff States fail to meet these deadlines, or if they provide inadequate notice despite lacking guidance from CMS on the definition of key terms, Plaintiff States may expose themselves to legal liability from members or applicants for failure to comply with the statutory terms.

192.    Discarding the processes created over the past year in reliance on CMS' prior subregulatory guidance and, instead, creating and operationalizing a system of this scale in less than three months, within the constraints of the statute, will be exceedingly costly, in terms of both staff time and project outlays. Those costs are particularly pronounced where, as with the medical frailty exemption, Plaintiff States are required to first make *ex parte* use of available data before

56

obtaining more data from the enrollees. Plaintiff States must re-examine and in some cases re-do development of compliance systems, and incur concomitant cost, to assess the viability of, and even design and implement, a new electronic system to analyze data such as Medicaid claims data, provider data, and prescription data to assess whether an individual's condition significantly impaired their ability to meet the work requirements. This project would require Plaintiff States to contract with new vendors or expand existing contracts, commit substantial staff time to the project, and hire more employees to manage the administrative burden. While the statute certainly contemplates these processes, the date of implementation clearly indicates that Congress intended for States to have years, not months, to ensure compliance.

193.    The IFR itself contemplates significant investment of staff time and resources into compliance measures, noting that some of the "one-time system and process updates" the IFR mandates will require "a total of 7,128 hours" of staff time across the various jurisdiction, and cost at least several hundreds of thousands of dollars. 91 Fed. Reg. 33427. However, given the ambiguity and failure to account for the need for expediency, these are almost certainly underestimates.

194.    That process may also be a waste of resources for two reasons. First, the IFR's ambiguity about how to conduct a substantial impairment analysis or how to determine if an emergency exception applies, to identify only a few examples, means that Plaintiff States may expend capital to design an electronic verification system, then communicate how to manage that system to their enrollees to meet the August 31, 2026 deadline, only to learn that CMS considers the system to be insufficiently robust—requiring Plaintiff States to incur even more costs to re-design their system a third time. And any failure to predict how CMS will ultimately interpret the

provision might result in penalties to Plaintiff States for failure to comply with CMS' interpretation of the relevant provisions. *See* 42 U.S.C. § 1396b(u)(1).

195. Second, because the statute requires Plaintiff States to conduct *ex parte* verification where possible, Plaintiff States may design the system only to discover that *ex parte* verification is insufficient to meet this new standard, and thus it again has to re-design the system to comply with its obligations.

196. If *ex parte* verification is not sufficient to meet CMS' vague standards, then Plaintiff States must create a system to manually verify substantial impairment explainable to the public by August 31, 2026, which would result in significant long-term costs and expenses. For example, if states are not permitted to use existing electronic datasets that would allow a state to make a medical frailty assessment, Plaintiff States would have to develop a system to obtain and analyze additional information from Medicaid enrollees about the nature of any medical condition and the extent to which it impairs their ability to work. This would require Plaintiff States to devote significant resources to preparing new application materials, distributing these materials to the public, and manually reviewing the materials that are submitted. Plaintiff States would have to hire and train new staff who can verify that Medicaid applicants and members meet the definition of medical frailty.

197. The cost of any manual review scheme would be immense. In New Jersey, for example, three employees currently spend the majority of their time making individualized determinations as part of the limited Medicaid Only program. Those employees collectively work at the rate of approximately 1.5 full-time equivalencies on eligibility determinations for approximately two thousand individuals. A similar regime to evaluate medical frailty for, depending on the State, thousands, even millions, of adults covered by the IFR would necessitate

roughly one hundred times more staff, a dramatic and unexpected expansion of staff and administrative capacity.

198. These operational burdens are only heightened by the IFR's changes to the renewal process. By requiring recertification every six months, limiting the lookback window to those claims adjudicated in the last twelve months, and phasing out self-attestation, the IFR requires Plaintiff States to adjust long-standing practices and adopt procedures to certify twice as often, using a more limited data set than in the past, and, starting in 2028, without the benefit of self-attestation as a regular option despite statutory language that requires them to be provided with such flexibility. Moreover, given the significant lag between when a medical claim is adjudicated and its submission to the State Medicaid agency, a timeliness of data determination of just 12 months all but ensures that Plaintiff States will be required to certify medical frailty based on an incomplete accounting of recent claims. As a result, establishing medical frailty using electronic data sources caused by a more recent medical event could be impossible, and the recertification procedure will not consider some significant procedures or medical incidents. These changes will necessarily increase administrative expenditures caused by Medicaid members' confusion and need for additional assistance.

199. Overall, Plaintiff States will need to create an electronic system which can make countless assessments, including of medical frailty, substantial impairment, short-term hardship, and community service *ex parte*, or adopt a manual process. Plaintiff States also must be able to communicate clearly to the public no later than August 31, 2026, then fully implement the system on January 1, 2027. Such a mandate was difficult to comply with when Plaintiff States had over a year of notice and consistent guidance from CMS. With just over two months to go until their first

major deadline, compliance with an entirely new set of expectations is now markedly more costly and difficult.

200.    The stakes for Plaintiff States are high. CMS has explicitly threatened States with significant financial penalties for any noncompliance with the IFR if they are later found to have determined individuals to be "medically frail in a manner inconsistent" with the IFR's new, unlawful definition. *See* 91 Fed. Reg. 33377. This potential liability includes risk of severe new financial penalties under H.R. 1's enhanced Payment Error Rate Measurement audit program.

201.    The IFR's shifting and heightened requirements for enrollees will also result in fewer individuals receiving Medicaid coverage beyond what is required by H.R. 1 because they may lose coverage even when they meet the statutory definition of medically frail or otherwise meet the criteria for the statutory exclusions, while the uncertain standards and increased paperwork burden may dissuade otherwise qualifying individuals from applying in the first place. The IFR itself estimates that that regulation will lead to seven percent of applicable individuals "los[ing] coverage due to administrative or procedural reasons" like "not responding to verification requests or submitting insufficient documentation." 91 Fed. Reg. 33460.

202.    When those uninsured individuals inevitably have a medical emergency, a risk which increases in the absence of non-emergency preventative care, public hospitals—whom federal law requires to treat patients regardless of ability to pay—will be forced to absorb the costs. This non-statutory restriction on Medicaid enrollment will thus predictably increase uncompensated care costs beyond what H.R. 1 already requires, which are borne by state-supported public hospitals and state uncompensated care funds. These costs are particularly stark given that emergency care is more expensive than the preventative care Medicaid members may

have otherwise obtained, and because, if the individual was still enrolled in Medicaid, the federal government would cover some portion of the cost.

203. Disenrollment could begin in the first few months of 2027, as individuals who are unable to verify they are compliant, excepted or specified excluded status have only 30 days from receiving a notice of non-compliance to demonstrate that they qualify for Medicaid. *See* 42 U.S.C. § 1396a(xx)(6). And given the ambiguity and novelty of the new requirements created by the IFR, many enrollees who should qualify for and are in need of Medicaid coverage, and who have previously relied on *ex parte* verification will likely (1) lack the necessary documentation to show that their condition significantly impairs their ability to meet the work requirements, (2) be limited by their condition in their ability to build and submit an appropriate record (for example, because chemotherapy side effects impair their ability to locate and organize medical paperwork, or because frequent travel to receive specialist care makes it difficult to collect medical records in one place), or (3) be deterred from recertifying by the complexity of the task. Indeed, research from several states suggests that the pre-IFR implementation would significantly decrease enrollment, and because the IFR will make maintaining coverage even harder, it will lead to more disenrollment.

204. Loss in insurance coverage for many low-income adults will cause cascading harms for patients, physicians, and taxpayers. Patients who lose coverage will face interruptions in treatment and potentially worsening health conditions. Such interruptions in care will have broader public health impacts, increasing the spread of preventable and communicable diseases. And patients who are able to continue their care will face increased costs that they are unable to pay in full. That, in turn, will lead to increases in uncompensated care as healthcare providers are unable to recover the costs of providing treatment that they may be required to provide, such as in

emergency settings. Some of these costs will be shifted to the public fisc, as Plaintiff States fund their safety net systems, causing the loss of federally funded Medicaid services

205.    The IFR is also likely to cause harm to State Medicaid agencies' relationship with the public. Plaintiff States invested considerable time and resources in their Medicaid programs and ensuring that eligible individuals obtain and maintain coverage. This builds on years of training, outreach, and education undertaken by State Medicaid agencies following the expansion of Medicaid under the ACA.

206.    Even the IFR acknowledges the importance of outreach to those impacted by the regulation, noting that "individuals who are medically frail might not realize that they qualify for an exclusion from the [work] requirement and will need clear, consumer-friendly information to help them understand if they are excluded." 91 Fed. Reg. 33371.

207.    By changing its guidance at the last minute, CMS places Plaintiff States in a reputational and legal bind. On August 31, 2026, Plaintiff States, despite deep confusion as to the requirements of the program, must begin sending notices to enrollees detailing whether and how they may qualify for either the work requirement, or, alternatively, for an exclusion. This inability to provide clear guidance in a shifting landscape will damage the trust State Medicaid agencies have built over years with the Expansion Population.

208.    Without trust, the public is less likely to rely on State health agencies to assist them with Medicaid enrollment, which will reduce the total number of enrollees and, for the reasons outlined in the preceding paragraphs, increase healthcare costs on Plaintiff States. Similarly, the burden of increased communication necessary to address inconsistencies and restore public confidence will be costly, to say nothing of the increase in call volume or other requests for assistance which will inevitably follow from the issuance of conflicting guidance.

62

## CAUSES OF ACTION

### Count I
### Violation of the Administrative Procedure Act –
### Contrary to Law I

209. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

210. The IFR is a "final agency action for which there is no other adequate remedy in a court," and thus is subject to judicial review. 5 U.S.C. § 704.

211. The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

212. Violation of H.R. 1 – "Significant Impairment" Improperly Limits Medical Frailty/Special Medical Needs Categorical Exclusion. The IFR's narrow definition of the entire "medically frail" or "special medical needs" exclusion  as limited only to those individuals whose "physical, mental, or other behavioral health condition *significantly impairs the individual[s'] ability to comply with the community engagement requirement,*" 42 C.F.R. § 435.554(c)(5)(i), is contrary to the specific and broader categorical exclusions in the statute, 42 U.S.C. § 1396a(xx)(9)(A)(ii)(V).

213. Violation of H.R. 1—Declared Emergency Limitation. The IFR's narrow definition of the exception to emergencies that "affect[] the ability of applicable individuals to demonstrate community engagement in a particular county or other equivalent unit of local government, or multiple counties, or statewide," 42 C.F.R. §435.555(d)(2)(i), is contrary to the broader exception from the Work Requirement for declared emergencies in the statute, 42 U.S.C. § 1396a(xx)(3)(B)(ii)(II)(aa).

214. Violation of H.R. 1– self-attestation. H.R.1 expressly permits states to "elect to not require an individual to verify information" that they are a "specified excluded individual," under

63

the age of 19, eligible for Medicare or another Medicaid eligibility group, or an inmate of a public institution. 42 U.S.C. § 1396a(xx)(3)(A). The IFR violates this provision by limiting States' use of self-attestation to verify eligibility for coverage (including eligibility for the medical frailty exclusion) starting in January 2028. 42 C.F.R. § 435.557 (f)(1)(ii);

215.   The above provisions of the IFR violate the APA because they are not in accordance with law. 5 U.S.C. § 706(2)(A).

## Count II
### Violation of the Administrative Procedure Act –
### Arbitrary and Capricious

216.   Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

217.   The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary [or] capricious." 5 U.S.C. § 706(2)(A).

218.   An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise*." Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Federal administrative agencies are required to engage in reasoned decision-making. "Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998).

219.   Although federal agencies may change their policies within statutory limits, they must "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016). If an agency relies on contrary factual findings, any justification for the changed policy must be "more detailed." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). And where, as here, federal agencies are "not writing on a blank slate," they are "required to assess whether there were any reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). A court "may uphold agency action only on the grounds that the agency invoked when it took the action." *Michigan v. EPA*, 576 U.S. 743, 758 (2015) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

220.   As discussed above, Defendants failed to provide adequate reasons for numerous changes they imposed in the IFR; failed to acknowledge or provide sufficiently reasoned explanations for changes from prior CMS rules and guidance, including reliance interests thereon; and failed to justify changes from prior factual findings. Defendants' arbitrary and capricious actions in the IFR include:

  a. Defining the entire "medically frail" or "special medical needs" categorical exclusion to include only an individual whose "physical, mental, or other behavioral health condition significantly impairs the individuals' ability to comply with the community engagement requirement," 42 C.F.R. § 435.554(c)(5)(i);

  b. Burdensome and contradictory guidance to States limiting ability to rely on information available to the State to make an *ex parte* determination of whether an individual's "physical, mental, or other behavioral health condition significantly impairs" ability to comply with work requirements, *see* 91 Fed. Reg. 33373

("Medically Frail Definition," indicating that States cannot "automatically classif[y] as medically frail or otherwise having special medical needs based solely on diagnosis or condition");

c.    Limits on States' ability to use self-attestation to verify eligibility for coverage. 42 C.F.R. § 435.557 (f)(i)-(ii);

d.    Limiting the review period for adjudicated claims and encounter data to the preceding 12 months. 42 C.F.R. §§ 435.557 (a)(vii), (a)(viii), and (f);

e.    Delays in the process for determining eligibility for short-term hardship exceptions. 42 C.F.R. § 435.556 (a)(1)-(2);

1.    Limits on short-term hardship exceptions based upon an emergency declaration. 42 C.F.R. § 435.555 (d)(2)(i), (iv); and

2.    Unreasonable time limits on the renewal process. 42 C.F.R. § 435.556(a)(2)(i); *see also* 91 Fed. Reg. 33411-12.

221.    These provisions of the IFR, together the Challenged Provisions, are therefore arbitrary and capricious. Pursuant to 5 U.S.C. § 706(2)(A), Plaintiff States are entitled to an order vacating these provisions of the IFR and declaratory and injunctive relief against Defendants taking any action to implement these provisions of the IFR.

**Count III**
**Violation of the Constitution**
**Spending Clause – Lack of Clear Notice**

222.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

223.    "The Congress shall have Power To . . . provide for the common Defense and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Legislation establishing the federal funding for the Medicaid program was enacted pursuant to the Spending Clause.

224.    Congress may impose conditions on states' acceptance of federal funds, but "the conditions must be set out unambiguously," *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006), so that states can "exercise their choice knowingly, cognizant of the consequences of their participation." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (internal citation omitted). "Though Congress' power to legislate under the spending power is broad, it does not include surprising participating States with post acceptance or 'retroactive' conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 25 (1981). Nor may consequences of conditions be so coercive that they constitute a "gun to the head" to sovereign states. *NFIB*, 567 U.S. at 581.

225.    The IFR does not provide clear notice of the Plaintiff States' obligations to satisfy the conditions to receive the restricted federal Medicaid funding. *See Pennhurst*, 451 U.S. at 17 ("The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'"). As described above, many of the IFR's conditions for how States may determine eligibility for exceptions or exclusions are ambiguous.

226.    The IFR further violates the "clear notice" requirement because it places retroactive conditions that Plaintiff States could not have reasonably anticipated when they began implementation of H.R. 1 in reliance on the language of the statute as well as CMS's prior, sub-regulatory guidance.

67

227. Overall, the IFR is an unfair, surprising, and coercive application of H.R. 1, and thus exercises Congress's Spending Clause power in an unconstitutional manner.

228. Defendants' violations of the Spending Clause have caused and will continue to cause ongoing, irreparable harm to Plaintiffs for which there is no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff States pray that the Court:

a. Stay the effective date of the Challenged Provisions of the IFR, identified in Counts I and II, above, as to Plaintiff States, pending judicial review;

b. Declare that the Challenged Provisions of the IFR, identified in Counts I and II above, are not in accordance with law and arbitrary and capricious in violation of the Administrative Procedure Act, and are an unlawful exercise of the federal government's power under the Spending Clause;

c. Preliminarily and permanently enjoin Defendants from implementing or enforcing the Challenged Provisions of the IFR, identified in Counts I and II above, as to Plaintiff States;

3. Vacate and set aside the Challenged Provisions of the IFR, identified in Counts I and II above; and

d. Award such additional relief as the interests of justice may require.

Dated: June 29, 2026                              Respectfully submitted,

**ANDREA JOY CAMPBELL**
 *Attorney General of Massachusetts*

By: */s/ Nita Kumaraswami Klunder*
Nita K. Klunder (BBO No. 689304)
 *State Trial Counsel*
Ethan W. Marks (BBO No. 690746)
 *Deputy Chief, Health Care Division*
Katherine D. Kearns (BBO No. 707105)
Julia S. Canney (BBO No. 717328)
 *Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2394
nita.klunder@mass.gov
*Attorneys for the Commonwealth of*
*Massachusetts*

**ROB BONTA**
*Attorney General for the State of California*

By: */s/ Anna Rich*
Neli N. Palma*
*Senior Assistant Attorney General*
Kathleen Boergers*
*Supervising Deputy Attorney General*
Anna Rich*
Ketakee Kane*
*Deputy Attorneys General*
1515 Clay Street
Oakland, CA 94612
510-879-0296
Anna.Rich@doj.ca.gov
*Attorneys for the People of the State of*
*California*

**JENNIFER DAVENPORT**
*Attorney General of New Jersey*

By: */s/ Shankar Duraiswamy*
Shankar Duraiswamy*
*Deputy Solicitor General*
Samuel Dolinger*
*Assistant Attorney General*
Geoffrey McGee*
Jake Mazeitis*
*Deputy Attorneys General*
124 Halsey St.
Newark, NJ 07101
(609) 649-1019
Shankar.Duraiswamy@njoag.gov
*Attorneys for the State of New Jersey*

**KRISTIN K. MAYES**
*Attorney General of Arizona*

By: */s/ Joshua A. Katz*
Joshua A. Katz*
*Assistant Attorney General*
2005 N. Central Ave.
Phoenix, AZ 85004
 (602) 542-8053
Joshua.Katz@azag.gov
*Attorney for the State of Arizona*

**PHILIP J. WEISER**
*Attorney General for the State of Colorado*


By: */s/ Ryan Lorch*
Ryan Lorch*
Sarah H. Weiss*
*Senior Assistant Attorneys General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Ryan.Lorch@coag.gov
Sarah.Weiss@coag.gov
*Attorneys for the State of Colorado*


**KATHLEEN JENNINGS**
*Attorney General of the State of Delaware*


By: */s/ Vanessa L. Kassab*
Ian R. Liston*
*Director of Impact Litigation*
Robin L. Jacobs*
*Assistant Attorney General*
Vanessa L. Kassab*
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for the State of Delaware*

**WILLIAM TONG**
*Attorney General of Connecticut*


By: */s/ Patricia E. McCooey*
Patricia E. McCooey*
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5210
Patricia.McCooey@ct.gov
*Attorney for the State of Connecticut*


**BRIAN L. SCHWALB**
*Attorney General of the District of Columbia*


By: */s/ Nicole S. Hill*
Nicole S. Hill*
*Assistant Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth Street NW
Washington, D.C. 20001
(202) 727-4171
Nicole.Hill@dc.gov
*Attorney for the District of Columbia*

**ANNE E. LOPEZ**
*Attorney General for the State of Hawaiʻi*

By: */s/ Kalikoʻonālani D. Fernandes*
Kalikoʻonālani D. Fernandes*
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorney for the State of Hawaiʻi*


**OFFICE OF THE GOVERNOR ex rel. ANDY BESHEAR**
*In His Official Capacity as Governor Of The Commonwealth Of Kentucky*

*/s/    S. Travis Mayo*
S. Travis Mayo*
*General Counsel*
Sam Flynn*
*Chief Deputy General Counsel*
Laura C. Tipton*
*Deputy General Counsel*
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov
*Attorneys for the Office of the Governor*


**KWAME RAOUL**
*Attorney General of Illinois*

By: */s/ Katharine Roller*
Katharine Roller*
Complex Litigation Counsel
Emily Hirsch*
Assistant Attorney General
115 S. LaSalle St
Chicago, IL 60603
773-519-1842
Katharine.roller@ilag.gov
Emily.hirsch@ilag.gov
*Attorneys for the State of Illinois*


**AARON M. FREY**
*Maine Attorney General*

By: */s/ Katherine W. Thompson*
Katherine W. Thompson*
*Special Counsel*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Kate.thompson@maine.gov
*Attorney for the State of Maine*

71

**ANTHONY G. BROWN**
*Attorney General of Maryland*

*/s/ Michael Drezner*
Michael Drezner*
*Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6959
Mdrezner@oag.state.md.us
*Attorney for the State of Maryland*

**KEITH ELLISON**
*Attorney General of Minnesota*

By: */s/Katherine Bies*
Katherine Bies*
*Assistant Attorney General*
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us
*Attorney for the State of Minnesota*

**RAÚL TORREZ**
*Attorney General Of New Mexico*

By: */s/ Anjana Samant*
Anjana Samant*
*Deputy Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
(505) 270-4332
asamant@nmdoj.gov
*Attorney for the State of New Mexico*

**DANA NESSEL**
*Attorney General of Michigan*

By: */s/ Neil Giovanatti*
Neil Giovanatti*
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
*Attorney for the State of Michigan*

**AARON D. FORD**
*Attorney General of Nevada*

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland*
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-8727
kireland@ag.nv.gov
*Attorney for the State of Nevada*

**LETITIA JAMES**
*Attorney General for the State of New York*

By: */s/ Morenike Fajana*
Morenike Fajana*
*Special Counsel*
Rabia Muqaddam*
*Chief Counsel for Federal Initiatives*
28 Liberty Street
New York, NY 10005
(347) 931-3187
Morenike.fajana@ag.ny.gov
*Attorneys for the State of New York*

72

**JEFF JACKSON**
Attorney General of North Carolina

By: */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
*Associate Deputy Attorney General*
Laura Howard*
*Chief Deputy Attorney General*
114 W. Edenton St.,
Raleigh, NC 27603
(919) 716-6026
dmosteller@ncdoj.gov
*Attorneys for the State of North Carolina*

**JOSH SHAPIRO**
*Governor of the Commonwealth of Pennsylvania*

By: */s/ Jacob B. Boyer*
Jennifer C. Selber*
*General Counsel*
Jacob B. Boyer*
*Deputy General Counsel*
Office of General Counsel
30 North Street, Suite 200
Harrisburg, PA 17101
717-460-6786
jacobboyer@pa.gov
*Attorneys for the Governor of the Commonwealth of Pennsylvania*

**DAN RAYFIELD**
*Attorney General of Oregon*

By: */s/ Scott P. Kennedy*
Scott P. Kennedy*
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Scott.Kennedy@doj.oregon.gov
*Attorney for the State of Oregon*

**PETER F. NERONHA**
*Attorney General of Rhode Island*

By*: /s/ Julia C. Harvey*
Julia C. Harvey*
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
jharvey@riag.ri.gov
*Attorney for the State of Rhode Island*

**CHARITY R. CLARK**
*Attorney General for the State of Vermont*

By: */s/ Ryan Patrick Kane*
Ryan Patrick Kane*
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
Ryan.kane@vermont.gov
*Attorney for the State of Vermont*


**NICHOLAS W. BROWN**
*Attorney General State of Washington*

By: */s/ Tyler Roberts*
Tyler Roberts*
*Assistant Attorney General*
William McGinty*
*Deputy Solicitor General*
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206)-464-7744
Tyler.Roberts@atg.wa.gov
William.McGinty@atg.wa.gov
*Attorneys for State of Washington*


**JAY JONES**
*Attorney General for the Commonwealth of Virginia*

/s/ *Megan C. Keenan*
Megan C. Keenan*
*Deputy Solicitor General*
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us
*Attorney for the Commonwealth of Virginia*


**JOSHUA L. KAUL**
*Attorney General for the State of Wisconsin*

By: */s/ Faye Hipsman*
Faye Hipsman*
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
faye.hipsman@wisdoj.gov
*Attorney for the State of Wisconsin*


*pro hac vice forthcoming

74