**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al., <br><br>     Plaintiffs, <br><br>        v. <br><br> MEHMET OZ, M.D., et al., <br><br>     Defendants. | Case No. 26-12962 |

**PLAINTIFF STATES' MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................... 1

BACKGROUND .......................................................................................................... 2

  I.  H.R. 1's Work Requirement ................................................................................. 3

  II. The IFR and the Challenged Provisions ............................................................. 5

ARGUMENT ............................................................................................................... 6

  I.  Plaintiffs are likely to succeed on the merits. .................................................... 6

      A. CMS's narrowing of statutory exclusions is contrary to law. ...................... 6

      B. The promulgation of the Challenged Provisions is arbitrary and capricious. ............... 9

          1.  All the Challenged Provisions are arbitrary and capricious because CMS failed to consider the resulting administrative burdens and coverage loss. ........................................................................ 10

          2.  The Medically Frail Definition is Arbitrary and Capricious for several additional reasons....................................................... 13

          3.  The Claims Period Limitation is arbitrary and capricious because CMS failed to consider that a year of data will not capture certain conditions............ 16

  II. The equities compel preliminary relief. ........................................................... 16

      A. Preliminary relief is needed to avert irreparable harm. ............................... 16

      B. The balance of equities and public interest favor preliminary relief........................... 19

III. The Court should enjoin enforcement of the notice deadline...................................... 20

CONCLUSION............................................................................................................ 20

# TABLE OF AUTHORITIES

PAGE

**CASES**

*Am. Hosp. Ass'n v. Kennedy*
   164 F.4th 28 (1st Cir. 2026) ...................................................................... 13, 19

*Barnhart v. Sigmon Coal Co., Inc.*
   534 U.S. 438 (2002) ....................................................................................... 7

*California v. Dep't of Ed.*
   132 F.4th 92 (1st Cir. 2025) ........................................................................... 9

*California v. Azar*
   911 F.3d 558 (9th Cir. 2018) .......................................................................... 6

*D.V.D. v. U.S. Dep't of Homeland Sec.*
   784 F. Supp. 3d 401 (D. Mass. 2025) ......................................................... 19

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*
   591 U.S. 1 (2020) ............................................................................. 10, 13, 14

*Doe v. Noem*
   152 F.4th 272 (1st Cir. 2025) ................................................................ 14, 15

*Doe v. Trump,*
   157 F.4th 36 (1st Cir. 2025) ......................................................................... 17

*Does 1-6 v. Mills*
   16 F.4th 20 (1st Cir. 2021) .......................................................................... 19

*Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*
   604 U.S. 542 (2025) ..................................................................................... 13

*Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*
   925 F.2d 6 (1st Cir. 1991) ............................................................................ 20

*Loper Bright Enter. v. Raimondo*
   603 U.S. 369 (2024) ....................................................................................... 7

*Mass. Ass'n of Older Americans v. Sharp*
   700 F.2d 749 (1st Cir. 1983) ........................................................................ 19

*McCuin v. Sec'y of Health & Hum. Servs.*
   817 F.2d 161, 174 (1st Cir. 1987) .................................................................. 8

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
      463 U.S. 29 (1983)......................................................................................9, 10

*Nat'l Fed. of Indep. Bus. v. Sebelius*
      567 U.S. 519 (2012).........................................................................................1

*New York v. U.S. Dep't of Homeland Sec.*
      969 F.3d 42 (2d Cir. 2020) ........................................................................... 17

*Nken v. Holder*
      556 U.S. 418 (2009)....................................................................................... 19

*Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*
      969 F.3d 12 (1st Cir. 2020) .............................................................................6

*Northwest Env't Def. Ctr. v. Bonneville Power Admin.*
      477 F.3d 668 (9th Cir. 2007) .........................................................................20

*Ohio v. EPA*
      603 U.S. 279 (2024).........................................................................................9

*Paiva v. Kijakazi*
      704 F. Supp. 3d 268 (D. Mass. 2023) ..............................................................8

*Public Int. Legal Found. v. Bellows*
      92 F.4th 36 (1st Cir. 2024) ..............................................................................7

*Pharm. Coal. for Patient Access v. United States*
      126 F.4th 947 (4th Cir. 2025)...........................................................................7

*RENEW Ne. v. U.S. Dep't of Interior*
      No. 25-cv-13961, 2026 WL 1078282 (D. Mass. Apr. 21, 2026) ..................... 17

*Rosario-Urdaz v. Rivera-Hernandez*
      350 F.3d 219 (1st Cir. 2003) ......................................................................... 16

*Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*
      102 F.3d 12 (1st Cir. 1996) ........................................................................... 18

*Shenzhen Youme Info. Tech. Co. v. FDA*
      147 F.4th 502 (5th Cir. 2025).........................................................................20

*Trump v. CASA, Inc.*
      606 U.S. 831 (2025)........................................................................................20

*United States v. Alvarez*

987 F.2d 77 (1st Cir. 1993) ....................................................................................... 20

*Urizar-Mota v. United States*
171 F.4th 445 (1st Cir. 2026) ......................................................................................7

*Utility Air Reg'y Grp. v. E.P.A.*
573 U.S. 302 (2014)......................................................................................................9

**FEDERAL STATUTES**

5 U.S.C.
§ 704................................................................................................................................6
§ 705..............................................................................................................................20
§ 706(2)(A) ................................................................................................................6, 9

42 U.S.C.
§ 440.315(f)...................................................................................................................4
§ 1382c(a)(3)..................................................................................................................8
§ 1396a(a)(10)...............................................................................................................2
§ 1396a(a)(19)..............................................................................................................12
§ 1396a(xx)(1) ..........................................................................................................3,17
§ 1396a(xx)(2) ...............................................................................................................3
§ 1396a(xx)(3) ...........................................................................................................3, 9
§ 1396a(xx)(5) ..............................................................................................................15
§ 1396a(xx)(8) ...........................................................................................3, 11, 17, 20
§ 1396a(xx)(9) ......................................................................................................*passim*
§ 1396a(xx)(11)........................................................................................................2, 20
§ 1396b(u)(1) ...............................................................................................................16
§ 18114.........................................................................................................................12

One Big Beautiful Bill Act, Pub. L. No. 119–21, 139 Stat. 172 (2025) ..............................*passim*

**REGULATORY MATERIALS**

Community Engagement Requirement for Certain Individuals, 91 Fed. Reg. 33348 (June 3, 2026) .......................................................................................................................*passim*

Community Engagement Requirement for Certain Individuals, 91 Fed. Reg. 39028 (June 29, 2026) .......................................................................................................................1

42 C.F.R.
§ 435.554(c)(5) ..............................................................................................................5
§ 435.555(d)(2) ..........................................................................................................5, 9
§ 435.557.......................................................................................................................15
§ 435.557(a)(vii), (vii), (f)(1).....................................................................................5
§ 435.558(a) .................................................................................................................15

§ 435.916(a)(2), (b) ................................................................................................... 15

§440.315(f) ................................................................................................................. 4

**OTHER AUTHORITIES**

H.R. Rep. No. 119-106 (2025) ..................................................................................... 8

**INTRODUCTION**

Following passage of the Affordable Care Act in 2010, the Plaintiff States have partnered with the Federal Government to expand the provision of Medicaid to low-income working age individuals, thereby achieving Congress' goal to "increase the number of Americans covered by health insurance and decrease the cost of health care." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012).[1] On July 4, 2025, the President signed H.R. 1, which created a requirement, effective January 1, 2027, that individuals in the expanded Medicaid program engage in work or other activities to maintain their Medicaid eligibility. Importantly, Congress also categorically excluded various individuals from this requirement, including certain groups of "medically frail" individuals. Upon H.R. 1's enactment, the Department of Health and Human Services ("HHS"), through the Centers for Medicare and Medicaid Services ("CMS"), immediately began providing guidance to States so they could implement the new requirements on schedule. Then, on June 1, 2026, CMS issued an Interim Final Rule (the "IFR") promulgating regulations that formally implement the work requirements.[2] Departing dramatically from both the statutory text and CMS's own prior guidance, the IFR substantially narrows the exclusions enacted in H.R. 1 and imposes significant new administrative and operational burdens on Plaintiff States.

The IFR violates two bedrock principles of administrative law. First, federal agencies cannot promulgate regulations that are contrary to federal statutes. Here, CMS has simply rewritten the key statutory exclusions, impermissibly substituting the agency's policy judgment for Congress's. Second, agency action cannot be arbitrary and capricious: an agency must consider important aspects of a problem, weigh serious reliance interests, assess reasonable alternatives,

---

[1] Internal citations and quotation marks are omitted unless otherwise noted.

[2] Just today, CMS amended portions of the IFR. *See* 91 Fed. Reg. 39028–031 (June 29, 2026). But despite the need for substantive guidance, these changes are ministerial and do not alleviate Plaintiff States' confusion or uncertainty.

and proffer a reasoned explanation for its regulatory choices. The IFR runs afoul of these constraints many times over—failing to meaningfully consider the onerous administrative burdens it imposes on States and Medicaid enrollees, ignoring the loss of health care coverage it will inflict on countless Americans, disregarding CMS's own past guidance to States, and more.

CMS's flouting of the statute and unreasoned decisionmaking have caused chaos for Plaintiff States, making it exceedingly difficult for them to comply with imminent deadlines.[3] And worse, because the challenged provisions will substantially scale back the available exclusions from the work requirement, they are projected to result in the loss of Medicaid coverage for thousands of individuals after that requirement goes into effect in January 2027—the effects of which will be an increase in uncompensated care costs borne by Plaintiff States and providers. Absent swift preliminary relief, the Plaintiff States will suffer significant irreparable harm as they scramble to implement CMS's unlawful new regulation. The challenged provisions of the IFR must be promptly stayed or enjoined.

### BACKGROUND

Created in 1965, Medicaid is a federally created public health insurance program for vulnerable populations that is administered by the States. In 2010, the Affordable Care Act enabled States to expand Medicaid eligibility to all low-income individuals aged 19 to 64 (the "Expansion Population"). 42 U.S.C. §1396a(a)(10)(A)(i)(VIII). Each of the Plaintiff States has expanded Medicaid to all or some of the Expansion Population and has partnered with HHS to provide full coverage to the Expansion Population, with great success.

---

[3] In order to meet the August 31, 2026 notice deadline, numerous Plaintiff States need to finalize their notices by July 31, 2026. Ex. 3 ¶ 52; Ex. 5 ¶ 43; Ex. 6 ¶ 22; Ex. 9 ¶ 45. Plaintiffs have asked Defendants to provide Plaintiffs with a six-month extension of the January 1, 2027 implementation deadline as permitted by H.R. 1, 42 U.S.C. § 1396a(xx)(11), and agreement not to enforce the statutory notice deadline. Plaintiffs will apprise the court regarding Defendants' response as this will inform whether or not relief is still needed on or before July 31, 2026.

## I.  H.R. 1's WORK REQUIREMENT

On July 4, 2025, H.R. 1 was enacted into law. It made significant changes to Medicaid, directing all States to impose new requirements for work or community engagement for "applicable individuals," defined as those who are eligible to enroll in Medicaid under a State's Expansion or under certain waivers of State Medicaid Plans. Pub. L. No. 119–21, tit. VII, §71119, 139 Stat. 72, 306-315 (2025) (codified at 42 U.S.C. §1396a(xx)) (the "Work Requirement"). The statute identifies seven ways in which an "applicable individual" can comply with the monthly Work Requirement, including by working or performing community service for at least 80 hours, being enrolled in an education program at least half-time, or earning equivalent monthly or seasonal minimum wages. 42 U.S.C. §1396a(xx)(2)(A)–(G).

Congress "specifi[cally] excluded" nine categories of individuals from complying with the Work Requirement, including individuals "who [are] medically frail or otherwise ha[ve] special medical needs." *Id.* §1396a(xx)(9)(A)(ii). Congress further identified certain "[m]andatory exception[s]," including for the aforementioned "specified excluded individual[s]" and permitted States to offer exceptions for those experiencing certain short-term hardships, including residents of an area experiencing a disaster or emergency declared by the President. *Id.* §1396a(xx)(3).

H.R. 1 set several key deadlines for implementation of these new provisions. First, it required States to implement the Work Requirement no later than January 1, 2027. *Id.* §1396a(xx)(1). Second, it required State Medicaid agencies to advise Medicaid members of the new Work Requirement, including how to comply, beginning no later than August 31, 2026. *Id.* §1396a(xx)(8).[4] Finally, Congress directed the HHS Secretary to promulgate an interim final rule,

---

[4] Although the statutory deadline for providing notice is August 31, CMS has indicated in guidance and the IFR itself that States must provide notice by September. 91 Fed. Reg. 33420; Ex. 6 ¶22 n.1. In light of this ambiguity, some States intend to issue notice in September, but the States remain at risk of enforcement if they do not issue notices by the end of August. *Id.*

"for purposes of implementing" Section 71119, no later than June 1, 2026.   Pub. L. No. 119–21, tit. VII, §71119(d), 139 Stat. 72, 314 (2025) (note).

Recognizing the breadth of the changes necessary to implement the Work Requirement, and the States' need to begin planning for these changes well before June 1, 2026, CMS began providing subregulatory guidance to the States in November 2025. This guidance included a slide deck first presented to the States on November 19, 2025 (and later shared by email on December 4, 2025), Dkt. No. 1-1 ("CMS Slide Deck"), a bulletin that was publicly released on December 8, 2025, Declaration of Nita K. Klunder Ex. 27,[5] and verbal guidance offered during a series of workgroup calls that began in December 2025 and continue to this day, Ex. 4 ¶¶11-18; Ex. 25 ¶¶12-20. Through this subregulatory guidance, CMS informed the States that, for the medically frail exception, it intended to "use a definition . . . similar to that described in regulations at 42 C.F.R. §440.315(f)," which closely resembles the language of H.R. 1. CMS Slide Deck at 11; Ex. 16 ¶13; Ex. 11 ¶17. CMS also informed the States that it expected to allow them to verify the exclusion through "medical claims data review or provider documentation, or completion of a screening tool." CMS Slide Deck at 11, 17; Ex. 13 ¶12; Ex. 21 ¶13. In the absence of formal guidance or regulations, the States relied on both the statutory language and this informal guidance from CMS to plan for compliance and implement operational, system, and process changes. Ex. 23 ¶12; Ex. 9 ¶12. In light of the magnitude of H.R. 1's changes, State Medicaid agencies necessarily started making substantial investments in systems upgrades well before June 1. Ex. 15 ¶¶39-41; Ex. 20 ¶¶17-19.

---

[5] Citations herein to "Ex. __" are to the Declaration of Nita K. Klunder, unless otherwise indicated.

## II.    THE IFR AND THE CHALLENGED PROVISIONS

On June 1, 2026, CMS released the IFR, which departed significantly from both the language of H.R. 1 and CMS's guidance. The IFR contains numerous unanticipated provisions that impermissibly narrow the statutory exemptions to the Work Requirements and impose onerous requirements on Plaintiff States to verify compliance. *See* Community Engagement Requirement for Certain Individuals, 91 Fed. Reg. 33348 (June 3, 2026). First, the IFR narrows the statutory exclusion of those "who [are] medically frail or otherwise ha[ve] special medical needs" to cover only those individuals whose "physical, mental, or other behavioral health condition significantly impairs [their] ability to comply with the community engagement requirement" ("Medically Frail Definition"), 42 C.F.R. §435.554(c)(5)(i). Moreover, the IFR suggests that in no case can States base their determinations of whether an individual is "medically frail" solely on their records that an individual has a "particular diagnosis or condition," 91 Fed. Reg. 33373. Second, the IFR improperly limits the short-term hardship exception for individuals experiencing an emergency declared by the President to those who can establish that the emergency renders them unable to comply with the Work Requirement ("Declared Emergency Limitation"). *Id.* §435.555(d)(2)(i). Third, for States using claims data to verify compliance or exclusion, the IFR arbitrarily limits them to relying on claims adjudicated in the preceding 12 months ("Claims Period Limitation"). *See id.* §435.557(a)(vii), (vii), (f)(1). Together, these are the "Challenged Provisions."

To implement the Challenged Provisions, Plaintiff States must make significant changes to the compliance plans they have developed over the past year. Ex. 2 ¶54; Ex. 15 ¶55. Many of those changes must be made in advance of an imminent deadline to inform residents how to comply with the Work Requirement or confirm their exclusion. Given the changes, for example, to the definition of medical frailty, Plaintiff States must now expend new funds, not previously budgeted for, to engage vendors, develop a system capable of evaluating an individual's ability to work by January

5

1, 2027, and communicate to members how to navigate this system by August 31, 2026. Ex. 3 ¶70; Ex. 6 ¶¶31-32; Ex. 14 ¶5 & Ex 3 thereto. And, because the Challenged Provisions will cause thousands of Medicaid members to lose their health insurance, they will impose a financial burden on Plaintiff States' uncompensated care funds, publicly run hospitals, and other programs for the uninsured. Ex. 3 ¶¶73-74; Ex. 7 ¶68.

## ARGUMENT

"When assessing a request for a preliminary injunction, a district court must consider (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest." *Norris ex rel. A.M. v. Cape Elizabeth Sch. Dist.*, 969 F.3d 12, 22 (1st Cir. 2020) (cleaned up). All four factors overwhelmingly support a preliminary injunction here.

### I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

#### A.  CMS's narrowing of statutory exclusions is contrary to law.

By impermissibly narrowing two separate statutory exemptions to the Work Requirement, the IFR runs afoul of the Administrative Procedure Act's ("APA") bar on agency actions that are "not in accordance with law," 5 U.S.C. §706(2)(A).[6]

First, the Medically Frail Definition runs contrary to the statute's categorical exclusion of five groups of medically vulnerable individuals from the Work Requirement. Specifically, Congress excluded individuals:

> who [are] medically frail or otherwise ha[ve] special medical needs (as defined by the Secretary), *including* an individual—(aa) who is blind or disabled (as defined in section 1382c of this title); (bb) with a substance use disorder; (cc) with a disabling mental disorder; (dd) with a physical, intellectual or developmental disability that significantly

---

[6] Interim final rules are "final agency action" which may be reviewed under the APA, 5 U.S.C. §704. *See California v. Azar*, 911 F.3d 558, 580 (9th Cir. 2018) (holding that the "key word" is "final," not "interim," because "interim" references "the Rule's intended duration" rather than "its tentative nature" (citation omitted)).

impairs their ability to perform 1 or more activities of daily living; or (ee) with a serious or complex medical condition.

42 U.S.C. §1396a(xx)(9)(A)(ii)(V) (emphasis added). While Congress gave the Secretary some discretion to define medical frailty, it also determined that the resulting definition must "includ[e]," at a minimum, individuals who have one of the five enumerated conditions—without any qualification. *See Public Int. Legal Found. v. Bellows*, 92 F.4th 36, 48 (1st Cir. 2024) (holding that "includes" is "a term of enlargement, and not of limitation" (citation omitted)); *Pharm. Coal. for Patient Access v. United States*, 126 F.4th 947, 960 (4th Cir. 2025) (holding similarly for "including"). In other words, Congress set the floor for the definition of medical frailty and permitted the agency to expand, but not contract, the definition beyond the enumerated categories. Far from being the "best reading" of the statute, as the IFR implausibly asserts, 91 Fed. Reg. 33373, CMS's decision to radically shrink the medically frail exclusion contravenes the "plain meaning" of the statute's text, *Urizar-Mota v. United States*, 171 F.4th 445, 461 (1st Cir. 2026) (citation omitted), and exceeds the "boundaries of [the Secretary's] delegated authority." *Loper Bright Enter. v. Raimondo*, 603 U.S. 369, 395 (2024) (citation omitted).

Other principles of statutory interpretation confirm what the text makes clear. When "Congress includes particular language in one section of a statute but omits it in another," that "exclusion" is "presumed [to be] intentional[] and purpose[ful]." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 452 (2002) (cleaned up). Here, in the *very same* section of H.R. 1, Congress identified one of the categories of individuals who must be excluded as "medically frail" as those whose disability "significantly impairs their ability to perform 1 or more activities of daily living." 42 U.S.C. §1396a(xx)(9)(A)(ii)(V)(dd).[7] So Congress knew very well how to limit the medical

---

[7] Likewise, in 42 U.S.C. §1396a(xx)(9)(A)(ii)(V)(aa), Congress defined the medically frail category of "disabled" individuals by cross-referencing the "disabled" definition in Section 1382c of the Social Security Act—which, unlike

7

frailty definition to individuals whose ability to perform certain activities is "significantly impaired," but chose not to apply this qualification to the medical frailty definition generally or to any of the other enumerated categories. And not only is CMS's interpretation at odds with the statute's text and structure, it also runs afoul of the interpretive principle that the Social Security Act, which houses the Medicaid program, "should be broadly construed and liberally applied in favor of beneficiaries." *Paiva v. Kijakazi*, 704 F. Supp. 3d 268, 276 (D. Mass. 2023) (cleaned up) (quoting *McCuin v. Sec'y of Health & Hum. Servs.*, 817 F.2d 161, 174 (1st Cir. 1987)).

Moreover, it is entirely reasonable that Congress did not want to tether the medical frailty exclusions overall to an individual's ability to work. Congress likely wanted to ensure continuity of care for individuals with especially significant health care needs. Indeed, that would be consistent with other exclusions, such as for pregnant individuals—who are not per se precluded from working, but for whom timely and uninterrupted access to care is critical. *See* 42 U.S.C. §1396a(xx)(9)(A)(ii)(IX). In addition, evidence suggests that people "with chronic conditions [are] more likely to lose Medicaid" when subject to work requirements and "the administrative burden" of having to prove their eligibility. Ex. 28, at 3. It would be entirely reasonable for Congress to spare from the Work Requirement those who would face particular burdens documenting compliance and unique health risks if they lost access to care. Whatever the reasons, Congress made this policy decision, and CMS is not authorized to undo it.[8]

---

the other enumerated categories of medical frailty set forth in the statute, defines an individual's disability by their ability to work. 42 U.S.C. §1382c(a)(3)(A) ("[A]n individual shall be considered to be disabled for purposes of this subchapter if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ."). That Congress did not apply such a qualification to the medical frailty definition generally confirms that it did not intend to limit the medical frailty exclusion to those unable to engage in work.

[8] Nothing in the legislative history supports CMS's interpretation either. The House committee report simply states that the Work Requirement "[do] not apply to . . . individuals who are considered medically frail," and notes that the category "includes, but is not limited to" the five groups recognized in the statute. H.R. Rep. No. 119-106, at 620. That portion of the committee report is detailed in the categories who need not comply with the work requirements but nowhere intimates that inability to comply with the work requirements is a precondition of the exclusion. *Id*.

Second, CMS impermissibly narrowed the statutory exception from the Work Requirement for any "individual resid[ing] in a county (or equivalent unit of local government) … in which there exists an emergency or disaster declared by the President pursuant to the National Emergencies Act …" 42 U.S.C. §1396a(xx)(3)(B)(ii)(II). Conjuring a constraint that is nowhere found in the statute, the Declared Emergency Limitation narrows this exception to emergencies that "affect[] the ability of applicable individuals to demonstrate community engagement in a particular county or other equivalent unit of local government, or multiple counties, or statewide." 42 C.F.R. §435.555(d)(2)(i). CMS asserts that this change is necessary because otherwise, the exception for declared emergencies could "nullify the community engagement requirement for an indefinite period of time" in a State impacted by an emergency declaration. 91 Fed. Reg. 33385. But the fact that CMS thinks the exception may sweep too broadly in a given case does not empower it to ignore the statutory text. It is a "core administrative-law principle" that an "agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Utility Air Reg'y Grp. v. EPA*, 573 U.S. 302, 328 (2014). Congress deliberately chose to except those residing in areas in which there exists a declared emergency. CMS is bound by that choice.

### B. The promulgation of the Challenged Provisions is arbitrary and capricious.

The Challenged Provisions also violate the APA's bar on "arbitrary or capricious" agency actions. 5 U.S.C. §706(2)(A). Agency actions must be "reasonable and reasonably explained," *Ohio v. EPA*, 603 U.S. 279, 292 (2024), which requires that the agency "'examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *California v. Dep't of Ed.*, 132 F.4th 92, 98 (1st Cir. 2025) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)) (citation modified). Moreover, an agency's action is arbitrary and

9

capricious where it "failed to consider an important aspect of the problem" and "ignored factors that Congress intended it to consider." *State Farm*, 463 U.S. at 43. This standard is even more exacting when an agency changes positions. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020). In such circumstances, an agency "must consider the alternatives that are within the ambit of the existing policy" and "potential reliance interests." *Id.* at 30 (citation modified). Here, the Challenged Provisions are arbitrary and capricious in numerous respects.

    1.   <u>All the Challenged Provisions are arbitrary and capricious because CMS failed to consider the resulting administrative burdens and coverage loss.</u>

CMS "entirely failed to consider" the administrative burdens created by the Challenged Provisions and the resulting impacts on health care coverage for the Expansion Population—the very individuals Congress sought to protect by expanding Medicaid. *State Farm*, 463 U.S. at 43.

Each of the Challenged Provisions imposes significant operational burdens on Plaintiff States and bureaucratic obstacles to obtaining healthcare coverage for the Expansion Population. The Medically Frail Definition requires States to verify, and individuals to establish, not only that an enrollee has a serious medical condition, but that the condition significantly impairs their ability to work—an unprecedented and costly process that could require resource-intensive medical visits and reviews for thousands of enrollees. Ex. 23 ¶44; Ex. 17 ¶14. Indeed, CMS itself estimates that establishing compliance with the Work Requirement—including establishing entitlement to a specified exclusion such as "medical frailty"—will impose an aggregate burden of more than 32 million hours per year on members. 91 Fed. Reg. 33434. The Claims Period Limitation exacerbates the burdens on States and enrollees because for permanent or chronic conditions that do not require regular treatment but impact someone's ability to work (such as quadriplegia), a limited 12-month window of historical claims data may not evidence an individual's present condition or degree of impairment. Ex. 11 ¶50. Likewise, the narrowing of the Declared Emergency Exception will

10

require States to develop a methodology for assessing whether a given national emergency precludes individuals from complying with the Work Requirement. These administrative burdens are compounded by the aggressive timeline for implementing the IFR and the IFR's departure from the statutory text and guidance provided by CMS over the past year, *see infra* Part I.B.2; Ex. 16 ¶41. States must shift course, notify enrollees about how their eligibility will be determined by August, 42 U.S.C. §1396a(xx)(8)(A), and potentially implement a substantially revised eligibility verification system by January. Ex. 16 ¶¶41-46.

CMS's narrowing of the Work Requirement will undoubtedly lead to a greater loss in coverage for Medicaid members—and not because they are statutorily ineligible, but simply because of the increased difficulty of showing eligibility. CMS itself acknowledges that 7 percent of individuals who would satisfy the Work Requirement or be excluded or excepted from it would nonetheless "lose coverage due to administrative or procedural reasons"—including "not responding to verification requests or submitting insufficient documentation." 91 Fed. Reg. 33459–60; *see also id.* at 33350 (noting studies of work requirements in certain States and conceding that "overall administrative complexity … can influence participation and compliance"). Remarkably, this constitutes 43 percent of all coverage losses that will result from the Work Requirement. *Id.* at 33460. CMS's acknowledgment of these impacts is unsurprising: it was provided with study after study showing that the greater the administrative burdens on proving compliance, the greater the likelihood that *eligible* individuals will lose coverage. Ex.26, p. 20, n.96, n.97 (citing studies "explaining that adding enrollment barriers leads to significant declines in reenrollment") Indeed, these burdens will pose an especially substantial barrier for those who fall within the statutory categories that the medical frailty exemption is meant to protect—for

example, people with disabling mental disorders or serious or complex medical conditions. Ex. 13 ¶47; Ex. 18 ¶48 Ex 30 .

CMS failed to meaningfully consider these critical issues when it promulgated the Challenged Provisions. It neglected to weigh the burdens on States of having to assess an individual's ability to work. And it failed to provide meaningful guidance on how States could implement a regime for validating medical frailty, much less by the January 1, 2027 implementation date. Even worse, the IFR never discusses how to limit the number of Medicaid members who would be disenrolled by the procedural hurdles created by the Challenged Provisions.[9] Likewise, the IFR says nothing about whether the purported benefits of the Challenged Provisions would outweigh this loss in Medicaid coverage. And CMS also failed to address the follow-on consequences of this broad coverage loss—a surge in uncompensated care costs incurred by doctors, hospitals, and States. Ex. 12 ¶27; Ex. 8 ¶¶25-26.

CMS's failure to consider the administrative burdens and impacts on health care access caused by the Challenged Provisions is especially egregious because these are precisely the factors Congress has directed CMS to consider. Federal law has long required prioritizing "simplicity of administration and the best interests of recipients" in the administration of Medicaid. 42 U.S.C. §1396a(a)(19). And it bars HHS from promulgating regulations that create "unreasonable barriers" to access to medical care. *Id.* §18114. Heedless of these Congressional directions, CMS has plowed ahead with a rule that undermines "administrative simplicity" and throws up unnecessary "barriers" to care. All of the Challenged Provisions should be enjoined as arbitrary and capricious.

---

[9] To underscore the point: CMS received a letter in November 2025 expressly noting that in states which had attempted to implement work requirements, members "struggled to find a willing provider or one who could timely sign off" Ex. 26, 19, n.98. The letter cited a study showing that providers were confused about and frequently unwilling to sign paperwork relating to work requirements in New Hampshire. *Id.*, 19 n.98. CMS failed to explain why they replaced the statute's categorical exclusion of certain medically frail groups with a definition that will likely require medical providers to make precisely the type of certification that New Hampshire providers could not provide.

12

2. The Medically Frail Definition is Arbitrary and Capricious for several additional reasons.

Apart from failing to meaningfully grapple with the administrative burdens and coverage loss that will flow from the IFR, CMS's promulgation of the Medically Frail Definition was arbitrary and capricious in numerous other respects.

First, in imposing the Medically Frail Definition, CMS failed to consider another key aspect of the problem: the States' "legitimate reliance" on CMS's earlier pronouncements about how States could comply with the work requirements. *Regents*, 591 U.S. at 30. "When an agency changes course," it must "assess whether there were reliance interests, determine whether they were significant, and weigh [those] interests against competing policy concerns." *Id*. at 30, 33.[10]

Here, Plaintiff States devoted significant resources to developing implementation plans based on CMS's assurances about how the Work Requirement could be applied—plans that have been upended as States scramble to try to implement the IFR's new provisions under threat of significant penalties for non-compliance. From the moment H.R. 1 was enacted, the States and CMS understood that the short timeline for implementation would require taking significant, costly, and binding steps ahead of the June 1, 2026 IFR. Ex. 23 ¶¶35-36; Ex. 25 ¶¶42-43. Accordingly, beginning in December 2025, CMS held at least bi-weekly calls with the State Medicaid agencies to provide guidance on how to implement H.R. 1. Ex. 24 ¶¶10-18; Ex. 1 ¶¶3, 6. At no point during these calls did CMS indicate that the medically frail exclusion would include a requirement that a condition "significantly impair" the individual's ability to comply with the Work Requirement. Ex. 11 ¶18; Ex. 13 ¶15. Nor did CMS indicate that States may need to conduct

---

[10] Even if an agency's departure from informal guidance does not formally trigger the change-in-position doctrine discussed in *Regents*—an unsettled question of law, *see Food & Drug Admin. v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 570 (2025)—it remains an "important aspect of the problem" that CMS should have, but failed, to consider. *See Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 31 (1st Cir. 2026) (affirming that the "[Plaintiffs'] reliance interests" are an "important aspect[] of the problem").

inquiries into applicants or enrollees' ability to work. Ex. 18 ¶23; Ex. 21 ¶23. To the contrary, in December 2025, Nebraska, with Defendants' blessing, announced that it would begin implementing the Work Requirement. Ex. 29. In its rollout, Nebraska identified a lengthy list of diagnosis and procedure codes that could be used to determine if someone qualified as medically frail; notably absent was any reference to the significant impairment of an individual's ability to comply with the Work Requirement. Nebraska's plan gave States further reason to rely on contemporaneous CMS communications that did not include a significant impairment requirement. As a result, Plaintiff States began building out systems at substantial cost, in both time and money, based on CMS' guidance that did not include reference to "significant impairment" when defining medically frail.  Ex. 20 ¶¶18-19; Ex. 8 ¶14.

Plaintiff States relied on these assurances in developing their implementation plans and now face the extraordinarily difficult task of making mid-stream implementation changes under tight timelines that may not be feasible. Ex. 19 ¶46; Ex. 23 ¶38. Defendants failed to "consider" these "reliance interests, determine whether they [are] significant, and weigh any such interest against competing policy concerns.'" *Doe v. Noem*, 152 F.4th 272, 290 (1st Cir. 2025) (quoting *Regents*, 591 U.S. at 33). Instead, the IFR ignored these concerns altogether.

Second, Defendants overlooked the "alternatives" that were "within the ambit of the existing" landscape. *Regents*, 591 U.S. at 30. Defendants were aware of alternative, less restrictive ways to define medically frail, as for months they communicated those to the States. CMS could have, and should have, simply declined to add the "significantly impairs" language and made clear that verification by diagnosis and condition data already available to the States was acceptable.

Third, if the Court finds the Medically Frail Definition is permitted but not required by the statute, the definition is still unlawful because CMS has not articulated any reasoned explanation

14

for adopting it. Though the agency notes that the statute "delegates definitional authority" to the Secretary, 91 Fed. Reg. 33373, CMS fails to explain why it is reasonable to exercise that authority to narrow the exclusion—particularly when doing so imposes substantial administrative burdens on States and members, would lead to a significant loss of health insurance for medically vulnerable populations, and would depart from CMS's initial guidance. Congress may confer on an agency a degree of discretion on a given issue, but the APA still requires the "executive agency's exercise of discretion be reasonable and reasonably explained." *Doe*, 152 F.4th at 289.

Finally, to the extent CMS asserts that States cannot rely solely on records of "the presence of a particular diagnosis and condition" to verify an individual's compliance with the "significantly impaired" requirement, 91 Fed. Reg. 33373, this too is arbitrary and capricious. Such guidance contradicts Congress's direction that States, when verifying exclusions, should not "requir[e], where possible, the applicable individual to submit additional information." 42 U.S.C. §1396a(xx)(5). Indeed, such records are exactly the kind of "reliable information available to the state" that would enable States to verify eligibility without additional information from an enrollee in accordance with other terms of the IFR, 42 C.F.R. §§435.557, 435.558(a)(i), and established Medicaid regulations on eligibility redeterminations, *id.* §435.916(a)(2) and (b).[11] In the IFR, CMS never acknowledges nor attempts to reconcile its apparent expectations of individualized ability to work determinations with these other regulatory and statutory provisions—nor does CMS provide

---

[11] The IFR notes that states have proposed using "algorithms using administrative claims data that assign acuity scores to individuals" or an "approach that relies on lists of qualifying diagnosis codes combined with utilization data and other factors, such as severity of conditions," to determine medical frailty. 91 Fed. Reg. 33406. This is consistent with preexisting regulations requiring an "ex parte" eligibility determination process for Medicaid members at renewal. *See* 42 C.F.R. §435.916(a)(2) and (b). However, CMS has not clarified "what administrative data a state can use or what would be an acceptable analysis of such data." Ex. 11 ¶28; Ex. 16 ¶22.

15

any meaningful guidance for how States should make those determinations—despite the fact that States may face penalties if they make administrative errors. *See* 42 U.S.C. §1396b(u)(1).

3. <u>The Claims Period Limitation is arbitrary and capricious because CMS failed to consider that a year of data will not capture certain conditions.</u>

The Claims Period Limitation is separately arbitrary and capricious because CMS failed to consider a critically "important aspect of the problem": some individuals have permanent disabling conditions that do not require ongoing treatment. Ex. 11 ¶50. CMS has limited States to using adjudicated claims from the last 12 months in assessing compliance with, or exception or exclusion from, the Work Requirement. But an individual with quadriplegia, for example, may be unable to comply with work requirements, but have no treatment for that condition, or records reflecting that diagnosis, in the preceding year. *Id.* And because providers and plans can take up to 12 months to submit claims data after a medical visit, a limited 12-month lookback period is unlikely to present a full and accurate account of an enrollee's medical condition. Ex. 10, ¶10. Limiting States to a one-year review period will therefore make it more difficult for them to verify eligibility. Moreover, people with chronic or permanent conditions that do not require regular treatment will face barriers to establishing their entitlement to an exclusion and risk losing coverage. Yet the IFR does not grapple with these issues or explain why a longer review period was not chosen.

## II.    THE EQUITIES COMPEL PRELIMINARY RELIEF.

### A. Preliminary relief is needed to avert irreparable harm.

Irreparable harm exists "[w]here a plaintiff stands to suffer a substantial injury that cannot adequately be compensated by an end-of-case award of money damages." *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 222 (1st Cir. 2003). Here, the States will suffer irreparable harm if forced to communicate these unlawful conditions to their members and due to the imminent outlays of agency staff time and funding necessary to comply with CMS' regulatory about-face. It

is well established that unrecoverable compliance costs constitute irreparable harm. *See RENEW Ne. v. U.S. Dep't of Interior*, No. 25-cv-13961, 2026 WL 1078282, at \*30 (D. Mass. Apr. 21, 2026) (collecting citations). Such costs are particularly irreparable where, as here, they have led to "administrative upheaval." *Doe v. Trump*, 157 F.4th 36, 79 (1st Cir. 2025).

The Challenged Provisions have already caused chaos for Plaintiff States' Medicaid agencies, adding unnecessary and costly burdens. Since November 2025, the States have been preparing to comply with the imminent notice deadline and the January 1, 2027 implementation deadline, consistent with their understanding of the statutory requirements and guidance provided by CMS. *See* 42 U.S.C. §§1396a(xx)(1), (8); Ex. 6 ¶19; Ex. 8 ¶¶13-14. But, just three months before the notice deadline, the IFR imposed new, ambiguous requirements on Medicaid enrollees that require States to make significant changes to their Medicaid systems. *See Doe*, 157 F.4th at 79 (no abuse of discretion in finding that federal regulations requiring "intensive alterations to [the States'] eligibility verification systems" for Medicaid imposed "irreparable harm").

These "costly revisions" require States to expend considerable resources on tight timelines to bring their systems in line with the IFR's unlawful provisions. *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 86 (2d Cir. 2020). For example, the IFR requires States to define "significantly impairs," identify the data they need to make assessments, acquire that data, develop systems and engage vendors with the expertise to process the data, and then implement that system at scale. Ex. 9 ¶57; Ex. 11 ¶65. And, because of the notice requirement, the statute only gives States until August 31, 2026 to determine key features of the system and decide how to communicate with residents about its implementation—a fact which dramatically increases the costs as States engage vendors to work rush jobs and ask their staff to work overtime to meet deadlines. *See* Ex.

17

18 ¶¶40, 54; Ex. 23 ¶50; Ex. 22 ¶ 17; *see also* 91 Fed. Reg. 33427 (acknowledging substantial resource commitments required by States to comply with IFR).

Those late-stage revisions also require increased spending on public outreach and administrative support for enrollees. Ex. 12 ¶24; Ex. 13 ¶54-55. The IFR itself acknowledges that many impacted by the regulation "will need clear, consumer-friendly information to help them understand if they are excluded." 91 Fed. Reg. 33377. But Plaintiff States are struggling to figure out how to inform members of how to navigate the Work Requirement in light of the IFR's new, unlawful provisions. Without judicial relief, at best Plaintiffs will be able to send incomplete or ambiguous notices to members, which would only serve to create confusion and erode the trust and goodwill that State Medicaid agencies have built up over time. Ex. 5 ¶53; Ex. 2 ¶51-52; *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 20 (1st Cir. 1996) ("By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable"). Moreover, it would require Plaintiff States to devote more staff time, and likely hire more employees, to address the deluge of calls, complaints, and appeals stemming from these regulatory changes.  Ex. 16 ¶56; Ex. 21 ¶54.

Finally, the Challenged Provisions will lead to disenrollments not contemplated by H.R. 1. Hundreds of thousands of members will lose coverage not because they are statutorily ineligible, but because CMS has unlawfully narrowed the statutory exemptions and created needless procedural obstacles to demonstrating eligibility. *See* 91 Fed. Reg. 33460 (estimating that 7 percent of otherwise eligible individuals would "lose coverage due to administrative or procedural reasons"); *see also* Ex. 4 ¶46; Ex. 10 ¶50. The most obvious and serious harm of the IFR is therefore the "[t]ermination of benefits" which will cause some of the States' most needy and ill residents "to forgo . . . necessary medical care," a "clearly irreparable injury" with life-or-death

18

consequences. *Mass. Ass'n of Older Ams. v. Sharp*, 700 F.2d 749, 753 (1st Cir. 1983). That loss of care also directly harms the public fisc by increasing the cost of uncompensated care that Plaintiff States must cover. Ex. 3 ¶¶73-74; Ex. 4 ¶56. Because an injunction is necessary to prevent these harms, the States have satisfied the second factor for preliminary relief.

### B. The balance of equities and public interest favor preliminary relief.

The balance of equities and public interest—which "merge when the [g]overnment is the opposing party," *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009))—also support preliminary relief. Most critically, by making it more difficult for members to establish compliance with, or an exclusion from, the Work Requirement, the Challenged Provisions will deprive many low-income enrollees of health insurance, threatening their ability to obtain medical care. Ex. 4 ¶46; Ex. 17 ¶9. The loss in coverage will also adversely affect public health more generally, as Medicaid enrollment helps limit the spread of communicable illnesses. Ex. 5 ¶58; Ex. 10 ¶71. And an increase in the uninsured population will saddle healthcare providers with uncompensated care costs. Ex. 3 ¶¶73-74; Ex. 7 ¶68.

By contrast, a preliminary injunction imposes no cognizable harms on Defendants. The Federal Government has long reimbursed Plaintiff States for their Medicaid costs without imposing the IFR's unlawful requirements. A preliminary injunction would "simply preserve[] the status quo," which only "underscore[s] the lack of any substantial injury" on the Government's behalf. *Am. Hosp. Ass'n v. Kennedy*, 164 F.4th 28, 36–37 (1st Cir. 2026); *D.V.D. v. U.S. Dep't of Homeland Sec.*, 784 F. Supp. 3d 401, 408 (D. Mass. 2025) (in the First Circuit, the status quo is "the last uncontested status which preceded the pending controversy").

Because Defendants cannot complain of an injunction that merely bars them from imposing conditions that did not exist a month ago, and because Plaintiff States suffer significant and

19

irreparable injury in the absence of relief, these factors favor both an injunction maintaining the status quo and a stay of the IFR to "prevent irreparable injury," 5 U.S.C. §705.[12]

### III.    THE COURT SHOULD ENJOIN ENFORCEMENT OF THE NOTICE DEADLINE.

In addition to enjoining the Challenged Provisions, Plaintiff States request that this Court enjoin the Secretary from penalizing them for any failure to meet the statutory deadline for notifying enrollees how they can demonstrate compliance with the Work Requirement. 42 U.S.C. §1396a(xx)(8)(A). But CMS has introduced substantial uncertainty into the process by abandoning its previous representations and adopting regulations that conflict with H.R. 1. As a result, even if this Court issues a ruling by July 31, some States may require a slightly longer lead time to finalize and issue notices in line with the Court's ruling. Ex. 9 ¶45.  Accordingly, CMS should not now be allowed to "penaliz[e]" Plaintiff States for their "good-faith reliance on the agency's prior positions." *Shenzhen Youme Info. Tech. Co. v. FDA*, 147 F.4th 502, 513 (5th Cir. 2025); *see also United States v. Alvarez*, 987 F.2d 77, 86 (1st Cir. 1993) (when the government is responsible for surprising a party, it "should not benefit from its own violation of [the law]"). Such an order accords with this Court's "broad [equitable] powers," *Northwest Env't Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 680–81 (9th Cir. 2007), to fashion "complete relief between the parties." *Trump v. CASA, Inc.*, 606 U.S. 831, 851 (2025).

### CONCLUSION

The Court should preliminarily enjoin Defendants from applying and enforcing the Challenged Provisions as to the Plaintiff States.

---

[12] For similar reasons, the Court should not require payment of a bond. *See Int'l Ass'n of Machinists & Aerospace Workers v. E. Airlines, Inc.*, 925 F.2d 6, 9 (1st Cir. 1991) (court has discretion whether to require a bond).

20

Dated: June 29, 2026                                  Respectfully submitted,

**ANDREA JOY CAMPBELL**                               **ROB BONTA**
*Attorney General of Massachusetts*                   *Attorney General for the State of California*

By: */s/ Nita Kumaraswami Klunder*                    By: */s/ Anna Rich*
Nita K. Klunder (BBO No. 689304)                      Neli N. Palma
  *State Trial Counsel*                               *Senior Assistant Attorney General*
Ethan W. Marks (BBO No. 690746)                       Kathleen Boergers*
  *Deputy Chief, Health Care Division*                *Supervising Deputy Attorney General*
Katherine D. Kearns (BBO No. 707105)                  Anna Rich*
Julia S. Canney (BBO No. 717328)                      Ketakee Kane*
  *Assistant Attorneys General*                       *Deputy Attorneys General*
One Ashburton Place                                   1515 Clay Street
Boston, MA 02108                                      Oakland, CA 94612
(617) 963-2394                                        510-879-0296
nita.klunder@mass.gov                                 Anna.Rich@doj.ca.gov
*Attorneys for the Commonwealth of*                   *Attorneys for the People of the State of*
*Massachusetts*                                       *California*


**JENNIFER DAVENPORT**                                **KRISTIN K. MAYES**
*Attorney General of New Jersey*                      *Attorney General of Arizona*

By*: /s/ Shankar Duraiswamy*                          By*: /s/ Joshua A. Katz*
Shankar Duraiswamy*                                   Joshua A. Katz*
*Deputy Solicitor General*                            *Assistant Attorney General*
Samuel Dolinger*                                      2005 N. Central Ave.
*Assistant Attorney General*                          Phoenix, AZ 85004
Geoffrey McGee*                                        (602) 542-8053
Jake Mazeitis*                                        Joshua.Katz@azag.gov
*Deputy Attorneys General*                            *Attorney for the State of Arizona*
124 Halsey St.
Newark, NJ 07101
(609) 649-1019
Shankar.Duraiswamy@njoag.gov
*Attorneys for the State of New Jersey*

21

**PHILIP J. WEISER**
*Attorney General for the State of Colorado*

By: */s/ Ryan Lorch*
Ryan Lorch*
Sarah H. Weiss*
*Senior Assistant Attorneys General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Ryan.Lorch@coag.gov
Sarah.Weiss@coag.gov
*Attorneys for the State of Colorado*

**KATHLEEN JENNINGS**
*Attorney General of the State of Delaware*

By: */s/ Vanessa L. Kassab*
Ian R. Liston*
*Director of Impact Litigation*
Robin L. Jacobs
*Assistant Attorney General*
Vanessa L. Kassab*
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for the State of Delaware*

**ANNE E. LOPEZ**
*Attorney General for the State of Hawaiʻi*

By: */s/ Kalikoʻonālani D. Fernandes*
Kalikoʻonālani D. Fernandes*
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorney for the State of Hawaiʻi*

**WILLIAM TONG**
*Attorney General of Connecticut*

By: */s/ Patricia E. McCooey*
Patricia E. McCooey*
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5210
Patricia.McCooey@ct.gov
*Attorney for State of Connecticut*

**BRIAN L. SCHWALB**
*Attorney General of the District of Columbia*

By: */s/ Nicole S. Hill*
Nicole S. Hill*
*Assistant Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth Street NW
Washington, D.C. 20001
(202) 727-4171
Nicole.Hill@dc.gov
*Attorney for District of Columbia*

**KWAME RAOUL**
*Attorney General of Illinois*

By: */s/ Katharine Roller*
Katharine Roller*
Complex Litigation Counsel
Emily Hirsch*
Assistant Attorney General
115 S. LaSalle St
Chicago, IL 60603
773-519-1842
Katharine.roller@ilag.gov
Emily.hirsch@ilag.gov
*Attorneys for the State of Illinois*

Case 1:26-cv-12962-DLC    Document 3    Filed 06/29/26    Page 29 of 32

**OFFICE OF THE GOVERNOR ex rel. ANDY BESHEAR**
*In His Official Capacity as Governor Of The Commonwealth Of Kentucky*

*/s/    S. Travis Mayo*
S. Travis Mayo*
*General Counsel*
Sam Flynn*
*Chief Deputy General Counsel*
Laura C. Tipton*
*Deputy General Counsel*
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov
*Attorneys for the Office of the Governor*

**AARON M. FREY**
*Maine Attorney General*

By: */s/ Katherine W. Thompson*
Katherine W. Thompson*
*Special Counsel*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Kate.thompson@maine.gov
*Attorney for the State of Maine*

**ANTHONY G. BROWN**
*Attorney General of Maryland*

*/s/ Michael Drezner*
Michael Drezner*
*Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6959
Mdrezner@oag.state.md.us
*Attorney for the State of Maryland*

**DANA NESSEL**
*Attorney General of Michigan*

By: */s/ Neil Giovanatti*
Neil Giovanatti*
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
*Attorney for the State of Michigan*

23

**KEITH ELLISON**
*Attorney General of Minnesota*

By: */s/Katherine Bies*
Katherine Bies*
*Assistant Attorney General*
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us
*Attorney for the State of Minnesota*

**RAÚL TORREZ**
*Attorney General Of New Mexico*

By: */s/ Anjana Samant*
Anjana Samant*
*Deputy Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
(505) 270-4332
asamant@nmdoj.gov
*Attorney for the State of New Mexico*

**JEFF JACKSON**
Attorney General of North Carolina
By: */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
*Associate Deputy Attorney General*
Laura Howard
*Chief Deputy Attorney General*
114 W. Edenton St.,
Raleigh, NC 27603
(919) 716-6026
dmosteller@ncdoj.gov
*Attorneys for the State of North Carolina*

**AARON D. FORD**
*Attorney General of Nevada*

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland*
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-8727
kireland@ag.nv.gov
*Attorney for the State of Nevada*

**LETITIA JAMES**
*Attorney General for the State of New York*

By: */s/ Morenike Fajana*
Morenike Fajana*
*Special Counsel*
Rabia Muqaddam*
*Chief Counsel for Federal Initiatives*
28 Liberty Street
New York, NY 10005
(347) 931-3187
Morenike.fajana@ag.ny.gov
*Attorneys for the State of New York*

**DAN RAYFIELD**
*Attorney General of Oregon*

By: */s/ Scott P. Kennedy*
Scott P. Kennedy*
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Scott.Kennedy@doj.oregon.gov
*Attorney for the State of Oregon*

24

**JOSH SHAPIRO**
*Governor of the Commonwealth of Pennsylvania*

By: */s/ Jacob B. Boyer*
Jennifer C. Selber*
*General Counsel*
Jacob B. Boyer*
*Deputy General Counsel*
Office of General Counsel
30 North Street, Suite 200
Harrisburg, PA 17101
717-460-6786
jacobboyer@pa.gov
*Attorneys for the Governor of the Commonwealth of Pennsylvania*

**PETER F. NERONHA**
*Attorney General of Rhode Island*

By: */s/ Julia C. Harvey*
Julia C. Harvey*
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400
jharvey@riag.ri.gov
*Attorney for the State of Rhode Island*

**CHARITY R. CLARK**
*Attorney General for the State of Vermont*

By: */s/ Ryan Patrick Kane*
Ryan Patrick Kane*
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
Ryan.kane@vermont.gov
*Attorney for the State of Vermont*

**JAY JONES**
*Attorney General for the Commonwealth of Virginia*

/s/ *Megan C. Keenan*
Megan C. Keenan*
*Deputy Solicitor General*
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us
*Attorney for Commonwealth of Virginia*

25

**NICHOLAS W. BROWN**
*Attorney General State of Washington*

By: */s/ Tyler Roberts*
Tyler Roberts*
*Assistant Attorney General*
William McGinty*
*Deputy Solicitor General*
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206)-464-7744
Tyler.Roberts@atg.wa.gov
William.McGinty@atg.wa.gov
*Attorneys for State of Washington*

**JOSHUA L. KAUL**
*Attorney General for the State of Wisconsin*

By: */s/ Faye Hipsman*
Faye Hipsman*
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
faye.hipsman@wisdoj.gov
*Attorney for State of Wisconsin*

*pro hac vice forthcoming

26