# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al., | Case No. __-_____ |
| Plaintiffs, | |
| v. | |
| MEHMET OZ, M.D., et al., | |
| Defendants. | |

**DECLARATION OF PATRICIA DENNIS**

I, Patricia Dennis, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

**BACKGROUND**

1. I am a resident of Arizona. I am over the age of 18 and have personal knowledge, or knowledge based on review in my capacity as AHCCCS Assistant Director of the Division of Member and Provider Services and serving as the agency's Executive Sponsor of H.R. 1 of information and records gathered by the Arizona Health Care Cost Containment System (AHCCCS) and agency staff, of the matters set forth below. If called as a witness, I could and would testify competently to the matters set forth below.

2. On June 1, 2026, the Centers for Medicare & Medicaid Services (CMS) published an Interim Final Rule with Comment Period (IFR) implementing the community engagement (work requirement) provisions of P.L. 119-21 (H.R. 1), Section 71119. This rule is effective July 31, 2026. H.R. 1 requires the state to implement the community engagement provisions by January 1, 2027, and the January 1 effective date is unchanged by the IFR.

3. AHCCCS has invested nearly a year and many thousands of staff hours to comply with and implement H.R.1 and to design an implementation plan based on H.R. 1's plain text and CMS continuing guidance, including CMS's December 2025 Informational Bulletin

and multiple representations by CMS officials that states would retain broad flexibility in key areas so long as they complied with the requirements in statute.

4. The IFR materially departs from, and conflicts with, the statute and the guidance continuously communicated by CMS prior to the IFR, frustrating AHCCCS' extensive work to support and implement H.R. 1's work requirements.

**THE IFR'S MEDICAL FRAILTY EXEMPTION & RESTRICTIONS ON SELF-ATTESTATIONS**

5. Section 71119 of H.R.1 exempts "medically frail" individuals from community engagement requirements. Congress identified particular conditions and disorders that would constitute medical frailty, but did not require states to verify functional impairment in addition to the specified condition and disorder, except for individuals with "physical, intellectual, or developmental disability," which Congress also required must "significantly impair[] their ability to perform one or more activities of daily living."

6. Prior to June 2026, CMS repeatedly advised states that the agency would *not* further define medical frailty beyond the statutory categories, and specifically cautioned states against using the more restrictive Alternate Benefit Plan (ABP) definition.[1]

7. Since July of 2025, AHCCCS relied on the statutory language and CMS's continuing representations in seeking implementation funding from the Arizona legislature, and in developing and structuring its implementation planning and system architecture. Prior to the IFR, AHCCCS's implementation plan used standalone International Classification of Diseases, 10th Revision (ICD-10) and other diagnostic codes and indicators, without the need for complex secondary qualifiers or resource-intensive, manual clinical adjudication.

8. From H.R. 1's passage in July 2025 through present, AHCCCS procured and paid its vendors, and invested extensive employee resources in its specific implementation architecture which includes: The ICD-10-based medical frailty determination framework; a self-attestation-forward verification workflow; and IT systems built to a unified eligibility workflow.

9. Although the IFR's most restrictive verification requirements do not take effect until January 1, 2028, the required re-engineering of AHCCCS's verification workflows cannot be deferred to the 2027 planning cycle. Planning, procurement, system design, development and testing for the 2028 overhaul must proceed concurrently with the

---

[1]The ABP standard requires conditions that are serious *and* complex, where H.R. 1 uses the disjunctive serious *or* complex, setting a less restrictive statutory standard.

January 2027 implementation build, creating resource conflicts across IT, contracting, and staffing that neither the 2027 nor 2028 timeline can absorb independently.

10. There is significant risk that AHCCCS will not be able to comply with the new, unanticipated, and prescriptive requirements of the IFR, for several reasons, including the following:

a. **Medical Frailty Infrastructure (New Workstream).** The IFR's functional-impairment screen requires AHCCCS to build from scratch: (a) a validated, auditable list of qualifying diagnoses with associated impairment thresholds; (b) an individualized review process for unlisted conditions; (c) a provider attestation workflow capable of capturing documentation of how a specific condition limits an individual's ability to meet the 80-hour per month standard; and (d) IT logic linking billing codes to functional severity data not currently captured in claims. None of these particular areas were specified in H.R.1 and none of these systems currently exist in the AHCCCS systems to implement H.R. 1. None are in current contract scopes, IT specifications, or staffing authorizations.

b. Because the IFR was not published until June 1, 2026, AHCCCS did not–and could not–seek funding for these requirements, and was not appropriated funding for them in the state budget signed into law on June 13, 2026. Initial estimates to complete these requirements exceed $16 million in addition to the agency's appropriation for FY2027, driven by staffing demands and system design costs.

c. **Urgent Deadlines.** AHCCCS faces several urgent deadlines with respect to implementing community engagement requirements. AHCCCS must apply community engagement requirements to applications and renewals as of January 1, 2027, and to do this, AHCCCS must substantially finalize eligibility system requirements by July 30, 2026, in order to enable development and appropriate testing from August to November for final deployment on December 10, 2026. After July 30, 2026, AHCCCS has limited ability to make further system changes for use by January 1, 2027.

d. **Notice Requirement.** AHCCCS is statutorily required to provide notice to members regarding community engagement requirements on or before September 1, 2026. 42 U.S.C. 1936a(xx)(8)(A) (directing States to begin outreach no later than four or more months before December 31, 2026). At present, AHCCCS is uncertain as to how, for example, a member might establish that they are medically frail in light of the new functional impairment requirements introduced for the first time by the IFR. AHCCCS intended to use existing known claim and encounter data with an ICD-10-based medical frailty determination framework to appropriately notify members who meet the medically frail criteria that additional

actions would not be needed by such individuals to demonstrate compliance. This process will no longer be an option in light of the IFR and accordingly, AHCCCS cannot provide clarity in the required notice to medically frail members about compliance with the new IFR requirements.

e. **IT and Operations Re-architecture For Bifurcated Eligibility Workflow.** The IFR, for the first time since enactment of H.R.1, establishes a mandatory three-step sequential eligibility determination process[2] with distinct data inputs, verification standards, and notice requirements at each step. A determination made before working through each separate and distinct step produces a potential procedural error subject to appeal and audit disallowance, and which would not be correctable.

f. In reliance on H.R.1 and CMS communications and guidance preceding the IFR, AHCCCS' current determination framework does not direct members through three separate and distinct steps, and therefore does not provide the audit trail or notice that the IFR appears to require. Complying with the new framework established by the IFR would require AHCCCS staff to expend thousands of additional hours and resources to perform eligibility determinations consistent with the IFR.

g. The IFR's proposed process adds considerable complexity to AHCCCS's Requests for Information (RFI) and decision letters[3] because the IFR requires more dependencies and variables to generate compliant letters.This added complexity arises from the IFR's requirement that notices reflect a prescribed, multi-step sequential determination process with distinct verification standards and outcomes at each stage. Compliance with these requirements necessitates the development of system logic to account for multiple conditional variables and to generate legally compliant notice content, requiring substantial system reprogramming and extensive testing to ensure accuracy and prevent erroneous

---

[2] The IFR requires states to process the adult expansion population through three sequential separate and distinct eligibility steps before determining whether an individual meets the requirements through qualifying activities and finally reaching a coverage decision: First, determine whether the individual is categorically excluded from community engagement requirements; second, determine whether the individual is an applicable individual subject to those requirements, and third, determine whether a mandatory exception or hardship exemption applies. *See* 42 CFR 435.558(b)(2).

[3] Requests for Information (RFIs) are formal written notices issued by the agency requesting additional information or verification necessary to complete an eligibility or compliance determination. Decision letters are official written notices communicating the agency's determination, including eligibility, exemption, or compliance status, and any associated rights to appeal, consistent with applicable Medicaid notice and fair hearing requirements.

eligibility determinations or improper adverse actions. These provisions prescribe operational steps for applying the policy, which is normally at the discretion of the state to ensure states can operationalize policies in a way that best meets the unique populations and needs of each state.

h. To put the impact of the IFR into context, Arizona estimates that more than 429,000 adult expansion members, including an estimated 250,000 "applicable individuals" will be subject to the new community engagement requirements under H.R. 1. Of the 250,000 "applicable individuals," approximately 29% of members (about 72,000 members) are estimated to already lack sufficient claims history for the preceding 12 months required under the IFR for ex parte medical frailty determinations and will have to obtain provider documentation to establish eligibility for an exemption.

i. It is estimated that more than 70% of "applicable individuals" have substantial claims histories under H.R. 1 to support determinations of medical frailty, but the IFR now makes those histories insufficient. As a result of the IFR, which requires functional impairment verification in addition to the existence of a qualifying medical condition, AHCCCS and the affected individuals must now obtain additional documentation establishing a dual requirement: both the existence of a medical condition *and* the resulting functional impairment that limits compliance with community engagement requirements.

j. Arizona's claims data suggest approximately 34% of "applicable individuals" had 25 or more claims in the past 12 months and 10% had more than 100 claims. Thus, nearly half of "applicable individuals" have moderate to high healthcare utilization and are therefore more likely to have significant chronic conditions, functional limitations, or complex care needs. These individuals would likely have been among the populations AHCCCS would have categorized as medically frail without additional documentation.

k. The IFR now shifts the burden of proof for establishing inability to meet the community engagement requirements onto these individuals, who may already face significant health barriers. As a result, the IFR will likely require hundreds of thousands of Arizonans to obtain additional clinical documentation which is anticipated to substantially increase administrative costs, create delays in exemption determinations, and elevate the risk that medically frail individuals are hindered in reasonably satisfying community engagement requirements.

l. **Arizona Providers Cannot Complete Additional Documentation to Establish Medical Frailty.** On May 4, 2026, AHCCCS convened a daylong workshop on medical frailty with 75 chief medical officers and other leaders from Arizona's

Medicaid health plans, large hospital systems, rural and community hospitals, community health centers, non-profit social service organizations, behavioral health providers, and county health departments. Leadership from most Arizona healthcare associations were in attendance, including the Arizona Alliance for Community Health Centers, Arizona Association of Health Plans, Arizona Council of Human Service Providers, Arizona Healthcare and Hospital Association, Arizona Nurses Association, and the Health System Alliance of Arizona.

m. After seven hours of discussion, the healthcare leaders in attendance unanimously agreed that it was not practical or feasible for Arizona healthcare providers to be asked to fill out documentation for hundreds of thousands of Arizonans seeking to establish or maintain Medicaid eligibility. Providers conveyed concerns about capacity, liability risks, and patient expectations that could give rise to conflicts or dual relationships.

n. Providers also raised significant concerns about workforce shortages in almost every health profession, and what this additional burden could do to already lengthy wait times.

o. **Verification Changes Create a Second Competing Modernization Effort.** The IFR's new verification requirements effective January 1, 2028, do not align with the 2027 implementation. Compliance with the 2028 requirements will require extensive reprogramming of eligibility systems, building multimodal document intake and retention infrastructure, and training thousands of eligibility workers, providers, and community assistors on distinct categories with different verification standards. Because planning and development must begin now, AHCCCS faces two overlapping modernization initiatives with substantively different requirements competing for the same staff, funding, and vendor capacity and operational resources. Neither implementation timeline was designed to accommodate concurrent modernization efforts of this scale, creating significant execution risk and pressure on timelines that were not designed to run concurrently. Both of these efforts are also competing with AHCCCS's mainframe modernization project, which must be completed during the same time period, and has been planned for almost a decade. Unlike the Affordable Care Act implementation, which AHCCCS had four years to complete, the IFR requires

AHCCCS to build and implement two distinct and separate complex eligibility processes within a six-month period.

**THE IFR'S IMPLEMENTATION FAILURES EXPOSE ARIZONA TO SIGNIFICANT COMPLIANCE AND AUDITING RISK AND FEDERAL FINANCIAL PENALTIES**

11. The IFR introduces new eligibility categories, new documentation requirements, and a new verification sequence, each of which creates new and independent sources of error for Payment Error Rate Measurement (PERM) reviewers or other auditors.

12. CMS has not supplied AHCCCS with adequate documentation, system controls, reliable data sources, or complete federal guidance to ensure AHCCCS has the necessary information and adequate advance notice needed in order to become audit compliant.

13. AHCCCS cannot build a PERM or audit-compliant determination methodology for two distinct eligibility processes (2027 and 2028), on a six-month timeline. This timeframe does not permit the systems planning, design and development, staff training, and operational testing and validation necessary to demonstrate adequate documentation and quality controls.

14. Arizona is among the first cohort of states for which payment error rates will be measured against the IFR's new requirements under the PERM Review process, considerably increasing Arizona's particular audit risk in an evolving and transformational process.

15. The IFR narrows the practical value of whatever good faith effort extension relief remains. The rule indicates that CMS expects to grant only short extensions (up to six months) and only to states that demonstrate "meaningful progress" with implementation in 2026, at the discretion of the HHS Secretary. But CMS did not define "meaningful progress."

16. Given the added complexity and the unreasonable time in which the agency must comply, AHCCCS faces a heightened risk of compliance and auditing errors.

Signed this 28th day of June, 2026.

*/s/ Patricia Dennis*

The paper document bears my original signature.