EXHIBIT 2

I, Yingjia Huang, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.     I am a resident of California. I am over the age of 18 and have personal knowledge, or knowledge based on review in my capacity as Deputy Director of Health Care Benefits and Eligibility of information and records gathered by the California Department of Health Care Services ("DHCS") and its staff, of the matters set forth below. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional and Agency Background**

2.     I am currently employed by the California Department of Health Care Services as Deputy Director of Health Care Benefits and Eligibility (HCBE) I have held the Deputy Director position since April 1, 2025. As Deputy Director, I am responsible for the development and implementation of a portfolio of programs, which includes benefits and eligibility policies for the Medi-Cal program. Prior to my appointment as Deputy Director, I served as Assistant Deputy Director of HCBE since 2021 and was formerly the Assistant Division Chief of the Medi-Cal Eligibility Division from 2018 to 2021. Throughout this time, I led the implementation of Medi-Cal eligibility policies across the Medi-Cal program, providing direct oversight and monitoring over all Medi-Cal eligibility policy and system operations as it relates to the administration of the Medi-Cal program.

3.     DHCS is the single state agency authorized to administer California's Medicaid program under Title XIX of the federal Social Security Act, referred to in California as "Medi-Cal." Medi-Cal provides low-income individuals with comprehensive healthcare coverage and access to affordable, integrated, high-quality healthcare at no or low cost. Medi-Cal's coverage

includes medical, dental, mental health and substance use treatment, long-term services and supports, and long-term care. Medi-Cal's mission is to improve the overall health and well-being of all Californians.

4. Medi-Cal insures over 14 million people, providing health coverage to children, families, and older adults—including some of the most vulnerable residents in the state, such as those experiencing homelessness, living with a disability, or who have a serious or complex medical condition.

5. California administers the Medi-Cal program pursuant to federal law and regulations as well as the terms of its federally approved State Plans and Section 1115 Demonstration Project. Medi-Cal receives federal Medicaid and Children's Health Insurance Program (CHIP) funding, known as "Federal Financial Participation" (FFP), which covers a projected average of 61% of Medi-Cal's expenditures on eligible enrollees based on State Fiscal Year 2026-2027 data.

**Medicaid Expansion in California**

6. On January 1, 2014, California implemented Medicaid expansion under the Affordable Care Act (the "ACA"). This expansion extended federally funded comprehensive health insurance to low-income adults aged 19 to 64 with household incomes up to 133% of the Federal Poverty Level, known as the Affordable Care Act Expansion group.

7. Enrollees in the Affordable Care Act Expansion group receive full, comprehensive benefits that include hospital care, prescription drugs, mental health services, dental, family planning, and preventive care. Currently, eligibility for the Affordable Care Act Expansion group requires that an individual (1) be an adult 19-64 years old; (2) be an individual with satisfactory immigration status; and (3) have household income less than or equal to 133% of the Federal

Poverty Level (or 138% if the state chooses to include an optional 5% income disregard). California elected to expand Medi-Cal to households with income less than or equal to 138% of the Federal Poverty Level.

8. As of January 2026, approximately 4.7 million Medi-Cal members are enrolled in the Affordable Care Act Expansion group. For the upcoming 2026-2027 state fiscal year, the state is projected to receive approximately $42,482,000,000 in FFP funding for the Affordable Care Act Expansion group.

**CMS's Pre-IFR Guidance to California**

9. My staff and I at DHCS have been closely following enactment and implementation of H.R. 1, in particular Section 71119, which imposes novel work or community engagement requirements for adults covered under the Medicaid expansion provisions of the ACA (the "work and community engagement requirements").

10. Prior to the enactment of H.R. 1, the Medicaid program has never required financially eligible individuals to work, volunteer, or meet other community engagement requirements to establish Medicaid eligibility. Consequently, Medi-Cal does not have in place systems by which to verify work, volunteer, or other community engagement activities.

11. Since November 2025, CMS has been providing guidance on expected work and community engagement requirements policy. On November 19, 2025, CMS presented a slide deck on work and community engagement requirements, which was later provided to states on December 4, 2025.

12. CMS has a practice of providing guidance to states, outside of formal rulemaking, to assist states in complying with urgent and significant changes in federal Medicaid law. In the absence of regulations, California has for many years relied on CMS guidance, and the associated

3

slide decks and other materials, to determine how to comply with new laws, implement operational, system, and process changes, and, ultimately, avoid financial penalties that those laws imposed for noncompliance.

13. California likewise relied on the guidance shared by CMS concerning H.R. 1, and I understand that other states did as well. Regarding the definition of medical frailty, CMS indicated that it intended to "use a definition … similar to that described in regulations at 42 CFR § 440.315(f)," which is a regulation whose language closely resembles the H.R. 1 language. CMS also stated that it expected to allow verification of medical frailty through "medical claims data review or provider documentation, or completion of a screening tool."

14. At no point between the passage of H.R. 1 in July 2025 and the promulgation of the Interim Final Rule in June 2026 did CMS indicate that it would require "medically frail" individuals also to have a significant impairment to their ability to comply with the work and community engagement requirements. Nor did CMS indicate that states would need to verify that a member had such a significant impairment when determining eligibility for the medical frailty exclusion.

15. Regarding use of self-attestation to verify medical frailty, while initially CMS signaled that only limited use of self-attestation would be permitted, CMS later indicated on or around March 2026 that self-attestation would be an acceptable verification method when data was not available.

16. In March 2026, CMS reiterated that states may use auditable self-attestation in the absence of claims data. CMS specifically noted that states could use such an auditable self-attestation "*to confirm ongoing medical frailty*" in addition to when a member newly identifies as medically frail. CMS also noted that States should be able to reassess individuals for medical frailty

at redetermination, *even without extensive claims history*, based on new information such as a major life event. At no point did CMS indicate members would be limited to only one self-attestation per enrollment period, even if they developed multiple sequential medical frailty conditions.

17. On Friday, May 1, 2026, during the work and community engagement requirements workgroup call, CMS showed states a slide deck that included a definition of the medical frailty exclusion. These slides did not mention any requirement that an individual's medically frail condition would need to impair their ability to comply with work and community engagement requirements.

18. On or about Wednesday, May 6, 2026, CMS informed states that information conveyed on the Friday, May 1, 2026, call should not be acted upon, and was subject to change.

19. In response to this and concerns that CMS would change its policy direction related to work and community engagement, Medi-Cal sent an email to CMS on May 27, 2026, conveying Medi-Cal's concerns with limiting the definition of medically frail and the use of self-attestation. (See *May 20 Email to CMS from DHCS*, Exhibit A.)

**CMS Issues the Interim Final Rule**

20. On June 1, 2026, CMS promulgated the Interim Final Rule ("IFR") relating to the work and community engagement requirements. The IFR includes several surprising provisions that are vague, differ substantially from CMS's prior guidance, and are more restrictive than statutory language. These provisions also will be very challenging and costly for Medi-Cal to implement before January 1, 2027, and are expected to cause significant harm to members and Medi-Cal once implemented. These provisions include the following:

5

*Medically Frail Definition*

21.     With respect to the medically frail exclusion, the IFR added a new requirement that, in addition to falling into one of the five categories enumerated in H.R. 1, a "medically frail" individual must *also* be "an individual whose physical, mental, or other behavioral health condition significantly impairs the individual's ability to comply with the work and community engagement requirements." 42 CFR § 435.554(c)(5)(i).

22.     This "significant impairment" requirement does not exist in the text of H.R. 1 Section 71119. *See* Social Security Act § 1902(xx)(9)(A)(ii)(II)(V) [42 U.S.C. 1396a(xx)(A)(ii)(II)(V)]. In a webinar and slide deck presented to state Medicaid agencies on June 9, 2026, CMS acknowledged that, in addition to the statutory requirement that an individual meet the definition of medically frail supplied by Congress in section 71119, as codified at, 42 U.S.C. § 1396a(xx) (section 1902(xx) of the Social Security Act), the IFR also requires that the individual be significantly impaired in their ability to comply with community engagement requirements in order to be considered medically frail. CMS cited no statutory basis for this second, new requirement.

23.     Additionally, the "significant impairment" requirement was not mentioned in any CMS written or verbal guidance before the IFR was published, up to and including the CMS guidance about medical frailty provided to states as recently as May 1, 2026.

24.     The IFR provides very little concrete guidance for states about how to verify whether an individual meets this new "significant impairment" requirement. However, the IFR does indicate that, in general, states *cannot* rely solely on diagnosis or condition codes, because doing so "would risk sweeping in individuals whose conditions do not significantly impair their functional capacity." 91 Fed. Reg. 33,373 (June 3, 2026). This is in direct conflict with prior

6

guidance provided by CMS that states may use claims-based data to verify whether an individual meets the medical frailty exemption in general. Instead, the IFR says that states should verify medical frailty using information from "multiple domains," to determine a member's "condition[s], utilization of services … and their level of impairment." 91 Fed. Reg. 33,406 (June 3, 2026). It also suggests that states could use "algorithms using administrative claims data that assign acuity scores to individuals," *id.*, but does not explain what administrative data a state can use or what would be an acceptable analysis of such data.

25.     Since the IFR's release, CMS has told states that it is developing significantly more guidance on the medically frail exclusion. However, this guidance has not yet been provided.

*Self-Attestation*

26.     Unlike the guidance provided by CMS through fall 2025 and spring 2026, which indicated that an "auditable self-declaration" could generally be used when reliable data was unavailable, *see supra* ¶¶ 15-16, the IFR significantly limits the occasions when an individual may rely on self-attestation to demonstrate compliance with work and community engagement requirements. It does so using a complex and limiting framework (that changes again after the first year of implementation) that will be harmful for members and difficult to implement.

27.     Thus, the IFR significantly limits members' ability to self-attest to work and community engagement eligibility factors after January 1, 2028. Of note, several work and community engagement eligibility factors are ones where documentation is unlikely to be available, such as whether a parent provides "some level of care" to their child (42 CFR § 435.554(a) (definition of "parent")); or the precise number of hours that a family caregiver provides assistance to a child or disabled individual (42 CFR § 435.554(c)(3)(i)(C)).

28. Under Section 1902 of the Social Security Act and 42 CFR § 435.916, state Medicaid agencies are required to periodically (at least annually) conduct a complete redetermination of an individual's Medicaid eligibility, commonly called a "renewal" or "renewal cycle." The Social Security Act does not recognize a "period of enrollment." That concept is used in a way that hinders states' operational efficiencies, puts medically at-risk members in danger of losing Medicaid coverage, and treats patients differently based on when in this period their medical impairment may arise.

29. A renewal cycle lasts at most 12 months (or when section 71107 of H.R. 1 takes effect, 6 months for certain individuals). In contrast, under the IFR's newly introduced construct, a period of enrollment can last several renewal cycles as long as the individual remains enrolled in Medicaid.

30. Under 42 CFR § 435.916, a renewal of Medicaid eligibility is a *de novo* review of all eligibility factors, except where prohibited to protect member eligibility (e.g., Medicaid agencies cannot require an individual to reverify citizenship under 42 CFR § 435.956(a)(4)(ii)). However, the IFR creates different sets of rules that the state must apply in conducting eligibility determinations related to the work and community engagement requirements based on whether an individual is within a period of enrollment and whether, during that period, the individual has previously submitted a self-attestation. This distinction on when self-attestation can be used exacerbates the operational complexity the state faces in implementing the requirements with fidelity and increases the risk of confusion on the part of the members.

31. Prior to the IFR and the introduction of the new concept of a "period of enrollment," the use of self-attestation or a failure to verify an eligibility factor in a previous renewal cycle would not adversely impact an individual in their current renewal.

32.     Furthermore, there is no lockout period or other prohibition on reapplying for Medicaid after an individual has been disenrolled for failure to verify compliance with or exemption from the work and community engagement requirements. Therefore, an individual who is prohibited from self-attesting to medical frailty for a second time in the same enrollment period and is subsequently terminated because the individual cannot verify medical frailty, can reapply once fully disenrolled and use self-attestation again at the start of a new period of enrollment. As such, the IFR will likely increase disruptions to an individual's continuity of healthcare, increase costs and complexity to the state in implementing the rule, and, at the same time, fails as a meaningful work incentive or program integrity measure.

*Data Feed Integration*

33.     The IFR places very broad requirements on states to identify reliable data sources for verifying work and community engagement eligibility factors. The IFR requires Medicaid agencies to use "reliable information available to the State" to verify eligibility, which it defines as "information necessary for determining [work and community engagement requirements] eligibility to which the agency has access *or should have access*." 42 CFR § 435.557(b) (emphasis added). The IFR thus appears to require states to seek out and, where feasible, incorporate data sources for every factor of work or community engagement, even though such factors are numerous, have non-centralized data, and often relate to areas that Medicaid agencies have never assessed before, such as school attendance, community volunteer work, and job program enrollment. While CMS has previously indicated there would be a phased approach to adding data sources, *see* 11/19/2025 CMS slide deck pg. 28, the new regulation does not expressly permit this.

*Short-term Hardship Exceptions*

34. H.R. 1 allows States to apply exceptions for certain short-term hardship events. These short-term hardship events include receiving inpatient medical services, residing in a county where an emergency or disaster has been declared by the President or where there is high unemployment, or traveling outside one's community for necessary medical services. *See* 42 U.S.C. § 1396a(xx)(3)(B).

35. The IFR provides that the short-term hardship exception requires a new applicant to demonstrate the exception "for at least one, but not more than 3 consecutive months, as specified in the State plan, *immediately preceding the month of application*." 91 Fed. Reg. 33473 (emphasis added). An applicant cannot demonstrate the exception for the same month in which they apply to Medicaid.

36. This requirement ensures that newly eligible individuals experiencing hardship events will have to wait at least until the start of the following month to receive necessary coverage, likely foregoing necessary care in the meantime or further straining our emergency health care system.

*Other*

37. Several of the timelines set out in the IFR do not take account of the fact that providers have 12 months to submit claims data. For determinations that are supposed to be made regarding the preceding year, Medi-Cal may not even have the relevant claims data. Once again, this provision will increase the risk of coverage loss for otherwise eligible individuals.

**DHCS's Efforts to Implement the Work and Community Engagement Requirements Before and After the IFR Issued**

38.     Immediately following the enactment of H.R. 1, DHCS recognized that it would be extraordinarily challenging to complete the necessary system and process changes required by the August 31, 2026, notice deadline and January 1, 2027, implementation dates, given the magnitude of changes needed to implement the work and community engagement requirements and the short period of time afforded by H.R. 1. Therefore, immediately after H.R. 1 was passed in July 2025, DHCS began immediate work to prepare to comply with work and community engagement requirements.

39.     Beginning in August 2025 and continuing until the release of the IFR, DHCS based its policy and system determination on the statutory language and the subregulatory guidance provided by CMS, as detailed above. Based on this guidance, DHCS has already done the following:

- DHCS released an All County Welfare Director's Letter (ACWDL) 25-30 (December 30, 2025) that provides preliminary guidance on work and community engagement requirements for California's 58 local county offices.

- DHCS helped develop an end-to-end system design in the California Healthcare Eligibility, Enrollment, and Retention System (CalHEERS) and the California Statewide Automated Welfare Systems (CalSAWS). Collectively, the two systems include the business rules to determine eligibility based on the work and community engagement requirements. The system design completion date for the work and community engagement requirements was May 8, 2026. This has been communicated to CMS's Data & Systems Group on DHCS's "Community Engagement Project Plan and Roadmap" update as part of the biweekly meetings between CMS and DHCS on work and community engagement system readiness.

The most recent submission of this deliverable from DHCS to CMS was May 8, 2026.

- As of June 1, 2026, the two systems are in the midst of system testing, which is a standard phase of the System Development Life Cycle for large information technology systems. System testing occurs once design is complete. It is a validation of business rules, workflows, data, and internal interfaces.

- As shared with CMS's Data & Systems Group in the biweekly meetings, California has built out a full system release schedule that outlines all the critical milestones for system implementation, with full user acceptance testing (the final phase of testing) anticipated on September 4, 2026, and a deployment of the work and community engagement functionality on September 21, 2026, pending a declaration of system readiness by DHCS.

- DHCS provided a system demo for CMS's Data & Systems Group on May 28, 2026, on the completed system design (still in testing) as part of the CMS request and review of California's system readiness as it relates to work and community engagement requirements.

- DHCS provided CalHEERS technical and functional system design artifacts for work and community engagement requirements to CMS's Data & Systems Group via CMS's Box online functionality on June 2, 2026.

- DHCS developed multiple draft notice of action snippets, outreach notices, a medical frailty screener and application insert that went through extensive community and stakeholder review, and user testing and readability. Notice of action language and the renewal form with work and community engagement

requirements have been translated into 19 Medi-Cal threshold languages and are already being programmed into the CalSAWS eligibility system.

- DHCS has begun text messaging to members to alert them that their Medi-Cal eligibility will become dependent on their compliance with work and community engagement requirements starting in January 2027.

- DHCS developed Medi-Cal budget estimates for system costs, county administration for workforce needs, and caseload projections.

40. With respect to implementing the medically frail exclusion in particular, DHCS has worked extensively with clinical and systems personnel to build a process to identify individuals who could be considered "medically frail." This system is based largely on claims data, in line with prior CMS guidance to "verify medical frailty" based on a "medical claims data review or provider documentation." Nov. 19, 2025, CMS Slide Deck, page 11; *see also* slide 17 ("medical frailty status … available through claims data"). DHCS developed processes to convey that information to eligibility systems.

41. DHCS faces several urgent deadlines with respect to implementing work and community engagement requirements. DHCS must apply work and community engagement requirements to applications as of January 1, 2027, and to do this, DHCS needed to substantially finalize eligibility system requirements by May 8, 2026, in order to enable full system deployment, with appropriate testing (which began in March and is scheduled to be ongoing through September 4, 2026). After May 8, 2026, DHCS has only limited ability to make further system changes for use by January 1, 2027. Moreover, DHCS is required by H.R. 1 to issue notices in August 2026 addressing the changes occasioned by the IFR. In order to issue those notices in a timely fashion, DHCS needs to begin sending information to members by July 2026.  The draft of the notice had

to be finalized by March 2, 2026, given the length of time needed for user testing, readability, community review, and translations into 19 Medi-Cal threshold languages.

42. Nevertheless, DHCS still lacks clarity on several crucial issues from the IFR. While the IFR says that DHCS will need to evaluate whether a member's medical condition significantly impairs their ability to work, CMS has provided only the most limited guidance about how DHCS should determine this. While CMS has said more subregulatory guidance will be provided, DHCS must develop its eligibility systems and processes without knowing what this future guidance is—bearing the risk that the *future* guidance will conflict with its system development. This lack of clarity impacts not only DHCS, but also the messages that DHCS can provide its members: if DHCS does not understand what it means for a medical condition to "significantly impair" a member's ability to work, it cannot educate its members about how to demonstrate compliance with this requirement. Finally, the IFR does not clarify which data sources DHCS is required to have integrated as of January 1, 2027, and which can be integrated later. DHCS requires clarity on these issues in order to implement community engagement requirements in a timely fashion and to ensure that its members are prepared for this implementation.

43. Of note, if DHCS is found to have built its systems inconsistently with CMS's incomplete and as-yet unissued guidance, the potential consequences are significantly heightened. If DHCS is found to have not configured its systems quickly enough or configured its systems inconsistently with CMS's eventual guidance, it could face negative audit findings and significant financial penalties under H.R. 1 Section 71106. In other words, at the same time that financial consequences for not complying with guidance are rising, CMS's failure to issue clear and timely guidance on work and community engagement requirements is making it harder for California and other states to comply.

14

**Human Costs of Work and Community Engagement Requirements, Made Worse By the IFR**

44. The purpose of the Affordable Care Act (ACA) was to ensure that low-income individuals receive comprehensive healthcare coverage and have access to affordable, integrated, high-quality healthcare at no or low cost. However, the work and community engagement requirements included in H.R. 1 are expected to result in large-scale disenrollment of members, including members who are eligible but cannot verify their eligibility.

45. As part of DHCS's caseload projections before the IFR release, caseload data suggest that at least 1.1 million of Medi-Cal's Affordable Care Act Expansion members or 23% will be disenrolled due to not providing responsive documents after the ex parte process as part of the work and community engagement process. Because the IFR goes beyond H.R. 1, stripping away the protections provided in H.R. 1 to the medically frail and adding new limitations on self-attestation that do not appear in H.R. 1, this analysis likely underestimates the impact to members.

46. Indeed, DHCS expects the "significant impairment" requirement to result in more members losing coverage than would otherwise have lost coverage under the statutory definition of medically frail. This is either because their condition may not meet the IFR's additional, non-statutory "significant impairment" threshold, or because they cannot obtain the proof required to demonstrate their ability to work is significantly impaired. The "significant impairment" requirement will also likely increase member confusion. Medi-Cal members may think they do not qualify as "medically frail," given the added complexity, and DHCS may see an increase in non-responses from members and decreased rates of application.

47. The "significant impairment" requirement will also likely decrease the number of people DHCS can automatically verify as medically frail, because, under the IFR, the *ex parte* verification process will generally require not just a diagnosis code, but also other data on

utilization of services and level of impairment, *see* 91 Fed. Reg. 33,406 (June 3, 2026), which may not be available for many renewing members. This will further increase coverage loss because individuals will need to provide documentation or additional information to successfully renew. Finally, members with complex medical conditions can see fluctuations in their symptoms from day-to-day or month-to-month, which will make it even more difficult to assess whether their condition meets the "significant impairment" threshold.

48. Members with conditions that meet the statutory categories of medical frailty, but who lose coverage due to inability to document CMS's additional "significant impairment" requirement may return to Medi-Cal sicker and costlier for the loss of health coverage to treat and manage their conditions. This type of "churn" in Medicaid enrollment both raises costs for Medi-Cal and decreases quality of care for members.

49. DHCS expects the IFR's limitations on self-attestation to increase member confusion and coverage loss as well. In DHCS's experience, the requirement to obtain third party documents to demonstrate eligibility creates a procedural hurdle that increases termination rates for otherwise eligible members. Thus, as self-attestation tightens, DHCS expects that more members who are actually eligible will be disenrolled simply because they are unable to meet the paperwork requirements to demonstrate their eligibility.

50. DHCS also expects the "once per enrollment period" limitation on medical frailty self-attestations to particularly harm members with multiple medically frail conditions, especially those who develop one medically frail condition, recover from it, and then develop a second medically frail condition during the same enrollment period. For example, a member could be diagnosed with cancer and self-attest to medical frailty on that basis, and then later (while still enrolled in Medi-Cal) develop an auto-immune disorder. Under the IFR, assuming

continuous Medicaid coverage during that period, the member *could not* self-attest to medical frailty based on the auto-immune disorder and thus could lose coverage if they could not obtain documentation for this diagnosis.

51. DHCS is statutorily required to provide notice to members regarding the changes occasioned by the IFR on or before August 31, 2026. 42 U.S.C. 1936a(xx)(8)(A) (directing States to begin outreach no later than four or more months before December 31, 2026). At present, DHCS is uncertain as to how, for example, a member might establish that they are medically frail. Accordingly, the content of this notice will not have the clarity required to communicate to members how they can comply with the new requirements.

52. DHCS has spent years conducting outreach and building relationships with Medi-Cal enrollees. Confusion over eligibility determinations risks harming that relationship and lowering institutional trust. Members who do not understand why they were disenrolled or what is required to be eligible may simply forego coverage.

**Administrative, Operational, and Financial Burdens on California**

*Burdens on DHCS*

53. Because CMS had never before imposed work and community engagement requirements across eligibility categories, Medi-Cal's eligibility system was not built to support these requirements and is not easily configured to incorporate the numerous eligibility factors necessary to evaluate work and community engagement. As of June 1, 2026, California requested approximately $78 million Total Funds, or approximately $59 million Federal Funds and $19 million state General Funds, to build system changes to support work and community engagement. With the newly released IFR, California is expected to request more funds to support operational and system build, in addition to funding to support additional workforce at the county level for

Medi-Cal case management as a result of work and community engagement requirements. The total amount of additional state funds is unknown at this time.

54. With respect to the medical frailty exclusion, the surprising additional "significant impairment" requirement—plus the uncertainty of what it means and how to implement it—will require DHCS to rapidly change its operational approach and systems development. In addition to analyzing, developing and implementing new ways to evaluate medical frailty, DHCS may need to integrate new data sources to evaluate members' eligibility for the medical frailty exclusion, which will add development costs as well as potential costs from accessing new data. As more individuals are impacted and denied coverage or disenrolled as a result of this requirement, DHCS expects more calls, more documents to process, and more appeals of adverse actions. And finally, in addition to the costs of operationalizing this new requirement, DHCS will also incur the cost of educating its members, staff, county eligibility workers, and other stakeholders about what the requirement means and how it can be met.

55. DHCS also expects the new, complex, and variable limitations on self-attestation to increase its operational complexity. These limitations will make it harder to train staff, vendors, assisters, and community organizations on eligibility processes. As with the medical frailty exclusion, DHCS expects the self-attestation limitation to lead to more calls, more documentation to be scanned and reviewed by staff, and more denials and disenrollments that, themselves, lead to more calls and appeals. In addition, the change in the self-attestation rules from 2027 to 2028 will require additional system development, training, and outreach and education to accommodate the new 2028 rules. Planning for these 2028 system adjustments and communications must start now in order to be ready in time for 2028.

56.     The burdens from work and community engagement requirements imposed by H.R. 1 and made worse by the IFR fall not just on DHCS, but on California more generally. As noted above, Medi-Cal members will likely face increased denials and disenrollments even when they are working or eligible for exclusion —and, due to the "significant impairment" requirement for medical frailty, many of those disenrollments could be of some of Medi-Cal's most medically needy members. The IFR will have a disproportionate impact on members with disabilities and chronic health conditions who are enrolled in the Affordable Care Act Expansion. California's budget will suffer harm due to loss of federal matching funds when eligible individuals lose Medicaid coverage. As the uninsured rate increases, there will be a greater financial strain on providers – in particular rural, community, and safety net hospitals as well as community health centers – that will be called upon to provide even greater levels of uncompensated care. Furthermore, individuals who are disenrolled from Medi-Cal will likely lose access to primary and preventive care – and care necessary to treat their statutorily recognized medical conditions – resulting in more individuals seeking high-cost, emergency care. In addition, the lack of preventative care will result in increased communicable disease outbreaks and more strain on DHCS. Most importantly, DHCS expects poorer health outcomes across California, as fewer people will be able to access appropriate care and manage chronic conditions.

57.     In addition, DHCS expects that the new medical frailty requirements—both the "significant impairment" requirement and the limitations of medical frailty self-attestation—will place a significant administrative strain on treating healthcare providers. In order to support members seeking medical frailty exemptions, providers may need to devote time to providing documentation to demonstrate that a member is medically frail and significant impairment in the

ability to work. This will require providers to take time away from their patient care and increase administrative strain on providers, adding to healthcare costs and impacting access to care.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 28th day of June 2026.

/s/Yingjia Huang
Deputy Director,
Health Care Benefits and Eligibility

# EXHIBIT A

| **From:** | Huang, Yingjia@DHCS |
| **To:** | Arcenas, Mary (CMS/CMCS) |
| **Cc:** | Sadwith, Tyler@DHCS; Freeman, Michael@DHCS; Crow, Sarah@DHCS; Stephens, Jessica O. (CMS/CMCS); daniel.brillman@cms.hhs.gov; AnneMarie.Costello@cms.hhs.gov; caprice.knapp1@cms.hhs.gov |
| **Subject:** | RE: [External]California 5/20/26 CE Update |
| **Date:** | Wednesday, May 27, 2026 12:43:00 PM |
| **Attachments:** | image001.png |

Hi Mary,

Thanks for the notes from our biweekly check-in on May 20, 2026.  As iterated on our call when discussing the content of the demos that California is preparing to share with CMS on May 28, 2026, we want to reiterate in writing our significant concerns should CMS materially alter its prior guidance on Medicaid work requirements in the forthcoming interim final rule (IFR) due June 1, 2026 with respect to medical frailty and self-attestation. DHCS has relied extensively on CMS's preliminary guidance over the last several months to design, build, and operationalize major programmatic, systems, and staffing changes needed to comply with H.R. 1 by January 1, 2027. To the extent the forthcoming IFR includes these substantial shifts, we believe those new policies would be inconsistent with the statutory requirements of H.R. 1, increase the risk of unintended coverage loss for eligible Medi-Cal individuals, and upend California's policy and operational planning efforts – making it extremely difficult for the State to meet the federal requirements by January 1, 2027.  The following lays out California's Department of Health Care Services' (DHCS) significant concerns.

Recently, we have heard that CMS may be narrowing the statutory "Medically Frail" exemption to apply to individuals who cannot work due to their condition.  We have significant concerns with this change. This approach seems to depart from the definition set forth in H.R. 1, which identifies specific clinical conditions, including serious or complex medical conditions, disabling mental health disorders, substance use disorders, and disabilities, without linking eligibility to work capacity. Specifically, Section 1902(xx)(9)(A)(ii)(V) of the Social Security Act enumerates specific clinical conditions as the basis for the medical frailty exemption, without reference to individuals' ability to work. By contrast, we note that for certain other federal programs, such as SNAP or SSI, Congress expressly links eligibility to an individual's ability to work – reinforcing that Congress clearly intended to exempt individuals who have the conditions outlined in H.R. 1, regardless of their work capacity.

Further, California has necessarily relied on CMS's earlier guidance on medical frailty permitting a comprehensive, data driven approach to identifying medically frail individuals using diagnostic, procedural, and prescription information. California's approach has been both consistent with CMS's guidance and the statutory definition of "medically frail" under H.R. 1. A pivot toward manual, documentation-based assessments would require California to completely reengineer our currently developed systems, workflows, and staffing – even, potentially, requiring provider or eligibility worker certifications that would seem to upend this data-driven approach and transform medical frailty to a largely manual, paper-based system that we have not been planning for. Many states, including ours, would be unable to operationalize these changes by January 2027.

Regarding the possible elimination of the self-attestation flexibility, CMS's Minimum Viable Product written guidance (December 2025) –which required all states to develop an operational workplan and provide a monthly report – permitted states to rely on self-attestation when data were unavailable for determining work requirement compliance or exemption. California has built this flexibility into its system to meet the statutory deadline. This flexibility is not merely a matter of CMS policy discretion - Section 1902(xx)(3)(A) of the Social Security Act expressly permits

states to elect not to require individuals to verify information resulting in an exemption. If the IFR removes or severely limits this option, members will face new significant documentation burdens, increasing the risk of avoidable coverage loss. States would need to build new verification workflows, train eligibility staff, and redesign IT functionality – changes that cannot be completed within the statutory timeframe.

If CMS's IFR diverges materially from its preliminary guidance, California will likely be unable to meet the statutory deadline despite significant good faith efforts and months of preparation since H.R. 1 was enacted and since CMS issued its initial guidance. Implementing new processes on this significantly shortened timeline would heighten the risk of systems errors, improper terminations, and administrative failures affecting eligible individuals. DHCS anticipates that any major shift in direction at this stage could delay implementation by 18-24 months.

For the past several months, DHCS has advanced major systems, operational, and staffing work based on CMS's preliminary guidance. Several critical work requirements-related system builds are already nearing completion, with expected go-live dates aligned to the statutory January 1, 2027, implementation timeline. Many of these components are already in final development and testing phases, with critical dependencies on prior CMS guidance. This includes the application & eligibility systems (CalHEERS / CalSAWS), data analytics & reporting, eligibility determination logic, and ex parte renewal logic. These components are all scheduled for deployment in September 2026, to be ready for activation on January 1, 2027.

CMS was aware throughout this period that California and other states were making time-sensitive, largely irreversible implementation decisions, including vendor contracts, IT builds, and staffing commitments, in direct reliance on its guidance, and continued providing that guidance without any indication that a material policy shift was under consideration. The reliance is embedded in systems that are already in final development and testing.

These system components form the core infrastructure needed for California to administer work requirements. Each system component represents substantial state investment and has proceeded based on CMS's earlier verbal and written guidance. Any major shift in federal policy at this stage, particularly concerning medically frail identification, self-attestation, or verification requirements, would require reengineering multiple system modules already approaching finalization, jeopardizing California's ability to meet the statutory deadlines.

Given these dynamics, DHCS is deeply concerned that significant late-stage policy shifts will increase coverage losses among eligible individuals, particularly those with disabilities and chronic or complex medical needs, introduce avoidable administrative barriers through new documentation requirements, and create operational instability during a major programmatic transition affecting millions of Californians.

In light of these concerns, DHCS respectfully requests that CMS maintain consistency with its preliminary guidance and the requirements of H.R. 1 with respect to medical frailty and self-attestation. To the extent CMS intends to finalize any significant changes that are both necessary and consistent with H.R. 1, it must provide states with adequate lead time to redesign systems and operations. California will likely to pursue a good faith waiver if material changes are finalized in the interim final rule that substantially diverge from the significant investment the State has made in reliance on CMS' prior guidance and the practical inability of reengineering nearly complete systems within the statutory timeframe. We request that CMS provide states with a transparent process for requesting good faith waivers, including clear criteria and timelines.

California remains committed to implementing H.R. 1 in good faith while upholding coverage protections for eligible residents. To succeed, states require, at minimum, clarity and stability in

CMS' policy direction. Abrupt changes at this stage risk undermining both states' ability to comply and member access.  As a steward of federal Medicaid funds and an administrator responsible for coverage continuity for millions of eligible Californians, DHCS has an obligation to raise these operational and legal concerns directly, and urges CMS to provide the policy stability necessary for states to implement H.R. 1 in a manner consistent with both the statute and sound program administration.


Thank you,
Yingjia

**Yingjia Huang** | Deputy Director
Health Care Benefits and Eligibility (HCBE)
California Department of Health Care Services
Office: (916) 954-1097

Executive Assistant's Email:  Vibha.Chandra@dhcs.ca.gov



---

**From:** Arcenas, Mary (CMS/CMCS) <mary.arcenas@cms.hhs.gov>
**Sent:** Wednesday, May 20, 2026 1:16 PM
**To:** Huang, Yingjia@DHCS <Yingjia.Huang@dhcs.ca.gov>; Crow, Sarah@DHCS <Sarah.Crow@dhcs.ca.gov>; Freeman, Michael@DHCS <Michael.Freeman@dhcs.ca.gov>; Ly, Jenny@DHCS <Jenny.Ly@dhcs.ca.gov>
**Subject:** [External]California 5/20/26 CE Update


**This Message Is From an External Sender**
This message came from outside of your organization. Please be cautious with links and attachments.

Report Suspicious


**Good afternoon, DHCS Partners,**


**Thank you for the Community Engagement (CE) updates shared today. Below is a summary of our discussion.**


**Demo**

- **The group confirmed May 28, from 12:00–1:00 p.m. Pacific Time, for an overview of the end-to-end application process flow based on the HR1 requirements. The session will not include a live demonstration; instead, it will feature a recorded walkthrough of the**

application flow using the CalHEERS sandbox environment. Yingjia will lead the session, with support from Sarah, Michael, project staff, and Deloitte.

- The dates for the four additional demonstration sessions, scheduled approximately one month apart, are tentative and subject to change.
- Yingjia will send Mary an email before the May 28 session outlining the objectives, scope, and relevant assumptions or limitations to help align expectations.
- Mary shared the general process flow for the demonstration sessions.
  - Before the session, the state project team will identify the MVP checklist items to be covered during the demonstration and confirm participation by state policy and IT staff.
  - During the demonstration:
    - Conduct roll call.
    - The state will identify the applicable MVP checklist items and any associated acceptance criteria.
    - If issues are identified during the discussion, including demonstration gaps, defects, or incomplete workflows, the state should:
      - Describe what is not working or is not aligned with expectations.
      - Explain the root cause, if known.
      - Provide a remediation plan and timeline.
      - Confirm whether updates to the project plan are needed.
  - Upon completion of the demonstration:
    - Mary will ask state policy staff whether the released functionality meets expectations for the intended functionality based on the state's current understanding.
    - Confirm action items and follow-up questions.

**APD**

- Two As-Needed APDs will be submitted in June:
  - CalHEERS: Updates related to Equifax and Truv.  Truv will provide verification data for gig workers.
  - MCED: Updates for county eligibility workers, including DDI and operational costs. The APD will also include a contract for surge staffing.
    - CMS is having internal discussions regarding 28G/H and will follow-up with the state
  - Separate MDBT is needed for DDI system costs.

**National Student Clearinghouse**

- National Student Clearinghouse (NSC) data will be available through a subscription with Equifax.
- NSC data will not be available for the January 2027 MVP release. The September 2026 release is already at capacity and could not accommodate the NSC integration. According to the tentative release timeline, integration testing is scheduled to conclude on January 15, 2027, with a targeted release date of February 22, 2027.
- Yingjia met with CMS Emmy representatives and determined that this is not the preferred approach.
- Mary shared that NSC and the VBA Disability API will be added to the hub. Additional details regarding the timeline will be provided later, but CMS is working to incorporate these capabilities before the CE requirements take effect on January 1, 2027.
- The state team expressed concern that the project schedule is already significantly compressed and that testing any new hub-related data integrations will be challenging.

Project Progress

- The project remains on track, with no schedule changes, blockers, or issues reported. However, the state team highlighted the significant risk to MVP delivery depending on guidance included in the forthcoming Interim Final Rule, expected on June 1, 2026.
- Yingjia reviewed the updated project plan shared by Sarah.
  - The updated project plan includes:
    - System Change Tracking Number cross-references for CalHEERS and CalSAWS.
    - New notes identified in red font.
    - MVP milestone dates for Volunteer and Work Program Data Sources.
- The state project team is conducting a quality review of project artifacts and will share the materials in Box once the review is complete.

Fair Hearings

- Sarah shared information regarding Fair Hearings via email on May 19, 2026. The process is managed outside of the eligibility and enrollment systems by the California Department of Social Services.
- The current process is manual, with no existing interfaces or plans for automated data exchange.

**Please let me know if you have any questions or suggested revisions to this summary.**

**Thank you, and I look forward to the overview next week.**

**Sincerely,**
**Mary**

**Mary Arcenas**

**Medicaid Enterprise Systems (MES) State Officer**

**Data and Systems Group**

**Center for Medicaid & CHIP Services (CMCS)**

**Centers for Medicare & Medicaid Services (CMS)**