# EXHIBIT 3

## DECLARATION OF ADELA FLORES-BRENNAN

I, Adela Flores-Brennan, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of Colorado. I am over the age of 18 and have personal knowledge, or knowledge based on review in my capacity as Colorado Medicaid Director and from information and records gathered by the Colorado Department of Health Care Policy and Financing (HCPF) and agency staff, of the matters set forth below. If called as a witness, I could and would testify competently to the matters set forth below.

## Professional and Agency Background

2. I am the Director for the Colorado State Medicaid program known in Colorado as Health First Colorado and Children's Health Insurance Program (CHIP) known in Colorado as the Child Health Plan *Plus* (CHP+).

3. HCPF is the single state agency responsible for administering Health First Colorado. Health First Colorado provides low-income individuals with comprehensive healthcare coverage and access to affordable, integrated, high-quality healthcare at no or low cost. Health First Colorado's coverage includes medical, dental, mental health and substance use treatment, long-term services and supports, and long-term care. Health First Colorado's mission is to improve the overall health of Colorado's residents by promoting affordable access to medically necessary care.

4. Health First Colorado provides low-income individuals with access to comprehensive healthcare coverage at no or low cost. Medicaid's coverage includes medical, dental, mental health, substance use disorder treatment, and long-term care.

5.      HCPF is the largest purchaser of health coverage in Colorado. The State's Medicaid and CHIP programs cover about 20% percent of the State's population. In total, the State's Medicaid and CHIP programs provide comprehensive health care coverage to approximately 1.3 million people, including over 542,500 children.

6.      Colorado administers the Health First Colorado program pursuant to federal law and regulations as well as the terms of its federally approved State Plans and its Section 1115 Demonstration Project. Health First Colorado receives federal Medicaid and CHIP funding, known as "Federal Financial Participation" (FFP), which covers an average of 57.58% of Health First Colorado's expenditures on eligible enrollees.

**Medicaid Expansion in Colorado**

7.      In January 2014, Colorado implemented Medicaid expansion under the authority of the Affordable Care Act (the "ACA"). This expansion extended federally funded comprehensive health insurance to low-income adults aged 19 to 64 with household incomes up to 133% of the Federal Poverty Level primarily through the Health First Colorado program.

8.      Expansion enrollees in Health First Colorado receive full, comprehensive benefits that include hospital care, prescription drugs, mental health services, and preventive care. Currently, eligibility for Medicaid expansion requires that an individual: (1) be an adult 19-64 years old; (2) be a citizen or qualified immigrant; and (3) have household income less than or equal to 133% of the Federal Poverty Level or (4) be a parent/caretaker relative with income between 69-133% of the Federal Poverty Level.

9.      As of May 2026, approximately 371,755 of Health First Colorado members (Medicaid recipients) are enrolled in the MAGI Adult Program (Individuals up to 133% are 329,731 and Parent/Caretaker Relatives 69-133% are 42,024). For the current state fiscal year

2026, Colorado projects that approximately $3,057,000,000, or 30.0% of Health First Colorado's total federal Medicaid funding, comes from the FFP for these 371,755 members.

**CMS's Pre-IFR Guidance to Colorado**

10. I and my staff at Health First Colorado have been closely following enactment and implementation of H.R. 1, in particular Section 71119, which imposes novel work or community engagement requirements for adults covered under the Medicaid expansion provisions of the ACA (the "community engagement requirements").

11. Prior to the enactment of H.R. 1, the Medicaid Act has never required financially eligible individuals to work, volunteer, or meet other community engagement requirements to establish Medicaid eligibility. Consequently, Health First Colorado does not have systems by which to verify work, volunteer, or other community engagement activities and to identify or document exclusions to and exemptions from community engagement requirements. As a result, and as discussed in more detail below, Health First Colorado has expended significant resources to design and build these systems based on the guidance from CMS over the past year.

12. Since November 2025, CMS has been providing guidance on expected community engagement requirements policy. On November 19, 2025, CMS presented a slide deck on community engagement requirements, which was later provided to states on December 4, 2025. On December 5, 2025, CMS began a series of workgroups to provide guidance and conduct question-and-answer sessions with states on implementing community engagement. These workgroup calls took place once every other week from December 2025 through April 2026 and switched to a weekly cadence starting in May 2026. As of the date of this declaration, this series of workgroup calls is still ongoing.

13. These sorts of calls represent a long-held practice by CMS to provide guidance to states, outside of formal rulemaking, in complying with urgent and significant changes in federal Medicaid law. In the absence of regulations and given the truncated timeline for implementation, and as within its common practice, Colorado relied on CMS guidance from these calls, and the associated slide decks and other materials, to determine how to comply with new laws, implement operational, system, and process changes, and, ultimately, avoid financial penalties that those laws imposed for noncompliance. The information CMS has conveyed in these calls has been particularly important for states given the extremely short timeframe for implementation of changes related to community engagement. This short timeframe required states to make IT systems and operational decisions prior to final release of the regulations.

14. In addition to these calls, CMS provided states with informational bulletins related to the community engagement requirements. On November 18, 2025, CMS provided an informational bulletin with a summary of the Medicaid and CHIP provisions in H.R. 1. CMS issued another informational bulletin on December 8, 2025 outlining the state requirements to establish the community engagement requirements.

15. States likewise relied on the guidance shared by CMS on regular calls concerning H.R. 1. Regarding the definition of medical frailty, CMS indicated that it intended to "use a definition … similar to that described in regulations at 42 CFR § 440.315(f)," which is a regulation whose language closely resembles the H.R. 1 language. Nov. 19, 2025 CMS Slide Deck, page 11. CMS also stated that it expected to allow verification of medical frailty through "medical claims data review or provider documentation, or completion of a screening tool." Nov. 19, 2025 CMS Slide Deck, page 11; *see also* slide 17 ("medical frailty status … available through claims data" or "medical screener").

16. At no point between the passage of H.R. 1 in July 2025 and the promulgation of the Interim Final Rule in June 2026 did CMS indicate that it would require "medically frail" individuals to have a significant impairment to their ability to comply with community engagement requirements. Nor did CMS indicate that states would need to verify that a member had such a significant impairment when determining eligibility for the medical frailty exclusion.

17. Regarding use of self-attestation to verify medical frailty, while initially CMS signaled that only limited use of self-attestation would be permitted, *see* Nov. 19, 2025 CMS Slide Deck pg. 16, CMS later indicated that self-attestation would be an acceptable verification method when data was not available.

18. In March 2026, CMS reiterated that states may use auditable self-attestation in the absence of claims data. CMS specifically noted that states could use such an auditable self-attestation "*to confirm ongoing medical frailty*" in addition to when a member newly identifies as medically frail. CMS also noted that states should be able to reassess individuals for medical frailty at redetermination, *even without extensive claims history*, based on new information such as a major life event. At no point did CMS indicate members would be limited to only one self-attestation per enrollment period, even if they developed multiple sequential medical frailty conditions.

19. On Friday, May 1, 2026, during the community engagement requirements workgroup call, CMS showed states a slide deck that included a definition of the medical frailty exclusion. These slides did not mention any requirement that an individual's medically frail condition would need to impair their ability to comply with community engagement requirements.

20. On or about Wednesday, May 6, 2026, CMS informed states that information conveyed on the Friday, May 1, 2026 call should not be acted upon, and was subject to change.

21. In response to this information and concerns that CMS would change its policy direction related to community engagement, Health First Colorado conveyed to its CMS-assigned state officer during a regular biweekly meeting on May 12, 2026 that if there were to be a change in the community engagement requirements in the Interim Final Rule ("IFR"), then significant rework would be required that would put Colorado's minimum viable product at risk. (Minimum Viable Product refers to the baseline requirements states must demonstrate for readiness for implementation on January 1, 2027). The state officer did not provide any response to these concerns.

**CMS Issues the Interim Final Rule**

22. On June 1, 2026, CMS promulgated the IFR relating to the community engagement requirement. The IFR includes several surprising provisions that are vague, differ substantially from CMS's prior guidance, and are more restrictive than statutory language. These provisions will be very challenging, if not impossible, and costly for Health First Colorado to design by August 31, 2026, and implement before January 1, 2027. They are expected to cause significant harm to members and Health First Colorado once implemented. These provisions include the following:

*Medically Frail Definition*

23. With respect to the medically frail exclusion, the IFR added a new requirement that, in addition to falling into one of the five categories enumerated in H.R. 1, a "medically frail" individual must *also* be "an individual whose physical, mental, or other behavioral health condition significantly impairs the individual's ability to comply with the community engagement requirements." IFR at 42 CFR § 435.554(c)(5)(i).

24. This "significant impairment" requirement does not exist in the text of H.R. 1 Section 71119. *See* Social Security Act § 1902(xx)(9)(A)(ii)(II)(V) [42 U.S.C. 1396a(xx)(A)(ii)(II)(V)]. In a webinar and slide deck presented to state Medicaid agencies on June 9, 2026, CMS acknowledged that, in addition to the statutory requirement that an individual meet the definition of medically frail supplied by Congress in section 71119, as codified at, 42 U.S.C. § 1396a(xx) (section 1902(xx) of the Social Security Act), the IFR also requires that the individual be significantly impaired in their ability to comply with community engagement requirements in order to be considered medically frail. CMS cited no statutory basis for this second, new requirement.

25. Additionally, the "significant impairment" requirement was not mentioned in any CMS written or verbal guidance before the IFR was published, up to and including the CMS guidance about medical frailty provided to states as recently as May 1, 2026.

26. The IFR provided very little concrete guidance for how states can verify whether an individual meets this new "significant impairment" requirement. However, the IFR does indicate that, in general, states *cannot* rely solely on diagnosis or condition codes, because doing so "would risk sweeping in individuals whose conditions do not significantly impair their functional capacity." 91 Fed. Reg. 33,373 (June 3, 2026). This is in direct conflict with prior guidance provided by CMS specified herein that states may use claims-based data to verify whether an individual meets the medical frailty exemption in general. Instead, the IFR says that states should verify medical frailty using information from "multiple domains," to determine a member's "condition[s], utilization of services … and their level of impairment." 91 Fed. Reg. 33,406 (June 3, 2026). It also suggests that states could use "algorithms using administrative claims data that assign acuity scores to individuals," *id.*, but does not explain what administrative data a

7

state can use or what would be an acceptable analysis of such data. The number of data sources and extensiveness of the data analysis required creates a great deal of additional work by Medicaid staff and yet may still not accurately identify all individuals who should be excluded. Moreover, some of the data sources a state could access are proprietary and would not hold up to audit scrutiny.

27. Since the IFR's release, CMS has told states that it is developing even more guidance on the medically frail exclusion. They have repeatedly said that some of the technical questions they received from states will require guidance, technical assistance, and continued engagement from CMS. On a June 9 call, CMS said these materials, guidance, and even sets of diagnoses codes would be shared in the coming weeks. But as of the date of this declaration, none of this has been shared with Colorado.

*Self-Attestation*

28. Unlike the guidance provided by CMS through fall 2025 and spring 2026, which indicated that an "auditable self-declaration" could generally be used when reliable data was unavailable, *see supra* ¶¶ 17-18, the IFR significantly limits the occasions when an individual may rely on self-attestation to demonstrate compliance with - or exemption from - community engagement requirements. It does so using a complex and limiting framework (that changes again after the first year of implementation) that will be harmful for members and difficult to implement.

29. Thus, the IFR significantly limits members' ability to self-attest to community engagement eligibility factors after January 1, 2028. Of note, several community engagement eligibility factors are ones where documentation is unlikely to be available, such as whether a parent provides "some level of care" to their child (42 CFR § 435.554(a) (definition of "parent"));

or the precise number of hours that a family caregiver provides assistance to a child or disabled individual (42 CFR § 435.554(c)(3)(i)(C)).

30. Health First Colorado's efforts to develop screening tools for members or applicants to self-attest to medical frailty have been underway for several months. In seeking to simplify reviews of these screeners, Health First Colorado designed a number of yes/no questions that would indicate impairment sufficient to meet medical frailty requirements. These types of questions are common in online applications because it can be programmed into the eligibility logic. However, CMS has indicated verbally that yes/no questions would not satisfy self-attestation requirements. This significantly frustrates the ability to automate determinations as is contemplated in the statute.

31. Notably, Health First Colorado routinely uses yes/no-type questions to simplify eligibility determinations for other types of Medicaid benefits. CMS has allowed the use of such questions for these determinations. However, CMS has provided no meaningful explanation as to why similar types of yes/no questions cannot be used for the community engagement requirements.

32. Under Section 1902 of the Social Security Act and 42 CFR § 435.916, state Medicaid agencies are required to periodically (at least annually) conduct a complete redetermination of an individual's Medicaid eligibility, commonly called a "renewal" or "renewal cycle." The Social Security Act does not recognize a "period of enrollment." That concept is introduced for the first time in the IFR and used in a way that hinders states' operational efficiencies, puts medically at-risk members in danger of losing Medicaid coverage, and treats members differently based on when in this period their medical impairment may arise.

33. A renewal cycle lasts at most 12 months (or when section 71107 of H.R. 1 takes effect, six (6) months for certain individuals). In contrast, under the IFR's newly introduced

9

construct, a period of enrollment can last several renewal cycles as long as the individual remains enrolled in Medicaid.

34. Under 42 CFR § 435.916, a renewal of Medicaid eligibility is a *de novo* review of all eligibility factors, except where prohibited to protect member eligibility (e.g. Medicaid agencies cannot require an individual to reverify citizenship under 42 CFR § 435.956(a)(4)(ii)). However, the IFR creates different sets of rules that the state must apply in conducting eligibility determinations related to the community engagement requirements based on whether an individual is within a period of enrollment and whether, during that period, the individual has previously submitted a self-attestation. This distinction on when self-attestation can be used exacerbates the operational complexity the state faces in implementing the requirements with fidelity and increases the risk of confusion on the part of the members.

35. Prior to the IFR and the introduction of the new concept of a "period of enrollment," the use of self-attestation or a failure to verify an eligibility factor in a previous renewal cycle would not adversely impact an individual in their current renewal.

36. Furthermore, there is no lockout period or other prohibition on reapplying for Medicaid after an individual has been disenrolled for failure to verify compliance with or exemption from the community engagement requirements. Therefore, an individual who is prohibited from self-attesting to medical frailty for a second time in the same enrollment period and is subsequently terminated because the individual cannot verify medical frailty, can reapply once fully disenrolled and use self-attestation again at the start of a new period of enrollment. As such, the IFR will likely increase disruptions to an individual's continuity of healthcare, increase costs and complexity to the state in implementing the rule, and, at the same time, fails as a meaningful work incentive or program integrity measure.

10

37.     The IFR places very broad requirements on states to identify reliable data sources for verifying community engagement eligibility factors. The IFR requires Medicaid agencies to use "reliable information available to the State" to verify eligibility, which it defines as "information necessary for determining [community engagement requirements] eligibility to which the agency has access *or should have access*." 42 CFR § 435.557(b) (emphasis added). The IFR thus appears to require states to seek out and, where feasible, incorporate data sources for every factor of community engagement, even though such factors are numerous, have non-centralized data, and often relate to areas that Medicaid agencies have never assessed before, such as school attendance, community volunteer work, and job program enrollment. While CMS has previously indicated there would be a phased approach to adding data sources, *see* 11/19/2025 CMS slide deck pg. 28, the new regulation does not expressly permit this.

*Renewal Process*

38.     The IFR lays out procedures for states to evaluate member compliance with community engagement requirements at renewal. However, these procedures will, in effect, deny members the full window of time they are granted in H.R. 1 to demonstrate they comply with work requirements.

39.     If a state cannot verify whether a member is still eligible for Medicaid through its *ex parte* data sources, the state sends the member a pre-populated renewal form to complete. *See* 42 CFR § 435.916(a)(3). According to the IFR, most states begin their renewal process and, if necessary, send this pre-populated form about 60 to 90 days before a member's renewal is due. 91 Fed. Reg. 33,390 (June 3, 2026). According to the IFR, if a state cannot *ex parte* verify compliance with community engagement requirements, the state may either send "a notice of noncompliance"

with this renewal form, or as a follow-up after the member returns the renewal form if the state still cannot verify community engagement. 91 Fed. Reg. 33,411–12. The "notice of noncompliance," which is mandated by H.R. 1, provides members with only 30 days to respond, after which the member must be disenrolled if compliance with community engagement still cannot be verified. Social Security Act Section 1902(xx)(6) [42 U.S.C. 1396a(xx)(6)]. This disenrollment must happen no later than the month following the month in which the 30-day period expires. *Id.* The IFR says that this 30-day period cannot be extended and says that "states must complete the entire renewal process, including the noncompliance procedures, by the end of the beneficiary's eligibility period. 91 Fed. Reg. 33,412 (June 3, 2026).

40. The effect of this structure is that members will be evaluated for compliance with work requirements before—often *months* before—the time period in which they are entitled to comply with work requirements is complete. This abbreviated time period will increase the likelihood of coverage loss for otherwise eligible members.

*Short-term Hardship Exceptions*

41. H.R. 1 allows States to apply exceptions for certain short-term hardship events. These short-term hardship events include receiving inpatient medical services, residing in a county where an emergency or disaster has been declared by the President or where there is high unemployment, or traveling outside one's community for necessary medical services. *See* SSA § 1902(xx)(3)(B).

42. The IFR provides that, the short-term hardship exception requires a new applicant to demonstrate the exception "for at least one, but not more than 3 consecutive months, as specified in the State plan, *immediately preceding the month of application*." 91 Fed. Reg. 33473 (emphasis

added). An applicant cannot demonstrate the exception for the same month in which they apply to Medicaid.

43. This requirement ensures that newly eligible individuals experiencing hardship events will have to wait at least until the start of the following month to receive necessary coverage, likely foregoing necessary care in the meantime or further straining our emergency health care system.

44. The requirement that the short-term hardship must be met in the month preceding application is also a significant deviation from long-standing policy and practice in Medicaid to accept current monthly income. This unexpected deviation required Health First Colorado to scrap previously designed systems intended to implement the hardship. Health First Colorado is currently reassessing whether it can redesign and implement the system in time for the January 1, 2027 statutory deadline. This is likely to result in confusion to members and stakeholders on the availability of the hardship exclusion in Colorado.

*Disability Definition Discrepancies*

45. The IFR applies multiple, distinct definitions of "disability," which creates operational and compliance risk for states.

46. Colorado currently applies the definition of "disability" set forth in the Social Security Act at 42 U.S.C. § 1614(a)(3). But the IFR's medical frailty standard does not account for the disability definition already set forth in the Social Security Act. In addition, for caregiver pathways, the IFR relies on the definition of disability in the Americans with Disabilities Act at 28 C.F.R. § 35.108. This definition is broader and does not require an inability to work for an individual to be considered disabled.

47. These standards differ materially in scope and threshold, resulting in multiple co-existing definitions within a single eligibility framework. Without clarification from CMS on the scope of these definitions, the current discrepancies create risk of inconsistent determinations, system complexity, member confusion, and audit exposure, particularly where similar terminology is used across contexts. The caregiver pathway also introduces an additional challenge: the disability determination applies to the person receiving care, who may not be part of the Medicaid case, and the IFR does not clearly address how states should verify or link that information.

*Claims Data Delay*

48. Several of the timelines set out in the IFR do not take account of the fact that providers have 365 days to submit claims data. For determinations that are supposed to be made regarding the preceding year, Health First Colorado may not even have the relevant claims data. Once again, this provision will increase the risk of coverage loss for otherwise eligible individuals.

**Health First Colorado's Efforts to Implement the Community Engagement Requirements Before and After the IFR Issued**

49. Following the enactment of H.R. 1, Health First Colorado recognized that it would be extraordinarily challenging to complete the necessary system and process changes required by the August 31, 2026 notice deadline and January 1, 2027 implementation dates, given the magnitude of changes needed for the community engagement requirements and the short period of time afforded by H.R. 1. Therefore, after H.R. 1 was passed in July 2025, Health First Colorado immediately began working to prepare to comply with community engagement requirements.

50. Beginning in August 2025 and continuing until the release of the IFR, Health First Colorado based its policy and system determination on the statutory language and the

subregulatory guidance provided by CMS, as detailed above. Based on this guidance, Health First Colorado has already done the following:

- Filed an Advance Planning Document (APD) with CMS on October 28, 2025, which CMS then approved on November 28, 2025.

- Worked with a vendor to augment staffing to add capacity for policy analysis, data analysis, communications and project management at a cost of $3,785,600.

- Created and launched formal workgroup structures for all H.R. 1 projects.

- Developed high level business requirements for Colorado's Benefits Management System and Program Eligibility and Application Kit System changes through extensive workgroup sessions followed by comprehensive elicitation sessions to develop business requirement documents.

- Prepared for and began execution of required system demonstrations for CMS review. These required demonstrations are intended to demonstrate progress to CMS on various components of the implementation like client correspondence, eligibility worker online portals, verifications, and reporting.

- Drafted and developed proposed eligibility and work requirement state regulations based on information received from CMS in late 2025 and early 2026. Typically this rulemaking process takes months to promulgate pursuant to state administrative procedural requirements.

- Created numerous resources for stakeholders, partners, and members, this included building an H.R. 1 resources webpage, launching a screener tool for the member facing website, working with the Center to Advance Consumer Partnership to develop an H.R. 1 Communications Toolkit, and holding multiple webinars for

stakeholders and members. These public-orientated resources were largely developed based on the CMS guidance provided to states in late 2025 and early 2026, as discussed above.

- Submitted a supplemental budget request of $45,786,371.00 total funds for FY2027 to the Colorado General Assembly for IT systems changes, call center staffing, additional appeals officers, audit and compliance support, and additional outreach resources.

- Developed required member notices which entailed extensive feedback from members and stakeholders.

- Created a medical frailty workgroup which consulted with other states, conducted a review of possible diagnosis codes to determine medical frailty, and created medical frailty questions for new Medicaid applicants. These diagnosis codes and medical frailty questions were based on the CMS guidance provided to states in late 2025 and early 2026.

51. With respect to implementing the medically frail exclusion in particular, Health First Colorado has worked extensively with clinical and systems personnel to build a process to identify individuals who could be considered "medically frail." This system is based largely on claims data, in line with CMS guidance to "verify medical frailty" based on a "medical claims data review or provider documentation." Nov. 19, 2025 CMS Slide Deck, page 11; *see also* slide 17 ("medical frailty status … available through claims data").

52. Health First Colorado faces several urgent deadlines with respect to implementing community engagement requirements. Health First Colorado must apply community engagement requirements to applications and renewals as of January 1, 2027, and to do this, Health First

Colorado must substantially finalize eligibility system requirements by July 18, 2026, in order to enable full system deployment, with appropriate testing beginning in October 2026. After October 15, 2026, Health First Colorado will only have a limited ability to make further system changes for use by January 1, 2027. Moreover, Health First Colorado is required by H.R.1 to issue notices no later than August 31, 2026[1] addressing the changes outlined in the IFR. Ideally, this information would be sent to the vendor by June 30, 2026, but Health First Colorado can make necessary changes to the information up to July 31, 2026. Any changes to the community engagement requirements after July 31, 2026 could jeopardize Health First Colorado's ability to send new information to the vendor, revise the member notices, and also meet the August deadline.

53. Nevertheless, Health First Colorado still lacks clarity on several crucial issues from the IFR. While the IFR says that Health First Colorado will need to evaluate whether a member's medical condition significantly impairs their ability to work, CMS has provided only the most limited guidance about how Health First Colorado should determine this. While CMS has said more subregulatory guidance will be provided, Health First Colorado must develop its eligibility systems and processes without knowing what this future guidance is—bearing the risk that the *future* guidance will conflict with Colorado's system development.

54. This lack of clarity impacts not only Health First Colorado, but also the information that Health First Colorado can provide its members. If Health First Colorado does not understand what it means for a medical condition to "significantly impair" a member's ability to work, it cannot educate its members about how to demonstrate compliance with this requirement.

---

[1] There is a discrepancy between the IFR and H.R.1 as to whether notices must be sent to members by August or September 2026. In an abundance of caution, Health First Colorado intends to issue notices by August 31, 2026.

55. Finally, the IFR does not clarify which data sources Health First Colorado is required to have integrated as of January 1, 2027, and which can be integrated later. Health First Colorado requires clarity on these issues in order to implement community engagement requirements in a timely fashion and to ensure that its members are prepared for this implementation.

56. The consequences that will result from Health First Colorado building its systems inconsistently with CMS's incomplete and as-yet unissued guidance are significant. If Health First Colorado is not able to configure its systems quickly enough, or if it configures its systems inconsistently with CMS's eventual guidance, it could face negative audit findings and significant financial penalties under H.R. 1 Section 71106. In other words, at the same time that financial consequences for not complying with guidance are rising, CMS's failure to issue clear and timely guidance on community engagement requirements is making it harder for Colorado and other states to comply.

57. This risk is especially heightened for Colorado given upcoming Payment Error Rate Measurement (PERM) audits conducted by CMS. PERM is a federal audit program that reviews a sample of Medicaid eligibility determinations and payments to determine whether they comply with applicable federal and state requirements and are supported by sufficient documentation. PERM produces an eligibility improper payment rate or error rate. New H.R. 1 provisions increase financial accountability for states exceeding a 3% PERM Eligibility error rate. For example, each 1/10 of a percentage over this error rate can result in a $9 million withholding of federal funding. The next PERM cycle begins in 2029 but crucially here, these audits will review eligibility determinations beginning on July 1, 2027, just six months after the community engagement requirements implementation deadline. For all the reasons discussed throughout this declaration,

the instability caused by the unexpected changes in the IFR will likely lead to eligibility errors and potentially significant financial risk for HCPF depending on the outcome of the PERM audits.

**Human Costs of Community Engagement Requirements, Made Worse By the IFR**

58. The purpose of the Affordable Care Act (ACA) was to ensure that low-income individuals receive comprehensive healthcare coverage and have access to affordable, integrated, high-quality healthcare at no or low cost. However, the community engagement requirements included in H.R. 1 are expected to result in large-scale disenrollment of members, including members who are eligible but cannot verify their eligibility.

59. In Colorado, an estimated 378,000 adults per year in the Health First Colorado expansion population will be subject to H.R. 1's community engagement and six-month redetermination requirements (a provision of H.R. 1 that requires Medicaid expansion adults' eligibility to be reevaluated every six months). Of those 378,000 individuals, approximately 155,000 will be required to demonstrate community engagement or qualify for an exclusion or exception.

60. These numbers were developed prior to the issuance of the IFR. Because the IFR goes beyond H.R. 1 in stripping away the protections provided to the medically frail and adding new limitations on self-attestation that do not appear in statute, these numbers likely underestimate the impact to members.

61. Indeed, Health First Colorado expects the "significant impairment" requirement to result in more members losing coverage than would otherwise have lost coverage under the statutory definition of medically frail. This is either because their condition may not meet the IFR's additional, non-statutory "significant impairment" threshold, or because they cannot obtain the proof required to demonstrate their ability to work is significantly impaired. The "significant

impairment" requirement will also likely increase member confusion. Health First Colorado members may think they do not qualify as "medically frail," given the added complexity, and Health First Colorado may see an increase in non-responses from members and a corresponding loss of coverage.

62. The "significant impairment" requirement will also likely decrease the number of people Health First Colorado can automatically verify as medically frail, because, under the IFR, the *ex parte* verification process will generally require not just a diagnosis code, but also other data on utilization of services and level of impairment, *see* 91 Fed. Reg. 33,406 (June 3, 2026), which may not be available for many renewing members. This will further increase coverage loss because individuals will need to provide documentation or additional information to successfully renew. Finally, members with complex medical conditions can see fluctuations in their symptoms from day-to-day or month-to-month, which will make it even more difficult to assess whether their condition meets the "significant impairment" threshold.

63. Members with conditions that meet the statutory categories of medical frailty but who lose coverage due to inability to document "significant impairment" may return to Health First Colorado sicker and costlier for the loss of health coverage to treat and manage their conditions. This type of "churn" in Medicaid enrollment both raises costs for Health First Colorado and decreases quality of care for members.

64. Health First Colorado expects the IFR's limitations on self-attestation to increase member confusion and coverage loss as well. In Health First Colorado's experience, the requirement to obtain third party documents to demonstrate eligibility creates a procedural hurdle that increases termination rates for otherwise eligible members. Thus, as self-attestation tightens,

Health First Colorado expects that more members who are actually eligible will be disenrolled simply because they are unable to demonstrate their eligibility.

65.     Health First Colorado also expects the "once per enrollment period" limitation on medical frailty self-attestations to cause particular harm to members with multiple medically frail conditions, especially those who develop one medically frail condition, recover from it, and then develop a second medically frail condition during the same enrollment period. For example, a member could be diagnosed with cancer and self-attest to medical frailty on that basis, and then later (while still enrolled in Health First Colorado) be diagnosed with end-stage renal disease (ESRD) or chronic obstructive pulmonary disease (COPD). Under the IFR, assuming continuous Medicaid coverage during that period, the member *could not* self-attest to medical frailty based on the later-diagnosed ESRD or COPD conditions and thus could lose coverage if they could not obtain documentation for these diagnoses.

66.     Moreover, and as discussed above, Health First Colorado is statutorily required to provide notice to members regarding the changes occasioned by the IFR on or before August 31, 2026. 42 U.S.C. 1936a(xx)(8)(A) (directing states to begin outreach no later than four or more months before December 31, 2026). At present, Health First Colorado is uncertain as to how, for example, a member might establish that they are medically frail. Accordingly, the content of this notice will not have the clarity required to communicate to members how they can comply with the new requirements.

67.     Health First Colorado has spent years conducting outreach and building relationships with Health First Colorado enrollees. Confusion over eligibility determinations risks harming that relationship and lowering institutional trust. Members who do not understand why they were disenrolled or what is required to be eligible may simply forego coverage.

68. Given that Medicaid is Colorado's single largest health care coverage program, Colorado's uninsured rates will undoubtedly increase with the number of members impacted by these unexpected changes in the IFR. As discussed below, this has negative economic and health care impacts on both Health First Colorado and the entire state.

**Administrative, Operational, and Financial Burdens on Colorado**

*Burdens on Health First Colorado*

69. Because CMS had never before imposed community engagement requirements across eligibility categories, Health First Colorado's eligibility system was not built to support community engagement requirements and it is not easily configured to incorporate the numerous eligibility factors necessary to evaluate community engagement. Typically, eligibility systems changes require 12 months to complete, test, and implement. Given that the IFR was released only seven months prior to the effective date of these requirements, Colorado will struggle to implement IT systems changes consistent with the IFR.

70. As mentioned above, HCPF submitted its Advance Planning Document (APD) to CMS on October 28, 2025, based on then-available information and guidance from CMS. CMS approved Colorado's APD in November 2025. Since then, HCPF worked with the Colorado General Assembly during the 2026 legislative session, which ran from January to May, to secure matching state funds for systems changes and needed staff. The new and unexpected requirements in the IFR upends that planning and will require additional funds, staff, and contractors to complete, which HCPF cannot secure before the January 1, 2027 effective date of the IFR requirements. And given Colorado's already well-documented budget crisis, allocating additional state resources to implementing these work requirements will take limited state funding away from other Colorado programs or away from core Medicaid benefits and services.

71.     With respect to the medical frailty exclusion, the surprising additional "significant impairment" requirement—plus the uncertainty of how to implement it—will require Health First Colorado to rapidly change its operational approach and systems development. In addition to analyzing, developing, and implementing new ways to evaluate medical frailty, Health First Colorado may need to integrate new data sources to evaluate members' eligibility for the medical frailty exclusion, which will add development costs as well as potential costs from accessing new data. As more individuals are impacted and denied coverage or disenrolled as a result of this requirement, Health First Colorado expects more calls, more documents to process, and more administrative appeals of adverse actions. And finally, in addition to the costs of operationalizing this new requirement, Health First Colorado will also incur the cost of educating its members, staff, and other stakeholders about what the requirement means and how it can be met.

72.     Health First Colorado also expects the new, complex, and variable limitations on self-attestation to increase its operational complexity. These limitations will make it harder to train staff, vendors, application assisters, and community organizations on eligibility processes. As with the medical frailty exclusion, Health First Colorado expects the self-attestation limitation to lead to more calls, more documentation to be scanned and reviewed by staff, and more denials and disenrollments that, themselves, lead to more calls and appeals. In addition, the change in the self-attestation rules from 2027 to 2028 will require additional system development, training, and outreach and education to accommodate the new 2028 rules.

*Burdens on Colorado*

73.     The burdens from community engagement requirements imposed by H.R. 1, and made worse by the IFR, fall not just on Health First Colorado, but on Colorado more generally. As noted above, Health First Colorado members will likely face increased denials and

disenrollments—and, due to the "significant impairment" requirement for medical frailty, many of those disenrollments could be of some of Health First Colorado's most medically needy members. The IFR will have a disproportionate impact on members with disabilities and chronic health conditions who are part of Health First Colorado's expansion population. Colorado's budget will suffer harm due to loss of federal matching funds when eligible individuals lose Medicaid coverage and due to providing individuals with largely uncompensated emergency care whose health has deteriorated while they were unable to secure needed health care services as a result of the community engagement requirements. Health First Colorado also anticipates that more people will move into disability categories of coverage, which are higher cost and draw a significantly lower federal match of 50% instead of Colorado's current 90% expansion population match under the Affordable Care Act.

74. As the uninsured rate increases, there will be a greater financial strain on providers – in particular rural, community, and safety net hospitals as well as community health centers – that will be called upon to provide even greater levels of uncompensated care.

75. Furthermore, individuals who are disenrolled from Health First Colorado will likely lose access to primary and preventive care – and care necessary to treat their medical conditions – resulting in more individuals seeking high-cost, emergency care. This lack of preventative care will result in increased communicable disease outbreaks and more strain on Health First Colorado. Most importantly, Health First Colorado expects poorer health outcomes across Colorado, as fewer people will be able to access appropriate, timely care and manage chronic conditions.

76. Finally, Health First Colorado expects that the new medical frailty requirements—both the "significant impairment" requirement and the limitations of medical frailty self-attestation—will place a significant administrative strain on treating healthcare providers. In order

to support members seeking medical frailty exemptions, providers may need to devote time to providing documentation to demonstrate that a member is medically frail and experiencing significant impairment in their ability to work. This will require providers to take time away from their patient care and will increase administrative strain, adding to healthcare costs and impacting access to care. Providers are already sharing their concerns about additional paperwork, the lack of medical training for the specific purpose of opining on ability to work, and the malpractice insurance implications.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 26th day of June 2026.

/s/ Adela Flores-Brennan
Adela Flores-Brennan
Medicaid Director, Colorado Department of Health
Care Policy and Financing