# EXHIBIT 6

## DECLARATION OF MELISA BYRD

I, Melisa Byrd, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of the District of Columbia. I am over the age of 18 and have personal knowledge, or knowledge based on review in my capacity as Senior Deputy Director and Medicaid Director at the District of Columbia Department of Health Care Finance ("DHCF") of information and records gathered by DHCF staff, of the matters set forth below. If called as a witness, I could and would testify competently to the matters set forth below.

## Professional and Agency Background

2. I am the Director for the District of Columbia State Medicaid program and Children's Health Insurance Program (CHIP) (known together in the District as DC Medicaid).

3. DHCF is the single state agency responsible for administering DC Medicaid. DC Medicaid provides low-income individuals and people with disabilities with comprehensive healthcare coverage and access to affordable, integrated, high-quality healthcare at no or low cost. DC Medicaid's coverage includes medical, dental, mental health and substance use treatment, long-term services and supports, and pharmacy.

4. DC Medicaid insures approximately 250,000 people, providing health coverage to children, families, and older adults—including some of the most vulnerable residents in the District, such as those experiencing homelessness, living with a disability, or who have a serious or complex medical condition.

5. DHCF administers DC Medicaid pursuant to federal law and regulations as well as the terms of the District's federally approved State Plans and its Section 1115 Demonstration Project. DC Medicaid receives federal Medicaid and CHIP funding, known as "Federal Financial

Participation" (FFP), which covers at least 70 percent (for most populations) and up to 90 percent (for certain expansion adults) of DC Medicaid's expenditures on services for eligible enrollees.

**Medicaid Expansion in the District of Columbia**

6.      On January 1, 2014, the District implemented Medicaid expansion under the Affordable Care Act (the "ACA"). This expansion extended federally funded comprehensive health insurance to low-income childless adults aged 19 to 64 with household incomes up to 133% of the Federal Poverty Level.

7.      Enrollees in the District's Medicaid expansion program receive full, comprehensive benefits that include hospital care, prescription drugs, mental health services, and preventive care. Currently, eligibility for the District's Medicaid expansion program requires that an individual (1) be an adult 19-64 years old; (2) be a citizen or qualified immigrant; and (3) have household income less than or equal to 133% of the Federal Poverty Level.

8.      As of FY 2026, approximately 79,000 (29%) of DC Medicaid members are enrolled in the District's Medicaid expansion program in an average month. For the District's current fiscal year 2026 approved budget, approximately $1.1 billion (27%) of DC Medicaid's federal Medicaid funding for provider services comes from the FFP for the District's Medicaid expansion program members.

**CMS's Pre-IFR Guidance to the District of Columbia**

9.      Prior to the enactment of H.R. 1, the Medicaid Act has never required financially eligible individuals to work, volunteer, or meet other community engagement requirements to establish Medicaid eligibility. Consequently, DHCF does not have in place systems by which to verify work, volunteer, or other community engagement activities for DC Medicaid members.

10.     Since November 2025, CMS has been providing guidance on expected community engagement requirements policy. On December 5, 2025, CMS began working calls with states to provide guidance and conduct question-and-answer sessions with states on implementing community engagement. In the absence of regulations, DHCF relied on CMS guidance from these calls, and the associated slide decks and other materials, to determine how to comply with new laws, implement operational, system, and process changes, and, ultimately, avoid financial penalties that those laws imposed for noncompliance.

11.     DHCF likewise relied on the guidance shared by CMS on these regular calls concerning H.R. 1. Although CMS indicated that the guidance was non-final, at no point between the passage of H.R. 1 in July 2025 and the promulgation of the Interim Final Rule in June 2026 did CMS indicate that it would require "medically frail" individuals to have a significant impairment to their ability to comply with community engagement requirements. Nor did CMS indicate that states would need to verify that a member had such a significant impairment when determining eligibility for the medical frailty exclusion.

12.     Regarding use of self-attestation to verify medical frailty, while initially CMS signaled that only limited use of self-attestation would be permitted, CMS later indicated that self-attestation would be an acceptable verification method when data was not available.

**CMS Issues the Interim Final Rule**

13.     On June 1, 2026, CMS promulgated the Interim Final Rule ("IFR") relating to the community engagement requirement. The IFR includes several provisions that will be very challenging for DHCF to design by August 31, 2026, and implement before January 1, 2027, and are expected to cause significant harm to DC Medicaid members and DHCF once implemented.

14.     **Medical Frailty Exclusion**: The IFR added a new requirement that, in addition to falling into one of the five categories enumerated in H.R. 1, a "medically frail" individual must also be "an individual whose physical, mental, or other behavioral health condition significantly impairs the individual's ability to comply with the community engagement requirements." 42 CFR § 435.554(c)(5)(i).

15.     **Self-Attestation:** The IFR also significantly limits the occasions when an individual may rely on self-attestation to demonstrate compliance with community engagement. It does so using a complex and limiting framework (that changes again after the first year of implementation) that will be harmful for DC Medicaid members and difficult for DHCF to implement. The IFR also significantly limits members' ability to self-attest to community engagement eligibility factors after January 1, 2028, including for those factors where documentation is unlikely to be available, such as the precise number of hours that a family caregiver provides assistance to a family member or disabled individual (42 CFR § 435.554(c)(3)(i)(C)).

16.     **Data Feed Integration:** The IFR places very broad requirements on states to identify reliable data sources for verifying community engagement eligibility factors. The IFR appears to require DHCF to seek out and, where feasible, incorporate data sources for every factor of community engagement, even though such factors are numerous, have non-centralized data, and often relate to areas that DHCF has never assessed before, such as school attendance, community volunteer work, and job program enrollment.

17.     **Renewal Process:** The IFR lays out procedures for states to evaluate member compliance with community engagement requirements at renewal. However, these procedures will, in effect, deny DC Medicaid members the full window of time they are granted in H.R. 1 to

demonstrate they comply with work requirements. The effect of this structure is that electronic information for members will be evaluated for compliance with work requirements before—often months before—the end of the time period in which they are entitled to comply with work requirements is complete.

18. **Short-term Hardship Exceptions:** Although H.R. 1 allows states to apply exceptions for certain short-term hardship events, under the IFR, the short-term hardship exception requires a new applicant to demonstrate the exception for at least one, but not more than three consecutive months. An applicant also cannot demonstrate the exception for the same month in which they apply to Medicaid. This requirement ensures that newly eligible individuals experiencing hardship events will have to wait at least until the start of the following month to receive necessary coverage.

**<u>DHCF's Efforts to Implement the Community Engagement Requirements Before and After the IFR Issued</u>**

19. Following the enactment of H.R. 1, DHCF recognized that it would be extraordinarily challenging to complete the necessary system and process changes required by the August 31, 2026 notice deadline and January 1, 2027 implementation dates, given the magnitude of changes needed for the community engagement requirements and the short period of time afforded by H.R. 1. Therefore, after H.R. 1 was passed in July 2025, DHCF began work to prepare to comply with community engagement requirements.

20. Beginning in November 2025, and continuing until the release of the IFR, DHCF based its DC Medicaid policy and system determination on the statutory language and the subregulatory guidance provided by CMS. Based on this guidance, DHCF has already done the following:

- Conducted public outreach meetings based on statutory interpretation and preliminary guidance from CMS

- Drafted rulemaking for publication in the DCMR

- Drafted policy and procedure document based on statutory interpretation and preliminary guidance from CMS

- Drafted updates to application questions, eligibility notices, noncompliance letter, and adverse action letters and submitted documents for legal sufficiency review

- Developed eligibility system design for community engagement implementation, which included weeks of Joint Application Design and Joint Application Review with inter-agency stakeholders and DCAS contractors

- Allocated DHCF staff and contractor application development resources to ensure timely release of communication engagement system infrastructure (delaying other key releases to ensure federal compliance)

- Drafted RFP and contracted with public outreach firm to ensure broad communication of community engagement requirements in the District

21. With respect to implementing the medically frail exclusion in particular, DHCF has worked extensively to review clinical and systems information that will support a process to identify individuals who could be considered "medically frail." This information is based largely on claims data, in line with initial CMS guidance, but must now be substantially updated to accommodate new requirements proposed by CMS related to impairment.

22. DHCF faces several urgent deadlines with respect to implementing community engagement requirements for DC Medicaid. DHCF must apply community engagement requirements to applications and renewals as of January 1, 2027, and to do this, DHCF must

substantially finalize eligibility system requirements by June 26, 2026, in order to enable full system deployment, with appropriate testing, in December 2026. After June 26, 2026, DHCF will only have limited ability to make further system changes for use by January 1, 2027. Moreover, DHCF is required by H.R. 1 to issue notices by August 31, 2026 addressing the changes occasioned by the IFR.[1]  In order to issue notices by August 31, 2026, DHCF would need the content of the notice finalized by July 31, 2026, so that it can be sent for translation by August 15, 2026, and provided to the vendor for mailing by August 27, 2026.

23.     Nevertheless, DHCF still lacks clarity on several crucial issues from the IFR. While the IFR says that DHCF will need to evaluate whether a DC Medicaid member's medical condition significantly impairs their ability to work, CMS has provided only the most limited guidance about how DHCF should determine this. While CMS has said more subregulatory guidance will be provided, DHCF must develop its DC Medicaid eligibility systems and processes without knowing what this future guidance is—bearing the risk that the *future* guidance will conflict with its system development. This lack of clarity impacts not only DHCF, but also the messages that DHCF can provide DC Medicaid members: if DHCF does not understand what it means for a medical condition to "significantly impair" a member's ability to work, it cannot educate its members about how to demonstrate compliance with this requirement. Finally, the IFR does not clarify which data sources DHCF is required to have integrated as of January 1, 2027, and which can be integrated later. DHCF requires clarity on these issues in order to implement community engagement

---

[1] CMS has indicated in guidance and in the IFR that certain Medicaid agencies can issue notices in September 2026, *see* 91 Fed. Reg. 33,420, and DHCF has relied on this guidance to prepare to send information to DC Medicaid enrollees by September 4, 2026. For the reasons noted above, adjusting the timeline to send notices by the August 31, 2026 deadline in H.R. 1 would be even more challenging.

requirements in a timely fashion and to ensure that its members are prepared for this implementation.

24. Of note, the consequences for DHCF from building its DC Medicaid systems inconsistently with CMS's incomplete and as-yet unissued guidance are significantly heightened. If DHCF is not able to configure its systems quickly enough, or if it configures its systems inconsistently with CMS's eventual guidance, it could face negative audit findings and significant financial penalties under H.R. 1 Section 71106. In other words, at the same time that financial consequences for not complying with guidance are rising, CMS's failure to issue clear and timely guidance on community engagement requirements is making it harder for the District and other states to comply.

**Human Costs of Community Engagement Requirements, Made Worse By the IFR**

25. DHCF expects the "significant impairment" requirement to result in more DC Medicaid program members losing coverage than would otherwise have lost coverage under the statutory definition of medically frail. This is either because their condition may not meet the IFR's additional, non-statutory "significant impairment" threshold, or because they cannot obtain the proof required to demonstrate their ability to work is significantly impaired. The "significant impairment" requirement will also likely increase member confusion. DC Medicaid program members may think they do not qualify as "medically frail," given the added complexity, and DHCF may see an increase in non-responses from DC Medicaid members and decreased rates of application and renewal. The "significant impairment" requirement will also likely decrease the number of people DHCF can automatically verify as medically frail, because, under the IFR, the *ex parte* verification process will generally require not just a diagnosis code, but also other data on utilization of services and level of impairment, *see* 91 Fed. Reg. 33,406 (June 3, 2026), which may

not be available for many renewing members. This will further increase coverage loss because individuals will need to provide documentation or additional information to successfully renew. Finally, members with complex medical conditions can see fluctuations in their symptoms from day-to-day or month-to-month, which will make it even more difficult to assess whether their condition meets the "significant impairment" threshold.

26. Members with conditions that meet the statutory categories of medical frailty but who lose coverage due to inability to document "significant impairment" may return to DC Medicaid sicker and costlier for the loss of health coverage to treat and manage their conditions. This type of "churn" in Medicaid enrollment raises costs for DC Medicaid.

27. DHCF expects the IFR's limitations on self-attestation to increase DC Medicaid member confusion and coverage loss as well. In DHCF's experience, the requirement to obtain third party documents to demonstrate eligibility creates a procedural hurdle that increases termination rates for otherwise eligible members. Thus, as self-attestation tightens, DHCF expects that more DC Medicaid members who are actually eligible will be disenrolled simply because they will be unable to demonstrate their eligibility.

28. Beginning in 2028, DHCF also expects the "once per enrollment period" limitation on medical frailty self-attestations to particularly harm DC Medicaid members with multiple medically frail conditions, especially those who develop one medically frail condition, recover from it, and then develop a second medically frail condition during the same enrollment period. For example, a member could be diagnosed with cancer and self-attest to medical frailty on that basis, and then later (while still enrolled in DC Medicaid) be diagnosed with congestive heart failure. Under the IFR, assuming continuous Medicaid coverage during that period, the

9

member *could not* self-attest to medical frailty based on the congestive heart failure and thus could lose coverage if they could not obtain documentation for this diagnosis.

29. Under H.R. 1, DHCF is required to provide notice to DC Medicaid members regarding the changes occasioned by the IFR by August 31, 2026. 42 U.S.C. 1936a(xx)(8)(A). At present, DHCF is uncertain as to how, for example, a DC Medicaid member might establish that they are medically frail in accordance with the IFR. Accordingly, the content of this notice may not have the clarity required to communicate to members how they can comply with the new requirements.

30. DHCF has spent years conducting outreach and building relationships with DC Medicaid enrollees. Confusion over eligibility determinations risks harming that relationship and lowering institutional trust. Members who do not understand why they were disenrolled or what is required to be eligible may simply forego coverage.

**Administrative, Operational, and Financial Burdens on the District**

31. Because CMS had never before imposed community engagement requirements across eligibility categories, DC Medicaid's eligibility system was not built to support community engagement requirements and is not easily configured to incorporate the numerous eligibility factors necessary to evaluate community engagement. In addition to the federal grant funds for system implementation, DHCF anticipates at least another $2 million in system-related costs.

32. With respect to the medical frailty exclusion, the additional "significant impairment" requirement—plus the uncertainty of how to implement it—will require DC Medicaid to rapidly change its operational approach and systems development. In addition to analyzing, developing and implementing new ways to evaluate medical frailty, DC Medicaid may need to integrate new data sources to evaluate members' eligibility for the medical frailty

exclusion, which will add development costs as well as potential costs from accessing new data. As more individuals are impacted and denied coverage or disenrolled as a result of this requirement, DHCF expects more calls, more documents to process, and more appeals of adverse actions. And finally, in addition to the costs of operationalizing this new requirement, DHCF will also incur the cost of educating DC Medicaid members, staff, and other stakeholders about what the requirement means and how it can be met.

33. DHCF also expects the new, complex, and variable limitations on self-attestation to increase DC Medicaid's operational complexity. These limitations will make it harder to train staff, vendors, assisters, and community organizations on eligibility processes. As with the medical frailty exclusion, DHCF expects the self-attestation limitation to lead to more calls, more documentation to be scanned and reviewed by staff, and more denials and disenrollments that, themselves, lead to more calls and appeals. In addition, the change in the self-attestation rules from 2027 to 2028 will require additional system development, training, and outreach and education to accommodate the new 2028 rules.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 26th day of June 2026.

Melisa Byrd
Senior Deputy Director and Medicaid Director
District of Columbia Department of Health Care
Finance

11