# EXHIBIT 7

<u>**DECLARATION OF KATHERINE YAGER**</u>

I, Katherine Yager, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.	I am a resident of Illinois. I am over the age of 18 and have personal knowledge, or knowledge based on review in my capacity as Administrator of Medical Eligibility of information and records gathered by the Illinois Department of Healthcare and Family Services ("HFS") and agency staff, of the matters set forth below. If called as a witness, I could and would testify competently to the matters set forth below.

<u>**Professional and Agency Background**</u>

2.	I am the Administrator of Medical Eligibility for the Illinois State Medicaid program and Children's Health Insurance Program (CHIP) (known together in Illinois as the Illinois Medical Assistance Program).  In this role, I oversee eligibility determinations and enrollment into Illinois medical assistance programs, consisting of Medicaid and numerous other medical programs. My educational background includes a Master of Arts degree in Economics from the University of Missouri – Kansas City (2005) and Bachelor of Arts degree in Economics from the State University of New York – Binghamton (2001).  I have worked in the health care field since 2018.  During that time, I have served the public in state and city government and nonprofit positions, including as the Director of Medicaid for Chicago Public Schools, a board member of the National Alliance for Medicaid in Education (NAME), and a state health policy advocate in Illinois.

3.	 HFS is the single state agency responsible for administering the Illinois Medical Assistance Program. HFS's mission is to improve access to quality healthcare for the individuals enrolled in its programs, while simultaneously containing costs and maintaining program integrity.

4. The Illinois Medical Assistance Program covers approximately 3 million people, providing health coverage to children, families, and older adults--including some of the most vulnerable residents in the state, such as those experiencing homelessness, living with a disability, or who have a serious or complex medical condition.

5. Illinois administers the Illinois Medical Assistance Program in accordance with federal law and regulations as well as the terms of its federally approved State Plan and Medicaid waivers. A significant portion of the Illinois Medical Assistance Program is authorized and funded through the Medicaid federal-state partnership. The State of Illinois, through HFS, receives Medicaid dollars, known as "Federal Financial Participation" (FFP) which reimburses Illinois for an average of 60% of its expenditures on eligible enrollees.

6. HFS operates a single integrated eligibility system ("IES") in partnership with our sister agencies, the Illinois Department of Human Services and Illinois Department of Innovation and Technology, to administer the Illinois Medical Assistance Program, Supplemental Nutrition Assistance Program ("SNAP"), and Temporary Assistance for Needy Families ("TANF") program. Additionally, the three state agencies must jointly coordinate with a third-party vendor with their own contractual limitations, to manage the day-to-day system management, updates, and improvements, and the incorporation of updates needed to meet the new H.R. 1 requirements placed on the Illinois Medical Assistance Program and SNAP. Due to the complexity of the IES system and its effect on multiple state agencies and programs, the changes required by HR 1, and the compressed timeframe in which HFS has to implement them, place an inordinate strain on Illinois' system and processes.

**Medicaid Expansion in Illinois**

7. On January 1, 2014, the Illinois Medical Assistance Program expanded coverage to a new group of individuals eligible for Medicaid under the Affordable Care Act ("ACA"). This expansion extended federally funded health coverage under the federal Medicaid program to low-income adults aged 19 to 64 with household incomes up to 133% of the Federal Poverty Level. As of May 2026, approximately 660,000 of about 3 million Illinois Medical Assistance Program customers are in the ACA Adult Eligibility Group.

8. Individuals who are eligible for the Illinois Medical Assistance Program under the ACA Adult Eligibility Group receive full, comprehensive benefits that include hospital care, prescription drugs, mental health services, and preventive care. Currently, eligibility for the ACA Adult Eligibility Group in Illinois requires that an individual meet certain financial and nonfinancial requirements, including but not limited to (1) being an adult 19 to 64 years old; (2) being a citizen or qualified immigrant; (3) not being a parent or caretaker relative to minor children living in the home, and (4) having household income less than or equal to 133% of the Federal Poverty Level.

**CMS's Pre-IFR Guidance to Illinois**

9. I and my staff at HFS have been closely following the enactment and implementation of H.R. 1, in particular Section 71119, which imposes novel work or "community engagement" requirements for adults covered under the Medicaid expansion provisions of the ACA (the "work requirements").

10. Prior to the enactment of H.R. 1, the Medicaid Act has never required otherwise eligible individuals to work, volunteer, or meet other community engagement requirements to establish Medicaid eligibility. Consequently, the Illinois Medical Assistance Program does not

have existing systems capable of making eligibility determinations with regard to the work requirements included in H.R. 1.

11. Since November 2025, the Center for Medicaid and Medicare Services ("CMS") has been providing guidance on the expected work requirements policy. On November 19, 2025, CMS presented a slide deck on work requirements, which was later provided to states on December 4, 2025. On December 5, 2025, CMS began a series of workgroups to provide guidance and conduct question-and-answer sessions with states on implementing work requirements. These community engagement workgroup calls generally took place once every other week from December 2025 through April 2026 and switched to a weekly cadence starting in May 2026. As of the date of this declaration, this series of workgroup calls is still ongoing.

12. In addition to participating in these calls, from January 2026 through June 2026, the Illinois Medical Assistance Program engaged with CMS staff directly, including through biweekly one-on-one meetings with CMS staff, a meeting with senior CMS staff, and by sharing Illinois' Minimum Viable Product ("MVP") materials, which included a draft project plan and roadmap specific to Illinois. The Illinois Medical Assistance Program staff also provided additional information and clarification to these submissions upon CMS' request.

13. On January 7, 2026, the Illinois Medical Assistance Program sent its project plan and roadmap to CMS with design, production, testing, and implementation details and timelines for system changes. On January 30, 2026, the Illinois Medical Assistance Program sent the completed MVP checklist to CMS. Additional information and details on the state implementation schedule were sent to CMS throughout May 2026. As of the date of this declaration, the Illinois Medical Assistance Program has received no comments or concerns from CMS regarding these submissions.

14. In a one-on-one meeting on May 11, 2026, senior CMS staff leadership inquired about our readiness to meet the January 1, 2027 implementation date, based on the previously submitted release schedule, to which Illinois Medical Assistance Program staff responded that design for the most significant eligibility system changes began in January 2026 and would continue through June 2026 to ensure adequate time for production, testing and implementation before January 1, 2027. CMS staff raised no additional concerns about the phased implementation schedule in this conversation.

15. In the same one-on-one meeting, and in subsequent bi-weekly meetings, CMS expressed urgency in having Illinois demonstrate the functionality of completed system changes for CMS staff.

16. At CMS' recommendation, Illinois Medical Assistance Program staff documented policy decisions and working assumptions for these system changes made from January 2026 through May 2026 to document the state's good faith effort to implement work requirements timely. These working assumptions were submitted to CMS on May 31, 2026.

17. These interactions, as well as remarks provided by CMS at conferences and other state meetings, represent a long-held practice by CMS to provide guidance to states, outside of formal rulemaking, to aid in complying with urgent and significant changes in federal Medicaid law. In the absence of regulations, Illinois has historically looked to CMS subregulatory guidance, including those methods noted above, to inform how we can comply with new laws, implement operational, system, and process changes, and, ultimately, avoid financial penalties that those laws imposed for noncompliance.

18. In keeping with past practice, HFS used the guidance shared by CMS on these regular calls, their communications in our one-on-one meetings, remarks in national meetings and

conferences, and their written materials concerning H.R. 1, to inform us of our implementation strategy. This guidance was consistent with the plain language of H.R. 1 itself, which HFS also used as the basis of our design and implementation to date.

19. Specifically, regarding the definition of medical frailty, CMS indicated that it intended to "use a definition … similar to that described in regulations at 42 CFR § 440.315(f)," which is a regulation whose language closely resembles the H.R. 1 language regarding medical frailty. Nov. 19, 2025 CMS Slide Deck, page 11. CMS also stated that it expected to allow verification of medical frailty through "medical claims data review or provider documentation, or completion of a screening tool." Nov. 19, 2025 CMS Slide Deck, page 11; *see also* slide 17 ("medical frailty status … available through claims data" or "medical screener").

20. At no point between the passage of H.R. 1 in July 2025 and the promulgation of the Interim Final Rule in June 2026 did CMS indicate to the Illinois Medical Assistance Program that it would require medically frail individuals to have a "significant impairment" to their ability to comply with work requirements. Nor did CMS indicate that Illinois would need to verify that significant impairment when determining eligibility for the medical frailty exclusion.

21. Regarding the use of self-attestation to verify medical frailty, while initially CMS signaled that only limited use of self-attestation would be permitted, *see* Nov. 19, 2025 CMS Slide Deck pg. 16, CMS later indicated during the community engagement workgroup call on March 27, 2026, that self-attestation would be an acceptable verification method when data was not available.

22. During the community engagement workgroup call on March 27, 2026, CMS reiterated that states may use auditable self-attestation in the absence of data to verify medical frailty. CMS specifically noted that states could use such an auditable self-attestation "*to confirm*

6

*ongoing medical frailty"* in addition to when a customer newly identifies as medically frail. CMS also noted that states should be able to reassess individuals for medical frailty at redetermination, *even without extensive claims history*, based on new information such as a major life event. At no point did CMS indicate customers would be limited to only one self-attestation per enrollment period, even if they developed multiple and/or sequential medical frailty conditions.

23. On Friday, May 1, 2026, during the community engagement workgroup call, CMS presented a slide deck that included a definition of the medical frailty exclusion. These slides did not mention any requirement that an individual's medically frail condition would need to impair their ability to comply with work requirements.

24. On or about Wednesday, May 6, 2026, CMS informed states that information conveyed on the Friday, May 1, 2026 call should not be acted upon, and was subject to change.

**CMS Issues the Interim Final Rule**

25. On June 1, 2026, CMS promulgated the Interim Final Rule ("IFR") relating to work requirements. The IFR includes several surprising provisions that are vague, differ substantially from CMS's prior guidance, and/or are more restrictive than statutory language. To achieve compliance with the IFR, Illinois would have to reverse and rebuild significant system design, which will be costly, time consuming and could delay our ability to communicate the details of program changes to customers by August 31, 2026, and to implement before January 1, 2027. These provisions are also expected to cause significant harm to customers and to the Illinois Medical Assistance Program once implemented. These provisions include the following:

*Medically Frail Definition Changes*

26. With respect to the medically frail exclusion, the IFR added a new requirement that, in addition to falling into one of the five categories enumerated in H.R. 1, a "medically frail"

7

individual must *also* be "an individual whose physical, mental, or other behavioral health condition significantly impairs the individual's ability to comply with" the work requirements. 42 CFR § 435.554(c)(5)(i). This "significant impairment" requirement does not exist in the text of H.R. 1 Section 71119. *See* Social Security Act § 1902(xx)(9)(A)(ii)(II)(V) [42 U.S.C. 1396a(xx)(A)(ii)(II)(V)]. Additionally, the "significant impairment" requirement was not mentioned in any CMS written or verbal guidance communicated to the Illinois Medical Assistance Program before the IFR was published, this includes the CMS guidance about medical frailty provided to states as recently as May 1, 2026.

27. Because this requirement was unknown to Illinois until June 1, 2026, the extensive policy and system design undertaken prior to that date to meet statutory deadlines did not include it.

28. The IFR itself provides very little concrete guidance for states about how to verify whether an individual meets this new "significant impairment" requirement. However, the IFR does indicate that, in general, states *cannot* rely solely on diagnosis or condition codes, because doing so "would risk sweeping in individuals whose conditions do not significantly impair their functional capacity." 91 Fed. Reg. 33,373 (June 3, 2026). This is in direct conflict with prior guidance provided by CMS that states would have discretion in clinical standards for verification of medical frailty, including using claim-based data, such as diagnosis codes, to verify whether an individual meets the medical frailty exemption. Instead, the IFR says that states should verify medical frailty using information from "multiple domains," to determine a customer's "condition[s], utilization of services … and their level of impairment." 91 Fed. Reg. 33,406 (June 3, 2026). It also suggests that states could use "algorithms using administrative claims data that

assign acuity scores to individuals," *id.*, but does not explain what administrative data a state can use or what would be an acceptable analysis of such data.

29. Since the IFR's release, CMS has informed states on multiple occasions that it is developing significantly more guidance on the medically frail exclusion. However, as of the date of this declaration, this guidance has not yet been provided to the Illinois Medical Assistance Program.

*Self-Attestation Changes*

30. Unlike the guidance provided by CMS through fall 2025 and spring 2026, which indicated that an "auditable self-declaration" could generally be used when reliable data was unavailable, *see supra* ¶¶ 21-22, the IFR significantly limits the occasions when an individual may rely on self-attestation to demonstrate compliance with the work requirements. It does so using a complex and limiting framework (that changes again after the first year of implementation) that will be harmful for customers and difficult to implement.

31. Specifically, the IFR significantly limits customers' ability to self-attest to work requirement eligibility factors after January 1, 2028 by newly introducing the construct of a "period of enrollment" that can last several renewal cycles as long as the individual remains enrolled in Medicaid. The IFR limits self-attestation frequency to once in any customer's "period of enrollment."

32. Under Section 1902 of the Social Security Act and 42 CFR § 435.916, state Medicaid agencies are required to periodically (at least annually) conduct a complete redetermination of an individual's Medicaid eligibility, commonly called a "renewal" or "renewal cycle." The Social Security Act does not recognize a "period of enrollment," and Illinois's eligibility system is not designed to implement one and cannot be so designed without a significant

new level of effort from HFS staff and our eligibility system vendor. The "period of enrollment" concept is used in a way that hinders Illinois's operational ability to effectively and timely administer eligibility determinations for the Medicaid program, puts medically at-risk customers in danger of losing Medicaid coverage, and treats patients differently based on when in this period their medical impairment may arise.

33. Generally, a renewal of Medicaid eligibility involves a review of all eligibility factors. However, the IFR creates different sets of rules that Illinois must apply in conducting eligibility determinations related to the work requirements based on whether an individual is within a period of enrollment and whether, during that period, the individual has previously submitted a self-attestation. This distinction on when self-attestation can be used exacerbates the operational complexity the state faces in implementing the requirements with fidelity and increases the risk of confusion on the part of the customers.

34. Prior to the IFR and its introduction of the new concept of a "period of enrollment," the use of self-attestation or a failure to verify an eligibility factor in a previous renewal cycle would not adversely impact an individual in their current renewal.

35. Furthermore, the new requirements regarding the frequency of self-attestation, particularly as they relate to medical frailty, will likely create confusion around eligibility and compliance which can lead to disruptions in the continuity of care.

*Data Integration Changes*

36. The IFR places very broad requirements on states to identify reliable data sources for verifying work requirement eligibility factors. The IFR requires Medicaid agencies to use "reliable information available to the State" to verify eligibility, which it defines as "information necessary for determining [community engagement requirements] eligibility to which the agency

10

has access *or should have access*." 42 CFR § 435.557(a) (emphasis added). The IFR thus appears to require states to seek out and, where feasible, incorporate data sources for every factor of work requirements, even though such factors are numerous, have non-centralized data, and often relate to areas that Medicaid agencies have never assessed before, such as school attendance, community volunteer work, and job program enrollment. While CMS has previously indicated there would be a phased approach to adding data sources, *see* 11/19/2025 CMS slide deck pg. 28, the new regulation does not expressly permit this, and implementation in Illinois will impose operational challenges, risk our implementation schedule, and subject the state to additional cost.

*Renewal Process Changes*

37. The IFR lays out procedures for states to evaluate customer compliance with work requirements at renewal. However, these procedures will, in effect, deny customers the full window of time they are granted in H.R. 1 to demonstrate they comply with work requirements.

38. If a state cannot verify whether a customer is still eligible for Medicaid through its *ex parte* data sources, the state sends the customer a pre-populated renewal form to complete. *See* 42 CFR § 435.916(a)(3). According to the IFR, most states begin their renewal process and, if necessary, send this pre-populated form about 60 to 90 days before a customer's renewal is due. 91 Fed. Reg. 33,390 (June 3, 2026). Illinois sends renewals out 60 days before a customer's renewal is due. According to the IFR, if a state cannot *ex parte* verify compliance with work requirements, the state may either send "a notice of noncompliance" with this renewal form or as a follow-up after the customer returns the renewal form if the state still cannot verify work requirements compliance. 91 Fed. Reg. 33,411–12. The "notice of noncompliance," which is mandated by H.R. 1, provides customers with only 30 days to respond, after which the customer must be disenrolled if compliance with work requirements still cannot be verified. Social Security

11

Act Section 1902(xx)(6) [42 U.S.C. 1396a(xx)(6)]. This disenrollment must happen no later than the month following the month in which the 30-day period expires. *Id.* The IFR says that this 30-day period cannot be extended and says that "[s]tates must complete the entire renewal process, including the noncompliance procedures, by the end of the beneficiary's eligibility period." 91 Fed. Reg. 33,412 (June 3, 2026).

39. The effect of this structure is that customers will be evaluated for compliance with work requirements before—often *months* before—the time period in which they are entitled to comply with work requirements is complete. This abbreviated time period will increase the likelihood of coverage loss for otherwise eligible customers.

*Short-term Hardship Exception Changes*

40. H.R. 1 allows states to apply exceptions for certain short-term hardship events. These short-term hardship events include receiving inpatient medical services, residing in a county where an emergency or disaster has been declared by the President or where there is high unemployment, or traveling outside one's community for necessary medical services. *See* SSA § 1902(xx)(3)(B).

41. The IFR provides that the short-term hardship exception requires a new applicant to demonstrate the exception "for at least one, but not more than 3 consecutive months, as specified in the State plan, *immediately preceding the month of application*." 91 Fed. Reg. 33473 (emphasis added). An applicant cannot demonstrate the exception for the same month in which they apply to Medicaid.

42. This requirement ensures that newly eligible individuals experiencing hardship events will have to wait at least until the start of the following month to receive necessary coverage,

likely foregoing necessary care in the meantime or further straining our emergency health care system.

*Other Changes*

43. Several of the timelines set out in the IFR, including those for determining medical frailty and short-term hardships, do not take account of the fact that providers generally have 180 days to submit claims data. For determinations that are supposed to be made regarding the preceding year, the Illinois Medical Assistance Program may not have the most accurate and up-to-date claims data included in our system to process. Once again, the revised timelines associated with determining these exceptions will increase the risk of coverage loss for otherwise eligible individuals, particularly in light of the IFR's restrictions on self-attestation.

**The Illinois Medical Assistance Program's Efforts to Implement Work Requirements Before and After the IFR Issued**

44. Following the enactment of H.R. 1, the Illinois Medical Assistance Program recognized that it would be extraordinarily challenging to complete the necessary policy, system, and other process changes required by the August 31, 2026 notice deadline and January 1, 2027 implementation date. Given the short period of time afforded by H.R. 1 and the magnitude of changes needed to implement work requirements, along with other H.R. 1 mandated changes that impact the state's integrated eligibility and enrollment system, including changes to noncitizen eligibility, redetermination periods, retroactive coverage, and the SNAP program, the Illinois Medical Assistance Program began preparation to comply with work requirements immediately after the July 2025 passage of H.R. 1.

45. Moreover, the Illinois Medical Assistance Program is required by H.R. 1 to issue customer notices addressing the work requirements in H.R. 1 in August 2026. In order to meet this deadline, the Illinois Medical Assistance Program must have complete and accurate information

for inclusion in the notice by July 1, 2026. Case workers, call centers, and other state staff will need adequate time to train and be prepared to respond to customer and stakeholder inquiries after the notice is sent.

46. The Illinois Medical Assistance Program based its policy and system design on the statutory language and the guidance provided by CMS, as detailed above. Based on this guidance and in a good faith effort to meet the January 1, 2027 implementation deadline, the Illinois Medical Assistance Program has completed the following:

- Developed a project plan and roadmap detailing the technical buildout and timeline for our eligibility and enrollment system. The project plan and roadmap included a phased approach for design and development with the core design and build of the functionalities, as outlined in CMS' MVP checklist, scheduled for completion in the first half of calendar year 2026 to ensure adequate time for testing and implementation to enable full system deployment by January 1, 2027.

- Developed and shared with CMS a comprehensive release schedule encompassing all technical changes to its enrollment and eligibility system;

- Developed charters for each scheduled release that include detailed scopes of work and level of effort required by state agencies and the system vendors;

- Engaged in more than 60 design sessions and counting, making necessary policy and operational decisions based on existing guidance to ensure sufficient development, testing, and implementation time, including creating eligibility flows, processing logic, and language to program work requirements into the following:
  - o Revised application (paper and online);
  - o The work requirements screener;

- o The client and caseworker portals;

- o Eligibility determination logic and change in circumstances processes;

- o *Ex parte* renewal logic;

- o Six-month redetermination logic and processes;

- o Verification logic and exemption assessment; and

- o New and revised language for our notice of decision, redetermination forms, and request for additional verification notices, many others.

- Developed and launched a comprehensive customer and stakeholder engagement strategy. This engagement effort initiated broad communications with stakeholders to socialize H.R. 1 requirements and our working assumptions and progress, began development of customer centered tools for H.R. 1 requirements, and completed phase one of our customer outreach plan.

- Conducted comprehensive staffing assessments, including evaluation of health services caseworker hiring needs, staff training and other resources.

  - o These assessments did not include the additional specialized staffing resources required to meet the new administrative burdens in the IFR due to the changes to medical frailty and self-attestation noted above.

47. With respect to implementing the medically frail exclusion in particular, the Illinois Medical Assistance Program has worked extensively with consultants, HFS' actuarial vendor, and internal claims systems personnel to build a process to verify an individual's "medical frailty." This process is built largely on existing claims data, in line with CMS guidance to "verify medical frailty" based on a "medical claims data review or provider documentation." Nov. 19, 2025 CMS Slide Deck, page 11; *see also* slide 17 ("medical frailty status … available through claims data").

48. The Illinois Medical Assistance Program faces several urgent deadlines with respect to implementing work requirements. The Illinois Medical Assistance Program must apply work requirements to applications and renewals as of January 1, 2027. At this time, the Illinois Medical Assistance Program has very limited ability to make system changes outside of the current scope of work, which is based on the previous guidance. Any significant deviations from that previously provided guidance will require extensive policy and systems changes that jeopardize the state's ability to meet the January 1, 2027 deadline.

49. While the IFR signals a significant departure from this guidance, the Illinois Medical Assistance Program still lacks clarity on several crucial issues from the IFR. While the IFR says that the Illinois Medical Assistance Program will need to evaluate whether a customer's medical condition significantly impairs their ability to work, CMS has provided only the most limited guidance about how the Illinois Medical Assistance Program should determine this. While CMS has said more subregulatory guidance will be provided, the Illinois Medical Assistance Program is finalizing its eligibility systems and processes now, without knowing what this future guidance is—bearing the risk that the *future* guidance will also conflict with the systems changes already in place.

50. This lack of clarity impacts not only the administration of the Illinois Medical Assistance Program, but also the information that the Illinois Medical Assistance Program can provide its customers, stakeholders, and staff: if the Illinois Medical Assistance Program does not understand what it means for a medical condition to "significantly impair" a customer's ability to work, it cannot educate its customers about how to demonstrate compliance with this requirement, nor train its caseworkers and other staff responsible for processing applications and redeterminations in compliance with the new guidelines.

51.     Finally, the IFR does not clarify which data nor which data sources will be considered adequate to support a determination of significant impairment sufficient to build an *ex parte* verification process within our claims system and integrate those verifications into individual cases in our eligibility and enrollment system. The Illinois Medical Assistance Program requires clarity on these issues in order to implement work requirements in a timely fashion and to ensure that its customers are prepared for this implementation.

52.     Of note, the consequences for the Illinois Medical Assistance Program building its systems inconsistently with CMS's incomplete and as-yet unissued guidance are significantly heightened. If the Illinois Medical Assistance Program is not able to configure its systems quickly enough, or if it configures its systems inconsistently with CMS's eventual guidance, it could face negative audit findings and significant financial penalties under H.R. 1 Section 71106. In other words, at the same time that financial consequences for not complying with guidance are rising, CMS's failure to issue clear and timely guidance on work requirements is making it harder for Illinois to comply.

**Human Costs of Work Requirements, Made Worse By the IFR**

53.     The purpose of the ACA was to ensure that low-income individuals receive comprehensive healthcare coverage and have access to affordable, integrated, high-quality healthcare at no or low cost. However, the work requirements included in H.R. 1 are expected to result in large-scale disenrollment of customers, including customers who are eligible but unable to verify their eligibility in a manner that satisfies the stringent requirements in H.R. 1.

54.     Illinois studies conducted before the IFR was released suggest that (1) approximately 330,000 individuals or 50% of the Illinois Medical Assistance Program's ACA Adult Eligibility Group could be disenrolled at some point due to the combination of work

requirements and six-month redeterminations (a provision of H.R. 1 that requires ACA Adult Eligibility Group customers' eligibility to be reevaluated every six months), and (2) Illinois uninsured rates could grow from approximately 6% of the state's population to over 14%, reflective of pre-ACA uninsured levels. Because the IFR goes beyond H.R. 1, stripping away the protections provided in H.R. 1 to the medically frail and adding new limitations on self-attestation that do not appear in H.R. 1, there will be significant additional detrimental impacts that cannot be fully estimated at this time.

55. Indeed, the Illinois Medical Assistance Program expects the "significant impairment" requirement to result in more customers losing coverage than would otherwise have lost coverage under the statutory definition of medically frail. This is either because their condition may not meet the IFR's additional, non-statutory "significant impairment" threshold, or because they cannot obtain the proof required to demonstrate their ability to work is significantly impaired.

56. The "significant impairment" requirement will also likely increase customer confusion. The Illinois Medical Assistance Program customers may think they do not qualify as "medically frail," given the added complexity, and the Illinois Medical Assistance Program may see an increase in non-responses from customers and decreased rates of application. The "significant impairment" requirement will also likely decrease the number of people the Illinois Medical Assistance Program can automatically verify as medically frail, because, under the IFR, the *ex parte* verification process will generally require not just a diagnosis code or claims data, but also other and as yet unidentified data on utilization of services and level of impairment, *see* 91 Fed. Reg. 33,406 (June 3, 2026), which may not be available for many renewing customers. This will further increase coverage loss because individuals will need to provide documentation or additional information to successfully renew. Finally, customers with complex medical conditions

can see fluctuations in their symptoms from day-to-day or month-to-month, which will make it even more difficult to assess whether their condition meets the "significant impairment" threshold.

57. Customers with conditions that meet the statutory categories of medical frailty but who lose coverage due to inability to document "significant impairment" may return to the Illinois Medical Assistance Program sicker and costlier due to the loss of health coverage and inability to treat and manage their conditions. This type of "churn" in Medicaid enrollment both raises costs for the Illinois Medical Assistance Program and decreases the health and quality of life of customers.

58. The Illinois Medical Assistance Program expects the IFR's limitations on self-attestation to increase customer confusion and coverage loss as well. In the Illinois Medical Assistance Program's experience, the requirement to obtain third party documents to demonstrate eligibility creates a procedural hurdle that increases termination rates for otherwise eligible customers. Thus, as the use of self-attestation becomes more restricted, the Illinois Medical Assistance Program expects that more customers who are indeed eligible will be disenrolled due to barriers created by the new requirements.

59. The Illinois Medical Assistance Program also expects the "once per enrollment period" limitation on medical frailty self-attestations to be particularly harmful to customers with multiple medically frail conditions, especially those who develop one medically frail condition, recover from it, and then develop a second medically frail condition during the same enrollment period. For example, a customer could be diagnosed with cancer and self-attest to medical frailty on that basis, and then later (while still enrolled in the Illinois Medical Assistance Program) suffer from a new condition that takes time to be diagnosed and have associated claims. Under the IFR, assuming continuous Medicaid coverage during that period, the customer *could not* self-attest to

19

medical frailty based on the new condition and thus could lose coverage if they could not obtain adequate documentation for this diagnosis.

60.     The Illinois Medical Assistance Program is statutorily required to provide notice to customers regarding the changes occasioned by the IFR on or before August 31, 2026. 42 U.S.C. 1936a(xx)(8)(A) (directing States to begin outreach no later than four or more months before December 31, 2026). At present, the Illinois Medical Assistance Program is uncertain as to how, for example, a customer might establish that they are medically frail. Accordingly, the content of this notice will not have the clarity required to communicate to customers how they can comply with the new requirements.

61.     The Illinois Medical Assistance Program has spent years conducting outreach and building relationships with Illinois Medical Assistance Program customers. Confusion over eligibility determinations risks harming that relationship and lowering institutional trust. Customers who do not understand why they were disenrolled or what is required to be eligible may simply forego coverage.

**Administrative, Operational, and Financial Burdens on Illinois**

*Burdens on the Illinois Medical Assistance Program*

62.     Because CMS had never before imposed work requirements across eligibility categories, the Illinois Medical Assistance Program's eligibility and enrollment system was not built to support work requirements and is not easily configured to incorporate the numerous changes necessary to administer a work requirements program.

63.     The State of Illinois operates within a July 1 – June 30 fiscal year, which required the passage of a fiscal year budget for 2027 by the Illinois State Legislature in advance of May 31, 2026, the end of our annual legislative session. For fiscal year 2027, HFS requested state

appropriations to fund additional system enhancements, additional headcount, and customer outreach and communication resources based on operating assumptions that stemmed from H.R. 1's statutory requirements, as well as information and guidance we received from CMS staff in writing and orally in both public and one-on-one meeting settings. At the time the state budget was passed, HFS could not anticipate the increased appropriations for additional programming and specialized staffing that would be required to implement the significant and surprising new requirements presented in the IFR, thus exacerbating the budget impact on the State.

64. With respect to the medical frailty exclusion, the surprising additional "significant impairment" requirement—plus the uncertainty of how to implement it—would require the Illinois Medical Assistance Program to rapidly change its operational approach and systems development. In addition to analyzing, developing and implementing new ways to evaluate medical frailty, the Illinois Medical Assistance Program may need to integrate new data sources to evaluate customers' eligibility for the medical frailty exclusion, which will add development costs, as well as potential costs associated with accessing new data. Making such substantive changes puts our implementation schedule at grave risk.

65. Post implementation, as more individuals are impacted and denied coverage or disenrolled as a result of this requirement, the Illinois Medical Assistance Program expects more calls, more documents to process, and more appeals of adverse actions. These increased burdens on our staff and systems will demand additional caseworker, policy, and appeals staff resources and the need for ongoing and costly system updates.

66. Finally, in addition to the costs of operationalizing this new requirement, the Illinois Medical Assistance Program will also incur the cost of educating its customers, staff, and other stakeholders about what the requirement means and how it can be met. State caseworkers do not

have the qualifications nor expertise necessary to evaluate medical records. The Illinois Medical Assistance Program will incur additional costs in the training and hiring of staff with clinical expertise to perform these evaluations, as well as implementing systems changes to be able to accept this required documentation.

67. The Illinois Medical Assistance Program also expects the new, complex, and variable limitations on self-attestation to increase its operational complexity. These limitations will make it harder to train caseworkers, staff, vendors, enrollment assisters, and community organizations on eligibility processes. As with the medical frailty exclusion, the Illinois Medical Assistance Program expects the self-attestation limitation to lead to more calls, more documentation to be scanned and reviewed by staff, and more denials and disenrollments that, themselves, lead to more calls and appeals.

*Burdens on Illinois*

68. The burdens from work requirements imposed by H.R. 1 and made worse by the IFR fall not just on the Illinois Medical Assistance Program, but on Illinois more generally. As noted above, the Illinois Medical Assistance Program customers will likely face increased denials and disenrollments with the IFR likely disproportionately impacting customers with disabilities and chronic health conditions who are enrolled in the ACA Adult Eligibility Group and unable to verify the "significant impairment" requirement for medical frailty. As the uninsured rate increases, there will likely be a greater strain on providers – in particular, rural, community, and safety net hospitals as well as community health centers – that could be called upon to provide even greater levels of uncompensated care. Furthermore, individuals that are disenrolled from the Illinois Medical Assistance Program will likely lose access to primary and preventive care, resulting in more individuals seeking high-cost, emergency care. Most importantly, the Illinois

Medical Assistance Program expects poorer health outcomes across Illinois, as fewer people will be able to access appropriate care and manage chronic conditions.

69.    In addition, the Illinois Medical Assistance Program expects that the new medical frailty requirements—both the "significant impairment" requirement and the limitations on medical frailty self-attestation—will place a significant administrative strain on healthcare providers and Illinois human services staff. In order to support members seeking medical frailty exemptions, providers may need to devote uncompensated time to providing documentation to demonstrate that a member is medically frail and significant impairment in the ability to work. This will require providers to take time away from their patient care and increase their administrative strain adding to healthcare costs and impacting access to care.

70.    As noted above, the Illinois Medical Assistance Program will need to create an appropriately staffed infrastructure for the medical frailty evaluation and make eligibility system updates to accept customer and provider submitted content, which HFS neither contemplated prior to the IFR nor budgeted for.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 26th day of June 2026.

_____

Katherine Yager
Administrator of Medical Eligibility
Illinois Department of Healthcare and Family
Services

23