# EXHIBIT 8

## DECLARATION OF LISA LEE

I, Lisa Lee, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of the Commonwealth of Kentucky. I am over the age of 18 and have personal knowledge, or knowledge based on review in my capacity as Commissioner of the Kentucky Department for Medicaid Services of information and records gathered by our agency and agency staff, of the matters set forth below. If called as a witness, I could and would testify competently to the matters set forth below.

### Professional and Agency Background

2. I am the Director for the Kentucky State Medicaid program and Children's Health Insurance Program (CHIP) (known together in Kentucky as the Department for Medicaid Services or DMS).

3. DMS is the single state agency responsible for administering the Medicaid program. Medicaid provides low-income individuals with comprehensive healthcare coverage and access to affordable, integrated, high-quality healthcare at no or low cost. Medicaid's coverage includes medical, dental, mental health and substance use treatment, long-term services and supports, and long-term care. Medicaid's mission is to provide comprehensive healthcare coverage for a wide range of services, including, but not limited to: primary care; hospitalization; laboratory tests; x-rays; prescriptions; mental health care, including substance use disorder or addiction treatment; dental care; hearing care; vision care; and preventive screenings for Kentucky's residents who need this coverage.

4. DMS insures approximately 1,436,949 million Kentucky residents, providing health coverage to children, families, and older adults, including some of the most vulnerable

1

residents in the state, such as those experiencing homelessness, living with a disability, or who have a serious or complex medical condition.

5.      Kentucky administers the Medicaid program pursuant to federal law and regulations as well as the terms of its federally approved State Plans and its Section 1115 Demonstration Project. Kentucky Medicaid receives federal Medicaid and CHIP funding, known as "Federal Financial Participation" (FFP), which covers a percentage of Kentucky's expenditures on eligible enrollees. The current blended FFP across all populations for Kentucky is approximately 80% federal and 20% state.

**Medicaid Expansion in Kentucky**

6.      On January 1, 2014, Kentucky implemented Medicaid expansion under the Affordable Care Act (the "ACA"). This expansion extended federally funded comprehensive health insurance to low-income adults aged 19 to 64 with household incomes up to 133% of the Federal Poverty Level primarily through the Kentucky Medicaid program.

7.      Enrollees in Kentucky's Medicaid Expansion program receive full, comprehensive benefits that include hospital care, prescription drugs, mental health services, and preventive care. Currently, eligibility for Kentucky's Medicaid Expansion program requires that an individual (1) be an adult 21-64 years old; (2) be a citizen or qualified immigrant; and (3) have household income less than or equal to 133% of the Federal Poverty Level.

8.      As of June 22, 2026 approximately 443,570 of Kentucky's Medicaid program members are enrolled in Medicaid Expansion. For the current state fiscal year 2026, approximately $6.5 billion (32%) of Kentucky Medicaid's budget is spent on Medicaid Expansion members. Of this amount, 90% is funded by federal dollars.

**CMS's Pre-IFR Guidance to Kentucky**

9.      Me and my staff at DMS have been closely following enactment and implementation of H.R. 1, in particular Section 71119, which imposes novel work or community engagement requirements for adults covered under the Medicaid expansion provisions of the ACA (the "community engagement requirements").

10.     Prior to the enactment of H.R. 1, the Medicaid Act has never required financially eligible individuals to work, volunteer, or meet other community engagement requirements to establish Medicaid eligibility. Consequently, DMS does not have in place systems by which to verify work, volunteer, or other community engagement activities.

11.     Since enactment of H.R. 1, my staff and I have been developing and designing a system to support work and community engagement requirements for Medicaid Expansion members based on preliminary information and informal communications from CMS, pending the issuance of formal federal guidance.

**CMS Issues the Interim Final Rule**

12.     On June 1, 2026, CMS promulgated the Interim Final Rule ("IFR") relating to the community engagement requirement. The IFR includes several provisions that are vague, differ substantially from CMS's prior guidance, and are more restrictive than statutory language. These provisions will also be very challenging and costly for DMS to design by August 31, 2026, and implement before January 1, 2027, and are expected to cause significant harm to members and DMS once they are implemented. These provisions include the following:

- The medical frailty provisions contained in the federal final rule differ significantly from the preliminary information and informal communications that Kentucky had previously received from CMS. The final rule establishes more prescriptive requirements for identifying, evaluating, documenting, and maintaining medical

3

frailty exemptions than Kentucky anticipated during our initial planning efforts. As a result, the Department must reassess system designs, operational workflows, staffing models, and member communication strategies to ensure compliance with the finalized federal requirements.

- From an administrative perspective, the final rule will increase implementation and ongoing operational costs for Kentucky Medicaid. DMS will need to develop new screening and assessment processes, modify eligibility and case management systems, train staff, coordinate with managed care organizations and providers, establish appeal and review procedures, and maintain documentation demonstrating compliance with federal standards. These activities require significant information technology investments and additional administrative resources that were not fully contemplated under earlier planning assumptions.

- The requirements will likely also create challenges for Medicaid members. Individuals seeking a medical frailty exemption may be required to navigate additional documentation, verification, and reporting processes, which can be particularly difficult for individuals with serious physical health conditions, behavioral health conditions, cognitive impairments, substance use disorders, unstable housing, or limited access to healthcare providers. Increased administrative complexity can lead to confusion, delays in obtaining exemptions, and a greater risk that eligible individuals may experience interruptions in coverage if they are unable to successfully complete the required processes.

- The final rule's treatment of educational activities differs from the assumptions Kentucky Medicaid had been using during implementation planning. Based on

prior discussions and available information, DMS anticipated having greater flexibility in recognizing a broad range of educational pursuits as qualifying community engagement activities. However, the Interim Final Rule appears to define educational programs more narrowly, focusing on high school completion, GED programs, and traditional post-secondary education, such as two-year and four-year degree programs and community, technical, or career institutions.

- This narrower interpretation raises questions regarding whether graduate and professional education programs qualify as educational activities for purposes of meeting community engagement requirements. Excluding graduate-level education would create an inconsistency in policy, as individuals pursuing advanced degrees are engaged in rigorous educational activities specifically designed to improve workforce participation, increase earning potential, and address critical workforce shortages, including in healthcare, education, and other high-demand fields.

- From an administrative perspective, a narrower definition would require Kentucky Medicaid to develop additional eligibility and verification processes to distinguish between qualifying and non-qualifying educational programs. This increases operational complexity, requires modifications to eligibility systems and member guidance materials, and may create confusion among beneficiaries attempting to comply with community engagement requirements.

- For Medicaid members, the distinction may be difficult to understand and could result in individuals enrolled in graduate or professional programs being subject to work requirements despite actively participating in educational activities that support long-term economic self-sufficiency. Allowing graduate school to qualify

as an educational activity would better align with the underlying goals of community engagement, reduce administrative burden on the state, and provide clearer, more equitable treatment of individuals pursuing advanced education.

- The final rule's application of community engagement verification requirements to individuals receiving presumptive eligibility (PE) is particularly concerning because it does not adequately account for the temporary and preliminary nature of PE determinations. PE is designed to provide short-term access to healthcare services while a full Medicaid eligibility determination is completed. At the time PE is granted, the state has not yet completed all eligibility verifications and, in many cases, cannot determine with certainty whether an individual will ultimately qualify for Medicaid, let alone whether they will be enrolled in the expansion population subject to community engagement requirements.

- Requiring individuals receiving PE to demonstrate compliance with work and community engagement requirements is therefore neither practical nor operationally efficient. Kentucky Medicaid would be required to establish verification processes for individuals whose coverage may last only a matter of weeks and who may ultimately be determined ineligible for Medicaid or eligible under a coverage category exempt from community engagement requirements. This would require significant investments in systems, staffing, training, and administrative oversight to track and verify activities for individuals who may never become subject to the requirements.

- The IRF also creates unnecessary burden for applicants. Individuals seeking PE are often experiencing immediate healthcare needs and are focused on obtaining access

6

to medical services. Requiring these individuals to navigate community engagement reporting or verification processes before a final eligibility determination has been completed may create confusion, discourage participation, and delay access to needed care. The result is additional administrative complexity for Kentucky Medicaid and beneficiaries without a corresponding program integrity benefit.

**The Kentucky Department for Medicaid Service's Efforts to Implement the Community Engagement Requirements Before and After the IFR Issued**

13. Following the enactment of H.R. 1, Kentucky DMS recognized that it would be extraordinarily challenging to complete the necessary system and process changes required by the August 31, 2026 notice deadline and January 1, 2027 implementation dates, given the magnitude of changes needed for the community engagement requirements and the short period of time afforded by H.R. 1. Therefore, after H.R. 1 was passed in July 2025, DMS began work to prepare to comply with community engagement requirements.

14. Beginning in November 2025 and continuing until the release of the IFR, DMS based its policy and system determination on the statutory language and the subregulatory guidance provided by CMS, as detailed above. Based on this guidance, DMS has already done the following:

- Since the enactment of H.R. 1, Kentucky has undertaken substantial planning and implementation activities to prepare for the community engagement requirements applicable to Medicaid expansion members. These efforts began immediately following enactment and were based on the statutory requirements and the information available from CMS at the time. The Commonwealth has devoted significant staff time and resources across policy, eligibility, operations,

information technology, legal, communications, and program integrity functions to ensure timely compliance with federal requirements.

- Kentucky has initiated extensive modifications to its Integrated Eligibility and Enrollment System (IEES) to support the identification, tracking, administration, and reporting of community engagement requirements. These system changes include the development of functionality to identify individuals potentially subject to the requirements, capture exemption information, track compliance activities, support eligibility determinations related to community engagement, and facilitate required reporting and oversight activities. In addition, the Commonwealth has evaluated and begun modifying system interfaces and data-sharing processes necessary to support verification and compliance monitoring.

- The Commonwealth has also undertaken significant planning related to beneficiary communications and outreach. Draft member notices, educational materials, correspondence templates, and operational guidance have been developed to inform beneficiaries of their rights and responsibilities under the new requirements. These materials are intended to ensure members understand who is subject to community engagement requirements, available exemptions, reporting obligations, and the consequences of noncompliance. Kentucky has also begun preparing training materials and operational procedures for eligibility staff, call center personnel, managed care organizations, and other partners responsible for assisting members.

- Recognizing the importance of stakeholder input, Kentucky has conducted outreach and engagement activities with providers, managed care organizations, advocacy organizations, beneficiary representatives, and other interested parties to discuss

implementation considerations and identify potential operational challenges. These discussions have informed system design decisions, member communication strategies, and implementation planning efforts.

- The Commonwealth has further dedicated resources to policy development, legal analysis, business process redesign, project management, and operational readiness activities. These efforts have included assessing federal requirements, developing implementation timelines, identifying necessary system enhancements, evaluating staffing and training needs, and coordinating across multiple state agencies and contractors.

15. DMS faces several urgent deadlines with respect to implementing community engagement requirements. DMS must apply community engagement requirements to applications and renewals as of January 1, 2027, and to do this DMS must substantially finalize eligibility system requirements by July 1, 2026, in order to enable full system deployment, with appropriate testing, in October and November of 2026. After August 15, 2026, DMS will only have limited ability to make further system changes for use by January 1, 2027. Moreover, DMS is required by H.R. 1 to issue notices in July of 2026 addressing the changes occasioned by the IFR.

16. Of note, the consequences for Kentucky DMS from building its systems inconsistently with CMS's incomplete and as-yet unissued guidance are significantly heightened. If Kentucky DMS is not able to configure its systems quickly enough, or if it configures its systems inconsistently with CMS's eventual guidance, it could face negative audit findings and significant financial penalties under H.R. 1 Section 71106. In other words, at the same time that financial consequences for not complying with guidance are rising, CMS's failure to issue clear

9

and timely guidance on community engagement requirements is making it harder for Kentucky and other states to comply.

**Human Costs of Community Engagement Requirements, Made Worse By the IFR**

17. The purpose of the Affordable Care Act (ACA) was to ensure that low-income individuals receive comprehensive healthcare coverage and have access to affordable, integrated, high-quality healthcare at no or low cost.

18. Based on my professional experience, I believe that the requirements of IFR will harm the Commonwealth of Kentucky by creating a significant chilling effect that will result in individuals foregoing benefits for which they are eligible or seeking to disenroll themselves and their families from Kentucky Medicaid. Some people will also avoid critical preventative care and necessary medical treatment, and in some cases may even avoid emergency medical services, possibly resulting in death or serious injury.

19. This will also likely increase the risk of adverse health impacts for people in Kentucky. Deferring care can result in late-stage disease detection, unintended pregnancy, adverse health effects during pregnancy and childbirth, overdose, and increased morbidity and mortality for late-stage disease. Decreased access to prenatal care will lead to increased rates of premature births, low birth weight infants, and congenital defects.

20. These adverse health impacts will further strain scarce resources, negatively impact the budgeting assumptions underlying a managed care-dominant Medicaid program, and create worse health outcomes for Kentucky Medicaid members. For example, effective prenatal care lowers risks of premature births and NICU stays—each more expensive per capita. Managing chronic conditions (e.g., diabetes, hypertension) early and providing high quality preventive care can prevent expensive hospitalizations and more expensive episodes of care. Without Medicaid

10

coverage, these costs fall on state healthcare systems, community health centers, and local public health funds, undermining the cost-savings that Medicaid normally delivers. To the extent the treatment is left uncompensated, the cost of which will ultimately be shifted to the broader healthcare delivery system and the state.

**Administrative, Operational, and Financial Burdens on Kentucky**

*Burdens on Kentucky DMS*

21. Because CMS had never before imposed community engagement requirements across eligibility categories, DMS's eligibility system was not built to support community engagement requirements and is not easily configured to incorporate the numerous eligibility factors necessary to evaluate community engagement. Kentucky has requested $18.4 million and has spent $517,804, to date.

22. Implementation of Medicaid work and community engagement requirements imposes substantial administrative, operational, technological, and financial burdens on state Medicaid agencies. Unlike traditional eligibility determinations, community engagement requirements require ongoing monitoring, verification, exemption determinations, beneficiary education, and compliance tracking for a large population of members whose circumstances may change frequently.

Key administrative burdens include:

**Information Technology and Systems Changes**

- Modifying eligibility and enrollment systems to identify individuals subject to the requirements.
- Developing functionality to track participation hours, exemptions, good-cause exceptions, and compliance status.

11

- Creating interfaces with external data sources used to verify employment, education, training, volunteer activities, and other qualifying activities.

- Programming notices, alerts, workflows, reporting functions, and adverse action processes.

- Conducting testing, quality assurance, and ongoing system maintenance.

**Eligibility and Case Management Operations**

- Determining which beneficiaries are subject to community engagement requirements.

- Evaluating and processing exemption requests, including medical frailty determinations and other statutory exemptions.

- Reviewing and documenting good-cause exceptions.

- Monitoring compliance on an ongoing basis.

- Processing changes in circumstances that affect compliance status.

- Conducting eligibility redeterminations and coverage actions related to noncompliance.

**Verification and Documentation Requirements**

- Collecting and reviewing documentation from beneficiaries.

- Verifying employment, educational participation, volunteer activities, caregiving responsibilities, and other qualifying activities.

- Resolving discrepancies between self-attestation and third-party data sources.

- Maintaining documentation sufficient to satisfy federal oversight and audit requirements.

**Member Communications and Education**

- Developing and distributing beneficiary notices explaining requirements and exemptions.

- Updating websites, member handbooks, FAQs, and educational materials.

- Responding to beneficiary inquiries through call centers and eligibility workers.

- Conducting outreach to ensure beneficiaries understand reporting obligations and deadlines.

**Staffing and Training**

- Training eligibility workers, supervisors, call center staff, managed care organizations, and contractors.

- Developing policies, procedures, manuals, and job aids.

- Hiring or reallocating staff to manage increased workloads associated with verification, exemptions, appeals, and compliance monitoring.

- Providing ongoing training as federal guidance evolves.

**Appeals, Fair Hearings, and Due Process**

- Processing appeals related to exemption determinations and compliance findings.

- Preparing documentation and evidence for administrative hearings.

- Responding to beneficiary challenges and requests for reconsideration.

- Ensuring compliance with federal notice and due process requirements.

**Managed Care Coordination**

- Coordinating implementation activities with managed care organizations.

- Establishing data-sharing protocols and reporting requirements.

- Training managed care partners regarding beneficiary outreach and support responsibilities.

- Monitoring contractor performance and compliance.

**Federal Reporting and Oversight**

- Producing reports required by CMS.

- Responding to federal audits, reviews, and monitoring activities.

- Maintaining documentation demonstrating compliance with federal requirements.

- Tracking program outcomes and performance measures.

**Project Management and Governance**

- Coordinating implementation across multiple state agencies, contractors, and stakeholders.

- Managing information technology projects, procurement activities, and vendor contracts.

- Monitoring implementation timelines and regulatory compliance.

- Updating policies and procedures in response to new federal guidance.

Collectively, these requirements represent a significant expansion of Medicaid administrative responsibilities. They require substantial investments in technology, staffing, training, communications, and operational infrastructure that extend well beyond traditional Medicaid eligibility administration. The burden is particularly significant because compliance must be monitored continuously, exemptions must be evaluated on an ongoing basis, and beneficiary circumstances often change from month to month, requiring repeated review and verification activities.

*Burdens on Kentucky*

23. The burdens from community engagement requirements imposed by H.R. 1 and made worse by the IFR fall not just on DMS, but on Kentucky in general.

24. These negative health outcomes will also harm the overall health of all residents, by both straining Kentucky's healthcare delivery system as well as by increasing the potential risks of the spread of infection and illness.

25. Community-wide health suffers when individuals avoid care. The healthcare system will be overload in emergency departments and public clinics. There will be a rising disease

14

transmission risks, particularly for conditions detectable via routine screening as well as delays in addressing infectious outbreaks, due to underutilized testing and treatment services.

26. Hospitals are legally obligated to treat patients regardless of their ability to pay for emergency medical care. When individuals receive care at hospitals and cannot pay or refuse to enroll in Medicaid given the chilling effect of federal policies, the uncompensated care costs are pushed onto hospitals already operating on slim margins, potentially impacting service capacity and resulting in budget cuts, staffing reductions, and increased service costs for all individuals receiving care at the facility.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 26th day of June 2026.

Lisa Lee, Commissioner
Kentucky Department of Medicaid Services