# EXHIBIT 11

**DECLARATION OF RYAN SCHWARZ**

I, Ryan Schwarz, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of Massachusetts. I am over the age of 18 and have personal knowledge, or knowledge based on review in my capacity as State Medicaid Director of information and records gathered by EOHHS and agency staff, of the matters set forth below. If called as a witness, I could and would testify competently to the matters set forth below.

**Professional and Agency Background**

2. I am the Director for the Massachusetts State Medicaid program and Children's Health Insurance Program (CHIP) (known together in Massachusetts as MassHealth), and Assistant Secretary for the Massachusetts Executive Office of Health and Human Services (EOHHS).

3. EOHHS is the single state agency responsible for administering MassHealth. MassHealth provides low-income individuals with comprehensive healthcare coverage and access to affordable, integrated, high-quality healthcare at no or low cost. MassHealth's coverage includes medical, dental, mental health and substance use treatment, long-term services and supports, and long-term care. MassHealth's mission is to improve the health outcomes of our members for their families through services which sustainably and equitably promote health, well-being, independence, and quality of life.

4. MassHealth insures approximately 1.8 million people, providing health coverage to children, families, and older adults—including some of the most vulnerable residents in the state, such as those experiencing homelessness, living with a disability, or who have a serious or complex medical condition.

5. Massachusetts administers the MassHealth program pursuant to federal law and regulations as well as the terms of its federally approved State Plans and its Section 1115 Demonstration Project. MassHealth receives federal Medicaid and CHIP funding, known as "Federal Financial Participation" (FFP), which covers an average of 55% of MassHealth's expenditures on eligible enrollees.

**Medicaid Expansion in Massachusetts**

6. On January 1, 2014, Massachusetts implemented Medicaid expansion under the Affordable Care Act (the "ACA"). This expansion extended federally funded comprehensive health insurance to low-income adults aged 19 to 64 with household incomes up to 133% of the Federal Poverty Level primarily through the MassHealth CarePlus program.

7. Enrollees in MassHealth CarePlus receive full, comprehensive benefits that include hospital care, prescription drugs, mental health services, and preventive care. Currently, eligibility for MassHealth CarePlus requires that an individual (1) be an adult 21-64 years old; (2) be a citizen or qualified immigrant; (3) be a resident of Massachusetts; and (4) have household income less than or equal to 133% of the Federal Poverty Level.

8. As of May 2026, approximately 270,000 (14%) of MassHealth members are enrolled in CarePlus. For the current state fiscal year 2026, approximately $2.2 billion / 18% of MassHealth's federal Medicaid funding comes from the FFP for CarePlus members.

9. Since the passage of the ACA, Massachusetts has led the nation with the highest percentage of residents covered by health insurance, including MassHealth, commercial insurance, Medicare or other coverage. Currently, 97.9% of Massachusetts residents have health insurance.

**New Community Engagement Requirement**

10. In July 2025, the One Big Beautiful Bill Act, also known as H.R. 1, was signed into law. H.R. 1 included a provision, Section 71119, newly imposing community engagement requirements for adults covered under the Medicaid expansion provisions of the ACA as well as adults enrolled in certain 1115 demonstrations (the "community engagement requirements").

11. Section 71119 is summarized by the Congressional Research Service as follows[1]:

> This section requires, beginning not later than the first quarter after December 31, 2026 (or earlier, at the option of the state), individuals who are eligible for Medicaid as part of the Medicaid expansion population to engage in community service, work, or other activities in order to qualify for Medicaid.
>
> Specifically, the section requires these individuals to, on a monthly basis, (1) work at least 80 hours, (2) complete at least 80 hours of community service, (3) participate in a work program for at least 80 hours, (4) be enrolled at least half-time in an educational program, or (5) engage in any combination thereof for a total of at least 80 hours. Individuals may also qualify if they have a monthly income (or, for seasonal workers, an average monthly income over six months) that is at least as much as the equivalent of minimum wage multiplied by 80 hours.
> ...
>
> The section excludes certain individuals from these requirements, including those with serious medical conditions or with dependent children aged 13 or younger.

12. As noted by the Congressional Research Service's summary, through H.R. 1, Congress provided that certain individuals would be exempt from the community engagement requirement. Among other exemptions, the law exempted any individual "who is medically frail or otherwise has special medical needs (as defined by the Secretary), including an individual— (aa) who is blind or disabled (as defined in section 1614); (bb) with a substance use disorder; (cc) with a disabling mental disorder; (dd) with a physical, intellectual or developmental disability

---

[1] *See* H.R.1 - 119th Congress (2025-2026): An act to provide for reconciliation pursuant to title II of H. Con. Res. 14. | Congress.gov | Library of Congress.

that significantly impairs their ability to perform 1 or more activities of daily living; or (ee) with a serious or complex medical condition." Social Security Act § 1902(xx)(9)(A)(ii)(II)(V) [42 U.S.C. 1396a(xx)(A)(ii)(II)(V)].

13. H.R. 1 required CMS to promulgate an interim final rule implementing Section 71119 no later than June 1, 2026. H.R. 1 § 71119(d).

**CMS's Pre-Interim Final Rule (IFR) Guidance to States**

14. Prior to the enactment of H.R. 1, the Medicaid Act has never required financially eligible individuals to work, volunteer, or meet other community engagement requirements to establish Medicaid eligibility. Consequently, MassHealth does not have in place systems by which to verify work, volunteer, or other community engagement activities.

15. Since November 2025, CMS has been providing guidance on expected community engagement requirements policy. On November 19, 2025, CMS presented a slide deck on community engagement requirements, which was later provided to states on December 4, 2025. On December 5, 2025, CMS began participating in a series of workgroups to provide guidance and conduct question-and-answer sessions with states on implementing community engagement. These workgroup calls took place once every other week from December 2025 through April 2026 and switched to a weekly cadence starting in May 2026. As of the date of this declaration, this series of workgroup calls is still ongoing.

16. These sorts of calls represent a long-held practice by CMS to provide guidance to states, outside of formal rulemaking, in complying with urgent and significant changes in federal Medicaid law. Since at least the passage of the Families First Coronavirus Response Act (the "FFCRA", Public Law No. 116-127 (03/18/2020)), which created immediate pandemic-era protections upon enactment for Medicaid beneficiaries and continuing after the enactment of the

4

Consolidated Appropriations Act of 2023 (the "CAA", Public Law No: 117-328 (12/23/2022)), which required states to fully re-evaluate Medicaid eligibility for all beneficiaries at the end of pandemic-era enrollment protections, these calls and accompanying slide decks have been vital tools for state compliance with major changes in federal Medicaid law. In the absence of regulations, Massachusetts relied on CMS guidance from these calls, and the associated slide decks and other materials, to determine how to comply with the FFCRA and CAA, implement operational, system, and process changes, and, ultimately, avoid financial penalties that those laws imposed for noncompliance.

17. States likewise relied on the guidance shared by CMS on these regular calls concerning H.R. 1. Regarding the definition of medical frailty, CMS indicated that it intended to "use a definition … similar to that described in regulations at 42 CFR § 440.315(f)," which is a regulation whose language closely resembles the H.R. 1 language. Nov. 19, 2025 CMS Slide Deck, 11. CMS also stated that it expected to allow verification of medical frailty through "medical claims data review or provider documentation, or completion of a screening tool." Nov. 19, 2025 CMS Slide Deck, 11; *see also* 17 ("medical frailty status … available through claims data" or "medical screener.")

18. At no point between the passage of H.R. 1 in July 2025 and the promulgation of the Interim Final Rule in June 2026 did CMS indicate that it would require "medically frail" individuals to have a significant impairment to their ability to comply with community engagement requirements. Nor did CMS indicate that states would need to verify that a member had such a significant impairment when determining eligibility for the medical frailty exclusion.

19. Regarding use of self-attestation, while initially CMS signaled that only limited use of self-attestation would be permitted (*see* Nov. 19, 2025 CMS Slide Deck, 16), in February 2026

5

CMS indicated that self-attestation would be an acceptable verification method when data was not available. Specifically, CMS informed states that, when data was not available, auditable self-declaration would be one of two paths available to states for verification (the other path being requesting documentation).

20. In March 2026, CMS reiterated that states may use auditable self-attestation to verify medical frailty in the absence of claims data. CMS specifically noted that states could use such an auditable self-attestation *to confirm ongoing medical frailty* in addition to when a member newly identifies as medically frail. CMS also noted that states should be able to reassess individuals for medical frailty at redetermination, *even without extensive claims history*, based on new information such as a major life event. At no point did CMS indicate members would be limited to only one self-attestation per enrollment period, even if they developed multiple sequential medical frailty conditions.

21. On Friday, May 1, 2026, during the community engagement requirements workgroup call, CMS showed states a slide deck that included a definition of the medical frailty exclusion. These slides did not mention any requirement that an individual's medically frail condition would need to impair their ability to comply with community engagement requirements.

22. On or about Wednesday, May 6, 2026, CMS informed states that information conveyed on the Friday, May 1, 2026 call should not be acted upon, and was subject to change.

23. In response to this and concerns that CMS would change its policy direction related to community engagement, MassHealth sent a letter to CMS on May 29, 2026, conveying MassHealth's concerns with limiting the definition of medically frail and the use of self-attestation. This letter is attached as Exhibit A.

**CMS Issues Interim Final Rule**

24.	On June 1, 2026, CMS promulgated the Interim Final Rule ("IFR") relating to the community engagement requirement. The IFR includes several provisions that are vague, differ substantially from CMS's prior guidance, and are more restrictive than statutory language. These provisions also will be very challenging and costly for MassHealth to implement before January 1, 2027, and are expected to cause significant harm to members and MassHealth once implemented. These provisions include the following:

*Medical Frailty Definition*

25.	With respect to the medical frailty exclusion, the IFR added a new requirement that, in addition to falling into one of the five categories enumerated in H.R. 1, a "medically frail" individual must *also* be "an individual whose physical, mental, or other behavioral health condition significantly impairs the individual's ability to comply with the community engagement requirements." 42 CFR § 435.554(c)(5)(i).

26.	This "significant impairment" requirement does not exist in the text of H.R. 1 Section 71119. *See* Social Security Act § 1902(xx)(9)(A)(ii)(II)(V) [42 U.S.C. 1396a(xx)(A)(ii)(II)(V)]. In a webinar and slide deck presented to state Medicaid agencies on June 9, 2026, CMS acknowledged that, in addition to the statutory requirement that an individual meet the definition of medically frail supplied by Congress in section 71119, as codified at, 42 U.S.C. § 1396a(xx) (section 1902(xx) of the Social Security Act), the IFR also requires that the individual be significantly impaired in their ability to comply with community engagement requirements in order to be considered medically frail. CMS cited no statutory basis for this second, new requirement.

27.     Additionally, the "significant impairment" requirement was not mentioned in any CMS written or verbal guidance before the IFR was published, up to and including the CMS guidance about medical frailty provided to states as recently as May 1, 2026.

28.     The IFR provided very little concrete guidance for states about how to verify whether an individual meets this new "significant impairment" requirement.  However, the IFR does indicate that, in general, states *cannot* rely solely on diagnosis or condition codes, because doing so "would risk sweeping in individuals whose conditions do not significantly impair their functional capacity."  91 Fed. Reg. 33,373.  This is in direct conflict with prior guidance provided by CMS that states may use claims-based data to verify whether an individual meets the medical frailty exemption in general. Instead, the IFR says that states should verify medical frailty using information from "multiple domains," to determine a member's "condition[s], utilization of services … and their level of impairment."  91 Fed. Reg 33,406.  It also suggests that states could use "algorithms using administrative claims data that assign acuity scores to individuals" (*id.*) but does not explain what administrative data a state can use or what would be an acceptable analysis of such data.

29.     Since the IFR's release, CMS has told states that it is developing more guidance on the medically frail exclusion. However, this guidance has not yet been provided.

*Self-Attestation*

30.     Other than the IFR implementing H.R. 1, CMS allows state Medicaid agencies to accept self-attestation "without requiring further information (including documentation) from the individual" except "where the law requires other procedures (such as for citizenship and immigration status information)." 42 CFR 435.945(a).

31.     Apart from laws regarding verification of citizenship and immigration status, there are no other laws that prohibit or limit the use of self-attestation to verify other aspects of Medicaid eligibility, including H.R. 1's community engagement requirements.

32.     Unlike the guidance provided by CMS in winter and spring 2026, which indicated that an auditable self-declaration could generally be used when reliable data was unavailable, the IFR significantly limits the occasions when an individual may rely on self-attestation to demonstrate compliance with community engagement.  It does so using a complex and limiting framework that will be harmful for members and difficult to implement.

33.     <u>Before January 1, 2028</u>, the IFR says that states may accept self-attestation of compliance with community engagement requirements as well as eligibility for exceptions and exclusions, including medical frailty, if reliable data is not available to the state.  *See* 42 CFR § 435.557(b)(2)(i), (f)(i).

34.     <u>After January 1, 2028</u>, however, the IFR promulgates much more limited rules for when self-attestation may be used:

- For verifying the <u>medically frail</u> exclusion, states may accept self-attestation "only once during the beneficiary's period of enrollment."  42 CFR § 435.557(f)(1)(ii).  A beneficiary's period of enrollment is defined as "a continuous period of enrollment in coverage … without the individual being disenrolled."  42 CFR § 435.557(a).  In other words, a member can only self-attest to medical frailty once during a period of enrollment, even if a member later develops a new condition for which claims and other administrative data is not yet available.

- For verifying <u>other community engagement factors</u> apart from the medically frail exclusion, states "must require documentation whenever documentation is

reasonably available." 42 CFR § 435.557(b)(2)(ii). Only if documentation is not reasonably available must states accept "information other than documentation." 42 CFR § 435.557(b)(2)(ii)(A). In other words, a state must require a member to provide documentation whenever it cannot verify a community engagement eligibility factor via reliable data sources; only if no documentation is available can a state accept "other information" such as self-attestation from a member.

35. Thus, the IFR significantly limits members' ability to self-attest to community engagement eligibility factors after January 1, 2028. Of note, several community engagement eligibility factors are ones where documentation is unlikely to be available, such as whether a parent provides "some level of care" to their child (42 CFR § 435.554(a) (definition of "parent")); or the precise number of hours that a family caregiver provides assistance to a child or disabled individual (42 CFR § 435.554(c)(3)(i)(C)).

36. Under Section 1902 of the Social Security Act and 42 CFR § 435.916, state Medicaid agencies are required to periodically (at least annually) conduct a complete redetermination of an individual's Medicaid eligibility, commonly called a "renewal" or "renewal cycle." The Social Security Act does not recognize a "period of enrollment." That concept is introduced for the first time in the IFR and used in a way that hinders states' operational efficiencies, puts medically at-risk members in danger of losing Medicaid coverage, and treats patients differently based on when in this period their medical impairment may arise.

37. A renewal cycle generally lasts 12 months (or when section 71107 of H.R. 1 takes effect, 6 months for certain individuals). In contrast, under the IFR's newly introduced construct, a period of enrollment can last several renewal cycles as long as the individual remains enrolled in Medicaid.

38.     Under 42 CFR § 435.916, a renewal of Medicaid eligibility is a *de novo* review of all eligibility factors, except where prohibited to protect member eligibility (e.g., Medicaid agencies cannot require an individual to reverify citizenship under 42 CFR § 435.956(a)(4)(ii)). However, the IFR creates different sets of rules that the state must apply in conducting eligibility determinations related to the community engagement requirements based on whether an individual is within a period of enrollment and whether, during that period, the individual has previously submitted a self-attestation.  The IFR's distinction regarding when self-attestation can be used exacerbates the operational complexity the state faces in implementing the requirements with fidelity and increases the risk of confusion on the part of the members.

39.     Prior to the IFR and the introduction of the new concept of a "period of enrollment", the use of self-attestation or a failure to verify an eligibility factor in a previous renewal cycle would not adversely impact an individual in the current renewal.

40.     However, under the IFR, an individual who self-attests to medical frailty in, for example, 2028, and remains in the same period of enrollment through 2032 will be prohibited from self-attesting to medical frailty at a renewal in 2032, even if the individual is trying to attest to an entirely different medical frailty condition.  The result of the IFR's "period of enrollment" limitation is that members will be treated differently in their first attestation than in later renewals, even if they develop or experience new or different conditions that may qualify them for medical frailty exemptions later in their period of enrollment.

41.     Furthermore, there is no lockout period or other prohibition on reapplying for Medicaid after an individual has been disenrolled for failure to verify compliance with or exemption from the community engagement requirements. Therefore, an individual who is prohibited from self-attesting to medical frailty for a second time in the same enrollment period

11

and is subsequently terminated because the individual cannot obtain documents to verify medical frailty, can reapply once fully disenrolled and use self-attestation again at the start of a new period of enrollment. As such, the IFR has the potential to disrupt an individual's continuity of healthcare, increase costs and complexity to the state in implementing the rule, and, at the same time, fails as a meaningful work incentive or program integrity measure.

*Data Feed Integration*

42. The IFR places very broad requirements on states to identify reliable data sources for verifying community engagement eligibility factors. The IFR requires Medicaid agencies to use "reliable information available to the State" to verify eligibility, which it defines as "information necessary for determining [community engagement requirements] eligibility to which the agency has access *or should have access*." 42 CFR § 435.557(b) (emphasis added). The IFR thus appears to require states to seek out and, where feasible, incorporate data sources for every factor of community engagement, even though such factors are numerous, have non-centralized data, and often relate to areas that Medicaid agencies have never assessed before, such as school attendance, community volunteer work, and job program enrollment. While CMS has previously indicated there would be a phased approach to adding data sources (*see* 11/19/2025 CMS Slide Deck, 28), the new regulation does not expressly permit this.

*Renewal Process*

43. The IFR lays out procedures for states to evaluate member compliance with community engagement requirements at renewal. However, these procedures will, in effect, deny members with the full window of time they are granted in H.R. 1 to demonstrate they comply with community engagement requirements.

44.     H.R. 1 states that members only need to demonstrate compliance with community engagement requirements for one month "between such individual's most recent determination … of eligibility and such individual's next regularly scheduled redetermination of eligibility[.]" Social Security Act Section 1902(xx)(1)(B)(i) [42 U.S.C. 1396a(xx)(1)(B)(i)].[2] The IFR interprets this timeframe to mean that a member must demonstrate compliance with community engagement requirements "during the period between the effective date of such individual's most recent determination … and the date the individual's renewal is due." 42 CFR 435.556(a)(2)(i).  In prior published guidance on community engagement requirements, CMS has emphasized that it interprets H.R. 1 to mean that "the state *may not dictate* the specific months during which an applicable individual must demonstrate community engagement" between renewal periods.  CMS Informational Bulletin regarding Community Engagement Requirements, pg. 7 (emphasis added), dated Dec. 8, 2025, (available at State Requirements to Establish Medicaid Community Engagement Requirements).

45.     However, the IFR's process for evaluating community engagement requirements at renewal denies members this statutorily mandated opportunity to demonstrate compliance with community engagement requirements during any month since their last renewal and before their next renewal is due.

46.     As part of standard eligibility processes, if a state cannot verify whether a member is still eligible for Medicaid through its *ex parte* data sources, the state sends the member a pre-populated renewal form to complete.  *See* 42 CFR § 435.916(a)(3).  According to the IFR, most states begin their renewal process and, if necessary, send this pre-populated form about 60 to 90

---

[2] States may elect to have members demonstrate compliance with community engagement requirements for more than one month.  Social Security Act Section 1902(xx)(1)(B) [42 U.S.C. 1396a(xx)(1)(B)].  Massachusetts does not intend to do so.

days before a member's renewal is due. 91 Fed. Reg. 33,390. According to the IFR, if a state cannot *ex parte* verify compliance with community engagement requirements, the state may either send "a notice of noncompliance" with this renewal form, or as a follow-up after the member returns the renewal form if the state still cannot verify community engagement. 91 Fed. Reg. 33,411–12. The "notice of noncompliance," which is mandated by H.R. 1, provides members with only 30 days to respond, after which the member must be disenrolled if compliance with community engagement still cannot be verified. Social Security Act Section 1902(xx)(6) [42 U.S.C. 1396a(xx)(6)]. This disenrollment must happen no later than the month following the month in which the 30-day period expires. *Id.* The IFR says that this 30-day period cannot be extended and says that "states must complete the entire renewal process, including the noncompliance procedures, by the end of the beneficiary's eligibility period." 91 Fed. Reg. 33,412.

47. The effect of this structure is that members will be evaluated for compliance with community engagement requirements before—often *months* before—the time period in which they are entitled to comply with community engagement requirements is complete. For example, if a state starts renewal processes 90 days before an individual's renewal period expires, and sends the member a prepopulated renewal form and notice of noncompliance at this time, the member will be asked to demonstrate community engagement requirements when they are *only halfway through* the months in which they are entitled to comply with community engagement requirements (assuming they are on a 6 month renewal schedule).

48. The IFR expressly acknowledges this scenario: "Because most States currently take between 60 and 90 days to complete all steps in the renewal process for a cohort, an individual subject to renewals once every 6 months may only have been enrolled in their current eligibility

period for approximately 3 months when the State initiates the next renewal and begins checking reliable information available to the State." 91 Fed. Reg. 33,390.

49.     Per H.R. 1 and the IFR, members are required to respond to the notice of noncompliance within 30 days. Social Security Act Section 1902(xx)(6) [42 U.S.C. 1396a(xx)(6)]; 42 CFR § 435.558(a)(2). Thus, a member could be required to report on their community engagement activities *two months before* the period when they are allowed to engage in these activities is complete. For example, a member whose eligibility period began on January 1, could be asked on April 1 whether they have done work, school, or volunteering during any month between January and June, and the member could be required to report this information by May 1 – before May and June have even happened. The structure of the rule thus deprives members of two months in which they could meet or demonstrate exclusion from the community engagement requirements in order to maintain their coverage.

*Claims Data*

50.     The IFR limits states to using claims data that has been "adjudicated in the preceding 12 months." 42 CFR § 435.557(f). This provision prohibits MassHealth from accessing claims data relevant to determining a member's status as medically frail. For example, some individuals have permanent disabling conditions, such as quadriplegia, that do not require ongoing treatment—they may not have any claims data in the past 12 months that reflects their condition. This provision thus increases the risk of coverage loss for eligible individuals.

51.     Several of the provisions set out in the IFR do not take account of the fact that providers have 90 days to submit claims data. For individuals who have acquired a medically frail condition within the past 90 days, there may not be claims data available reflecting that condition. While permitting self-attestation could address this gap, as described above, the IFR has placed

15

stringent limits on when and how members may self-attest to medical frailty. Once again, this provision will increase the risk of coverage loss for otherwise eligible individuals.

**MassHealth's Efforts to Implement the Community Engagement Requirements Before and After the IFR Issued**

52. Following the enactment of H.R. 1, MassHealth recognized that it would be extraordinarily challenging to complete the necessary system and process changes required by the January 1, 2027 implementation date, given the magnitude of changes needed for community engagement requirements and the short period of time afforded by H.R. 1. Therefore, immediately after H.R. 1 was passed in July 2025, MassHealth began work to prepare to comply with community engagement requirements.

53. Beginning in November 2025 and continuing until the release of the IFR, MassHealth based its policy and system determination on the statutory language and the guidance provided by CMS, as detailed above. Due both to internal development timelines and timelines imposed by our eligibility system vendor, MassHealth did a large amount of work to implement community engagement requirements before the IFR was released. Based on pre-IFR guidance, MassHealth did the following:

- Conducted in-depth analysis of statutory text and CMS guidance, translating it into policy, operational, and system specification documents, requiring significant time and resources from MassHealth policy, clinical, systems, operations, fiscal/budget, strategy, legal, and leadership teams;

- Developed and programmed significant system functionality that was designed to enable MassHealth to determine if a member is subject to, excluded from, or compliant with community engagement requirements, based on MassHealth's

understanding of the statutory provisions and CMS guidance provided prior to the release of the IFR;

- Began actively developing integrations with new data sources;

- Drafted new notices and new application questions;

- Initiated public outreach and education campaigns in partnership with stakeholders to inform members, including presentations for thousands of members, advocates, plans, providers, community groups, municipalities, and other stakeholders;

- Expanded the contract with our contact center vendor to account for increased call volume; and

- Began the hiring process to increase number of state staff to account for increased documentation review.

54. With respect to implementing the medically frail exclusion in particular, MassHealth has worked extensively with clinical and systems personnel to build a process to identify individuals who could be considered "medically frail." This system is based largely on claims data, in line with CMS guidance to "verify medical frailty" based on a "medical claims data review or provider documentation." Nov. 19, 2025 CMS Slide Deck, 11; *see also* 17 ("medical frailty status … available through claims data").

55. MassHealth faces several urgent deadlines with respect to implementing community engagement requirements. MassHealth must apply community engagement requirements to applications and renewals as of January 1, 2027, and to do this, MassHealth must substantially finalize eligibility system requirements by mid-August, in order to enable full system deployment, with appropriate testing, in December 2026. After mid-August, MassHealth will only have limited ability to make further system changes for use by January 1, 2027. Moreover,

17

MassHealth is required by H.R. 1 to issue notices by August 31, 2026 addressing the changes occasioned by the IFR. Given the volume of notices being sent, MassHealth plans to begin sending notices in early August, which will require finalizing the notice by the beginning of August.

56. Nevertheless, MassHealth still lacks clarity on several crucial issues from the IFR. While the IFR says that MassHealth will need to evaluate whether a member's medical condition significantly impairs their ability to work, CMS has provided only the most limited guidance about how MassHealth should determine this. While CMS has said more guidance will be provided, MassHealth must develop its eligibility systems and processes without knowing what this future guidance is—bearing the risk that the future guidance will conflict with its system development. This lack of clarity impacts not only MassHealth, but also the messages that MassHealth can provide its members: if MassHealth does not understand what it means for a medical condition to "significantly impair" a member's ability to work, it cannot educate its members about how to demonstrate compliance with this requirement. Finally, the IFR does not clarify which data sources MassHealth is required to have integrated as of January 1, 2027, and which can be integrated later. MassHealth requires clarity on these issues in order to implement community engagement requirements in a timely fashion and to ensure that its members are prepared for this implementation.

57. The consequences for MassHealth from building its systems inconsistently with CMS's incomplete and as-yet unissued guidance are significant. If MassHealth is not able to configure its systems quickly enough, or if it configures its systems inconsistently with CMS's eventual guidance, it could face negative audit findings and significant financial penalties under H.R. 1 Section 71106. In other words, at the same time that financial consequences for not

complying with guidance are rising, CMS's failure to issue clear and timely guidance on community engagement requirements is making it harder for Massachusetts to comply.

**Harms to MassHealth's Members**

58.    The purpose of the Affordable Care Act (ACA) was to ensure that low-income individuals receive comprehensive healthcare coverage and have access to affordable, integrated, high-quality healthcare at no or low cost. It transformed Medicaid into a program designed to meet the health care needs of the entire nonelderly population with income below 133 percent of the poverty level. It formed a central building block of a comprehensive national plan to provide universal health insurance coverage. However, the community engagement requirements included in H.R. 1 are expected to result in large scale disenrollment of members, including members who are eligible but cannot verify their eligibility.

59.    Massachusetts studies conducted before the IFR was released suggest that (1) at least half of MassHealth's CarePlus members will be disenrolled at some point due to the combination of community engagement requirements and six-month redeterminations (a provision of H.R. 1 that requires CarePlus members' eligibility to be reevaluated every six months), and (2) Massachusetts uninsured rates will increase by up to 50%.[3] Because the IFR goes beyond H.R. 1, stripping away the protections provided in H.R. 1 to the medically frail and adding new limitations on self-attestation that do not appear in H.R. 1, these studies likely underestimate the impact to members.

60.    Indeed, MassHealth expects the "significant impairment" requirement to result in more members losing coverage than would otherwise have lost coverage under the statutory

---

[3] 90325_SixMonth_Redetermination_and_Work_Requirements_Impact_on_Massachusetts.pdf

definition of medical frailty. This is either because their condition may not meet the IFR's additional, non-statutory "significant impairment" threshold, or because they cannot obtain the proof required to demonstrate their ability to work is significantly impaired. The "significant impairment" requirement will also likely increase member confusion. MassHealth members may think they do not qualify as "medically frail," given the added complexity, and MassHealth may see an increase in non-responses from members and decreased rates of application. The "significant impairment" requirement will also likely decrease the number of people MassHealth can automatically verify as medically frail, because, under the IFR, the *ex parte* verification process will generally require not just a diagnosis code, but also other data on utilization of services and level of impairment, *see* 91 Fed. Reg. 33,406, which may not be available for many renewing members. This will further increase coverage loss because individuals will need to provide documentation or additional information to successfully renew. Finally, members with complex medical conditions can see fluctuations in their symptoms from day-to-day or month-to-month, which will make it even more difficult to assess whether their condition meets the "significant impairment" threshold.

61. MassHealth expects the IFR's limitations on self-attestation to increase member confusion and coverage loss as well. In MassHealth's experience, the requirement to obtain third party documents to demonstrate eligibility creates a procedural hurdle that increases termination rates for otherwise eligible members. Thus, as self-attestation tightens, MassHealth expects that more members who are actually eligible will be disenrolled simply because they are be unable to demonstrate their eligibility.

62. MassHealth also expects the "once per enrollment period" limitation on medical frailty self-attestations to particularly harm members with multiple medically frail conditions,

especially those who develop one medically frail condition, recover from it, and then develop a second medically frail condition during the same enrollment period. For example, a member could be diagnosed with cancer and self-attest to medical frailty on that basis in order to ensure immediate coverage for treatment, and then later (while still enrolled in MassHealth) develop major depressive disorder. Under the IFR, assuming continuous Medicaid coverage during that period, the member *could not* self-attest to medical frailty based on the major depressive disorder and thus could lose coverage if they could not obtain documentation for this diagnosis.

**Harm to MassHealth's Reputation with its Members and the Community**

63.     MassHealth has spent years conducting community-based outreach and building relationships with MassHealth members and member-serving organizations across the state. These efforts have also emphasized connecting with communities that historically face barriers to accessing and/or maintaining coverage, such as members experiencing homelessness and speakers of languages other than English. Confusion over eligibility determinations risks materially harming that relationship by lowering institutional trust, inserting confusion, and rolling back years of work to ensure that eligible members have the support and information necessary to stay covered. Members who do not understand why they were disenrolled or what is required to be eligible may simply forego coverage.

**Administrative, Operational, and Financial Burdens on Massachusetts**

*Burdens on MassHealth*

64.     Because CMS had never before imposed community engagement requirements across eligibility categories, MassHealth's eligibility system was not built to support community engagement requirements and is not easily configured to incorporate the numerous eligibility factors necessary to evaluate community engagement.     MassHealth is already expending

significant funds and resources toward implementing community engagement requirements—by way of example, MassHealth requested additional funding from the state legislature for fiscal year 2027 for purposes of implementing community engagement requirements—and expects those burdens to increase in the future. Now, the newly released IFR imposes an even greater burden on MassHealth, in particular by deviating from the statutory language and prior CMS guidance, adding a "significant impairment" requirement to the medically frail exclusion, and limiting the use of self-attestation.

65. With respect to the medical frailty exclusion, the added "significant impairment" requirement—plus the uncertainty of how to implement it—will require MassHealth to rapidly change its operational approach and systems development. In addition to analyzing, developing and implementing new ways to evaluate medical frailty, MassHealth may need to integrate new data sources to evaluate members' eligibility for the medical frailty exclusion, which will add development costs as well as potential costs from accessing new data. As more individuals are impacted and denied coverage or disenrolled as a result of this requirement, MassHealth expects more calls, more documents to process, and more appeals of adverse actions. And finally, in addition to the costs of operationalizing this new requirement, MassHealth will also incur the cost of educating its members, staff, and other stakeholders about what the requirement means and how it can be met.

66. CMS has provided little guidance to date on what will be required for states to implement the "significant impairment" requirement for medical frailty. However, to the extent CMS requires MassHealth to make individualized determinations of members' ability to work based on medical documentation, MassHealth expects that would be very costly and challenging. MassHealth eligibility workers do not currently have expertise in, or capacity for, reading

extensive medical documentation or determining how a members' ability to work is affected by certain medical conditions. Nor do eligibility workers have expertise in evaluating the physical and mental requirements for various potential work or community engagement activities necessary to determine whether an individual is significantly impaired in their ability to engage in those efforts. Developing this expertise and hiring enough workers to handle this additional workload would require a significant and unexpected expenditure of time and resources.

67. MassHealth also expects the new, complex, and variable limitations on self-attestation to increase its operational complexity. These limitations will make it harder to train staff, vendors, assisters, and community organizations on eligibility processes. As with the medical frailty exclusion, MassHealth expects the self-attestation limitation to lead to more calls, more documentation to be scanned and reviewed by staff, and more denials and disenrollments that, themselves, lead to more calls and appeals. In addition, the change in the self-attestation rules from 2027 to 2028 will require additional system development, training, and outreach and education to accommodate the new 2028 rules.

*Burdens on Massachusetts*

68. The burdens from community engagement requirements imposed by H.R. 1 and made worse by the IFR fall not just on MassHealth, but on Massachusetts more generally. As noted above, MassHealth members will likely face increased denials and disenrollments—and, due to the "significant impairment" requirement for medical frailty, many of those disenrollments could be of some of MassHealth's most medically needy members. As the uninsured rate increases, there will likely be a greater financial strain on providers – in particular rural, community, and safety net hospitals as well as community health centers – that will be called upon to provide even greater levels of uncompensated care. Furthermore, individuals that are

disenrolled from MassHealth will likely lose access to primary and preventive care – and care necessary to treat their statutorily recognized medical conditions – resulting in more individuals seeking high-cost, emergency care.  Most importantly, MassHealth expects poorer health outcomes across the Commonwealth, as fewer people will be able to access appropriate care and manage chronic conditions.

69.     In addition, MassHealth expects that the new medical frailty requirements—both the "significant impairment" requirement and the limitations of medical frailty self-attestation— will likely place a significant administrative strain on treating healthcare providers.  In order to support members seeking medical frailty exemptions, providers may need to devote time to providing documentation to demonstrate that a member is medically frail and significant impairment in the ability to work.  This will require providers to take time away from their patient care and increase administrative strain on providers, adding to healthcare costs and impacting access to care.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 26th day of June 2026.

Ryan Schwarz
Assistant Secretary for MassHealth
Executive Office of Health and Human Services

# EXHIBIT A





**MAURA T. HEALEY**
GOVERNOR

**KIAME MAHANIAH, MD, MBA**
SECRETARY

**KIMBERLEY DRISCOLL**
LIEUTENANT GOVERNOR

**MIKE LEVINE**
UNDERSECRETARY
FOR MASSHEALTH

May 29, 2026

Dan Brillman
Deputy Administrator and Director, Center for Medicaid & CHIP Services
7500 Security Boulevard
Baltimore, MD 21244

**Re: Massachusetts Feedback on Forthcoming CMS Interim Final Rule Regarding Medicaid Community Engagement Requirements**

Dear Director Brillman,

I am writing in reference to the forthcoming interim final rule regarding Medicaid Community Engagement requirements, which the Centers for Medicare and Medicaid Services (CMS) will issue as required by Public Law 119-21, also known as the "Working Families Tax Cut" (WFTC) legislation. Since the WFTC legislation was enacted last summer, Massachusetts has devoted considerable resources toward preparing for compliance with the new requirements, effective January 1, 2027, by responding to iterative guidance released by CMS and working in good faith to develop system, policy, and operational changes in a manner consistent with both the underlying statute and CMS' operational expectations as expressed through CMS interim guidance. I am writing this letter to share Massachusetts' perspective on the upcoming interim final rule and share some concerns about the potential impact of any significant deviation from the statute and CMS guidance shared to date.

One of the key assumptions impacting states' preparations for new Community Engagement requirements is related to the application of a "medically frail" exclusion, as described at Section 71119(a)(xx)(9)(A)(ii)(V) of the WFTC legislation. The statute excludes from the Community Engagement requirements "medically frail" individuals who have special medical needs as defined in five categories, including individuals 1) who are blind or disabled (as defined in section 1614 of the Social Security Act); 2) with a substance use disorder; 3) with a disabling mental disorder; 4) with a physical, intellectual, or developmental disability that significantly impairs their ability to perform one or more activities of daily living; or 5) with a "serious or complex" medical condition.

Massachusetts appreciates CMS staff highlighting Louisiana as a model for implementing the "medically frail" exclusion, where state officials have proposed using available data from claims and encounters (including ICD-10, CPT, and HCHPC codes) to identify members who meet the definitional categories for medical frailty. Additional CMS information provided to states, such as recommended strategies to

identify individuals with chronic conditions using CMS' Chronic Conditions Warehouse, have also helped inform our approach to implementation.

After reflecting on these inputs from CMS since the law's passage, Massachusetts believes that leveraging clinical data derived from claims and encounters provides the strongest strategy to ensure compliance with Community Engagement rules. Massachusetts is building system functionality to ingest claims- and encounter-based clinical information to inform whether members are excluded from the Community Engagement requirements taking effect on January 1, 2027. By leveraging these data to identify individuals who meet the five statutory categories for "medically frail," as well as accepting self-reported information from applicants with no available claims history, Massachusetts believes it can achieve broad, auditable compliance with federal rules, while minimizing the burden on members and providers impacted by Community Engagement requirements and allowing eligible Medicaid members to maintain their coverage.

Another key concept impacting states is the use of self-declaration in establishing eligibility criteria related to Community Engagement requirements. Historically, and unless otherwise required by law, CMS has allowed states to accept self-declaration to verify eligibility factors (*see* 42 CFR 435.945(a)). Massachusetts believes that the acceptance of self-declaration in certain situations is a critical tool to facilitate enrollment of new members, keep eligible members covered, and reduce administrative churn where eligible members may experience gaps in coverage due to paperwork issues. Allowing self-declaration is consistent with CMS' guidance since the passage of the WFTC legislation and reflects our shared commitment to preventing unintended member coverage loss.

Given the need for Massachusetts to meet statutory deadlines related to the WFTC legislation, we appreciate CMS' consideration of these points and ongoing partnership, as we continue our extensive system and policy development work in anticipation of CMS' interim final rule. We are well into the development process and have very limited time remaining before the January 1, 2027 effective date; as such, any material shift in federal policy regarding Medicaid Community Engagement requirements could result in a significant increase in implementation costs and disruptions to Massachusetts.

Sincerely,

Mike Levine
Undersecretary for MassHealth