# EXHIBIT 12

<u>**DECLARATION OF ELIZABETH HERTEL**</u>

I, Elizabeth Hertel, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am a resident of Michigan. I am over the age of 18 and have knowledge of all the facts stated herein, either personally or in consultation with staff at the Michigan Department of Health and Human Services (MDHHS) and/or based on documents that I have reviewed. If called as a witness, I could and would testify competently to the matters stated herein.

<u>**Professional and Agency Background**</u>

2.      I am the Director of MDHHS. In this role, I oversee Michigan's Medicaid programs.

3.      MDHHS is responsible for providing services and administering programs to improve the health, safety, and prosperity of the residents of the State of Michigan. One of these programs is Michigan's Medicaid program. Collectively, Michigan's Medicaid program and its Children's Health Insurance Program (CHIP) typically are referred to as Michigan Medicaid.

4.      Michigan Medicaid provides low-income individuals with comprehensive healthcare coverage and access to affordable, integrated, high-quality healthcare at no or low cost. Coverage includes medical, dental, mental health, substance use disorder treatment, long-term services and supports, and long-term care. MDHHS's mission is to improve the overall health and well-being of all Michiganders, which includes maintaining health care coverage for Michigan's residents using all relevant scientific and other data.

5.      Michigan Medicaid covers approximately twenty-five percent of Michigan's population. In total, MDHHS insures more than 2.4 million people, including over 1 million children—almost half of Michigan's kids—and almost half a million seniors and people with

disabilities. Michigan Medicaid recipients include some of Michigan's most vulnerable residents, such as those experiencing homelessness or those with serious or complex medical conditions.

6. MDHHS administers Michigan Medicaid pursuant to federal law and regulations, as well as the terms of its federally approved State Plans. Michigan Medicaid receives federal Medicaid and CHIP funding, known as "Federal Financial Participation" (FFP), which covers an average of seventy-one percent of Michigan Medicaid's expenditures.

**Medicaid Expansion in Michigan**

7. In 2013, Michigan implemented Medicaid expansion under the Affordable Care Act (ACA). This expansion extended federally funded comprehensive health insurance to low-income adults aged 19 to 64 with household incomes up to 133% of the Federal Poverty Level primarily through the Healthy Michigan Plan program (HMP).

8. Enrollees in HMP receive full, comprehensive benefits that include hospital care, prescription drugs, mental health services, and preventive care. Currently, eligibility for HMP requires that an individual (1) be an adult 19 to 64 years old; (2) be a citizen or qualified immigrant; and (3) have household income less than or equal to 133% of the Federal Poverty Level.

9. As of May 2026, approximately 650,000 or 26% of Michigan Medicaid enrollees are enrolled in HMP. For State fiscal year 2025, approximately $6 Billion or 32% of Michigan Medicaid's federal Medicaid funding comes from the FFP for HMP enrollees.

**CMS Issues the Interim Final Rule**

10. On June 1, 2026, CMS promulgated the Interim Final Rule (IFR) related to the new community engagement requirement contained within Section 71119 of H.R. 1. The IFR includes several provisions that are vague or are more restrictive than H.R. 1's requirements, including:

a. *Medically Frail Definition*: The IFR defines "medically frail" as "an individual whose physical, mental, or other behavioral health condition significantly impairs the individual's ability to comply with the community engagement requirements." 42 CFR § 435.554(c)(5)(i). The IFR provided little guidance for States about how to verify whether an individual meets this new "significant impairment" requirement. CMS has indicated that it is developing more guidance, though none has been provided.

b. *Self-Attestation Limitation*: A State's ability to accept a self-attestation related to the community engagement requirements is limited, as the IFR prohibits States from accepting a self-attestation if an individual has already used one during that enrollment period.

c. *Data Feed Integration*: States must identify reliable data sources, to which it "has or should have access," 42 CFR § 435.557(b), for verifying community engagement eligibility factors. These factors are numerous, have non-centralized data, and often relate to areas that Medicaid agencies do not typically assess, such as school attendance, community volunteer work, and job program enrollment. Although CMS has indicated its intention to develop national data interfaces to streamline access to these various verification sources, current federal guidance confirms that little of this infrastructure will be operational by January 1, 2027, leaving States without the integrated data supports contemplated under the IFR.

d. *Renewal Process*: The procedure for evaluating enrollee compliance with the community engagement requirements—including the IFR's deadlines, notice requirements, and documentation submission requirements, *e.g.*, 91 Fed. Reg.

33,390, 33,411–12 (June 3, 2026)—artificially abbreviates the time period enrollees may actually comply with the community engagement requirements. Under these procedures, enrollees may be evaluated for compliance with the community engagement requirements months before the deadline for demonstrating compliance.

e. *Short-Term Hardship Exemption*: The IFR prohibits States from allowing a short-term hardship exception for an individual in the same month they apply to Medicaid. 91 Fed. Reg. 33473. Additionally, H.R. 1 grants discretion to States to adopt some, all, or none of the exemptions; however, the IFR requires States to adopt all of them together, removing the flexibility built into H.R. 1.

f. *Timelines*: Several timelines fail to account for the 12-month claims data submission period. For determinations that must be made regarding the preceding year, MDHHS may not have the complete set of relevant data.

**MDHHS's Efforts to Implement the Community Engagement Requirements**

11. Following the enactment of H.R. 1, MDHHS recognized that it would be challenging to complete the necessary system and process changes required by the August 31, 2026 notice deadline and January 1, 2027 implementation date, given the magnitude of changes needed. Therefore, after H.R. 1 was passed in July 2025, MDHHS promptly began work to prepare to comply with the community engagement requirements. For example, MDHHS has reviewed and mapped its eligibility and verification workflows, identified the system modifications needed to incorporate new work-activity reporting and exemption-validation fields, and began coordinating with its systems vendors to define the technical requirements. MDHHS has also engaged program, legal, and IT staff in design sessions to ensure that the necessary policy changes,

4

data pathways, and notice templates can be developed within the statutory timelines. In addition, MDHHS has convened cross-agency workgroups, including representatives from workforce programs and education partners, to assess feasible data-sharing pathways and broader partnership opportunities.

12. With respect to implementing the medically frail exclusion in particular, MDHHS has worked extensively with clinical and systems personnel to build a process to identify individuals who could be considered "medically frail," leveraging claims data and other sources that reflect significant medical or functional vulnerabilities.

13. MDHHS faces several urgent deadlines with respect to implementing the community engagement requirements. MDHHS must apply community engagement requirements to applications and renewals as of January 1, 2027. As the deadline for identifying and defining required system changes has already passed, MDHHS is currently operating within a compressed period in which only narrowly targeted system changes can feasibly be implemented by January 1, 2027.

14. Moreover, MDHHS is required by H.R. 1 to issue notices by August 31, 2026, addressing the changes occasioned by the IFR. In order to issue those notices in a timely fashion, MDHHS will send an early awareness mailing in early July 2026 and will begin sending the formal member notices on August 17, 2026.

15. Following the issuance of the IFR, MDHHS has continued to develop its eligibility systems and processes and is striving to comply with the IFR's new requirements. However, MDHHS lacks clarity on certain aspects of the IFR, including, for example, how to implement the significant impairment requirement.

**Impact to Michigan Medicaid Enrollees**

16.     Michigan initially estimated that at least 200,000 Michigan Medicaid enrollees will be disenrolled at some point due to H.R. 1's combination of community engagement requirements and six-month redeterminations. MDHHS expects the "significant impairment" requirement to result in even more Michigan Medicaid enrollees losing coverage for a variety of reasons, including because the individual's condition may not meet the IFR's "significant impairment" threshold, because the "significant impairment" requirement limits the State's ability to verify the exclusion automatically, or because the individual cannot obtain the requisite proof to demonstrate such "significant impairment."

17.     Enrollees with conditions that meet the statutory categories of medical frailty, but who lose coverage due to inability to document "significant impairment" may return to Michigan Medicaid with more advanced health needs, increasing the cost and complexity of their care.

18.     MDHHS further expects that the limitations on self-attestation will increase Michigan Medicaid enrollee confusion. In MDHHS's experience, the requirement to obtain third party documents to demonstrate eligibility creates a procedural hurdle that increases termination rates for otherwise eligible enrollees.

19.     MDHHS is statutorily required to provide notice to enrollees regarding the changes occasioned by the IFR on or before August 31, 2026. 42 U.S.C. 1936a(xx)(8)(A) (directing States to begin outreach no later than four or more months before December 31, 2026). But MDHHS does not have the necessary clarity on the IFR's requirements to effectively communicate the changes.

20.     MDHHS has spent years conducting outreach and building relationships with Michigan Medicaid enrollees. Confusion over eligibility determinations risks harming that

relationship and lowering institutional trust. Enrollees who do not understand why they were disenrolled or what is required to be eligible may simply forego coverage.

**Harms to Michigan**

21. When H.R. 1 was enacted, MDHHS's eligibility system was not built to support community engagement requirements and required significant reconfiguration to incorporate the numerous eligibility factors necessary to evaluate community engagement. At the same time, MDHHS's eligibility workforce was already operating at capacity, limiting its ability to absorb the substantially increased workload associated with implementing community engagement determinations.

22. Michigan Governor Gretchen Whitmer's FY2027 budget proposal included substantial investments to support the increased administrative and operational demands associated with H.R. 1, including $80.3 million for ongoing Medicaid and SNAP staffing (589.0 FTEs); $11.7 million for beneficiary outreach, education, hearings, oversight, project management, and technical assistance; $30 million for workforce training and apprenticeship expansion; $2 million for a new data-sharing platform in the Michigan Department of Technology, Management and Budget; and an additional $2.8 million to upgrade the Bridges eligibility system to meet CMS technical requirements for H.R. 1 implementation.

23. Moreover, MDHHS is attempting to configure its eligibility system without a full understanding of the requirements of the IFR and, in particular, the significant impairment requirement. While additional guidance is forthcoming, the deadlines for MDHHS to design and define the eligibility system changes needed for the January 1, 2027 effective date have already passed, and MDHHS is now operating under significantly constrained timelines. MDHHS must rapidly change its operational approach and systems development; analyze, develop, and

implement new ways to evaluate medical frailty; and integrate new data sources, adding development costs as well as potential costs from accessing new data. If MDHHS is not able to reconfigure its systems quickly enough, or if it reconfigures its systems inconsistent with future CMS guidance on implementation, MDHHS could face negative audit findings and significant financial penalties under H.R. 1 Section 71106.

24. Additionally, as more individuals are impacted and denied coverage or disenrolled due to the significant impairment requirement, MDHHS expects more calls, more documents to process, and more appeals of adverse actions. MDHHS will also incur the cost of educating Michigan Medicaid enrollees, staff, and other stakeholders.

25. MDHHS further expects the limitations on self-attestation to increase its operational complexity, making it harder to train staff, vendors, assisters, and community organizations on eligibility processes. MDHHS expects the self-attestation limitation to lead to more calls, more documentation to be scanned and reviewed by staff, and more denials and disenrollments that, themselves, lead to more calls and appeals.

26. Michigan Medicaid enrollees will likely face increased denials and disenrollments, and many of those disenrollments could be of some of Michigan Medicaid's most medically needy. Individuals that are disenrolled from Michigan Medicaid will likely lose access to primary and preventive care, resulting in more individuals seeking high-cost, emergency care. In addition, the lack of preventative care will result in increased communicable disease outbreaks and more strain on MDHHS. MDHHS expects poorer health outcomes across Michigan, as fewer people will be able to access appropriate care and manage chronic conditions.

27. As the uninsured rate increases, there will be a greater financial strain on providers—in particular rural, community, and safety net hospitals as well as community health

centers—that will be called upon to provide even greater levels of uncompensated care. MDHHS also expects that the new medical frailty requirements will place an administrative strain on providers, who may need to devote time that otherwise would be spent treating patients to document both medical frailty and significant impairment in the ability to work.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 26th day of June 2026.

_____
Elizabeth Hertel
Director, Michigan Department of Health and
Human Services