

EXHIBIT 15

<u>**DECLARATION OF GREGORY WOODS**</u>

I, Gregory Woods, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of New Jersey. I am over the age of 18 and have personal knowledge, or knowledge based on review in my capacity as State Medicaid Director, of information and records gathered by the New Jersey Department of Human Services (DHS), Division of Medical Assistance and Health Services (DMAHS) and Department staff, of the matters set forth below. If called as a witness, I could and would testify competently to the matters set forth below.

<u>**Professional and Agency Background**</u>

2. I am the Assistant Commissioner for DMAHS and Director for the New Jersey State Medicaid program and Children's Health Insurance Program (CHIP) (known together in New Jersey as NJ FamilyCare).

3. DHS, through DMAHS, is the single state agency responsible for administering NJ FamilyCare. NJ FamilyCare provides low-income individuals with comprehensive healthcare coverage and access to affordable, integrated, high-quality healthcare at no or low cost. NJ FamilyCare's coverage includes medical, dental, mental health and substance use treatment, and home and community-based services. NJ FamilyCare's mission is to provide high-quality health coverage to people who qualify for the program.

4. NJ FamilyCare insures approximately 1.8 million people, providing health coverage to children, families, and older adults—including some of the most vulnerable residents in the state, such as those living with disabilities, experiencing homelessness, or who have serious or complex medical conditions.

5. New Jersey administers the NJ FamilyCare program pursuant to federal law and regulations as well as the terms of its federally approved State Plans and its Section 1115 Demonstration Project. NJ FamilyCare receives federal Medicaid and CHIP funding, known as "Federal Financial Participation" (FFP). In State Fiscal Year 2025, FFP provided approximately 61% of New Jersey's Medicaid and CHIP expenditures and New Jersey paid for 39% of those expenditures.

**Medicaid Expansion in New Jersey**

6. On January 1, 2014, New Jersey implemented Medicaid expansion under the Patient Protection and Affordable Care Act (the "ACA"). This expansion extended federally funded comprehensive health insurance to low-income adults aged 19 to 64 with household incomes up to 133% of the Federal Poverty Level primarily through the ACA Expansion group. The FFP for those covered under the Affordable Care Act Medicaid expansion is 90%.

7. Enrollees in the ACA Expansion group receive full, comprehensive benefits that include hospital care, prescription drugs, mental health services, and preventive care. Currently, eligibility for the ACA Expansion group requires that an individual (1) be an adult 19-64 years old; (2) be a citizen or qualified immigrant; and (3) have household income less than or equal to 133% of the Federal Poverty Level.

8. As of May 2026, approximately 30% of NJ FamilyCare members are enrolled in the ACA Expansion group. For the State Fiscal Year 2025, approximately $5.7 billion or 35% of NJ FamilyCare's federal Medicaid and CHIP benefit funding comes from the FFP for the ACA Expansion group.

<u>**CMS's Pre-IFR Guidance to New Jersey**</u>

9. I and my staff at NJ FamilyCare have been closely following enactment and implementation of H.R. 1, in particular Section 71119, which imposes novel work / community engagement requirements for adults covered under the ACA Expansion group (the "community engagement requirements").

10. Prior to the enactment of H.R. 1, the Medicaid Act has never required financially eligible individuals to work, volunteer, or meet other community engagement requirements to establish Medicaid eligibility. Consequently, NJ FamilyCare does not have in place systems by which to verify work, volunteer, or other community engagement activities.

11. Since November 2025, CMS has been providing guidance on expected community engagement requirements policy to States through a range of webinars, calls, workgroups, and forums. This is consistent with long-held practice by CMS to provide guidance to states, outside of formal rulemaking, in complying with urgent and significant changes in federal Medicaid law. In the absence of regulations, New Jersey has relied on CMS guidance from these calls, and the associated slide decks and other materials, to determine how to comply with new laws, implement operational, system, and process changes, and, ultimately, avoid financial penalties that those laws imposed for noncompliance.

12. States likewise relied on the guidance shared by CMS on various calls and forums concerning H.R. 1. Regarding the definition of medical frailty, CMS indicated in a December 4, 2025 slide deck that it emailed to states that it intended to "use a definition … similar to that described in regulations at 42 C.F.R. § 440.315(f)," which is a regulation whose language closely resembles the H.R. 1 language. Exhibit 1 (CMS Slide Deck) at 11. CMS also stated that it expected to allow verification of medical frailty through "medical claims data review or provider

documentation, or completion of a screening tool." Exhibit 1 at 11, 17 ("medical frailty status …

available through claims data" or "medical screener").

13.     Not until shortly before the issuance of the Interim Final Rule in June 2026 did CMS give any indication that it may require "medically frail" individuals to have a significant impairment to their ability to comply with community engagement requirements. Nor did CMS indicate that states would need to verify that a member had such a significant impairment when determining eligibility for the medical frailty exclusion.

14.     Regarding use of self-attestation to verify medical frailty, while initially CMS signaled that only limited use of self-attestation would be permitted, *see* Exhibit 1 at 16, CMS later indicated that self-attestation would be an acceptable verification method when data was not available.

15.     In March 2026, CMS communicated that states may use auditable self-attestation in the absence of claims data. CMS specifically noted that states could use such an auditable self-attestation to confirm ongoing medical frailty in addition to when a member newly identifies as medically frail. CMS also noted that States should be able to reassess individuals for medical frailty at redetermination, even without extensive claims history, based on new information such as a major life event. At no point did CMS indicate members would be limited to only one self-attestation per enrollment period, even if they developed multiple sequential medical frailty conditions.

16.     In May 2026, CMS presented to states a slide deck that included a definition of the medical frailty exclusion. These slides did not mention any requirement that an individual's medically frail condition would need to impair their ability to comply with community engagement requirements.

17. On or about Wednesday, May 13, 2026, CMS informed states that preliminary policy decisions conveyed in previous calls had subsequently changed, though those policy decisions were not specified.

**<u>CMS Issues the Interim Final Rule</u>**

18. On June 1, 2026, CMS promulgated the Interim Final Rule ("IFR") relating to the community engagement requirements. The IFR includes several surprising provisions that are vague, differ substantially from CMS's prior guidance, and are more restrictive than statutory language. These provisions also will be very challenging and costly for NJ FamilyCare to implement before January 1, 2027. Furthermore, these provisions are expected to cause significant harm to members and NJ FamilyCare once implemented. These provisions include the following:

*Medically Frail Definition*

19. With respect to the medically frail exclusion, the IFR added a new requirement that, in addition to falling into one of the five categories enumerated in H.R. 1, a "medically frail" individual must *also* be "an individual whose physical, mental, or other behavioral health condition significantly impairs the individual's ability to comply with the community engagement requirement." 42 C.F.R. § 435.554(c)(5)(i).

20. This "significant impairment" requirement does not exist in the text of H.R. 1 Section 71119. *See* Social Security Act § 1902(xx)(9)(A)(ii)(V), 42 U.S.C. § 1396a(xx)(9)(A)(ii)(V). In a webinar and slide deck presented to state Medicaid agencies on June 9, 2026, CMS acknowledged that, in addition to the statutory requirement that an individual meet the definition of medically frail supplied by Congress in Section 71119, *as codified at* 42 U.S.C. § 1396a(xx) (section 1902(xx) of the Social Security Act), the IFR also requires that the individual be significantly impaired in their ability to comply with community engagement requirements in

order to be considered medically frail. CMS cited no statutory basis for this second, new requirement.

21. Additionally, the "significant impairment" requirement was not mentioned in any CMS written or verbal guidance before the IFR was published, up to and including the CMS guidance about medical frailty provided to states as recently as early May 2026.

22. The IFR provided very little concrete guidance for states about how to verify whether an individual meets this new "significant impairment" requirement. However, the IFR does indicate that, in general, states *cannot* rely solely on diagnosis or condition codes, because doing so "would risk sweeping in individuals whose conditions do not significantly impair their functional capacity." 91 Fed. Reg. 33,373 (June 3, 2026). This is in direct conflict with prior guidance provided by CMS that states may use claims-based data to verify whether an individual meets the medical frailty exclusion in general. Instead, the IFR says that states should verify medical frailty using information from "multiple domains," to determine a member's "condition(s), utilization of services … and their level of impairment." 91 Fed. Reg. 33,406 (June 3, 2026). It also suggests that states could use "algorithms using administrative claims data that assign acuity scores to individuals," *id.*, but does not explain what administrative data a state can use or what would be an acceptable analysis of such data.

23. Since the IFR's release, CMS has told states that it is considering releasing further guidance or supporting documentation on the medical frailty exclusion. However, this additional documentation has not yet been provided.

*Self-Attestation*

24. Unlike the guidance provided by CMS through fall 2025 and spring 2026, which indicated that an "auditable self-declaration" could generally be used when reliable data was

unavailable, the IFR significantly limits the occasions when an individual may rely on self-attestation to demonstrate compliance with community engagement. It does so using a complex and limiting framework, one that changes again after the first year of implementation and will be harmful for members and difficult to implement.

25. Thus, the IFR significantly limits members' ability to self-attest to community engagement eligibility factors after January 1, 2028. Of note, several community engagement eligibility factors are ones where documentation is unlikely to be available, such as whether a parent provides "some level of care" to their child (42 C.F.R. § 435.554(a) (definition of "parent")); or the precise number of hours that a family caregiver provides assistance to a child or disabled individual (42 C.F.R. § 435.554(c)(3)(i)(C)).

26. Under Section 1902 of the Social Security Act and 42 C.F.R. § 435.916, state Medicaid agencies are required to periodically (at least annually) conduct a complete redetermination of an individual's Medicaid eligibility, commonly called a "renewal" or "renewal cycle." The Social Security Act does not recognize a "period of enrollment." That concept is introduced for the first time in the IFR and used in a way that hinders states' operational efficiencies, puts medically at-risk members in danger of losing Medicaid coverage, and treats patients differently based on when in this period their medical impairment may arise.

27. A renewal cycle lasts at most 12 months (or when Section 71107 of H.R. 1 takes effect, 6 months for certain individuals). In contrast, under the IFR's newly introduced construct, a period of enrollment can last several renewal cycles as long as the individual remains enrolled in Medicaid.

28. Under 42 C.F.R. § 435.916, a renewal of Medicaid eligibility is a *de novo* review of all eligibility factors, except where prohibited to protect member eligibility (e.g. Medicaid

agencies cannot require an individual to reverify citizenship under 42 C.F.R. § 435.956(a)(4)(ii)). However, the IFR creates different sets of rules that the state must apply in conducting eligibility determinations related to the community engagement requirements based on whether an individual is within a period of enrollment and whether, during that period, the individual has previously submitted a self-attestation of medical frailty. This distinction on when self-attestation can be used exacerbates the operational complexity the state faces in implementing the requirements with fidelity and increases the risk of confusion on the part of the members.

29. Prior to the IFR and the introduction of the new concept of a "period of enrollment," the use of self-attestation or a failure to verify an eligibility factor in a previous renewal cycle would not adversely impact an individual in their current renewal.

30. Furthermore, there is no lockout period or other prohibition on reapplying for Medicaid after an individual has been disenrolled for failure to verify compliance with or exclusion or exception from the community engagement requirements. Therefore, an individual who is prohibited from self-attesting to medical frailty for a second time in the same enrollment period, and is subsequently terminated because the individual cannot verify medical frailty, can reapply once fully disenrolled and use self-attestation again at the start of a new period of enrollment. As such, the IFR will likely increase needless disruptions to an individual's continuity of healthcare, increase costs and complexity to the state in implementing the rule, and, at the same time, fail as a meaningful work incentive or program integrity measure.

*Data Feed Integration*

31. The IFR places very broad requirements on states to identify reliable data sources for verifying community engagement eligibility factors. The IFR requires Medicaid agencies to use "reliable information available to the State" to verify eligibility, which it defines as

8

"information necessary for determining [community engagement requirements] eligibility to which the agency has access *or should have access*." 42 C.F.R. § 435.557(b) (emphasis added). The IFR thus appears to require states to seek out and, where feasible, incorporate data sources for every factor of community engagement, even though such factors are numerous, have non-centralized data, and often relate to areas that Medicaid agencies have never assessed before, such as school attendance, community volunteer work, and job program enrollment.

*Renewal Process*

32. The IFR lays out procedures for states to evaluate member compliance with community engagement requirements at renewal. However, these procedures will, in effect, deny members the full window of time they are granted in H.R. 1 to demonstrate they comply with work requirements.

33. If a state cannot verify whether a member is still eligible for Medicaid through its *ex parte* data sources, the state sends the member a pre-populated renewal form to complete. *See* 42 C.F.R. § 435.916(a)(3). According to the IFR, most states begin their renewal process and, if necessary, send this pre-populated form about 60 to 90 days before a member's renewal is due. 91 Fed. Reg. 33,390 (June 3, 2026). According to the IFR, if a state cannot *ex parte* verify exclusion or exception from or compliance with community engagement requirements, the state may either send "a notice of noncompliance" with this renewal form, or as a follow-up after the member returns the renewal form if the state still cannot verify community engagement. 91 Fed. Reg. 33,411–12. The "notice of noncompliance," which is mandated by H.R. 1, provides members with 30 days to respond, after which the member must be disenrolled if compliance with community engagement still cannot be verified. Social Security Act Section 1902(xx)(6), 42 U.S.C. § 1396a(xx)(6). This disenrollment must happen no later than the month following the month in

9

which the 30-day period expires.  *Id.*  The IFR says that this 30-day period cannot be extended and says that "[s]tates must complete the entire renewal process, including the noncompliance procedures, by the end of the beneficiary's eligibility period."  91 Fed. Reg. 33,412 (June 3, 2026).

34.     The effect of this structure is that members will be evaluated for compliance with work requirements before—often *months* before—the time period during which they are entitled to comply with work requirements is complete. This abbreviated time period will increase the likelihood of coverage loss for otherwise eligible members and is inconsistent with existing practice to evaluate eligibility factors like income using the most recent available data. The modified structure for renewals will also likely result in undoing some of the progress that DMAHS has made in improving the *ex parte* renewal process and outcomes over the last several years, representing substantial reductions in administrative and member burden for eligible NJ FamilyCare members.

*Short-term Hardship Exceptions*

35.     H.R. 1 allows States to apply exceptions for certain short-term hardship events. These short-term hardship events include receiving inpatient medical services, residing in a county where an emergency or disaster has been declared by the President or where there is high unemployment, or traveling outside one's community for necessary medical services. *See* Social Security Act Section 1902(xx)(3)(B), 42 U.S.C. § 1396a(xx)(3)(B).

36.     The IFR provides that, the short-term hardship exception requires a new applicant to demonstrate the exception "for at least one, but not more than 3 consecutive months, as specified in the State plan, *immediately preceding the month of application*." 91 Fed. Reg. 33473 (emphasis added). An applicant cannot demonstrate the exception for the same month in which they apply to Medicaid.

10

37. This requirement ensures that newly eligible individuals experiencing hardship events will have to wait at least until the start of the following month to receive, and possibly even apply for, necessary coverage, likely foregoing necessary care in the meantime or further straining our emergency health care system. This structure prevents Expansion Adult members experiencing short-term hardship events like a hospitalization from receiving coverage to reduce the financial burden of that care.

*Relevant available data*

38. Several of the timelines set out in the IFR do not comport with the extended timeframe allowed to providers to submit claims to insurers. Under NJ FamilyCare, providers have 180 days to submit initial claims to Managed Care Organizations (MCOs) and 12 months to submit initial claims covered by Fee for Service (FFS). For medical frailty determinations that are supposed to be made regarding the preceding year, NJ FamilyCare may not even have the relevant claims data. Once again, this provision will increase the risk of coverage loss for otherwise eligible individuals.

## NJ FamilyCare's Efforts to Implement the Community Engagement Requirements Before and After the IFR Issued

39. Following the enactment of H.R. 1, DMAHS recognized that it would be extraordinarily challenging to complete the necessary system and process changes required by the August 31, 2026 notice initiation deadline and January 1, 2027 implementation date, given the magnitude of changes needed for the community engagement requirements and the short period of time afforded by H.R. 1. Therefore, immediately after H.R. 1 was passed in July 2025, DHS began work to prepare to comply with community engagement requirements.

40.     Beginning in July 2025 and continuing until the release of the IFR, DMAHS based its policy and system determination on the statutory language and the subregulatory guidance provided by CMS, as detailed above. Based on this guidance, DMAHS has already done the following:

- Conducted analysis of the statutory text to assess changes needed to NJ FamilyCare policies, procedures, systems, communications, financing, and other components of Medicaid and CHIP operations

- Estimated the impact of H.R. 1 on funding for NJ FamilyCare and enrolled providers

- Made budget requests to address reductions in FFP required by H.R. 1, and made available funding in the current State Fiscal Year (ending June 30, 2026) to move forward urgent operational work to prepare for community engagement and other requirements

- Completed substantial systems planning, including establishing a new community engagement engine to evaluate exclusion or exception from or compliance with community engagement requirements, with more work still required

- Drafted changes to NJ FamilyCare application, renewal and other notification materials to reflect changes required by H.R. 1

- Supported Eligibility Determining Agencies in hiring, staff to complete new systems, eligibility and other work required by H.R. 1

- Made multiple amendments to DMAHS's contract with its Health Benefits Coordinator (HBC) vendor, which supports eligibility determinations for a majority of Expansion Adult members

- Hired professional services support to conduct project management, policy analysis and other planning support to implement H.R. 1 requirements

- Conducted substantial public outreach about H.R. 1 requirements, including launching a public-facing website, a self-service tool intended to help individuals evaluate how the community engagement requirements will affect them, and mailing letters to every household with at least one Expansion Adult member notifying them that eligibility changes are coming

- With respect to implementing the medically frail exclusion in particular, DMAHS has worked extensively with clinical, data analytics, and systems personnel to build a process to identify individuals who could be considered "medically frail." This system is based largely on claims data, in line with CMS guidance to "verify medical frailty" based on a "medical claims data review or provider documentation." Exhibit 1 at 11; *see also id.* at 17 ("medical frailty status … available through claims data").

41. DMAHS faces several urgent deadlines with respect to implementing community engagement requirements. NJ FamilyCare must apply community engagement requirements to applications and renewals as of January 1, 2027. To achieve that target, DMAHS began developing a community engagement engine in the last quarter of 2025 that must be integrated with two existing eligibility determination systems used by the County Social Service Agencies and the HBC vendor. Although NJ FamilyCare is using an agile, iterative project methodology to streamline development, meeting the January 1, 2027 deadline required substantially finalizing policy requirements by May 1, 2026, a date that has already passed. As a result, the January 1, 2027 deadline is no longer achievable without a change to scope, schedule, or resources. Absent

intervention, NJ FamilyCare will either miss the January 1, 2027 deadline outright or be forced to implement live with insufficient testing, materially increasing the risk that eligible compliant, excluded, or excepted individuals are erroneously denied or terminated from coverage. This compressed timeline is a direct consequence of the interval between the issuance of final implementation guidance and the statutory deadline and the fact that the IFR differed substantially from CMS's prior guidance.

42.     Moreover, NJ FamilyCare is required by H.R. 1 to issue notices beginning by the end of August 2026 addressing the changes occasioned by the IFR. In order to issue those notices in a timely fashion, DMAHS needs to finalize the information to be provided in those notices in mid-August.

43.     Nevertheless, DMAHS still lacks clarity on several crucial issues from the IFR. While the IFR says that DMAHS will need to evaluate whether a member's medical condition significantly impairs their ability to work, CMS has provided only the most limited guidance about how DMAHS should determine this. Prior to the IFR, DMAHS had been developing a diagnosis-code-based approach to identifying medical frailty, work that was already underway, including the clinical review needed to designate which diagnosis codes qualify. The IFR's impairment standard would require substantially modifying this approach: a qualifying diagnosis code alone is no longer sufficient to establish medical frailty, and DMAHS must now also evaluate and document whether that condition specifically impairs the individual's ability to meet the 80-hour community engagement requirement. Furthermore, while CMS has said more subregulatory guidance may be provided, DMAHS must develop its eligibility systems and processes without knowing what this future guidance is—bearing the risk that the *future* guidance will conflict with its system development. This lack of clarity impacts not only DMAHS, but also the messages that DMAHS

14

can provide to stakeholders, members, providers, or other organizations that serve members: if DMAHS does not understand what it means for a medical condition to "significantly impair" a member's ability to work, it cannot educate others about how to demonstrate exclusion or exception from or compliance with this requirement, nor can DMAHS begin to modify the *ex parte* process.

44. The shift from a diagnosis-only standard to an impairment-based standard also has a direct, compounding effect on system design: an automated, *ex parte* determination based on diagnosis code alone could previously be made entirely within the eligibility system, without requiring any new information from the member or their provider. An impairment-based determination may not be able to be made this way. If DMAHS pursues an automated approach to determining impairment, it must still account for the fact that impairment may not be static (a provider attestation confirming impairment may need to be re-verified on a recurring basis every six months) to remain valid, since the system must be able to demonstrate, on an ongoing and auditable basis, that the member continues to be impaired. This may introduce a new category of system functionality—a recurring clinical documentation collection, tracking, and expiration process that did not previously exist in the eligibility system's design. In order to modify the proposed definition of and verification process for medical frailty in New Jersey, DMAHS and partners will need to align on new business requirements, agree on those business requirements with clinical leadership, and then complete a substantial technical build and test process. Any recurring documentation requirement needs to be built, tested, and kept synchronized across DMAHS's full eligibility systems environment, not just the system performing the determination, which substantially increases both the technical scope and the testing burden of this change relative

to the diagnosis-code-only approach DMAHS had originally begun building. DMAHS expects that this process will take multiple months.

45. Finally, the IFR does not clarify which data sources DMAHS is required to have integrated as of January 1, 2027, and which can be integrated later. DMAHS requires clarity on these issues in order to implement community engagement requirements in a timely fashion and to ensure that its members are prepared for this implementation.

46. Of note, the consequences for DMAHS from building its systems inconsistently with CMS's incomplete and as-yet unissued medical frailty guidance are significantly heightened. If DMAHS is not able to configure its systems quickly enough, or if it configures its systems inconsistently with CMS's eventual guidance, it could face negative audit findings and significant financial penalties under H.R. 1 Section 71106. In other words, at the same time that financial consequences for not complying with guidance are rising, CMS's failure to issue clear and timely guidance on community engagement requirements is making it harder for New Jersey and other states to comply.

**Human Costs of Community Engagement Requirements, Made Worse By the IFR**

47. The purpose of the ACA was to ensure that low-income individuals receive comprehensive healthcare coverage and have access to affordable, integrated, high-quality healthcare at no or low cost. However, the community engagement requirements included in H.R. 1 are expected to result in large-scale disenrollment of members, including members who are eligible but cannot verify their eligibility.

48. Independent analysis conducted before the IFR was released suggest that between 155,000 and 304,000 fewer individuals will have NJ FamilyCare coverage in 2028 as a result of the community engagement and six-month redetermination requirements (a provision of H.R. 1

that requires ACA Expansion group members' eligibility to be reevaluated every six months). This represents between 29% and 56% of the total Adult Expansion population enrolled in NJ FamilyCare in September 2025. Because the IFR goes beyond H.R. 1, stripping away the protections provided in H.R. 1 to the medically frail and adding new limitations on self-attestation that do not appear in H.R. 1, even the "low mitigation" scenario included in this analysis, representing decisions by states to impose stricter requirements and narrower exclusions and exceptions, may underestimate the impact to members. Matthew Buettgens et al., Urban Institute, *Projected Reductions in Medicaid Expansion Enrollment Under OBBBA's Work Requirements and SixMonth Redeterminations* (Mar. 25, 2026), https://www.urban.org/research/publication/projected-reductions-medicaid-expansion-enrollment-under-obbbas-work.

49. Indeed, DMAHS expects the "significant impairment" requirement to result in more members losing coverage than would otherwise have lost coverage under the statutory definition of medically frailty. This is either because their condition may not meet the IFR's additional, non-statutory "significant impairment" threshold, or because they cannot obtain the proof required to demonstrate their ability to work is significantly impaired. The "significant impairment" requirement will also likely increase member confusion. NJ FamilyCare members may think they do not qualify as "medically frail," given the added complexity, and NJ FamilyCare may see an increase in non-responses from members and decreased rates of application. The "significant impairment" requirement will also likely decrease the number of people DMAHS can automatically verify as medically frail, because, under the IFR, the *ex parte* verification process will generally require not just a diagnosis code, but also other data on utilization of services and level of impairment, *see* 91 Fed. Reg. 33,406 (June 3, 2026), which may not be available for many

renewing members. This will further increase coverage loss because individuals will need to provide documentation or additional information to successfully renew. Finally, members with complex medical conditions can see fluctuations in their symptoms and abilities from day-to-day or month-to-month, which will make it even more difficult to assess whether their condition meets the "significant impairment" threshold.

50. Members with conditions that meet the statutory categories of medical frailty but who lose coverage due to inability to document "significant impairment" may return to NJ FamilyCare sicker and it may ultimately be costlier for the State to treat and manage their conditions due to the loss of health coverage and resulting lack of treatment in the intervening time. This type of "churn" in Medicaid enrollment both raises costs for NJ FamilyCare and decreases quality of care for members.

51. DMAHS expects the IFR's limitations on self-attestation to increase member confusion and coverage loss as well. In DMAHS's experience, the requirement to obtain third party documents to demonstrate eligibility creates a procedural hurdle that increases termination rates for otherwise eligible members. Thus, as self-attestation tightens, DMAHS expects that more members who are actually eligible will be disenrolled simply because they are unable to demonstrate their eligibility.

52. DMAHS also expects the "once per enrollment period" limitation on medical frailty self-attestations, which takes effect January 1, 2028, to particularly harm members with multiple medically frail conditions, especially those who develop one medically frail condition, recover from it, and then develop a second, distinct medically frail condition within the same enrollment period: having already used their one self-attestation for the first condition, these members would be unable to self-attest to the second and would instead need to meet a higher verification standard,

18

even though their underlying circumstances changed through no fault of their own. Implementing this "once per enrollment period" limitation would require DMAHS and partners to conduct systems discovery, validate the approach against existing eligibility logic, and complete a technical build and test process. This change would need to be coordinated across multiple technology systems and likely represents a multi-month effort. For example, a member could be diagnosed with cancer and self-attest to medical frailty on that basis, and then later (while still enrolled in NJ FamilyCare) go into remission from cancer but subsequently develop congestive heart failure or major depressive disorder. Under the IFR, assuming continuous Medicaid coverage during that period, the member *could not* self-attest to medical frailty based on congestive heart failure or major depressive disorder and thus could lose coverage for this diagnosis.

53. DMAHS is statutorily required to provide notice to members regarding the changes occasioned by the IFR starting by August 31, 2026. 42 U.S.C. § 1936a(xx)(8)(A) (directing States to begin outreach no later than four or more months before December 31, 2026). At present, DMAHS is uncertain as to how, for example, a member might establish that they are medically frail. Accordingly, the content of this notice will not have the clarity required to communicate to members how they can comply with the new requirements.

54. DMAHS has spent years conducting outreach and building relationships with its members. Confusion over eligibility determinations risks harming that relationship and lowering institutional trust. Members who do not understand why they were disenrolled or what is required to be eligible may simply forego coverage.

**Administrative, Operational, and Financial Burdens on New Jersey**

*Burdens on NJ FamilyCare*

55. Because CMS had never before imposed community engagement requirements across eligibility categories, NJ FamilyCare's eligibility system was not built to support community engagement requirements and is not easily configured to incorporate the numerous eligibility factors necessary to evaluate community engagement. As a result, DMAHS requires substantial additional resources to conduct the additional verifications required to establish eligibility for Expansion Adults starting January 1, 2027. DMAHS has spent at least $7.5 million in State Fiscal Year 2026 on project management, policy analysis, and other implementation support to ensure timely, compliant implementation of H.R. 1 changes, including community engagement. In addition, DMAHS projects spending at least an additional $35 million to comply with H.R. 1 requirements, including new resources required to support eligibility systems, operations, project management and other work on community engagement. With respect to the medical frailty exclusion, the surprising additional "significant impairment" requirement—plus the uncertainty of how to implement it—will require DMAHS to rapidly change its operational approach and systems development. In addition to analyzing, developing, and implementing new ways to evaluate medical frailty, DMAHS may need to integrate new data sources to evaluate members' eligibility for the medical frailty exclusion, which will add development costs as well as potential costs from accessing new data. The expanded requirements to establish medical frailty will also increase the ongoing workload for eligibility staff at initial application as well as at renewal. As more individuals are impacted and denied coverage or disenrolled as a result of this requirement, DMAHS expects it will be required to respond to more calls, process more documents, and handle more appeals of adverse actions. And finally, in addition to the costs of operationalizing this new requirement, NJ FamilyCare will also incur the cost of educating its members, staff, and other stakeholders about what the requirement means and how it can be met.

56. DMAHS also expects the new, complex, and variable limitations on self-attestation to increase its operational complexity. These limitations will make it harder to train staff, vendors, assisters, and community organizations on eligibility processes. As with the medical frailty exclusion, DMAHS expects the self-attestation limitation to lead to more calls, more documentation to be scanned and reviewed by staff, and more denials and disenrollments that, themselves, lead to more calls and appeals. In addition, the change in the self-attestation rules from 2027 to 2028 will require additional system development, training, and outreach and education to accommodate the new 2028 rules.

*Burdens on New Jersey*

57. The burdens from community engagement requirements imposed by H.R. 1 and made worse by the IFR fall not just on NJ FamilyCare, but on New Jersey more generally. As noted above, NJ FamilyCare members will likely face increased denials and terminations—and, due to the "significant impairment" requirement for medical frailty, many of those terminations could be of some of NJ FamilyCare's most medically needy members. The IFR will have a disproportionate impact on members with disabilities and chronic health conditions who are enrolled in the ACA Expansion group. New Jersey's budget will suffer harm due to loss of federal matching funds when eligible individuals lose Medicaid coverage. As the uninsured rate increases, there will be a greater financial strain on providers—in particular rural, community, and safety net hospitals as well as community health centers—that will be called upon to provide even greater levels of uncompensated care. Furthermore, individuals who are disenrolled from NJ FamilyCare will likely lose access to primary, behavioral health, and preventive care—and care necessary to treat their statutorily recognized medical conditions—resulting in more individuals seeking high-cost emergency care. In addition, the lack of preventative care may result in increased transmission

of communicable diseases and more strain on NJ FamilyCare and public health systems more broadly. Most importantly, DMAHS expects poorer health outcomes across New Jersey, as fewer people will be able to access appropriate care and manage chronic conditions.

58. In addition, DMAHS expects that the new medical frailty requirements—both the "significant impairment" requirement and the limitations on medical frailty self-attestation—will place a significant administrative strain on treating healthcare providers. In order to support members seeking medical frailty exclusions, providers may need to devote time to providing documentation to demonstrate that a member is medically frail and significant impairment in the ability to work. This will require providers to take time away from their patient care and increase administrative strain on providers, adding to healthcare costs and impacting access to care.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 27th day of June 2026.

*Gregory Woods*

Gregory Woods
Assistant Commissioner and Medicaid Director
New Jersey Department of Human Services

# Implementing Section 71119 of the Working Families Tax Cut Legislation

# Key Requirements and Preliminary Policy Direction from CMS

**November 19, 2025**

EMBARGOED
Not for distribution



This communication was printed, published, or produced and disseminated at U.S. taxpayer expense.

# Contents

1. Background and Vision for Community Engagement (C-E)

2. Applicable Populations and Exceptions/Exclusions

3. Demonstrating and Verifying C-E Compliance & Exceptions/Exclusions

4. Implementation Timing

5. Developing a Minimum Viable Product

6. Additional Policy Areas

7. CMS' Compliance and Monitoring Strategy

8. Forthcoming Guidance and Next Steps



Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.



# Background and Vision for Community Engagement

# Background

- Pub. L. No. 119-21, referred to by CMS as the "Working Families Tax Cut" (WFTC) legislation, introduced community engagement (C-E) requirements for certain applicable adults as a condition of their Medicaid eligibility.[1]

- Key Facts:
  - This new requirement applies in any state and the District of Columbia that provides coverage to the adult expansion group under the state plan or similar adult group through certain 1115 demonstrations.
  - U.S. territories, regardless of whether they adopted the adult group, are not required to implement community engagement.
  - States must implement C-E requirements by January 1, 2027, and may elect to implement earlier.
  - C-E requirements may not be waived under section 1115 demonstration authority.

1. Section 71119 of WFTC legislation amended Section 1902 of the Social Security Act (the Act) to add subsection (xx) - Community Engagement Requirement For Applicable Individuals.

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

# Important Considerations

- Information presented in this slide deck **represents CMS' preliminary policy, systems, and operational considerations** as of mid-November 2025 related to implementation of Section 71119 of the WFTC legislation.

- CMS is developing formal guidance that will be released on a rolling basis in 2025-2026. By June 1, 2026, **CMS will also publish an Interim Final Rule** outlining requirements and expectations for all states.

- While states and vendors are strongly encouraged to review this deck to inform planning,  please note that **all information described here is preliminary and subject to change**.

- The information summarizing Section 71119 in this document is intended only to be a general informal summary of technical legal standards. It is not intended to take the place of the statutory language that it is based upon. We encourage readers to refer to the applicable statutory language for complete information.

- Please contact CMS for additional guidance and direction: MedicaidWorks@cms.hhs.gov.

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

# CMS Vision for C-E Implementation

1. **Connect Members to Work and Community.** Community engagement has potential to empower Medicaid beneficiaries through employment, education, or volunteer service so they can escape isolation, build confidence, and achieve prosperity.

2. Start on time by **retaining state flexibility.** Balance the benefits of flexibility with the potential costs of options, including systems and operational costs.

3. **Promote alignment.** Anywhere possible, align new policies with existing statutory and regulatory requirements, including existing requirements for Medicaid, SNAP, TANF, IRS, and the Marketplace. This will help defray operational costs and streamline business flows.

4. **Protect taxpayers.** Ensure program integrity by ensuring that state determinations and policy decisions are easily auditable.

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

Who is Subject to Community Engagement Requirements:

Applicable Populations & Exceptions/Exclusions

# Definition of Applicable Individual

- Applicable individuals must demonstrate compliance with community engagement requirements as a condition of Medicaid eligibility.

- Applicable individuals are generally those:
  - Eligible for or enrolled under the state plan **in the adult group** described in §1902(a)(10)(A)(i)(VIII) of the Act; or
  - Eligible to enroll or is enrolled in a section **1115 demonstration that provides minimum essential coverage (MEC),** and who are at least 19 and under 65 years of age, not pregnant, not entitled to or enrolled for benefits under Medicare Part A or Part B, and not otherwise eligible to enroll under the state Medicaid plan.

- Individuals enrolled in the parent/caretaker relative group under the state plan are *not* included as an applicable population, regardless of the age of their dependent(s).

Community engagement requirements <u>do not</u> apply to individuals enrolled in an 1115 demonstration if the only coverage available to these individuals is not MEC (e.g., family planning-only services). Requirements do apply in states with 1115 demonstrations for partial expansions that provide MEC. CMS continues to evaluate which section 1115 demonstration populations fall into the definition of an applicable individual.

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

8

# Mandatory Exceptions & Exclusions

Individuals are excepted from demonstrating C-E for a month if for any part of a month the individual was: **under the age of 19**; entitled to or enrolled in **Medicare Part A** or enrolled in **Medicare Part B**; described in a **mandatory categorically needy eligibility group.** An additional exception applies to an individual who was an **inmate of a public institution at any point during the three-month period** ending on the first day of a month in which the individual is otherwise subject to the C-E requirement.

Individuals in any of the specified groups below are excluded from C-E requirements:

1. **Former foster care children** defined in §1902(a)(10)(A)(i)(IX);
2. Most **American Indians and Alaska Natives**;
3. A **parent, guardian, caretaker relative or family caregiver** of a dependent child under the age of 14 or a disabled individual;
4. **Veterans** with a total disability rating as defined under 38 U.S.C. §1155;
5. Individuals who are **medically frail** or otherwise have special medical needs (as defined by the Secretary);
6. Individuals who are **already compliant with TANF work requirements**;
7. Members of households that **receive SNAP benefits who are not exempt from SNAP work requirements** for able-bodied adults without dependents at 7 USCS § 2015(o)(2);
8. Participants in certain **drug addiction or alcoholic treatment and rehabilitation programs**;
9. **Inmates of a public institution**; and
10. **Pregnant women** or individuals entitled to **postpartum medical assistance**.

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

# Key Definitions: Family Caregiver Exclusion

- The RAISE Act defines family caregiver as "an adult family member or other individual who has a _significant relationship_ with, and who provides a broad range of assistance to, an individual with a chronic or other health condition, disability, or functional limitation."

- CMS expects to limit application of the family caregiver exclusion to individuals who provide care to:
  1. an individual living in their household;
  2. a relative (to be further defined); or
  3. another individual for whom the applicable individual provides a minimum number of hours of caregiving per month

  Additional guidance is forthcoming.

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

# Key Definitions: Medical Frailty Exclusion

- CMS intends to require states to use a definition of medical frailty similar to that described in regulations at 42 CFR § 440.315(f). This regulatory definition includes certain individuals described in the community engagement statute (e.g., those with serious and complex medical conditions or who have a disabling mental disorder). (See slide 36 for comparison.)

    - CMS does not intend to provide states with flexibility to add other types of individuals to the definition of medical frailty, beyond those listed in the statute.

- CMS will expect states to implement an auditable approach to verify medical frailty, in alignment with certain guardrails.

    - E.g., medical claims data review or provider documentation, or completion of a screening tool. States may require new applicants without any claims history to complete a screening tool to verify medical frailty, but CMS expects to require states to confirm that determination via claims data/documentation within 6 months post enrollment.

- CMS will expect states to distinguish between conditions justifying a medical frailty exclusion that are permanent (to be reverified at least every 12 months) vs. temporary (to be reverified at least at every renewal).

- Additional details and guardrails forthcoming.

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

11

# SNAP and TANF

The WFTC legislation treats exemptions for TANF and SNAP participants differently.
- An individual <u>must be excluded</u> from demonstrating the Medicaid community engagement requirements if the individual:

  1. is *compliant* with any work requirements applied by the individual's state **TANF** program; or
  2. is a member of a household that receives SNAP benefits and is *not exempt* from **SNAP** work requirements under such Act for able-bodied adults without dependents at 7 USC § 2015(o)(2).

- States will need to know if an individual in a household receiving SNAP is subject to or exempt from SNAP work requirements. Medicaid agencies will also need to identify when this status changes.
- If someone fails to meet SNAP work requirements, or has another change that affects SNAP eligibility, this will affect their SNAP eligibility, and the Medicaid agency should be made aware of changes to SNAP eligibility to process the potential Medicaid change in circumstance.
- As part of CMS' plan to collect data from states specific to C-E, CMS may ask states to separately report the number of applicable individuals who are excepted from Medicaid community engagement because they must meet work requirements in SNAP or TANF.

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.



**Demonstrating and Verifying C-E Compliance & Exceptions/ Exclusions**

# Community Engagement Compliance

To meet C-E requirements in a given month, applicable individuals must do one or more of the following, if they are neither excepted nor excluded:



Work at least 80 hours.

Complete at least 80 hours of community service.

Participate in a work program for at least 80 hours.

Be enrolled in an educational program at least half-time.

Have a monthly income that is not less than the applicable **federal** minimum wage[1] multiplied by 80 hours (i.e., currently, $7.25 \times 80 = \$580$ per month).

Is a seasonal worker[2], and have an average monthly income over the preceding 6 months that is not less than the applicable federal minimum wage[1] multiplied by 80 hours.

**Any combination of these activities for a total of at least 80 hours**

Section 1902(xx)(2) of the Act.
1. Federal minimum wage is defined by section 6 of the Fair Labor Standards Act of 1938, 29 U.S.C. § 206(a)(1)(C).
2. A seasonal worker is described in section 45R(d)(5)(B) of the Internal Revenue Code of 1986.

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

# Verification of C-E Compliance

States must establish processes and attempt to use reliable information, including reliable data sources (e.g., payroll, encounter data, data in state eligibility systems/case record) to establish whether an individual met the community engagement requirement, without requiring, where possible, the applicable individual to submit additional information.

> Generally, the existing **Medicaid statutory and regulatory framework** for eligibility verification applies to verification of community engagement compliance, including requirements for agencies to:
>
> - Use available electronic data sources before requesting documentation or additional information from individuals *(see 42 CFR 435.948(b))*.
> - Minimize requests for information to the minimum needed to verify compliance or exceptions *(42 CFR 435.952(c))*
> - Permit individuals to provide any necessary documentation through all modalities (online, mail, phone, etc.) *(42 CFR 435.907(a))*.
> - Accept information from the applicant/beneficiary, adult in the applicable individual's household, authorized representative, or individual acting responsibly for the adult *(42 CFR 435.907(a))*.

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

15

# Verifying Exceptions & Exclusions

- CMS expects states to use available data, including from the individual case record or reliable sources, to verify an applicant's or beneficiary's status as excepted or excluded from community engagement requirements.

- States must <u>not</u> request documentation from individuals to verify a mandatory exception where reliable data is available (e.g., from claims data or the beneficiary record).

- To ensure program integrity, CMS intends to require that states maximize use of data sources and other auditable information to verify exclusions and exceptions and to limit states' use of self-declaration to the greatest extent possible.

**Sample VA Benefit Summary Letter (or VA Award Letter) documenting individual's total disability. Available for download by all veterans on VA.gov.**



Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

# Potential Sources for Verification of Exceptions & Exclusions

| | Exclusion/Exception | Verification Source & Process |
|---|---|---|
| **Information already collected and stored in states' eligibility systems** | Former Foster Care Status | **Information in application.** Collected at application and available in state eligibility system or from IV-E agency. |
| | American Indian/Alaska Native | **Information in application.** Collected at application and available in state eligibility system. Exclusion aligns with exceptions required for cost-sharing provision of WFTC legislation, so states will need this information for multiple purposes. |
| | Pregnant/Postpartum Status | **Information in application.** Collected at application or post-enrollment. States must accept reports of pregnancy, under penalty of perjury, unless the state has information that is not reasonably compatible with the information provided (see 435.956(e)). |
| **For enrolled benes, must start with available data. If no data exists, then move to other verification approaches as applicable**<br><br>**Additional guidance forthcoming.** | Medical Frailty Status | Available through **claims data** for enrolled Medicaid beneficiaries. If no claims, use other verification approaches. CMS expects to require that states use at least a medical **screener** at application or for individuals newly declaring medical frailty. |
| | Participant in Drug/Alcohol Addiction Treatment/Rehab | Available through **claims data** for enrolled Medicaid beneficiaries. If no claims, provider documentation or a screener could be used to the extent permissible under federal law and regulations. |

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

# Potential Sources for Verification of Exceptions & Exclusions

| | Exclusion/Exception | Verification Source & Process |
|---|---|---|
| **Available through state interfaces or other state systems** | TANF Compliance or SNAP Enrollment | **Information exists.** May be obtained through integrated **state eligibility system** or via interface and data sharing agreement between agencies. |
| | Inmate of a Public Institution Within Prior 3 months | **Information exists.** May be accessible using methods developed under CAA 2023, Section 5121 Medicaid provisions and/or 1115 reentry policies, which outline how states can obtain information on timing of an inmate's release. |
| **No data source. Standard documentation exists** | Veteran with Total Disability | **New to Medicaid**. Veterans can provide a VA Benefit Summary Letter (see slide 16). This is a downloadable letter on VA.gov. |
| **No data source or standard documentation** | Family Caregiver Status | **New to Medicaid** for caregivers of individuals not enrolled in Medicaid. Additional guidance forthcoming. |

**Note:** Additional details forthcoming

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.



# Implementation Timing

# Implementation Timing

- States must implement new community engagement requirements by **January 1, 2027.** Outreach to existing beneficiaries would begin no later than September 2026.
- States **may adopt C-E earlier** than the effective date via the state plan or 1115 authority.
  - If a state elects to begin outreach for community engagement prior to August 2026, CMS may allow a "hold harmless period" (up to 4 months) where states may choose whether to disenroll non-compliant individuals as they test systems. States must be in full compliance by January 1, 2027.
- CMS **may not waive** the requirements under section 1115 demonstration authority.

# Outreach

- States must conduct outreach to applicable individuals enrolled in Medicaid before they implement community engagement requirements and periodically thereafter. Outreach requirements cannot be waived by starting early.
- States must conduct outreach to applicable individuals between 4 and 6 months prior to the first day that individuals must comply with the requirements, depending on whether a state elects a 1-, 2-, or 3-month review period (i.e., the number of consecutive months a state requires individuals to demonstrate community engagement at application).
- CMS anticipates requiring that all states conduct periodic outreach to applicable individuals at least once every 6 months after implementation.

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

# State Review Period for Community Engagement Compliance at Application

**Review period for community engagement compliance at application (Option for 1, 2, or 3 consecutive months)**

**3 consecutive months before App Month**

**(State Option)**

State may require applicant to demonstrate meeting community engagement requirements **in each of the 3** consecutive months prior to the application month

**2 consecutive months before App month**

**(State Option)**

State may require applicant to demonstrate meeting community engagement requirements **in each of the 2** consecutive months prior to the application month

**1 month before App month**

**(Required)**

Applicant must demonstrate meeting community engagement requirements in the **month prior** to the application month

**Application Month (Month 0)**

**1 month after App Month**

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

# State Options for Initial Beneficiary Outreach & Compliance Review Periods at Application

Assumes **January 1, 2027,** as the state's community engagement implementation date. Timelines account for the required 3 months of initial outreach to existing beneficiaries and the state's "review period" – how many months an applicable individual must demonstrate C-E to qualify for Medicaid at application (1-3 months, at state option).

**Implementation: Jan 1, 2027**

**Option 1:** Applicants must demonstrate <u>1 month</u> of community engagement

| | | Sept 2026 | Oct 2026 | Nov 2026 | Dec 2026 |

**Beneficiary outreach begins**

**Applicant must demonstrate community engagement**

**Option 2:** Applicants must demonstrate <u>2 consecutive months</u> of community engagement

| | Aug 2026 | Sept 2026 | Oct 2026 | Nov 2026 | Dec 2026 |

**Beneficiary outreach begins**

**Applicant must demonstrate community engagement**

**Option 3:** Applicants must demonstrate <u>3 consecutive months</u> of community engagement

| Jul 2026 | Aug 2026 | Sept 2026 | Oct 2026 | Nov 2026 | Dec 2026 |

**Beneficiary outreach begins**

**Applicant must demonstrate community engagement**

# Early Starters: State Options for Initial Beneficiary Outreach & Compliance Review Periods at Application

Assumes **June 1, 2026,** as the state's community engagement implementation date. Timelines account for the required 3 months of initial outreach to existing beneficiaries and the state's "review period" – how many months an applicable individual must demonstrate C-E to qualify for Medicaid at application (1-3 months, at state option).



Implementation: June 1, 2026

**Option 1:** Applicants must demonstrate <u>1 month</u> of community engagement

Feb 2026 | Mar 2026 | Apr 2026 | May 2026

Beneficiary outreach begins

Applicant must demonstrate community engagement

**Option 2:** Applicants must demonstrate <u>2 consecutive months</u> of community engagement

Jan 2026 | Feb 2026 | Mar 2026 | Apr 2026 | May 2026

Beneficiary outreach begins

Applicant must demonstrate community engagement

**Option 3:** Applicants must demonstrate <u>3 consecutive months</u> of community engagement

Dec 2025 | Jan 2026 | Feb 2026 | Mar 2026 | Apr 2026 | May 2026

Beneficiary outreach begins

Applicant must demonstrate community engagement

4-month "hold harmless" period (at state option): No individuals disenrolled for C-E non-compliance until at least **October 1, 2026**



# Implementing Community Engagement:
# Developing a Minimum Viable Product

# Systems and Operational Requirements for Full C-E Implementation

Full implementation of C-E includes multiple, interdependent elements that extend beyond system updates. States will need to address policy, process, and operational capacity to meet compliance. The following is meant as an example only and is not an exhaustive list.

| System Development | Process and Policy Changes | Operational Updates and Training | Optional Enhancements Improvements |
|---|---|---|---|
| • **Procure new vendor(s)** and/or update existing vendor contracts.<br>• **Update applications and renewal forms** to capture and validate C-E-related information.<br>• Integrate **new data sources** and update E&E systems workflows to identify and verify applicable individuals at application and renewal.<br>• Modify existing functionality to enable data **monitoring and reporting** of compliance, exceptions, and disenrollments.<br>• **Update eligibility rules engines data exchanges, and notices** to reflect C-E compliance determinations.<br>• Update all **consumer and worker portals** to include new C-E related elements. | • Determine the **initial beneficiary outreach & compliance review periods**.<br>• Define **verification procedures**<br>• Establish **auditable procedures** for verifying compliance, exclusions, and short-term exceptions.<br>• **Revise paper applications and renewal forms** to include community engagement-related questions.<br>• Update **call center scripts** and Interactive Voice Response messaging.<br>• **Update eligibility manuals**, make necessary **state regulatory** and other administrative directive changes.<br>• Pursue necessary **state legislative changes.** | • **Train eligibility workers**, call center staff, and contractors on new business processes and systems logic.<br>• Develop **updated communication/ outreach and notice templates** that include C-E requirements and rights.<br>• **Update state monitoring /** compliance processes.<br>• **Update managed care contracts**, inter-agency agreements or other contracts. | • Further **expand data sources** over time to improve verification accuracy (e.g., for workforce programs and volunteer activities).<br>• Establish data-driven, **closed-loop referral pathways** connecting beneficiaries to employment, education, and community-based resources.<br>• **Integrate referrals with case management systems** and external partners to document outcomes and verify participation. |

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

25

# Potential C-E Systems Workflow – Initial Application



**Individual Completes and Submits Application**

Individuals must be able to submit applications through the following modalities:
(1) Online,
(2) Telephone,
(3) Mail, and
(4) In-person.

**Update applications, customer and worker portals to include questions that screen for compliance with and exclusions from C-E.**



**State Receives & Processes Application**

States' systems intake applications through manual and/or automated processes.

States identify if the individual is in the applicable population.

**Update eligibility logic, state systems, and worker training to identify applicable population subject to C-E and route them through appropriate determination process.**



**State Verifies C-E Compliance or Exemption**

Use reliable information, including information obtained through reliable data sources, to verify compliance with or exemption from C-E.

Request additional documentation, as applicable.

**Add data sources and update processes and eligibility logic to verify individuals' compliance with or exemption from C-E.**



**State Makes Determination**

Determine eligibility. If no satisfactory showing (i.e., compliance or exception) is made after appropriate notices, the state must redetermine eligibility on other bases.

States must provide individuals a minimum of 30 calendar days from the notice of non-compliance to demonstrate compliance or an exception.

**Update rules engine and eligibility determination logic.**



**State Provides Notice**

If the individual is determined eligible, the state sends notice and enrolls them.

If ineligible on all bases, the state must deny eligibility with appropriate notices and fair hearing rights, and transfer the account to the appropriate program, including the Marketplace, if potentially eligible.**

**Update rules engine and eligibility determination logic. Update account transfer logic to send accts to the Marketplace.**

*States must conduct outreach to applicable individuals between 4 and 6 months prior to the first day that individuals must comply with the requirements.
** Individuals determined ineligible for Medicaid for non-compliance with C-E requirements are not eligible for financial assistance to obtain Marketplace coverage.

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

# Potential C-E Systems Workflow – Renewal









**State Identifies the Renewal Cohort**

**State Verifies C-E Compliance or Exemption**

**State Makes Determination**

**State Provides Notice**

| State Identifies the Renewal Cohort | State Verifies C-E Compliance or Exemption | State Makes Determination | State Provides Notice |
|---|---|---|---|
| Identify the cohort of individuals enrolled in Medicaid for whom a renewal must be initiated and whether those individuals are in the applicable population. Renewals will occur every 6 months for most applicable individuals.<br><br>**Update eligibility logic, state systems, and worker training to identify applicable population subject to C-E and route them through appropriate redetermination process.** | Use reliable information, including information obtained through data sources, to verify income and other eligibility criteria compliance with or exception from C-E.<br><br>Request additional documentation, if applicable.<br><br>**Add data sources and update processes and eligibility logic to verify individuals' compliance with or exemption from C-E.** | State rules engine determines whether the individual is eligible.<br><br>If no satisfactory showing (i.e., compliance or exception) is made after appropriate notices with appeal rights, the state must redetermine eligibility on other bases.<br><br>Note: States must provide individuals a <u>minimum of 30 calendar days</u> from the notice of non-compliance to demonstrate compliance or an exception.<br><br>**Update rules engine and eligibility determination logic.** | If individual is determined eligible, the state sends notice and renews eligibility. Notice includes reminder of C-E and other obligations.*<br><br>If an individual is determined ineligible on all bases, and after a minimum 30-day period to demonstrate compliance, the state must provide appropriate notices and appeal rights, deny eligibility, and transfer the account to the appropriate program, including the Marketplace, if applicable**.<br><br>**Update rules engine and eligibility determination logic. Update notice and outreach materials.** |

\* States must conduct periodic outreach to applicable individuals.
\*\* Individuals determined ineligible for Medicaid for non-compliance with C-E requirements are not eligible for financial assistance to obtain Marketplace coverage.

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

# Minimum Viable Product for Initial State Implementation

- CMS is outlining requirements of a **minimum viable product (MVP)** for all states to achieve.

- States will be expected to implement basic systems and operational requirements of the statute in first year (**the MVP**) as they work to expand use of data sources and enhance systems to support increased reliance on data sources in years 2 and 3.

- CMS is exploring data sources for states to verify educational status and will also use the additional time in years 2 and 3 to identify and include more data sources in the federal data Hub and elsewhere.

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

# Vision of Systems Development From Year 1 to Year 2+

## Minimum Viable Product (Year 1 2027)

- Implement all core systems functionality (updates to eligibility determination logic, eligibility worker and customer portal, etc.).
- For Verification of Qualifying Activities:
  - Work Hours & Education: Primary use of electronic **data sources or auditable documents.**
  - Community Service & Job Program Enrollment: Auditable individual declaration allowed in year 1, under penalty of perjury; states are encouraged to use data or documents if available.
  - Mandatory Exceptions & Exclusions: Validation using data from data sources; MMIS/eligibility system, auditable individual declaration under penalty of perjury, etc. (see slides 17-18 for more detail).

## Enhanced Functionality for Verification (Year 2+ 2028)

- Maximum reliance on data.
- Primary use of data sources for all qualifying activities, including work, education, job programs, and community service.
- Fixes and improvements over year 1 functionality.

**January 2027> MVP; January 2028> and beyond Further Improvements**

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.



Additional Policy Areas

# Additional Policy Areas

CMS intends to provide states flexibility in certain areas, which include but are not limited to, the following:

- <u>Verification Frequency</u>: States have flexibility in determining frequency of compliance with qualifying activities and exceptions that are subject to change, within the statutory framework.
  - *Note*: Consistent with 42 CFR 435.916(d)(1) (in effect as of 2023), states must promptly act on all information received from a beneficiary that may affect eligibility.

- <u>Approaches to Outreach</u>: CMS will not prescribe additional required forms of individual outreach beyond those specified in statute but will provide examples states may consider – e.g., text, emails, calls, in person. Managed care plans are considered a potential modality for individual outreach.

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.



# CMS' Compliance and Monitoring Strategy

# CMS' Proposed Approach to Assessing Readiness

CMS will establish a consistent, transparent systems and operational readiness assessment framework to evaluate state progress toward MVP implementation and guide technical assistance (TA) and compliance decisions.

**Systems Readiness Assessment Framework:**
- Will be based upon monthly State Officer state meetings, the review of systems projects status reports, and demonstrations.
- TA to states, as needed, will be provided through engagement with partner organizations (i.e., S-TAG monthly workgroup, state cohort meetings, NAMD CIO Affinity Group meetings).

**Operational Readiness Assessment Framework:**
- Will consider factors such as budget requests, procurement, staffing, training, development of outreach materials and inter-agency agreements, and coordination with managed care plans.
- CMS will meet with states on a regular cadence to assess progress, including via quarterly deep-dive sessions with states to address emerging issues.

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

33

# Monitoring and Compliance

- CMS will expect regular data reporting from states on community engagement.
    - CMS is reviewing existing CMS data sources to assess where those data may need to be updated or enhanced.
    - Expect forthcoming guidance about potential updates to Performance Indicator and Eligibility Processing data sets and T-MSIS data quality priorities.

- States that fail to meet expected timelines or compliance deadlines may be placed on a corrective action plan and may be subject to compliance action under Section 1904 of the Act (withholding of federal matching funds).

- CMS also plans to outline any new processes and procedures for ensuring compliance in the IFR for states that do not comply with the community engagement requirements.

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

34

# Forthcoming Guidance and Next Steps

- WFTC Legislation Overview Center Informational Bulletin (CIB) and Accompanying Slide Deck (available on www.Medicaid.gov/medicaidreforms)

- Interim Final Rule – no later than June 2026

- Resuming Friday NAMD/CMCS Eligibility Workgroup Calls

- MedicaidWorks@cms.hhs.gov



Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

# Appendix: Medical Frailty – Comparison of Statutory & Regulatory Definitions

**Medically frail definition for an Alternative Benefit Plan:**

42 CFR 440.315(f):  The State's definition of individuals who are medically frail or otherwise have special medical needs must at least include all of the following:

- Individuals described in § 438.50(d)(3) of this chapter,
- **Individuals with disabling mental disorders** (including children with serious emotional disturbances and adults with serious mental illness),
- **Individuals with** chronic **substance use disorders,**
- **individuals with serious and complex medical conditions,**
- **Individuals with a physical, intellectual or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living, [and]**
- Individuals with a disability determination based on Social Security criteria or in States that apply more restrictive criteria than the Supplemental Security Income program, the State plan criteria.

C-E medically frail definition in statute includes **bolded** bullets above and "an individual—(aa)who is blind or disabled (as defined in section 1614);"

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.