# EXHIBIT 18

# DECLARATION OF SARAH GREGOSKY

I, Sarah Gregosky, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of North Carolina. I am over the age of 18 and have personal knowledge, or knowledge based on review in my capacity as Assistant Secretary and Deputy Medicaid Director of North Carolina Medicaid, of information and records gathered by the North Carolina Department of Health and Human Services ("NC DHHS") and agency staff, of the matters set forth below. If called as a witness, I could and would testify competently to the matters set forth below.

## Professional and Agency Background

2. I am the Assistant Secretary and Deputy Medicaid Director for the North Carolina State Medicaid program ("NC Medicaid").

3. NC DHHS is the single state agency responsible for administering NC Medicaid. NC Medicaid provides low-income individuals with comprehensive healthcare coverage and access to affordable, integrated, high-quality healthcare at no or low cost. NC Medicaid's coverage includes medical, pharmacy, dental, mental health and substance use treatment, long-term services and supports, and long-term care. NC Medicaid's mission is to strengthen access to quality health care for all North Carolinians.

4. NC Medicaid insures more than three million people, providing health coverage to children, families, and older adults—including some of the most vulnerable residents in the state, such as those experiencing homelessness, living with a disability, or who have a serious or complex medical condition.

5.      North Carolina administers the NC Medicaid program pursuant to federal law and regulations as well as the terms of its federally approved State Plans, Section 1115 Demonstration Project, and waivers. NC Medicaid receives federal Medicaid funding, known as "Federal Financial Participation" ("FFP"), which covers an average of 68% of NC Medicaid's expenditures on eligible enrollees.

**Medicaid Expansion in North Carolina**

6.      On December 1, 2023, North Carolina implemented Medicaid expansion under the Affordable Care Act (the "ACA"). This expansion extended federally funded comprehensive health insurance to low-income adults aged 19 to 64 with household incomes up to 133% of the Federal Poverty Level primarily through North Carolina's Medicaid expansion program.

7.      Enrollees in NC Medicaid's expansion program receive full, comprehensive benefits that include medical, pharmacy, dental, mental health and substance use treatment, long-term services and supports, and long-term care. Eligibility for NC Medicaid's expansion program requires that an individual (1) be an adult 19-64 years old; (2) be a citizen or qualified immigrant; and (3) have household income less than or equal to 133% of the Federal Poverty Level.

8.      As of May 1, 2026, 727,341 (approximately 23%) of NC Medicaid's members are enrolled in the expansion program. For the current state fiscal year 2026, approximately $6.8 billion, equal to about 27% of NC Medicaid's federal Medicaid funding, comes from the FFP for NC Medicaid's expansion program members.

**CMS's Pre-Interim Final Rule (IFR) Guidance to North Carolina**

9.      I and my staff at NC Medicaid have been closely following enactment and implementation of H.R. 1, in particular Section 71119, which imposes novel community

engagement requirements for adults covered under the Medicaid expansion provisions of the ACA (the "community engagement requirements").

10. Prior to the enactment of H.R. 1, Title XIX of the Social Security Act never required financially eligible individuals to work, volunteer, or meet other community engagement requirements to establish Medicaid eligibility. Consequently, NC Medicaid does not have in place systems by which to verify work, volunteer, or other community engagement activities.

11. Since November 2025, the Centers for Medicare and Medicaid Services ("CMS") has been providing guidance on expected community engagement requirements policy. On November 19, 2025, CMS presented a slide deck on community engagement requirements, which was later provided to states on December 4, 2025. On December 5, 2025, CMS began a series of workgroup calls to provide guidance and conduct question-and-answer sessions with states on implementing community engagement ("Workgroup Calls"). These Workgroup Calls took place once every other week from December 2025 through April 2026 and switched to a weekly cadence starting in May 2026. As of the date of this declaration, CMS continues to hold Workgroup Calls.

12. These Workgroup Calls, usually occurring after rule making, are part of a historical practice by CMS to provide guidance to states, outside of formal rulemaking, in complying with urgent and significant changes in federal Medicaid law. In the absence of regulations, NC Medicaid relied on CMS guidance provided during these Workgroup Calls, and the accompanying slide decks and other materials, to determine how to comply with new community engagement requirements in H.R. 1; implement operational, system, and process changes; and, ultimately, avoid financial penalties for noncompliance. Other states also relied on this guidance.

13. H.R. 1 excludes medically frail individuals. Guidance from CMS during Workgroup Calls indicated that it intended to "use a definition … similar to that described in

regulations at 42 CFR § 440.315(f)," which is a regulation whose language closely resembles the H.R. 1 language. CMS also stated that it expected to allow verification of medical frailty through "medical claims data review or provider documentation, or completion of a screening tool."

14. At no point between the passage of H.R. 1 in July 2025 and the promulgation of the Interim Final Rule in June 2026 did CMS indicate that it would require "medically frail" individuals to have a significant impairment in order to be excluded from community engagement requirements. Nor did CMS indicate that states would need to verify that a member had such a significant impairment when determining eligibility for the medical frailty exclusion.

15. During a November 2025 Workgroup Call, CMS signaled that only limited use of self-attestation would be permitted to verify medical frailty. Several months later CMS indicated that self-attestation would be an acceptable verification method when data was not available.

16. In the March 27, 2026, Workgroup Call, CMS reiterated that states may use auditable self-attestation in the absence of claims data. CMS specifically noted that states could use such an auditable self-attestation "*to confirm ongoing medical frailty*" in addition to when a member newly identifies as medically frail. CMS also noted that States should be able to reassess individuals for medical frailty at redetermination, *even without extensive claims history*, based on new information such as a major life event. At no point did CMS indicate members would be limited to only one self-attestation per enrollment period, which may include several "renewal cycles" or redetermination periods, even if they developed multiple sequential medical frailty conditions.

17. On Friday, May 1, 2026, during Workgroup Call, CMS shared a slide deck that included a definition of the medical frail exclusion. These slides did not mention any requirement

4

that an individual's medically frail condition would need to impair their ability to comply with community engagement requirements.

18. On or about Wednesday, May 6, 2026, CMS informed states that information conveyed on the Friday, May 1, 2026, call should not be acted upon and was subject to change.

**CMS Issues the Interim Final Rule**

19. On June 1, 2026, CMS released the IFR, which was published in the Federal Register on June 3, 2026 (91 FR 33,348), relating to the community engagement requirement. The IFR includes several surprising provisions that are vague, differ substantially from CMS's prior guidance, and are more restrictive than statutory language. These provisions also will be very challenging and costly for NC Medicaid to design by August 31, 2026, and implement before January 1, 2027, and are expected to cause significant harm to members and NC Medicaid once implemented. These provisions include the following:

*Medically Frail Definition*

20. With respect to the medically frail exclusion, the IFR added a new requirement that, in addition to falling into one of the five categories enumerated in H.R. 1, a "medically frail" individual must *also* be "an individual whose physical, mental, or other behavioral health condition significantly impairs the individual's ability to comply with the community engagement requirements." 42 CFR § 435.554(c)(5)(i).

21. The phrase "significantly impairs" only exists in the text of H.R. 1 Section 71119 in the context of inability to perform one or more activities of daily living; not in the context of inability to comply with community engagement requirements. In a webinar and slide deck presented to state Medicaid agencies on June 9, 2026, CMS acknowledged that, in addition to the statutory requirement that an individual be medically frail, the IFR adds a new element of

requiring that the individual be significantly impaired in their ability to comply with community engagement requirements in order to be considered medically frail. CMS cited no statutory basis for this new, required element.

22. Additionally, the "significant impairment" element was not mentioned in the context of an individual's ability to comply with community engagement requirements in any CMS written or verbal guidance before the IFR was published, up to and including the CMS guidance about medical frailty provided to states as recently as May 1, 2026.

23. The IFR provided very little concrete guidance for states about how to verify whether an individual meets this new "significant impairment" requirement. However, the IFR does indicate that, in general, states *cannot* rely solely on diagnosis or condition codes, because doing so "would risk sweeping in individuals whose conditions do not significantly impair their functional capacity." 91 Fed. Reg. 33,373 (June 3, 2026). This is in direct conflict with prior guidance provided by CMS that states may use claims-based data to verify whether an individual meets the medically frail exclusion in general. Instead, the IFR requires that states should verify medical frailty using information from "multiple domains," to determine a member's "condition[s], utilization of services … and their level of impairment." 91 Fed. Reg. 33,406 (June 3, 2026). It also suggests that states could use "algorithms using administrative claims data that assign acuity scores to individuals," *id.*, but does not explain what administrative data a state can use or what would be an acceptable analysis of such data.

24. In a Workgroup Call since the IFR's release, CMS informed states that it is developing more guidance on the medically frail exclusion. However, as of date of June 26, 2026, this guidance has not yet been provided.

6

25. Unlike the guidance provided by CMS through fall 2025 and spring 2026, which indicated that an "auditable self-declaration" could generally be used when reliable data was unavailable, *see supra* ¶¶ 15-16, the IFR significantly limits the occasions when an individual may rely on self-attestation to demonstrate compliance with community engagement. The IFR uses a complex and limiting framework (that changes again after the first year of implementation) that will be harmful for members and difficult to implement.

26. Thus, the IFR significantly limits members' ability to self-attest to community engagement eligibility factors after January 1, 2028. Of note, several community engagement eligibility factors are ones where documentation is unlikely to be available, such as whether a parent provides "some level of care" to their child (42 CFR § 435.554(a) (definition of "parent")); or the precise number of hours that a family caregiver provides assistance to a child or disabled individual (42 CFR § 435.554(c)(3)(i)(C)).

27. Under Section 1902 of the Social Security Act and 42 CFR § 435.916, state Medicaid agencies are required to periodically (at least annually) conduct a complete redetermination of an individual's Medicaid eligibility, commonly called a "renewal" or "renewal cycle." The Social Security Act does not recognize a "period of enrollment." That concept is introduced for the first time in the IFR. Because self-attestations to medical frailty will be limited to once per period of enrollment, which includes multiple renewal periods or "renewal cycles", this new concept operates to hinder states' operational efficiencies, to put medically at-risk members in danger of losing Medicaid coverage, and to treat patients differently based on when in this period their medical impairment may arise.

28.     A renewal cycle lasts at most 12 months (or when section 71107 of H.R. 1 takes effect, 6 months for certain individuals). In contrast, under the IFR's newly introduced construct, a period of enrollment can last several renewal cycles as long as the individual remains enrolled in Medicaid. Exceeding 12 months conflicts with long standing law and regulation.

29.     Under 42 CFR § 435.916, a renewal of Medicaid eligibility is a *de novo* review of all eligibility factors, except where prohibited to protect member eligibility (e.g. Medicaid agencies cannot require an individual to reverify citizenship under 42 CFR § 435.956(a)(4)(ii)). However, the IFR creates different sets of rules that the state must apply in conducting eligibility determinations when evaluating exclusion from community engagement requirements. The IFR's analysis, absent other evidence to demonstrate medical frailty, is based on whether the individual has previously submitted a self-attestation during the current period of enrollment. This distinction on when self-attestation can be used increases the operational complexity states face in implementing the requirements with fidelity and increases the risk of confusion on the part of the members.

30.     Prior to the IFR and the introduction of the new concept of a "period of enrollment," the use of self-attestation or a failure to verify an eligibility factor in a previous renewal cycle would not adversely impact an individual in their current renewal.

31.     Furthermore, there is no lockout period or other prohibition on reapplying for Medicaid after an individual has been disenrolled for failure to verify compliance with or exemption from the community engagement requirements. Therefore, an individual who is prohibited from self-attesting to medical frailty for a second time in the same enrollment period and is subsequently terminated because the individual cannot verify medical frailty, can reapply once disenrolled and use self-attestation again at the start of a new period of enrollment. As such,

the IFR will likely increase disruptions to an individual's continuity of healthcare, increase costs, and increase administrative burden on the State and our county Departments of Social Services (entities who make eligibility determinations in North Carolina) in implementing the rule. Simultaneously, it fails as a meaningful work incentive or program integrity measure.

*Data Feed Integration*

32.     The IFR places very broad requirements on states to identify reliable data sources for verifying community engagement eligibility factors. The IFR requires Medicaid agencies to use "reliable information available to the State" to verify eligibility, which it defines as "information necessary for determining [community engagement requirements] eligibility to which the agency has access *or should have access*." 42 CFR § 435.557(b) (emphasis added). Particularly, to determine whether an individual is medically frail, the IFR would require North Carolina to build systems and complex algorithms to incorporate data sources and the co-occurrence of multiple data elements for each factor of medical frailty, even though such factors are numerous, vary depending on medical condition, and often relate to areas that Medicaid agencies have never assessed before to assess eligibility, such as medical diagnoses and healthcare services as it relates to an individual's ability to comply with the community engagement requirements. It is not possible for North Carolina to build the systems and complex algorithms necessary to determine compliance with the community engagement requirements or eligibility for exemptions or exclusions to the requirements based on all of the new, additional requirements being imposed under the IFR by January 1, 2027.

*Renewal Process*

33.     The IFR lays out procedures for states to evaluate member compliance with community engagement requirements at renewal. However, these procedures will, in effect, deny members the full window of time they are granted in H.R. 1 to demonstrate they comply with work requirements.

34.     If a state cannot verify whether a member is still eligible for Medicaid through its *ex parte* data sources, the state sends the member a pre-populated renewal form to complete. *See* 42 CFR § 435.916(a)(3). CMS acknowledges in the IFR that most states begin their renewal process and, if necessary, send this pre-populated form about 60 to 90 days before a member's renewal is due. 91 Fed. Reg. 33,390 (June 3, 2026). According to the IFR, if a state cannot *ex parte* verify compliance with community engagement requirements, the state may either send "a notice of noncompliance" with this renewal form, or as a follow-up after the member returns the renewal form if the state still cannot verify community engagement. 91 Fed. Reg. 33,411–12. The "notice of noncompliance," which is mandated by H.R. 1, provides members with only 30 days to respond, after which the member must be disenrolled if compliance with community engagement still cannot be verified. This disenrollment must happen no later than the month following the month in which the 30-day period expires. *Id.* The IFR says that this 30-day period cannot be extended and says that "states must complete the entire renewal process, including the noncompliance procedures, by the end of the beneficiary's eligibility period. 91 Fed. Reg. 33,412 (June 3, 2026).

35.     The effect of this structure is that members will be evaluated for compliance with work requirements before—often *months* before—the time period in which they are entitled to comply with work requirements is complete. This abbreviated time period will increase the likelihood of coverage loss for otherwise eligible members.

*Short-term Hardship Exceptions*

36.     H.R. 1 allows States to apply exceptions for certain short-term hardship events. These short-term hardship events include receiving inpatient medical services, residing in a county where an emergency or disaster has been declared by the President or where there is high unemployment, or traveling outside one's community for necessary medical services.

37.     The IFR provides that, the short-term hardship exception requires a new applicant to demonstrate the exception "for at least one, but not more than 3 consecutive months, as specified in the State plan, *immediately preceding the month of application*." 91 Fed. Reg. 33473 (emphasis added). An applicant cannot demonstrate the exception for the same month in which they apply to Medicaid.

38.     This requirement ensures that newly eligible individuals experiencing hardship events will have to wait at least until the start of the following month to receive necessary coverage, likely foregoing necessary care in the meantime or further straining our emergency health care system.

*Other*

39.     Several of the timelines set out in the IFR do not account for the fact that providers have 12 months to submit claims. For determinations that are supposed to be made regarding the preceding year, NC Medicaid may not even have the relevant claims data. Once again, this provision will increase the risk of coverage loss for otherwise eligible individuals.

**NC Medicaid's Efforts to Implement the Community Engagement Requirements Before and After the IFR Issued**

40.     Following the enactment of H.R. 1, NC Medicaid recognized that it would be extraordinarily challenging to complete the necessary system and process changes required by the

11

July 1, 2026, notice deadline and January 1, 2027, implementation dates, given the magnitude of changes needed for the community engagement requirements and the short period of time afforded by H.R. 1 (North Carolina has an earlier deadline to notice beneficiaries than required by H.R. 1 so as to comply with State law requirements.). Therefore, after H.R. 1 was passed in July 2025, NC Medicaid promptly began work to prepare to comply with community engagement requirements.

41. Beginning in August 2025 and continuing until the release of the IFR, NC Medicaid based its policy and system determination on the statutory language and the guidance provided by CMS, as detailed above. Based on this guidance, NC Medicaid has already done the following:

- Initiated internal workgroups with NC DHHS staff to develop work plan, policy and technology requirements, and external stakeholder engagement approach. To date, NC Medicaid has held 18 cross functional workgroup meetings, in addition to 33 weekly program leadership meetings and 31 communications and engagement meetings.

- Initiated internal workgroups with NC DHHS staff to develop medical frailty approach. To date, NC Medicaid has held 19 medical frailty workgroup meetings with clinical leadership and data subject matter experts.

- Initiated workgroups with Managed Care Health Plan staff to review work plans, policy and technology requirements, and external stakeholder engagement approach. To date, NC Medicaid has held 12 meetings with Managed Care Health Plan staff.

- Initiated workgroups with eligibility and enrollment system (NCFAST) to review and implement policy and statutory requirements. To date, NC Medicaid has held

68 meetings with NCFAST staff and an additional 29 meetings with NC DHHS leadership to ensure cross program alignment with other economic service programs managed within NCFAST.

- Developed budget estimates to implement and operationalize community engagement requirements and sought state and federal budgetary authority to support the requirements.

- Developed stakeholder engagement materials and began stakeholder engagement, including website content, call scripting, and training presentations. To date, NC Medicaid has met with 63 external stakeholder groups, including community partner organizations and county Departments of Social Services staff.

- Analyzed existing eligibility policies to confirm necessary updates to support community engagement and began necessary updates.

- Began updating paper and electronic application aligned with community engagement requirements.

- Drafted and began mailing member notification letters to Medicaid expansion beneficiaries regarding upcoming eligibility policy changes. Initiated proactive communication to beneficiaries, including text, email and phone outreach about upcoming eligibility changes to Medicaid expansion beneficiaries.

- Initiated design and development of new data sources to support automation of community engagement requirements, including education data, work program data, NC Medicaid claims and encounter data, NC Health Information Exchange electronic medical record data, and veteran's disability rating data.

- Initiated design and development of existing data sources to support automation of community engagement requirements, including wage data, incarceration data, and managed care eligibility data.

42. With respect to implementing the medically frail exclusion in particular, NC Medicaid has worked extensively with clinical and systems personnel to build a process to identify individuals who could be considered "medically frail." This system is based largely on claims and encounter data available through NC Medicaid data warehouse and electronic health record data available through NC Health Information Exchange, in line with CMS guidance to "verify medical frailty" based on a "medical claims data review or provider documentation."

43. NC Medicaid faces several urgent deadlines with respect to implementing community engagement requirements. NC Medicaid must apply community engagement requirements to applications and renewals as of January 1, 2027, and to do this, NC Medicaid must substantially finalize eligibility system requirements by September 2026, in order to enable full system deployment, with appropriate testing, in September 2026. After September 2026, NC Medicaid will only have limited ability to make further system changes for use by January 1, 2027. NC Medicaid has already passed the deadline to build the systems and complex algorithms to incorporate multiple data sources or data elements as contemplated by the IFR to begin determining medical frailty exclusions effective January 1, 2027. Moreover, NC Medicaid is required by H.R. 1 to issue notices addressing the changes occasioned by the IFR. In order to issue those notices in a timely fashion, NC Medicaid needs to send information by no later than July 1, 2026, due to additional State law look-back provisions for determining compliance with the community engagement requirements. Additionally, N.C. Gen. Stat. § 108A-54.2 requires NC Medicaid to engage in a public notice and comment process to promulgate and implement new

medical coverage policies necessary to implement H.R. 1, including the IFR. In order to comply with that State law and meet the implementation deadlines in H.R. 1, NC Medicaid needs to publish the new medical coverage policies for public comment by August 2026.

44. NC Medicaid still lacks clarity on several crucial issues from the IFR. While the IFR says that NC Medicaid will need to evaluate whether a member's medical condition significantly impairs their ability to work, CMS has provided only the most limited guidance about how NC Medicaid should determine this. While CMS has said more guidance will be provided, NC Medicaid must develop its eligibility systems and processes without knowing what this future guidance is—bearing the risk that the *future* guidance will conflict with its system development. This lack of clarity impacts not only NC Medicaid internal processes, but also the clarity of communications that NC Medicaid can provide its members. If NC Medicaid does not understand what it means for a medical condition to "significantly impair" a member's ability to work, it cannot educate its members about how to demonstrate compliance with this requirement. Finally, the IFR does not clarify which data sources NC Medicaid is required to have integrated as of January 1, 2027, and which can be integrated later. NC Medicaid requires clarity on these issues in order to implement community engagement requirements in a timely fashion and to ensure that its members are prepared for this implementation.

45. If NC Medicaid cannot configure its systems quickly enough, or if it configures its systems inconsistently with CMS's eventual guidance, it could face negative audit findings and significant financial penalties under H.R. 1 Section 71106 in addition to the expense of bringing the systems into compliance. In other words, while financial consequences for not complying with guidance are rising, CMS's failure to issue clear and timely guidance on community engagement requirements is making it harder for North Carolina and other states to comply.

**Human Costs of Community Engagement Requirements, Made Worse By the IFR**

46. The purpose of the Affordable Care Act (ACA) was to ensure that low-income individuals receive comprehensive healthcare coverage and have access to affordable, integrated, high-quality healthcare at no or low cost. However, the community engagement requirements included in H.R. 1 are expected to result in large-scale disenrollment of members, including members who are eligible but cannot verify their eligibility.

47. National estimates for North Carolina conducted before the IFR was released estimate that at least 30% of NC Medicaid's Expansion program members will be disenrolled at some point due to the combination of community engagement requirements and six-month redeterminations (H.R. 1 requires NC Medicaid expansion program members' eligibility to be reevaluated every six months). Because the IFR goes beyond H.R. 1, stripping away the protections provided in H.R. 1 for the medically frail and adding new limitations on self-attestation that do not appear in H.R. 1, these national estimates likely underestimate the impact to members.

48. Indeed, NC Medicaid expects the "significant impairment" requirement to result in more members losing coverage than would otherwise have lost coverage under the statutory definition of medically frail. This is either because their condition may not meet the IFR's additional, non-statutory "significant impairment" threshold, or because they cannot obtain the proof required to demonstrate their ability to work is significantly impaired. The "significant impairment" requirement will also likely increase member confusion. NC Medicaid members may think they do not qualify as "medically frail," given the added complexity, and NC Medicaid may see an increase in non-responses from members and decreased rates of application. The "significant impairment" requirement will also likely decrease the number of people NC Medicaid can automatically verify as medically frail, because, under the IFR, the *ex parte* verification

16

process will generally require not just a diagnosis code, but also other data on utilization of services and level of impairment, *see* 91 Fed. Reg. 33,406 (June 3, 2026), which may not be available for many renewing members. This will further increase coverage loss because individuals will need to provide documentation or additional information to successfully renew. Finally, members with complex medical conditions can see fluctuations in their symptoms from day-to-day or month-to-month, which will make it even more difficult to assess whether their condition meets the "significant impairment" threshold.

49. Members with conditions that meet the statutory categories of medical frailty but who lose coverage due to inability to document "significant impairment" may return to NC Medicaid sicker and costlier due to the loss of health coverage to treat and manage their conditions. This type of "churn" in Medicaid enrollment both raises costs for NC Medicaid and decreases quality of care for members.

50. NC Medicaid expects the IFR's limitations on self-attestation to increase member confusion and coverage loss as well. In NC Medicaid's experience, the requirement to obtain third party documents to demonstrate eligibility creates a procedural hurdle that increases termination rates for otherwise eligible members. Thus, as self-attestation tightens, NC Medicaid expects that more members who are actually eligible will be disenrolled simply because they are unable to demonstrate their eligibility.

51. NC Medicaid also expects the "once per enrollment period" limitation on medical frailty self-attestations to particularly harm members with multiple medically frail conditions, especially those who develop one medically frail condition, recover from it, and then develop a second medically frail condition during the same enrollment period. For example, a member could be diagnosed with cancer and self-attest to medical frailty on that basis, and then later (while still

enrolled in NC Medicaid) develop a substance use disorder. Under the IFR, assuming continuous Medicaid coverage during that period, the member *could not* self-attest to medical frailty based on the newly developed substance use disorder and thus could lose coverage if they could not obtain documentation for this diagnosis.

52. NC Medicaid is required by State law to provide notice to members regarding the changes occasioned by the IFR on or before July 1, 2026. At present, NC Medicaid is uncertain as to how, for example, a member might establish that they are medically frail. Accordingly, the content of this notice does not have the clarity required to communicate to members how they can comply with the new requirements.

53. NC Medicaid has spent years conducting outreach and building relationships with NC Medicaid enrollees. Confusion over eligibility determinations risks harming that relationship and lowering institutional trust. Members who do not understand why they were disenrolled or what is required to be eligible may simply forego coverage.

**Administrative, Operational, and Financial Burdens on NC Medicaid**

*Burdens on NC Medicaid*

54. Because CMS had never before imposed community engagement requirements across eligibility categories, NC Medicaid's eligibility system was not built to support community engagement requirements and is not easily configured to incorporate the numerous eligibility factors necessary to evaluate community engagement. North Carolina anticipated system costs and staffing needs to be approximately $29.9 million in start-up costs and an additional $44.4 million annual operational funding to support implementation prior to the release of the IFR. NC Medicaid anticipates that the additional requirements under the IFR will result in increased costs to

implement system changes and will increase resources required to support ongoing operations, above prior estimates.

55. With respect to the medical frailty exclusion, the surprising additional "significant impairment" requirement—plus the uncertainty of how to implement it—will require NC Medicaid to rapidly redirect its operational approach and systems development. In addition to analyzing, developing and implementing new ways to evaluate medical frailty, NC Medicaid may need to integrate new data sources to evaluate members' eligibility for the medical frailty exclusion, which will add development costs as well as potential costs from accessing new data. As more individuals are impacted and denied coverage or disenrolled as a result of this requirement, NC Medicaid expects more calls, more documents to process, additional manual processing by county caseworkers that may increase processing errors, and more appeals of adverse actions. And finally, in addition to the costs of operationalizing this new requirement, NC Medicaid will also incur the cost of educating its members, staff, and other stakeholders about what the requirement means and how it can be met.

56. NC Medicaid also expects the new, complex, and variable limitations on self-attestation to increase its operational complexity. These limitations will make it harder to train staff, vendors, assisters, and community organizations on eligibility processes. As with the medical frailty exclusion, NC Medicaid expects the self-attestation limitation to lead to more calls, more documentation to be scanned and reviewed by staff, and more denials and disenrollments that, themselves, lead to more calls and appeals. In addition, the change in the self-attestation rules from 2027 to 2028 will require yet more additional system development, training, and outreach and education to accommodate the new 2028 rules.

57.     The burdens from community engagement requirements imposed by H.R. 1 and made worse by the IFR fall not just on NC Medicaid, but on North Carolina more generally. As noted above, NC Medicaid members will likely face increased denials and disenrollments—and, due to the "significant impairment" requirement for medical frailty, many of those disenrollments could be of some of NC Medicaid's most medically needy members. The IFR will have a disproportionate impact on members with disabilities and chronic health conditions who are enrolled in NC Medicaid's expansion program. As the uninsured rate increases, there will be a greater financial strain on providers—in particular rural, community, and safety net hospitals as well as community health centers—that will be called upon to provide even greater levels of uncompensated care. Furthermore, individuals that are disenrolled from NC Medicaid will likely lose access to primary and preventive care—and care necessary to treat their statutorily recognized medical conditions—resulting in more individuals seeking high-cost, emergency care. In addition, the lack of preventative care will result in increased communicable disease outbreaks and more strain on NC DHHS. Most importantly, NC Medicaid expects poorer health outcomes across North Carolina, as fewer people will be able to access appropriate care and manage chronic conditions.

58.     Lastly, NC Medicaid expects that the new medical frailty requirements—both the "significant impairment" requirement and the limitations of medical frailty self-attestation—will place a significant administrative strain on treating healthcare providers. In order to support members seeking medical frailty exemptions, providers may need to devote time to providing documentation to demonstrate that a member is medically frail and significant impairment in the ability to work. This will require providers to take time away from their patient care and increase administrative strain on providers, adding to healthcare costs and impacting access to care.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 26th day of June 2026.

/s/ Sarah Gregosky
Sarah Gregosky, MSPH
Assistant Secretary and Deputy Medicaid Director
NC Department of Health and Human Services,
Division of Health Benefits (NC Medicaid)