# EXHIBIT 20

# DECLARATION OF HOA PHAM

I, Hoa Pham, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of Pennsylvania. I am over the age of 18 and have personal knowledge, or knowledge based on review in my capacity as Deputy Secretary of the Pennsylvania Department of Human Services' ("DHS") Office of Income Maintenance of information and records gathered by DHS and agency staff, of the matters set forth below. If called as a witness, I could and would testify competently to the matters set forth below.

## Professional and Agency Background

2. I am the Deputy Secretary for Pennsylvania DHS' Office of Income Maintenance ("OIM"). In this role, I am responsible for administering assistance programs that primarily serve low-income Pennsylvanians such as Medicaid, Children's Health Insurance Program (CHIP), Supplemental Nutrition Assistance Program (SNAP), Temporary Assistance for Needy Families (TANF) and Low Income Home Energy Assistance Program (LIHEAP). That work includes but is not limited to overseeing core eligibility determination policy and operational functions.

3. DHS is the single state agency responsible for administering Medicaid in Pennsylvania, known in Pennsylvania as Medical Assistance. Through its Medicaid program, DHS provides low-income individuals with comprehensive healthcare coverage and access to affordable, integrated, high-quality healthcare at no or low cost. DHS' Medicaid coverage includes medical, dental, mental health and substance use treatment, long-term services and supports, and long-term care.

4. DHS seeks to promote whole-person health for all Pennsylvanians served by Medicaid and CHIP by modernizing systems and programs, ensuring access to the highest value healthcare available, and removing barriers to equity and wellness.

5. DHS' Medicaid program insures approximately 2.8 million people, providing health coverage to children, families, and older adults—including some of the most vulnerable residents in the state, such as those experiencing homelessness, living with a disability, or who have a serious or complex medical condition.

6. Pennsylvania DHS administers the Medicaid program pursuant to federal law and regulations as well as the terms of its federally approved State Plans and its Section 1115 Demonstration Project. DHS receives federal Medicaid and CHIP funding, known as Federal Financial Participation (FFP), which typically covers 56.06% of DHS's expenditures on eligible Medicaid enrollees and 69.24% of expenditures on CHIP enrollees. There are exceptions to these rates for certain specific populations.

**Medicaid Expansion in Pennsylvania**

7. In 2015, Pennsylvania implemented Medicaid expansion under the Affordable Care Act (the "ACA"). This expansion extended federally funded comprehensive health insurance to low-income adults aged 19 to 64 with household incomes up to 133% of the Federal Poverty Level with a mandatory 5% income disregard primarily through DHS' Medicaid program.

8. Enrollees in Pennsylvania's Medicaid expansion program receive full, comprehensive benefits that include hospital care, prescription drugs, mental health services, and preventive care. Currently, eligibility for Pennsylvania's Medicaid expansion program requires that an individual (1) be an adult 21-64 years old; (2) be a citizen or qualified immigrant; and (3)

have household income less than or equal to 133% of the Federal Poverty Level with a mandatory 5% income disregard.

9. As of May 2026, approximately 751,092 Pennsylvanians are enrolled in Medicaid through DHS' Medicaid expansion program. There are 2,897,539 Pennsylvanians enrolled in Medicaid, so the expansion program covers roughly 26% of Pennsylvania's total Medicaid enrollment. For the current state fiscal year (2025-26), approximately $8.139 billion or 25.77% of Pennsylvania's federal Medicaid funding comes from the 90% Federal Financial Participation rate for 803,177 Medicaid expansion members (which is the program monthly average).

**CMS's Pre-IFR Guidance to Pennsylvania**

10. I and my staff at OIM, as well as colleagues across DHS, have been closely following enactment and implementation of H.R. 1, and in particular Section 71119, because it imposes novel work or community engagement requirements for adults covered under the Medicaid expansion provisions of the ACA.

11. Before H.R. 1, the Medicaid Act had never required financially eligible individuals to work, volunteer, or meet other community engagement requirements to establish Medicaid eligibility. Consequently, DHS does not have systems in place to verify work, volunteer, or other community engagement activities for Medicaid.

12. CMS launched a Community Engagement Requirements Workgroup in December 2025. DHS regularly participated in these Workgroup meetings. Between December 2025 and May 2026, CMS consistently described the statutory medical frailty exemption that exists for the community engagement requirements in categorical, diagnosis-based terms that would allow for self-attestation of a qualifying medical condition and did not include an obligation to establish how the condition may impair functioning.

13.     DHS sent a memo to CMS on March 11, 2026, outlining its proposed approach to evaluating medical frailty (described more fully below), and then met with CMS on April 16, 2026, to review the March 11 memo. During the April 16, 2026, meeting, DHS repeatedly asked if it could proceed with implementing its proposed approach. CMS did not indicate that DHS would need to revise its approach to include a functional test to assess medical frailty. In fact, CMS asked if it could refer other states to Pennsylvania to learn about DHS's proposed approach.

14.     During a May 1, 2026 meeting of the Community Engagement Requirements Workgroup, CMS reinforced that H.R.1 Section 71119 defines individuals meeting medical frailty as individuals meeting one or more categories (e.g., who is blind or disabled; with an SUD; with a disabling mental disorder; with a physical, intellectual, or developmental disability that significantly impairs their ability to perform one or more activities of daily living; or with a serious or complex medical condition), CMS elaborated that states may need to consider severity of medical condition as a part of evaluation for medical frailty exclusions but notably did not indicate that states must evaluate ability to work or participate in community engagement requirements.

**CMS Issues the Interim Final Rule**

15.     On June 1, 2026, CMS promulgated an Interim Final Rule ("IFR") relating to the community engagement requirement. The IFR includes several provisions that are vague, differ substantially from CMS's prior guidance, and are more restrictive than statutory language. These provisions also will be very challenging and costly for DHS to design by August 31, 2026, and implement before January 1, 2027, and are expected to cause significant harm to Pennsylvania's Medicaid program and Medicaid expansion members once implemented.

16.     Most acutely, the IFR's definition of an individual excluded from the community engagement requirements on the basis of medical frailty is dependent upon the condition

significantly impairing the individual's ability to work or otherwise comply with the community engagement requirement (effectively a functionality standard). The IFR's application of a functional test is more restrictive than what is specified in H.R.1, and would require substantially more manual effort from clients and DHS to verify an individual's medical frailty status.  DHS has already expended nearly $1 million in manpower hours across clinical experts and data analysts to develop a medical frailty approach that would allow it to rely on existing databases including claims and encounter information. DHS must redeploy subject matter experts to reclassify thousands of medical condition diagnostic codes to account for an evaluation of an individual's functionality. Further, DHS expects that it will be highly unlikely that administrative data alone can be used to successfully verify the IFR's medical frailty status. That means individual Medicaid expansion recipients and their healthcare providers must all complete hours of assessment, documentation and reporting to DHS to verify the IFR's definition of medical frailty status, which DHS must then process.

**DHS's Efforts to Implement the Community Engagement Requirements Before and After the IFR Issued**

17.     Following the enactment of H.R. 1, DHS recognized that it would be extraordinarily challenging to complete the necessary system and process changes required by the August 31, 2026, notice deadline and January 1, 2027, implementation dates, given the magnitude of changes needed for the community engagement requirements and the short period of time afforded by H.R. 1. Therefore, immediately after H.R. 1 was passed in July 2025, DHS began to prepare to comply with the new community engagement requirements.

18.     Beginning in November 2025 and continuing until the release of the IFR, DHS has based its policy and system determination on the statutory language and the subregulatory

guidance provided by CMS, as detailed above. Based on this guidance, DHS had already done the following at the time the IFR was released:

- Designed and began operationalizing an automated, data-driven medical frailty determination process. This work has involved significant investment across clinical review, policy design, analytics, IT development, claims and encounter data processing, eligibility-system planning, and technical coordination with managed care organizations and Pennsylvania's health information exchange. DHS conservatively estimates this work to date to have cost $1 million.

- Initiated public outreach to keep Pennsylvanians and strategic partners informed about upcoming Medicaid community engagement requirements and drive necessary implementation preparation. Outreach has included extensive stakeholder engagement through mass digital communications; partner meetings; town halls and workgroup activations.

- Retooled DHS' internal technical teams, vendors and their associated contracts to transition its longstanding System Development Lifecycle away from a waterfall-based, 12-18 month project timeline to an agile lifecycle to support iterative development, testing and deployment. DHS formally launched technical system design workgroups in February 2026. As of the IFR's publication, DHS already completed eight separate sprints to address Medicaid member and parallel DHS caseworker portal changes; changes to eligibility determination logic; verification and exemption logic; augment automated *ex parte* renewal processes; update electronic data exchanges; support Marketplace coordination; update internal reporting structures to support performance management and auditing; and update

automated notices and forms to Medicaid members. This technical effort has already cost DHS nearly $6M.

- Drafted notices and forms to Medicaid expansion members outlining community engagement requirements, consequences of noncompliance, and Constitutionally-required appeal rights. These drafts included feedback from over 14 unique stakeholders groups ranging from county partners to community advocates to managed care organizations and healthcare providers across the Commonwealth of Pennsylvania.

- Incorporated feedback from managed care organizations to inform DHS' coordinated strategies related to member education and outreach and automated data exchanges.

19. Despite DHS' significant expenditure of human resources and nearly $6M to date to prepare to implement the community engagement requirement. DHS will need to expend additional resources to accommodate new requirements included in the IFR. DHS has already added 5 additional weeks of discovery and technical development to its project timeline to account for new and pending guidance from CMS (see Sections 16-20 for outline of undue burden created by new IFR guidance). For example, the IFR (Section H(3)(e), *Notifying Individuals about Eligibility Decisions and Changes in Eligibility Requirements*) imposes a novel requirement to provide advanced notice and fair hearing rights consistent with §§ 435.917 through 435.918 and part 431 subpart E for individuals who lose a specified exclusion status. DHS now needs to quickly develop new technical functionality to trigger advanced notification; DHS will now assume ongoing mail production costs for this new notice.

20.     DHS faces several urgent deadlines with respect to implementing community engagement requirements. DHS must apply community engagement requirements to applications and renewals as of January 1, 2027, and to do this, DHS needed to substantially finalize eligibility system requirements by June 12, 2026, and conduct extensive testing to ensure full functionality to meet its originally targeted October 31, 2026, system deployment date. Of note, the IFR will likely require DHS to delay this deployment further. After full system deployment, DHS will have only limited ability to make further system changes for use by January 1, 2027. Moreover, DHS is required by H.R. 1 to begin the outreach process by August 31, 2026, addressing the changes occasioned by the IFR. In order to do that, DHS needs to account for multiple time-sensitive milestones, including finalizing language of required notices, document translation into six languages, configuration of recipient files, mail printing and processing through the U.S. Postal Service. If DHS does not finalize the language of the notices by August 1, 2026, DHS is at risk for issuing untimely notices.

21.     Of note, the consequences for DHS from building its systems inconsistent with CMS's incomplete and as-yet unissued guidance are significantly heightened. If DHS is not able to configure its systems quickly enough, or if it configures its systems inconsistent with CMS's eventual guidance, it could face negative audit findings and significant financial penalties under H.R. 1 Section 71106. In other words, at the same time that financial consequences for not complying with guidance are rising, CMS's failure to issue clear and timely guidance on community engagement requirements is making it significantly harder for Pennsylvania and other states to comply.

**Human Costs of Community Engagement Requirements, Made Worse By the IFR**

22. The purpose of the Affordable Care Act (ACA) was to ensure that low-income individuals receive comprehensive healthcare coverage and have access to affordable, integrated, high-quality healthcare.

23. DHS originally projected that the Medicaid eligibility changes necessitated by H.R.1 would result in 310,000 people in Pennsylvania losing their Medicaid eligibility, and with no healthcare coverage, would lead to increased uncompensated care across Pennsylvania's hospital ecosystem.

24. DHS has recent experience enforcing similar work requirements in its SNAP program and has already experienced significant eligibility loss despite internal data indicating that the majority of SNAP recipients are already working. From June 2025 to April 2026, nearly 89,000 Pennsylvanians lost SNAP eligibility, likely as a result of failure to meet administrative work reporting requirements.

25. The IFR imposes an impairment test to qualify for a medical frailty exemption that extends beyond H.R.1, and DHS expects that this more narrow definition and administrative requirement will cause significant member confusion; strain on healthcare providers experiencing an influx in requested appointments to conduct impairment assessments; increase costs; and ultimately result in even more Pennsylvanians losing Medicaid eligibility and increased uncompensated care.

**Administrative, Operational, and Financial Burdens on Pennsylvania**

*Burdens on DHS*

26. Because CMS had never before imposed community engagement requirements across eligibility categories, DHS's eligibility system was not built to support community

engagement requirements and is not easily configured to incorporate the numerous eligibility factors necessary to evaluate community engagement. DHS has worked quickly to wholesale retool its technical teams to meet CMS' requirements within a significantly compressed timeline. This has included hours of contract renegotiation, retraining technical teams to deliver faster products, carefully stacking technical projects—in some cases, wholly delaying some projects—across DHS' eligibility system  to minimize risk and downstream impact to other DHS programs, like SNAP and the nearly 2 million Pennsylvanians it serves, and the other technical systems that rely upon data from DHS' eligibility system such as the Pennsylvania Department of Treasury or the Internal Revenue Service.

27.     Retooling DHS' eligibility system, again, to comply with the IFR within a condensed timeframe, seriously jeopardizes DHS' good faith efforts to effectively implement community engagement requirements, as well as DHS' other technical and policy mandates. These mandates include, notably, other technical projects also directed by CMS, such as changing Medicaid eligibility and enrollment system functionality for certain noncitizen groups and augmenting automated *ex parte*.

28.     DHS has already expended over $6M in up front technical work, and earmarked $10M in annual verification service transaction costs to meet CMS' "minimum viable product" (MVP) requirements for Community Engagement Requirements.

29.     When H.R.1 was enacted into law, DHS projected it would need 500-800 additional casework staff to fulfill the new Medicaid-related administrative requirements. Beyond the MVP, with the IFR requirements and what other requirements may be clarified from additional pending guidance from CMS, DHS expects other technical work and costs associated with enhanced verification services will be needed to effectively implement community engagement requirements

10

in a way that reduces member abrasion, maximizes efficiencies and aligns with other assistance program requirements like SNAP—as envisioned by HR1.

30. Failure to effectively implement clear eligibility processes with community engagement requirements will likely lead to increased strain on DHS' performance tracking and quality assurance functions, financial claims processing and fair hearings and appeals processing.

*Burdens on the Commonwealth of Pennsylvania*

31. The burdens from community engagement requirements imposed by H.R. 1 and made worse by the IFR fall not just on DHS, but Pennsylvania's healthcare ecosystem. DHS projects that community engagement requirements, as outlined by the IFR, will lead to Pennsylvanians losing healthcare coverage from Medicaid; will exclude Pennsylvanians from enrolling in healthcare coverage through the Marketplace; and ultimately increase strain on Pennsylvania hospitals, particularly rural and urban hospitals which serve higher proportions of Medicaid patients. Health Management Associates, using publicly available data sources on the uninsured, approximates that in Pennsylvania a 1% increase in uninsured individuals will drive $10.8 million in uncompensated care.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 26th day of June 2026.

_____

Hoa Pham

Deputy Secretary
Pennsylvania Department of Human Services
Office of Income Maintenance