EXHIBIT 23

<u>**DECLARATION OF STEVEN FORD**</u>

I, Steven Ford, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am a resident of Virginia. I am over the age of 18 and have personal knowledge, or knowledge based on review in my capacity as State Medicaid Director of information and records gathered by Department of Medical Assistance Services ("DMAS") and agency staff, of the matters set forth below. If called as a witness, I could and would testify competently to the matters set forth below.

<u>**Professional and Agency Background**</u>

2.      I am the Director for the Virginia State Medicaid program and Children's Health Insurance Program (CHIP) (known together in Virginia as Cardinal Care).

3.      DMAS is the single state agency responsible for administering Medicaid in Virginia. Virginia Medicaid provides low-income individuals with comprehensive healthcare coverage and access to affordable, integrated, high-quality healthcare at no or low cost. Medicaid coverage includes medical, dental, mental health and substance use treatment, long-term services and supports, and long-term care. Medicaid's mission is improving the health and well-being of Virginians through access to high-quality health care coverage.

4.      Virginia Medicaid insures approximately 1.8 million people, providing health coverage to children, families, and older adults—including some of the most vulnerable residents in the state, such as those experiencing homelessness, living with a disability, or who have a serious or complex medical condition.

5.      Virginia administers Medicaid pursuant to federal and state law and regulations as well as the terms of its federally approved State Plan and approved Waivers. Virginia receives

federal Medicaid and CHIP funding, known as "Federal Financial Participation" (FFP), which covers about 50% of expenditures for most Medicaid members and 90% of expenditures for people with Medicaid expansion coverage.

**Medicaid Expansion in Virginia**

6. On January 1, 2019, Virginia implemented Medicaid expansion under the Affordable Care Act (the "ACA"). This expansion extended federally funded comprehensive health insurance to low-income adults aged 19 to 64 with household incomes up to 133% of the Federal Poverty Level primarily through the Medicaid expansion program.

7. Enrollees in the Medicaid expansion program receive full, comprehensive benefits that include hospital care, prescription drugs, mental health services, and preventive care. Currently, eligibility for the Medicaid expansion program requires that an individual (1) be an adult 21-64 years old; (2) be a citizen or qualified immigrant; and (3) have household income less than or equal to 133% of the Federal Poverty Level.

8. As of June 15, 2026, approximately 540,000 individuals (about 30% of total enrollment) are enrolled in Virginia's Medicaid expansion program. For the current state fiscal year 2026, approximately $5.6 billion of Virginia's federal Medicaid funding comes from the FFP for Medicaid expansion program members.

**CMS's Pre-IFR Guidance to Virginia**

9. I and my staff at DMAS have been closely following enactment and implementation of H.R. 1, in particular Section 71119, which imposes novel work or community engagement requirements for adults covered under the Medicaid expansion provisions of the ACA (the "work requirements").

10.     Prior to the enactment of H.R. 1, the Medicaid Act has never required financially eligible individuals to work, volunteer, or meet other work requirements to establish Medicaid eligibility. Consequently, Virginia does not have in place systems by which to verify work, volunteer, or other community engagement activities for Medicaid applicants and enrollees.

11.     Since November 2025, CMS has been providing guidance on expected work requirements policy. On November 19, 2025, CMS presented a slide deck on work requirements, which was later provided to states on December 4, 2025. On December 5, 2025, CMS began a series of workgroups to provide guidance and conduct question-and-answer sessions with states on implementing work requirements. These workgroup calls took place once every other week from December 2025 through April 2026 and switched to a weekly cadence starting in May 2026. As of the date of this declaration, this series of workgroup calls is still ongoing.

12.     These sorts of calls represent a long-held practice by CMS to provide guidance to states, outside of formal rulemaking, in complying with urgent and significant changes in federal Medicaid law. In the absence of regulations, Virginia relied on CMS guidance from these calls, and the associated slide decks and other materials, to determine how to comply with new laws, implement operational, system, and process changes, and, ultimately, avoid financial penalties that those laws imposed for noncompliance.

13.     Virginia likewise relied on the guidance shared by CMS on these regular calls concerning H.R. 1. Regarding the definition of medical frailty, CMS indicated that it intended to "use a definition … similar to that described in regulations at 42 CFR § 440.315(f)," which is a regulation whose language closely resembles the H.R. 1 language. Nov. 19, 2025 CMS Slide Deck, page 11. CMS also stated that it expected to allow verification of medical frailty through "medical claims data review or provider documentation, or completion of a screening tool." Nov. 19, 2025

CMS Slide Deck, page 11; *see also* slide 17 ("medical frailty status … available through claims data" or "medical screener").

14. At no point between the passage of H.R. 1 in July 2025 and the promulgation of the Interim Final Rule in June 2026 did CMS indicate that it would require "medically frail" individuals to have a significant impairment to their ability to comply with work requirements. Nor did CMS indicate that states would need to verify that a member had such a significant impairment when determining eligibility for the medical frailty exclusion.

15. Regarding use of self-attestation to verify medical frailty, while initially CMS signaled that only limited use of self-attestation would be permitted, *see* Nov. 19, 2025 CMS Slide Deck pg. 16, CMS later indicated that self-attestation would be an acceptable verification method when data was not available.

16. In March 2026, CMS reiterated that states may use auditable self-attestation in the absence of claims data. CMS specifically noted that states could use such an auditable self-attestation "*to confirm ongoing medical frailty*" in addition to when a member newly identifies as medically frail. CMS also noted that States should be able to reassess individuals for medical frailty at redetermination, *even without extensive claims history*, based on new information such as a major life event. At no point did CMS indicate members would be limited to only one self-attestation per enrollment period, even if they developed multiple sequential medical frailty conditions.

17. On Friday, May 1, 2026, during the work requirements workgroup call, CMS showed states a slide deck that included a definition of the medical frailty exclusion. These slides did not mention any requirement that an individual's medically frail condition would need to impair their ability to comply with work requirements.

18.    On or about Wednesday, May 6, 2026, CMS informed states that information conveyed on the Friday, May 1, 2026 call should not be acted upon, and was subject to change.

19.    In response to this and concerns that CMS would change its policy direction related to work requirements, DMAS sent a letter to CMS on May 28, 2026, conveying DMAS's concerns with limiting the definition of medically frail and the use of self-attestation. This letter is attached as Exhibit A.

**<u>CMS Issues the Interim Final Rule</u>**

20.    On June 1, 2026, CMS promulgated the Interim Final Rule ("IFR") relating to work requirements. The IFR includes several surprising provisions that are vague, differ substantially from CMS's prior guidance, and are more restrictive than statutory language. These provisions will be very challenging and costly for DMAS to implement before January 1, 2027, and are expected to cause significant harm to Medicaid members and health care providers once implemented. These provisions include the following:

*Medically Frail Definition*

21.    With respect to the medically frail exclusion, H.R. 1 excludes individuals from work requirements if they are medically frail, defined as having certain health needs across five categories in the statute. *See* Social Security Act § 1902(xx)(9)(A)(ii)(V) [42 U.S.C. 1396a(xx)(A)(ii)(V)]. The IFR added a new requirement that, in addition to falling into one of these five categories enumerated in H.R. 1, a "medically frail" individual must *also* be "an individual whose physical, mental, or other behavioral health condition significantly impairs the individual's ability to comply with the work requirements." 42 CFR § 435.554(c)(5)(i). Thus, per the IFR, having cancer or HIV/AIDS may or may not be enough to be deemed exempt from H.R. 1's work requirements; states will need to determine whether the individual also is impaired in

their ability to work or comply with the work requirements, using a process that remains unclear. 91 Fed. Reg. 33,373 (June 3, 2026).

22. This "significant impairment" requirement does not exist in the text of H.R. 1 Section 71119. *See* Social Security Act § 1902(xx)(9)(A)(ii)(V) [42 U.S.C. 1396a(xx)(A)(ii)(V)]. In a webinar and slide deck presented to state Medicaid agencies on June 9, 2026 following the IFR, CMS acknowledged that, in addition to the statutory requirement that an individual meet the definition of medically frail supplied by Congress in section 71119, as codified at, 42 U.S.C. § 1396a(xx) (section 1902(xx) of the Social Security Act), the IFR also requires that the individual be significantly impaired in their ability to comply with work requirements in order to be considered medically frail. CMS cited no statutory basis for this new, more restrictive requirement.

23. Additionally, the "significant impairment" requirement was not mentioned in any CMS written or verbal guidance before the IFR was published, up to and including the CMS guidance about medical frailty provided to states as recently as May 1, 2026.

24. The IFR provided very little concrete guidance for states about how to verify whether an individual meets this new "significant impairment" requirement. However, the IFR does indicate that, in general, states *cannot* generally rely solely on claims data indicating someone's medical diagnosis or condition, because doing so "would risk sweeping in individuals whose conditions do not significantly impair their functional capacity." 91 Fed. Reg. 33,373 (June 3, 2026). This is in direct conflict with prior guidance provided by CMS that states may use claims-based data to verify whether an individual meets the medical frailty exemption in general. Instead, the IFR says that states should verify medical frailty using information from "multiple domains," to determine a member's "condition[s], utilization of services … and their level of impairment." 91 Fed. Reg. 33,406 (June 3, 2026). It also suggests that states could use "algorithms using

administrative claims data that assign acuity scores to individuals," *id.*, but does not explain how to build these algorithms or how states should connect the acuity of someone's condition to their ability to work.

25. Since the IFR's release, CMS has told states that it is developing significantly more guidance on the medically frail exclusion. However, as of the date this declaration was executed, this guidance has not yet been provided.

*Self-Attestation*

26. Self-attestation is a longstanding tool used in Medicaid under federal regulations for individuals to verify certain eligibility criteria. Additionally, H.R. 1 expressly allows individuals to self-attest to their exemption from work requirements in certain circumstances. *See* Section 1902(xx)(3)(A) of the Social Security Act. However, the IFR significantly limits members' ability to self-attest to work requirement eligibility factors after January 1, 2028.

27. Within this framework, the IFR applies different and complex restrictions to medical frailty specifically. Under the IFR, beginning in 2028, individuals who are medically frail may only self-attest to their medically frail status once during a single period of enrollment. 42 C.F.R. § 435.557(f)(ii). Under Section 1902 of the Social Security Act and 42 CFR § 435.916, state Medicaid agencies are required to periodically (at least annually) conduct a complete redetermination of an individual's Medicaid eligibility, commonly called a "renewal" or "renewal cycle." The Social Security Act does not recognize a "period of enrollment." That concept is introduced for the first time in the IFR and used in a way that hinders states' operational efficiencies, puts medically at-risk members in danger of losing Medicaid coverage, and treats patients differently based on when in this period their medical impairment may arise.

28. Beginning in January 2027, a renewal cycle lasts at most 6 months for individuals with Medicaid expansion coverage—and thus, individuals subject to work requirements—as a result of another provision in H.R. 1 (section 71107 of H.R. 1). In contrast, under the IFR's newly introduced construct, a period of enrollment can last several renewal cycles as long as the individual remains continuously enrolled in Medicaid.

29. Under 42 CFR § 435.916, a renewal of Medicaid eligibility is a *de novo* review of all eligibility factors, except where prohibited to protect member eligibility (e.g. Medicaid agencies cannot require an individual to reverify citizenship under 42 CFR § 435.956(a)(4)(ii)). However, the IFR creates different sets of rules that the state must apply in conducting eligibility determinations related to the work requirements based on whether an individual is within a period of enrollment and whether, during that period, the individual has previously submitted a self-attestation of medical frailty. This distinction on when self-attestation can be used exacerbates the operational complexity the state faces in implementing the requirements with fidelity. It also increases the risk of confusion on the part of the members and creates unnecessary barriers to coverage.

30. As such, the IFR will likely increase disruptions to an individual's continuity of healthcare and increase costs and complexity to the state in implementing the rule.

*Short-term Hardship Exceptions*

31. H.R. 1 allows States to apply exceptions for certain short-term hardship events. These short-term hardship events include receiving inpatient medical services, residing in a county where an emergency or disaster has been declared by the President or where there is high unemployment, or traveling outside one's community for necessary medical services. *See* SSA § 1902(xx)(3)(B).

32. The IFR provides that, the short-term hardship exception requires a new applicant to demonstrate the exception "for at least one, but not more than 3 consecutive months, as specified in the State plan, *immediately preceding the month of application*." 91 Fed. Reg. 33473 (emphasis added). An applicant cannot demonstrate the exception for the same month in which they apply to Medicaid.

33. This requirement ensures that newly eligible individuals experiencing hardship events will have to wait at least until the start of the following month to receive necessary coverage, likely foregoing necessary care in the meantime or further straining our emergency health care system.

*Other*

34. Several of the timelines set out in the IFR do not take account of the fact that providers have 12 months to submit claims data. Despite this, the IFR specifically requires states to only use data from the 12 preceding months in order to determine whether an individual is medically frail. 42 C.F.R. § 435.557. This means DMAS may not yet have the relevant claims data to identify whether someone qualifies for this exemption from work requirements. Once again, this provision will increase the risk of coverage loss for otherwise eligible individuals.

**DMAS's Efforts to Implement the Work Requirements Before and After the IFR Issued**

35. Following the enactment of H.R. 1, DMAS recognized that it would be extraordinarily challenging to complete the necessary system and process changes required by the August 31, 2026 deadline in H.R. 1 for notifying Medicaid members about these changes and the January 1, 2027 implementation deadline, given the magnitude of changes needed for the work requirements and the short period of time afforded by H.R. 1

36. Beginning in November 2025 and continuing until the release of the IFR, DMAS based its policy and system determinations on the statutory language and the subregulatory guidance provided by CMS, as detailed above. Based on this guidance, in coordination with the Virginia Department of Social Services (which administers Virginia's eligibility system for Medicaid), DMAS has devoted significant time and resources toward the following:

- Establishing core definitions for the activities individuals can show to demonstrate compliance with work requirements, as well as the exemptions individuals may meet to otherwise satisfy these requirements;

- Engaging with a vendor to design and implement necessary changes to Virginia's eligibility system, including the design of a new portal for individuals to upload information related to work requirements;

- Identifying and leveraging new data sources within and outside the state to automatically determine individuals' compliance with, or exemption from, work requirements;

- Evaluating current state processes for verifying eligibility to determine how to consistently and efficiently integrate work requirements in this framework, including how individuals generally verify their eligibility information, when self-attestation is permitted, and how existing state eligibility systems store this information;

- Establishing a data verification hierarchy to determine how the state eligibility system should integrate and coordinate multiple data sources to most effectively and accurately verify eligibility;

- Revising the Medicaid application and renewal form to incorporate work requirements;

- Designing and initiating a public engagement, education, and outreach strategy by drafting member notices and FAQs, coordinating with managed care plans to prepare for member outreach, and engaging with providers, community-based organizations, and other stakeholders;

- Completing contract negotiations across several areas based on information prior to the IFR, including contracts to expand call center capacity, implement a unit to handle data entry and verification processing, and conduct outreach via texting;

- Evaluating internal workforce needs to implement work requirements and requested and received funding from the General Assembly based on our understanding prior to the IFR;

- Executing amendments to existing contracts with the state's managed care plans;

- Designing comprehensive IT-system updates and changes necessary to stand up these requirements; and

- Developing a comprehensive framework for identifying and verifying medical frailty, as described further below.

37. With respect to implementing the medically frail exclusion in particular, DMAS has worked extensively with clinical and systems personnel to build a process to identify individuals who could be considered "medically frail." This system is based largely on claims data, in line with CMS guidance to "verify medical frailty" based on a "medical claims data review or provider documentation." Nov. 19, 2025 CMS Slide Deck, page 11; *see also* slide 17 ("medical frailty status … available through claims data"). To this end, to implement an approach for medical

frailty based on H.R. 1's statutory text and CMS guidance, DMAS has engaged in a comprehensive review and validation of thousands of diagnostic and clinical condition codes, procedure codes, and prescription drug codes to establish a clinically-driven and robust framework for verifying this exclusion. DMAS has collaborated with other states to learn from their approaches and validate its findings. In addition, based on CMS guidance, DMAS has designed processes to verify medical frailty for individuals for whom data is unavailable by designing a screening tool for medical frailty that could be incorporated in the Medicaid application and renewal form.

38.     DMAS faces several urgent deadlines with respect to implementing work requirements. H.R. 1 requires Virginia to apply work requirements to applications and renewals as of January 1, 2027. To do this, DMAS must substantially finalize eligibility system requirements by mid-July 2026 to enable appropriate testing and full deployment by late fall of 2026. This timing is necessary to launch these major eligibility changes by the statutory deadline of January 1, 2027. As a result, DMAS will be extremely limited in its ability to make any eligibility system changes after July 2026 and still meet the statutory deadline.

39.     Moreover, H.R. 1 requires Virginia to issue notices no later than August 31, 2026, which will need to address the changes occasioned by the IFR. To issue those notices in a timely fashion, DMAS intends to finalize the information included in these notices by mid-July 2026 in order to enable appropriate translation and distribution. My current understanding is that the latest date by which DMAS would be able to pull the notice back from the vendor and make any needed changes before mailing the notice to members is August 7, 2026. After that date, DMAS could try to provide updated information on the agency's website and engage in additional messaging campaigns, but the agency would not be able to pull back the notice being mailed to members.

40. Given this landscape, it will be extremely challenging to implement work requirements by January 1, 2027 in light of the complex and significant changes in the IFR.

41. Adding to these challenges, DMAS still lacks clarity on several crucial issues from the IFR. While the IFR says that DMAS will need to evaluate whether a member's medical condition significantly impairs their ability to work, CMS has provided only limited guidance about how DMAS should determine this. While CMS has said more subregulatory guidance will be provided, DMAS must develop its eligibility systems and processes without knowing what this future guidance is, which could risk further systems changes, delays, and costs if CMS's *future* guidance conflicts with this system development. This lack of clarity also impacts the messages that DMAS can provide its members: if DMAS does not understand what it means for a medical condition to "significantly impair" a member's ability to work, it cannot educate its members about how to demonstrate compliance with this requirement. Finally, H.R. 1 requires states to use data where possible to verify exemptions, including medical frailty, and the IFR expressly contemplates that states will use data for this purpose. However, the IFR does not clarify how states can effectively use data to make determinations of medical frailty when medical claims data do not generally convey information about individuals' ability to work. DMAS requires clarity on these fundamental issues in order to implement work requirements in a timely fashion and to ensure that its members are prepared for these major changes to Medicaid eligibility.

42. Of note, the consequences for DMAS from building its systems inconsistent with CMS's incomplete and as-yet unissued guidance are significantly heightened. If DMAS is not able to configure its systems quickly enough, or if it configures its systems inconsistently with CMS's eventual guidance, it could face negative audit findings and significant financial penalties, which CMS acknowledges in the IFR. 91 Fed. Reg. 33, 377 (June 3, 2026). In other words, at the same

time that financial consequences for not complying with guidance are rising, CMS's failure to issue clear and timely guidance on work requirements is making it harder for Virginia and other states to comply.

**<u>Human Costs of Work Requirements, Made Worse By the IFR</u>**

43. The purpose of the Affordable Care Act (ACA) and the expansion of Medicaid was to ensure that low-income individuals receive comprehensive healthcare coverage and have access to affordable, integrated, high-quality healthcare. However, the work requirements included in H.R. 1 are expected to create major barriers to coverage and result in members losing coverage, including members who are eligible but cannot verify their eligibility due to administrative challenges.

44. As noted above, about 540,000 individuals with Medicaid expansion coverage in Virginia will be subject to new work requirements, in addition to new applicants for Medicaid. DMAS studies conducted before the IFR suggest that more than 200,000 individuals—about 37 percent of the Medicaid expansion population in Virginia—could be exempt based on medical frailty, allowing these individuals to maintain continuous coverage and, thus access to needed medical care. DMAS expects CMS's "significant impairment" requirement in the IFR to result in more Medicaid members losing coverage than would otherwise have lost coverage under the statutory definition of medically frail. This is either because their condition may not meet the IFR's additional, non-statutory "significant impairment" threshold, or because they cannot obtain the proof required to demonstrate their ability to work is significantly impaired. The "significant impairment" requirement will also likely increase member confusion. Medicaid members may think they do not qualify as "medically frail," given the added complexity and ambiguity, and DMAS may see an increase in non-responses from members and decreased rates of application.

The "significant impairment" requirement will also likely decrease the number of people DMAS can automatically verify as medically frail, because, under the IFR, the *ex parte* verification process will generally require not just a diagnosis code, but also other data on utilization of services and level of impairment, *see* 91 Fed. Reg. 33,406 (June 3, 2026), which may not be available for many renewing members. As noted above, CMS has not clarified how states can use medical claims data to make decisions about whether someone can or cannot work or satisfy the work requirements. This will further increase coverage loss because individuals will need to take steps to affirmatively show they are medically frail, either through self-attestation (when allowed) or through documentation, potentially even requiring the involvement of medical providers. These steps create administrative complexities that become barriers to coverage, leading eligible people to lose Medicaid and access to critical health services. Finally, members with complex medical conditions can see fluctuations in their symptoms from day-to-day or month-to-month, which will make it even more difficult to assess whether their condition meets the "significant impairment" threshold. Ultimately, the IFR means continued access to Medicaid for roughly 200,000 Virginians with significant health needs is now in question, as many of these individuals will no longer be exempt and many others will now need to navigate additional requirements that could lead them to inadvertently lose the coverage they need.

45. Members with conditions that meet the statutory categories of medical frailty but who lose coverage due to inability to document "significant impairment" may return to Medicaid sicker and costlier for the loss of health coverage to treat and manage their conditions. This type of "churn" in Medicaid enrollment both raises costs for DMAS and decreases quality of care for members.

46.    DMAS expects the IFR's limitations on self-attestation to increase member confusion and coverage loss as well. In DMAS's experience, the requirement to obtain third party documents to demonstrate eligibility creates a procedural hurdle that increases termination rates for otherwise eligible members. Thus, as self-attestation tightens, DMAS expects that more members who are actually eligible will be disenrolled simply because they are unable to demonstrate their eligibility.

47.    DMAS also expects the "once per enrollment period" limitation on medical frailty self-attestations to particularly harm members for whom medical data will not be available—for example, people who develop multiple conditions at different points in time or face challenges accessing medical services. For example, a member could be hospitalized and self-attest to medical frailty on that basis while getting treatment, and then later (while still enrolled in Medicaid) experience a stroke. As noted above, providers have up to 12 months to submit claims for reimbursement. Months-long lags exist between the time services are delivered and related data appears in DMAS databases. Because of this, individuals who are recently diagnosed with new conditions may not have their health needs reflected in data available to the state. In these cases, self-attestation is an important tool for these individuals to verify their medical frailty, particularly for individuals who face challenges accessing medical providers from whom they can obtain other documentation—such as individuals living in rural regions or who are experiencing homelessness. Arbitrarily restricting medically frail individuals to one use of self-attestation during a period of enrollment undercuts this important verification tool, which has long been used by the Medicaid program in other contexts consistent with federal requirements.

48.    DMAS is statutorily required to provide notice to members regarding the changes occasioned by the IFR on or before August 31, 2026. See Social Security Act § 1902(xx)(8)(A)

[42 U.S.C. 1396a(xx)(8)] (directing States to begin outreach no later than four or more months before December 31, 2026). At present, DMAS is uncertain as to how, for example, a member might establish that they are medically frail. Accordingly, the content of this notice will not have the clarity required to communicate to members how they can comply with the new requirements.

49. DMAS has spent years conducting outreach and building relationships with Medicaid enrollees. Confusion and lack of clarity over eligibility determinations risk harming that relationship, lowering institutional trust, and creating more barriers to re-enrollment for eligible individuals.

**Administrative, Operational, and Financial Burdens on Virginia**

*Burdens on DMAS*

50. Because CMS had never before imposed work requirements across eligibility categories, Virginia's eligibility system for Medicaid was not built to support work requirements and is not easily configured to incorporate the numerous eligibility factors necessary to evaluate the work requirements. About $141.7 million dollars have been allocated for implementation of the work requirements to date. Additional funding and personnel will be requested and needed due to significant changes in the IFR.

51. With respect to the medical frailty exclusion, the surprising additional "significant impairment" requirement—plus the uncertainty of how to implement it—will require DMAS to fundamentally change its operational approach and systems development—a process that will take substantial time and resources, putting our ability to meet the January 1, 2027 deadline at risk. In addition to requiring changes to our approach to data and systems, the IFR's requirements for medical frailty mean more individuals will need to submit documentation to verify their exemption. This means more resources will be needed to develop this process, establish which

documents are allowable, actually review and verify documentation submitted, and train state workers as well as, potentially, health providers to evaluate whether someone is impaired in complying with the work requirements. As more individuals are denied coverage, DMAS expects more calls, more documents to process, and more appeals of adverse actions, all of which further generate costs and resource demands. These changes to medical frailty in the IFR further require DMAS to revise our education and outreach efforts to members, staff, and other stakeholders about what the requirement means and how it can be met.

52. DMAS also expects the new, complex, and variable limitations on self-attestation to increase its operational complexity. These limitations will make it harder to train staff, vendors, assisters, and community organizations on eligibility processes. DMAS expects the IFR's requirements on self-attestation to lead to more calls, more documentation to be scanned and reviewed by staff, and more denials and disenrollments that, themselves, lead to more calls and appeals, all of which will require additional resources from the state. In addition, the change in the self-attestation rules from 2027 to 2028 will require additional system development, training, and outreach and education to accommodate the new 2028 rules.

*Burdens on Virginia*

53. The burdens from work requirements imposed by H.R. 1 and made worse by the IFR fall not just on DMAS, but on Virginia broadly. As noted above, more Medicaid members will lose coverage—and, due to the "significant impairment" requirement for medical frailty, many of those disenrollments could be of some of DMAS's most medically needy members. The IFR will have a disproportionate impact on members with disabilities and chronic health conditions who are enrolled in Medicaid expansion. As the uninsured rate increases, there will be a greater financial strain on providers—in particular, rural, community, and safety net hospitals as well as

community health centers—that will be called upon to provide even greater levels of uncompensated care. Furthermore, individuals disenrolled from Medicaid will likely lose access to primary and preventive care as well as care necessary to treat their statutorily recognized medical conditions—resulting in more individuals seeking high-cost, emergency care and poorer health outcomes. This will undermine public health and increase health care costs across the Commonwealth as fewer people are able to access appropriate care and manage serious health conditions.

54. In addition, DMAS expects that the new medical frailty requirements—both the "significant impairment" requirement and the limitations on medical frailty self-attestation—will place a significant administrative strain on treating healthcare providers. In order to support members seeking medical frailty exemptions, providers may need to devote time to assessing and providing documentation demonstrating whether a member is medically frail and significantly impaired in their ability to work. This will require providers to take time away from their patient care and increase administrative strain on providers, adding to healthcare costs and impacting access to care.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 26th day of June 2026.

Steven Ford
Director, Department of Medical Assistance
Services

19

# EXHIBIT A



# COMMONWEALTH of VIRGINIA
## *Department of Medical Assistance Services*

STEVE FORD
DIRECTOR

SUITE 1300
600 EAST BROAD STREET
RICHMOND, VA 23219
804/786-7933
804/343-0634 (TDD)
www.dmas.virginia.gov

May 28,2026

Dear Director Brillman,

First, let me express my thanks to the CMS team for the hard work they have engaged in thus far with us and other states to implement H.R. 1, including Medicaid work and community engagement requirements. As you well know, these are major changes to Medicaid, and we have significantly relied on the guidance you have provided over the past many months to stand up core aspects of our program.

I have become aware that major changes to CMS's prior guidance may be under consideration for the forthcoming final rule. These include, potentially, restricting medical frailty to individuals who cannot work and potentially eliminating the use of self-attestation when data are unavailable. If finalized, these policies would be significant departures from CMS's prior guidance. I am writing to express our strong legal, policy, and operational concerns with these changes, and to encourage CMS to not pursue these policies in its final rule.

First, these policies seem to conflict with H.R. 1's text. The law exempts people who are medically frail, including people who are disabled, have a substance use disorder, disabling mental health condition, or serious or complex condition. The law does not mention capacity to work in this definition. Similarly, with respect to attestation, H.R. 1 explicitly allows states "to not require an individual to verify information resulting in" an exception or specified exclusion. Restricting the use of self-attestation for exemptions would seem to contradict this explicit flexibility.

Second, Virginia is concerned that these policy changes would increase the risk of unintended coverage loss among eligible individuals, particularly people with serious health conditions and disabilities. Virginia has been developing clinically informed, data-driven approaches to medical frailty that rely on diagnosis, procedure, prescription drug, and claims data to identify medically frail individuals in an automated and administratively efficient manner. Tying medical frailty to work capacity could potentially require document-based verification and individualized assessments, creating

substantial new administrative barriers for eligible individuals, including new paperwork requirements, provider certifications, and delays in processing eligibility and exemptions. These burdens are likely to result in eligible individuals losing or failing to maintain coverage despite having significant medical needs or disabilities, undermining the core purpose of the exemption. With respect to eliminating self-attestation, scaling back this flexibility would similarly require significantly increased paperwork and complexity that could drive further coverage loss due to procedural issues.

Finally, Virginia is deeply concerned about the operational and implementation impacts of these late-stage policy changes. In reliance on CMS's prior guidance – including written guidance shared in December on states' minimum viable product for 2027 in which CMS explicitly allowed states to accept self-attestation for compliance and exemptions for 2027, regular ongoing conversations with CMS staff, and repeated engagement with your systems teams on updates to Virginia's eligibility systems – Virginia has already spent significant time and resources implementing core aspects of work requirements. We have developed a new work requirement portal; developed a comprehensive, data-driven approach to medical frailty;  initiated extensive modifications to the VaCMS and MES systems; begun contract modifications and implementation work for call centers, work support vendors, data exchanges with managed care organizations, and verification sources; and commenced hiring and training activities for new and existing classified staff. Reversing course now to implement fundamentally different verification and exemption processes would require major system redesigns, operational restructuring, additional procurement activity, new staffing models, and significant additional funding and time.

The Commonwealth is concerned these potential changes cannot reasonably be implemented by January 2027 without substantial operational risk, systems errors, implementation delays, or noncompliance with federal requirements. This could mean we will need to pursue a good faith waiver requesting additional time for implementation.

Virginia respectfully urges CMS to reconsider these potential policy changes and maintain the flexibility previously provided to states regarding medical frailty determinations and self-attestation processes.

Again, I appreciate CMS's ongoing engagement and support regarding implementation of Medicaid work and community engagement requirements under H.R. 1. and look forward to our continued partnership.

Sincerely,

Steve Ford
Director

Cc: Deputy Director Costello