EXHIBIT 25

<u>**DECLARATION OF DEBRA STANDRIDGE**</u>

I, Debra Standridge, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of Wisconsin. I am over the age of 18 and have personal knowledge, or knowledge based on review in my capacity as the Deputy Secretary of the Wisconsin Department of Health Services (WI DHS) of information and records gathered by WI DHS and agency staff, of the matters set forth below. If called as a witness, I could and would testify competently to the matters set forth below.

<u>**Professional and Agency Background**</u>

2. I am the Deputy Secretary of WI DHS. Wisconsin DHS is the single state agency responsible for administering Wisconsin's Medicaid program, and the Division of Medicaid Services within WI DHS is responsible for the administration of the state's Medicaid program and Children's Health Insurance Program (CHIP).

3. Wisconsin DHS operates Wisconsin's Medicaid program and CHIP, which insure approximately 1.25 million people. Wisconsin's Medicaid program and CHIP provide comprehensive health coverage at low or no cost to children and adults of all ages. Our members include some of the most vulnerable residents in the state, such as those experiencing homelessness, living with a disability, or who have a serious or complex medical condition.

4. Wisconsin's full-benefit Medicaid programs include medical, dental, mental health and substance use treatment, and long-term services and supports.

5. BadgerCare Plus is Wisconsin's largest Medicaid program and covers roughly 800,000 members, including children, parents, pregnant people, former foster care youth, and

adults aged 19 to 64 without dependent children. Adults aged 19 to 64 without dependent children are known as our "childless adult" group.

6.     Wisconsin administers its Medicaid program pursuant to federal and state law and regulations as well as by the terms of its federally approved State Plan Amendments and other federally approved Waivers and Section 1115 Demonstration Projects. Wisconsin Medicaid receives federal Medicaid and CHIP funding, known as "Federal Financial Participation" (FFP), which covers an average of 60% of expenditures on eligible enrollees.

**Wisconsin Medicaid Coverage of Childless Adults**

7.     In 2013, the Centers for Medicare and Medicaid Services (CMS) approved Wisconsin's section 1115 demonstration, which permits Wisconsin to provide Medicaid coverage under the BadgerCare Plus program to the childless adult group. Wisconsin's section 1115 demonstration extended federally funded comprehensive health insurance to low-income adults aged 19 to 64 with household incomes up to 100% of the Federal Poverty Level. In 2024, CMS approved a five-year extension of Wisconsin's section 1115 demonstration, effective from January 1, 2025, to December 31, 2029.

8.     Childless adults enrolled in BadgerCare Plus receive full, comprehensive benefits that include hospital care, prescription drugs, mental health services, and preventive care. Currently, eligibility for BadgerCare Plus for childless adults requires, in part, that an individual (1) be an adult 19-64 years old; (2) be a citizen or qualified immigrant; (3) not be enrolled in Medicare; and (4) have countable income that does not exceed 100% of the Federal Poverty Level.

9.     As of May 2026, approximately 193,000 childless adults are enrolled in BadgerCare Plus.

10.     I and my staff at WI DHS have been closely following enactment and implementation of H.R. 1, including Section 71119, which imposes novel work or community engagement requirements for adults covered under the Medicaid expansion provisions of the ACA (the "community engagement requirements").

11.     Prior to the enactment of H.R. 1, the Medicaid Act has never required financially eligible individuals to work, volunteer, or meet other community engagement requirements to establish Medicaid eligibility. Consequently, WI DHS does not have in place operational systems by which to verify work, volunteer, or other community engagement activities for childless adults enrolled in BadgerCare Plus.

12.     Since November 2025, CMS has been providing guidance on expected community engagement requirements policy. On November 19, 2025, CMS presented a slide deck on community engagement requirements, which was later provided to states on December 4, 2025. On December 5, 2025, CMS began a series of workgroups to provide guidance and conduct question-and-answer sessions with states on implementing community engagement. These workgroup calls took place once every other week from December 2025 through April 2026 and switched to a weekly cadence starting in May 2026. As of the date of this declaration, this series of workgroup calls is still ongoing.

13.     These sorts of calls represent a long-held practice by CMS to provide guidance to states, outside of formal rulemaking, in complying with urgent and significant changes in federal Medicaid law. In the absence of regulations, Wisconsin relied on CMS guidance from these calls, and the associated slide decks and other materials, to determine how to comply with new laws,

implement operational, system, and process changes, and, ultimately, avoid financial penalties that those laws imposed for noncompliance.

14.     States likewise relied on the guidance shared by CMS on these regular calls concerning H.R. 1. Regarding the definition of medical frailty, CMS indicated that it intended to "use a definition … similar to that described in regulations at 42 CFR § 440.315(f)," which is a regulation whose language closely resembles the H.R. 1 language. Nov. 19, 2025 CMS Slide Deck, page 11. CMS also stated that it expected to allow verification of medical frailty through "medical claims data review or provider documentation, or completion of a screening tool." Nov. 19, 2025 CMS Slide Deck, page 11; *see also* slide 17 ("medical frailty status … available through claims data" or "medical screener").

15.     At no point between the passage of H.R. 1 in July 2025 and the promulgation of the Interim Final Rule in June 2026 did CMS indicate that it would require "medically frail" individuals to have a significant impairment to their ability to comply with community engagement requirements. Nor did CMS indicate that states would need to verify that a member had such a significant impairment when determining eligibility for the medical frailty exclusion.

16.     Regarding use of self-attestation to verify medical frailty, while initially CMS signaled that only limited use of self-attestation would be permitted, *see* Nov. 19, 2025 CMS Slide Deck pg. 16, CMS later indicated that self-attestation would be an acceptable verification method when data was not available.

17.     In March 2026, CMS reiterated that states may use auditable self-attestation in the absence of claims data. CMS specifically noted that states could use such an auditable self-attestation "*to confirm ongoing medical frailty*" in addition to when a member newly identifies as medically frail. CMS also noted that States should be able to reassess individuals for medical frailty

at redetermination, *even without extensive claims history*, based on new information such as a major life event. At no point did CMS indicate members would be limited to only one self-attestation per enrollment period, even if they developed multiple sequential medical frailty conditions.

18. On Friday, May 1, 2026, during the community engagement requirements workgroup call, CMS showed states a slide deck that included a definition of the medical frailty exclusion. These slides did not mention any requirement that an individual's medically frail condition would need to impair their ability to comply with community engagement requirements.

19. On or about Wednesday, May 6, 2026, CMS informed states that information conveyed on the Friday, May 1, 2026, call should not be acted upon and was subject to change.

20. In addition, CMS published two informational bulletins, dated November 18, 2025, and December 8, 2025, which define "specified excluded individual[s]" as including those who are medically frail. In defining medical frailty in these information bulletins, CMS does not reference or require a state assessment of an individual's inability to comply with community engagement because of medical frailty.

**CMS Issues the Interim Final Rule**

21. On June 1, 2026, CMS promulgated the Interim Final Rule ("IFR") relating to the community engagement requirement. The IFR includes several surprising provisions that are vague, differ substantially from CMS's prior guidance, and are more restrictive than statutory language. These provisions also will be very challenging and costly for WI DHS to design by August 31, 2026, and implement before January 1, 2027, and are expected to cause significant harm to members and Wisconsin Medicaid once implemented. These provisions include the following:

22.     With respect to the medically frail exclusion, the IFR added a new requirement that, in addition to falling into one of the five categories enumerated in H.R. 1, a "medically frail" individual must *also* be "an individual whose physical, mental, or other behavioral health condition significantly impairs the individual's ability to comply with the community engagement requirements." 42 CFR § 435.554(c)(5)(i).

23.     This "significant impairment" requirement does not exist in the text of H.R. 1 Section 71119. *See* Social Security Act § 1902(xx)(9)(A)(ii)(II)(V) [42 U.S.C. 1396a(xx)(A)(ii)(II)(V)]. In a webinar and slide deck presented to state Medicaid agencies on June 9, 2026, CMS acknowledged that, in addition to the statutory requirement that an individual meet the definition of medically frail supplied by Congress in section 71119, as codified at, 42 U.S.C. § 1396a(xx) (section 1902(xx) of the Social Security Act), the IFR also requires that the individual be significantly impaired in their ability to comply with community engagement requirements in order to be considered medically frail. CMS cited no statutory basis for this second, new requirement.

24.     Additionally, the "significant impairment" requirement was not mentioned in any CMS written or verbal guidance before the IFR was published, up to and including the CMS guidance about medical frailty provided to states as recently as May 1, 2026.

25.     The IFR provided very little concrete guidance for states about how to verify whether an individual meets this new "significant impairment" requirement. However, the IFR does indicate that, in general, states *cannot* rely solely on diagnosis or condition codes, because doing so "would risk sweeping in individuals whose conditions do not significantly impair their functional capacity." 91 Fed. Reg. 33,373 (June 3, 2026). This is in direct conflict with prior

6

guidance provided by CMS that states may use claims-based data to verify whether an individual meets the medical frailty exemption in general. Instead, the IFR says that states should verify medical frailty using information from "multiple domains," to determine a member's "condition[s], utilization of services … and their level of impairment." 91 Fed. Reg. 33,406 (June 3, 2026). It also suggests that states could use "algorithms using administrative claims data that assign acuity scores to individuals," *id.*, but does not explain what administrative data a state can use, a state's ability to access potentially relevant data, does not address delay in potential administrative data, or what would be an acceptable analysis of such data.

26.     Since the IFR's release, CMS has told states that it is developing significantly more guidance on the medically frail exclusion. However, this guidance has not yet been provided.

### *Self-Attestation*

27.     Unlike the guidance provided by CMS through fall 2025 and spring 2026, which indicated that an "auditable self-declaration" could generally be used when reliable data was unavailable, *see supra* ¶¶ 15-16, the IFR significantly limits the occasions when an individual may rely on self-attestation to demonstrate compliance with community engagement. It does so using a complex and limiting framework (that changes again after the first year of implementation) that will be harmful for members and difficult to implement.

28.     Thus, the IFR significantly limits members' ability to self-attest to community engagement eligibility factors after January 1, 2028. Of note, several community engagement eligibility factors are ones where documentation is unlikely to be available, such as whether a parent provides "some level of care" to their child (42 CFR § 435.554(a) (definition of "parent")); or the precise number of hours that a family caregiver provides assistance to a child or disabled individual (42 CFR § 435.554(c)(3)(i)(C)).

29.     Under Section 1902 of the Social Security Act and 42 CFR § 435.916, state Medicaid agencies are required to periodically (at least annually) conduct a complete redetermination of an individual's Medicaid eligibility, commonly called a "renewal" or "renewal cycle." The Social Security Act does not recognize a "period of enrollment." That concept is introduced for the first time in the IFR and used in a way that hinders states' operational efficiencies, puts medically at-risk members in danger of losing Medicaid coverage, and treats patients differently based on when in this period their medical impairment may arise.

30.     A renewal cycle lasts at most 12 months (or when section 71107 of H.R. 1 takes effect, 6 months for certain individuals). In contrast, under the IFR's newly introduced construct, a period of enrollment can last several renewal cycles as long as the individual remains enrolled in Medicaid.

31.     Under 42 CFR § 435.916, a renewal of Medicaid eligibility is a *de novo* review of all eligibility factors, except where prohibited to protect member eligibility (e.g. Medicaid agencies cannot require an individual to reverify citizenship under 42 CFR § 435.956(a)(4)(ii)). However, the IFR creates different sets of rules that the state must apply in conducting eligibility determinations related to the community engagement requirements based on whether an individual is within a period of enrollment and whether, during that period, the individual has previously submitted a self-attestation. This distinction on when self-attestation can be used exacerbates the operational complexity the state faces in implementing the requirements with fidelity and increases the risk of confusion on the part of the members.

32.     Prior to the IFR and the introduction of the new concept of a "period of enrollment," the use of self-attestation or a failure to verify an eligibility factor in a previous renewal cycle would not adversely impact an individual in their current renewal.

33. Furthermore, there is no lockout period or other prohibition on reapplying for Medicaid after an individual has been disenrolled for failure to verify compliance with or exemption from the community engagement requirements. Therefore, an individual who is prohibited from self-attesting to medical frailty for a second time in the same enrollment period and is subsequently terminated because the individual cannot verify medical frailty, can reapply once fully disenrolled and use self-attestation again at the start of a new period of enrollment. As such, the IFR will likely increase disruptions to an individual's continuity of healthcare, increase costs and complexity to the state in implementing the rule, and, at the same time, fails as a meaningful work incentive or program integrity measure.

*Data Feed Integration*

34. The IFR places very broad requirements on states to identify reliable data sources for verifying community engagement eligibility factors. The IFR requires Medicaid agencies to use "reliable information available to the State" to verify eligibility, which it defines as "information necessary for determining [community engagement requirements] eligibility to which the agency has access *or should have access*." 42 CFR § 435.557(b) (emphasis added). The IFR thus appears to require states to seek out and, where feasible, incorporate data sources for every factor of community engagement, even though such factors are numerous, have non-centralized data, and often relate to areas that Medicaid agencies have never assessed before, such as school attendance, community volunteer work, and job program enrollment. While CMS has previously indicated there would be a phased approach to adding data sources, *see* 11/19/2025 CMS slide deck pg. 28, the new regulation does not expressly permit this.

35.     The IFR lays out procedures for states to evaluate member compliance with community engagement requirements at renewal. However, these procedures will, in effect, deny members the full window of time they are granted in H.R. 1 to demonstrate they comply with work requirements.

36.     If a state cannot verify whether a member is still eligible for Medicaid through its *ex parte* data sources, the state sends the member a pre-populated renewal form to complete. *See* 42 CFR § 435.916(a)(3). According to the IFR, most states begin their renewal process and, if necessary, send this pre-populated form about 60 to 90 days before a member's renewal is due. 91 Fed. Reg. 33,390 (June 3, 2026). According to the IFR, if a state cannot *ex parte* verify compliance with community engagement requirements, the state may either send "a notice of noncompliance" with this renewal form, or as a follow-up after the member returns the renewal form if the state still cannot verify community engagement. 91 Fed. Reg. 33,411–12. The "notice of noncompliance," which is mandated by H.R. 1, provides members with only 30 days to respond, after which the member must be disenrolled if compliance with community engagement still cannot be verified. Social Security Act Section 1902(xx)(6) [42 U.S.C. 1396a(xx)(6)]. This disenrollment must happen no later than the month following the month in which the 30-day period expires. *Id.* The IFR says that this 30-day period cannot be extended and says that "states must complete the entire renewal process, including the noncompliance procedures, by the end of the beneficiary's eligibility period. 91 Fed. Reg. 33,412 (June 3, 2026).

37.     The effect of this structure is that members will be evaluated for compliance with work requirements before—often *months* before—the time period in which they are entitled to

comply with work requirements is complete. This abbreviated time period will increase the likelihood of coverage loss for otherwise eligible members.

*Short-term Hardship Exceptions*

38.     H.R. 1 allows States to apply exceptions for certain short-term hardship events. These short-term hardship events include receiving inpatient medical services, residing in a county where an emergency or disaster has been declared by the President or where there is high unemployment, or traveling outside one's community for necessary medical services. *See* SSA § 1902(xx)(3)(B).

39.     The IFR provides that, the short-term hardship exception requires a new applicant to demonstrate the exception "for at least one, but not more than 3 consecutive months, as specified in the State plan, *immediately preceding the month of application*." 91 Fed. Reg. 33473 (emphasis added). An applicant cannot demonstrate the exception for the same month in which they apply to Medicaid.

40.     This requirement ensures that newly eligible individuals experiencing hardship events will have to wait at least until the start of the following month to receive necessary coverage, likely foregoing necessary care in the meantime or further straining our emergency health care system.

*Other*

41.     Several of the timelines set out in the IFR do not take account of the fact that providers have 365 days to submit claims data. For determinations that are supposed to be made regarding the preceding year, WI DHS may not even have the relevant claims data. Once again, this provision will increase the risk of coverage loss for otherwise eligible individuals.

42. Following the enactment of H.R. 1, WI DHS recognized that it would be extraordinarily challenging to complete the necessary system and process changes required by the August 31, 2026, notice deadline and January 1, 2027, implementation date, given the magnitude of changes needed for the community engagement requirements and the short period of time afforded by H.R. 1. Therefore, immediately after H.R. 1 was passed in July 2025, WI DHS began work to prepare to comply with community engagement requirements.

43. Beginning July 2025 and continuing until the release of the IFR, WI DHS based its policy and system determination on the statutory language and the subregulatory guidance provided by CMS, as detailed above. Based on this guidance, WI DHS has already done the following:

- Completed detailed statutory analysis;

- Developed detailed systems requirements based on guidance and other information from CMS;

- Hired a dedicated project manager and established a project management structure;

- Assigned state staff and contractors to several related workgroups;

- Secured state funding and vendor resources for automation of new policy;

- Completed requirements and design of systems automation related to the new policy;

- Established a new data exchange to transmit claims information to our eligibility system;

- Completed extensive analysis of diagnosis and procedure codes and claims data to support the new data exchange;

- Drafted member notices, text messages and emails;

- Developed plans for training, call scripts and ongoing technical support for eligibility workers;

- Developed updates to online applications, renewals, and change reports;

- Updated information on our website;

- Communicated new policy requirements to community partners, including training and technical assistance;

- Developed new reports for evaluation and analysis.

44. With respect to implementing the medically frail exclusion in particular, WI DHS has worked extensively with clinical and systems personnel to build a process to identify individuals who could be considered "medically frail." This system is based largely on claims data, in line with CMS guidance to "verify medical frailty" based on a "medical claims data review or provider documentation." Nov. 19, 2025 CMS Slide Deck, page 11; *see also* slide 17 "medical frailty status … available through claims data".

45. Wisconsin DHS faces several urgent deadlines with respect to implementing community engagement requirements. Wisconsin DHS must apply community engagement requirements to impacted BadgerCare Plus applications and renewals as of January 1, 2027, and to do this, WI DHS must substantially finalize eligibility system requirements by the beginning of August 2026, in order to enable full system deployment, with appropriate testing, in October 2026. After October, WI DHS will have limited ability to make further system changes for use by January 1, 2027. Moreover, WI DHS is required by H.R. 1 to issue notices no later than August 31, 2026, addressing the changes to BadgerCare Plus occasioned by the IFR. In order to issue those notices

in a timely fashion, WI DHS needs to identify potentially impacted members and send information in August to allow for mailing in stages given the large number of affected members.

46. Nevertheless, WI DHS still lacks clarity on several crucial issues from the IFR. While the IFR says that states will need to evaluate whether a member's medical condition significantly impairs their ability to work, CMS has provided only the most limited guidance about how states should determine this. While CMS has said more subregulatory guidance will be provided, WI DHS must develop its eligibility systems and processes without knowing what this future guidance is—bearing the risk that the *future* guidance will conflict with its system development. This lack of clarity impacts not only members enrolled in BadgerCare Plus, but also the messages that WI DHS can provide its members: if WI DHS does not understand what it means for a medical condition to "significantly impair" a member's ability to work, it cannot educate its members about how to demonstrate compliance with this requirement. Finally, the IFR does not clarify which data sources WI DHS is required to have integrated as of January 1, 2027, and which can be integrated later. Wisconsin DHS requires clarity on these issues in order to implement community engagement requirements in a timely fashion and to ensure that its members are prepared for this implementation.

47. Of note, the consequences for WI DHS from building its systems inconsistently with CMS's incomplete and as-yet unissued guidance are significantly heightened. If WI DHS is not able to configure its systems quickly enough, or if it configures its systems inconsistently with CMS's eventual guidance, it could face negative audit findings and significant financial penalties under H.R. 1 Section 71106. In other words, at the same time that financial consequences for not complying with guidance are rising, CMS's failure to issue clear and timely guidance on community engagement requirements is making it harder for Wisconsin and other states to comply.

14

**Human Costs of Community Engagement Requirements, Made Worse By the IFR**

48. The purpose of the Affordable Care Act (ACA) was to ensure that low-income individuals receive comprehensive healthcare coverage and have access to affordable, integrated, high-quality healthcare at no or low cost. Similarly, the purpose of Wisconsin's 1115 demonstration is, in part, to ensure that low-income childless adults have access to full, comprehensive health care benefits. However, the community engagement requirements included in H.R. 1 are expected to result in large-scale disenrollment of members, including members who are eligible but cannot verify their eligibility.

49. Before the IFR was released, Wisconsin DHS estimated that approximately 33% of childless adults covered by BadgerCare Plus may be disenrolled at some point due to community engagement requirements, likely increasing Wisconsin's uninsured rates. Because the IFR goes beyond H.R. 1, stripping away the protections provided in H.R. 1 to the medically frail and adding new limitations on self-attestation that do not appear in H.R. 1, this estimate likely underestimates the impact to members.

50. Indeed, WI DHS expects the "significant impairment" requirement to result in more BadgerCare Plus members losing coverage than would otherwise have lost coverage under the statutory definition of medically frail. This is either because their condition may not meet the IFR's additional, non-statutory "significant impairment" threshold, or because they cannot obtain the proof required to demonstrate their ability to work is significantly impaired. The "significant impairment" requirement will also likely increase member confusion. BadgerCare Plus members may think they do not qualify as "medically frail," given the added complexity, and WI DHS may see an increase in non-responses from members and decreased rates of application. The "significant impairment" requirement will also likely decrease the number of BadgerCare Plus

members who can automatically verify as medically frail, because, under the IFR, the *ex parte* verification process will generally require not just a diagnosis code, but also other data on utilization of services and level of impairment, *see* 91 Fed. Reg. 33,406 (June 3, 2026), which will not be available for many renewing members. This will further increase coverage loss because individuals will need to provide documentation or additional information to successfully renew. Finally, members with complex medical conditions can see fluctuations in their symptoms from day-to-day or month-to-month, which will make it even more difficult to assess whether their condition meets the "significant impairment" threshold.

51. Members with conditions that meet the statutory categories of medical frailty but who lose coverage due to inability to document "significant impairment" may return to Wisconsin Medicaid sicker and costlier for the loss of health coverage to treat and manage their conditions. This type of "churn" in Medicaid enrollment both raises costs for Wisconsin and decreases quality of care for members.

52. Wisconsin DHS expects the IFR's limitations on self-attestation to increase member confusion and coverage loss as well. In WI DHS's experience, the requirement to obtain third party documents to demonstrate eligibility creates a procedural hurdle that increases termination rates for otherwise eligible members. Thus, as self-attestation tightens, WI DHS expects that more members who are actually eligible will be disenrolled simply because they are unable to demonstrate their eligibility. Further, WI DHS anticipates that potentially eligible individuals may be less likely to enroll in Wisconsin Medicaid because of concern that they will be unable to demonstrate their eligibility.

53. Wisconsin DHS also expects the "once per enrollment period" limitation on medical frailty self-attestations to particularly harm members with multiple medically frail

conditions, especially those who develop one medically frail condition, recover from it, and then develop a second medically frail condition during the same enrollment period. For example, a member could be diagnosed with cancer and self-attest to medical frailty on that basis, and then later while still enrolled in BadgerCare Plus, be diagnosed with COPD. Under the IFR, assuming continuous Medicaid coverage during that period, the member *could not* self-attest to medical frailty based on the new COPD diagnosis and thus would lose coverage if they could not obtain documentation for this diagnosis.

54.     Wisconsin DHS is statutorily required to provide notice to BadgerCare Plus members regarding the changes occasioned by the IFR on or before August 31, 2026. 42 U.S.C. 1936a(xx)(8)(A) (directing States to begin outreach no later than four or more months before December 31, 2026). At present, WI DHS is uncertain as to how, for example, a member might establish that they are medically frail. Accordingly, the content of this notice will not have the clarity required to communicate to members how they can comply with the new requirements.

55.     Wisconsin DHS has spent years conducting outreach and building relationships with BadgerCare Plus enrollees. Confusion over eligibility determinations risks harming that relationship and lowering institutional trust. Members who do not understand why they were disenrolled or what is required to be eligible may simply forego coverage.

**Administrative, Operational, and Financial Burdens on Wisconsin**

*Burdens on Wisconsin Department of Health Services and BadgerCare Plus*

56.     Because CMS had never before imposed community engagement requirements across eligibility categories, the eligibility system used for BadgerCare Plus eligibility determinations was not built to support community engagement requirements and is not easily configured to incorporate the numerous eligibility factors necessary to evaluate community

engagement. Wisconsin DHS estimates that systems enhancements will cost $10,000,000. This estimate does not include staff time, costs for any systems rework that may be needed with CMS's change in direction, or costs to incorporate data sources to verify every factor of community engagement.

57. With respect to the medical frailty exclusion, the surprising additional "significant impairment" requirement—plus the uncertainty of how to implement it—will require WI DHS to rapidly change its operational approach and systems development. In addition to analyzing, developing and implementing new ways to evaluate medical frailty, WI DHS may need to integrate new data sources to evaluate BadgerCare Plus members' eligibility for the medical frailty exclusion, which will add development costs as well as potential costs from accessing new data. As more individuals are impacted and denied coverage or disenrolled as a result of this requirement, WI DHS expects more calls, more documents to process, and more appeals of adverse actions. And finally, in addition to the costs of operationalizing this new requirement, WI DHS will also incur the cost of educating its members, staff, and other stakeholders about what the requirement means and how it can be met.

58. Wisconsin DHS also expects the new, complex, and variable limitations on self-attestation to increase its operational complexity. These limitations will make it harder to train staff, vendors, assisters, and community organizations on eligibility processes. As with the medical frailty exclusion, WI DHS expects the self-attestation limitation to lead to more calls, more documentation to be scanned and reviewed by staff, and more denials and disenrollments that, themselves, lead to more calls and appeals. In addition, the change in the self-attestation rules from 2027 to 2028 will require additional system development, training, and outreach and education to accommodate the new 2028 rules.

18

59.     The burdens from community engagement requirements imposed by H.R. 1 and made worse by the IFR fall not just on WI DHS and BadgerCare Plus members, but on Wisconsin more generally. As noted above, BadgerCare Plus members will likely face increased denials and disenrollments—and, due to the "significant impairment" requirement for medical frailty, many of those disenrollments could be of some of BadgerCare Plus's most medically needy members. The IFR will likely have a disproportionate impact on members with disabilities and chronic health conditions who are enrolled in BadgerCare Plus. Wisconsin's budget will suffer harm due to loss of federal matching funds when eligible individuals lose Medicaid coverage. As the uninsured rate increases, there will be a greater financial strain on providers – in particular rural, community, and safety net hospitals as well as community health centers – that will be called upon to provide even greater levels of uncompensated care. Furthermore, individuals that are disenrolled from BadgerCare Plus will likely lose access to primary and preventive care – and care necessary to treat their statutorily recognized medical conditions – resulting in more individuals seeking high-cost, emergency care. In addition, the lack of preventative care will likely result in increased communicable disease outbreaks and more strain on WI DHS.  Most importantly, WI DHS expects poorer health outcomes across Wisconsin, as fewer people will be able to access appropriate care and manage chronic conditions.

60.     In addition, WI DHS expects that the new medical frailty requirements—both the "significant impairment" requirement and the limitations of medical frailty self-attestation—will place a significant administrative strain on healthcare providers treating impacted members. In order to support members seeking medical frailty exemptions, providers may need to devote time to providing documentation to demonstrate that a member is medically frail and significant

impairment in the ability to work. This will require providers to take time away from their patient care and increase administrative strain on providers, adding to healthcare costs and impacting access to care, potentially increasing provider shortages.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 24th day of June 2026.

s/ Debra Standridge
Debra Standridge
Deputy Secretary of the Wisconsin Department of Health Services