

EXHIBIT 26



**Elizabeth G. Taylor**
**Executive Director**

**Board of Directors**

**Ann M. Kappler**
**Chair**
Prudential Financial, Inc.

**William B. Schultz**
**Vice Chair**
Zuckerman Spaeder LLP

**Shamina D. Sneed**
**Treasurer**
TCW Group, Inc.

**Arian M. June**
**Secretary**
Debevoise & Plimpton LLP

**John Bouman**
Legal Action Chicago

**Hailyn J. Chen**
Munger, Tolles & Olson LLP

**Jeanna M. Cullins**
Aon Hewitt (Ret.)

**Joel Ferber**
Legal Services of Eastern Missouri

**Robert J. Nelson**
Lieff, Cabraser, Heimann & Bernstein, LLP

**Juliana S. O'Reilly**
American Express

**Jane Preyer**
Environmental Defense Fund (Ret.)

**Osula Evadne Rushing**
KFF

**Nick Smirensky**
New York State Health Foundation (Ret.)

**Stephen L. Williams**
Houston Health Department

**Senior Advisor to the Board**
**Hon. Henry A. Waxman**
Waxman Strategies

**General Counsel**
**Marc Fleischaker**
ArentFox Schiff LLP

November 19, 2025

**VIA MAIL AND EMAIL**

The Honorable Robert F. Kennedy, Jr., Secretary
U.S. Department of Health and Human Services
Hubert H. Humphrey Building
200 Independence Ave., S.W.
Washington, D.C. 20201

Dr. Mehmet Oz, Administrator
Centers for Medicare & Medicaid Services
7500 Security Blvd.
Baltimore, MD 21244

**Re: Implementation of Medicaid Work Requirements**

Dear Secretary Kennedy and Administrator Oz:

The National Health Law Program (NHeLP) is a public interest law firm working to advance access to quality health care and protect the legal rights of low-income and under-served people. We are writing regarding forthcoming guidance and regulations implementing the work requirements provisions of the 2025 Reconciliation Act.[1]

As you know, the 2025 Reconciliation Act requires states to impose work requirements on Medicaid applicants and beneficiaries who fall within the expansion population, effective January 1, 2027.[2] Congress directed the Secretary of Health and Human Services (HHS) to promulgate an interim final rule implementing the work requirements provisions no later than June 1, 2026.[3] In addition, it is our understanding that the Centers for Medicare & Medicaid Services (CMS) is planning to issue further guidance for states prior to promulgating an interim final rule (IFR).[4]

We are submitting comments for your consideration as you develop the guidance and IFR. We ask that the full text of our comments, as well as the full text of each of the studies cited below, be considered part of the formal administrative record on any guidance documents and the IFR.

## I. Conditions of Compliance

Under the 2025 Reconciliation Act, an "applicable individual" demonstrates compliance with the work requirements if the individual meets one or more of the seven listed conditions.[5] Through guidance and the IFR, we urge CMS to explain the scope of several of these conditions, as follows.

<u>Work</u>

An individual demonstrates compliance if the "individual works not less than 80 hours."[6] CMS should make clear to states that Congress did not limit "work" to paid work. As a result, "work" includes in-kind and unpaid work. Indeed, that has been the longstanding interpretation of similar language in the statute establishing work requirements for certain SNAP recipients. In the SNAP statute, one of the conditions for compliance with the work requirements is to "work 20 hours or more per week," on average over the month.[7] Regulations implementing the provision define work to include paid work, "in kind" work (meaning work done "in exchange for goods or services"), and unpaid work.[8] That definition makes good sense. For example, it captures unpaid internships, which are common in the non-profit, government, and for-profit sectors, and can lead to full-time paid work.[9] Further, aligning the definition of "work" in SNAP and Medicaid will make implementation of the Medicaid work requirements easier for states (as well as for applicants and beneficiaries).

---

[1] An Act to provide for reconciliation pursuant to title II of H. Con. Res. 14, Pub. L. No. 119-21, 139 Stat. 172 (2025) [hereinafter "2025 Reconciliation Act"].

[2] *Id*. § 71119(a) (codified at 42 U.S.C. § 1396a(xx)). Congress gave states the option to impose the work requirements at an earlier date, "subject to" the provisions of the statute. *Id*. (codified at 42 U.S.C. § 1396a(xx)(1)).

[3] *Id*. § 71119(d).

[4] *See* CMS, *CMCS Informational Bulletin, "Working Families Tax Cut" Legislation, Public Law 119-21: Summary of Medicaid and Children's Health Insurance Program (CHIP) Related Provisions* 21 (Nov. 18, 2025) (indicating that additional guidance is forthcoming).

[5] 42 U.S.C. § 1396a(xx)(2).

[6] *Id*. § 1396(xx)(2)(A).

[7] 7 U.S.C. § 2015(o)(2)(A).

[8] 7 C.F.R. § 273.74(a)(2); *see* U.S. Dep't of Agric., Food & Nutrition Serv., *Letter to SNAP Regional Directors, SNAP ABAWD Time Limit Policy and Program Access* 3 (Nov. 19, 2015), https://fns-prod.azureedge.us/sites/default/files/snap/ABAWD-Time-Limit-Policy-and-Program-Access-Memo-Nov2015.pdf.

[9] *See, e.g.*, Jiahong Zhang & Matthew Hora, The Ctr. for College-Workforce Transitions, Wis. Ctr. for Educ. Rsch., Sch. of Educ., Univ. of Wisconsin-Madison, *Data Snapshot #1, Who are the unpaid interns?* (2021), https://ccwt.wisc.edu/wp-content/uploads/2022/04/CCWT_report_data-snapshot-1.pdf.

<u>Community Service</u>

An individual demonstrates compliance if the individual "completes not less than 80 hours of community service."[10] Community service is a distinct form of unpaid work. According to the current Merriam-Webster dictionary, community service is "work that is done without pay to help people in a community."[11] It would include unpaid work with a nonprofit organization or a government agency. In addition, it would include unpaid work that an individual undertakes on their own or with a less formal group. For example, it would include participating in a local effort to clean up a beach, as well as organizing a local support group for people who are dealing with a particular health condition. Further, CMS should make clear to states that community service is not limited to volunteer work; rather, it would include unpaid work that is court-ordered or done to meet an educational requirement.

<u>Education</u>

An individual demonstrates compliance if "the individual is enrolled in an education program at least half-time."[12] Congress did not provide an exclusive definition of the term "education program." Rather, Congress stated that the "term 'educational program' *includes* – (i) an institution of higher education (as defined in section 101 of the Higher Education Act of 1965); and (ii) a program of career and technical education (as defined in section 3 of the Carl D. Perkins Career and Technical Education Act of 2006)."[13]

CMS should define the term "education program" to include all high school programs, as well as GED programs.[14] Individuals who are over 18 (and as a result, subject to work requirements) remain in high school for various reasons, such as starting school late, repeating a grade, or leaving school before graduation to work and then returning later.[15] There is no basis to exclude enrollment in high school or a GED program from the definition

---

[10] 42 U.S.C. § 1396a(xx)(2)(B).

[11] Merriam-Webster Dictionary, entry for "community service," https://www.merriam-webster.com/ (accessed Oct. 27, 2025).

[12] 42 U.S.C. § 1396a(xx)(2)(D).

[13] *Id*. § 1396a(xx)(9)(B) (emphasis added).

[14] Some specialized high school programs are programs of career and technical education. *See* Carl D. Perkins Career and Technical Education Act of 2006, Pub. L. No. 109-270, § 3(3)(A)-(B), (5), 120 Stat. 683, 685,686.

[15] *See, e.g.*, *Healthy People 2030, High School Graduation*, Off. of Disease Prevention & Health Promotion, HHS, https://odphp.health.gov/healthypeople/priority-areas/social-determinants-health/literature-summaries/high-school-graduation#cit13 (citing research finding that among students who were not reading proficiently in 3rd grade, those who lived in poverty for at least a year between 2nd and 11th grade were less likely than those who did not to finish high school on time or at all); Nat'l Ctr. for Educ. Stats., *The Condition of Education, Ch. 2 Preprimary, Elementary, and Secondary Education, Section: High School Persistence and Completion* (2024), https://nces.ed.gov/programs/coe/pdf/2024/coi_508c.pdf (finding during the 2021-2022 school year, the U.S. average adjusted cohort graduation rate (ACGR) – which measures the percentage of students who graduate within the traditional four years – was 87%, meaning that 13% of students did not graduate within that time).

of an education program. Indeed, having a high school degree (or the equivalent) is correlated with better job prospects and higher earnings.[16]

Further, individuals enroll in a wide range of educational programs that can improve their career and earning prospects, such as professional development, continuing education, certification programs, and English as a second language courses.[17] To the extent that these courses do not fall within the definitions of "an institution of higher education" or "a program of career and technical education," CMS should instruct states to consider them to be an educational program.

As for how to determine the enrollment status of a student, CMS should look to existing SNAP regulations and guidance. While the effect of participation in educational activities is different in Medicaid and SNAP, it nevertheless makes sense for CMS to borrow from SNAP in this context. Aligning the rules for determining enrollment status will be simpler for states, as well as for Medicaid beneficiaries who are familiar with the SNAP rules.[18] In fact, one-third of households enrolled in Medicaid or CHIP participate in SNAP.[19] Thus, CMS should provide guidance to states that an individual is enrolled half-time or full-time if the school designates them as such.[20] And, as in SNAP, that enrollment status begins "on the first day of the school term" and is "deemed to continue through normal periods of class attendance, vacation and recess, unless the student graduates, is suspended or expelled, drops out, or does not intend to register for the next normal school term (excluding summer school)."[21] For example, this means that a student who is enrolled half-time (or full-time) in

---

[16] *See Education Pays, Earnings and Unemployment Rates by Educational Attainment, 2024*, U.S. Bureau of Labor Stats., https://www.bls.gov/emp/chart-unemployment-earnings-education.htm (Aug. 28, 2025); *Healthy People 2030, High School Graduation*, Off. of Disease Prevention & Health Promotion, HHS, https://odphp.health.gov/healthypeople/priority-areas/social-determinants-health/literature-summaries/high-school-graduation#cit13 (noting that not finishing high school is linked to "limited employment prospects, low wages, and poverty").

[17] *See generally* Jill H. Wilson, Metro. Pol'y Program, Brookings, *Investing in English Skills: The Limited English Proficient Workforce in U.S. Metropolitan Areas* (2014), https://www.brookings.edu/wp-content/uploads/2014/09/metro_20140924_investing_in_english_skils_report.pdf (noting that individuals who are proficient in English earn higher wages and finding that "increasing the investment in adult English instruction now would enhance the human capital of immigrants that could lead to more productive work, and benefit their children, sooner").

[18] Ample evidence shows that public benefits recipients are often not aware of or have a hard time understanding complex program rules. *See, e.g.*, HHS, Assistant Sec'y for Plan. & Evaluation, Off. of Health Pol'y, *Medicaid Demonstrations and Impacts on Health Coverage: A Review of the Evidence* (2021), https://aspe.hhs.gov/sites/default/files/private/pdf/265161/medicaid-waiver-evidence-review.pdf (documenting low awareness and/or understanding of work requirements, healthy behavior incentives, and "health savings account-like arrangements" in state § 1115 projects). Aligning SNAP and Medicaid work requirements will at least help mitigate this problem.

[19] Jonathan Schwabish, Urban Inst., *About 12 Million Households Receive Both Medicaid and SNAP. The Reconciliation Bill Puts Them At Risk* (2025), https://www.urban.org/urban-wire/about-12-million-households-receive-both-medicaid-and-snap-reconciliation-bill-puts-them.

[20] U.S. Dep't of Agric., Food & Nutrition Serv. (FNS), *Letter to All SNAP State Agencies, SNAP Institutions of Higher Education and Student Eligibility Rules* (Feb. 7, 2023), https://www.fns.usda.gov/snap/ihe-student-eligibility-rules.

[21] 7 C.F.R. § 273.5(c).

a college program maintains that enrollment status during winter break, spring break, and the summer, even if they do not take any classes during those periods. Further, CMS should consider any student with an active Individualized Education Plan to be enrolled in school, even when the student is in between placements, and clarify that any student with an IEP should be deemed in compliance with the work requirements.

<u>Combination of Activities</u>

An individual demonstrates compliance "if the individual engages in any combination of the activities described in subparagraphs (A) through (D), for a total of not less than 80 hours."[22] This means that an individual who engages in any combination of work, community service, work program activities, or educational program activities for 80 hours total has satisfied the work requirements.

To avoid confusion, CMS should explain to states how educational program activities factor into this combination provision. While subparagraph (D) refers to an individual "enrolled in an educational program at least half-time," an individual enrolled in an educational program for less than half-time can use the hours spent in that program to reach the 80-hour threshold. A different interpretation would be nonsensical, as an individual enrolled in an educational program at least half-time would never need to rely on a combination of activities to satisfy the work requirements. Further, there is no reason to distinguish between an individual who is enrolled less than half-time and also working part-time and an individual who is enrolled half-time.

<u>Income</u>

Alternatively, individuals demonstrate compliance if they: (1) have monthly income not less than the applicable federal minimum wage multiplied by 80 hours; or (2) are a seasonal worker and have an average monthly income over the preceding six months not less than the applicable federal minimum wage multiplied by 80 hours.[23] CMS should require states to count *all* gross income – rather than to apply the Modified Adjusted Gross Income (MAGI) standard – to determine compliance under these provisions. This is because MAGI excludes non-taxable income derived from employment (*e.g.*, employee and employer contributions to retirement accounts).[24] Given that the 2025 Reconciliation Act is meant, in part, to incentivize employment, it would not make sense to discount a portion of those wages when determining compliance. For the same reason, the standard 5% disregard to countable income under MAGI[25] should not apply to this determination.

---

[22] 42 U.S.C. § 1396a(xx)(2)(E).
[23] *Id*. § 1396a(xx)(2)(F) & (G).
[24] *See* 42 C.F.R. § 435.603;  Ctr. on Budget & Pol'y Priorities, *Key Facts: Income Definitions for Marketplace and Medicaid Coverage*, (2025), https://www.healthreformbeyondthebasics.org/key-facts-income-definitions-for-marketplace-and-medicaid-coverage/.
[25] *See* 42 C.F.R. § 435.603(d)(4).

Second, state wage databases, like SWICA and The Work Number, generally do not have the capacity to reflect non-taxable, net income and, instead, show only gross wages.[26] Thus, to determine income eligibility under MAGI, states often have to subtract those deductions manually. Mandating that states also use this manual process to determine whether someone is in compliance under either of these provisions would hinder automated data matching and create unnecessary administrative burden for state agencies.

## II. Optional Exceptions for Short-Term Hardship Events

<u>Suggested Definitions for Terms Used to Describe a Hardship Event</u>

Congress directed CMS to specify standards for states to use in establishing their own procedures for evaluating short-term hardship exceptions, if the state elects to offer such exceptions.[27] Individual short-term hardship exceptions are limited to two circumstances.[28] The first offers an exception to those who "receive inpatient hospital services, nursing facility services, services in an intermediate care facility for individuals with intellectual disabilities, inpatient psychiatric hospital services, or ***such other services of similar acuity (including outpatient care relating to other services specified in this subclause) as the Secretary determines appropriate***…."[29]

At the outset, CMS should be sure to include other *inpatient* psychiatric settings that are covered under Medicaid but are not specifically listed by the 2025 Reconciliation Act, such as psychiatric residential treatment facilities. Furthermore, in deciding what other services of similar acuity to include, CMS should adhere to the federal government's long-standing position that health care should be provided in the least restrictive, most integrated setting.[30] For example, some services related to inpatient psychiatric care that address or

---

[26] *See* 45 C.F.R. § 205.51(c) (listing information SWICA provides); *see also Social Service Verifications*, The Work Number, https://theworknumber.com/solutions/products/social-service-verification (last visited Nov. 17, 2025) (stating The Work Number verification provides "the most recent 12 pay periods of Gross Earnings.").

[27] *See id*. § 1396a(xx)(3)(B)(i).

[28] A third short-term hardship exception exists for individuals living in counties or equivalent units of local governments where there is an emergency or disaster declared or where the unemployment rate is at or above the lesser of 8% or 1.5 the national unemployment rate. *Id*. § 1396a(xx)(3)(B)(ii)(II).

[29] *See id*. § 1396a(xx)(3)(B)(ii)(I).

[30] *Community Living and Olmstead,* HHS, https://www.hhs.gov/civil-rights/for-individuals/special-topics/community-living-and-olmstead/index.html (Sept. 23, 2025); Substance Abuse and Mental Health Servs. Admin. (SAMHSA), *2025 Nat'l Guidelines for a Behavioral Health Coordinated System of Crisis Care* 45 (2025), https://988crisissystemshelp.samhsa.gov/sites/default/files/2025-04/national-guidelines-crisis-care-pep24-01-037.pdf (listing "least restrictive natural environment" as a SAMHSA System of Care Guiding Principle); *see also* SAMSHA, *Recovery-Oriented, Person Centered Behavioral Treatment* 3 (2024), https://www.govinfo.gov/content/pkg/GOVPUB-HE20_400-PURL-gpo234312/pdf/GOVPUB-HE20_400-PURL-gpo234312.pdf ("Recovery-oriented care promotes individuals to pursue independence and community integration. Institutional and coercive care are to be avoided whenever possible and individuals and families are provided with the services needed to live in home and community-based settings.").

stabilize psychiatric needs but can be provided in less restrictive settings include: partial hospitalization programs;[31] intensive outpatient services;[32] Assertive Community Treatment;[33] mobile crisis response units and crisis stabilization services;[34] psychosocial rehabilitation;[35] and intensive home and community-based services for youth with Serious Emotional Disturbance.[36]

[31] *See* Medicare Program: Hospital Outpatient Prospective Payment and Ambulatory Surgical Center Payment Systems; Payment for Intensive Outpatient Services in Hospital Outpatient Departments, Community Mental Health Centers, Rural Health Clinics, Federally Qualified Health Centers, and Opioid Treatment Programs, 88 Fed. Reg. 81540, 81809 (Nov. 22, 2023) (final rule) (providing background on partial hospitalization program services); *see also* Medicaid and CHIP Payment and Access Comm'n (MACPAC), *Behavioral health services covered under state plan authority* (2021), https://www.macpac.gov/subtopic/behavioral-health-services-covered-under-state-plan-authority/.

[32] *See* 88 Fed. Reg. at 81811 (describing intensive outpatient services); *see also* MACPAC, *Behavioral health services covered under state plan authority* (Jan. 11, 2021), https://www.macpac.gov/subtopic/behavioral-health-services-covered-under-state-plan-authority/.

[33] Assertive Community Treatment (ACT) is a team-based, intensive behavioral health intervention for individuals with Serious Mental Illness (SMI) that delivers psychiatric treatment, medication management, rehabilitative supports, crisis intervention, and case management in an environment where an individual is naturally located, rather than in an institutional setting. *See* SAMHSA, *Assertive Community Treatment (ACT) Evidence-Based Practices (EBP) KIT* (2008), https://www.samhsa.gov/resource/ebp/assertive-community-treatment-act-evidence-based-practices-ebp-kit. It is often treated as a bundled service, and some states bill ACT using HCPCS H0040 (per diem) or HCPCS H0039 (15 minutes intervals). *See, e.g.*, *HCPCS Code for Assertive Community Treatment Program, Per Diem*, AAPC, https://www.aapc.com/codes/hcpcs-codes/H0040 (last visited Nov. 17, 2025); *HCPCS Code for Assertive Community Treatment, Face-to-Face, Per 15 Minutes*, AAPC, https://www.aapc.com/codes/hcpcs-codes/H0039 (last visited Nov. 17, 2025); CMS, *Dear State Health Official Letter, SHO # 25-004, Best Practices for Implementing the Continuum of Crisis Services under Medicaid and CHIP* (Sept. 5, 2025), https://www.medicaid.gov/federal-policy-guidance/downloads/sho25004.pdf [hereinafter CMS, *SHO #25-004*"].

[34] CMS, *SHO #25-004*.

[35] CMS, *State Operations Manual*, *Appx. F-Community Mental Health Centers (CMHC) Interpretative Guidance* (2024), https://www.cms.gov/files/document/som107apfcmhc.pdf (in discussing community mental health center services intended to provide outpatient treatment to those with acute psychiatric needs, defining intensive outpatient (IOP) services, partial hospitalization services, and psychosocial rehabilitation).

[36] Intensive home- and community-based services for youth with Serious Emotional Disturbance are defined as a coordinated array of behavioral health services designed to prevent institutional or residential placement. Federal guidance identifies the core ICBS bundle as including: (1) Intensive Care Coordination (ICC), often delivered through a wraparound model; (2) Intensive In-Home Behavioral Health Services providing individualized therapy, skills training, and behavioral interventions; and (3) mobile crisis response and stabilization services available 24/7 and delivered by a trained team. *See* CMS & SAMHSA, *Informational Bulletin: Coverage of Behavioral Health Services for Children, Youth, and Young Adults with Significant Mental Health Conditions* (May 7, 2013), https://www.medicaid.gov/federal-policy-guidance/downloads/cib-05-07-2013.pdf; CMS, *SHO #25-004*; CMS, *Informational Bulletin: Leveraging Medicaid, CHIP, and Other Federal Programs in the Delivery of Behavioral Health Services for Children and Youth* (Aug. 18, 2022), https://www.medicaid.gov/sites/default/files/2022-08/bhccib08182022.pdf; MACPAC, *Report to Congress on Medicaid & CHIP, Chapter 3: Access to Behavioral Health Services for Children and Adolescents Covered by Medicaid and CHIP* (2021), https://www.macpac.gov/wp-content/uploads/2021/06/Chapter-3-Access-to-Behavioral-Health-Services-for-Children-and-Adolescents-Covered-by-Medicaid-and-CHIP.pdf.

Relatedly, CMS should be careful to avoid incentivizing receipt of care in inpatient settings when that same care can be provided more cost-effectively in an outpatient setting.[37] And, in determining the most cost-effective and prudent course of treatment, health care providers should not be asked to consider whether a patient will be subject to work requirements. To address this concern, CMS should consider listing in its guidance those medical services that are often provided in inpatient settings but can be more efficiently provided in a home or community-based setting. For example, CMS should include: home health services (including durable medical equipment, consumable medical supplies, home health aides, and outpatient therapeutic services)[38] and ambulatory surgical centers.[39] Importantly, whether an individual requires acute care at home is not dependent on whether they are homebound.[40]

The second available individual short-term hardship exception applies when an "individual or their dependent must **travel outside of their community** for an **extended period of time** to receive medical services necessary to treat a serious or complex medical condition (as described in § 1396a(xx)(9)(A)(ii)((V)(ee)) that are **not available within their community of residence**."

In determining what constitutes "**travel outside of their community**" and "**not available within their community of residence**," CMS should look to existing federal Medicaid managed care regulations, which require states to develop network adequacy standards that include "the geographic location of network providers and Medicaid enrollees, considering distance, travel time, and the means of transportation ordinarily used by

---

[37] Iris Megido et al., *Cost Effectiveness of Home Care Versus Hospital Care: A Retrospective Analysis*, 21 COST EFFECTIVENESS & RES. ALLOCATION 13, 18 (2023), https://resource-allocation.biomedcentral.com/articles/10.1186/s12962-023-00424-0 (finding that hospital services provided at home and in community-based settings "are significantly lower than those of inpatient care"); *see also* Sarah Klein, Commonwealth Fund, "*Hospital at Home" Programs Improve Outcomes, Lower Costs But Face Resistance from Providers and Payers* (Feb. 4, 2019), https://www.commonwealthfund.org/publications/newsletter-article/hospital-home-programs-improve-outcomes-lower-costs-face-resistance; Brad Spellberg et al., *Health Economic Analysis of an All-Virtual, At-Home Acute Care Model*, 8 JAMA NETWORK OPEN e2517114 (2025), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2835465 (finding that virtual, at-home acute care "achieved significant avoidance of hospital days and associated cost savings, without compromising patient safety").

[38] Home health services would include services the state must cover in accordance with 42 U.S.C. § 1396a(a)(10)(D) and 42 C.F.R.§ 440.70. *See* Off. of the Assistant Sec'y for Plan. & Evaluation, HHS, *Subacute Care: Review of the Literature* (1994), https://aspe.hhs.gov/reports/subacute-care-review-literature-0 (describing discharge to home health services as "subacute care").

[39] Seth A. Strope et al., *Disparities in the Use of Ambulatory Surgical Centers: A Cross Sectional Study*, 9 BMC HEALTH SERVS. RSCH. 121 (2009), https://bmchealthservres.biomedcentral.com/articles/10.1186/1472-6963-9-121 ("Ambulatory surgical centers (ASCs) provide outpatient surgical services more efficiently than hospital outpatient departments, benefiting patients through lower co-payments and other expenses").

[40] Health Care Fin. Admin. (HCFA), *Dear State Medicaid Director Letter, Olmstead Update No. 3* (July 25, 2000), https://www.medicaid.gov/sites/default/files/Federal-Policy-Guidance/downloads/smd072500b.pdf (attachment 3-g, stating use of a "homebound" requirement violates 42 C.F.R. §§ 440.230(c) and 440.240(b)).

Medicaid enrollees."[41] CMS should allow states to adopt their managed care network adequacy standards to establish specific distance and/or travel time standards for deciding when a service is "not available" within a "community of residence." For example, under the network adequacy standards in Arizona, all beneficiaries under age 21 in counties other than Maricopa and Pima must have access to a pediatric cardiologist within 110 minutes or 100 miles from their residence.[42] Thus, if an beneficiary needed to travel more than 110 minutes or 100 miles for their dependent child to see a pediatric cardiologist, they would have traveled outside of their community for services not available within their community of residence.

As CMS has previously acknowledged, states vary widely in provider accessibility across geographic regions, so a certain amount of flexibility is needed to account for these variations.[43] In developing these existing standards, states have already analyzed and factored in these unique provider and enrollee demographics. By allowing states to rely on these existing standards, CMS can capitalize on work that has already been done which, in turn, will reduce state administrative burden in implementing work requirements.

Similarly, in both the Medicaid managed care and fee-for-service contexts, CMS directs states to "determine a geographic distance within which transportation is generally provided" for the prior authorization of non-emergency medical transportation services (NEMT).[44] CMS could allow states to use their existing NEMT standards to also judge whether a service is unavailable in the community.

Finally, all services authorized under 42 C.F.R. § 431.52(b)(3) & (4) (governing Medicaid reimbursement for out-of-state Medicaid services) should qualify as medical services not available in the community of residence.

Thus, CMS should give states the option to use all of the above standards to measure whether care requires travel outside of the community because it is not available within the community.

To establish a measurement for an "extended period of time," CMS should direct states to use the same travel time and distance standards that govern how far an individual within a managed care network must travel before the managed care organization is required to arrange for and cover an alternative out of network provider.[45] Rural residents, in particular,

[41] 42 C.F.R. § 438.68(c)(1)(vi).

[42] Ariz. Health Care Cost Containment Sys., *AHCCCS Contractor Operations Manual § 436 – Network Standards* 3 (effective Oct. 1, 2025), https://www.azahcccs.gov/shared/Downloads/ACOM/PolicyFiles/400/436_Network_Standards.pdf.

[43] Medicaid and Children's Health Insurance Program (CHIP) Programs; Medicaid Managed Care, CHIP Delivered in Managed Care, and Revisions Related to Third Party Liability, 81 Fed. Reg. 27498, 27659 (May 6, 2016) (final rule).

[44] CMS, *Dear State Medicaid Director Letter, SMD #23-006, Assurance of Transportation: A Medicaid Transportation Coverage Guide* (Sept. 28, 2023), www.medicaid.gov/sites/default/files/2023-12/smd23006.pdf.

[45] 42 C.F.R. § 438.68(c)(1)(vi).

already struggle to access health care in their communities and therefore forego critical treatment.[46] As stated above, states have widely disparate demographics as they relate to health care access. If CMS fails to account for these disparities in defining the above terms, then rural residents will be further disincentivized from seeking treatment for serious or complex medical conditions (or transporting their dependents to access the same). This, in turn, will only exacerbate unequal health outcomes between rural and urban populations. The managed care and NEMT standards adopted by states already take these concerns into account. CMS should therefore defer to their conclusions.

<u>Limits on Requesting a Short-Term Hardship Exception</u>

While the 2025 Reconciliation Act provides that, where an individual meets a short-term hardship exception, the state must "deem such individual to have demonstrated community engagement under paragraph (2) *for such month*," the Act does not prescribe a limit or cap on the number of times an individual can request an exception. CMS should make clear to states that, so long as an individual meets the criteria, he or she must remain eligible for the exception. In other words, there is no limit on the duration of a short-term hardship exemption. Any other interpretation would be contrary to statute. Furthermore, given that the exceptions in § 1396a(xx)(3)(B)(ii)(I) & (III) relate to the medical needs of an individual or their dependent, including whether their condition is "serious and complex" – considerations that also factor into whether an individual is a "specified excluded individual" (i.e., "medically frail") – CMS should direct states to assess whether the individual continues to be an "applicable individual" when they qualify for more than one month of a short-term hardship exception. As discussed in the Compliance & Ex Parte Verifications

---

[46] *See* Macarena C. Garcia et al., *Reducing Potentially Excess Deaths from the Five Leading Causes of Death in the Rural United States*, 66 MMWR SURVEILLANCE SUMMARIES 1 (2017), https://www.cdc.gov/mmwr/volumes/66/ss/ss6602a1.htm (finding that during 1999–2014, annual age-adjusted death rates for the five leading causes of death were higher in rural areas than in urban areas, and the proportion of potentially excess deaths among persons under age 80 was higher in rural areas compared with urban areas); GAO, GAO 21-93, *Rural Hospital Closures: Affected Residents Had Reduced Access to Health Care Services* (2020), https://www.gao.gov/products/gao-21-93 (documenting the effect of rural hospital closures on access to care); John Pender, U.S. Dep't of Agric., Econ. Rsch. Serv., *Charts of Note, Availability of healthcare providers in rural areas lags that of urban areas* (2023), https://www.ers.usda.gov/data-products/charts-of-note/chart-detail?chartId=106208; Thomas A. Arcury et al., *The Effect of Geography and Spatial Behavior on Health Care Utilization Among the Residents of a Rural Region*, 20 HEALTH SERVS. RSCH. 135 (2005), https://pmc.ncbi.nlm.nih.gov/articles/PMC1361130/; Leighton Chan et al., *Geographic Access to Health Care for Rural Medicare Beneficiaries*, 22 J. RURAL HEALTH 140 (2006), https://pubmed.ncbi.nlm.nih.gov/16606425/ (finding that rural patients needed to travel two to three times farther to see medical and surgical specialists than those living in urban areas, and increasing rurality was related to decreased specialist visits and increased reliance on generalists); Daniel Thomas et al., *Rural Mental Health Workforce Needs Assessment – A National Survey*, 12 RURAL & REMOTE HEALTH 2176 (2012), https://pubmed.ncbi.nlm.nih.gov/23088609/ (reporting that many rural people are not receiving care because of excessive travel distances and wait times); Tracy Onega et al., *Geographic Access to Cancer Care in the U.S.*, 112 CANCER 909 (2008), https://pubmed.ncbi.nlm.nih.gov/18189295/ (finding that increased travel time to healthcare services has been associated with greater risk of presenting with advanced cancer, decreased utilization of breast-conserving therapy, and lower enrollment in clinical trials).

section below, states are also required under statute to screen individuals for exclusions, including whether they have a serious and complex medical condition before requiring them to engage in work. This would also align with similar SNAP guidance that requires the state agency, upon learning that more than one exception applies, to apply the exception of the longest duration.[47] It would also reduce administrative burden on states and beneficiaries.

<u>Notice & Process Available for a Short-Term Hardship Exception</u>

In accordance with SNAP regulations, state agencies are required to inform applicants and beneficiaries about the availability of good cause exceptions to SNAP's ABAWD work requirements.[48] Similarly, here, if the state elects an optional short-term hardship under § 1396a(xx)(3)(B)(ii)(I) or (III), CMS should require states to inform applicants and beneficiaries about these options and how to apply.[49] Notably, the 2025 Reconciliation Act requires that states include this information in notices of non-compliance.[50] And unlike in SNAP – where the good cause exception is open-ended[51] – the circumstances under which an individual can meet a short-term hardship event here are limited, making it possible to list all available exceptions in all written communications between the applicant or beneficiary and the state Medicaid agency, including descriptions of the states' Medicaid program, notices, (including notices of denial, non-compliance, or termination, and requests for information), and applications.

Further, CMS should inform states that the process for requesting a hardship exception under § 1396a(xx)(3)(B)(ii)(I) & (III) should align with existing Medicaid regulations that require states to accept applicant information through internet, telephone, mail, in-person delivery, and other commonly available electronic means.[52] And, importantly, states must

---

[47] 7 C.F.R. 273.24(k);  FNS, *Letter to Supplemental Nutrition Assistance Program All Regions*, *Supplemental Nutrition Assistance Program (SNAP) – Question and Answer #1 for the Program Purpose and Work Requirement Provisions of the Fiscal Responsibility Act of 2023 Final Rule* (Dec. 20, 2024), https://fns-prod.azureedge.us/sites/default/files/resource-files/SNAP-FRA-Final-Rule-Question-and-Answer-1.pdf [hereinafter "*FNS, Question and Answer #1*"].

[48] 7 C.F.R. § 273.7(c)(1)(iii) ("consolidated written notice must include…an explanation of the process for requesting good cause (including examples of good cause circumstances and contact information to initiate a good cause request)"); *see also* FNS, *Supplemental Nutrition Assistance Program (SNAP) Able-Bodied Adults Without Dependents (ABAWD) Policy Guide* 23 (2023), https://fns-prod.azureedge.us/sites/default/files/resource-files/SNAP-ABAWD-Policy-Guide-September-2023.pdf.

[49] *See* 42 C.F.R. § 435.905(a) (requiring states to inform all applicants, as well as other individuals upon request, of the eligibility requirements, available Medicaid services, and the rights and responsibilities of applicants and beneficiaries).

[50] *See* 42 U.S.C. § 1396a(xx)(6)(B)(i) (describing the information to be included in the notice of noncompliance, including how to make a "satisfactory showing" that an individual "should be deemed to have demonstrated community engagement under paragraph (3)" (which includes the short-term hardship events)).

[51] *See* 7 C.F.R. § 273.7(i)((2) (defining good cause to include any circumstances beyond the individual's control).

[52] 42 C.F.R. § 435.907(a).

conduct an *ex parte* review using reliable information available to states (including claims or encounter data) before it asks for verification directly from the individual.[53]

## III. Specified Excluded Individuals

<u>Medically Frail or Otherwise Has Special Medical Needs</u>

Congress excluded from the work requirements an individual "who is medically frail or otherwise has special medical needs."[54] While Congress authorized the Secretary to define the term, it required the definition to include an individual: who is blind or disabled (as defined in section 1614); with a substance use disorder; with a disabling mental disorder; with a physical, intellectual or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living; or with a serious or complex medical condition.[55]

Before addressing the meaning of several of these categories, we want to raise an overarching concern that CMS should consider in issuing guidance and an IFR. We have already seen draft state work requirements policies that require an individual who falls within one or more of the five listed categories to show that they are also unable to work. CMS should make clear to states that the plain language of the statute prohibits such policies for each of the categories other than "an individual who is . . . disabled (as defined in section 1614)."[56] If Congress had intended for the exclusion to only apply to individuals who cannot work, it would have said so explicitly.[57]

Significantly, the history of the phrase "medically frail or otherwise has special medical needs" reveals that it is unrelated to ability to work. In 2006, when Congress amended the Medicaid Act to give states the flexibility to require beneficiaries to enroll in Alternative Benefit Plans, it exempted from mandatory enrollment any individual "who is medically frail or otherwise an individual with special medical needs."[58] Under the implementing regulation, CMS allows states to define the phrase, but their definition must include at least six listed categories of individuals.[59] In creating the six categories, CMS wanted to ensure that individuals with significant health care needs maintain adequate health coverage.[60] In

---

[53] 42 U.S.C. § 1396a(xx)(5).
[54] *Id*. § 1396a(xx)(9)(A)(ii)(V).
[55] *Id*.
[56] *Id*. § 1396a(xx)(9)(A)(ii)(V)(aa); *see id*. § 1382c(a)(3) (generally defining disabled as "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months").
[57] *See, e.g.*, 7 U.S.C. § 2015(o)(B)(3) (exempting from the SNAP work requirements an "individual who is medically certified as physically or mentally unfit for employment").
[58] Deficit Reduction Act of 2005, Pub. L. No. 109-171, § 6044, 120 Stat. 4, 90 (codified at 42 U.S.C. § 1396u-7(a)(2)(B)(vi)).
[59] 42 C.F.R. § 440.315(f).
[60] *See, e.g.*, Medicaid and Children's Health Insurance Programs: Essential Health Benefits in Alternative Benefit Plans, 78 Fed. Reg. 42160, 42231 (July 15, 2013) ("To ensure appropriate service protection for individuals with disabilities and special medical needs, we have included a

the 2025 Reconciliation Act, Congress adopted each of the categories in the regulation, dropping only the category that is limited to children under age 19 (who, of course, are not subject to work requirements).[61] In borrowing from this existing language, Congress expressed its intent to exclude from the work requirements applicants and beneficiaries who have a particular need for comprehensive health care coverage. Thus, CMS should inform states that the statute explicitly prohibits them from grafting "inability to work" onto the medically frail categories listed in the 2025 Reconciliation Act (with the exception of an individual who is "disabled (as defined in section 1614) because that definition explicitly incorporates whether an individual can participate in "substantial gainful activity").[62]

In addition, CMS should explain the scope of several of the "medically frail or otherwise has special medical needs" categories as follows:

*Individual with a Substance Use Disorder:* Substance use disorders are chronic, relapsing medical conditions that are treatable and manageable, but not curable in the traditional sense.[63] Given that, CMS should define an individual "with a substance use disorder" to include an individual who is in recovery. This aligns with the clinical understanding of the term. The Diagnostic and Statistical Manual of Mental Disorders (DSM-V-TR) – the authoritative guide for diagnosing mental health conditions in the U.S. – indicates that an individual continues to have a SUD if their condition is in remission. A SUD is in remission if the individual previously met the diagnostic criteria for the condition, but has not met any of the criteria (other than craving or a strong desire to use the substance) for at least three months.[64] Relatedly, it indicates that an individual who is receiving maintenance therapy for opioid use disorder (OUD) or tobacco use disorder continues to have a SUD.[65]

Individuals with a SUD in remission face serious harm if their Medicaid coverage is terminated. Research shows that continuing care is beneficial for many individuals in recovery.[66] For example, individuals taking methadone to treat OUD need to remain on the

---

basic definition of medically frail that we anticipate will ensure that vulnerable individuals with special medical needs are not mandatorily enrolled in an ABP that may not provide appropriate medical treatment for their individual medical condition. Section 440.315(f) provides states with a minimum standard for defining medically frail populations."); *id*. at 42233 (regarding individuals with a substance use disorder).

[61] *Compare* 42 C.F.R. § 440.315(f) *with* 42 U.S.C. § 1396a(xx)(9)(A)(ii)(V) (omitting individuals described in 42 C.F.R. § 438.50(d)(3)).

[62] *See* 42 U.S.C. § 1382c(a)(3)(A). Notably, under § 1382c(a)(2), individuals who are blind under this provision do not have to show that they cannot participate in substantial gainful activity.

[63] Nat'l Inst. on Drug Abuse, Nat'l Inst. of Health, *Drugs, Brains, and Behavior: The Science of Addiction, Treatment & Recovery* (2020), https://nida.nih.gov/publications/drugs-brains-behavior-science-addiction/treatment-recovery; *Treatment of Substance Use Disorders*, CDC, https://www.cdc.gov/overdose-prevention/treatment/ (April 25, 2024).

[64] Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 547, 553-54, 575-76, 587-88, 601-02, 608-10, 620-21, 632-34, 645-46, 652-53 (5th ed., text rev.) (2022) [hereinafter "DSM-V-TR"] (distinguishing between early remission (3 months to 12 months) and sustained remission (12 months or longer) for SUDs).

[65] *Id*. at 608-10, 645-46.

[66] *See, e.g.,* James R. McKay, *Impact of Continuing Care on Recovery from Substance Use Disorder* 41 ALCOHOL RSCH. 1 (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC7813220/pdf/arcr-

medication for at least 12 months; some individuals need to remain on the medication long-term.[67] Medicaid coverage makes it possible for individuals to access these ongoing services.[68] Losing coverage, and as a result access to SUD treatment services, could result in dire health consequences.[69]

*Individual with a Disabling Mental Disorder:* Under the DSM-V-TR, a mental disorder is "a syndrome characterized by clinically significant disturbance in an individual's cognition, emotion regulation, or behavior that reflects" a problem in mental functioning and "is usually associated with significant distress or disability in social, occupational, or other important activities."[70] Many mental disorders are chronic and/or episodic conditions that are treatable, but not curable.[71] Thus, CMS should provide guidance to states that an individual "with a disabling mental disorder" includes an individual who is receiving successful

40-1-1.pdf ("Regardless of the intervention selected for use, it is clear that the status of most patients with SUD will change and evolve over time, and interventions need to include provisions to assess patients on a regular basis and to change or adapt treatment when warranted.").

[67] *Methadone*, SAMHSA, https://www.samhsa.gov/substance-use/treatment/options/methadone (March 29, 2024); *see also Buprenorphine*, SAMHSA, https://www.samhsa.gov/substance-use/treatment/options/buprenorphine (March 28, 2024) (noting that treatment with buprenorphine can be indefinite).

[68] *See* Madeline Guth et al., KFF, *The Effects of Medicaid Expansion under the ACA: Updated Findings from a Literature Review* 9 (2020), https://files.kff.org/attachment/Report-The-Effects-of-Medicaid-Expansion-under-the-ACA-Updated-Findings-from-a-Literature-Review.pdf (collecting research showing that Medicaid expansion is associated with increased access to SUD treatment, including medications to treat OUD); Madeline Guth & Meghana Ammula, KFF, *Building on the Evidence Base: Studies on the Effects of Medicaid Expansion, February 2020 to March 2021*, at 8 (2021) https://files.kff.org/attachment/Report-Building-on-the-Evidence-Base-Studies-on-the-Effects-of-Medicaid-Expansion.pdf; *see also* Mark Olfson et al., *Healthcare Coverage and Service Access for Low-Income Adults with Substance Use Disorders*, 137 J. SUBSTANCE ABUSE TREATMENT 108710 (2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9086121/ (finding that among low-income adults with an SUD, those with no insurance coverage had lower likelihood of receiving SUD treatment, compared to those with discontinuous or continuous coverage); Joanne Constantin et al., *Medicaid Unwinding and changes in Buprenorphine Dispensing*, 8 JAMA NETWORK OPEN e258469 (2025), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2833436 (finding that Medicaid unwinding was associated with disruptions in buprenorphine use).

[69] *See, e.g.*, Thomas Santo, Jr. et al., *Association of Opioid Agonist Treatment With All-Cause Mortality and Specific Causes of Death Among People with Opioid Dependence*, 78 JAMA PSYCHIATRY 1 (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8173472/#H1-4-YOI210027 (finding opioid agonist treatment is associated with a 50% lower risk of all-cause mortality).

[70] DSM-V-TR at 14.

[71] *See, e.g.*, *Bipolar Disorder*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/bipolar-disorder/diagnosis-treatment/drc-20355961 (Aug. 14, 2024) (noting bipolar disorder is a lifelong condition); *Schizophrenia*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/schizophrenia/symptoms-causes/syc-20354443 (Oct. 16, 2024) (noting people with schizophrenia need lifelong treatment); *Depression*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/depression/symptoms-causes/syc-20356007 (noting depression can require lifelong treatment; most people have multiple episodes); *Personality Disorders*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/personality-disorders/diagnosis-treatment/drc-20354468 (July 14, 2023) (noting treatment can last for months or years); Sukhmanjeet Kaur Mann et al., *Posttraumatic Stress Disorder*, STATPEARLS (2023), https://www.ncbi.nlm.nih.gov/books/NBK559129/ ("Chronic PTSD is common, with estimates that one-third of patients still have symptoms 1 year after diagnosis, and another third of patients still have symptoms 10 years after diagnosis.").

treatment for a mental disorder that can be disabling, and as a result, is not experiencing any impairment in their social, work, or family activities.[72]

Like people whose SUD is in remission, individuals receiving treatment for a disabling mental disorder face serious harm if their Medicaid coverage is terminated. Continuing treatment is critical for this population, and Medicaid coverage enables individuals to access that care.[73] Losing access to ongoing care will exacerbate their conditions and lead to higher utilization of more costly, intensive psychiatric services.[74]

*Individual with a Serious or Complex Medical Condition:* CMS should not permit states to establish an exclusive list of serious or complex medical conditions. Indeed, CMS has previously noted that it would not be possible to create such a list.[75] Instead, CMS should require states to: 1) create a non-exclusive list of serious or complex conditions, allowing for easy identification of applicants and beneficiaries who are medically frail and have a diagnosis; and 2) provide notice to individuals that the list is not exhaustive and other conditions can qualify as serious or complex.[76]

Further, many serious or complex medical conditions are chronic conditions that can be managed with treatment, but cannot be cured.[77] Here too, CMS should provide guidance to

---

[72] "Disabling" cannot have the same definition as "disabled (as defined in section 1614)." 42 U.S.C. § 1396a(xx)(9)(A)(ii)(V)(aa). Otherwise, the "disabling mental disorder" category would be entirely duplicative of the "disabled (as defined in section 1614)" category.

[73] *See, e.g.*, Madeline Guth et al., KFF, *The Effects of Medicaid Expansion under the ACA: Updated Findings from a Literature Review* 9 (2020), https://files.kff.org/attachment/Report-The-Effects-of-Medicaid-Expansion-under-the-ACA-Updated-Findings-from-a-Literature-Review.pdf (collecting research showing that Medicaid expansion is associated with increased access to behavioral health care); Xu Ji et al., *Effect of Medicaid Disenrollment on Health Care Utilization Among Adults with Mental Health Disorders*, 57 MED. CARE 574 (2019), https://pubmed.ncbi.nlm.nih.gov/31295187/.

[74] *See, e.g*, Xu Ji et al., *Discontinuity of Medicaid Coverage: Impact on Cost an Utilization among Adult Medicaid Beneficiaries with Major Depression*, 55 MED. CARE 735 (2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC6684341/ (finding that among adults with depression, those whose coverage was disrupted had higher use of ED and inpatient services, suggesting that maintenance of continuous coverage helps prevent acute episodes); Bentson H. McFarland & Jon C. Collins, *Medicaid Cutbacks and State Psychiatric Hospitalization of Patients with Schizophrenia*, 62 PSYCHIATRIC SERVS. 871 (2011), https://pubmed.ncbi.nlm.nih.gov/21807824/ (finding a "strong connection between Medicaid termination and increased state psychiatric hospitalization"); Jeffrey S. Harman et al., *Association Between Interruptions in Medicaid Coverage and Use of Inpatient Psychiatric Services*, 54 PSYCHIATRIC SERVS. 999 (2003), https://pubmed.ncbi.nlm.nih.gov/12851437/ (finding interruptions in Medicaid coverage are associated with increased psychiatric hospitalization among individuals with schizophrenia).

[75] Medicaid and Children's Health Insurance Programs: Essential Health Benefits in Alternative Benefit Plans, 78 Fed. Reg. 42160, 42233 (July 15, 2013) (noting that that "illnesses such as HIV/AIDS, viral hepatitis, cancer and end stage renal disease are all serious chronic medical conditions" but creating an exhaustive list of conditions would not be possible).

[76] *See* 42 U.S.C. § 1396a(xx)(6)(B), (8)(A).

[77] *See, e.g.*, *Lupus*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/lupus/symptoms-causes/syc-20365789 (Oct. 21, 2022) (noting that most people with lupus have episodic "flares" and while the condition is treatable, there is no cure); *Multiple Sclerosis*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/multiple-sclerosis/symptoms-causes/syc-20350269

states that an individual "with a serious or complex condition" includes an individual who: 1) has an episodic condition that is in a period of remission; and/or 2) is receiving ongoing treatment for the condition, which is mitigating its negative effects on their health and/or functioning. This is good policy for many reasons. Again, the health of individuals with serious or complex medical conditions will suffer dramatically if they lose Medicaid coverage.[78] CMS should not incentivize individuals to forego treatment and have their condition deteriorate so that they can continue to qualify for Medicaid.

<u>Parents and Other Caregivers</u>

In addition, Congress excluded from the work requirements an individual "who is the parent, guardian, caretaker relative, or family caregiver (as defined in section 2 of the RAISE Family Caregivers Act) of a dependent child 13 years of age and under or a disabled individual."[79] CMS should make clear to states that for purposes of this provision, "disabled individual" includes an individual who is "medically frail or otherwise has special medical needs." That would align with CMS's previous position that "all people with disabilities" fall within the medically frail definition."[80] What is more, aligning the groups of specified excluded individuals in this way would make sense from a policy perspective. If CMS were to adopt a more stringent definition of "disabled individual," there could be situations in which the person being cared for is exempt from work requirements as medically frail, but their family caregiver is not.

---

(Nov. 1, 2024) (noting that people with multiple sclerosis have period "attacks" with periods of remission in between, and while there is no cure, treatment can help manage the condition).

[78] Abundant research demonstrates that gaps in Medicaid coverage lead to negative health outcomes, including premature mortality. *See, e.g.*, Sarah Miller et al., Nat'l Bureau of Econ. Rsch.*, Medicaid and Mortality: New Evidence From Linked Survey and Administrative Data*, *Working Paper 26081* (2019), https://www.nber.org/system/files/working_papers/w26081/w26081.pdf; Benjamin D. Sommers, *State Medicaid Expansions and Mortality, Revisited: A Cost-Benefit Analysis*, 3 AM. J. HEALTH ECON. 392 (2017), https://dash.harvard.edu/server/api/core/bitstreams/7312037d-ed01-6bd4-e053-0100007fdf3b/content; Benjamin D. Sommers et al., *Health Insurance Coverage and Health—What the Recent Evidence Tells Us*, 377 N. ENG. J. MED. 586 (2017), http://www.nejm.org/doi/full/10.1056/NEJMsb1706645; Benjamin D. Sommers et al., *Mortality and Access to Care among Adults after State Medicaid Expansions*, 367 NEW ENG. J. MED. 1025 (2012), https://www.nejm.org/doi/full/10.1056/nejmsa1202099; Allyson G. Hall et al.*, Lapses in Medicaid Coverage: Impact on Cost and Utilization among Individuals with Diabetes Enrolled in Medicaid*, 48 MED. CARE 1219 (2008), https://pubmed.ncbi.nlm.nih.gov/19300311/; Andrew Bindman et al., *Interruptions in Medicaid Coverage and Risk for Hospitalization for Ambulatory Care-Sensitive Conditions*, 149 ANNALS INTERNAL MED. 854 (2008), https://pubmed.ncbi.nlm.nih.gov/19075204/; Leighton Ku and Erika Steinmetz, *Bridging the Gap: Continuity and Quality of Coverage in Medicaid,* Ass'n for Cmty. Affiliated Plans (2013), http://www.communityplans.net/Portals/0/Policy/Medicaid/GW%20Continuity%20Report%20%209-10-13.pdf.

[79] 42 U.S.C. § 1396a(xx)(9)(A)(ii)(III).

[80] Medicaid, Children's Health Insurance Programs, and Exchanges: Essential Health Benefits in Alternative Benefit Plans, 78 Fed. Reg. 4594, 4631 (Jan. 22, 2013) (proposed rule).

## IV. Compliance & *Ex Parte* Verifications

The 2025 Reconciliation Act requires that states conduct compliance checks to determine whether an applicable individual has met the work requirements during the period between their most recent eligibility (re)determination and their next regularly scheduled redetermination.[81] However, states "may elect to not require an individual to verify information" for exceptions and exclusions.[82]

Because applicable individuals are those eligible for Medicaid coverage under § 1396a(10)(A)(i)(VIII) (or a waiver that provides coverage that is equivalent to minimum essential coverage), this period is generally every six months (beginning January 1, 2027).[83] However, states may elect to conduct more frequent compliance verifications.[84] Congress has directed CMS to adopt procedures for verification of compliance (as well as exceptions and exclusions, where the state so chooses[85]) but also explicitly requires that those verifications be conducted *ex parte*.[86] That is, the Act requires states to check compliance (and exceptions and exclusions) using information already possessed by the state before it is allowed to request it directly from individuals.

In the guidance or IFR, CMS should list the minimum set of databases that states are required to use in undertaking this mandatory *ex parte* review process. The 2025 Reconciliation Act delineates three areas where the state must utilize an *ex parte* review process: (1) to determine actual compliance with the work requirements; (2) where the state elects to require verification, to determine whether the individual should be deemed compliant because they meet a specific exception (including but not limited to short-term hardship exceptions); and (3) to determine whether an individual is a "specified excluded individual." Manatt Health has published a chart that contains an extensive list of databases that CMS should direct states to engage with when conducting *ex parte* reviews.[87]

---

[81] 42 U.S.C. § 1396a(xx)(4).

[82] *Id*. § 1396a(xx)(3)(A).

[83] *See id*. § 1396a(e)(14)(L) (6-month redeterminations are required for individuals enrolled in the Medicaid expansion under the state plan or under a waiver that covers the entire expansion population).

[84] *See id*. § 1396a(xx)(4).

[85] "Exclusions" or, more specifically, those who are "specified excluded individuals" are defined at 42 U.S.C. § 1396a(xx)(9)(A)(ii). Again, Congress does not require states to undertake any verification process for determining whether an individual meets the exceptions under in § 1396a(xx)(3)(A).

[86] *See id*. § 1396a(xx)(5). This directive aligns with current regulations requiring states to determine or renew eligibility based on information possessed by the agency without requiring additional information for the applicant or enrollee unless that information is found not to be reasonably compatible or cannot be obtained electronically. *See* 42 C.F.R. § 435.952(b), (c).

[87] Kinda Serafi et al., State Health & Value Strategies, *Medicaid Work Reporting Requirements: Verifying Compliance and Exemptions* (2025), https://shvs.org/wp-content/uploads/2025/09/Coverage-and-Access_Work-Requirements-Compliance-and-Exeptions-Verification_09.12.2025_Rev.pdf; *see also* Manatt Health & State Health & Value Strategies, *Strategic Verification Hierarchy for Medicaid Work Reporting Requirements* (2025), https://shvs.org/wp-content/uploads/2025/10/Work-Requirements-Verification-Hierarchy_10.06.2025.pdf.

Furthermore, existing regulations require states to attempt to verify financial eligibility for Medicaid by reviewing SNAP eligibility and enrollment data.[88] Forthcoming CMS guidance, including the IFR, should build on this and require states to access SNAP data to verify compliance (*e.g.*, use SNAP verified income to establish that an "individual has a monthly income that is no less than the applicable minimum wage…multiplied by 80 hours").

While *ex parte* verifications will be a critical component in the implementation of the requirements,[89] it is important to note that such verifications are imperfect. Certain systems states rely on to verify applicant and enrollee data have limited utility and can be unreliable.[90] For example, wage data systems – which are costly to the state – often do not capture seasonal, intermittent, or gig work and, when employment information can be captured, it is often out of date.[91] Additionally, state databases will be unable, in certain instances, to capture all possible exemptions. For example, states will likely be unable to capture those who are caring for a dependent with a disability, those enrolled half-time in an educational program, or those who are engaging in unpaid work or community service.[92] And, of course, states may have failed to successfully implement *ex parte* verifications in full as we saw during the unwinding of the public health emergency.[93]

Given the concerns discussed above, CMS should require states to use the least burdensome verification method available, self-attestation. Notably, self-attestation has been found to be a highly reliable form of verification.[94] Further, it is less burdensome for

---

[88] *See* 42 C.F.R. § 435.948(a)(2).

[89] *See generally* Pamela Herd et al., *Interventions to Automate Medicaid Renewals Reduce Procedural Denials and Increase Coverage*, 44 HEALTH AFFS. 1336 (2025), https://www.healthaffairs.org/doi/10.1377/hlthaff.2025.00316?url_ver=Z39.88-2003&rfr_id=ori%3Arid%3Acrossref.org&rfr_dat=cr_pub++0pubmed [hereinafter "Herd et al., *Interventions to Automate Medicaid Renewals*"].

[90] Adrianna McIntyre et al., *New Medicaid Enrollment Barriers and Lessons from Unwinding*, 6 JAMA Health F. e254849 (2025), https://jamanetwork.com/journals/jama-health-forum/fullarticle/2838677 [hereinafter "McIntyre et al., *New Medicaid Enrollment Barriers*"].

[91] *Id.*; *see also* U.S. Gov't Accountability Off. (GAO), *GAO-17-111, Supplemental Nutrition Assistance Program: More Information on Promising Practices Could Enhance States' Use of Data Matching for Eligibility* 19 (2016), https://www.gao.gov/products/gao-17-111; GAO, *GAO-21-183, Federal Low-Income Programs, Use of Data to Verify Eligibility Varies Among Selected Programs and Opportunities Exist to Promote Additional Use* 37 (2021), https://www.gao.gov/products/gao-21-183.

[92] McIntyre et al., *New Medicaid Enrollment Barriers*.

[93] Herd et al., *Interventions to Automate Medicaid Renewals* at 1342 ("In the case under study, it was not enough to require states to automate renewal processes for beneficiaries.… [S]tates needed both the capacity and the policy and technical expertise to effectively implement automation and ensure that those eligible for critical benefits such as Medicaid can actually access them.").

[94] *See* MaryBeth Musumeci et al., KFF, *Medicaid Public Health Emergency Unwinding Policies Affecting Seniors & People with Disabilities: Findings from a 50-State Survey* (2022), https://www.kff.org/report-section/medicaid-public-health-emergency-unwinding-policies-affecting-seniors-people-with-disabilities-findings-from-a-50-state-survey-issue-brief/ (noting that when New Jersey compared self-attestation with actual electronic asset verification in a representative sample of applicants from 2015-2016, it found a 0% error rate).

the state[95] and the best method for ensuring that eligible individuals do not lose health coverage due to administrative barriers.[96] Ample research demonstrates that additional administrative barriers deter and reduce coverage.[97] For example, when states implemented work requirements through section 1115 projects, many individuals who were required to submit evidence from a provider to verify the existence of a disability-related exemption struggled to find a willing provider or one who could timely sign off.[98] Given that Medicaid beneficiaries are limited to the smaller pool of providers that accept Medicaid and – if subject to managed care models – are also limited to in-network providers, then finding a willing provider becomes even more difficult.[99] And, of course, applicants who are

---

[95] MACPAC, Public Meeting Transcript 88-90 (Sept. 18-19, 2025), https://www.macpac.gov/wp-content/uploads/2025/09/09-18-25-and-09-19-25-MACPAC-Public-Transcript.pdf (former CMS official testifying that self-attestation is less expensive and easier to implement from a systems perspective).

[96] *See, e.g.*, Herd et al., *Interventions to Automate Medicaid Renewals* at 1340 ("People frequently lose coverage because they did not receive the renewal form, were confused about how to complete it, or *struggled to find the information and documentation they needed to complete it*.") (emphasis added).

[97] *See, e.g.*, Jennifer Wagner & Judy Solomon, *States' Complex Medicaid Waivers will Create Costly Bureaucracy and Harm Eligible Beneficiaries* 3-4 (2018), https://www.cbpp.org/research/health/states-complex-medicaid-waivers-will-create-costly-bureaucracy-and-harm-eligible; KFF, *Implications of Emerging Waivers on Streamlined Medicaid Enrollment and Renewal Process* (2018), https://www.kff.org/medicaid/fact-sheet/implications-of-emerging-waivers-on-streamlined-medicaid-enrollment-and-renewal-processes/ (explaining that adding enrollment barriers leads to significant declines in enrollment, while streamlining enrollment and renewal processes contributes to an increase in enrollment and retention); Ashley M. Fox et al., *Administrative Easing: Rule Reduction and Medicaid Enrollment*, 80 PUB. ADMIN. REV. 104 (2020), https://onlinelibrary.wiley.com/doi/epdf/10.1111/puar.13131; Michael Perry et al., KFF, *Medicaid and Children, Overcoming Barriers to Enrollment, Findings from a National Survey* (2000), https://www.kff.org/wp-content/uploads/2013/01/medicaid-and-children-overcoming-barriers-to-enrollmentreport.pdf; Leighton Ku et al., Ass'n for Cmty. Affiliated Plans, *Improving Medicaid's Continuity of Coverage and Quality of Care* 12-16 (2009), http://www.communityplans.net/Portals/0/ACAP%20Docs/Improving%20Medicaid%20Final%20070209.pdf.

[98] Ian Hill et al., Urban Inst., *New Hampshire's Experience with Medicaid Work Requirements: New Strategies, Similar Results* 24 (2020), https://www.urban.org/sites/default/files/publication/101608/new_hampshires_experience_with_medicaid_work_requirements_2.pdf [hereinafter, "Ian Hill et al., *New Hampshire's Experience with Medicaid Work Requirements*"].

[99] Walter R. Hsiang et al., *Medicaid Patients Have Greater Difficulty Scheduling Health Care Appointments Compared With Private Insurance Patients: A Meta-Analysis*, 56 INQUIRY 1 (2019), https://pmc.ncbi.nlm.nih.gov/articles/PMC6452575/; MACPAC, *Evaluating the Effects of Medicaid Payment Changes on Access to Physician Services* (2025), https://www.macpac.gov/wp-content/uploads/2025/01/Evaluating-the-Effects-of-Medicaid-Payment-Changes-on-Access-to-Physician-Services.pdf ("In general, physicians are less likely to serve patients covered by Medicaid than those with Medicare or private insurance. In a MACPAC analysis of the 2017 National Electronic Health Records Survey (NEHRS), fewer physicians reported accepting new Medicaid patients (74 percent) compared to those accepting new Medicare patients (88 percent) or new privately insured patients (96 percent)."); Off. of Inspector Gen., HHS, *Rep. No. OEI-02-22-00050, A Lack of Behavioral Health Providers in Medicare and Medicaid Impedes Enrollees' Access to Care* (2024), https://oig.hhs.gov/documents/evaluation/9844/OEI-02-22-00050.pdf.

uninsured often have no access to a provider at all, making it impossible for them to have a provider certify their condition.[100]

Furthermore, acceptance of self-attestation as the standard form of verification would align with existing Medicaid and SNAP regulations. Medicaid regulations give states the option to accept self-attestation for the vast majority of information necessary to prove eligibility.[101] Self-attestation can be accomplished by the individual or, to ensure that the application and redetermination processes are accessible, by an adult in the household, family member, or authorized representative.[102] And, even where states require something other than self-attestation, they:

> must establish an exception [to the required verification process] to permit, on a case-by-case basis, self-attestation of individuals for all eligibility criteria when documentation does not exist at the time of application or renewal, or is not reasonably available, such as in the case of individuals who are homeless or have experienced domestic violence or a natural disaster.[103]

Finally, where the state turns up information during an *ex parte* review or verification period that would otherwise lead to a denial or termination of Medicaid eligibility, individuals must have the opportunity to rebut such information before eligibility is denied or terminated.[104] There is simply no reason that these requirements should not apply equally to verification of compliance with work requirements.

Similarly, under SNAP regulations governing work requirement compliance, states are required to affirmatively screen individuals for potential exceptions from those requirements and act promptly where one is discovered.[105] States are also not required to verify ABAWD exceptions, unless questionable.[106] And, like in Medicaid, where an individual is asked to provide verification to address questionable information supplied in a SNAP application or recertification, the state agency must provide assistance.[107]

---

[100] Jane M. Zhu et al., *Medicaid Managed Care Organizations' Experiences with Network Adequacy*, 3 HEALTH AFFS. SCHOLAR 1, 6 (2025) https://doi.org/10.1093/haschl/qxaf049.
[101] *See* 42 C.F.R. § 435.945(a); *see also id*. § 435.956(e) (requiring states to accept self-attestation for pregnancy unless not reasonably compatible with other information already in the state's possession).
[102] *Id*. § 435.945(a).
[103] *Id*. § 435.952(c)(3).
[104] *Id*. § 435.952(d).
[105] FNS, *Question and Answer #1*; *see also* 7 C.F.R. §§ 273.7(b)(3) (work screening), 273.24(k) (ABAWD screening); FNS, *Supplemental Nutrition Assistance Program (SNAP) Provisions of the One Big Beautiful Bill Act of 2025 – ABAWD Exceptions – Implementation Memorandum* (Oct. 3, 2025), https://www.fns.usda.gov/snap/obbb-ABAWD-exemptions-implementation-memo (directing state agencies to "immediately screen for and apply" the new exceptions) [hereinafter, "FNS, ABAWD Exceptions – Implementation Memorandum"].
[106] FNS, *Question and Answer #1*; *see also* 7 C.F.R. § 273.24(l).
[107] FNS, *Question and Answer #1*.

## V. Procedures & Notices in the Case of Noncompliance

Under the 2025 Reconciliation Act, Congress directs CMS to adopt standards to guide the procedures states will use in the case of noncompliance.[108] This includes the: (1) timeframe for and content of notice of noncompliance; (2) time period an individual is given to make a "satisfactory showing" of compliance or an exemption; and (3) other important procedural protections, including continuation of benefits through this process, *ex parte* review of other possible eligibility categories prior to termination, and the opportunity for a fair hearing to challenge the state's decision. These processes should align with existing CMS regulations regarding Medicaid eligibility denials and terminations.

Process to Make a "Satisfactory Showing"

CMS should explain to states that to make a "satisfactory showing," an individual need only provide the information that the state would need to make an initial determination of compliance, exception, or exclusion. In other words, a satisfactory showing is not a more demanding standard than the verification requirement under § 1396a(xx)(4).

Where an individual is instructed to show compliance, CMS should require that states accept proof of compliance (or an exception or exclusion) through multiple modalities, including through the internet, telephone, mail, in-person, or other commonly available means. The process for providing proof of compliance should also include the ability for an individual to provide the information via "someone acting responsibly" on their behalf. This would align with existing Medicaid regulations.[109] It would also account for the reality that a significant percentage of adults in the U.S. are not digitally literate and will find it difficult to navigate web-based eligibility systems.[110] And, as stated above, the state agency should be required to assist individuals with obtaining whatever verification is required to prove eligibility.[111]

---

[108] 42 U.S.C. § 1396a(xx)(6)(A),

[109] 42 C.F.R. § 435.907(a) (listing the modalities in which the state agency must accept "any documentation required to establish eligibility").

[110] John B. Horrigan, Pew Rsch. Ctr., *Digital Readiness Gaps* (2016) https://www.pewresearch.org/internet/2016/09/20/digital-readiness-gaps/ (Digital literacy is the ability to find, evaluate, and communicate information using typing or digital media platforms. As many as 52% of U.S. adults are relatively unprepared to use digital tools, due to limited digital skills and/or mistrust of online information. Women, minorities, and those with less education and lower incomes are more likely to be among this group.); Emily A. Vogels, *Digital divide persists even as americans with lower incomes make gains in tech adoption*, Pew Rsch. Ctr. (June 22, 2021), https://www.pewresearch.org/short-reads/2021/06/22/digital-divide-persists-even-as-americans-with-lower-incomes-make-gains-in-tech-adoption/ (finding that 24% of adults with household income below $30,000 do not own a smartphone, 43% do not have broadband service at home, 41% do not own a laptop or desktop, and 59% do not own a tablet); Anuj Gangopadhyaya & Michael Karpman, *The Impact of Arkansas Medicaid Work Requirements on Coverage and Employment: Estimating Effects Using National Survey Data*, HEALTH SERVS. RSCH. e14624 (2025), https://pubmed.ncbi.nlm.nih.gov/40205643/ (finding that coverage losses associated with Arkansas's prior work requirements "were concentrated among adults without internet access").

[111] 42 C.F.R. § 435.908(a).

Where an individual makes a satisfactory showing, CMS should require states to issue a notice of approval/compliance that provides such feedback. For those who successfully show compliance at this particular stage, a notice of approval will reinforce their understanding of how to navigate the process and what is required. It is also in line with existing Medicaid and SNAP regulations.[112]

CMS should include in the guidance that states have the opportunity to align their existing Medicaid and SNAP verification processes with the 2025 Reconciliation Act's procedures in cases of non-compliance. To do so, CMS should clarify that, after conducting an *ex parte* review to determine compliance with – or an exception or exclusion from – work requirements, that states have the option to send a request for information or other written communication describing what specific information is needed.

Further, the statute does not require states to move directly from the *ex parte* review process described at § 1396a(xx)(5) to issuing notices of non-compliance so long as the state does both. This flexibility will allow states to overlay these new work requirements with existing eligibility processes which, in turn, will mitigate administrative and financial burden on the states.

For those who make a "satisfactory showing" that they are not an "applicable individual" as described in § 1396a(xx)(9)(A), CMS should direct states to remove the individual from further compliance assessments until the state receives notification that the individual no longer meets an exclusion. This can mitigate the risk of churn because it would eliminate unnecessary paperwork and verification demands on the household.[113]

Content of Notices of Noncompliance

Under § 1396a(xx)(6)(B), states are directed to include specific information in notices of non-compliance, including "how such individual may make a satisfactory showing that such requirement does not apply to…[them]…on the basis that…[they]…do[] not meet the definition of applicable individual under paragraph (9)(A)." An "applicable individual" is only an individual who is enrolled (or seeking enrollment) in Medicaid pursuant to § 1396a(a)(10)(A)(i)(VIII) (or, enrolled under a waiver that provides coverage that is equivalent to minimum essential coverage). Accordingly, states should be directed to include a statement in the notice of non-compliance that individuals have the choice of category under 42 C.F.R. § 435.404 and, if they believe they are eligible under one of the

---

[112] *See id*. §§ 435.916(b)(1)(i), (ii), 435.917(a) (governing Medicaid approvals); 7 C.F.R. § 273.10(g)(1)(i)(A) (governing approvals in SNAP).

[113] *See* Gregory Mills et al., Urban Inst., *Understanding the Rates, Causes, and Costs of Churning in the Supplemental Nutrition Assistance Program (SNAP) – Final Report* 74-77 (2014), https://www.urban.org/sites/default/files/publication/33566/413257-Understanding-the-Rates-Causes-and-Costs-of-Churning-in-the-Supplemental-Nutrition-Assistance-Program-SNAP-.PDF (concluding that "[a]ctions to reduce the burden to clients of establishing their eligibility in order to remain on the program" could lead to a reduction in churn).

other available Medicaid categories, then they should notify the agency of that choice (and CMS and/or states should develop a process for accepting that request).

In addition, the title "Notice of Noncompliance" for a document that is <u>not</u> meant to convey ineligibility but instead is meant to instruct individuals about the steps needed to establish or continue eligibility, is likely to lead to confusion among applicants and beneficiaries or worse, lead them to incorrectly believe the state has already reached an adverse eligibility decision and abandon the process.[114] For that reason, states should be given the flexibility to change the title of such notice so long as they include the information required by the statute and CMS. Again, this can mitigate administrative burden on states by allowing them to align current eligibility processes with the new work requirements.

Finally, the notice should contain a clear explanation of the time period in which someone was required to be in actual compliance with the work requirements.[115] The failure to include this information could result in confusion and erroneous denials or terminations and could violate due process.[116] As HHS has acknowledged, awareness and understanding of prior Medicaid work requirements was low.[117] To avoid erroneous denials and terminations

---

[114] Civilla, *Human-Centered Work Requirements in Medicaid Report* 6 (2025), https://civilla.org/assets/files/Civilla-Human-Centered-Work-Requirements-Medicaid-Report.pdf (based on past research and experience redesigning benefits access in Michigan, creating a detailed list of notice content in the implementation of the 2025 Reconciliation Act).

[115] *See* 42 U.S.C. § 1396a(xx)(1).

[116] In New Hampshire's implementation of work requirements, the State's notice giving individuals one month to cure a non-compliance issue caused confusion among beneficiaries "because it was unclear whether beneficiaries only needed to make up the shortfall from the previous month, or whether they were required to work a full 100 hours *plus* the hours needed to meet the prior month's shortfall." Ian Hill et al., *New Hampshire's Experience with Medicaid Work Requirements* at 19.

[117] *See, e.g.*, Letter from Chiquita Brooks-LaSure, Adm'r, CMS, to Dawn Stehle, Deputy Dir. for Health & Medicaid, Ark. Dep't of Hum. Servs. 5-6 (March 17, 2021), https://www.medicaid.gov/medicaid/section-1115-demonstrations/downloads/ar-works-ca2.pdf; HHS, Assistant Sec'y for Plan. & Evaluation, Off. of Health Pol'y, *Medicaid Demonstrations and Impacts on Health Coverage: A Review of the Evidence* (2021), https://aspe.hhs.gov/sites/default/files/private/pdf/265161/medicaid-waiver-evidence-review.pdf (linking low awareness of work requirements and coverage loss); *see also* L.A. Smith et al., *Knowledge of welfare reform program provisions among families of children with chronic conditions*, 92 Am. J. Pub. Health 228, 228-230 (2002), https://pmc.ncbi.nlm.nih.gov/articles/PMC1447047/; Jessica Greene, *Medicaid Recipients' Early Experience With the Arkansas Medicaid Work Requirement*, Health Affs. Blog (Sept. 5, 2018), https://www.healthaffairs.org/content/forefront/medicaid-recipients-early-experience-arkansas-medicaid-work-requirement (In-depth interviews with 18 adult Medicaid enrollees in Arkansas in September 2018 revealed "a profound lack of awareness" about the work requirements, with two-thirds of the enrollees having not heard of them); Benjamin D. Sommers et al., *Medicaid Work Requirements: Results from the First Year in Arkansas*, 381 NEJM 1073, 1080 (2019), https://www.nejm.org/doi/full/10.1056/NEJMsr1901772; Benjamin D. Sommers et al., *Consequences of Work Requirements in Arkansas: Two-Year Impacts on Coverage, Employment, and Affordability of Care*, 39 Health Affs. 1522 (2020), https://pmc.ncbi.nlm.nih.gov/articles/PMC7497731/ (finding that as of late 2019, nearly 35% of Arkansans ages 30-49 with Medicaid or Marketplace coverage in the prior year had heard nothing at all about the work requirements policy, and only 5.7% correctly answered that the requirements were not in effect).

due to these complex requirements, CMS should take all necessary steps to ensure states issue clear and accessible written notice.

<u>Termination of Denials Due to Non-Compliance</u>

The Constitution requires notices of an adverse action regarding Medicaid eligibility determinations to be sent prior to termination and to be reasonably calculated to apprise an individual of the intended action.[118] The notice must also include a statement of the specific facts on which the agency relied to determine that an individual failed to comply with the work requirements.[119] When requested in a timely manner, state agencies must continue benefits pending an appeal.[120] CMS should ensure guidance reinforces these critical procedural protections.

Finally, CMS should direct states to update their administrative hearing guidance to hearing officers instructing them to screen for exemptions regardless of whether the individual has raised the argument. This aligns with SNAP regulations requiring states to affirmatively screen for exemptions from work requirements at all stages of the process.[121] It also helps to address the concern that many public benefits recipients have trouble understanding and navigating complex eligibility criteria.[122]

## VI. Conclusion

We appreciate your consideration of our comments. If you have questions about these comments, please contact us.

Sincerely,

/s/*Katy DeBriere*  	/s/*Catherine McKee*
Katy DeBriere  	Catherine McKee
Senior Attorney  	Senior Attorney
debriere@healthlaw.org  	mckee@healthlaw.org

---

[118] *Goldberg v. Kelly*, 397 U.S. 254 (1970); *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).
[119] Due process requires a notice "detailing the reasons for a proposed termination" and including "the legal and factual bases" for the decision. *Goldberg*, 397 U.S. at 267-68. *See also, e.g., Hamby v. Neel*, 368 F.2d 549 (6th Cir. 2004); *Ortiz v. Eichler*, 794 F.2d 889 (3d Cir. 1986); *Turner v. Walsh*, 574 F.2d 456 (8th Cir. 1978); *Vargas v. Trainor*, 508 F.2d 485 (7th Cir. 1974); *Baker v. Alaska DHHS*, 191 P.3d 1005 (Alaska 2008).
[120] 42 C.F.R. § 431.231(c) ("The agency must reinstate and continue services until a decision is rendered after a hearing if…[t]he beneficiary requests a hearing within 10 days from the date that the individual receives the notice of action.").
[121] FNS, *Question and Answer #1*; *see also* 7 C.F.R. §§ 273.7(b)(3) (work screening), 273.24(k) (ABAWD screening); *see also* FNS, ABAWD Exceptions – Implementation Memorandum.
[122] *See* note 116, *supra*.