# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF MASSACHUSETTS, STATE OF CALIFORNIA, STATE OF NEW JERSEY, STATE OF ARIZONA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF HAWAI'I, STATE OF ILLINOIS, OFFICE OF THE GOVERNOR ex rel. Andy Beshear, in his official capacity as Governor of the COMMONWEALTH OF KENTUCKY, STATE OF MAINE, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NEVADA, STATE OF NORTH CAROLINA, STATE OF OREGON, JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, STATE OF WISCONSIN,

        *Plaintiffs*,

    v.

MEHMET OZ, M.D., in his official capacity as Director of the Centers for Medicare & Medicaid Services; CENTERS FOR MEDICARE & MEDICAID SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health & Human Services; U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES,

        *Defendants*.

Case No. 1:26-cv-12962-RGS

**[PROPOSED] BRIEF OF AMICI CURIAE AMERICAN MEDICAL ASSOCIATION AND MASSACHUSETTS MEDICAL SOCIETY IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**INTEREST OF AMICI CURIAE**

The American Medical Association ("AMA") is the largest professional association of physicians, fellows, residents, and medical students in the country. AMA members practice in every medical specialty and in every state. Through its House of Delegates, which includes state and specialty medical societies and other physician groups, the AMA includes representatives of nearly all physicians, residents, and medical students in the United States in its policy-making process. The AMA's core purposes remain—as they were at its founding in 1847—to promote the art and science of medicine and the betterment of public health.

The Massachusetts Medical Society ("MMS"), founded in 1781, is the oldest continuously operating medical society in the U.S. MMS is the Commonwealth's statewide professional association with representation in the AMA House of Delegates. MMS is dedicated to advancing medical knowledge, elevating the practice of medicine, improving patient care, and promoting public health. Through advocacy, education, and physician leadership, the MMS engages in legislative, regulatory, and legal efforts affecting the practice of medicine and the delivery of health care in Massachusetts, including Medicaid coverage and federal health policy.

The AMA and MMS file this brief in their own right and as representatives of the Litigation Center of the American Medical Association and State Medical Societies. The Litigation Center is a coalition of the AMA and the medical societies of each state and the District of Columbia formed to represent the interests of the medical profession and their patients in the courts. The Litigation Center regularly participates in litigation involving federal health policy, administrative law, and the regulation of medical practice. These issues are of particular significance to Massachusetts physicians, patients, and health systems, which may face substantial operational disruption if the Rule proceeds as written.

- 1 -

**INTRODUCTION**

The AMA and MMS submit this brief to emphasize the harm flowing from portions of the Centers for Medicare & Medicaid Services ("CMS") interim final rule (the "Rule")[1] implementing Medicaid work requirements under H.R. 1[2]; specifically, CMS's decision to restrict the exclusion for medically frail individuals to patients who can prove that their condition significantly impairs their ability to work. *Amici* represent the nation's physicians who will be called upon to make unnecessary patient assessments for this unlawful coverage condition, and who know firsthand the grave consequences when people with serious medical conditions lose their health coverage. Only a prompt injunction will prevent millions of patients from receiving notices in August with an impermissibly narrow exclusion for medically frail individuals, which will cause confusion and burden physicians with explaining the unlawful Rule to their patients.

The expansion of Medicaid under the Affordable Care Act allows 20 million Americans today to have access to the health care they need. Because the loss of access to care can have devastating consequences, the AMA has long maintained that those with significant medical conditions like cancer and multiple sclerosis must be protected from losing Medicaid coverage due to work requirements. Congress adopted that same principle in H.R. 1 by expressly excluding medically frail individuals from the work requirements. Congress recognized that medically frail individuals should not lose Medicaid coverage based on their ability to work, a point emphasized by the legislation's sponsors. Under the Rule, however, millions of eligible patients stand to lose Medicaid coverage not because they fail to satisfy Congress's definition of medical frailty, but because they cannot satisfy an additional eligibility criterion imposed by

---

[1] Centers for Medicare & Medicaid Services, Medicaid Program; Community Engagement Requirement for Certain Individuals, 91 Fed. Reg. 33348 (June 3, 2026) (to be codified at 42 C.F.R. 435).
[2] Pub. L. No. 119–21, tit. VII, §71119, 139 Stat. 72, 306-315 (July 4, 2025) (codified at 42 U.S.C. §1396a(xx)) ("H.R.1").

CMS—either because they do not meet the Rule's extra-statutory standard or because they are unable to document compliance with it. This addition—that is nowhere in the statute and conflicts with a plain reading of the text—is likely to undermine physician-patient relationships, interfere with patient care, and unnecessarily add to the paperwork burden on patients and physicians. At a time when excessive administrative tasks are a leading contributor to gaps in patient care and physician burnout, these additional responsibilities create new burdens for medically frail patients and the physicians who care for them.

*Amici* and their members are deeply concerned that without this Court's intervention, millions of Americans who remain eligible for Medicaid will lose coverage and access to necessary medical care, risking catastrophic health outcomes and inserting physicians into the burdensome process of making unnecessary determinations for this unlawful condition.

## ARGUMENT

The AMA and MMS urge the Court to grant Plaintiffs' Motion for a Preliminary Injunction and halt enforcement and implementation of the Rule's medical frailty provisions.

## I.       Medicaid Expansion Provides a Lifeline to Patients Who Are Medically Frail.

Today, 20 million Americans receive their health coverage through Medicaid expansion,[3] which Congress enacted as part of the Affordable Care Act in 2010. Forty states plus D.C. have implemented this option to cover adults with incomes below 133 percent of the federal poverty level, resulting in far lower rates of uninsurance than in the ten states that did not expand Medicaid.[4] The work requirements in H.R. 1 apply to individuals in the expansion population

---

[3] KFF, Status of State Medicaid Expansion Decisions (May 21, 2026), https://www.kff.org/medicaid/status-of-state-medicaid-expansion-decisions/.
[4] Madeline Guth et al., *The Effects of Medicaid Expansion under the ACA: Studies from January 2014 to January 2020*, KFF.org (Mar. 17, 2020), https://www.kff.org/affordable-care-act/the-effects-of-medicaid-expansion-under-the-aca-updated-findings-from-a-literature-review/ (collecting sources).

and the Rule risks undoing the progress that Medicaid expansion has brought.

All Americans benefit from ready access to medically necessary health care services. This is especially true for those with substance use disorders, various disabilities, and individuals living with serious or complex medical conditions that may require active monitoring by specialists or swift medical intervention. Unsurprisingly, the evidence shows that Medicaid expansion was associated with reduced mortality rates overall among eligible adults. Numerous studies document Medicaid expansion's impact on earlier treatment, improved outcomes, and increased survival for serious conditions like cancer, heart disease, opioid use disorder and liver disease.[5] These studies show what any practicing clinician can readily observe: when people with serious conditions lack health coverage, they are more likely to get sicker faster and die sooner.

## II.    CMS's Rule Defies Congressional Intent to Protect Medically Frail Individuals from Coverage Losses and Burdensome Paperwork.

Congress expressly excluded medically frail individuals from work requirements and directed states to use all available data to verify coverage without requesting documentation from patients. Despite these statutory requirements, the Rule unduly restricts the definition of

---

[5] *Id.*; Ginger Y. Jiang et al., *Medicaid Expansion Under the Affordable Care Act and Association with Cardiac Care: A Systematic Review*, Circulation: 16 Cardiovasc. Qual. & Outcomes 411 (June 20, 2023), https://www.ahajournals.org/doi/10.1161/CIRCOUTCOMES.122.009753; Madeline Guth et al., *Building on the Evidence Base: Studies on the Effects of Medicaid Expansion, February 2020 to March 2021*, KFF (May 6, 2021), https://www.kff.org/affordable-care-act/building-on-the-evidence-base-studies-on-the-effects-of-medicaid-expansion-february-2020-to-march-2021; Brian P. Lee, et al., *Medicaid Expansion and Variability in Mortality in the USA: A National, Observational Cohort Study*, 7 Lancet Pub. Health E48 (Jan. 2022), https://www.thelancet.com/journals/lanpub/article/PIIS2468-2667(21)00252-8/fulltext; Kristin M. Primm et al., *Effect of Medicaid Expansion on Cancer Treatment and Survival Among Medicaid Beneficiaries and the Uninsured*, 13 Cancer Med. e7461 (July 6, 2024), https://doi.org/10.1002/cam4.7461; Miranda B. Lam et al., *Medicaid Expansion and Mortality Among Patients with Breast, Lung, and Colorectal Cancer*, 3 JAMA Network Open e2024366 (Nov. 5, 2020), https://doi.org/10.1001/jamanetworkopen.2020.24366; Anh P. Nguyen et al., *Health Plan Disenrollment and Mortality After Initiation of Medications for Opioid Use Disorder*, 83 JAMA Psychiatry 491 (May 1, 2026), https://pubmed.ncbi.nlm.nih.gov/41779402/; Leticia M. Nogueira et al., *Medicaid Expansion Under the Affordable Care Act and Early Mortality Following Lung Cancer Surgery*, J. Thoracic & Cardiovascular Surgery e2351529 (Jan. 2, 2024), https://pubmed.ncbi.nlm.nih.gov/38214932/.

"medically frail" and arbitrarily limits states' ability to leverage Medicaid claims data to identify qualifying conditions.

    A.  The Rule Contradicts H.R.1's Exclusion of Medically Frail Individuals from <u>Work Requirements Regardless of Their Ability to Work.</u>

When Congress imposed work requirements on those in the Medicaid expansion population through H.R. 1, it specifically excluded any individual "who is medically frail or otherwise has special medical needs." 42 U.S.C. § 1396a(xx)(9)(A)(ii)(V). Although Congress afforded the agency discretion to define this term, H.R.1 specifies that the definition must "include[e] an individual" with one of five types of clinical conditions. *Id.*

The statutory language describing the five conditions makes clear that Congress did not intend that the medical frailty exclusion be limited to those with conditions that impair their ability to comply with the work requirements. While some of the conditions, by definition, entail some degree of impairment (e.g., 42 U.S.C. § 1396a(xx)(9)(A)(ii)(V)(aa) (incorporating the blindness and disability standards of the supplemental social security income program)), others do not. *E.g.*, *id.* § 1396a(xx)(9)(A)(ii)(V)(ee) (serious or complex medical condition). Furthermore, in Section 1396a(xx)(9)(A)(ii)(V)(dd), Congress provided that individuals are medically frail if they have a "a physical, intellectual or developmental disability that *significantly impairs their ability to perform 1 or more activities of daily living*" (emphasis added). That Congress expressly references impairment in describing this qualifying clinical condition but not the others, strongly implies that Congress did not intend for impairment to be a factor in every qualifying condition.

This omission was not accidental. Congress understood the importance of avoiding coverage losses for people with conditions in the five specified categories. Due to the need to navigate their health conditions, individuals in these categories already face significant fiscal,

psychological, and/or physical burdens on a day-by-day basis, making it important to spare them and their families from the risk of coverage loss and from additional paperwork burdens to maintain vital access to health coverage.

In response to vigorous advocacy from physicians, other clinicians, and patient groups, members of Congress reassured the public that people with heightened medical needs would not lose Medicaid coverage under the work requirements policy. For example, House Energy & Commerce Chairman Guthrie wrote after the bill passed that, "This policy applies only to able-bodied, unemployed adults . . .  Our bill couldn't be clearer about that . . . You're exempt if you're medically frail, which includes anyone who's blind, disabled, battling a chronic substance-use disorder or living with a serious and complex medical condition like cancer."[6]

Despite the statute's clear language and Congress's public commitments, CMS added a new restriction that is not present in the statute: to qualify as medically frail, not only must an individual have a qualifying condition, but that condition must "significantly impair[] the individual's ability to comply" with work requirements. 42 C.F.R. § 435.554(c)(5)(i). While CMS may provide additional detail on the diagnoses that qualify someone as medically frail (e.g., the Rule could omit tobacco use disorder as a qualifying diagnosis under substance use order), CMS cannot add a new requirement that individuals must meet to qualify for the medical frailty exception, as it has done in the Rule.

B.   The Rule Arbitrarily Restricts States' Ability to Rely on Medicaid Claims Data.

Consistent with longstanding Medicaid eligibility policies, H.R.1 directs states to verify compliance with work requirements—including via exclusions such as medical frailty—using "reliable information available to the State (such as … encounter data . . . and data on payments

---

[6] Brett Guthrie, *Don't Fall for the Lies about the GOP's Plan for Medicaid: We're Actually Strengthening It*, New York Post (June 22, 2025).

. . .) without requiring, where possible, the applicable individual to submit additional information." 42 U.S.C. §1396a(xx)(5).

In the Rule, however, CMS prohibited states from relying on Medicaid claims data older than twelve months when verifying medical frailty or other special medical needs. 42 C.F.R. § 435.557(f)(1) (directing states to verify exclusion status using, among other things, claims adjudicated in the preceding twelve months). The twelve-month limit is arbitrary and inconsistent with clinical experience that for many conditions, including a spinal cord injury, congenital intellectual disability, limb loss, or advanced neurodegenerative disease, a longer period of relevant records is appropriate. These are permanent conditions that qualify the individual for an exclusion from work requirements under the statute but may not be evident in the patient's medical records every twelve months.

Elsewhere in the Rule, CMS recognizes that for veterans with a permanent disability status, states must rely on the Department of Veterans Affairs' determination that the condition is unlikely to improve. The same principle should apply to the medical frailty exclusion. Where reliable records establish that an individual has a permanent, irreversible, or progressive condition satisfying the medical frailty exclusion, the individual should be excluded from work requirements—even if these records are more than twelve months old at the time of the eligibility assessment.

III.    **This Unlawful Rule Will Cause Eligible Patients to Lose Coverage and Create Unnecessary Administrative Burdens for Both Patients and Physicians.**

A.  The Rule Will Cause Eligible People to Lose Coverage.

The Rule's requirement that states establish that individuals are significantly impaired in their ability to work to qualify for the medical frailty exclusion sharply curtails the ability of states to use data to identify individuals exempt from work requirements. Instead, the Rule

promotes a process that relies on physicians, among others, to make individualized determinations about who can work and who cannot. As practicing physicians know well, Medicaid data generally are used to document the care that a physician has provided, record diagnoses, and facilitate payment. While these data are a useful tool for identifying who is medically frail, the data rarely convey significant information about a patient's ability to work. As such, CMS's decision to add the new requirement that individuals demonstrate an inability to work will make it impossible in nearly all cases to rely on existing data alone to determine exclusions, as Congress intended. Aside from the use of self-attestations in 2027 and once per enrollment in 2028, physicians or other clinicians will likely need to make such determinations.

As a result, the likely impact from the medical frailty provision is predictable: patients who should be excluded from the work requirements and remain eligible for Medicaid will, nevertheless, lose coverage. Experience from prior work requirement pilots in several states shows that administrative friction, rather than substantive ineligibility, causes many otherwise eligible individuals to lose coverage. Each additional document request, third-party verification requirement, or delay in obtaining records increases the risk that applicants and beneficiaries will lose coverage for procedural rather than substantive reasons.

The Rule's limitation on states' use of health care data more than twelve months old is likely to exacerbate the paperwork burden on patients and providers, especially for individuals with enduring conditions. To avoid loss of coverage, individuals are likely to need to contact their clinicians not only to prove that they are significantly impaired in their ability to work, but also to establish the basic fact that they have a condition that would allow them to qualify as medically frail due to the arbitrary limit of a 12-month period of available data.

One expert report estimates that of the 20.6 million people subject to work requirements

- 8 -

in fiscal year 2027, approximately 6.4 million will lose coverage under a "plain language" reading of the statute.[7] If the Rule is implemented as written, however, estimated coverage losses will increase by 30 percent to 8.2 million, resulting in nearly 1 in 10 Medicaid enrollees nationwide losing coverage due to the work requirements.

    B.  The Rule Will Burden Patients and Providers with Administrative Tasks, Interfering with Patient Care and Treatment.

The Rule will result in treating clinicians being tasked with making judgements about an individual's ability to satisfy Medicaid work requirements. Under the Rule, states may ask physicians to assess—without validated criteria or clear standards—whether a patient is too impaired to comply, i.e. whether that patient's medical condition "significantly impairs" their ability to meet the work requirements. Requiring clinicians to assess whether a patient's medical condition prevents them from satisfying the work requirements will require patients to schedule appointments solely to obtain Medicaid eligibility documentation, reducing appointment availability for all patients seeking medical care in an already overburdened system.

Most importantly, overreliance on physicians would come at the expense of patient care. Eligibility-related paperwork would consume limited time otherwise available for evaluating symptoms, developing treatment plans, counseling patients, and coordinating care. These administrative obligations may also create additional burdens for clinical support staff and health systems already operating under workforce and capacity constraints. The impact would be particularly significant for Medicaid patients, whose multiple and often complex medical, behavioral health, and social needs frequently must be addressed in a single visit.

Physicians also do not routinely determine whether a patient can meet work

---

[7] Manatt Health, CMS' Medicaid Work Requirements Rule: A 50-State Analysis of Additional Coverage Losses, FFY 2027-2034 (July 16, 2026), https://www.manatt.com/insights/white-papers/2026/cms-medicaid-work-requirements-rule-a-50-state-analysis-of-additional-coverage-losses-ffy-2027-2034.

requirements. Completing work assessments is a special skill for which most U.S. physicians are not trained. Although many physicians complete routine forms documenting the need to miss work or school due to an appointment, injury or illness, few are trained to make vocational capacity assessments. Other federal disability programs, such as Social Security, rely on trained medical consultants for consultative examinations to assess a patient's ability to work when medical records are not available. By contrast, the Rule allows states to require treating clinicians to make high-stakes eligibility assessments about a patient's ability to satisfy Medicaid work requirements. Without appropriate training and lacking clear guidance, physicians may inadvertently over- or under-assess an individual patient's ability to work.

### IV.    A Preliminary Injunction is Necessary to Prevent Patients and Their Physicians from Receiving Incorrect Information About Their Medicaid Coverage.

Notices that advise patients they may lose Medicaid coverage are likely to create confusion and disruption for patients, physicians, and health systems, creating unnecessary anxiety and administrative burdens even though the Rule's addition of the functional requirement to the medical frailty standard is unlawful. While states, and organizations like the AMA and MMS, have been preparing clinicians for how work requirements will be implemented, informational materials to clinicians are also in flux and without an injunction, physicians (who will be helping their patients navigate these changes) will be confused too. Only a preliminary injunction will ensure that physicians understand how patients qualify for exclusions and Medicaid notices accurately reflect the statutory requirements when sent to millions of patients nationwide beginning next month.[8]

---

[8] Although Plaintiffs do not ask the Court to extend the statutory deadlines, Congress recognized that accelerated implementation may prove infeasible by including a good faith waiver exception to the January 1, 2027 deadline, reflecting that CMS should consider the feasibility of implementation of the work requirements rather than strictly adhering to the January 1, 2027 implementation date.

**CONCLUSION**

For the foregoing reasons, the court should enter a preliminary injunction blocking

Defendants from applying and enforcing the provisions of the Rule challenged in Plaintiffs'

Motion for a Preliminary Injunction.

July __, 2026                                    Respectfully submitted,


_____
Eric M. Gold, BBO #660393
MANATT, PHELPS & PHILLIPS, LLP
1 Beacon Street, 11th Floor
Boston, MA 02108
Tel: 617-646-1400
EGold@manatt.com

*Counsel for American Medical Association and
Massachusetts Medical Society*

- 11 -