**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al.,<br>Plaintiffs,<br><br>v.<br><br>MEHMET OZ, M.D., et al.,<br><br>Defendants. | Case No. 26-12962 |

**PLAINTIFF STATES' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS


INTRODUCTION ........ 1

BACKGROUND ........ 3

I. H.R. 1's Work Requirement ........ 3

II. The IFR and the Challenged Provisions ........ 5

ARGUMENT ........ 6

I. The Court should vacate and enjoin the Significant Impairment Provision. ........ 7

A. The Significant Impairment Provision is contrary to law. ........ 7

1. The Significant Impairment Provision excludes from the medical frailty definition individuals whom Congress directed CMS to include. ........ 9

2. CMS cannot disregard statutory constraints on its definitional authority. ... 15

B. CMS's promulgation of the Significant Impairment Provision was arbitrary and capricious ........ 17

II. CMS's promulgation of the Claims Period Limitation was arbitrary and capricious and should be vacated and enjoined. ........ 24

III. CMS's promulgation of the Self-Attestation Limitation was arbitrary and capricious and should be vacated and enjoined. ........ 26

IV. Plaintiffs are entitled to the relief they seek. ........ 28

A. Plaintiffs are entitled to vacatur of the Challenged Provisions. ........ 28

B. Plaintiffs are entitled to a permanent injunction of the Challenged Provisions. 28

C. Plaintiffs are entitled to a stay of enforcement of the IFR for six months. ........ 29

CONCLUSION ........ 30

# TABLE OF AUTHORITIES

**PAGE**

**CASES**

*Am. Public Health Ass'n v. NIH*
791 F. Supp. 3d 119 (D. Mass. 2025)....18, 27

*Amerijet Int'l, Inc., v. Pistole*
753 F.3d 1343 (D.C. Cir. 2014).... 18

*Ass'n of Am. Universities v. DoD*
806 F. Supp. 3d 79 (D. Mass. 2025) .... 28

*Ass'n of American Universities v. NSF*
788 F. Supp. 3d 106 (D. Mass. 2025) ....8

*Artis v. District of Columbia*
583 U.S. 71 (2018)....9

*Barnhart v. Sigmon Coal Co., Inc.*
534 U.S. 438 (2002)....11

*Bennet v. Murphy*
166 F. Supp. 3d 128 (D. Mass. 2016) ....7

*California v. Mullin*
183 F.4th 42 (1st Cir. 2026) ....8

*City of Arlington v. FCC*
569 U.S. 290 (2013)....9

*CREW v. DOJ*
846 F.3d 1235 (D.C. Cir. 2017).... 30

*DeCambre v. Brookline Housing Auth'y*
826 F.3d 1 (1st Cir. 2016) ....8

*Dep't of Agriculture Rural Dev. Rural Hous. Serv.v. Kirtz*
601 U.S. 43 (2024).... 11

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*
591 U.S. 1 (2020)....18

*Doe v. Trump*,
157 F.4th 36 (1st Cir. 2025)....13, 29

*Doe v. R.I. Interscholastic League*
137 F.4th 34 (1st Cir. 2025)……………………………………………………..28,29

*Dorcas Int'l Inst. of Rhode Island v. CIS*
No. 26-cv-132-JJM-PAS, 2026 WL 1622708 (D.R.I. June 5, 2026) .................................8

*Dubois v. United States Dep't of Agric.*
102 F.3d 1273 (1st Cir. 1996) ........................................................................................ 25

*Encino Motorcars, LLC. v. Navarro*
579 U.S. 222 (2016)........................................................................................................ 26

*FAIC Securities v. United States*
768 F.2d 352 (D.C. Cir. 1985)........................................................................................ 11

*Firearms Regul. Accountability Coal., Inc. v. Garland*
112 F.4th 507 (8th Cir. 2024) ......................................................................................... 18

*Franklin California Tax-Free Trust v. Puerto Rico*
805 F.3d 322 (1st Cir. 2015) .......................................................................................... 13

*George v. McDonough*
596 U.S. 740 (2022)........................................................................................................ 13

*Harrington v. Chao*
280 F.3d 50 (1st Cir. 2002) ............................................................................................ 28

*Hincapie-Zapata v. Attorney General*
977 F.3d 1197 (11th Cir. 2020)…………………………………………………10, 11

*Illinois v. Fed. Emergency Mgmt. Agency*
801 F. Supp. 3d 75 (D.R.I. 2025).................................................................................... 29

*Illinois v. Fed. Emergency Mgmt. Agency*
No. cv 25-206 WES, 2025 WL 2908807 (D.R.I. Oct. 14, 2025)...................................... 30

*In re Horne*
876 F.3d 1076 (11th Cir. 2017) ...................................................................................... 10

*In re JPMorgan Chase Bank, N.A.*
799 F.3d 36 (1st Cir. 2015) ............................................................................................ 14

*INS v. Yang*
519 U.S. 26 (1996)………………………………………………………………...25, 26

*IRS v. Murphy*

892 F.3d 29 (1st Cir. 2018) ....................................................................................... 10

*Kisor v. Wilkie*
588 U.S. 558 (2019)................................................................................................ 19

*Littlefield v. Dep't of Interior*
656 F. Supp. 3d 280 (D. Mass. 2023) ...................................................................7

*Loper Bright Enter. v. Raimondo*
603 U.S. 369 (2024)................................................................................................ 15

*Massachusetts v. Sebelius*
638 F.3d 24 (1st Cir. 2011)...................................................................................... 12

*McCuin v. Sec'y of Health & Hum. Servs.*
817 F.2d 161, 174 (1st Cir. 1987)……………………………………………………..12

*Michigan v. EPA*
576 U.S. 743 (2015)…………………………………………………………...20, 25, 26

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*
463 U.S. 29 (1983)………………………………………………………………….*passim*

*Nat'l Council of Nonprofits v. McMahon*
No. 25-13242-MJJ, 2026 WL 1876366 (D. Mass. June 30, 2026) ....................................8

*Nat'l Min. Ass'n v. US Army Corps. of Eng'rs*
145 F.3d 1399 (D.C. Cir. 1998)............................................................................... 29

*Nat'l Shooting Sports Found., Inc. v. Jones*
716 F.3d 200 (D.C. Cir. 2013)................................................................................. 17

*New Jersey v. Bessent*
149 F.4th 127 (2d Cir. 2025) ....................................................................................8

*New York v. HHS*
414 F. Supp. 3d 475 (S.D.N.Y. 2019) ...................................................................... 27

*New York v. DHS.*
969 F.3d 43 (2d Cir. 2020) ....................................................................................... 29

*Nken v. Holder*
556 U.S. 418 (2009)................................................................................................. 29

*Northwest Env't Def. Ctr. v. Bonneville Power Admin.*
477 F.3d 668 (9th Cir. 2007) .................................................................................... 30

*Ohio v. EPA*
603 U.S. 279 (2024)........................................17

*Ortiz-Santiago v. Barr*
924 F.3d 956 (7th Cir. 2019)........................................15

*Paiva v. Kijakazi*
704 F. Supp. 3d 268 (D. Mass. 2023)........................................12

*Polselli v. IRS*
598 U.S. 432 (2023)........................................12

*POM Wonderful LLC v. Coca-Cola Co.*
573 U.S. 102 (2014)........................................8

*Project Vote/Voting for America, Inc. v. Long*
682 F.3d 331 (4th Cir. 2012)........................................9

*Public Int. Legal Found. v. Bellows*
92 F.4th 36 (1st Cir. 2024)........................................10

*President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*
798 F. Supp. 3d 77 (D. Mass. 2025)........................................20

*Rhode Island v. Trump*
155 F.4th 35 (1st Cir. 2025)........................................29

*Ryan v. ICE*
974 F.3d 9 (1st Cir. 2020)........................................8

*Safer Chems., Healthy Families v. EPA*
943 F.3d 397 (9th Cir. 2019)........................................15, 16

*SEC v. Sanchez-Diaz*
88 F.4th 81 (1st Cir. 2023)........................................30

*Slessinger v. Sec'y of HHS*
835 F.2d 937 (1st Cir. 1987)........................................12

*Succar v. Ashcroft*
394 F.3d 8 (1st Cir. 2005)........................................13, 14

*Taylor v. Am. Chemistry Council*
576 F.3d 16 (1st Cir. 2009)........................................6, 7

*United Dominion Industries v. United States*
523 U.S. 822 (2001)........................................................................................... 11

*United States v. Cline*
986 F.3d 873 (5th Cir. 2021)................................................................................ 11

*Washington v. FEMA*
818 F. Supp. 3d 195 (D. Mass. 2025) ....................................................................8

*Washington v. HUD*
No. 25-cv-626-MSM-AEM, 2026 WL 1863886 (D.R.I. June 29, 2026)
........................................................................................................................ 20
, 23

*Whitman v. American Trucking Associations*
531 U.S. 457 (2001)........................................................................................... 15

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agriculture*
No. 25-1428, 2026 WL 2279789, at *19 (1st Cir. Aug. 7, 2026)…….…………………28

**FEDERAL STATUTES**

5 U.S.C.

§ 705............................................................................................................. 30
§ 706………………………………………………………………………..*passim*

42 U.S.C.
§ 440.315(f)……………………………………………………………….4, 5
§ 1382c(a)(3)……………………………………………………………..9, 12
§ 1396...............................................................................................................3
§ 1396a(a)(10)...................................................................................................3
§ 1396a(a)(19)................................................................................................. 20
§ 1396a(xx)(1)……………………………………………………………….4
§ 1396a(xx)(2) ...................................................................................................3
§ 1396a(xx)(3) ...............................................................................................3
§ 1396a(xx)(5)…………………………………………………………23, 25
§ 1396a(xx)(9) ...........................................................................................*passim*
§ 1396a(xx)(11).............................................................................................. 29
§ 18114………………………………………………………………….18, 19

One Big Beautiful Bill Act, Pub. L. No. 119–21, 139 Stat. 172 (2025) ...............................*passim*

**REGULATORY MATERIALS**

Community Engagement Requirement for Certain Individuals, 91 Fed. Reg. 33348 (June 3, 2026) ....23, 28

42 C.F.R.
§ 435.554(c)(5).... 9, 16
§ 435.557....23, 24, 25
§ 435.558(a)....23
§ 435.916(a)(2), (b)....23
§440.315(f)....4, 5

**OTHER AUTHORITIES**

H.R. Rep. No. 119-106 (2025).... 14

Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts*....10

Black's Law Dictionary (12th ed. 2024)....10

Merriam-Webster Dictionary (2026) ....10

## INTRODUCTION

In 2025, Congress enacted for the first time in Medicaid's 60-year history a new nationwide requirement for certain adult Medicaid enrollees, mandating that they engage in work or other kinds of community engagement to maintain eligibility for healthcare coverage. But Congress placed important limits on the work requirement. Recognizing that a loss of health insurance could have dire consequences for those with significant health care needs, Congress explicitly excluded from the work requirement anyone who was "medically frail" or had a "serious medical condition." And it defined that term to include, at a minimum, five groups of medically vulnerable individuals.

Three months ago, however, the Center for Medicare and Medicaid Services ("CMS") issued an implementing regulation (the "IFR") that partially abrogated the "medically frail" exemption enacted by Congress. In what appears to have been a last-minute regulatory decision, CMS directly contravened the statute's direction that the "medically frail" exclusion extend to individuals falling within one of the five enumerated categories. Instead, the IFR denies the exclusion to anyone falling within these statutory categories unless they can also show that their medical condition "significantly impairs" their ability to work—an extra-statutory requirement that CMS conjured out of thin air.

Not only is this significant impairment provision at odds with the statute, it has wreaked havoc on the States' ability to implement the new work requirement. For months, CMS had provided the States with implementation guidance suggesting that its forthcoming definition of "medically frail" would capture the five categories set forth in the statute—no more and no less. In reversing course and imposing the significant-impairment requirement, CMS has saddled the States with the exceptionally complex and difficult task of somehow determining the extent to which a Medicaid member's health condition impairs their individual ability to work. Worse, the IFR compounded this administrative problem in two ways: by limiting States' ability to consider

claims data that could be relevant to assessing medical frailty and by restricting the use of self-attestation as a means of verifying exclusion from the work requirement.

These three provisions of CMS's implementing regulations are unlawful under the Administrative Procedure Act (APA). First and foremost, the significant impairment provision is contrary to law. Whatever its policy preferences, an executive agency does not have the authority to supplant the will of Congress. Yet CMS has upended Congress' judgment by subjecting untold numbers of medically vulnerable individuals to the very work requirements Congress excluded them from. Second, all three provisions are arbitrary and capricious. While this Court may not substitute its policy judgment for an agency's, the APA requires the Court to ensure that CMS's regulatory decisions are reasonably explained and that the agency has at least considered important policy considerations derived from the statute. Here, CMS has failed these basic requirements for agency rulemaking. It has not offered a cogent affirmative reason to have adopted any of the challenged provisions. And it failed to consider, much less weigh, several ways in which the provisions undermine the statutory purpose and operation of the Medicaid program—including by denying healthcare coverage to potentially millions of medically vulnerable Medicaid members and by imposing unworkable administrative burdens on State agencies.

To be clear, Plaintiffs do not challenge Congress's decision to impose work requirements on non-medically frail individuals. Whatever the wisdom of that policy decision, it was Congress's to make, and Plaintiffs are working diligently to implement it. Instead, Plaintiffs challenge CMS's decision to impose work requirements on people Congress chose to exempt. Further, Plaintiffs do not seek to block the entirety of the IFR. Rather, as the attached Proposed Order shows, Plaintiffs ask that the Court narrowly vacate and enjoin the three offending provisions, and otherwise protect

States from being penalized for delays caused by the IFR. This will enable both CMS and the States to move forward with implementing the statutory work requirement as Congress intended.

## BACKGROUND

Established in 1965, Medicaid is a federally-created, state-administered public health insurance program for vulnerable populations. It furnishes medical assistance to individuals of limited means, helping them "attain or retain capability for independence or self-care." 42 U.S.C. § 1396; *see also* Statement of Material Facts ("SMF") ¶3. In 2010, the Affordable Care Act enabled States to expand Medicaid eligibility to low-income individuals aged 19 to 64 (the "Expansion Population"). 42 U.S.C. §1396a(a)(10)(A)(i)(VIII); *see also* SMF ¶¶2, 13. Each of the Plaintiff States has expanded Medicaid to include all or some of the Expansion Population. SMF ¶14.

### I. H.R. 1's Work Requirement

For the first sixty years of the Medicaid program, eligibility—and with it, access to medical care for low-income, disabled, and other vulnerable populations—did not depend on whether an individual was engaged in any particular activity. That changed on July 4, 2025, when H.R. 1 was enacted into law. SMF ¶¶20, 21. It directed all States to impose new requirements for work or community engagement for "applicable individuals" who are members of the Expansion Population. One Big Beautiful Bill Act, Pub. L. No. 119–21, tit. VII, §71119, 139 Stat. 72, 306-315 (2025) (codified at 42 U.S.C. §1396a(xx)) (the "Work Requirement"); *see* SMF ¶21. The statute identifies seven ways in which an "applicable individual" can comply with the monthly Work Requirement, including by working or performing community service for at least 80 hours, being enrolled in an education program at least half-time, or earning equivalent monthly or seasonal minimum wages. 42 U.S.C. §1396a(xx)(2)(A)–(G).

Congress placed important limitations on the Work Requirement. Among these, H.R. 1 identified nine groups of "specified excluded individual[s]" as exempt from the Work

Requirement. *Id.* at §1396a(xx)(9)(A)(ii). One of the groups Congress excluded was individuals "who [are] medically frail or otherwise ha[ve] special medical needs"—which, the statute directs, must "includ[e] an individual" who is: (i) "blind or disabled," (ii) has a "substance use disorder," (iii) has a "disabling mental disorder," (iv) has a "physical, intellectual or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living"; or (v) has a "serious or complex medical condition." *Id.* at §1396a(xx)(9)(A)(ii)(V); SMF ¶22. While the statute includes an "impairment" requirement for certain of these groups, it does not include a general "impairment" requirement applicable to all of the groups.

H.R. 1 set key deadlines for implementation of these new provisions. First, it gave States 18 months to implement the new Work Requirement, *i.e.*, by January 1, 2027. *Id.* §1396a(xx)(1). Second, Congress directed the HHS Secretary to promulgate an interim final rule, "for purposes of implementing" the Work Requirement, no later than June 1, 2026. Pub. L. No. 119–21, tit. VII, §71119(d), 139 Stat. 72, 314 (2025) (note); SMF ¶29.

Recognizing the breadth of the changes necessary to implement the Work Requirement, and the States' need to begin planning for them well before June 1, 2026, CMS began providing subregulatory guidance to the States in November 2025. SMF ¶30. This guidance included a slide deck first presented to the States on November 19, 2025 (and later shared by email on December 4, 2025), SMF ¶¶31-33, 35-42, a bulletin released on December 8, 2025, SMF ¶¶43-47, and verbal guidance during a series of workgroup calls beginning in December 2025, SMF ¶¶48-49. CMS's guidance informed the States that, for the medically frail exclusion, it intended to "use a definition . . . similar to that described in regulations at 42 C.F.R. §440.315(f)"—a longstanding Medicaid regulation that likewise exempts "medically frail" individuals from certain program requirements. SMF ¶¶33-34. That regulation defines "medically frail" as generally including the five categories

of individuals whom H.R. 1 directed CMS to exclude from the Work Requirement as "medically frail," without any further condition or qualification—in particular, without any requirement that the individual be unable to perform work or other activities. *Compare* 42 C.F.R. §440.315(f) *with* 42 U.S.C. §1396a(xx)(9)(A)(ii)(V). CMS also informed the States that it expected to allow them to verify whether an individual qualified for the medical frailty exclusion through "medical claims data review or provider documentation, or completion of a screening tool," absent any indication that claims data review would be temporally limited. SMF ¶36. CMS also indicated that self-attestation would be a permissible means of verifying exclusions and unlike attestations used for compliance, did not indicate exclusion attestations would be limited in 2028. SMF ¶40. The States relied on CMS's guidance to plan operational, system, and process changes. SMF ¶¶67-68. In light of the magnitude of H.R. 1's changes, State Medicaid agencies necessarily started making substantial investments in systems upgrades well before June 1. SMF ¶¶67-83.

## II. THE IFR AND THE CHALLENGED PROVISIONS

On June 1, 2026, CMS released the IFR, which departed significantly from both the language of H.R. 1 and CMS's prior guidance. SMF ¶¶181, 185. The IFR includes certain unanticipated provisions that impermissibly narrow the medically-frail exclusion that Congress enacted and impose burdensome restrictions that undermine States' ability to verify exclusion from the Work Requirement. *See* SMF ¶¶185-93.

First, the IFR narrows the statutory exclusion of those "who [are] medically frail or otherwise ha[ve] special medical needs" to cover only those individuals whose "physical, mental, or other behavioral health condition significantly impairs [their] ability to comply with the [Work Requirement]" ("Significant Impairment Provision"), SMF ¶¶186-87—a broad impairment requirement not in the statute.6 Moreover, the IFR preamble states that in no case can States base their medical frailty determinations solely on records showing that an individual has a "particular

diagnosis or condition," SMF ¶213; *see* SMF ¶215. Second, the IFR limits States' use of medical records to verify an individual's exclusion from the Work Requirement to only records from the preceding 12 months ("Claims Period Limitation"). *See* SMF ¶¶188-90. Third, when Medicaid agencies cannot otherwise determine an individual's status as medically frail, CMS limits individuals to one self-attestation concerning medical frailty per period of enrollment beginning in 2028—meaning States will need to expend additional resources to conduct member outreach and somehow obtain and review independent evidence of an individual's status as medically frail. *See* SMF ¶¶191-94. Together, these are the "Challenged Provisions."[1]

The Challenged Provisions will impose massive administrative burdens and costs on Plaintiff States. They will make the process of determining each individual's compliance with or exclusion from the Work Requirement extraordinarily difficult—for example, by requiring States to make individualized "impairment" assessments. SMF ¶¶10-11, 93, 104, 126-27, 172, 233-45, 256, 262-63. Moreover, Plaintiff States must make substantial changes to the implementation plans they developed over the past year, expending new funds and resources to develop new eligibility verification systems and communicate to members how to navigate this system. SMF ¶¶228, 230-31, 237-40. And, because the Challenged Provisions will cause significant disenrollment, they will impose new burdens on Plaintiff States' uncompensated care funds, publicly-run hospitals, and other programs for the uninsured. SMF ¶¶250-59, 261-63; *see* SMF ¶107.

**ARGUMENT**

Summary judgment is appropriate when there is no genuine dispute of material fact. Fed. R. Civ. P. 56(a). "A genuine issue of fact exists where the evidence is such that a reasonable

---

[1] Counts I and II of Plaintiffs' Complaint also challenged CMS's rules regarding short-term hardship exceptions, see Complaint ¶¶ 213, 220(e), but Plaintiffs have elected to narrow their claims under Counts I and II to the Challenged Provisions addressed in this motion.

[factfinder] could return a verdict for the nonmoving party." *Taylor v. Am. Chemistry Council*, 576 F.3d 16, 24 (1st Cir. 2009). The non-moving party must "present affirmative evidence" to support any alleged dispute of fact. *Bennett v. Murphy*, 166 F. Supp. 3d 128, 143 (D. Mass. 2016).

For APA claims, "the traditional Rule 56 standard does not apply; rather, a motion for summary judgment is simply a vehicle to tee up a case for judicial review." *Littlefield v. Dep't of Interior*, 656 F. Supp. 3d 280, 290 (D. Mass. 2023). Under the APA, a court must set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).[2]

## I. THE COURT SHOULD VACATE AND ENJOIN THE SIGNIFICANT IMPAIRMENT PROVISION.

The Court should vacate and enjoin the IFR's Significant Impairment Provision for two independent reasons. First, it is contrary to law: Congress directed CMS to exclude as "medically frail" five medically vulnerable groups. The IFR runs afoul of this statutory directive by denying the medically-frail exclusion to members of these groups. Second, the Significant Impairment Provision is arbitrary and capricious: CMS did not reasonably explain why it adopted this provision; failed to consider its harmful effects on the health and well-being of Medicaid members; and failed to consider the immense operational burdens it imposed on States.

### A. The Significant Impairment Provision is contrary to law.

Under the APA, this Court can, and should, "hold unlawful and set aside" the Significant Impairment Provision because it is "in excess of statutory jurisdiction, authority, or limitations" and "not in accordance with the law." 5 U.S.C. § 706(2)(A), (C). Agencies violate the APA when they re-define rights conferred by statute or promulgate regulations that are inconsistent with

[2] At this time, Plaintiffs seek judgment only as to Counts I and II of their Complaint. Plaintiffs reserve the right to pursue Count III.

statutory directives. 5 U.S.C. § 706(2)(C); *see New Jersey v. Bessent*, 149 F.4th 127, 144 (2d Cir. 2025) ("An administrative agency does not have authority to pass regulations that are inconsistent with the meaning of a statute."); *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 120 (2014) (holding that agencies generally may not "reorder federal statutory rights without congressional authorization."). After all, "[s]tatutory rights and obligations are established by Congress," not agencies. *DeCambre v. Brookline Hous. Auth'y*, 826 F.3d 1, 9 (1st Cir. 2016). Consistent with this bedrock principle of administrative law, courts routinely exercise their authority to vacate agency regulations, or sub-sections thereof, that contravene statutory directives. *See, e.g.*, *California v. Mullin*, 183 F.4th 42, 48–49 (1st Cir. 2026) (upholding the district court's vacatur of an administrative action because a successful "excess-of-statutory-authority APA claim" under § 706(2)(C) "in and of itself fully supports" vacatur of the unlawful rule); *Ryan v. ICE*, 974 F.3d 9, 19 (1st Cir. 2020) ("When an agency acts in a manner not authorized by statute, its action is ultra vires and a violation of the APA.").[3]

The Significant Impairment Provision is contrary to statute because it excludes from the definition of medical frailty many individuals whom Congress expressly directed CMS to include. The plain text of the statute, judicial precedent, and legislative history all confirm this. And while Congress gave CMS authority to define the term "medically frail," it placed a clear limit on that authority: CMS must include individuals belonging to certain medically vulnerable groups. As the Supreme Court has made clear, this Court must police the statutory boundaries of CMS's delegated authority to ensure that they have stayed within it. Because the Significant Impairment Provision

[3] *See also Nat'l Council of Nonprofits v. McMahon*, No. 25-13242-MJJ, 2026 WL 1876366, at *33 (D. Mass. June 30, 2026) ("[T]he Final Rule is contrary to law[,]… [and is thus] VACATED."); *Washington v. FEMA*, 818 F. Supp. 3d 195, 204–05 (D. Mass. 2025) (vacating agency actions which contradicted FEMA's statutory obligations); *Ass'n of Am. Univs. v. NSF*, 788 F. Supp. 3d 106, 144 (D. Mass. 2025) ("The [administrative rules] are vacated and declared … contrary to law."); *Dorcas Int'l Inst. of R.I. v. CIS*, No. 26-cv-132-JJM-PAS 2026 WL 1622708 *54 (D.R.I. June 5, 2026) ("Because each of the Challenged Policies … are "contrary to law" … the Court VACATES the Challenged Policies.").

goes beyond those boundaries, the Court must vacate and enjoin it.

1. The Significant Impairment Provision excludes from the medical frailty definition individuals whom Congress directed CMS to include.

"Where Congress has established a clear line, the agency cannot go beyond it." *City of Arlington v. FCC*, 569 U.S. 290, 307 (2013). Here, Congress established a "clear line" by categorically excluding from the Work Requirement individuals:

> who [are] medically frail or otherwise ha[ve] special medical needs (as defined by the Secretary), ***including*** an individual—(aa) who is blind or disabled (as defined in section 1382c of this title); (bb) with a substance use disorder; (cc) with a disabling mental disorder; (dd) with a physical, intellectual or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living; or (ee) with a serious or complex medical condition.

42 U.S.C. §1396a(xx)(9)(A)(ii)(V) (emphasis added).

By specifying that these five particular categories of individuals are *per se* exempt from the Work Requirement, Congress "set[] a floor" for the definition of "medically frail." *Project Vote/Voting for America, Inc. v. Long*, 682 F.3d 331, 337 (4th Cir. 2012). But CMS' definition of medically frail falls below this floor: it covers individuals who fall within the statutory categories only *if* their condition "significantly impairs [their] ability to comply with the" Work Requirement. 42 C.F.R. 435.554(c)(5)(i). That additional criterion leaves out a significant subset of the enumerated groups Congress directed CMS to "includ[e]": not just those who are not significantly impaired but also those who cannot jump through the bureaucratic hoops to prove their condition significantly impairs their ability to work.

This is the only way logical way to interpret Congress's use of the word "including"—as the plain text of the statute, judicial precedent, and multiple canons of interpretation all confirm. When "determining the meaning of a statutory provision," courts "look first to its language, giving the words used their ordinary meaning." *Artis v. District of Columbia*, 583 U.S. 71, 83 (2018). As

one appellate court put it, "include" means the "whole" "contain[s] [the listed examples] as a part or member." *Hincapie-Zapata v. Attorney General*, 977 F.3d 1197, 1201-02 (11th Cir. 2020) (quoting Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts* § 15, at 132 n.1 (2012)); *see also Public Int. Legal Found. v. Bellows*, 92 F.4th 36, 48 (1st Cir. 2024) (holding that "includes" is "a term of enlargement, and not of limitation"); *Include*, BLACK'S LAW DICTIONARY (12th ed. 2024) (participle "*including*" generally "indicates a partial list," though "some drafters use phrases such as *including without limitation and including but not limited to*—which mean the same thing") (emphasis in original); *Include/Including*, MERRIAM-WEBSTER DICTIONARY (2026), https://www.merriam-webster.com/dictionary/including ("[T]o take in or comprise as a part of a whole or group"). Thus, the five categories after "including" establish, at a minimum, individuals who must be "contain[ed]" within the definition of medically frail. The Secretary is free to expand the list but may not shut out individuals Congress decided to include.

A word's plain meaning can also be confirmed by its "ordinary usage." *IRS v. Murphy*, 892 F.3d 29, 35 (1st Cir. 2018). If your spouse says "get whatever we need from the grocery store, including milk and eggs," you would presume they have directed you to get milk and eggs, along with anything else that is needed. That you may have discretion to determine whatever else you need does not mean you can forget the milk and eggs.

Case law confirms what everyday usage suggests: when a general term is followed by a list introduced by the word "including," the items on that list are necessarily encompassed by the general term. *See In re Horne*, 876 F.3d 1076, 1080–81 (11th Cir. 2017) (holding that "costs and attorney's fees" counted as "actual damages" under the statute, where Congress used the phrase "including costs and attorney's fees" to elucidate the meaning of "actual damages" because "the word 'including' serv[es] as a word of enlargement"); *Hincapie-Zapata*, 977 F.3d at 1201–02

(where statute defines "material support" to terrorists as "*including* … [the] transfer of funds or other material financial benefit," "the 'including' clause … lists examples that do qualify" as "material support."); *United States v. Cline*, 986 F.3d 873, 876 (5th Cir. 2021) (where statute defines a protection order in part as "any injunction, restraining order, *or any other order … including any temporary or final order* issued by a civil or criminal court," use of "including" indicates "an illustrative application of the general principle," so all orders listed after "including" fell "within the definition of [a] protection order").

Canons of statutory construction substantiate what the plain text and precedent make clear. Consider the rule against superfluities, which directs courts to presume that Congress does not employ statutory terms which are "superfluous or void of significance." *Dep't of Agriculture Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 53 (2024). Any interpretation that gives CMS free reign to decide whether, and to what extent, the medically-frail definition should leave out members of the groups the statute expressly included would render all of the words in the statute beginning with "including" a nullity. Indeed, to find that the "authority to define terms" amounts to the "power to *redefine* those terms that the statute itself defines" would constitute a "repeal" of the "originally mandated definition." *FAIC Sec., Inc. v. United States*, 768 F.2d 352, 362 (D.C. Cir. 1985) (emphasis in original). The inclusion of each sub-category in the statute, no less than the language preceding them, represents the will of Congress and constrains CMS's definitional authority.

CMS's imposition of a separate impairment-based limitation also runs afoul of the canon of *exclusio unius*, which states that "the mention of some implies the exclusion of others not mentioned." *United Dominion Indus, Inc. v. United States*, 523 U.S. 822, 836 (2001) (internal citation omitted). This canon has particular significance when "Congress includes particular

language in one section of a statute but omits it in another[.]" *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 452 (2002) (cleaned up). Here, Congress defined one exclusion as including those whose disability "significantly impairs their ability to perform 1 or more activities of daily living." 42 U.S.C. §1396a(xx)(9)(A)(ii)(V)(dd). And, in subsection (aa), Congress specifically referenced the definitions of "blind" and "disabled" at 42 U.S.C. § 1382c, which includes a similar requirement that a disabled individual be found "unable to engage in any substantial gainful activity." 42 U.S.C. § 1382c(a)(3)(A). So "[h]ad Congress wanted to include" a functional impairment requirement over the entire section, "it certainly knew how to do so." *Polselli v. IRS*, 598 U.S. 432, 439 (2023). That is strong evidence that Congress did not intend the medical frailty definition to be qualified with a generalized "impairment" requirement. Moreover, the Supreme Court has found this presumption—that use of a particular statutory phrase in one part of a statute implies its exclusion otherwise—to be especially strong where, as here, "the provision in question" is "in the adjacent section, having been enacted in the same Public Law." *Id.*

Substantive canons point in the same direction. The Medicaid program is enshrined in "Title XIX of the Social Security Act." *Massachusetts v. Sebelius*, 638 F.3d 24, 25 (1st Cir. 2011). And the First Circuit has long held that the Social Security Act "should be broadly construed and liberally applied in favor of beneficiaries." *Paiva v. Kijakazi*, 704 F. Supp. 3d 268, 276 (D. Mass. 2023) (cleaned up) (quoting *McCuin v. Sec'y of Health & Hum. Servs.*, 817 F.2d 161, 174 (1st Cir. 1987)); *see also Slessinger v. Sec'y of HHS*, 835 F.2d 937, 943 (1st Cir. 1987) ("The principle of liberal construction governs interpretations of the Social Security Act."). As this Court has held, the intent of the Act is "inclusion rather than exclusion of coverage" and courts should "resolv[e] doubts in favor of coverage." *Paiva*, 704 F. Supp. 3d at 276.

A construction which reads the five enumerated subcategories as a definitional minimum is also "confirmed by both statutory [] and legislative history." *Franklin Cal. Tax-Free Trust v. Puerto Rico*, 805 F.3d 322, 338 (1st Cir. 2015). Begin with the history of the statutory language. In 2006, Congress gave States the ability to require their Medicaid beneficiaries to enroll in "Alternative Benefit Plans" (ABPs). 42 U.S.C. § 1396u-7(a)(2)(B)(vi). But Congress did not permit mandatory enrollment for those who were "medically frail or otherwise [have] special medical needs." *Id.* CMS promulgated regulations defining this term as encompassing five categories of medically vulnerable individuals. SMF ¶34. Importantly, CMS defined these groups as *per se* medically frail—without any separate significant impairment requirement or other qualification. SMF ¶34. Then, when drafting the "medically frail" provision of H.R. 1, Congress lifted the same five categories from the ABP regulations and imported them into the statutory text of the "medically frail" definition with only minor changes. SMF ¶35. This history is instructive because when "Congress employs a term of art obviously transplanted from another legal source, it brings the old soil with it," meaning that courts should presume that incorporation of a regulatory definition into a statute gives that regulatory phrase, and its longstanding interpretations, the force of statutory law. *Doe v. Trump*, 157 F.4th 36, 59 (1st Cir. 2025) (cleaned up). This presumption applies with particular force where, as here, the term "had a long regulatory history in this very context." *George v. McDonough*, 596 U.S. 740, 746 (2022). Congress' decision to import into H.R. 1 the same set of sub-categories set forth in the ABP regulations—which do not include any "significant impairment" limitation—therefore underscores its intent to deem those groups "medically frail" without qualification, just as the ABP regulations did.

And the legislative history indicates that lawmakers understood H.R. 1's medical frailty exclusion to offer broad protection for those in the enumerated sub-categories. *See Succar v.*

*Ashcroft*, 394 F.3d 8, 31 (1st Cir. 2005) (noting that consulting legislative history is appropriate where it "confirm[s] whether the plain text reading is correct"). The House committee report states categorically that medically frail "includes, but is not limited to" the five enumerated sub-categories, confirming that the "including" clause set a definitional floor. H.R. Rep. No. 119-106, at 816. Advocates for the legislation repeatedly assured the public that those with serious illness and other qualifying conditions would be excluded, as Representative Brett Guthrie confirmed that individuals were exempt if they were "medically frail"—which he stated, without qualification, "includes anyone who's blind, disabled, battling a chronic substance-use disorder or living with a serious and complex medical condition like cancer." SMF ¶25; *see also* SMF ¶¶24, 26-28 (Senators noting that medically frail individuals will keep their Medicaid coverage).[4]

Finally, it is no answer for CMS to argue that the Significant Impairment Provision is consistent with the underlying purpose of H.R. 1. As an initial matter, any such argument fails as a matter of law. As the First Circuit has held, when "Congress has spoken with specificity," CMS "may not promulgate regulations that are an attempted addition" to statutory conditions, even when "the attempted addition is consistent with the underlying intent behind the authorizing statute." *In re JPMorgan Chase Bank, N.A.*, 799 F.3d 36, 42 (1st Cir. 2015). Defendants have not identified any basis to conclude that Congress intended the medical frailty exclusion to apply only to individuals who are unable to comply with the Work Requirement. To the contrary, H.R. 1's exclusions demonstrate that Congress intended to balance its desire to incentivize work with concern about continuous access to healthcare for those with higher needs for healthcare services. For example, the statute also exempts from the Work Requirement all pregnant individuals, who

[4] Senator Grassley, defending the legislation on the Senate floor, also defined medically frail as including the five sub-categories, and similarly did not mention any requirement of significant impairment in order to qualify as medically frail. *See* 171 Cong. Rec. S3497 (daily ed. June 24, 2025) (statement of Sen. Chuck Grassley).

could suffer serious consequences if their care were interrupted for any reason, even though pregnancy generally does not interfere with ability to work. The same is true of the medically vulnerable sub-categories (including someone who is blind) whom Congress directed CMS to include in its medical frailty definition regardless of ability to work.

2. CMS cannot disregard statutory constraints on its definitional authority.

Though H.R. 1 gives CMS some authority to define who qualifies as medically frail, it sets an important boundary on that authority: the agency must include in its definition individuals falling within five specified groups. As the Supreme Court made clear in *Loper Bright Enterprises v. Raimondo*, even where Congress has delegated statutory authority, courts must "independently identify" and "police the outer statutory boundaries" of that delegated authority, ensuring that the agency "exercise[s] their discretion" within the statute's text. 603 U.S. 369, 404 (2024); *see also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 485 (2001) (agencies "may not construe [a] statute in a way that completely nullifies textually applicable provisions meant to limit discretion."); *Ortiz-Santiago v. Barr*, 924 F.3d 956, 961 (7th Cir. 2019) ("If Congress has defined a term, then an implementing regulation cannot re-define that term in a conflicting way.").

Again, judicial precedent confirms that, even when an agency has definitional authority, "that discretion may only be exercised within the bounds of the statutory definition itself." *Safer Chemicals, Healthy Fams. v. EPA*, 943 F.3d 397, 425 (9th Cir. 2019). In *Safer Chemicals*, the Ninth Circuit assessed the meaning of the statutory term "conditions of use" within the Toxic Substances Control Act. *Id*. The statute defined the term to mean "the circumstances, as determined by the [EPA] Administrator, under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." *Id.* at 406–07. The EPA maintained that its definitional authority, included in that provision, allowed it to define "conditions of use" to exclude from consideration any chemicals no longer being actively

manufactured. The Ninth Circuit disagreed, holding that the inclusion of terms after a general term meant that the "definition" of the statutory term was "clear" such that agency lacked the discretion to depart from the "clear[] inclu[sion]" of those examples within the general phrase, even when granted definitional authority. *Id.* at 425.

CMS may argue, as it did at the preliminary injunction stage, that its definitional authority permits it to define not just "medically frail," but also the meaning of the statutory sub-categories—for example, what it means to have a "substance use disorder" or "serious or complex" medical condition. But even assuming that is true, it is irrelevant: the Significant Impairment Provision that Plaintiffs challenge is not part of CMS's definition of the statutory sub-categories. Rather, the IFR defines medically frail individuals as those who fall within the enumerated sub-categories *and* whose condition significantly impairs their ability to comply with the Work Requirement:

> An individual who is medically frail or otherwise has special medical needs is defined as an individual [1] whose … health condition significantly impairs the individual's ability to comply with the community engagement requirement … *and* [2] is an individual [who meets one of the five sub-categories].

42 C.F.R. § 435.554(c)(5)(i) (emphasis added). In other words, under the IFR, medical frailty has two separate and independent preconditions: (1) a condition which causes significant impairment, and (2) membership in one of the statutory sub-categories, as defined by CMS. Plaintiffs challenge only the former precondition—the Significant Impairment Provision—not CMS's definitions of the individual sub-categories.[5]

* * *

Congress granted those in the five statutory sub-categories an exclusion from the Work

[5] As to the individual sub-categories, the IFR did not use the exact language of the statute and instead provided more particularized definitions. For example, it elaborated on what it means to have a "substance use disorder." *Compare* 42 C.F.R. § 435.554(c)(5)(i)(B) *with* 42 U.S.C. §1396a(xx)(9)(A)(ii)(V)(bb). But it did not add a "significant impairment" element to any sub-category definition.

Requirement. CMS disagrees with that policy and is now attempting to use its delegated authority to overcome clear statutory text. But fundamental principles of administrative law prevent CMS from overriding the will of Congress. The Court must ensure the statute is enforced as written.

**B. CMS's promulgation of the Significant Impairment Provision was arbitrary and capricious.**

Even if CMS had statutory authority to promulgate the Significant Impairment Provision, it should still be vacated and enjoined because it separately violates the APA's bar on "arbitrary or capricious" agency actions. 5 U.S.C. §706(2)(A). An agency action is arbitrary or capricious "if it is not reasonable and reasonably explained.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024). "In reviewing an agency's action under that standard," courts ask whether the agency "has offered 'a satisfactory explanation for its action, including a rational connection between the facts found and the choice made.'" *Id.* Among other things, agency action is arbitrary and capricious if the agency "has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, … or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), or failed to "consider and explain its rejection of… significant and viable and obvious alternatives," *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013).

Whatever discretion Congress affords an agency in implementing a statute, the APA requires that the agency exercise that discretion in a reasonable way—and requires courts to ensure that they do. So, while Congress directed CMS to issue a rule implementing the Work Requirement, CMS was required to take a reasoned approach to implementation: providing reasoned explanations for its regulatory choices and considering the impacts of those choices on

the statutory goals of the Medicaid program—including ensuring healthcare coverage for eligible individuals and administrative simplicity.

The Significant Impairment Provision falls short of these requirements. First and most fundamentally, CMS failed to "reasonably explain" why it promulgated the Provision.[6] Its lone explanation is that "[r]eading the statute to require automatic classification as medically frail or otherwise having special medical needs based solely on diagnosis or condition would risk sweeping in individuals whose conditions do not significantly impair their functional capacity." SMF ¶215. This circular statement is a tautology—essentially saying that reading the statue without CMS's requirement risks sweeping in individuals who do not meet CMS's requirement. This is neither reasonable nor reasonably explained. *Am. Pub. Health Ass'n v. NIH*, 791 F. Supp. 3d 119, 131, 180, 183 (finding circular definition of DEI arbitrary and capricious and noting that "conclusory statements will not do"); *Firearms Regul. Accountability Coal., Inc. v. Garland*, 112 F.4th 507, 523 (8th Cir. 2024) (rejecting as arbitrary and capricious an agency standard that relies on circular reasoning); *Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (finding agency action arbitrary and capricious where agency provided "not a statement of reasoning, but of conclusion"). Without an articulated need for this provision, its promulgation was plainly arbitrary and capricious.

Second, CMS "failed to consider an important aspect of the problem": the impact of the Significant Impairment Provision on the ability of medically vulnerable Medicaid members to obtain necessary treatment for their complex medical conditions. *State Farm*, 463 U.S. at 43. This consideration is especially important because Congress has barred CMS from promulgating

[6] Notwithstanding the length of the administrative record, over 4,800 pages, the mere existence of supporting evidence in the record is insufficient to uphold an agency action. *See, e.g., Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 591 U.S. 1, 20 (2020) ("It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'")

regulations that create "unreasonable barriers" to access to medical care. 42 U.S.C. § 18114(1). And here, CMS knew well that additional administrative hurdles would cause individuals to lose coverage: the administrative record is replete with evidence that tying the definition of medically frail to ability to work would prevent medically vulnerable people, including those with cancer and HIV, from being excluded from the Work Requirement and lead to disenrollment and gaps in coverage with potentially fatal consequences. SMF ¶¶113-16, 150-51 172, 174-77.[7] To be sure, the IFR's Regulatory Impact Analysis concedes that many Medicaid members who are eligible for Medicaid will lose their health insurance due to administrative complexities associated with the statutory work requirements generally. SMF ¶223. Yet the IFR fails to provide any analysis of the *additional* procedural disenrollments that will result from the Challenged Provisions in particular—despite clear evidence that they would increase disenrollments by imposing additional administrative burdens on Medicaid members.[8]

The administrative record is replete with evidence regarding the additional loss of health insurance that would result from the Work Requirement generally, and the Challenged Provisions specifically. SMF ¶¶93, 104, 124 (self-attestation ensures eligible individuals do not lose coverage), 126, 129-32 (using a 12 month claims look back period as opposed to a 24 month look

[7] In addition, CMS ignored evidence from states that previously rolled out Medicaid work requirements, like Georgia and Arkansas, which showed loss of coverage, including for individuals who were working or had serious medical conditions and should have been eligible for exemptions, with *no* increase in employment. SMF ¶¶92-97, 103-04. CMS concluded in the IFR preamble that "[the] early implementation experience [in Arkansas and Georgia] provides insight into operational considerations," SMF ¶221, but later dismissed the early experiences in the Regulatory Impact Analysis as "involv[ing] different implementation patterns" that are not "directly applicable," stating "[w]e have not relied on these previous demonstrations for data or assumptions used in this analysis." SMF ¶222.

[8] One estimate projects disenrollments resulting from the Work Requirement—after accounting for the effects of the IFR—at 8.2 million by 2034. SMF ¶251. That is approximately 3 million more than reliable estimates of the number of disenrollments resulting from the statute alone, and nearly 5 million more than CMS's estimated disenrollment. SMF ¶¶224, 248. This underscores CMS's glaring failure to analyze the number of people who would lose coverage as a result of the IFR's Challenged Provisions. At the July hearing, counsel for Defendants claimed that CMS "firmly grappled with [the fact that its choice created millions of additional disenrollments], and it still chose the policy path that it did in spite of acknowledging the significant number of disenrollments." SMF ¶225. But there is no evidence of this grappling, let alone engagement with unfavorable facts, and the *ipse dixit* of litigation counsel is irrelevant to this Court's arbitrary and capricious analysis. *Kisor v. Wilkie*, 588 U.S. 558, 579 (2019).

back period reduces the number of individuals who qualify as medically frail by at least 2 million), 175-76 (Significant Impairment Provision would limit ability to get coverage or delay coverage which "[f]or a cancer patient… can be deadly"), 178-79. Faced with this evidence, CMS was required to explain how the choice to promulgate the Challenged Provisions, which would exacerbate these massive societal costs, carried a countervailing benefit. *President & Fellows of Harvard Coll. v. U.S. Dep't of Health & Hum. Servs.*, 798 F. Supp. 3d 77, 131 (D. Mass. 2025) (defendants must "consider the potential societal costs"); *Washington v. HUD*, No. 25-cv-626-MSM-AEM 2026 WL 1863886 (D.R.I. June 29, 2026), at *4 (finding agency explanation arbitrary and capricious where it gave "little to no thought or analysis of the negative externalities created" by the agency action"). But the agency provided no explanation at all.

Third, CMS "failed to consider [another] important aspect of the problem": the significantly heightened burden that States face in administering the non-statutory Significant Impairment Provision. The burdens of implementation and compliance on regulated entities are a core factor that agencies must consider when issuing regulations. *See Michigan v. EPA*, 576 U.S. 743, 759 (2015) ("The Agency must consider cost—including, most importantly, cost of compliance—before deciding whether regulation is appropriate and necessary."). That is especially true here, where Congress has expressly directed CMS to prioritize "simplicity of administration" in the administration of Medicaid. 42 U.S.C. §1396a(a)(19).

The administrative record shows that CMS was presented with extensive evidence that (i) administrative efficiency is critical to state Medicaid agencies' ability to make eligibility determinations, and (ii) that the more cumbersome the process for verifying compliance with or exclusion from the Work Requirement, the more administrative strain it would impose on States. SMF ¶¶93, 124, 140-44 ("determination of functional limitations should include an individual,

face-to-face assessment"). Indeed, it will be exceptionally difficult for States to conduct individualized assessments of the ability to work for potentially millions of Medicaid recipients. SMF ¶¶10-11, 172 (Significant Impairment Provision will "set up an enormous administrative process for states to go through to determine eligibility and determine work ability on top of that"), 238, 242, 244-45, 256 (engaging directly with members is "costly and time-intensive"), 262-63. That is especially true given CMS's indication in the preamble to the IFR that States cannot rely solely on records of "the presence of a particular diagnosis and condition" to verify an individual's compliance with the significant-impairment requirement. SMF ¶213. Yet CMS plowed ahead with the Significant Impairment Provision without addressing or even acknowledging these concerns.

CMS's failure to consider the administrative burdens on the States is especially egregious in light of the contrary guidance that CMS had earlier provided to the States. Plaintiff States necessarily began time-consuming and costly efforts to implement H.R. 1's Work Requirement immediately after enactment. SMF ¶¶67-88. Both Plaintiffs and CMS were faced with the staggering challenge of implementing the Work Requirement by January 2027. As such, CMS provided detailed guidance, frequent meetings, and an approved exemplar in Nebraska's early roll out. SMF ¶39. And just as CMS intended, the States relied on its guidance.[9] SMF ¶¶67-88, 157, 161 (California "relied extensively on CMS's preliminary guidance over the last several months to design, build, and operationalize major programmatic, systems, and staffing changes needed to comply with H.R. 1 by January 1, 2027"), 167. Having engaged in this crucial partnership for at least seven months, CMS was not free to ignore the burden placed on Plaintiffs by changing key system and policy requirements a few months before a major implementation deadline. This is

[9] "CMS was aware…that California and other states were making time-sensitive, largely irreversible implementation decisions, including vendor contracts, IT builds, and staffing commitments, in direct reliance on its guidance, and continued providing that guidance without any indication that a material policy shift was under consideration. The reliance is embedded in systems that are already in final development and testing." SMF ¶161.

more than an "important aspect of the problem": it is *the* key gating factor for launching the Work Requirement on time. *State Farm*, 463 U.S. at 43.

Notably, CMS itself acknowledged that "[c]ommunity engagement is an entirely new factor of eligibility, and as such, States must consider criteria that were not previously applicable to Medicaid eligibility and establish new policies and procedures for verif[ication]." SMF ¶212. Against this backdrop, CMS had to consider how its late-stage departure from its own guidance and the "entirely new factor" would impact State Medicaid agencies. The administrative record and the IFR demonstrate zero consideration of these important factors, and evidence in the administrative record underscores the problem. For example, in March, months ahead of the IFR release, CMS received an urgent request for "examples of acceptable formats/models for screeners" noting "[t]he state needs to update applications, code into eligibility systems and logic, do user testing, etc. – and **rule release in June is likely too late to stay on track for timely implementation.**" SMF ¶87. All States, including those not party to this litigation, were faced with the herculean task of designing, testing, and implementing new systems on an already tight timeline, and CMS knew this. For example, Louisiana, which in February 2026 provided CMS its "Medically Frail Definition & Diagnosis Framework" (which permitted *ex parte* verification), indicated that having completed this first step in the process, significant work remained to be done in the then 11 months leading up to the implementation deadline. SMF ¶¶76-78, 80-81.

Knowing that the medically frail definition was the linchpin from which every other step flowed, CMS was required to consider that changing the definition in June 2026 would cause States to redo systems requirements and workflow to which they had already committed significant personnel time and financial resources based on CMS' original guidance and to make those changes within an incredibly challenging timeline. Missing from the administrative record—and

thus unconsidered by CMS—are the multiple submissions provided to CMS by Plaintiff States and their Medicaid agencies once rumors of CMS's change in direction had circulated. SMF ¶¶154-71. For example, California's Medicaid agency noted, "[i]mplementing new processes on this significantly shortened timeline would heighten the risk of systems errors, improper terminations, and administrative failures affecting eligible individuals. DHCS anticipates that any major shift in direction at this stage could delay implementation by 18-24 months." SMF ¶161. CMS was required to consider the constraints imposed on States by the January 1, 2027, implementation deadline, and its failure to do that was arbitrary and capricious. *Washington*, 2026 WL 1863886, at *3 (agency action was arbitrary and capricious where it failed to "consider the impact that a rapid, untimely overhaul would have on the organizations that administer these programs and the individuals that rely upon them").

Fourth, CMS also failed to consider the administrative burdens resulting from the Significant Impairment Provision in light of its assertion in the IFR's preamble that States cannot rely solely on records of "the presence of a particular diagnosis and condition" to verify an individual's compliance with the "significantly impaired" requirement, SMF ¶¶ 213, 215. That statement contradicts, without explanation, Congress's direction that States, when verifying exclusions, should not "requir[e], where possible, the applicable individual to submit additional information." 42 U.S.C. §1396a(xx)(5). Indeed, such records are exactly the kind of "reliable information available to the state" that would enable States to verify eligibility without additional information from an enrollee in accordance with other terms of the IFR, 42 C.F.R. §§ 435.557, 435.558(b), and with established Medicaid regulations on eligibility redeterminations, *id.* § 435.916(a)(2) and (b). And CMS was presented with a clear alternative to limiting *ex parte* verification: several public health scholars provided CMS with a "structured, validated, and

auditable approach that states may use to automatically exempt medically frail individuals using ICD-10… codes." SMF ¶¶119-21. So, to the extent the IFR suggests States cannot rely solely on existing information, such as claims data, to verify the medical frailty exclusion, that is arbitrary and capricious in itself and also underscores the unreasonableness of the agency's failure to consider the Provision's burden on States.

CMS's failure to consider these important factors is unsurprising given their late-breaking decision to add the Significant Impairment Provision. *See* SMF ¶152 (noting rumors in May 2026 that "the White House [was] pushing CMS to tighten the exemption definitions"); *see also* SMF ¶55. Indeed, portions of the IFR still read as if there were no significant-impairment requirement, as originally envisioned and communicated to States for the preceding six months. SMF ¶214.[10]

## II. CMS'S PROMULGATION OF THE CLAIMS PERIOD LIMITATION WAS ARBITRARY AND CAPRICIOUS AND SHOULD BE VACATED AND ENJOINED.

The Claims Period Limitation is also arbitrary and capricious for several reasons. First, it is neither reasonable nor reasonably explained. CMS attempts to justify the 12-month limit by asserting that "older information may not reflect the individual's current condition." SMF ¶218. But that is necessarily true of all categories of data used to verify eligibility and any time period selected. *See* 42 C.F.R. § 435.557(a)(i)-(viii). As to claims data, data from just one month, *may* not reflect an individual's current status—but it also may. An individual with a chronic or permanent condition, like an intellectual or developmental disability, may not receive care evidencing the underlying condition in a shorter time period, but may see a provider for other reasons where that condition would not be obvious in 12-months of claims data. SMF ¶136; *see also* ¶¶137, 139. CMS does not explain why States should be categorically barred from considering potentially probative

---

[10] Plaintiffs have repeated their request, pursuant to Executive Order 12866, for the original IFR submitted to OIRA a month after their original request, on August 16, 2026 but have received no response. SMF ¶209.

claims data simply because, like any other source of data, it may not be determinative. And CMS's position is especially incoherent given that it chose not to place temporal limits on other categories of potentially relevant data, such as "[p]ayroll data." 42 C.F.R § 435.557(a)(vi).

Second, CMS failed to consider an incredibly "important aspect of the problem": uncontroverted data in the administrative record indicating that a one-year claims period—as opposed to a two-year claims period—would result in denying the medical frailty exclusion to at least two million people with serious conditions. SMF ¶¶131-32; *State Farm*, 463 U.S. at 43. This is in part because claims data in months 13-24 sometimes identifies people who would qualify as medically frail, such as a person with a chronic or permanent condition who may not receive treatment for that condition in months 1-12. SMF ¶136. In fact, conditions like intellectual or developmental disabilities often do not show up on every claim. SMF ¶136. Nothing in the administrative record indicates that allowing State Medicaid agencies to review additional historic claims data would cause them to make arbitrary medically frail determinations.[11] Accordingly, CMS has prescribed a limitation with no benefit, but clear detriment. *Michigan*, 576 U.S. at 753 ("[R]easonable regulation ordinarily requires paying attention to the advantages *and* the disadvantages of agency decisions."). Yet CMS failed to consider this issue. Nor did it consider the obviously "reasonable alternative[]" of a two-year lookback. *Dubois v. United States Dep't of Agric.*, 102 F.3d 1273, 1289 (1st Cir. 1996). These failures were arbitrary and capricious.

Third, the Claims Period Limitation is inconsistent with the statute's direction—and CMS's direction—that States should, to the greatest extent possible, verify compliance with and exclusion from the Work Requirement "without requiring" Medicaid members "to submit additional information." 42 U.S.C. § 1396a(xx)(5); *see* SMF ¶38; *see INS v. Yang*, 519 U.S. 26, 32 (1996)

[11] State Medicaid agencies need to maintain auditable records, and risk Payment Error Rate Measurement (PERM) penalties if they incorrectly exclude members as medically frail. SMF ¶241.

("[A]n irrational departure from [a governing] policy ... constitute[s] action that must be overturned as 'arbitrary, capricious, or an abuse of discretion'" under the APA). Artificially limiting the claims period impedes States' ability to follow the Congressional mandate to use every effort to verify medically frail exclusions based on already-available information. The 12-month limit is also inconsistent with CMS's own direction that States "must consider such factors as the administrative costs associated with establishing and using the data match compared with the administrative costs associated with relying on documentation, and on program integrity in terms of the potential for ineligible individuals to be enrolled and for eligible individuals to be denied coverage." SMF ¶220. CMS' failure to consider or explain these inconsistencies is arbitrary and capricious. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 222 (2016); *State Farm*, 463 U.S. at 43. The administrative costs of allowing States to use a longer claims period are net positive: the burden of adding months (or even years) of claims data to a system that already evaluates claims data is minimal, whereas seeking additional documentation from members is time-consuming and costly. SMF ¶256. Imposing these additional costs on Plaintiff was an "important aspect of the problem" and CMS's failure to consider it was arbitrary and capricious. *Michigan*, 576 U.S. at 759 ("The Agency must consider cost—including, most importantly, cost of compliance").

## III. CMS'S PROMULGATION OF THE SELF-ATTESTATION LIMITATION WAS ARBITRARY AND CAPRICIOUS AND SHOULD BE VACATED AND ENJOINED.

CMS's decision to limit Medicaid members to one self-attestation of medical frailty per enrollment period starting in 2028 should also be vacated as arbitrary and capricious for several reasons: CMS failed to provide any reasoned explanation for this limitation and failed to consider evidence regarding the difficulty Medicaid members would face in obtaining provider documentation regarding medical frailty and the burdens on providers that such a documentation requirement would impose.

First, CMS's lone explanation for the self-attestation limitation was that the agency "believe[s] that requiring verification of medical frailty to confirm an individual's specified excluded status using data or documentation [after one self-attestation] will motivate individuals to access care." SMF ¶217. But CMS points to no evidence—nor is there any in the administrative record—that this extra administrative barrier to coverage will make Medicaid members more likely to access available care. Unsubstantiated "conclusory statements will not do" to satisfy the requirement of reasoned decisionmaking. *NIH*, 791 F. Supp. 3d at 178. And absent any factual support, CMS has simply offered a "solution in search of a problem," confirming that the self-attestation limit is arbitrary and capricious. *New York v. HHS*, 414 F. Supp. 3d 475, 546 (S.D.N.Y. 2019). Requiring patients to schedule provider visits for the purpose of obtaining documentation of their medical frailty will unduly burden providers and increase costs to state and federal governments to pay for such visits. SMF ¶¶262-63. The Self-Attestation Limitation will only further strain already-stretched provider networks. That CMS failed to acknowledge, let alone grapple with, any of these issues, is also arbitrary and capricious. *State Farm*, 463 U.S. at 43.

CMS's rationale is especially unreasonable because, as discussed above, *see infra* at 24, seeing a provider will not necessarily result in claims data that speaks to an individual's status as medically frail. For example, if a medically frail individual seeks necessary medical care for an ear infection, the claims data generated from that visit will not demonstrate the individual's medical frailty, but instead will show services provided for an ear infection. SMF ¶¶136-39.

Second, CMS failed to consider evidence in the administrative record that it can be quite difficult for a Medicaid beneficiary to obtain documentation from a provider confirming that they qualify for a work requirement exclusion. SMF ¶¶98-101 (past work requirement experiments showed individuals struggled to find willing providers to sign off on disability related exemptions

in a timely manner, particularly given the smaller pool of Medicaid providers). CMS was also presented with evidence that "self-attestation has been found to be a highly reliable form of verification" that is "less burdensome to states and the best method for ensuring that eligible individuals do not lose health coverage due to administrative barriers." SMF ¶124. But CMS failed to acknowledge, let alone grapple with, this evidence.

## IV. PLAINTIFFS ARE ENTITLED TO THE RELIEF THEY SEEK.

### A. Plaintiffs are entitled to vacatur of the Challenged Provisions.

Finally, Plaintiffs seek only "[t]he normal remedy for a successful APA challenge": "vacatur of the [challenged agency action] and its applicability to all who have been subject to it." *Woonasquatucket River Watershed Council v. U.S. Dept. of Agriculture*, No. 25-1428, 2026 WL 2279789, at *19 (1st Cir. Aug. 7, 2026); *see also Harrington v. Chao*, 280 F.3d 50, 60 (1st Cir. 2002). To be clear, Plaintiffs seek to vacate *only* those "part[s] of [the] agency rule" which constitute the "relevant discrete agency action"—here, incorporation of the Challenged Provisions—leaving the vast majority of the IFR untouched. *Ass'n of Am. Univs. v. DoD*, 806 F. Supp. 3d 79, 121 (D. Mass. 2025). The IFR itself states that CMS and HHS "inten[d] that if any provision of this final rule is held to be invalid … it shall be severable[.]" 91 Fed. Reg. 33351. Plaintiffs neither challenge the full IFR nor seek to vacate anything beyond the Challenged Provisions.

### B. Plaintiffs are entitled to a permanent injunction of the Challenged Provisions.

Plaintiffs have also met the burden for permanent injunctive relief. The traditional standard requires Plaintiffs to demonstrate (1) "actual success on the merits," (2) "irreparable injur[y] in the absence of injunctive relief," (3) "that the harm suffered "from the defendant's conduct would exceed the harm to the defendant accruing from the issuance of an injunction," and (4) that "the public interest would not be adversely affected." *Doe v. R.I. Interscholastic League*, 137 F.4th 34,

40 (1st Cir. 2025). However, "once the court reach[es] the conclusion that the rule was indeed illegal … there [is] no separate need to show irreparable injury." *Illinois v. FEMA*, 801 F. Supp. 3d 75, 97 (D.R.I. 2025) (quoting *Nat'l Min. Ass'n v. US Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998).[12] That holding is congruent with the text of the APA, which permits "actions for … prohibitory or mandatory injunction[s]." 5 U.S.C. § 703. Following that precedent, and assuming Plaintiffs succeed on the merits, all that remains are the final two factors, which "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). And effectuating Congressional policy to ensure continued Medicaid access for medically frail Americans is an undoubtedly weightier interest than "the perpetuation of unlawful agency action" which serves "no public interest." *Rhode Island v. Trump*, 155 F.4th 35, 50 (1st Cir. 2025).

**C. Plaintiffs are entitled to a stay of enforcement of the IFR for six months.**

Finally, consistent with CMS's statutory authority to allow States additional time to comply with H.R. 1's new Medicaid provisions, 42 U.S.C. § 1396a(xx)(11), this Court should enjoin CMS from penalizing Plaintiffs for a period of six months for any delays in complying with the IFR. Plaintiffs have worked diligently towards implementing the Work Requirement. However, CMS's promulgation of unlawful regulatory constraints—particularly the Significant Impairment Provision and Claims Period Limitation—has badly disrupted the States' implementation plans. SMF ¶¶227-45. Plaintiffs have been forced to overhaul their plans for verifying compliance with, or exclusion from, the Work Requirement. As the detailed declarations from experienced State Medicaid administrators show, valuable implementation time has been irrevocably lost as Plaintiffs

[12] In any event, the record clearly establishes that Plaintiffs will suffer irreparable injury if they are required to implement the Challenged Provisions—all of which impose substantial administrative costs on State Medicaid agencies by requiring them to engage in more burdensome efforts to verify compliance with and exclusion from the Work Requirements. *See* SMF ¶¶236-38, 240-45. Indeed, the First Circuit has already held that "intensive alterations" to "eligibility verification systems for [] federal programs" constitute irreparable injury due to the necessary and unrecoverable expenditures. *Doe v. Trump*, 157 F.4th 36, 79 (1st Cir. 2025); *see also New York v. DHS*, 969 F.3d 42, 86 (2d Cir. 2020) ("undertak[ing] costly revisions to [Medicaid] eligibility systems" constitutes irreparable harm).

devoted resources to trying to comply with the Challenged Provisions. SMF ¶¶227-45. Thus, even with a ruling vacating and enjoining those provisions, Plaintiffs cannot guarantee that there will not be brief delays in implementing the remainder of the IFR by January 1, 2027.

Plaintiffs thus request that this Court exercise its "broad [equitable] powers" to ensure Plaintiffs are not penalized for having lost approximately six months of implementation time as they attempted to navigate implementation of the unlawful Challenged Provisions. *NW Env't. Def. Ctr. v. Bonneville Power Admin*., 477 F.3d 668, 680–81 (9th Cir. 2007); *see also CREW v. DOJ*, 846 F.3d 1235, 1242 (D.C. Cir. 2017) (holding that a district court's equitable powers are especially broad "where, as here, federal law is at issue and the public interest is involved"); *see* 5 U.S.C. § 705 ("[T]he reviewing court … may issue all necessary and appropriate process … to preserve status or rights[.]"). To be sure, Plaintiffs will continue to work diligently to implement the Work Requirement as soon as possible—and in many cases, that will be by January 1, 2027. But to protect them against the risk of enforcement if they face any delays or errors resulting from the chaos caused by CMS's promulgation of the unlawful provisions, Plaintiffs ask the Court restore the pre-litigation status quo by enjoining Defendants—for a period of six months—from penalizing Plaintiffs for failure to comply with the IFR. *See SEC v. Sanchez-Diaz*, 88 F.4th 81, 88 (1st Cir. 2023) (explaining that equitable remedies necessarily involve "restoring the status quo"); *Illinois v. FEMA*, 2025 WL 2908807 (D.R.I. Oct. 14, 2025) (granting relief in an APA case beyond vacatur, including prohibiting enforcement).

## CONCLUSION

For the reasons stated above, Plaintiff States respectfully request that the Court grant their motion and enter judgment in Plaintiffs' favor.

Dated: September 1, 2026

Respectfully submitted,

**ANDREA JOY CAMPBELL**
*Attorney General of Massachusetts*

By: */s/ Nita Kumaraswami Klunder*
Nita K. Klunder (BBO No. 689304)
*State Trial Counsel*
Ethan W. Marks (BBO No. 690746)
*Deputy Chief, Health Care Division*
Katherine D. Kearns (BBO No. 707105)
Julia S. Canney (BBO No. 717328)
*Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2394
nita.klunder@mass.gov
*Attorneys for the Commonwealth of Massachusetts*

**ROB BONTA**
*Attorney General for the State of California*

By: */s/ Anna Rich*
Neli N. Palma*
*Senior Assistant Attorney General*
Kathleen Boergers*
*Supervising Deputy Attorney General*
Anna Rich*
Ketakee Kane*
*Deputy Attorneys General*
1515 Clay Street
Oakland, CA 94612
510-879-0296
Anna.Rich@doj.ca.gov
*Attorneys for the People of the State of California*

**JENNIFER DAVENPORT**
*Attorney General of New Jersey*

By*: /s/ Shankar Duraiswamy*
Shankar Duraiswamy*
*Deputy Solicitor General*
Samuel Dolinger*
*Assistant Attorney General*
Geoffrey McGee*
Jake Mazeitis*
*Deputy Attorneys General*
124 Halsey St.
Newark, NJ 07101
(609) 649-1019
Shankar.Duraiswamy@njoag.gov
*Attorneys for the State of New Jersey*

**KRISTIN K. MAYES**
*Attorney General of Arizona*

By*: /s/ Joshua A. Katz*
Joshua A. Katz*
*Assistant Attorney General*
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-8053
Joshua.Katz@azag.gov
*Attorney for the State of Arizona*

**PHILIP J. WEISER**
*Attorney General for the State of Colorado*

By: */s/ Ryan Lorch*
Ryan Lorch*
Sarah H. Weiss*
*Senior Assistant Attorneys General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Ryan.Lorch@coag.gov
Sarah.Weiss@coag.gov
*Attorneys for the State of Colorado*

**WILLIAM TONG**
*Attorney General of Connecticut*

By: */s/ Patricia E. McCooey*
Patricia E. McCooey*
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5210
Patricia.McCooey@ct.gov
*Attorney for State of Connecticut*

**KATHLEEN JENNINGS**
*Attorney General of the State of Delaware*

By: */s/ Vanessa L. Kassab*
Ian R. Liston*
*Director of Impact Litigation*
Robin L. Jacobs
*Assistant Attorney General*
Vanessa L. Kassab*
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for the State of Delaware*

**BRIAN L. SCHWALB**
*Attorney General of the District of Columbia*

By: */s/ Nicole S. Hill*
Nicole S. Hill*
*Assistant Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth Street NW
Washington, D.C. 20001
(202) 727-4171
Nicole.Hill@dc.gov
*Attorney for District of Columbia*

**ANNE E. LOPEZ**
*Attorney General for the State of Hawaiʻi*

By: */s/ Kalikoʻonālani D. Fernandes*
Kalikoʻonālani D. Fernandes*
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorney for the State of Hawaiʻi*

**KWAME RAOUL**
*Attorney General of Illinois*

By: */s/ Katharine Roller*
Katharine Roller*
Complex Litigation Counsel
Emily Hirsch*
Assistant Attorney General
115 S. LaSalle St
Chicago, IL 60603
773-519-1842
Katharine.roller@ilag.gov
Emily.hirsch@ilag.gov
*Attorneys for the State of Illinois*

**OFFICE OF THE GOVERNOR ex rel. ANDY BESHEAR**
*In His Official Capacity as Governor Of The Commonwealth Of Kentucky*

*/s/ S. Travis Mayo*
S. Travis Mayo*
*General Counsel*
Sam Flynn*
*Chief Deputy General Counsel*
Laura C. Tipton*
*Deputy General Counsel*
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov
*Attorneys for the Office of the Governor*

**AARON M. FREY**
*Maine Attorney General*

By: */s/ Katherine W. Thompson*
Katherine W. Thompson*
*Special Counsel*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Kate.thompson@maine.gov
*Attorney for the State of Maine*

**ANTHONY G. BROWN**
*Attorney General of Maryland*

*/s/ Michael Drezner*
Michael Drezner*
*Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6959
Mdrezner@oag.state.md.us
*Attorney for the State of Maryland*

**DANA NESSEL**
*Attorney General of Michigan*

By: */s/ Neil Giovanatti*
Neil Giovanatti*
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
*Attorney for the State of Michigan*

**KEITH ELLISON**
*Attorney General of Minnesota*

By: */s/Katherine Bies*
Katherine Bies*
*Assistant Attorney General*
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us
*Attorney for the State of Minnesota*

**AARON D. FORD**
*Attorney General of Nevada*

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland*
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-8727
kireland@ag.nv.gov
*Attorney for the State of Nevada*

**RAÚL TORREZ**
*Attorney General Of New Mexico*

By: */s/ Anjana Samant*
Anjana Samant*
*Deputy Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
(505) 270-4332
asamant@nmdoj.gov
*Attorney for the State of New Mexico*

**LETITIA JAMES**
*Attorney General for the State of New York*

By: */s/ Morenike Fajana*
Morenike Fajana*
*Special Counsel*
Rabia Muqaddam*
*Chief Counsel for Federal Initiatives*
28 Liberty Street
New York, NY 10005
(347) 931-3187
Morenike.fajana@ag.ny.gov
*Attorneys for the State of New York*

**JEFF JACKSON**
Attorney General of North Carolina
By: */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
*Associate Deputy Attorney General*
Laura Howard
*Chief Deputy Attorney General*
114 W. Edenton St.,
Raleigh, NC 27603
(919) 716-6026
dmosteller@ncdoj.gov
*Attorneys for the State of North Carolina*

**DAN RAYFIELD**
*Attorney General of Oregon*

By: */s/ Scott P. Kennedy*
Scott P. Kennedy*
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Scott.Kennedy@doj.oregon.gov
*Attorney for the State of Oregon*

**JOSH SHAPIRO**
*Governor of the Commonwealth of Pennsylvania*

By: */s/ Jacob B. Boyer*
Jennifer C. Selber
*General Counsel*
Jacob B. Boyer*
*Deputy General Counsel*
Office of General Counsel
30 North Street, Suite 200
Harrisburg, PA 17101
717-460-6786
jacobboyer@pa.gov
*Attorneys for the Governor of the Commonwealth of Pennsylvania*

**PETER F. NERONHA**
*Attorney General of Rhode Island*

By: */s/ Lee Staley*
Lee B. Staley*
*Chief, Health Care Unit*
150 South Main Street
Providence, RI 02903
Phone: (401) 274-4400
Fax: (401) 222-2995
lstaley@riag.ri.gov
*Attorney for the State of Rhode Island*

**CHARITY R. CLARK**
*Attorney General for the State of Vermont*

By: */s/ Ryan Patrick Kane*
Ryan Patrick Kane*
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
Ryan.kane@vermont.gov
*Attorney for the State of Vermont*

**JAY JONES**
*Attorney General for the Commonwealth of Virginia*

/s/ *Megan C. Keenan*
Megan C. Keenan*
*Deputy Solicitor General*
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us
*Attorney for Commonwealth of Virginia*

**NICHOLAS W. BROWN**
*Attorney General State of Washington*

By: */s/ Tyler Roberts*
Tyler Roberts*
*Assistant Attorney General*
William McGinty*
*Deputy Solicitor General*
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206)-464-7744
Tyler.Roberts@atg.wa.gov
William.McGinty@atg.wa.gov
*Attorneys for State of Washington*

**JOSHUA L. KAUL**
*Attorney General for the State of Wisconsin*

By: */s/ Faye Hipsman*
Faye Hipsman*
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
faye.hipsman@wisdoj.gov
*Attorney for State of Wisconsin*

*pro hac vice granted

**CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic filing (NEF).

/s/ Nita K. Klunder
Nita K. Klunder (BBO #689304)
*State Trial Counsel*
1 Ashburton Pl.
Boston, MA 02108
617.963.2394
Nita.klunder@mass.gov
*Counsel for the Commonwealth of Massachusetts*