**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al.<br>Plaintiffs,<br><br>v.<br><br>MEHMET OZ, M.D., et al.<br><br>Defendants. | Case No. 1:26-cv-12962 |

**PLAINTIFF STATES' STATEMENT OF MATERIAL FACTS**
**IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I. MEDICAID PROGRAM OVERVIEW

### A. Medicaid Generally

1. Medicaid is a cooperative federal-state program that provides medical services to low-income individuals and individuals with disabilities, funded with both federal and state funds. *See* 42 U.S.C. § 1396-1; Ex.[1] 55, 2; Ex. 72 (AR), 002328 *see., e.g.*, Ex. 6 ¶5; Ex. 7 ¶5.

2. In 2010, Congress expanded Medicaid to cover low-income, working-age adults. Ex. 55, 2-3; AR, 002357, 002360, 003655.

3. Medicaid's purpose is to enable States to furnish medical assistance to individuals who cannot otherwise afford it and to provide services to help those individuals "attain or retain capability for independence or self-care." *See* 42 U.S.C. §1396-1; Ex. 55, 2.

4. State Medicaid agencies administer the Medicaid program pursuant to State plans, which are reviewed and approved by the Centers for Medicare and Medicaid Services (CMS).

[1] References to "Ex." herein refer to Exhibits to the Declaration of Nita K. Klunder, dated September 1, 2026.

*See* 42 U.S.C. § 1396-1; *see, e.g.*, Ex. 2 ¶5; Ex. 5 ¶5; Ex. 6 ¶5; Ex. 7 ¶5; Ex. 8 ¶5; Ex. 12 ¶6; Ex. 15 ¶5; Ex. 20 ¶6; Ex. 21 ¶5; Ex. 39 ¶5.

5. Federal law requires states to determine eligibility for Medicaid services in a way that both simplifies administration of the program and is in the best interests of Medicaid recipients. *See* 42 U.S.C. § 1396a(a)(19); Ex. 55, 2.

6. CMS is responsible for overseeing State compliance with federal rules and regulations relating to Medicaid and has authority to impose severe financial penalties if States are found to be out of compliance with their State Medicaid plans and federal regulations. Ex. 57, 1-2; Ex. 58, 1-2, 11.

7. The Payment Error Rate Measurement Program (PERM) measures improper state Medicaid payments. 91 Fed. Reg. 33377[2]; AR, 002310-11.

8. CMS has a long-held practice of providing guidance to States, outside of formal rulemaking, to assist States in complying with urgent and significant changes in federal Medicaid law. *See, e.g.*, Ex. 3 ¶13; Ex. 4 ¶12; Ex. 9 ¶12; Ex. 10 ¶12; Ex. 11 ¶16; Ex. 13 ¶11; Ex. 16 ¶12; Ex. 18 ¶12; Ex. 19 ¶13; Ex. 23 ¶12; Ex. 39 ¶12.

9. State Medicaid agencies have for many years relied on CMS guidance, and the associated slide decks and other written materials, to determine how to comply with new laws, implement operational, system, and process changes, and, ultimately, avoid financial penalties that those laws imposed for noncompliance. *See, e.g.*, Ex. 2 ¶12; Ex. 5 ¶12; Ex. 7 ¶17; Ex. 21 ¶12; Ex. 24 ¶12; Ex. 25 ¶13; Ex. 39 ¶12.

---

[2] The Interim Final Rule, 91 Fed. Reg. 33348 (June 3, 2026) is included in the administrative record at 000001-135. Citations herein are to the Federal Register page numbers.

10. While a few States have chosen to experiment with work requirements in the past, the Medicaid program as a whole has never before required Medicaid recipients to work, volunteer, or meet other community engagement requirements to establish Medicaid eligibility. State Medicaid agencies therefore do not have in place systems for verification of compliance with work requirements. *See, e.g.*, Ex. 6 ¶¶9, 31; Ex. 8 ¶¶9-11, 21; Ex. 13 ¶9; Ex. 19 ¶11; Ex. 20 ¶11; Ex. 25 ¶11.

11. State Medicaid agencies also do not have systems in place for determining an individual's ability to work. State Medicaid agencies generally do not employ occupational medicine experts with the training to ascertain severity of impairment in relationship to ability to work. *See, e.g.*, Ex. 1 ¶10a; Ex. 7 ¶47; Ex. 15 ¶43; Ex. 16 ¶55; Ex. 21 ¶53; Ex. 22 ¶16; Ex. 55, 11.

12. Eligibility specialists who make decisions about eligibility for Supplemental Security Income (SSI) or Social Security Disability Insurance (SSDI) rely on extensive guidance from the Social Security Administration with details about what constitutes a disability and relevant factors for adjudicators to consider, including functional limitations like ability to work and residual functional abilities, relative to prior job experience. *See, e.g.*, Ex. 55, 11; Ex. 59; Ex. 60; Ex. 61.

**B. Medicaid Expansion Populations**

13. Individuals who are eligible for Medicaid due to the expansion of coverage authorized by the Patient Protection and Affordable Care Act (ACA), Pub. L. No. 111-148, 124 Stat. 119, codified as amended at 42 U.S.C. § 18001 *et seq.* (Mar. 23, 2010), for low-income, working-aged adults ages 19-65 (the "Expansion Population") are subject to the Interim Final Rule. *See* 42 C.F.R. § 435.551; *see, e.g.*, Ex. 4 ¶6; Ex. 10 ¶6; Ex. 15 ¶6; Ex. 17 ¶5; Ex. 18 ¶6; Ex. 19 ¶7; Ex. 23 ¶6; Ex. 24 ¶6; Ex. 55, 2-3.

14. The Plaintiff States have each expanded Medicaid to all or some of the Expansion Population. *See, e.g.*, Ex. 2 ¶6; Ex. 3 ¶7; Ex. 11 ¶6; Ex. 14, Exh. 2 at 2-3; Ex. 17 ¶5; Ex. 25 ¶7; Ex. 39 ¶6; Ex. 55 at 2-3.

15. In the Plaintiff States, approximately 51 million residents are covered by Medicaid and CHIP, and of those, approximately 15 million residents are enrolled as part of the Expansion Population. Ex. 1 ¶10.h; Ex. 2 ¶¶4,8; Ex. 3 ¶¶5, 9; Ex. 4 ¶¶ 4, 8; Ex. 5 ¶¶ 4, 8; Ex. 6 ¶¶4, 8; Ex. 7 ¶¶4, 7; Ex. 8 ¶¶4, 8; Ex. 9 ¶¶4, 8; Ex. 10 ¶¶4, 8; Ex. 11 ¶¶4,8; Ex. 12 ¶¶5, 9; Ex. 13 ¶¶3, 7; Ex. 14, Exh. 1 at 1, Exh. 2 at 16; Ex. 15 ¶¶4, 8; Ex. 16 ¶¶4, 8; Ex. 17 ¶¶4, 6; Ex. 18 ¶8; Ex. 19 ¶¶5, 9; Ex. 20 ¶¶5, 9; Ex. 21 ¶¶4, 8; Ex. 22 ¶¶4, 7; Ex. 23 ¶8; Ex. 24 ¶¶4, 8; Ex. 25 ¶¶3, 9; Ex. 39 ¶¶4, 8.

16. Plaintiff States have enjoyed higher rates of insurance, increased healthcare affordability, improvements in health access and outcomes, and expanded economic benefits for medical providers and Medicaid members as a result of expanding access to Medicaid for the Expansion Population. Ex. 14, Exh. 2 at 1-2; Ex. 55, 2-3.

17. As part of Medicaid expansion, the Plaintiff States adopted new methods that allow for greater automation of eligibility determinations. *See* Ex. 56, 3, 15, 16.

18. State Medicaid agencies must attempt to conduct what are known as *ex parte* renewals for all Medicaid members; in other words, decisions regarding renewal that are based on reliable information available to the State Medicaid agency through electronic data sources. AR, 002312-13.

19. When possible, *ex parte* verification helps State Medicaid agencies make decisions about eligibility without demanding more information from the Medicaid member or applicant. AR, 002312-13.

## II. H.R. 1

20. On July 4, 2025, the One Big Beautiful Bill Act, also known as H.R. 1, was signed into law. H.R. 1, Pub. L. No. 119-21, 139 Stat. 172 (2025); *see, e.g.*, Ex. 4 ¶39; Ex. 11 ¶10; Ex. 20 ¶17.

21. H.R. 1 included Section 71119, which newly imposed community engagement requirements for "applicable individuals," who include adults covered under the Medicaid expansion provisions of the ACA and adults enrolled in certain 1115 demonstrations. Pub. L. No. 119-21, tit. VIII, § 71119, 139 Stat. 72, 306 (2025) (codified at 42 U.S.C. § 1396a(xx)) (Work Requirement); *see, e.g.*, Ex. 2 ¶9; Ex. 11 ¶10.

22. Within Section 71119 of H.R. 1, Congress defined "Specified Excluded Individual"—individuals to whom the Work Requirement does not apply—to include "an individual, as determined by the State (in accordance with standards specified by the Secretary)— . . . (V) who is medically frail or otherwise has special medical needs (as defined by the Secretary), including an individual—(aa) who is blind or disabled (as defined in section 1614); (bb) with a substance use disorder; (cc) with a disabling mental disorder; (dd) with a physical, intellectual or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living; or (ee) with a serious or complex medical condition." 42 U.S.C. § 1396a(xx)(9)(A)(ii)(V).

23. As a result of H.R. 1, State Medicaid agencies must make substantial changes to administration of their Medicaid programs for applicants and enrollees in the Expansion Population. *See, e.g.*, Ex. 1 ¶¶ 3, 8-10; Ex. 7 ¶¶44-46; Ex. 8 ¶¶13-14; Ex. 15 ¶¶10, 39-40; Ex. 17 ¶¶13-14; Ex. 21 ¶¶10, 40-42; Ex. 22 ¶¶9, 13, 15; Ex. 25 ¶¶11, 42-44.

24. Proponents of H.R. 1 repeatedly described the medically frail exclusion without reference to an individual's ability to comply with the Work Requirement. Ex. 62, 6-7.

25. Representative Guthrie, Chairman of the House Energy and Commerce Committee, assured the public that individuals are "exempt if you're medically frail, which includes *anyone* who's blind, disabled, battling a chronic substance-use disorder or living with a serious and complex medical condition like cancer," and that "our bill couldn't be clearer" that it "includes a long list of exempted individuals." Ex. 62, 6 (emphasis added).

26. Senator Grassley explained that Congress provided "reasonable exemptions" for "[i]ndividuals who are blind, have [a] substance abuse disorder, a disabling mental disorder, a physical or intellectual disability that significantly impairs their ability to perform one or more activities of daily living or a serious, complex medical condition." Ex. 62, 6-7.

27. Senator Crapo assured colleagues that the legislation "does not take Medicaid away from . . . the medically frail." Ex. 62, 7.

28. Senator Sullivan described exemptions for "individuals who are medically frail or are dealing with a substance use disorder" as unqualified protections. Ex. 62, 7.

29. In H.R. 1, Congress directed the Secretary of Health and Human Services to "promulgate an interim final rule for purposes of implementing the provisions of" Section 71119 "[n]ot later than June 1, 2026." Pub. L. No. 119–21, tit. VII, §71119(d), 139 Stat. 72, 314 (2025) (note).

## III. CMS Implementing Guidance

### A. Communications from CMS to Plaintiffs

30. Between at least November 2025 and June 1, 2026, CMS provided guidance to State Medicaid agencies concerning implementation of the Work Requirement. *See, e.g.*, Ex. 2 ¶11; Ex. 3, ¶12; Ex. 11 ¶15; Ex. 13 ¶10; Ex. 22 ¶10; Ex. 25 ¶12.

31. On November 19, 2025, CMS presented a slide deck to State Medicaid agencies with the title "Implementing Section 71119 of the Working Families Tax Cut Legislation: Key

Requirements and Preliminary Direction from CMS." *See* Ex. 15, Exh. 1 (November 2025 Slide Deck), 1; *see, e.g.*, Ex. 2 ¶11; Ex. 4 ¶11; Ex. 5 ¶11; Ex. 9 ¶11; Ex. 18 ¶11; Ex. 21 ¶11.

32. The November 2025 Slide Deck was provided to State Medicaid agencies on December 4, 2025. *See, e.g.*, Ex. 2 ¶11; Ex. 4 ¶11; Ex. 5 ¶11; Ex. 9 ¶11; Ex. 18 ¶11; Ex. 21 ¶11.

33. In the November 2025 Slide Deck, CMS stated: "CMS intends to require states to use a definition of medical frailty similar to that described in regulations at 42 CFR § 440.315(f)." November 2025 Slide Deck, 11.

34. 42 CFR § 440.315(f), which CMS described as the "Medically frail definition for an Alternative Benefit Plan," states: "For these purposes, the State's definition of individuals who are medically frail or otherwise have special medical needs must at least include those individuals described in § 438.50(d)(3) of this chapter, individuals with disabling mental disorders (including children with serious emotional disturbances and adults with serious mental illness), individuals with chronic substance use disorders, individuals with serious and complex medical conditions, individuals with a physical, intellectual or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living, or individuals with a disability determination based on Social Security criteria or in States that apply more restrictive criteria than the Supplemental Security Income program, the State plan criteria." 42 C.F.R. § 440.315(f); *see* November 2025 Slide Deck, 36.

35. CMS included the following slide in the November 2025 Slide Deck reflecting a "Comparison of Statutory & Regulatory Definitions" of "Medical Frailty":

## Appendix: Medical Frailty – Comparison of Statutory & Regulatory Definitions

**<u>Medically frail definition for an Alternative Benefit Plan:</u>**

42 CFR 440.315(f): The State's definition of individuals who are medically frail or otherwise have special medical needs must at least include all of the following:

- Individuals described in § 438.50(d)(3) of this chapter,
- **Individuals with disabling mental disorders** (including children with serious emotional disturbances and adults with serious mental illness),
- **Individuals with** chronic **substance use disorders,**
- **individuals with serious and complex medical conditions,**
- **Individuals with a physical, intellectual or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living, [and]**
- Individuals with a disability determination based on Social Security criteria or in States that apply more restrictive criteria than the Supplemental Security Income program, the State plan criteria.

C-E medically frail definition in statute includes **bolded** bullets above and "an individual—(aa)who is blind or disabled (as defined in section 1614);"

Pre-decisional and iterative. The preliminary information presented in this deck is for exclusive use by states and vendors to inform planned implementation of Medicaid community engagement requirements. All policies and requirements are subject to change.

November 2025 Slide Deck, 36.

36. In the November 2025 Slide Deck, CMS also stated: "CMS will expect states to implement an auditable approach to verify medical frailty, in alignment with certain guardrails. E.g., ***medical claims data review*** or provider documentation, or completion of a screening tool. States may require new applicants without any claims history to complete a screening tool to verify medical frailty, but CMS expects to require states to confirm that determination via claims data/documentation within 6 months post enrollment." November 2025 Slide Deck, 11 (emphasis added). CMS did not indicate that it would impose a temporal limitation on claims data review. *Id.*

37. CMS then reiterated its expectation that States use available data, including claims data, to verify exceptions or exclusions from the Work Requirement, including the medically

frail exclusion. *See* November 2025 Slide Deck, 16, 17, 29. CMS did not indicate that it would impose a temporal limitation on claims data review. *Id.*

38. CMS further informed States that it expected them to use reliable information, including data, to conduct *ex parte* verification to "establish whether an individual met the community engagement requirement, without requiring, where possible, the applicable individual to submit additional information." November 2025 Slide Deck 15; *see id.* at 29.

39. In the November 2025 Slide Deck, CMS also stated "[f]ull implementation of C-E [Community Engagement] includes multiple, interdependent elements that extend beyond system updates" and "States will need to address policy, process, and operational capacity to meet compliance." November 2025 Slide Deck, 25. CMS noted further, "CMS is developing formal guidance that will be released on a rolling basis in 2025-2026" and listed as a next step, resuming weekly "Eligibility Workgroup Calls." November 2025 Slide Deck, 5, 35.

40. In a slide addressing States' "Minimum Viable Product," CMS stated that an "[a]uditable individual declaration" would be allowed in 2027—"year 1"—for "Community Service and Job Program Enrollment" and did not include any comparable "year 1" only limits for declarations regarding other community engagement criteria. *Id.* at 29. On the same slide, CMS did not mention any limits on use of auditable declarations for determining "Mandatory Exceptions & Exclusions." *Id*.

41. Though the November 2025 Slide Deck contained disclaimers stating that the information provided therein was preliminary and subject to change, it said that "states and vendors are strongly encouraged to review this deck to inform planning." November 2025 Slide Deck, 5. Several slides also include a disclaimer in small print that includes the following statement: "[t]he preliminary information presented in this deck is for exclusive use by states

and vendors to inform planned implementation of Medicaid community engagement requirements." *Id.* at 2, 4-6, 8-12, 14-18, 20-21, 25-29, 31, 33-36.

42. CMS also "encourage[d] readers to refer to the applicable statutory language for complete information." November 2025 Slide Deck, 5.

43. On December 8, 2025, CMS publicly released an Informational Bulletin with the subject "Section 71119 of the 'Working Families Tax Cut' Legislation, Public Law 119-21: Requirements for States to Establish Medicaid Community Engagement Requirements for Certain Individuals" (December 8 Bulletin). AR, 000905-17;

44. In the December 8 Bulletin, CMS stated "we recognize that planning must begin now, as States enter budget and legislative sessions and begin procurement of new systems and services to support implementation of the Medicaid provisions in the WFTC legislation." AR, 000906.

45. The December 8 Bulletin also listed among the "specified excluded individuals," "[a]n individual who is medically frail or otherwise has special medical needs (as defined by the Secretary), including an individual: who is blind or disabled (as defined in section 1614 of the Act); with a substance use disorder; with a disabling mental disorder; with a physical, intellectual, or developmental disability that significantly impairs their ability to perform one or more activities of daily living; or with a serious or complex medical condition." AR, 000909-10. It added no other test or qualification. *Id*.

46. It also informed the States that "[t]he state may not request additional information or documentation unless it is unable to establish that the individual met community engagement requirements (or was not required to do so) using reliable information available to it." AR, 000912.

47. The December 8 Bulletin did not include any limits on the use of auditable self-declaration. AR, 000905-17.

48. Around the same time, on December 5, 2025, CMS began participating in workgroup calls to provide guidance and conduct question-and-answer sessions with States concerning implementing the Work Requirement. *See, e.g.*, Ex. 3 ¶12; Ex. 6 ¶10; Ex. 10 ¶11; Ex. 11 ¶15; Ex. 13 ¶10; Ex. 16 ¶11; Ex. 24 ¶11.

49. These workgroup calls took place once every other week from December 2025 through April 2026, then switched to a weekly cadence beginning in May 2026, and continued through at least June 2026. *See, e.g.*, Ex. 13 ¶10; Ex. 16 ¶11; Ex. 19 ¶12; Ex. 21 ¶11; Ex. 23 ¶11; Ex. 24 ¶11.

50. CMS initially signaled to State Medicaid agencies that it intended to limit use of self-attestation. November 2025 Slide Deck, 16; *see, e.g.*, Ex. 2 ¶15; Ex. 4 ¶15; Ex. 5 ¶15; Ex. 9 ¶15; Ex. 18 ¶15.

51. But CMS later indicated to State Medicaid agencies that self-attestation would be an acceptable verification method when data was not available., *See, e.g.*, Ex. 2 ¶15; Ex. 11 ¶ 19; Ex. 18 ¶15; Ex. 19 ¶16; Ex. 21 ¶15; Ex. 23 ¶15.

52. In March 2026, CMS reiterated to State Medicaid agencies that they could use auditable self-declaration to verify applicability of the "medically frail" exclusion, specifically when confirming ongoing medical frailty and when a member newly identifies as medically frail. *See, e.g.*, Ex. 2 ¶16; Ex. 4 ¶16; Ex. 5 ¶16; Ex. 9 ¶16; Ex. 10 ¶16; Ex. 11, ¶20; Ex. 21 ¶16; Ex. 23 ¶16.

53. Also in March 2026, CMS submitted the draft Interim Final Rule to the Office of Information and Regulatory Affairs in the Office of Management and Budget for review. Ex. 63.

54. On May 1, 2026, CMS presented to the State Medicaid agencies a slide deck that included a definition of the "medically frail" exclusion and did not mention a requirement that an individual's condition impair their ability to comply with the Work Requirement. *See, e.g.*, Ex. 5 ¶17; Ex. 10 ¶17; Ex. 13 ¶16; Ex. 16 ¶17; Ex. 24 ¶17; Ex. 25 ¶18.

55. On or about May 6, 2026, CMS informed State Medicaid agencies that information conveyed by CMS on the May 1, 2026, workgroup call should not be acted upon and was subject to change. *See, e.g.*, Ex. 10 ¶18; Ex. 11 ¶22; Ex. 16 ¶18; Ex. 24 ¶18; Ex. 25 ¶19.

56. At no point before promulgation of the Interim Final Rule in June 2026 did CMS indicate to State Medicaid agencies that Medicaid members would be limited to using self-declaration only once per enrollment period. *See, e.g.*, Ex. 2 ¶16; Ex. 3 ¶18; Ex. 7 ¶22; Ex. 9 ¶16; Ex. 13 ¶15; Ex. 16 ¶16; Ex. 23 ¶16.

57. At no point between passage of H.R. 1 and promulgation of the Interim Final Rule in June 2026 did CMS indicate that the medically frail exclusion would include a requirement that a condition "significantly impair" the individual's ability to comply with the Work Requirement. *See, e.g.*, Ex. 6 ¶11; Ex. 11 ¶18; Ex. 13 ¶13.

**B. Early Implementation of the Work Requirement in Nebraska**

58. On December 17, 2025, Nebraska and CMS Administrator Mehmet Oz, M.D., announced that Nebraska would be the first State to implement the Work Requirement on May 1, 2026. Ex. 29, 1.

59. Administrator Oz stated that "CMS will be working together with Nebraska and its 50 counterparts to ensure every program is implemented smoothly, responsibly, and in compliance with federal law." Ex. 29, 3.

60. A press release regarding the announcement stated "Nebraska Medicaid will use available data to verify compliance during application and renewal." Ex. 29, 2.

61. A press release regarding the announcement included a list of individuals who "are excluded from this requirement," which included "[p]eople who are medically frail" with no reference to whether those people are significantly impaired from otherwise complying with the Work Requirement. Ex. 29, 2-3.

62. In later state guidance addressing the "Medically Frail and SUD Treatment Program Exemptions," Nebraska's Department of Health and Human Services referred to a list of "medical diagnosis and procedure codes" identifying "conditions that may qualify an individual as medically frail or participating in an SUD treatment program." Ex. 64, 2.

63. This guidance stated that, for existing enrollees, "[i]f qualifying medical conditions or treatment indicators are identified" based on those codes, "the individual will be treated as exempt without needing to take additional action." *Id.* at 1.

64. Nebraska's reliance on diagnosis and procedure codes allows the State to conduct *ex parte* verifications of medical frailty or serious or complex medical conditions. *See id.*

65. This guidance did not reference the significant impairment of an individual's ability to comply with the Work Requirement. *Id.* at 1-3.

66. CMS noted in the Regulatory Impact Analysis included with the Interim Final Rule that "Nebraska began implementing the community engagement requirement on May 1, 2026." 91 Fed. Reg. 33459.

**C. States' Implementation Efforts Based on CMS's Preliminary Guidance**

67. Consistent with CMS's direction that States begin preparing to implement the Work Requirement that they could begin providing member notices by the August 31, 2026, date, and could be operational by the January 1, 2027, implementation date, and in line with past practice, State Medicaid agencies necessarily relied on the subregulatory guidance CMS provided to make their choices and investments in advance of promulgation of the Interim Final Rule (IFR) on

June 1, 2026. *See, e.g.*, Ex. 1 ¶3; Ex. 2 ¶39; Ex. 3 ¶50; Ex. 4 ¶40; Ex. 5 ¶41; Ex. 6 ¶20; Ex. 7 ¶¶11-12, 46; Ex. 8 ¶14; Ex. 22 ¶10; Ex. 39 ¶¶12, 19.

68. Consistent with CMS's earlier acknowledgment that the States should "refer to the applicable statutory language for complete information," Plaintiff States also relied on the language of H.R. 1 itself to inform their implementation efforts. *See, e.g.*, November 2025 Slide Deck, 5; Ex. 9 ¶43; Ex. 10 ¶41; Ex. 11 ¶53; Ex. 13 ¶40; Ex. 15 ¶40; Ex. 16 ¶41.

69. The States understood that the short timeline for implementation would require taking significant, costly, and binding steps ahead of the June 1, 2026, IFR. *See, e.g.*, Ex. 12 ¶11; Ex. 18 ¶¶40-41; Ex. 19 ¶¶42-43; Ex. 20 ¶¶17-18; Ex. 21 ¶¶40-41; Ex. 23 ¶¶35-36; Ex. 24 ¶¶40-41; Ex. 25 ¶¶42-43.

70. Plaintiff States worked with their State legislatures to appropriately fund the statutory changes required by H.R. 1. *See, e.g.*, Ex. 2 ¶53; Ex. 3 ¶70; Ex. 7 ¶63; Ex. 10 ¶61; Ex. 12 ¶22; Ex. 13 ¶40; Ex. 14 ¶¶5-6.

71. Plaintiff States worked with third-party vendors to make the necessary changes to their eligibility systems and allow for use of new data sources. *See, e.g.*, Ex. 1 ¶8; Ex. 12 ¶11; Ex. 15 ¶40; Ex. 16 ¶41; Ex. 21 ¶41; Ex. 23 ¶36.

72. Plaintiff States prepared notices and other outreach materials and campaigns for members. *See, e.g.*, Ex. 2 ¶39; Ex. 3 ¶50; Ex. 4 ¶40; Ex. 5 ¶41; Ex. 6 ¶20; Ex. 7 ¶46; Ex. 8 ¶14; Ex. 9 ¶43.

73. Plaintiff States initiated processes to hire and train new staff. *See, e.g.*, Ex. 11 ¶53; Ex. 15 ¶40; Ex. 16 ¶41; Ex. 21 ¶41; Ex. 22 ¶13; Ex. 23 ¶36.

74. Plaintiff States developed plans and entered into new contracts and expanded existing contracts to account for increased call volume and new processes. *See, e.g.*, Ex. 8 ¶14; Ex. 9 ¶43; Ex. 11 ¶53; Ex. 19 ¶63; Ex. 25 ¶43.

75. Plaintiff States worked extensively with clinical and systems personnel to build processes to identify individuals who are "medically frail" or have a "serious or complex medical condition," including by identifying specific diagnostic and procedure codes to confirm eligibility for the exclusion on an *ex parte* basis. *See, e.g.*, Ex. 1 ¶8; Ex. 2 ¶40; Ex. 3 ¶51; Ex. 4 ¶41; Ex. 5 ¶42; Ex. 6 ¶21; Ex. 7 ¶47.

76. Louisiana submitted to CMS a "Medically Frail Definition and Diagnosis Framework" dated February 6, 2026. AR, 004342-86.

77. Louisiana's "Definition and Diagnosis Framework" relied on "Algorithms/Medical Codes," and Louisiana also submitted to CMS the "draft medical code list" it had created. AR, 004351-86.

78. Louisiana's reliance on medical codes would allow the State to conduct *ex parte* verifications of medical frailty or serious or complex medical conditions. *See* AR, 004354-55, 004357, 004359, 004361-64.

79. The framework does not include any reference to whether a condition identified via diagnosis code "significantly impairs" or otherwise affects an individual's ability to comply with the Work Requirement. AR, 004342-86.

80. As of February 6, 2026, Louisiana reported its "Tasks Complete" in the following order: "Medically frail definition established," then "Working draft medical code list created to identify those who meet the definition of medically frail." AR, 004385.

81. Also as of February 6, 2026, Louisiana reported the following next steps; "Continue to refine list and put into format needed by IT (excel?)"; "Work with Mitzi/others on trial data run with codes"; "Refine list"; "Build claims algorithm (IT)"; "Create verification pathways for self and clinical attestation"; "Set up notice and appeals processes"; "Meetins [*sic*] set with LDH physician focus groups to review codes"; "Engage stakeholders —goal to start next quarter"; and "Finalize policy." AR, 004385.

82. Utah also communicated to CMS its "first draft of Utah's implementation of the medical frailty exception," which included a "Comprehensive ICD-10 Code List for Medical Frailty." AR, 004759-61.

83. Utah's approach classified "conditions according to three levels of severity," and proposed that the different levels of severity would merit different lengths of "exception" based on medical frailty. AR, 004759-60.

84. Throughout this time period, in weekly calls with CMS representatives and, at CMS's direction, through direct communication with CMS staff, the State Medicaid agencies informed CMS of the States' efforts to operationalize the work requirements, asked questions, and sought additional guidance and clarification. *See* November 2025 Slide Deck, 5; AR, 004840 (row 516, column D) (noting that "States submitted 18 questions related to HR1 requirements during" a recent meeting); *see, e.g.*, Ex. 9 ¶¶11-12; Ex. 10 ¶¶11-12; Ex. 11 ¶15-16; Ex. 13 ¶¶10-11; Ex. 15 ¶¶11-12; Ex. 16 ¶¶11-12; Ex. 18 ¶¶11-12; Ex. 19 ¶¶12-13; Ex. 21 ¶¶11-12; Ex. 22 ¶10; Ex. 23 ¶¶11-12; Ex. 24 ¶¶11-12; Ex. 25 ¶¶12-13.

85. At CMS's direction, State Medicaid agencies also communicated directly with CMS staff to provide updates on their implementation efforts, ask questions, and seek additional

guidance and clarification. *See* November 2025 Slide Deck, 5; *see, e.g.*, Ex. 18 ¶¶11-12; Ex. 19 ¶¶12-13; Ex. 21 ¶¶11-12.

86. A spreadsheet labeled by CMS in the administrative record Index as "State Requests for Technical Assistance re: 71119-Community engagement data" reflects that States submitted approximately 690 requests and questions to CMS between July 16, 2025 and May 29, 2026. AR, 004840, (column K).

87. In one such submission dated March 27, 2026, Plaintiff New Jersey asked, "Is CMS able to publicly release a few examples of acceptable formats/models for screeners as soon as possible (i.e. in the next couple of weeks), that would be incredibly helpful. The State needs to update applications, code into eligibility systems and logic, do user testing, etc. – and rule release in June is likely too late to stay on track for timely implementation." AR, 004840 (row 507, column D).

88. States also met on a regular basis with CMS IT system leads to report on their progress in building their IT systems to implement a minimum viable product workplan. *See, e.g.*, Ex. 1 ¶3; Ex. 2 ¶11, Exh. A; Ex. 3 ¶12; Ex. 4 ¶11; Ex. 7 ¶¶12-17, 46; Ex. 8 ¶¶11, 12; Ex. 9 ¶¶11-12; Ex. 10 ¶¶11-12; Ex. 12 ¶11; Ex. 15 ¶¶11-12; Ex. 20 ¶¶12-13; Ex. 21 ¶¶11-12; Ex. 22 ¶10.

## IV. Information Before CMS Prior to Promulgation of the IFR

### A. Information in the Administrative Record

89. Before June 1, 2026, stakeholders provided CMS with relevant data and concerns relating to the implementation of the Work Requirement. *E.g.*, AR, 003865-4013; AR, 004007-08; AR, 004723-30.

90. The administrative record reflects many communications from third parties along with other research, data, and suggestions that were available to CMS prior to promulgation of the IFR on June 1, 2026. *See* AR Certification; AR, Index 1-21; AR, 000001-4840.

**1. Pre-HR 1 Implementations of Medicaid Work Requirements**

91. The administrative record includes information about State implementation of work requirements prior to enactment of H.R. 1. *E.g.*, AR, 000922; AR, 004733-36.

92. A slide deck in the administrative record titled "Implementing Community Engagement Requirements in Medicaid: Draft chapter and recommendation" by the Medicaid And CHIP Payment and Access Commission (AR, 000916-36) noted that "before recent changes in federal law, some states pursued Section 1115 demonstrations to implement work and CE requirements." AR, 000922.

93. The slide deck noted that where such work and "CE" requirements were implemented, "observed and projected coverage losses were ***substantial***." AR, 000922 (emphasis added). It added that common reasons for lack of compliance included "[l]ack of beneficiary awareness, barriers to employment, and ***administrative challenges***." *Id.* (emphasis added).

94. A March 27, 2026 letter to CMS from six Members of Congress also discussed the projected and observed coverage losses from earlier State implementation of work requirements. AR, 004733-36.

95. Concerning an earlier "short-lived" implementation in Michigan, the letter stated, "80,000 individuals were at risk of losing their health care coverage within the first month of implementation, and 100,000 were expected to lose coverage in the first year of implementation." AR, 004733. It also stated that "49 percent of beneficiaries were already working, and 10 percent were students or homemakers, suggesting that many of those at risk of

losing coverage were already meeting the new requirements, but faced coverage loss as a result of the red tape associated with the policy." AR, 004733-34.

96. Addressing Georgia's Pathways to Coverage Program, which it described as "a statewide program that expanded Medicaid eligibility to adults aged 19-64 years with low incomes and simultaneously introduced work requirements for newly eligible enrollees," the Members of Congress wrote: "They experienced no gains in Medicaid coverage or in employment rates compared with their counterparts in neighboring non-expansion states during the 15 months after Pathways to Coverage." AR, 004734. They added, "Georgia's program ***reduced coverage without increasing employment***, suggesting that the red tape associated with work requirements impeded Medicaid enrollment in the state." AR, 004734 (emphasis added).

97. On the subject of implementation of work requirements in Arkansas, the letter stated "[i]n Arkansas, work requirements decreased Medicaid and Marketplace coverage by 13.2 percentage points among adults aged 30-49 years within six months, while there was no change in employment or engagement in community activities." AR, 004734. It also said, "more than 18,000 adults in Arkansas lost coverage because of Medicaid work requirements, out of an estimated 100,000 people who were subject to them." *Id*.

98. A November 19, 2025 letter to CMS from the National Health Law Program (NHeLP) (AR, 003990-4013) noted that, "when states implemented work requirements through section 1115 projects, many individuals who were required to submit evidence from a provider to verify the existence of a disability-related exemption struggled to find a willing provider or one who could timely sign off. AR, 004008; *see also* Ex. 26.

99. In support of this contention, NHeLP cited a research report by Ian Hill et. al, titled *New Hampshire's Experience with Medicaid Work Requirements: New Strategies, Similar Results."* AR, 004008.

100. The research report reflected reports from stakeholders that "many providers were confused or did not want to participate" in completing medical frailty exemption requests. Ex. 65, 22-23.

101. NHeLP wrote, "[g]iven that Medicaid beneficiaries are limited to the smaller pool of providers that accept Medicaid and—if subject to managed care models—are also limited to in-network providers, then finding a willing provider becomes even more difficult." AR, 004008.

102. CMS itself, in a March 17, 2021 letter to the Arkansas Department of Human Services "withdrawing approval of the community engagement requirement" raised several difficulties with the implementation in Arkansas. AR, 000937-90.

103. CMS noted that "[b]efore the court halted the community engagement requirement, the State reported that from August 2018 through December 2018, a total of 18,164 individuals were disenrolled from coverage for 'noncompliance with the work requirement'" and that "there was no associated increase in employment or other community engagement activities among low-income individuals subject to the community engagement requirement whether in the first year when the policy was still in effect or nine months after the policy was blocked." AR, 000940, 000942.

104. CMS also noted that, in Arkansas, New Hampshire, and Michigan, "evidence suggests that even individuals who were working or those who had serious health needs, and therefore should have been eligible for exemptions, lost coverage or were at risk of losing coverage because of complicated administrative and paperwork requirements." AR, 000943-44.

105. The administrative record also contains a "Georgia Section 1115 Demonstration Waiver Extension Request" dated April 28, 2025, which relates to its Pathways to Coverage Program. AR, 000991-1128.

106. The Georgia Extension Request included an Interim Evaluation Report providing "findings and recommendations based on the first 13 months of the Demonstration, July 1, 2023, through July 31, 2024" from a state-contracted Independent Evaluator, required by CMS. AR, 000999, 001041. The Interim Evaluation Report included the findings that "[e]nrollment into Pathways was lower than projected in the first year" and "[t]he [qualifying hours and activities] requirement limited Pathways enrollment." AR, 001041-42. Its recommendations included "[s]treamline and simplify the application and documentation processes." AR, 001042.

107. A letter from "22 public health and health policy deans, chairs, and scholars," dated December 12, 2025 (AR, 004183-96) noted that "Medicaid enrollees who lost coverage due to Arkansas's work requirement were significantly more likely to delay obtaining healthcare due to cost (56 percent) and delay obtaining medications due to cost (64 percent), compared to those who remained enrolled in coverage." AR, 004191.

108. The letter also stated that "Arkansas Medicaid enrollees also reported that the work requirement created heightened stress and fear that they might lose coverage." AR, 004191.

**2. The Medically Frail Exclusion**

109. The administrative record reflects communications and other information relevant to the medically frail exclusion. *E.g.*, AR, 003990-4013.

110. Regarding the medically frail exclusion, NHeLP wrote in its November 19, 2025 letter that "the history of the phrase 'medically frail or otherwise has special medical needs' reveals that it is unrelated to ability to work." AR, 004001. NHeLP explained that under the implementing regulation for amendments to the Medicaid Act addressing Alternative Benefit

Plans (42 C.F.R. § 440.315(f); *see supra* ¶34), CMS permitted States to define the phrase "medically frail or otherwise an individual with special medical needs," but required that State definitions include "at least six categories of individuals" to "ensure that individuals with significant health care needs maintain adequate health coverage." AR, 004001-02.

111. NHeLP explained that, in H.R. 1, Congress adopted each of the categories from the Alternative Benefit Plan regulation, "dropping only the category that is limited to children under age 19," who are not subject to the Work Requirement, thus expressing "its intent to exclude from the work requirements applicants and beneficiaries who have a particular need for comprehensive health care coverage." AR, 004001-02.

112. In a December 12, 2025 letter, "22 public health and health policy deans, chairs, and scholars, in their individual capacities" submitted a comment to HHS and CMS to "share relevant research findings and recommendations for implementing the new work requirements" with a "specific focus on the exemption for people who are 'medically frail or otherwise have special medical needs.'' AR, 004183.

113. In the letter, they wrote that "[m]edical frailty has been part of Medicaid for 20 years, but [...] determining whether someone can work is not part of that process." AR, 004185. They also wrote that "H.R. 1's criteria almost exactly parallel's [*sic*] the ABP definition." AR, 004186.

114. They also wrote that "[i]ndividuals who are employed and have a serious or complex medical condition, or multiple conditions, often work in low-wage jobs and report that working conditions such as unpredictable schedules make it hard to manage their conditions" and "[t]he 'serious or complex' subcategory of HR 1 is an essential guardrail to ensure these

individuals maintain their coverage, regardless of their work status in a given month." AR, 004186.

115. An October 2025 document in the administrative record from the AIDS Institute, which is titled "7 Reasons to Exempt People with HIV from Medicaid's Community Engagement Requirement," (AR, 003867-68) states that "HIV can make it more difficult to adhere to a regular work schedule because of medication side effects, periods of illness, and the need to attend many doctors' appointments." AR, 003867.

116. It also states that "Medicaid is a work support for people with HIV, because it provides consistent and continuous access to treatment that keeps people with HIV healthy. Disruption of care due to administrative reporting requirements undermine the ability of people to work and can lead to long term unemployment." AR, 003867.

117. In an October 10, 2025 letter to CMS, the Consortium for Constituents with Disabilities (CCD), the Disability and Aging Collaborative (DAC), and allied organizations (AR, 003869-73) informed CMS that "Medicaid helps people with disabilities work by providing them with health care and important employment supports [...] [M]ost people enrolled in Medicaid who are not doing paid work are caregiving, retired, and/or have chronic conditions or disabilities and are temporarily unable to work or need supportive services to find and keep a job." AR, 003869.

118. They added that "[t]he reality is that people with disabilities face substantial barriers to employment, including inadequate accommodations, inaccessible workplaces, and outright stigma" and "emphasize[d] that having a disability or health condition that qualifies for an exemption is not inconsistent with an individual's ability to work." AR, 003871. They asked that the "Administration set standards that prohibit States from using 'ability to work' or

evidence of employment (such as payroll data) to deem an individual ineligible for this exemption." *Id.*

119. On March 12, 2026, researchers from the Harvard T.H. Chan School of Public Health and Brigham & Women's Hospital submitted a memo to CMS to "provide a structured, validated, and auditable approach that states may use to automatically exempt medically frail individuals using ICD-10 (International Classification of Diseases 10th Revision) codes, which capture conditions and diseases in medical claims." AR, 004492-674.

120. The authors wrote that they drew from two sources in developing this approach: CMS's "list of Chronic Conditions and Other Chronic Health, Mental Health, and Potentially Disabling Chronic Conditions Algorithms from the Chronic Conditions Warehouse" and "Alternative Benefit Plan (ABP) determination processes from states using medical frailty definitions that had been publicly released." AR, 004492-93. They then wrote that "[t]wo physicians independently reviewed each algorithm to determine whether it should be entirely included or entirely excluded based on statutory criteria for identifying medically frail individuals." AR, 004493.

121. The memo stated that ICD codes were included if they were deemed to meet three requirements: (1) "likely to result in ongoing medical care needs OR impairment that limits likelihood of employment, number of hours worked if employed, extent of community participation, or other aspects of economic self-sufficiency"; (2) "likely to last 6 months or longer," and (3) "not easily curable with treatment." AR, 004493.

### 3. Use of Auditable Self-Declaration

122. An issue brief in the administrative record titled "Promoting Effective Identification of Medically Frail Individuals Under Medicaid Expansion," AR, 003806-34, which addresses the medically frail exception to mandatory enrollment in Alternative Benefit

Plans, notes that CMS suggested in that context that States employ a combination of the following methods to identify individuals qualifying as medically frail: "[e]ligibility category (for example, those in a disabled or foster child eligibility category may be automatically deemed medically frail); "[h]istorical medical encounter data (e.g., for current enrollees)"; and/or "[s]elf-identification, as on a questionnaire/screening tool." AR, 003811.

123. In an April 9, 2026 slide deck, the Medicaid and CHIP Payment and Access Commission wrote "self-attestation will be important, especially where data are limited" on a slide titled "CMS and states should ensure that eligible individuals can gain and maintain coverage." AR, 000927.

124. In their November 19, 2025 letter, NHeLP wrote, "CMS should require states to use the least burdensome verification method available, self-attestation. Notably, self-attestation has been found to be a highly reliable form of verification. Further, it is less burdensome for the state and the best method for ensuring that eligible individuals do not lose health coverage due to administrative barriers." AR, 004007-08.

125. In a March 27, 2026 letter, the National Association of Community Health Centers wrote to CMS, "[t]o prevent administrative hurdles from disenrolling eligible individuals, CMS should encourage states to streamline, simplify state-led verification forms and other documents when verify [*sic*] medical frailty standards." AR, 004740.

**4. *Ex Parte* Verification**

126. In a slide deck included in the administrative record, the Medicaid and CHIP Payment and Access Commission wrote "[s]takeholders emphasized that ex parte processes can minimize beneficiary reporting and reduce coverage loss" and "[s]tates may modify their use of existing data (e.g., income, Medicaid applications, or claims) and add data sources, as well as automating data checks." AR, 000927.

127. In a January 21, 2026 letter, the HIV and Hepatitis Policy Institute wrote, "[u]nder statute, states are directed to maximize *ex parte* verification of eligibility in relation to the community engagement requirements. Automatic exemption through use of data already available to the Medicaid program (such as diagnostic codes and claims data) minimizes the burden on the enrollee. It also reduces the administrative burden on the state and on the health-care workforce providing care to people with HIV." AR, 004318.

128. In a March 11, 2026, in a letter to CMS outlining its approach to defining medical frailty, the Commonwealth of Pennsylvania's Department of Human Services wrote to CMS: "[t]he law further requires that states use reliable information available to the state to determine whether an individual meets the criteria for an exemption or has met the requirement for community engagement (i.e., ex parte) to prevent individuals from having to submit additional information when possible." AR, 004469.

**5. Use of Claims Data**

129. The administrative record includes a proposal by researchers at the Harvard T.H. Chan School of Public Health titled "*Identifying Persons Qualifying for Medical Frailty Exemptions Using Medicaid Claims Data*" and dated March 20, 2026. AR, 004723-30.

130. The proposal by researchers at the Harvard T.H. Chan School of Public Health, see paragraph 129, *supra*, notes that "[c]laims-based identification requires healthcare utilization that includes a diagnosis code," which "[i]ndicates the important [*sic*] of the diagnosis timeframe ('lookback period') for identifying relevant claims." AR, 004727.

131. It contains data demonstrating that using a "lookback window" of 1 year, rather than 2 years, reduces the number of people identified as "medically frail" by at least 2 million individuals. AR, 004728-29.

132. It also contains the following graphic demonstrating that a longer lookback period for claims data increased the cumulative share of Medicaid beneficiaries excluded from the Work Requirement as medically frail:




AR, 004730.

133. The administrative record also contains a document published by CMS in 2024 and authored by researchers at Mathematica titled "*Methodology for Identifying Medicaid Long-Term Services and Support Expenditures and Users, 2022*." AR, 003835-64.

134. This document notes that CMS's own Chronic Conditions Data Warehouse algorithms "draw from either one or two years of claims." AR, 003856.

135. The authors also wrote: "we can identify only chronic conditions with observable medical treatment. Chronic conditions with infrequent treatment . . . might also be under-identified[.]" AR, 003858.

136. Another document titled "State Associations Community Engagement Feedback – December 18th, 2025," AR, 004216, notes that CMS was informed in a meeting that "medical

frailty as it relates to disability might not show up in claims data the way we expect" and that "a person with ID/DD [Intellectual Disabilities/Developmental Disabilities] might go in for a physical or other medical appointment, but the claim will likely not point specifically to the person having ID/DD. Often those 'secondary' diagnoses don't show up in claims (particularly true for individuals with ID/DD, autism, etc.)" AR, 004218.

137. A letter from Dr. Kyu Rhee, President and CEO of the National Association of Community Health Centers to CMS dated March 27, 2026 recommends that "CMS should allow a 24-month period for states to confirm medical frailty" due to "providers having 12 months to submit claims as well as shorter review periods which may miss relevant conditions that are not frequently recoded or documented but are ongoing." AR, 004740.

138. In an article titled "Implementing Medical Frailty Exemptions Under HR 1: Clinical Considerations From Medicaid Medical Directors," a "group of senior clinicians serving in more than 40 state Medicaid agencies" wrote that "[o]perational flexibility from CMS will be essential to ensure that medical frailty definitions align with state-specific contexts." AR, 004784-85.

139. They gave the following example:

> "Take, for example, a 38-year-old woman with opioid use disorder and unstable housing who seeks to engage in treatment. In a state that covers a robust continuum of behavioral health and substance use disorder services, such as residential treatment, intensive outpatient programs, and case management, her utilization history may provide clear evidence of medical frailty. In a state with more limited benefits, however, the same patient may have fewer encounters or differently encoded services unrelated to the degree of clinical severity."

AR, 004785.

### 6. Administrative Burden

140. In its letter to CMS, NHeLP stated that "[a]mple research demonstrates that additional administrative barriers deter and reduce coverage," and provided CMS with citations to studies and articles in a footnote. AR, 004008.

141. The cited studies and articles do not appear in the administrative record. *Compare* AR, Index 1-21, *with* AR, 004008.

142. A comment related to the medically frail exception from mandatory Alternative Benefit Plans, noted in a section labeled "Identifying the Medically Frail" that "[i]n the preamble to the final regulation, CMS acknowledges that states may not have prior experience with implementation of an ABP or with identifying individuals who meet the criteria for exemption." AR, 003797.

143. The comment also states that "[a] determination of functional limitations should include an individual, face-to-face assessment by an independent assessment entity." AR, 003804.

144. An article in the administrative record titled "Implementing Medical Frailty Exemptions Under HR1: Clinical Considerations From Medicaid Medical Directors," authored by "senior clinicians serving in more than 40 state Medicaid agencies" states:

> "Administrative efficiency is also critical. Medicaid insurers and safety-net clinicians already operate under substantial administrative strain. ***Experience from prior work requirement demonstrations suggests that administrative complexity can contribute to coverage losses unrelated to actual eligibility.*** Streamlined processes, standardized forms, and alignment with existing workflows may reduce burdens on clinicians and patients alike. Limiting the use of clinician and patient attestation to times only when other data are not sufficient will mitigate unnecessary burden."

AR, 004786 (emphasis added).

**7. Population Subject to Work Requirement**

145. The administrative Record includes a May 30, 2025 issue brief from KFF titled "Understanding the Intersection of Medicaid and Work: An Update." AR, 003575-615.

146. The Issue brief states that "[d]ata show the majority of Medicaid enrollees are working." AR, 003575.

147. It continues, "in 2023, nearly two-thirds of adults ages 19-64 covered by Medicaid were working and nearly three in ten were not working because of caregiving responsibilities, illness or disability, or due to school attendance, reasons that counted as qualifying exemptions from the work requirements under previous policies." AR, 003576.

148. It further states, "[m]any Medicaid adults who work are employed by small firms and are not eligible for employer-sponsored health insurance at their job," AR003585, and "Medicaid adults who work full-time are eligible for Medicaid in expansion states because they work low-wage jobs and meet income eligibility criteria," AR, 003588.

**8. Consequences of Coverage Loss**

149. In a letter dated December 12, 2025, "22 public health and health policy deans, chairs, and scholars" wrote to CMS that "[t]he adverse health effects of being uninsured are well established: compared to those with insurance, uninsured adults are 'more likely to forgo needed care,' 'less likely . . . to receive preventive care and services for major health conditions and chronic diseases,' and 'more likely to be hospitalized for avoidable health problems and to experience declines in their overall health.'" AR, 004183, 004191 (citing Tolbert, J. Cervantes *et al*, (2024, December 18) *Key Facts about the Uninsured Population*. KFF. https://www.kff.org/uninsured/issue-brief/key-facts-about-the-uninsured-population/).

150. On October 28, 2025, the AIDS Institute, AIDS United and the Center for Health Law & Policy Innovation sent a letter to CMS regarding implementation of the Work Requirement. Ex. 54 ¶34 & Exh. A; AR, 003912-14.

151. The letter informed CMS that, "[f]or people living with HIV, loss of Medicaid due to arbitrary denials and administrative red tape can lead to care disruptions that can pose enduring, costly, and complex health risks." Ex. 54, Exh. A at 3; AR, 003914.

**B. Information Provided to CMS Due to Suspected Policy Changes**

152. In May 2026, while the IFR was being reviewed by the White House Office of Management and Budget, CMS staff were aware that rumors were circulating that "CMS may limit the self-attestation option and that the White House [was] pushing CMS to tighten the exemption definitions." AR, 004793.

153. In May 2026, several State Medicaid agencies became concerned that CMS would change its policy direction related to the Work Requirement after CMS informed them that subregulatory guidance provided on May 1, 2026 should not be acted upon and was subject to change. *See, e.g.*, Ex. 3 ¶¶20-21; Ex. 9 ¶¶18-19; Ex. 11 ¶¶22-23; Ex. 23 ¶¶18-19.

154. MassHealth, Plaintiff Commonwealth of Massachusetts' Medicaid agency, sent a letter to CMS on May 29, 2026. Ex. 11 ¶23 & Exh. A.

155. MassHealth wrote to "share some concerns about the potential impact of any significant deviation from the statute and CMS guidance shared to date," noting that Massachusetts was "well into the development process and [had] very limited time remaining before the January 1, 2027 effective date." Ex. 11, Exh. A at 1-2.

156. MassHealth also stated that "any material shift in federal policy regarding Medicaid Community Engagement requirements could result in a significant increase in implementation costs and disruptions to Massachusetts." Ex. 11, Exh. A at 2.

157. With respect to the "medically frail" exclusion, MassHealth expressed its belief, "[a]fter reflecting on . . . inputs from CMS since the law's passage," that "leveraging clinical data derived from claims and encounters" and "accepting self-reported information from applicants with no available claims history" would allow Massachusetts to "achieve broad, auditable compliance with federal rules, while minimizing the burden on members and providers

impacted by Community Engagement requirements and allowing eligible Medicaid members to maintain their coverage." Ex. 11, Exh. A at 2.

158. Addressing self-attestation, MassHealth wrote that self-declaration has been historically permitted in the Medicaid program and added that "the acceptance of self-declaration in certain situations is a critical tool to facilitate enrollment of new members, keep eligible members covered, and reduce administrative churn where eligible members may experience gaps in coverage due to paperwork issues." Ex. 11, Exh. A at 2.

159. This letter from MassHealth is not in the administrative record. *Compare* Ex. 11, Exh. A, *with* AR, Index 1-21.

160. Medi-Cal, California's Medicaid agency, also contacted CMS to express California's "significant concerns should CMS materially alter its prior guidance on Medicaid work requirements in the forthcoming interim final rule." Ex. 2 ¶19 & Exh. A at 1.

161. California explained that it had "relied extensively on CMS's preliminary guidance over the last several months to design, build, and operationalize major programmatic, systems, and staffing changes needed to comply with H.R. 1 by January 1, 2027." *Id*. It wrote, "CMS was aware throughout this period that California and other states were making time-sensitive, largely irreversible implementation decisions, including vendor contracts, IT builds, and staffing commitments, in direct reliance on its guidance, and continued providing that guidance without any indication that a material policy shift was under consideration. The reliance is embedded in systems that are already in final development and testing." *Id.* at Exh. A at 2. It added, "[i]mplementing new processes on this significantly shortened timeline would heighten the risk of systems errors, improper terminations, and administrative failures affecting eligible

individuals. DHCS anticipates that any major shift in direction at this stage could delay implementation by 18-24 months." *Id.* at Exh. A at 1-2.

162. California also wrote, "[a]ny major shift in federal policy at this stage, particularly concerning medically frail identification, self-attestation, or verification requirements, would require reengineering multiple system modules already approaching finalization, jeopardizing California's ability to meet the statutory deadlines." *Id.* at Exh. A at 2.

163. California added that any "significant late-stage policy shifts will increase coverage losses among eligible individuals, particularly those with disabilities and chronic or complex medical needs, as well as introduce avoidable administrative barriers through new documentation requirements and also create operational instability during a major programmatic transition affecting millions of Californians." *Id*.

164. This letter from Medi-Cal is not in the administrative record. *Compare* Ex. 2, Exh. A, *with* AR, Index 1-21.

165. The Governors of several other Plaintiff States also wrote to CMS in advance of the release of the Interim Final Rule. Ex. 66.

166. On May 29, 2026, the Governors of Oregon, Maine, Michigan, New York, New Mexico, and Washington sent a letter to Secretary Kennedy. *Id*.

167. In the letter, the governors reiterated the challenge their states faced in implementing community engagement requirements on a compressed timeline. They noted the continued absence of official guidance and reminded CMS that their States had made "good-faith operational decisions to revise [their] state systems" consistent with "verbal assurances" and "informal policy direction from CMS." They further requested that "published, final guidance align as closely as possible with states' working assumptions based on informal policy

direction from CMS to date and that states not be required to make significant changes at this stage of implementation." *Id.* at 1.

168. The governors highlighted the administrative complexity and resource-intensive nature of their States' implementation efforts, specifically reminding CMS of the "structural reality of Medicaid administration" that the States must work with third-party vendors to update their IT systems. *Id.* at 2.

169. They wrote, "[e]very change must be specified in writing, scoped and contracted with the vendor, reviewed for compliance with federal certification standards, independently tested, and validated before deployment," and "[v]endors typically require six to twelve months or more to complete significant system modifications." *Id.*

170. The governors also wrote that their States had "built out IT systems, drafted member communications, and developed the guidance and policies necessary to implement" the requirements, and "[i]f the IFR contains policy guidance that differs in any material respect from the operational choices states have made—whether in the absence of CMS guidance or in reliance on the verbal communications CMS has provided—states may need to revise or revisit significant portions of their implementation work." *Id.* at 1-2.

171. This letter from the Governors of Oregon, Maine, Michigan, New York, New Mexico, and Washington is not in the administrative record. *Compare* Ex. 66, *with* AR, Index 1-21.

172. An article dated May 26, 2026 that was forwarded internally within CMS titled "Families USA Sounds Alarm Over Rumored IFR Work Req Restrictions" includes the following statements from Families USA: "[t]his change in the definitions here [for] medical frailty would not only exclude many, many vulnerable individuals from the exemption, but also

set up an enormous administrative process for states to go through to determine eligibility and determine work ability on top of that, and that's just one that states are not prepared for, and they haven't been preparing for over the last year"; and"[h]aving the ability to self-attest is really paramount for people who would meet the medical frailty exemption but just don't have the paperwork to document their health status." AR, 004793-94.

173. The article also says "[s]tates have already begun the hard work of building their own medical frailty definitions and systems, including states that have already implemented and started work requirements early" and "[a] last-minute federal mandate tying medical frailty to inability to work would override state-level work that is already underway, take away the flexibility of the law, which it was designed to preserve, and cause chaos and confusion for people with disabilities and chronic conditions in states that have already begun implementation or states that are just starting to figure it out." AR, 004794.

174. On May 28, 2026, the American Cancer Society (ACS) sent an email to CMS stating, "[w]e have heard rumors that the rule CMS is planning to release could make it harder for cancer patients and those recovering from cancer to maintain or enroll in Medicaid coverage." AR, 004796.

175. ACS wrote that it had "heard that the administration may only apply the definition of medical frailty to individuals who cannot work" and "[t]ying medical frailty to an inability to work will prevent many people impacted by cancer from using this exemption." AR, 004797.

176. ACS further stated, "[l]imiting the exemption to just those deemed unable to work would set up a situation where many individuals will not be able to get Medicaid coverage right away—and lack access to care while they wait for a determination that they are unfit to work.

For a cancer patient, that gap in coverage—whether it's a few weeks, months, or years—can be deadly." AR, 004797.

177. ACS also wrote "[t]his change will also prevent cancer patients or survivors who can still work—and many want to—from working whatever hours they are able. It forces people with serious illnesses to choose between losing their Medicaid, working 80 hours per month, or not working at all to prove they are unable. It prevents cancer patients from picking up work when they can—for example, when they are well enough to work shifts in between chemo rounds, but not enough shifts to guarantee 80 hours/month." AR, 004797.

178. Concerning self-attestation, ACS wrote that it had "heard reports that the interim-final rule could eliminate or severely restrict the use of self-attestation for compliance and exemptions" and "[a]llowing individuals to self-attest to medical frailty and other criteria—including exemptions and qualifying activities—is an important and practical tool, especially for the first year of implementation." AR, 004797.

179. ACS wrote further, "[t]he impact on coverage could be enormous as additional documentation adds paperwork and bureaucracy that leads eligible people to lose coverage." AR, 004797.

180. ACS also wrote, "[f]or those medically frail, there are many reasons data in a patient's chart may not show up. People may face challenges seeing specialty providers in rural and medically underserved areas and states can experience data lags between the point of care and claims data." It added, "[a]sking cancer patients—who may be uninsured—to submit medical records or go to a doctor to certify their exemption status is a recipe for these individuals to lose coverage and, with it, a lifeline to the medical care they need." AR, 004797.

**V. Interim Final Rule**

181. On June 1, 2026, CMS released the IFR, entitled "*Medicaid Program: Community Engagement Requirement for Certain Individuals*" (IFR), which was published in the Federal Register on June 3, 2028. AR, Certification, 000001-135.

182. In the preamble, the IFR states: "The [Work Requirement] has the potential to empower Medicaid beneficiaries through employment, education, or volunteer service so they can escape isolation and dependency, build confidence, and achieve self-sufficiency and independence." 91 Fed. Reg. 33349.

183. It also states, "[i]mplementing the community engagement requirement, we believe will assist in prioritizing coverage for Medicaid's most vulnerable populations such as seniors, individuals with disabilities, pregnant women, and children while empowering able-bodied individuals through community engagement." 91 Fed. Reg. 33350.

184. In Section "V. Regulatory Impact Analysis," the Interim Final Rule states, "a well-designed community engagement requirement may benefit individuals so that they are not dependent, demoralized, or stuck in situations that hinder their economic, physical, and mental state." 91 Fed. Reg. 33451.

185. The Interim Final Rule includes several provisions that are vague, differ substantially from CMS's prior guidance, and are more restrictive than the language of H.R. 1. *See, e.g.*, Ex. 2 ¶20; Ex. 4 ¶19; Ex. 5 ¶19; Ex. 7¶25; Ex. 11 ¶ 24; Ex. 13 ¶18; Ex. 21¶19; Ex. 22 ¶11; Ex. 23 ¶20; Ex. 24¶19; Ex. 25 ¶21.

i. *Medically Frail or Otherwise Has Special Medical Needs*

186. The Interim Final Rule defines "[a]n individual who is medically frail or otherwise has special medical needs" as "an individual whose physical, mental, or other behavioral health

condition significantly impairs the individual's ability to comply with the community engagement requirement in this subpart and is an individual:

(A) Who is blind or disabled (as defined in section 1614 of the Social Security Act);

(B) With a substance use disorder, excluding an individual in stable recovery (which means, an individual who is in recovery for 5 or more years);

(C) With a disabling mental disorder;

(D) With a physical, intellectual, or developmental disability that significantly impairs their ability to perform one or more activities of daily living; or

(E) With a serious or complex medical condition which is a medical condition that is life threatening, seriously disabling without necessarily being life threatening, causing significant pain or discomfort that can cause serious interruptions to life activities, requiring a major time or effort commitment from caregivers for a substantial period of time, requiring frequent monitoring, associated with severe consequences or negative consequences for someone else, affecting multiple organ systems, requiring management to tight physiological parameters, requiring coordination of multiple specialties, requiring treatment that carries a risk of serious complications, or requiring adjustment in non-medical environments." 42 C.F.R. § 435.554(c)(5)(i).

187. The following language does not appear in H.R. 1: "an individual whose physical, mental, or other behavioral health condition significantly impairs the individual's ability to comply with the community engagement requirement in this subpart." *See* Pub. L. No. 119-21, 139 Stat. 172 (2025).

ii. *Use of Claims Data to Verify Medical Frailty*

188. The Interim Final Rule requires that, when verifying "medical frailty," a State Medicaid agency must "attempt to verify that an individual is a specified excluded individual on the basis that the individual is medically frail or otherwise has special medical needs . . . using reliable information available to the State, including claim(s) relevant to the individual that have been adjudicated in the preceding 12 months, including those that have been paid, pended or denied, and encounter data, as relevant to the individual." 42 C.F.R. § 435.557(f)(1).

189. It defines "reliable information available to the state" as

> "including, but not limited to: (i) information from electronic data sources that the agency has determined to be effective . . . ; (ii) Information from other State or local agencies; (iii) Information related to community engagement from Federal agencies and other data sources provided through the electronic services established by the Secretary . . . ; (iv) Information in the States' eligibility system; (v) Information in the individual's case record; (vi) Payroll data; (vii) Claim(s) relevant to the individual that have been adjudicated in the preceding 12 months, including those that have been paid, pended or denied; and (viii) Encounter data, as relevant to the individual, for the preceding 12 months."

42 C.F.R. § 435.557(a).

190. Of the eight categories of data specifically included in the definition of "reliable information available to the State," claims data and encounter data are the only two that are temporally limited. *See* 42 C.F.R. § 435.557(a).

iii. *Use of Auditable Self-Declaration*

191. With respect to the "medical frailty" exclusion, under the Interim Final Rule, a State Medicaid agency must first attempt to use "reliable information available to the State" to verify that an individual is "medically frail or otherwise has special medical needs." 42 C.F.R. § 435.557(f)(1).

192. When there is no "reliable information available to the State," a State Medicaid agency may require documentation or accept a statement or other information under penalty of

perjury" to verify that an individual is medically frail or otherwise has special medical needs, only "[b]efore January 1, 2028." 42 C.F.R. § 435.557(f)(1)(i).

193. "Beginning on January 1, 2028," a State Medicaid agency "may accept a statement or other information provided under penalty of perjury that provides sufficient information . . . to verify qualification for the exclusion only once during the beneficiary's period of enrollment . . . when there is no reliable information available to the State or the reliable information available to the State is not reasonably compatible with the information provided by or on behalf of the individual." 42 C.F.R. § 435.557(f)(1)(ii).

194. The Interim Final Rule defines a "period of enrollment" as a "continuous period of enrollment in coverage under the State plan or waiver without the individual being disenrolled, regardless of the number of consecutive eligibility period, of redeterminations or renewals, or of transitions between eligibility groups." 42 C.F.R. § 435.557(a). The Social Security Act does not recognize a "period of enrollment." *E.g.*, Ex. 2 ¶¶28-29; Ex. 11, ¶ 36; Ex. 15 ¶26; Ex. 21 ¶27. The concept of a "period of enrollment" in the context of Medicaid is introduced for the first time in the IFR. *E.g.*, Ex. 11, ¶ 36; Ex. 15 ¶26; Ex. 21 ¶27.

195. The Interim Final Rule provides that, when verifying "compliance with or exception or exclusion from the community engagement requirement" *other than exclusion due to medical frailty*, 42 C.F.R. § 435.557, the State Medicaid agencies "may require documentation or accept other information . . . when there is no reliable information available to the State or the reliable information is not reasonably compatible with the information provided by or on behalf of the individual" only "[b]efore January 1, 2028." 42 C.F.R. § 435.557(b)(2)(i).

196. Under the Interim Final Rule, "[b]eginning on January 1, 2028," when there is "no reliable information available to the State or the reliable information is not reasonably

compatible with the information provided by or on behalf of the individual, the agency must require documentation whenever documentation is reasonably available" to verify compliance with or exception or exclusion from the community engagement requirement, other than exclusion due to medical frailty. 42 C.F.R. § 435.557(b)(2)(ii).

197. Only when documentation is not reasonably available may a State Medicaid agency "[a]ccept information other than documentation" to verify eligibility or exception or exclusion from the Work Requirement, other than exclusion due to medical frailty. 42 C.F.R. § 435.557(b)(2)(iii).

## VI. CMS's Explanations and Considerations Concerning the Interim Final Rule

### A. The Administrative Record

198. On August 14, 2026, CMS provided to Plaintiffs the administrative record for the Interim Final Rule, along with an index and a "Certification of the Rulemaking Record." AR, Certification; AR, Index; AR000001-4840.

199. Of the 220 documents included in the administrative record, eight are documents from the Federal Register, which include the IFR itself and a correction issued to the IFR on June 29, 2026, and eight are executive orders and proclamations. *See* AR, Index 1-21.

200. The remaining 204 documents are labeled in the Index for the administrative record as "Other Materials." AR, Index 2-21.

201. Though the Index includes 220 documents total, only approximately ninety-three of those documents are cited in footnotes in the Interim Final Rule. 91 Fed. Reg. 33348-482.

202. Of the 204 documents labeled as "Other Materials," only approximately eighty-seven are cited in footnotes in the IFR. AR, Index 2-21; AR, 000001-4840.

203. Of the approximately eighty-seven documents labeled "Other Materials" that are cited in footnotes in the IFR, not one is cited in connection with (a) CMS's decision to add to the

medically frail exclusion the requirement that a condition "significantly impairs" an individual's ability to comply with the Work Requirement; (b) CMS's decision to limit self-attestation for the medically frail exclusion to once per enrollment period; or (c) CMS's decision to limit the use of claims data to claims adjudicated in the previous 12 months. 91 Fed. Reg. 33348–82; AR00001-3794. Those portions of the IFR do not cite any evidence to support CMS's choices.

204. The remaining approximately 117 documents labeled as "Other Materials" that are not cited in the IFR include published research, documents provided to CMS by third parties, and submissions from certain States to CMS.

205. There is no indication in either the administrative record or the IFR of how CMS did or did not consider, grapple with, or weigh the information contained in these approximately 117 documents.

206. For example, one document in the "Other Materials" category that is not cited in the IFR is a spreadsheet identified in the Index as "204. State Requests for Technical Assistance re: 71119-Community engagement data." AR004840.

207. The spreadsheet contains questions received from States regarding technical implementation of the Work Requirement. Though the spreadsheet indicates that many of the questions were answered, the answers are not included in the spreadsheet. AR004840.

208. The administrative record does not include the version of the IFR that was submitted to the Office of Information and Regulatory Affairs within the Office of Management and Budget on March 31, 2026. *See* AR, Index 1-21; *see also* Ex. 63.

209. Plaintiffs have, on two occasions, requested the version of the Interim Final Rule that was submitted to the Office of Information and Regulatory Affairs of the Office of Management and Budget, but they have not yet received a response. Ex. 31; Ex. 67.

210. The administrative record also does not include several communications from States and stakeholders addressing implementation of the Work Requirement. *Supra* ¶¶ 154-71; *Compare* Ex. 54 ¶37 & Exh. D, *with* AR, Index 1-21.

**B. CMS's Explanation of the Interim Final Rule**

211. The IFR contains a preamble that spans approximately 122 pages of the Federal Register. 91 Fed. Reg. 33348-69. It is broken into five Sections: "I. Background"; "II. Provisions of the Interim Final Rule with Comment Period"; "III. Good Cause for Proceeding With an Interim Final Rule With Comment Period"; "IV. Collection of Information Requirements"; and "V. Regulatory Impact Analysis."

212. Concerning the Work Requirement generally, CMS wrote in the preamble, "Community engagement is an entirely new factor of eligibility, and as such, States must consider criteria that were not previously applicable to Medicaid eligibility and establish new policies and procedures for verifying whether an individual meets those criteria." 91 Fed. Reg. 33395.

213. In this preamble, CMS stated: "The best reading of the statutory phrase 'medically frail or otherwise has special medical needs' is one that considers not only the presence of a particular diagnosis or condition, but also the extent to which the condition impairs an individual's ability to engage in community engagement activities (including but not limited to work) or otherwise comply with the statutory requirements in section 1902(xx) of the Act." 91 Fed. Reg. 33373.

214. Yet elsewhere in the preamble, CMS wrote, "[w]e are defining medically frail individuals as individuals who meet one or more of the five categories identified at section 1902(xx)(9)(ii)(V) of the Act" with no reference to the Significant Impairment Provision. 91 Fed. Reg. 33372.

215. CMS also stated, "[r]eading the statute to require automatic classification as medically frail or otherwise having special medical needs based solely on diagnosis or condition would risk sweeping in individuals whose conditions do not significantly impair their functional capacity. . . ." 91 Fed. Reg. 33373.

216. Regarding enforcement of its implementation of the medically frail exclusion, CMS stated in the preamble, "[i]f through Payment Error Rate Measurement Program (PERM) audits and reporting, or any other CMS audits, we determine that States determined that an individual is medically frail in a manner inconsistent with § 435.554(c)(5)(i) (meaning there is frequent approval of individuals as medically frail with little to no support for the conclusion that their physical, mental, or other behavioral health condition significantly impairs their ability to comply with the community engagement requirement), States would not be in compliance with the regulation." 91 Fed. Reg. 33377.

217. CMS also wrote, "[w]e believe that requiring verification of medical frailty to confirm an individual's specified excluded status using data or other documentation after the State has verified that exclusion using a statement or other information provided under penalty of perjury (such as a screening tool) will motivate individuals to access care." 91 Fed. Reg. 33406.

218. The preamble also states, "States may not consider information older than 12 months when verifying medical frailty or other special medical needs, because older information may not reflect the individual's current condition." 91 Fed. Reg. 33405.

219. It also states, "Section 1902(xx)(5) of the Act, implemented at § 435.557(b), requires States to conduct *ex parte* verification of compliance and deemed compliance with the

community engagement requirement, and qualification as a specified excluded individual." 91 Fed. Reg. 33392.

220. Discussing the data sources States may use, CMS wrote, "the State must consider such factors as the administrative costs associated with establishing and using the data match compared with the administrative costs associated with relying on documentation, and on program integrity in terms of the potential for ineligible individuals to be enrolled and for eligible individuals to be denied coverage." 91 Fed. Reg. 33394.

221. Concerning state implementation of work requirements prior to H.R. 1, CMS wrote in the preamble: "[t]his early implementation experience provides insight into operational considerations, indicating that beneficiary awareness, clarity of requirements, and the accessibility of reporting mechanisms, as well as overall administrative complexity, can influence participation and compliance." 91 Fed. Reg. 33350.

222. Later in the preamble, in the "Regulatory Impact Analysis" section, CMS wrote, "[p]rior to this IFC, States could only impose [community engagement] requirements through section 1115 demonstrations. The limited section 1115 demonstration experience that exists involved different implementation patterns, including reinstatements following terminations of eligibility and self-selected enrollment populations, that are not directly applicable to estimating the impact of mandatory requirements applied to an existing State plan enrollment. We have not relied on these previous demonstrations for data or assumptions used in this analysis." 91 Fed. Reg. 33456.

223. In the Regulatory Impact Analysis, CMS also wrote, "we estimate that 7 percent of applicable individuals who may be working, enrolled in school, or otherwise performing activities in line with community engagement requirement [*sic*], or qualify for a mandatory

exception or short-term hardship exception that deems them as demonstrating community engagement, would lose coverage due to administrative or procedural reasons (or in the case of a new applicant, may have their application denied and thus not enroll).” 91 Fed. Reg. 33460.

224. Also in the Regulatory Impact Analysis (which never once mentions the IFR’s significant-impairment provision of the medically frail exclusion, let alone the limitations on the use of claims and encounter data or on use of self-attestation), CMS “project[ed] that enrollment would be reduced by 2.3 million individuals in FY 2027 . . . and by between 3.1 to 3.3 million individuals in subsequent years.” 91 Fed. Reg. 33461.

### C. CMS’s Statements at the Preliminary Injunction Stage

225. During the hearing on Plaintiffs’ Motion for a Preliminary Injunction, counsel for the Defendants stated that CMS had “firmly grappled with this problem [disenrollments] and it still chose the policy path that it did in spite of acknowledging the significant number of disenrollments.” Ex. 68, 42:4-9.

226. At the same hearing, counsel for the Defendants also stated, “the regulation that dictates that agencies submit regulations to OIRA for review in coordination with the executive office, the President, and there is policy arms in coordination with other agencies before they are promulgated that is not just a process to rubber-stamp what agencies do. Sometimes those that are closer to the President and who are working in these formal policy roles have strong views about how things should be changed, and those views filter into policy.” *Id.* at 37:15-23.

## VII. States’ Efforts to Implement H.R. 1’s Work Requirement

### A. Efforts to Make Changes After the IFR

227. The revisions to the IFR require States to expend considerable resources on tight timelines to bring their systems in line with the IFR’s unlawful provisions.

228. For example, the IFR requires States to define "significantly impairs," identify the data they need to make assessments, acquire that data, develop systems and engage vendors with the expertise to process the data, and then implement that system at scale. Ex. 9 ¶57; Ex. 11 ¶65.

229. While State Medicaid agencies expected CMS to provide further definition of the terms "medically frail" or otherwise having "special medical needs," they did not expect that CMS would limit the category of individuals in the "medically frail or otherwise having special needs" to only those whose ability to comply with work requirements is substantially impaired because of their physical, mental, or behavioral health condition. *See, e.g.*, Ex. 39 ¶14; Ex. 44 ¶7; Ex. 45 ¶8; Ex. 46 ¶7; Ex. 48 ¶7; Ex. 49 ¶7; Ex. 50 ¶10; Ex. 51 ¶7; Ex. 52 ¶8; Ex. 53 ¶7.

230. And in light of the notice requirement, many States only had until August 31, 2026, or in some cases an even earlier date, to determine key features of the system and decide how to communicate with residents about its implementation—a fact which dramatically increases the costs as States engage vendors to work rush jobs and ask their staff to work overtime to meet deadlines. *See, e.g.*, Ex. 5 ¶40; Ex. 6 ¶9; Ex. 8 ¶15; Ex. 9 ¶42; Ex. 10 ¶40; Ex. 13 ¶39; Ex. 15 ¶39; Ex. 20 ¶¶17-18; Ex. 21 ¶¶40-41; Ex. 22 ¶¶12-14, 17; Ex. 25 ¶21; *see also* 91 Fed. Reg. 33427 (acknowledging substantial system and process updates required by States to comply with IFR).

231. These late-stage revisions also required increased spending on public outreach and administrative support for enrollees. *See, e.g.*, Ex. 2 ¶53; Ex. 3 ¶70; Ex. 5 ¶54; Ex. 6 ¶31; Ex. 9 ¶56; Ex. 10 ¶62; Ex. 11 ¶64; Ex. 12 ¶24; Ex. 13 ¶54-55.

232. Plaintiff States have struggled to figure out how to inform members of how to navigate the Work Requirement in light of the new "medically frail" provisions. *See, e.g.*, Ex. 1 ¶10; Ex. 2 ¶41; Ex. 3 ¶54; Ex. 4 ¶43; Ex. 36 ¶20.

## VIII. Plaintiffs Face Harms if the IFR is Implemented as Written

### A. Harms to State Medicaid Agencies

233. The IFR differs from CMS's pre-IFR guidance and the language of H.R. 1 in contradictory ways that render the States' obligations unclear. *See supra* ¶¶ 185-197, 227-32.

234. Since November 2025, the States have been preparing to comply with the notice deadline and the January 1, 2027, implementation deadline, consistent with their understanding of the statutory requirements and guidance provided by CMS. *See* 42 U.S.C. §§ 1396a(xx)(1), (8); *see, e.g.*, Ex. 1 ¶3; Ex. 2 ¶¶9, 11; Ex. 3 ¶¶10-12; Ex. 4 ¶9, 11; Ex. 7 ¶¶9, 11-12; Ex. 8 ¶¶9, 11, 13; Ex. 11 ¶¶15-16; Ex. 12 ¶11; Ex. 18 ¶¶9, 11-12; Ex. 19 ¶¶9-10, 12-13; Ex. 23 ¶¶ 9, 11-12; Ex. 24 ¶¶9, 11-12; Ex. 41 ¶¶6-11.

235. But just three months before the notice deadline, the IFR imposed new, ambiguous requirements on Medicaid enrollees that require States to make significant and new changes to their Medicaid systems. *See supra* ¶ 185.

236. Plaintiff States' Medicaid agencies communicated to CMS through the present litigation and other correspondence that they will suffer irreparable harm due to the imminent outlays of agency staff time and funding necessary to comply with CMS's regulatory about-face. *See, e.g.*, Ex. 2 ¶¶18-19; Ex. 3 ¶¶20-21; Ex. 9 ¶¶18-19; Ex. 11 ¶¶22-23; Ex. 19 ¶¶19-20; Ex. 23 ¶¶18-19.

237. Plaintiff States' Medicaid agencies have had to rapidly change their operational approach and systems development. *See, e.g.*, Ex. 2 ¶54; Ex. 15 ¶55; Ex. 39 ¶28; Ex. 41, ¶13; Ex. 44 ¶7; Ex. 45 ¶10; Ex. 46 ¶¶7, 9; Ex. 48 ¶¶7, 9; Ex. 49 ¶¶7, 9.

238. In addition to analyzing, developing, and implementing new ways to evaluate medical frailty, Plaintiff States' Medicaid agencies have needed to integrate new data sources to evaluate members' eligibility for the medical frailty exclusion, which has added development

costs as well as costs for accessing new data. *See, e.g.*, Ex. 33 ¶9; Ex. 38 ¶9; Ex. 39 ¶¶26-28; Ex. 50 ¶¶12-15; Ex. 51 ¶¶7, 9; Ex. 52 ¶10; Ex. 53 ¶¶9-10.

239. Plaintiff States' Medicaid agencies have had to send incomplete or ambiguous notices to members, which have served to create confusion and erode the trust and goodwill that State Medicaid agencies have built up over time. *See, e.g.*, Ex. 2 ¶51-52; Ex. 5 ¶53; Ex. 11 ¶63.

240. Plaintiff States' Medicaid agencies have had to incur the cost of educating their members, staff, and other stakeholders both about what the new requirements mean, and how they can be met in an unsteady legal environment. *See, e.g.*, Ex. 2 ¶54; Ex. 15 ¶55; Ex. 2 ¶51-55; Ex. 5 ¶¶52-53; Ex. 16 ¶55; Ex. 17 ¶14; Ex. 24 ¶52; Ex. 25 ¶57.

241. If Plaintiff States' Medicaid agencies are not able to configure their systems quickly enough, or if they configure systems inconsistently with CMS's guidance, they could face negative audit findings and significant financial penalties under H.R. 1 § 71106. State Medicaid agencies will need to maintain auditable records, and risk penalties through the Payment Error Rate Measurement Program (PERM) if they incorrectly exclude members as medically frail who are not. 91 Fed. Reg. 33377; AR, 002310-11; s*ee, e.g.*, Ex. 1 ¶14; Ex. 3 ¶57; Ex. 7 ¶52; Ex. 9 ¶47; Ex. 16 ¶45; Ex. 18 ¶45.

242. Plaintiff States' Medicaid agencies eligibility systems are not built to support community engagement requirements and are not easily configured to incorporate the numerous eligibility factors necessary to evaluate community engagement. *See, e.g.*, Ex. 3 ¶69; Ex. 4 ¶53; Ex. 6 ¶31; Ex. 8 ¶21; Ex. 11 ¶64; Ex. 15 ¶55; Ex. 16 ¶54.

243. Plaintiff States' Medicaid agencies have already requested funds for the statutory requirements under H.R. 1, and these funds have been expended. Plaintiff States are unable to request additional funds as required by the IFR due to limitations on fiscal year spending. *See,*

*e.g.*, Ex. 1 ¶7; Ex. 2 ¶53; Ex. 3 ¶50; Ex. 4 ¶53; Ex. 5 ¶41; Ex. 7 ¶63; Ex. 9 ¶56; Ex. 10 ¶61; Ex. 11 ¶64; Ex. 12 ¶11; Ex. 13 ¶40; Ex. 15 ¶40; Ex. 16 ¶54; Ex. 19 ¶43.

244. Plaintiff States' Medicaid agencies will experience new, complex, and variable limitations on self-attestation, which will require them to increase their operational complexity. These limitations will make it harder to train staff, vendors, assisters, and community organizations on eligibility processes. *See, e.g.*, Ex. 4 ¶55; Ex. 6 ¶33; Ex. 7 ¶67; Ex. 10 ¶65; Ex. 13 ¶54; Ex. 21 ¶54; Ex. 23 ¶52.

245. Plaintiff States' Medicaid agencies expect that the self-attestation limitation will—separate and apart from the medical frailty exclusion—lead to more calls, more documentation to be scanned and reviewed by staff, and more denials and disenrollments that, themselves, lead to more calls and appeals. The change in the self-attestation rules from 2027 to 2028 will require additional system development, training, and outreach and education to accommodate the new 2028 rules. *See, e.g.*, Ex. 5 ¶56; Ex. 7 ¶65; Ex. 16 ¶56; Ex. 17 ¶14; Ex. 19 ¶68; Ex. 21 ¶53; Ex. 22 ¶16.

**B. Disenrollment and Resulting Effects on States**

246. The purpose of the Affordable Care Act (ACA) was to "make affordable health insurance available to more people" and "[e]xpand the Medicaid program to cover all adults with income below 138% of the [Federal Poverty Line]." Ex. 69.

247. Studies conducted before the IFR was released suggest that Plaintiff States' Medicaid Expansion members will be disenrolled at some point due to the combination of community engagement requirements and six-month redeterminations. *See, e.g.*, Ex. 70, 6.

248. On October 28, 2025, the Congressional Budget Office (CBO) issued a "Supplemental Cost Estimate" "for the budgetary effects of title VII, Finance, subtitle B, Health, chapter 1, Medicaid, of P.L. 119-21, as enacted in July 2025." Ex. 70, 1.

249. In the Supplemental Cost Estimate, CBO and the Joint Committee on Taxation "estimate[d] that the number of people without health insurance will increase by 5.3 million in 2034" due to implementation of "Section 71119," the Work Requirements. Ex. 70, 6.

250. Separate and apart from the disenrollment effect of H.R. 1, the IFR's unlawful provisions will lead to further massive disenrollments not contemplated by H.R. 1. *See, e.g.*, Ex. 34 ¶18; Ex. 42. ¶18; Ex. 46 ¶18; Ex. 48 ¶18; Ex. 49 ¶18; Ex. 50 ¶25; Ex. 71, 1 (noting that "the IFR is likely to increase coverage loss significantly beyond what would have occurred under a plain-language reading of the statute").

251. An analysis by Manatt Health, entitled "CMS's Medicaid Work Requirements Rule: a 50-State Analysis of Additional Coverage Losses, FFY 2027–2034" states the following:

> Manatt health estimates Manatt Health estimates that the IFR implementation approach would increase average annual Medicaid coverage losses by **1.8 million people**, from **6.4 million to 8.2 million** between FFY 2027–2034—nearly **1 in 10 Medicaid enrollees** nationwide. The estimate assumes a 40% coverage-loss rate among those subject to work requirements, informed largely by New Hampshire's prior experience implementing work requirements. Coverage losses are projected to grow over time—from **2.8 million** people in FFY 2027 **to 9.2 million** people by FFY 2034, when the requirements are fully implemented.

Ex. 71, 1 (emphasis in original).

252. Hundreds of thousands of members will lose coverage not because they are statutorily ineligible, but because CMS has unlawfully narrowed the statutory exemptions and created needless procedural obstacles to demonstrating eligibility. *See* Ex. 4 ¶46; Ex. 6 ¶27; Ex. 7 ¶58; Ex. 12 ¶18; Ex. 10 ¶50; Ex. 20 ¶31.

253. The IFR will cause the termination of benefits for some of the States' most needy and ill residents and will increase the cost of uncompensated care that Plaintiff States must cover. *See, e.g.*, Ex. 3 ¶¶73-74; Ex. 4 ¶56; Ex. 8 ¶18; Ex. 20 ¶31; Ex. 38 ¶17; Ex. 39 ¶37; Ex. 40 ¶19; Ex. 48 ¶19; Ex. 51 ¶18; Ex. 52 ¶19.

254. Plaintiff States' budgets will suffer harm due to loss of federal matching funds when eligible individuals lose Medicaid coverage. *See, e.g.*, Ex. 3 ¶73; Ex. 5 ¶58; Ex. 10 ¶69; Ex. 19 ¶69; Ex. 21 ¶55; Ex. 24 ¶55; Ex. 25 ¶59; Ex. 35 ¶26.

255. More members will lose coverage than would otherwise have lost coverage under the statutory definition of medically frail. This is either because their condition may not meet the IFR's additional, non-statutory "significant impairment" threshold, or because they cannot obtain the proof required to demonstrate their ability to work is significantly impaired. *See, e.g.*, Ex. 2 ¶46; Ex. 3 ¶61; Ex. 4 ¶47; Ex. 9 ¶50; Ex. 13 ¶47; Ex. 16 ¶48; Ex. 71, 1.

256. More members will lose coverage because the "significant impairment" requirement will also decrease the number of people for whom the State Medicaid agencies can automatically verify medical frailty, because, under the IFR, the verification process cannot be based on just a diagnosis code, but also other data on utilization of services and level of impairment. *See* 91 Fed. Reg. 33406. *See, e.g.*, Ex. 39 ¶¶35-37; Ex. 43, ¶18; Ex. 44 ¶¶16-17; Ex. 46 ¶¶17-18; Ex. 48 ¶¶17-18; Ex. 49 ¶17. The 12-month limitation on use of claims data will also limit State Medicaid agencies' ability to automatically verify medical frailty, increasing the burden on States to engage in costly and time-intensive member interactions to seek documentation, whereas the systems being developed to review claims for purposes of determining medical frailty can be modified to expand the use of claims data with minimal burden. *See, e.g.*, Ex. 36 ¶17; Ex. 44 ¶15.

257. Members with conditions that meet the statutory categories of medical frailty but who lose coverage due to inability to document "significant impairment" may return to State Medicaid agencies sicker and costlier due to the loss of health coverage needed to treat and

manage their conditions. This both raises costs for State Plaintiffs and decreases quality of care for members. *See, e.g.*, Ex. 2 ¶48; Ex. 3 ¶63; Ex. 5 ¶49; Ex. 9 ¶51; Ex. 15 ¶50; Ex. 19 ¶56.

258. As the uninsured rate increases, there will be a greater financial strain on providers—in particular rural, community, and safety net hospitals as well as community health centers—that will be called upon to provide even greater levels of uncompensated care. *See, e.g.*, Ex. 4 ¶56; Ex. 7 ¶68; Ex. 11 ¶68; Ex. 12 ¶27; Ex. 16 ¶57; Ex. 20 ¶25; Ex. 38 ¶17; Ex. 55, 5.

259. Individuals who are disenrolled in Plaintiff States will likely lose access to primary and preventive care—and care necessary to treat their statutorily recognized medical conditions—resulting in more individuals seeking high-cost, emergency care. *See, e.g.*, Ex. 8 ¶18; Ex. 33 ¶¶23-24; Ex. 38 ¶17; Ex. 39 ¶37; Ex. 44 ¶18; Ex. 49 ¶18; Ex. 50 ¶25; Ex. 51 ¶18; Ex. 53 ¶19. Ex. 54, Exh. C(ii) at 6-7.

260. State Medicaid agencies have spent years conducting outreach and building relationships with their program enrollees. Confusion over eligibility determinations risks harming that relationship and lowering institutional trust. Members who do not understand why they were disenrolled or what is required to be eligible may simply forego coverage. *See, e.g.*, Ex. 2 ¶52; Ex. 3 ¶67; Ex. 7 ¶61; Ex. 9 ¶55; Ex. 19 ¶64; Ex. 24 ¶52.

261. The lack of preventative care will result in increased communicable disease outbreaks and more strain on Plaintiff States' Medicaid agencies. Plaintiff States' Medicaid agencies will see poorer health outcomes across the State, as fewer people will be able to access appropriate care and manage chronic conditions. *See, e.g.*, Ex. 2 ¶56; Ex. 3 ¶75; Ex. 10 ¶70; Ex. 12 ¶26; Ex. 54 ¶¶21-33.

262. Finally, Plaintiff States' Medicaid agencies anticipate that the new medical frailty requirements, coupled with the new limitations on self-attestation and *ex parte* verification, will

place a significant administrative strain on treating healthcare providers. Providers may need to devote time to providing documentation to demonstrate that a member is medically frail and that the member's condition significantly impairs their ability to comply with the Work Requirement. *See, e.g.*, Ex. 3 ¶76; Ex. 13 ¶57; Ex. 15 ¶58; Ex. 18 ¶58; Ex. 21 ¶56; Ex. 24 ¶56; ECF No. 89, 9-10.

263. These additional tasks will require that providers take time away from patient care, placing additional administrative strain on providers, adding to healthcare costs and impacting access to care across Plaintiff States. *See, e.g.*, Ex. 1 ¶10; Ex. 3 ¶76; Ex. 4 ¶57; Ex. 7 ¶69; Ex. 10 ¶73; Ex. 15 ¶58; ECF No. 89, 9-10; AR, 004465.

Dated: September 1, 2026

Respectfully submitted,

**ANDREA JOY CAMPBELL**
*Attorney General of Massachusetts*

By: */s/ Nita Kumaraswami Klunder*
Nita K. Klunder (BBO No. 689304)
*State Trial Counsel*
Ethan W. Marks (BBO No. 690746)
*Deputy Chief, Health Care Division*
Katherine D. Kearns (BBO No. 707105)
Julia S. Canney (BBO No. 717328)
*Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2394
nita.klunder@mass.gov
*Attorneys for the Commonwealth of Massachusetts*

**ROB BONTA**
*Attorney General for the State of California*

By: */s/ Anna Rich*
Neli N. Palma*
*Senior Assistant Attorney General*
Kathleen Boergers*
*Supervising Deputy Attorney General*
Anna Rich*
Ketakee Kane*
*Deputy Attorneys General*
1515 Clay Street
Oakland, CA 94612
510-879-0296
Anna.Rich@doj.ca.gov
*Attorneys for the People of the State of California*

**JENNIFER DAVENPORT**
*Attorney General of New Jersey*

By: */s/ Shankar Duraiswamy*
Shankar Duraiswamy*
*Deputy Solicitor General*
Samuel Dolinger*
*Assistant Attorney General*
Geoffrey McGee*
Jake Mazeitis*
*Deputy Attorneys General*
124 Halsey St.
Newark, NJ 07101
(609) 649-1019
Shankar.Duraiswamy@njoag.gov
*Attorneys for the State of New Jersey*

**KRISTIN K. MAYES**
*Attorney General of Arizona*

By: */s/ Joshua A. Katz*
Joshua A. Katz*
*Assistant Attorney General*
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-8053
Joshua.Katz@azag.gov
*Attorney for the State of Arizona*

**PHILIP J. WEISER**
*Attorney General for the State of Colorado*

By: */s/ Ryan Lorch*
Ryan Lorch*
Sarah H. Weiss*
*Senior Assistant Attorneys General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Ryan.Lorch@coag.gov
Sarah.Weiss@coag.gov
*Attorneys for the State of Colorado*

**WILLIAM TONG**
*Attorney General of Connecticut*

By: */s/ Patricia E. McCooey*
Patricia E. McCooey*
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5210
Patricia.McCooey@ct.gov
*Attorney for State of Connecticut*

**KATHLEEN JENNINGS**
*Attorney General of the State of Delaware*

By: */s/ Vanessa L. Kassab*
Ian R. Liston*
*Director of Impact Litigation*
Robin L. Jacobs
*Assistant Attorney General*
Vanessa L. Kassab*
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for the State of Delaware*

**BRIAN L. SCHWALB**
*Attorney General of the District of Columbia*

By: */s/ Nicole S. Hill*
Nicole S. Hill*
*Assistant Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth Street NW
Washington, D.C. 20001
(202) 727-4171
Nicole.Hill@dc.gov
*Attorney for District of Columbia*

**ANNE E. LOPEZ**
*Attorney General for the State of Hawai'i*

By: */s/ Kaliko'onālani D. Fernandes*
Kaliko'onālani D. Fernandes*
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorney for the State of Hawai'i*

**KWAME RAOUL**
*Attorney General of Illinois*

By: */s/ Katharine Roller*
Katharine Roller*
Complex Litigation Counsel
Emily Hirsch*
Assistant Attorney General
115 S. LaSalle St
Chicago, IL 60603
773-519-1842
Katharine.roller@ilag.gov
Emily.hirsch@ilag.gov
*Attorneys for the State of Illinois*

**OFFICE OF THE GOVERNOR ex rel. ANDY BESHEAR**
*In His Official Capacity as Governor Of The Commonwealth Of Kentucky*

/s/ S. Travis Mayo
S. Travis Mayo*
*General Counsel*
Sam Flynn*
*Chief Deputy General Counsel*
Laura C. Tipton*
*Deputy General Counsel*
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov
*Attorneys for the Office of the Governor*

**AARON M. FREY**
*Maine Attorney General*

By: /s/ Katherine W. Thompson
Katherine W. Thompson*
*Special Counsel*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Kate.thompson@maine.gov
*Attorney for the State of Maine*

**ANTHONY G. BROWN**
*Attorney General of Maryland*

/s/ Michael Drezner
Michael Drezner*
*Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6959
Mdrezner@oag.state.md.us
*Attorney for the State of Maryland*

**DANA NESSEL**
*Attorney General of Michigan*

By: /s/ Neil Giovanatti
Neil Giovanatti*
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
*Attorney for the State of Michigan*

**KEITH ELLISON**
*Attorney General of Minnesota*

By: */s/Katherine Bies*
Katherine Bies*
*Assistant Attorney General*
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us
*Attorney for the State of Minnesota*

**AARON D. FORD**
*Attorney General of Nevada*

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland*
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-8727
kireland@ag.nv.gov
*Attorney for the State of Nevada*

**RAÚL TORREZ**
*Attorney General Of New Mexico*

By: */s/ Anjana Samant*
Anjana Samant*
*Deputy Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
(505) 270-4332
asamant@nmdoj.gov
*Attorney for the State of New Mexico*

**LETITIA JAMES**
*Attorney General for the State of New York*

By: */s/ Morenike Fajana*
Morenike Fajana*
*Special Counsel*
Rabia Muqaddam*
*Chief Counsel for Federal Initiatives*
28 Liberty Street
New York, NY 10005
(347) 931-3187
Morenike.fajana@ag.ny.gov
*Attorneys for the State of New York*

**JEFF JACKSON**
Attorney General of North Carolina

By: */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
*Associate Deputy Attorney General*
Laura Howard
*Chief Deputy Attorney General*
114 W. Edenton St.,
Raleigh, NC 27603
(919) 716-6026
dmosteller@ncdoj.gov
*Attorneys for the State of North Carolina*

**DAN RAYFIELD**
*Attorney General of Oregon*

By: */s/ Scott P. Kennedy*
Scott P. Kennedy*
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Scott.Kennedy@doj.oregon.gov
*Attorney for the State of Oregon*

**JOSH SHAPIRO**
*Governor of the Commonwealth of Pennsylvania*

By: */s/ Jacob B. Boyer*
Jennifer C. Selber
*General Counsel*
Jacob B. Boyer*
*Deputy General Counsel*
Office of General Counsel
30 North Street, Suite 200
Harrisburg, PA 17101
717-460-6786
jacobboyer@pa.gov
*Attorneys for the Governor of the Commonwealth of Pennsylvania*

**PETER F. NERONHA**
*Attorney General of Rhode Island*

By: */s/ Lee Staley*
Lee B. Staley*
*Chief, Health Care Unit*
150 South Main Street
Providence, RI 02903
Phone: (401) 274-4400
Fax: (401) 222-2995
lstaley@riag.ri.gov
*Attorney for the State of Rhode Island*

**CHARITY R. CLARK**
*Attorney General for the State of Vermont*

By: */s/ Ryan Patrick Kane*
Ryan Patrick Kane*
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
Ryan.kane@vermont.gov
*Attorney for the State of Vermont*

**JAY JONES**
*Attorney General for the Commonwealth of Virginia*

/s/ *Megan C. Keenan*
Megan C. Keenan*
*Deputy Solicitor General*
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us
*Attorney for Commonwealth of Virginia*

**NICHOLAS W. BROWN**
*Attorney General State of Washington*

By: */s/ Tyler Roberts*
Tyler Roberts*
*Assistant Attorney General*
William McGinty*
*Deputy Solicitor General*
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206)-464-7744
Tyler.Roberts@atg.wa.gov
William.McGinty@atg.wa.gov
*Attorneys for State of Washington*

**JOSHUA L. KAUL**
*Attorney General for the State of Wisconsin*

By: */s/ Faye Hipsman*
Faye Hipsman*
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
faye.hipsman@wisdoj.gov
*Attorney for State of Wisconsin*

*pro hac vice granted

**CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic filing (NEF).

/s/ Nita K. Klunder
Nita K. Klunder (BBO #689304)
*State Trial Counsel*
1 Ashburton Pl.
Boston, MA 02108
617.963.2394
Nita.klunder@mass.gov
*Counsel for the Commonwealth of Massachusetts*