# EXHIBIT 19

# DECLARATION OF VIVIAN LEVY

I, Vivian Levy, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of Oregon. I am over the age of 18 and have personal knowledge, as well as knowledge based on my review, in my capacity as Interim State Medicaid Director, of information and records gathered by the Oregon Health Authority and agency staff, of the matters set forth below. If called as a witness, I could and would testify competently to the matters set forth below.

## Professional and Agency Background

2. I am the Interim Medicaid Director for the Oregon State Medicaid program and Children's Health Insurance Program (CHIP) (known together in Oregon as the Oregon Medicaid Program). As Interim Medicaid Director, I am responsible for the administration of the state's full benefit Medicaid program. Since graduating from Portland State University with a master's degree in Public Administration, I have spent over 16 years with the Oregon Medicaid Program. During this time, I have served in leadership roles across Medicaid policy, operations, outreach, and technology including as Deputy Medicaid Director, and now Interim Medicaid Director effective June 2026.

3. The Oregon Health Authority (OHA) is the single state agency responsible for administering the Oregon Medicaid Program.

4. The Oregon Medicaid Program provides low-income individuals with comprehensive healthcare coverage and access to affordable, integrated, high-quality healthcare at no or low cost. The Oregon Medicaid Program's coverage includes medical, dental, mental health and substance use treatment, long-term services and supports, and long-term care. The

Oregon Medicaid Program's mission is to increase access to health care for low-income Oregonians, improve the health of Oregonians by improving quality of care and access to preventive services, and contain the cost of health care.

5. The Oregon Medicaid Program insures approximately 1.4 million people, providing health coverage to children, families, and older adults—including some of the most vulnerable residents in the state, such as those experiencing homelessness, living with a disability, or who have a serious or complex medical condition.

6. Oregon administers the Oregon Medicaid Program pursuant to federal law and regulations as well as the terms of its federally approved State Plans and its Section 1115 Demonstration Project. The Oregon Medicaid Program receives federal Medicaid and CHIP funding, known as "Federal Financial Participation" (FFP), which covers a percentage of the Oregon Medicaid Program's expenditures on eligible enrollees.

**Medicaid Expansion in Oregon**

7. On January 1, 2014, Oregon implemented Medicaid expansion under the Affordable Care Act (the "ACA"). This expansion extended federally funded comprehensive health insurance to low-income adults aged 19 to 64 with household incomes up to 133% of the Federal Poverty Level.

8. Enrollees in Oregon's Medicaid expansion population receive full, comprehensive benefits that include hospital care, prescription drugs, mental health services, and preventive care. Currently, eligibility for the Medicaid expansion population requires that an individual (1) be an adult 19-64 years old; (2) be a citizen or qualified immigrant; and (3) have household income less than or equal to 133% of the Federal Poverty Level.

9. As of April 2026, approximately 565,694 (44.3%) of the Oregon Medicaid Program members are enrolled as part of the Medicaid expansion population, also referred to as the MAGI adult eligibility group. For the current state fiscal year 2026, approximately $4.7 billion, or 52%, of the Oregon Medicaid Program's federal Medicaid funding comes from the FFP for the MAGI adult eligibility group.

10. My staff at the Oregon Medicaid Program and I have been closely following enactment and implementation of H.R. 1, especially including Section 71119, which imposes novel work or community engagement requirements for adults covered under the Medicaid expansion provisions of the ACA (the "community engagement requirements").

11. Prior to the enactment of H.R. 1, the Medicaid Act has never required financially eligible individuals to work, volunteer, or meet other community engagement requirements to establish Medicaid eligibility. Consequently, the Oregon Medicaid Program does not have in place systems by which to verify work, volunteer, or other community engagement activities.

12. Since November 2025, CMS has been providing guidance on community engagement requirements policy. On November 19, 2025, CMS presented a slide deck on community engagement requirements, which was later provided to states on December 4, 2025. On December 5, 2025, CMS began a series of workgroups to provide guidance and conduct question-and-answer sessions with states on implementing community engagement. These workgroup calls took place once every other week from December 2025 through April 2026 and switched to a weekly cadence starting in May 2026. As of the date of this declaration, this series of workgroup calls is still ongoing.

13. These sorts of calls represent a long-held practice by CMS to provide guidance to states, outside of formal rulemaking, in complying with urgent and significant changes in federal

Medicaid law. In the absence of regulations, Oregon relied on CMS guidance from these calls, and the associated slide decks and other materials, to determine how to comply with new laws, implement operational, system, and process changes, and, ultimately, avoid financial penalties that those laws imposed for noncompliance.

14. States likewise relied on the guidance shared by CMS on these regular calls concerning H.R. 1. Regarding the definition of medical frailty, CMS indicated that it intended to "use a definition … similar to that described in regulations at 42 CFR § 440.315(f)," which is a regulation whose language closely resembles the H.R. 1 language. Nov. 19, 2025, CMS Slide Deck at 11. CMS also stated that it expected to allow verification of medical frailty through "medical claims data review or provider documentation, or completion of a screening tool." Nov. 19, 2025, CMS Slide Deck, page 11; *see also* slide 17 ("medical frailty status … available through claims data" or "medical screener").

15. At no point between the passage of H.R. 1 in July 2025 and the promulgation of the Interim Final Rule in June 2026 did CMS indicate that it would require "medically frail" individuals to have a significant impairment to their ability to comply with community engagement requirements. Nor did CMS indicate that states would need to verify that a member had such a significant impairment when determining eligibility for the medical frailty exclusion.

16. Regarding use of self-attestation to verify medical frailty, while initially CMS signaled that only limited use of self-attestation would be permitted, *see* Nov. 19, 2025, CMS Slide Deck at 16, CMS later indicated that self-attestation would be an acceptable verification method when data was not available.

17. In March 2026, CMS reiterated that states may use auditable self-attestation in the absence of claims data. CMS specifically noted that states could use such an auditable self-

attestation "*to confirm ongoing medical frailty*" in addition to when a member newly identifies as medically frail. CMS also noted that States should be able to reassess individuals for medical frailty at redetermination, *even without extensive claims history*, based on new information such as a major life event. At no point did CMS indicate members would be limited to only one self-attestation per enrollment period, even if they developed multiple sequential medical frailty conditions.

18. On Friday, May 1, 2026, during the community engagement requirements workgroup call, CMS showed states a slide deck that included a definition of the medical frailty exclusion. These slides did not mention any requirement that an individual's medically frail condition would need to impair their ability to comply with community engagement requirements.

19. On or about Wednesday, May 6, 2026, CMS informed states that information conveyed on the Friday, May 1, 2026, call should not be acted upon, and was subject to change.

20. In response to this and concerns that CMS would change its policy direction related to community engagement, Oregon Governor Tina Kotek sent a letter to CMS on May 29, 2026, conveying Oregon's concerns with limiting the definition of medically frail and the use of self-attestation. This letter is attached as Exhibit 1.

**<u>CMS Issues the Interim Final Rule</u>**

21. On June 1, 2026, CMS promulgated the Interim Final Rule ("IFR") relating to the community engagement requirement. The IFR includes several surprising provisions that are vague, differ substantially from CMS's prior guidance, and are more restrictive than statutory language. These provisions also will be very challenging and costly for the Oregon Medicaid Program to design by August 31, 2026, and implement before January 1, 2027, and are expected

to cause significant harm to members and the Oregon Medicaid Program once implemented. These provisions include the following:

*Medically Frail Definition*

22. With respect to the medically frail exclusion, the IFR added a new requirement that, in addition to falling into one of the five categories enumerated in H.R. 1, a "medically frail" individual must *also* be "an individual whose physical, mental, or other behavioral health condition significantly impairs the individual's ability to comply with the community engagement requirements." 42 CFR § 435.554(c)(5)(i).

23. This "significant impairment" requirement does not exist in the text of H.R. 1 Section 71119. *See* Social Security Act § 1902(xx)(9)(A)(ii)(II)(V) (codified at 42 U.S.C. § 1396a(xx)(A)(ii)(II)(V)). In a webinar and slide deck presented to state Medicaid agencies on June 9, 2026, CMS acknowledged that, in addition to the statutory requirement that an individual meet the definition of medically frail supplied by Congress in section 71119, as codified at 42 U.S.C. § 1396a(xx) (section 1902(xx) of the Social Security Act), the IFR also requires that the individual be significantly impaired in their ability to comply with community engagement requirements in order to be considered medically frail. CMS cited no statutory basis for this second, new requirement.

24. Additionally, the "significant impairment" requirement was not mentioned in any CMS written or verbal guidance before the IFR was published, up to and including the CMS guidance about medical frailty provided to states as recently as May 1, 2026.

25. The IFR provided very little concrete guidance for states about how to verify whether an individual meets this new "significant impairment" requirement. However, the IFR does indicate that, in general, states *cannot* rely solely on diagnosis or condition codes, because

doing so "would risk sweeping in individuals whose conditions do not significantly impair their functional capacity." 91 Fed. Reg. 33,373 (June 3, 2026). This is in direct conflict with prior guidance provided by CMS that states may use claims-based data to verify whether an individual meets the medical frailty exemption in general. Instead, the IFR says that states should verify medical frailty using information from "multiple domains," to determine a member's "condition[s], utilization of services … and their level of impairment." 91 Fed. Reg. 33,406 (June 3, 2026). It also suggests that states could use "algorithms using administrative claims data that assign acuity scores to individuals," *id.*, but does not explain what administrative data a state can use or what would be an acceptable analysis of such data. Since the IFR's release, CMS has told states that it is developing significantly more guidance on the medically frail exclusion. However, this guidance has not yet been provided, nor has a timeline been shared for when it will be provided. During the June 5, 2026, call CMS hosted for states, CMS acknowledged that states will need this additional guidance in order to understand and operationalize the IFR language on the medical frailty exclusion, and they were not able to answer questions raised by states at that time.

26. Since publication of the IFR, CMS has asserted that States must attempt to use reliable information, including claims or encounter data, to verify medical frailty, but if that information is not available then states must request documentation. The Oregon Medicaid Program seeks more clarity from CMS about how claims and encounter data alone can be used to reflect an individual's ability to work in light of the IFR's suggestion in the pre-amble that "particular claims or types of claims" will be necessary. The level of encounter data complexity that CMS prescribes that States use will impact the the Oregon Medicaid Program's ability to implement these changes by the January 1, 2027 timeline. Additionally, the requirement to request

documentation in the absence of reliable information is counter to the guidance given as recently as March 27, 2026.

*Self-Attestation*

27. Unlike the guidance provided by CMS through fall 2025 and spring 2026, which indicated that an "auditable self-declaration" could generally be used when reliable data was unavailable, *see supra* ¶¶ 16-17, the IFR significantly limits the occasions when an individual may rely on self-attestation to demonstrate compliance with community engagement. It does so using a complex and limiting framework (that changes again after the first year of implementation) that will be harmful for members and difficult to implement.

28. Thus, the IFR significantly limits members' ability to self-attest to community engagement eligibility factors after January 1, 2028. Of note, several community engagement eligibility factors are ones where documentation is unlikely to be available, such as whether a parent provides "some level of care" to their child (42 CFR § 435.554(a) (definition of "parent")); or the precise number of hours that a family caregiver provides assistance to a child or disabled individual (42 CFR § 435.554(c)(3)(i)(C)).

29. Under Section 1902 of the Social Security Act and 42 CFR § 435.916, state Medicaid agencies are required to periodically (at least annually) conduct a complete redetermination of an individual's Medicaid eligibility, commonly called a "renewal" or "renewal cycle." The Social Security Act does not recognize a "period of enrollment." That concept is introduced for the first time in the IFR and used in a way that hinders states' operational efficiencies, puts medically at-risk members in danger of losing Medicaid coverage, and treats patients differently based on when in this period their medical impairment may arise.

30. A renewal cycle lasts at most 12 months (or when section 71107 of H.R. 1 takes effect, 6 months for certain individuals). In contrast, under the IFR's newly introduced construct, a period of enrollment can last several renewal cycles as long as the individual remains enrolled in Medicaid.

31. Under 42 CFR § 435.916, a renewal of Medicaid eligibility is a *de novo* review of all eligibility factors, except where prohibited to protect member eligibility (e.g. Medicaid agencies cannot require an individual to reverify citizenship under 42 CFR § 435.956(a)(4)(ii)). However, the IFR creates different sets of rules that the state must apply in conducting eligibility determinations related to the community engagement requirements based on whether an individual is within a period of enrollment and whether, during that period, the individual has previously submitted a self-attestation. This distinction on when self-attestation can be used exacerbates the operational complexity the state faces in implementing the requirements with fidelity and increases the risk of confusion on the part of the members.

32. Prior to the IFR and the introduction of the new concept of a "period of enrollment," the use of self-attestation or a failure to verify an eligibility factor in a previous renewal cycle would not adversely impact an individual in their current renewal.

33. Furthermore, there is no lockout period or other prohibition on reapplying for Medicaid after an individual has been disenrolled for failure to verify compliance with or exemption from the community engagement requirements. Therefore, an individual who is prohibited from self-attesting to medical frailty for a second time in the same enrollment period and is subsequently terminated because the individual cannot verify medical frailty, can reapply once fully disenrolled and use self-attestation again at the start of a new period of enrollment. As such, the IFR will likely increase disruptions to an individual's continuity of healthcare, increase

costs and complexity to the state in implementing the rule, and, at the same time, fails as a meaningful work incentive or program integrity measure.

*Data Feed Integration*

34. The IFR places very broad requirements on states to identify reliable data sources for verifying community engagement eligibility factors. The IFR requires Medicaid agencies to use "reliable information available to the State" to verify eligibility, which it defines as "information necessary for determining [community engagement requirements] eligibility to which the agency has access *or should have access*." 42 CFR § 435.557(b) (emphasis added). The IFR thus appears to require states to seek out and, where feasible, incorporate data sources for every factor of community engagement, even though such factors are numerous, have non-centralized data, and often relate to areas that Medicaid agencies have never assessed before, such as school attendance, community volunteer work, and job program enrollment. While CMS has previously indicated there would be a phased approach to adding data sources, the new regulation does not expressly permit this.

*Renewal Process*

35. The IFR lays out procedures for states to evaluate member compliance with community engagement requirements at renewal. However, these procedures will, in effect, deny members the full window of time they are granted in H.R. 1 to demonstrate they comply with work requirements.

36. If a state cannot verify whether a member is still eligible for Medicaid through its *ex parte* data sources, the state sends the member a pre-populated renewal form to complete. *See* 42 CFR § 435.916(a)(3). According to the IFR, most states begin their renewal process and, if necessary, send this pre-populated form about 60 to 90 days before a member's renewal is due. 91

Fed. Reg. 33,390 (June 3, 2026). According to the IFR, if a state cannot *ex parte* verify compliance with community engagement requirements, the state may either send "a notice of noncompliance" with this renewal form, or as a follow-up after the member returns the renewal form if the state still cannot verify community engagement. 91 Fed. Reg. 33,411–12. The "notice of noncompliance," which is mandated by H.R. 1, provides members with only 30 days to respond, after which the member must be disenrolled if compliance with community engagement still cannot be verified. Social Security Act § 1902(xx)(6) [42 U.S.C. § 1396a(xx)(6)]. This disenrollment must happen no later than the month following the month in which the 30-day period expires. *Id.* The IFR says that this 30-day period cannot be extended and says that "[s]tates must complete the entire renewal process, including the noncompliance procedures, by the end of the beneficiary's eligibility period." 91 Fed. Reg. 33,412 (June 3, 2026).

37. The effect of this structure is that members will be evaluated for compliance with work requirements before—often *months* before—the time period in which they are entitled to comply with work requirements is complete. This abbreviated time period will increase the likelihood of coverage loss for otherwise eligible members.

*Short-term Hardship Exceptions*

38. H.R. 1 allows States to apply exceptions for certain short-term hardship events. These short-term hardship events include receiving inpatient medical services, residing in a county where an emergency or disaster has been declared by the President or where there is high unemployment, or traveling outside one's community for necessary medical services. *See* SSA § 1902(xx)(3)(B).

39. The IFR provides that, the short-term hardship exception requires a new applicant to demonstrate the exception "for at least one, but not more than 3 consecutive months, as specified

in the State plan, *immediately preceding the month of application*." 91 Fed. Reg. 33,473 (emphasis added). An applicant cannot demonstrate the exception for the same month in which they apply to Medicaid.

40. This requirement ensures that newly eligible individuals experiencing hardship events will have to wait at least until the start of the following month to receive necessary coverage, likely foregoing necessary care in the meantime or further straining our emergency health care system.

*Other*

41. Several of the timelines set out in the IFR do not take account of the fact that providers have 12 months to submit claims data. For determinations that are supposed to be made regarding the preceding year, the Oregon Medicaid Program may not even have the relevant claims data. Once again, this provision will increase the risk of coverage loss for otherwise eligible individuals.

**The Oregon Medicaid Program's Efforts to Implement the Community Engagement Requirements Before and After the IFR Issued**

42. Following the enactment of H.R. 1, the Oregon Medicaid Program recognized that it would be extraordinarily challenging to complete the necessary system and process changes required by the August 31, 2026 notice deadline and January 1, 2027 implementation dates, given the magnitude of changes needed for the community engagement requirements and the short period of time afforded by H.R. 1. Therefore, after H.R. 1 was passed in July 2025, the Oregon Medicaid Program began work to prepare to comply with community engagement requirements.

43. Beginning with the passage of H.R. 1 and continuing until the release of the IFR, the Oregon Medicaid Program based its policy and system determination on the statutory language

and the sub-regulatory guidance provided by CMS, as detailed above. Based on this guidance, the Oregon Medicaid Program has already done the following:

- Statutory analysis
- Development and documentation of IT system requirements
- Redesign of existing member notices and creation of new required notices
- Submission and approval of state funds required to support implementation (received approval for significantly less funding than requested from legislature given State budget deficit secondary to H.R. 1)
- Held 152 engagements with community partners, 19 engagements with clinical partners, member advocates, and managed care entities, as well as training sessions for over 1100 application assisters
- Requested new eligibility staff positions from the State legislature based on work models

44. With respect to implementing the medically frail exclusion in particular, the Oregon Medicaid Program has worked extensively with clinical and systems personnel to build a process to identify individuals who could be considered "medically frail." This system is based largely on claims data, in line with CMS guidance to "verify medical frailty" based on a "medical claims data review or provider documentation." Nov. 19, 2025, CMS Slide Deck at 11.

45. The Oregon Medicaid Program faces several urgent deadlines with respect to implementing community engagement requirements. The Oregon Medicaid Program must apply community engagement requirements to applications and renewals as of January 1, 2027, and to do this, the Oregon Medicaid Program must substantially finalize eligibility system requirements by July 10, 2026, in order to enable full system deployment, with time for basic testing. There is

not adequate time for sufficient system testing even if that date is met given the overall implementation timeline. After March 16, 2026, the Oregon Medicaid Program has had limited ability to make further system changes for use by January 1, 2027. This is because the system design was already approved. Implementing the required systems changes to operationalize the policy shifts in the IFR will require Oregon and our contractors to reopen the systems design and make changes, resulting in additional work, reviews, and approvals within an already constrained timeline. Due to the volume and scope changes required by the IFR's policy shifts and the absence of additional time to accommodate these systems changes, Oregon will not be able to conduct an end-to-end review of the design document. This introduces significant project risk, prevents adherence to best Project Management Practices, and requires the Oregon Medicaid Program to accept these risks and move forward with the work without feasible mitigation strategies in order to do everything in the State's ability to come into compliance and prevent federal financial penalties that would be detrimental to Oregon's state budget.

46. Implementing the required systems changes to operationalize the policy shifts in the IFR creates significant development and testing impacts for the Oregon Medicaid Program. Development was already in progress and mostly complete for all the Oregon Medicaid Program's eligibility system updates. These scope changes will require our contractor to make coding changes, perform additional development activities, and retest the updates. System Integration Testing (SIT) was already in progress, and test cases will need to be re-executed after these new development changes are completed. The schedule does not allow for additional testing time, so this adds significant risk to the project and overall quality. Guidance must be provided to the Oregon Medicaid Program by August in order to allow for the very minimum required time to complete design, development, and testing.

47. Implementing the required systems changes to operationalize the policy shifts in the IFR creates significant release impacts for the Oregon Medicaid Program. Due to the compressed timeline, the coding changes can no longer be delivered in a single release. The work must now be split across two releases, one release in September and another in November. This adds a significant layer of complexity and risk to the project. New release planning is required to accommodate the new approach and will require coordination with other teams like MMIS, which will also be impacted by this new release schedule.

48. Combined, these design, development, testing, and release impacts have consequential resource impacts on Oregon as well as overall efforts to implement H.R. 1. The strain on existing resources is significant. As of June 24, 2026, Oregon is continuing to conduct an impact analysis to the other HR1 projects in progress, as Oregon has overlapping resource constraints. State resources have been and may continue to be reassigned from other H.R. 1 projects to focus on the MWR redesign, redevelopment, retesting, and increase the impact on release cycles in September, November and into 2027.

49. Moreover, the Oregon Medicaid Program is required by H.R. 1 to issue notices prior to the implementation of community engagement requirements addressing the changes occasioned by the IFR. For the Oregon Medicaid Program to issue any notice to members, it needs clear guidance on the policy contents of the notice approximately three months in advance of issuing those notices to allow sufficient time for designing, drafting, translating, printing, and mailing. Given CMS has not issued clear guidance about many policies that need to be included in the notice (i.e., “significant impairment” threshold), even receiving this guidance in August will still not leave sufficient time for the Oregon Medicaid Program to complete redesign, translations, printing, and mailings to members.

50. Nevertheless, the Oregon Medicaid Program still lacks clarity on several crucial issues from the IFR. While the IFR says that the Oregon Medicaid Program will need to evaluate whether a member's medical condition significantly impairs their ability to work, CMS has provided only the most limited guidance about how the Oregon Medicaid Program should determine this. CMS guidance is also required to clarify how States will both not rely on claims alone to verify the new "significant impairment" requirement while also using reliable data, such as claims, to verify medical frailty. While CMS has said more sub-regulatory guidance will be provided, the Oregon Medicaid Program must develop its eligibility systems and processes without knowing what this future guidance is—bearing the risk that the *future* guidance will conflict with its system development. This lack of clarity impacts not only the Oregon Medicaid Program, but also the messages that the Oregon Medicaid Program can provide its members and clinical providers: if the Oregon Medicaid Program does not understand what it means for a medical condition to "significantly impair" a member's ability to work, it cannot educate its members and their providers about how to demonstrate compliance with this requirement. Finally, the IFR does not clarify which data sources the Oregon Medicaid Program is required to have integrated as of January 1, 2027, and which can be integrated later. The Oregon Medicaid Program requires clarity on these issues in order to implement community engagement requirements in a timely fashion and to ensure that its members are prepared for this implementation.

51. Of note, the consequences for the Oregon Medicaid Program from building its systems inconsistently with CMS's incomplete and as-yet unissued guidance are significantly heightened. If the Oregon Medicaid Program is not able to configure its systems quickly enough, or if it configures its systems inconsistently with CMS's eventual guidance, it could face negative audit findings and significant financial penalties under H.R. 1 Section 71106. In other words, at

the same time that financial consequences for not complying with guidance are rising, CMS's failure to issue clear and timely guidance on community engagement requirements is making it harder for Oregon and other states to comply.

**Human Costs of Community Engagement Requirements, Made Worse By the IFR**

52. The purpose of the Affordable Care Act (ACA) was to ensure that low-income individuals receive comprehensive healthcare coverage and have access to affordable, integrated, high-quality healthcare at no or low cost. States were incentivized to create streamlined, automated technology systems with the goal of making real-time eligibility determinations for Medicaid applicants whenever possible using available and reliable data sources. However, the community engagement requirements included in H.R. 1 are expected to result in large-scale disenrollment of members, including members who are eligible but cannot verify their eligibility.

53. Oregon studies conducted before the IFR was released suggest that (1) at least 20% of the Oregon Medicaid Program's Medicaid expansion population members will be disenrolled at some point due to the combination of community engagement requirements and six-month redeterminations (a provision of H.R. 1 that requires Medicaid expansion population members' eligibility to be reevaluated every six months), and (2) Oregon adult uninsured rates could more than double , increasing from 4.1% to 9% (using 2024 estimates from the Oregon Health Insurance Survey). Because the IFR goes beyond H.R. 1, stripping away the protections provided in H.R. 1 to the medically frail and adding new limitations on self-attestation that do not appear in H.R. 1, these studies likely underestimate the impact to members.

54. Indeed, the Oregon Medicaid Program expects the "significant impairment" requirement to result in more members losing coverage than would otherwise have lost coverage under the statutory definition of medically frail. This is either because their condition may not

meet the IFR's additional, non-statutory "significant impairment" threshold, or because they cannot obtain the proof required to demonstrate their ability to work is significantly impaired. The "significant impairment" requirement will also likely increase member confusion. The Oregon Medicaid Program members may think they do not qualify as "medically frail," given the added complexity, and the Oregon Medicaid Program may see an increase in non-responses from members and decreased rates of application. The "significant impairment" requirement will also likely decrease the number of people the Oregon Medicaid Program can automatically verify as medically frail, because, under the IFR, the ex parte verification process will generally require not just a diagnosis code, but also other data on utilization of services and level of impairment, see 91 Fed. Reg. 33,406 (June 3, 2026), which may not be available for many renewing members. This will further increase coverage loss because individuals will need to provide documentation or additional information to successfully renew. Finally, members with complex medical conditions can see fluctuations in their symptoms from day-to-day, month-to-month, or season/quarters, which will make it even more difficult to assess whether their condition meets the "significant impairment" threshold. For example, an individual with rheumatoid arthritis (i.e. a condition that can have seasonal fluctuations) could be up for renewal in March, yet have had a flare up in February preventing them from working and be unable to schedule with a rheumatologist until after their renewal in March. In this scenario, if the individual had already self-attested once in a prior renewal period, the IFR's self-attestation policy would prohibit them from self-attesting at this time and they would be subject to procedural disenrollment despite remaining eligible. For all these reasons, the IFR's additional "significant impairment" requirement creates barriers to members understanding what is needed to keep their Medicaid coverage, barriers to providers in understanding what documentation is needed and sufficient to meet a threshold that is not

statutorily defined or based in extant evidence-based practice literature, and a more labor intensive process for both members and providers to submit complete applications or renewals.

55. Furthermore, the way that the IFR is written is ambiguous to the extent that the "significant impairment" threshold applies to community engagement activities - at this time, it is not known whether it is applicable to an individual's existing and current work, volunteering, schooling, or training activities, versus any future or hypothetical opportunity. For example, someone cannot work as a forestry logger with a fractured leg; however, they could work a remote computer-based position or stationary in-person position. This lack of guidance on the applicability of the "significant impairment" threshold makes it unclear whether the intention is to apply this broadly, which would be entirely subject to the opportunities available to an individual, such as regionality, accessibility, work experience, and more, as well as the individual's ability to access those opportunities, many of which lie outside of an individual's control. Furthermore, this lack of guidance of the applicability of "significant impairment" threshold has already created confusion among members, providers, and advocacy groups of which have contacted the Oregon Health Authority with questions. And most notably, the Oregon Medicaid Program is unable to successfully operationalize and be in compliance with the IFR policies given the lack of sufficient specificity as written.

56. Members with conditions that meet the statutory categories of medical frailty but who lose coverage due to inability to document “significant impairment” may return to the Oregon Medicaid Program sicker and costlier for the loss of health coverage to treat and manage their conditions. This type of “churn” in Medicaid enrollment both raises costs for the Oregon Medicaid Program and decreases quality of care for members.

57. The Oregon Medicaid Program expects the IFR's limitations on self-attestation to increase member confusion and coverage loss as well. In the Oregon Medicaid Program's experience, the requirement to obtain third party documents to demonstrate eligibility creates a procedural hurdle that increases termination rates for otherwise eligible members. Thus, as self-attestation tightens, the Oregon Medicaid Program expects that more members who are actually eligible will be disenrolled simply because they are unable to demonstrate their eligibility.

58. The Oregon Medicaid Program also expects the "once per enrollment period" limitation on medical frailty self-attestations to particularly harm members with multiple medically frail conditions, especially those who develop one medically frail condition, recover from it, and then develop a second medically frail condition during the same enrollment period. For example, a member could be diagnosed with cancer and self-attest to medical frailty on that basis, and then later (while still enrolled in the Oregon Medicaid Program) develop a pulmonary embolism or a stroke. Under the IFR, assuming continuous Medicaid coverage during that period, the member could not self-attest to medical frailty based on the embolic event and thus could lose coverage if they could not obtain documentation for this diagnosis and its impact on their ability to be compliant with the community engagement requirement.

59. The H.R. 1 medical exemptions, and IFR's "significant impairment" and self-attestation limit, combined with H.R. 1's requirement to process as many applications and renewals on an *ex parte* basis as possible, pose additional uncertainty and risk to coding and billing. The Oregon Medicaid Program only receives diagnosis information if and when it is linked to a service utilization. If we have any information at all, it will be inclusive of both diagnosis and service utilization. Best practices for health encounter coding encourage providers to only list health

conditions addressed at the point of care in that unique patient-provider encounter visit. This poses several serious risks:

- Individuals with chronic disabling conditions may not have the associated diagnosis and service utilization in the claims encounter data within the application or renewal lookback period. This would lead to those individuals' applications/renewals not being processed on an *ex parte* basis, which is contrary to H.R. 1 itself. This would put many individuals at risk of procedural disenrollment who are otherwise eligible.
- The medical exemptions in H.R. 1, combined with the IFR's "significant impairment" threshold, put undue burden on providers to change coding practices—for a purpose that is beyond the scope of providers' work—and thereby have wide ranging impacts for the Oregon Medicaid Program, the federal Medicaid system, and health care costs overall. This burden on providers is exacerbated by requiring providers to fill out additional information of an assessment of an individual's ability to work without having a definition or criteria for what meets "significant impairment" threshold.

60. Members who lose their coverage would lose access to treatment for chronic conditions such as diabetes, receive delayed diagnoses for conditions like cancer and face greater risks of death, and be unable to obtain needed prescriptions. Members who lose their coverage would be at risk of incurring a catastrophic financial event and medical debt. Medical events are estimated to be a contributing factor to over half of all personal bankruptcies in the United States, and Medicaid eligibility has been shown to reduce personal bankruptcies and medical debt.

61. The Oregon Medicaid Program is statutorily required to provide notice to members regarding the changes occasioned by the IFR on or before August 31, 2026. 42 U.S.C. § 1936a(xx)(8)(A) (directing States to begin outreach no later than four or more months before December 31, 2026). At present, the Oregon Medicaid Program is uncertain as to how, for example, a member might establish that they are medically frail. Accordingly, the content of this notice will not have the clarity required to communicate to members how they can comply with the new requirements.

62. The significant risks associated with the design, development, testing, and release changes needed to operationalize the unexpected policy shifts in the IFR mean that members, and anyone interacting with the eligibility system and member portal (e.g., the Oregon Medicaid Program staff, contractors, eligibility assistors) face increased odds of erroneous procedural disenrollment due to technology and systems issues that are the biproduct of the IFR's unexpected shifts in policy. These significant and compounding systems risks may lead to people being unable to finish an application or renewal as there could be system bugs, page timeouts, broken navigation, and/or accessibility features (e.g., screen readers, voice input, etc.) that are incomplete or broken. Eligible individuals may not complete an application and may lose coverage or experience delays in accessing needed medical care. There are risks that uploading documentation can fail or become confusing, given document submission flows are changing quickly to accommodate the IFR's new and yet still undefined documentation requirements. Upload buttons may not work across all web browsers or mobile devices, the system may fail to clearly indicate whether a document successfully uploaded, and there could be inconsistent file-type or size restrictions that limit eligible individual's ability to demonstrate the required proof despite having the required documents.

63. The most significant risk under the circumstances described above is increased system bugs due to insufficient testing secondary to the IFR's further compressed timeline. This is anticipated to lead to incomplete user acceptance testing; uncaught defects in functionality like identify verification, income calculations, eligibility determinations, renewal workflows, or case updates; and higher rates of crashes, frozen pages, or error loops. Members experiencing systems impacts will lead to higher burdens on call centers and caseworkers, resulting in call center volume spikes, eligibility workers manually verifying or re-entering information where automated steps fail, staff spending significant time answering questions, and overall delayed processing times. This results in significantly increased risk of incorrect eligibility determinations and wrongful terminations of coverage, delayed enrollment, and unnecessary appeals or fair hearings. People with limited English proficiency or disability would be disproportionately harmed due to these barriers to access. For example, in 2025, members in the Oregon Medicaid Program had 270 unique written language preferences and 293 unique spoken language preferences.

64. The Oregon Medicaid Program has spent years conducting outreach and building relationships with Oregon Medicaid Program enrollees. Confusion over eligibility determinations risks harming that relationship and lowering institutional trust. Members who do not understand why they were disenrolled or what is required to be eligible may simply forego coverage.

**Administrative, Operational, and Financial Burdens on Oregon**

*Burdens on the Oregon Medicaid Program*

65. The State of Oregon works on a two-year budget cycle which starts on July 1st of odd years. When large federal policy changes occur after this start date, it is much harder for individual agencies and the state to reallocate resources, as programs are already in stages of implementation. In the case of H.R. 1, the Oregon Medicaid Program instantly started working to

provide estimates of what was needed to implement H.R. 1 provisions. However, revenue constraints already placed on the state made it harder for Oregon to reallocate resources to the level needed for implementation. In addition, the condensed timelines of implementing H.R. 1 required additional strain on current resources and less ability to assess options and leverage cost savings.

66. Because CMS had never before imposed community engagement requirements across eligibility categories, the Oregon Medicaid Program's eligibility system was not built to support community engagement requirements and is not easily configured to incorporate the numerous eligibility factors necessary to evaluate community engagement. The Oregon Health Authority did receive a budget adjustment of $12.4 million in the Spring of 2026 to be able to implement Medicaid and SNAP requirements of H.R. 1. Of that, $1.7 million was for Information System Infrastructure updates for the state's "ONE" eligibility system and Medicaid Management Information System. With limited resources available, this funding did not include any contingency built in, only allowing for what was originally priced. For any new federal policy changes, the work would need to be scoped for additional costs and resources. Funding would then be requested later in the fall, with legislative approval not planned until Feb or March of 2027, putting the agencies in the position of doing work prior to ensuring funding is available or ensuring cashflow is feasible.

67. With respect to the medical frailty exclusion, the surprising additional "significant impairment" requirement—plus the uncertainty of how to implement it—will require the Oregon Medicaid Program to rapidly change its operational approach and systems development. In addition to analyzing, developing, and implementing new ways to evaluate medical frailty, the Oregon Medicaid Program may need to integrate new data sources to evaluate members' eligibility for the medical frailty exclusion, which will add development costs as well as potential costs from

accessing new data. As more individuals are impacted and denied coverage or disenrolled as a result of this requirement, the Oregon Medicaid Program expects more calls, more documents to process, and more appeals of adverse actions. And finally, in addition to the costs of operationalizing this new requirement, the Oregon Medicaid Program will also incur the cost of educating its members, staff, and other stakeholders about what the requirement means and how it can be met.

68. The Oregon Medicaid Program also expects the new, complex, and variable limitations on self-attestation to increase its operational complexity. These limitations will make it harder to train staff, vendors, assisters, and community organizations on eligibility processes. As with the medical frailty exclusion, the Oregon Medicaid Program expects the self-attestation limitation to lead to more calls, more documentation to be scanned and reviewed by staff, and more denials and disenrollments that, themselves, lead to more calls and appeals. In addition, the change in the self-attestation rules from 2027 to 2028 will require additional system development, training, and outreach and education to accommodate the new 2028 rules.

*Burdens on Oregon*

69. The burdens from community engagement requirements imposed by H.R. 1 and made worse by the IFR fall not just on the Oregon Medicaid Program, but on Oregon more generally. As noted above, the Oregon Medicaid Program members will likely face increased denials and disenrollments—and, due to the "significant impairment" requirement for medical frailty, many of those disenrollments could be of some of the Oregon Medicaid Program 's most medically needy members. The IFR will have a disproportionate impact on members with disabilities and chronic health conditions who are enrolled in the Medicaid expansion population . Oregon's budget will suffer harm due to loss of federal matching funds when eligible individuals

lose Medicaid coverage. As the uninsured rate increases, there will be a greater financial strain on providers – in particular rural, community, and safety net hospitals as well as community health centers – that will be called upon to provide even greater levels of uncompensated care. Furthermore, individuals that are disenrolled from the Oregon Medicaid Program will likely lose access to primary and preventive care – and care necessary to treat their statutorily recognized medical conditions – resulting in more individuals seeking high-cost, emergency care. In addition, the lack of preventative care will result in increased communicable disease outbreaks and more strain on Oregon Medicaid. Most importantly, the Oregon Medicaid Program expects poorer health outcomes across Oregon, as fewer people will be able to access appropriate care and manage chronic conditions.

70. In addition, the Oregon Medicaid Program expects that the new medical frailty requirements—both the "significant impairment" requirement and the limitations of medical frailty self-attestation—will place a significant administrative strain on treating healthcare providers. In order to support members seeking medical frailty exemptions, providers may need to devote time to providing documentation to demonstrate that a member is medically frail and significant impairment in the ability to work. This will require providers to take time away from their patient care and increase administrative strain on providers, adding to healthcare costs and impacting access to care.

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 29th day of June 2026.

*/s/ Vivian Levy*
VIVIAN LEVY
Interim Medicaid Director
Medicaid Division, Oregon Health Authority