# EXHIBIT 49

# DECLARATION OF VIVIAN LEVY

I, Vivian Levy, declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am a resident of Oregon. I am over the age of 18 and have personal knowledge, and knowledge based on review in my capacity as the interim State Medicaid Director of information and records gathered by the Oregon Health Authority (OHA) and agency staff, of the matters set forth below. If called as a witness, I could and would testify competently to the matters set forth below.

2. Since the passage of H.R. 1, OHA has worked to be ready to implement H.R. 1's work requirement ("Work Requirement") on January 1, 2027.

3. The Work Requirement applies to what Congress has defined as "Applicable Individuals." 42 U.S.C. § 1396a(xx)(9)(A). However, Congress excluded certain individuals from the Applicable Individual group. Congress identified several discrete categories of specified excluded individuals, including, as relevant here, those who are medically frail or otherwise have special needs. Practically speaking, this means that OHA will first determine whether an individual is a specified excluded individual. Only if they are not a specified excluded individual are they within the Applicable Individual category. Only Applicable Individuals need to show compliance with the Work Requirement.

4. Based on the Work Requirement as outlined in H.R. 1, a 30-year-old who is covered by Medicaid under the ACA expansion would have to show a separate exception or prove compliance with the 80-hour Work Requirement. If that 30-year-old were pregnant, they would be considered a "specified excluded individual" under the exclusion for pregnant persons. If that 30-

year-old had cerebral palsy, they would be considered a "specific excluded individual" under the exclusion for the medically frail.

***STATE WORK TO DATE ON THE MEDICALLY FRAIL EXCLUSION***

5. As to the Medically Frail exclusion, OHA understood, based on the plain language of H.R. 1, and confirmed by communications with CMS between July 2025 and May 2026, that Medically Frail individuals would include individuals that fell within one of the five categories enumerated by Congress. Section 1902(xx)(9)(A)(ii)(V)(aa)-(ee).

6. Based on this understanding, between July 1, 2025 and June 1, 2026, OHA was building a methodology based on diagnosis codes found in claims data to determine whether individuals were medically frail as defined in H.R. 1. As all claims necessarily are comprised of both a diagnosis code and a healthcare service, this methodology inherently included healthcare services utilization related to the qualifying diagnosis. While additional testing remained to be done on that system, OHA was planning to go live with that system by the statutory implementation deadline. This build-out was costly and time consuming, creating the need for urgent analysis and system requirement updates.

7. On June 1, 2026, OHA was surprised to learn CMS had added criteria to the statutory definition of medically frail. In particular, the imposition of the "significantly impairs" language on the medically frail definition not only contradicts the text of H.R. 1 and the guidance CMS had provided for months ahead of June 1, 2026, but also requires significant changes to our system, creating significant risk to our ability to be ready to implement H.R. 1's Work Requirement on January 1, 2027.

8. Compliance with the IFR appears to require a two-step inquiry to determine whether an individual is excluded from the Work Requirements as medically frail. First, OHA must

determine if an individual falls within one of the five excluded categories established by Congress. And second, OHA must determine if that person's ability to comply with the Work Requirement is significantly impaired.

9. Accordingly, OHA has had to redesign its methodology for determining whether someone meets the five congressionally established categories of medically frail exclusions *and* is significantly impaired. This has resulted in significant additional unplanned cost and use of staff time. In addition, the very limited time to change methodology has precluded OHA from obtaining input and feedback on the proposed new methodology from internal and external partners, resulting in less review of the code list. Lastly, this change has threatened the timelines for adequate system testing prior to implementation.

***EX PARTE VERIFICATION PROCESS***

10. *Ex parte* verification of eligibility is an established part of the Medicaid eligibility verification process. It refers to using data available to OHA to determine whether an individual is eligible for Medicaid, without requiring further information from the individual. Federal regulations already require that Medicaid agencies renew members' eligibility using *ex parte* verification processes when possible. *See* 42 CFR 435.916(a)(2). Specifically, during a member's eligibility renewal, OHA first attempts to use available data (such as data regarding income and residence) to determine whether the member remains eligible. If OHA can verify a member's eligibility using available data, then they find the member eligible without requiring input from the member. Only if OHA cannot verify eligibility using available data does OHA send the member a renewal form for the member to complete.

11. *Ex parte* verification reduces the burden on members and OHA and helps to ensure that fewer people are disenrolled due to administrative hurdles. Thus, *ex parte* verification helps ensure that eligible members remain enrolled.

12. *Ex parte* verification also reduces administrative burdens and costs on OHA by allowing OHA to process renewals without the costs and resources necessary to print, mail, and manually process returned renewal forms.

13. Through H.R. 1, Congress expressed a preference for using *ex parte* verification to verify work requirements. *See* H.R. 1 § 71119(a)(xx)(5) ("For purposes of verifying [work requirements] … the State shall … establish processes and use reliable information available to the state … without requiring, where possible, the applicable individual to submit additional information."). OHA also understood, based on the plain language of H.R. 1, and confirmed by communications with CMS between July 2025 and May 2026, that Work Requirement determinations, including determinations of medical frailty, were meant to be made on an *ex parte* basis, where possible.

14. In practice, to verify medical frailty for the Work Requirement, OHA would begin by *ex parte* consulting data available to OHA to determine if the individual qualifies as medically frail. If they cannot be *ex parte* verified as medically frail (and cannot otherwise be *ex parte* found to satisfy work requirements), they will be provided a form, requesting additional information through which OHA can determine whether the individual meets the criteria for medical frailty. The precise information OHA will need to collect – and thus the wording of the form – will vary depending on whether it is governed by H.R. 1 or whether the additional criteria from the IFR is operative.

15. Since the IFR was published, however, OHA is dealing with additional uncertainty around the use of *ex parte* verifications to validate medical frailty: in the preamble to the IFR, CMS indicated that states cannot rely solely on diagnosis or condition codes to determine Medical Frailty.

16. Additionally, the IFR limits the time period OHA can use when relying on Claims and Encounter data. However, it does not similarly limit the other six categories of data upon which OHA can rely when determining compliance with or exclusion from the Work Requirement. If CMS were to align Claims and Encounter data with the other categories, more people would have their eligibility determined on an *ex parte* basis and not be denied Medicaid simply because of administrative burdens.

17. If OHA cannot rely on *ex parte* verification to determine medical frailty, or if OHA is only permitted to use a limited algorithm approach that verifies a limited number of members, then the IFR will lead to more eligible members losing Medicaid. Renewal response rates show that many Medicaid members, especially those who are most vulnerable, do not respond to renewal notices. As such, a decreased ability to rely on *ex parte* verification will necessarily result in fewer people having access to Medicaid.

18. Beginning on January 1, 2027, Oregon Medicaid members who would be determined eligible but for the Challenged Provisions will be denied coverage if the IFR provisions are imposed. The turmoil and uncertainty introduced by the IFR increases the risk that individuals formerly covered by OHA will forgo preventive care and present only if they are acutely ill at hospital emergency departments and community health centers, increasing uncompensated care for Oregon hospitals, which was already $1.106B in 2025.

***STATE EFFORTS GOING FORWARD***

19. Given the limited time between June 1, 2026 and January 1, 2027 which OHA has to make significant eligibility and enrollment system changes to be compliant with the IFR, we will be unable to sufficiently analyze and validate our methodology for identifying Medical Frailty and complete the usual systems testing we would do before going live by January 1, 2027. We are prioritizing systems testing, resulting in an expected need to further revise our methodology over the course of 2027. This will cause confusion for members, healthcare providers, and community partners, and increase the likelihood of eligible individuals not retaining Medicaid coverage.

20. If the Court were to vacate the Challenged Provisions, OHA would need at least six months to update IT systems and business processes

I declare under penalty of perjury under the laws of the United States that, to the best of my knowledge, the foregoing is true and correct.

Executed this 19th day of August 2026.

*/s/ Vivian Levy*
Vivian Levy
Interim Medicaid Director
Oregon Health Authority