# EXHIBIT 71

manatt

JULY 2026

# CMS' Medicaid Work Requirements Rule: A 50-State Analysis of Additional Coverage Losses, FFY 2027–2034

## Vital Signs: 50-State Tracking

By Patti M. Boozang, Avi Herring, Adam D. Striar and Elizabeth A. Scott

# Key Takeaways

- Beginning January 1, 2027, H.R. 1 makes Medicaid work requirements a condition of eligibility for adults in the Medicaid expansion group and expansion-like waiver programs. To keep coverage, these adults must show that they are working, volunteering, or attending school for at least 80 hours per month—or qualify for an exemption, such as pregnancy, caregiving for a young child, medical frailty, or substance use disorder treatment.
- CMS' June 1 interim final rule (IFR) sets detailed state implementation requirements that, as written, take a narrower approach than H.R. 1's plain language, including by limiting access to medical frailty exemptions and restricting self-attestation of compliance or exemption.
- The IFR is likely to increase coverage loss significantly beyond what would have occurred under a plain-language reading of the statute. As a result, the rule is already drawing legal challenges. On June 29, a coalition of 26 states sued CMS, asserting that the IFR goes beyond the statutory language adopted by Congress, departs from guidance provided to states repeatedly over the last year, and does not adequately inform states about their obligations.
- Manatt Health estimates that the IFR implementation approach would increase average annual Medicaid coverage losses by **1.8 million people**, from **6.4 million** to **8.2 million** between FFY 2027–2034—nearly **1 in 10 Medicaid enrollees nationwide.** The estimate assumes a 40% coverage-loss rate among those subject to work requirements, informed largely by New Hampshire's prior experience implementing work requirements. Coverage losses are projected to grow over time—from **2.8 million** people in FFY 2027 to **9.2 million** people by FFY 2034, when the requirements are fully implemented (see Figure 1).

**Figure 1. Aggregate Change in Medicaid Enrollment from Baseline, FFYs 2027–2034 (millions)**




This report, a product of ***Manatt Health's Vital Signs: 50-State Tracking***, explains the key provisions in the IFR and Manatt Health's assumptions that inform the projected increases in coverage loss, and estimates expected coverage loss by state and over time.

# CMS' Rule Takes a Narrower Approach Than H.R. 1's Statutory Requirements

On June 1, CMS released an IFR on work requirements slated to go into effect on July 31, 2026. CMS is accepting comments on the rule through July 31, 2026 and could make adjustments, but the IFR has the full force of a formal regulation once it goes into effect. In the IFR, CMS adopts a significantly more narrow interpretation of H.R. 1 than it had communicated to states through informal guidance and regular meetings. Specifically, the IFR:

- **Narrows the definition of medical frailty.** H.R. 1 exempts "medically frail individuals" from work requirements. The statute specifies that medically frail individuals include those who are blind or disabled; have a substance use disorder; have a disabling mental disorder; have a physical, intellectual, or developmental disability that significantly impairs their ability to perform one or more activities of daily living; or have a serious or complex medical condition. Early CMS guidance indicated that states could look to patients' diagnoses to determine if they are medically frail, but the final rule adds a new requirement—one that appears nowhere in the statutory language of H.R. 1—that individuals who otherwise would be classified as medically frail must also demonstrate that their condition "significantly impairs" their ability to comply with the work requirements. In practice, this new requirement sharply

narrows who qualifies for the exemption and requires states to verify not just that someone has cancer, multiple sclerosis or another serious condition, but also that their condition significantly impairs their ability to work.

- **Limits the use of self-attestation beyond 2027.** The rule permits states to accept an individual's self-attestation of compliance with work requirements or an exemption through 2027—but this flexibility is temporary. Of particular note, individuals who are medically frail will only be able to attest to this once during an enrollment period, after which states must require documentation. This requirement will create additional operational challenges for enrollees, providers, and state eligibility and enrollment staff, as many individuals will need to get their health care provider to evaluate their ability to work—a task that is not a routine part of medical care, nor for which providers are trained—and submit their determination for documentation purposes.

The more restrictive implementation matters because it can be expected to compound coverage losses that were already projected to be substantial under the plain-language reading of the statute. For context, even prior to the IFR, the Congressional Budget Office (CBO) had projected that H.R. 1 would lead to more than $1 trillion in federal funding cuts and increase the ranks of those without health insurance by 10 million people over the next decade. Of those losing coverage, 5.3 million were projected to do so because of the work requirements. Importantly, approximately half of CBO's estimates reflected coverage losses driven by administrative barriers—eligible people who are unable to navigate the reporting and documentation requirements—rather than actual ineligibility. CBO also appears to have assumed that the requirement will have no meaningful increase on employment, based on its prior research and scoring of previous legislation. Evidence from states' earlier experience aligns with CBO's assumptions that many eligible individuals will lose coverage because of administrative barriers and paperwork burden (see **Figure 2** below for additional detail on state implementation experiences).

Notably, CMS projects in the IFR that the work requirements provision will lead to coverage loss of approximately 3.3 million at full ramp up, substantially lower than CBO and Manatt's estimates even prior to release of the IFR. Unlike both CBO and Manatt, CMS does not appear to account for the evidence from prior state implementation of work requirements, asserting that because prior state work requirement programs involved "different implementation patterns," there is "no direct historical experience from which to derive empirical estimates…" CMS then assumes a much lower rate of "procedural disenrollments"—that is, people who should retain Medicaid eligibility but lose it for administrative reasons—than actual state experience suggests will occur.[i]

**What Prior State Work Requirements Implementation Experience Tells Us**

Four states—Arkansas, Georgia, New Hampshire, and Michigan—have previously implemented (or begun implementing) Medicaid work requirements, and each saw (or determined that it would have seen) substantial coverage loss among eligible people before courts or state action halted the programs. The losses stemmed largely from administrative barriers, not ineligibility. As Figure 2 below summarizes, these states' comparative design features, particularly their use of automation and self-attestation, directly shaped how many enrollees lost or were at risk of losing coverage.

i. 91 FR 33456.

**Figure 2. Comparison of Prior State Work Requirements Implementation Experience**

| | New Hampshire[ii] | Arkansas[iii] | Michigan[iv] |
|---|---|---|---|
| **Population** | Medicaid Expansion Adults, ages 19–64 | Medicaid Expansion Adults, ages 19–49<br><br>Included an initial phase-in for adults ages 30–49 with incomes ≤100% of Federal Poverty Level (FPL) | Medicaid Expansion Adults, ages 19–62 |
| **Self-Attestation** | For certain good cause exemptions only[v] | Accepted for all exemptions | Accepted for all exemptions |
| **Level of Automation** | Medium | High | High |
| **Approximate Number and Share of Enrollees Subject to Requirements Disenrolled/ Projected to Disenroll**[vi] | 17,000, 41%[vii] | 18,000, 29%[viii] | 100,000, 14%[ix] |

Note: Because of Georgia's limited use of automation, we believe its Pathways program is not an appropriate point of comparison for the federal work requirement under H.R. 1, which requires state to rely on data for verification of compliance and/or exemption. Therefore, we have not included detail on Georgia Pathways in Figure 2.

# Manatt Health 50-State Analysis of Additional Coverage Losses Due to CMS Work Requirements Implementation Guidance

To assess how Medicaid work requirements in combination with the new IFR may affect Medicaid coverage, Manatt modeled two scenarios using different coverage loss assumptions:

- **Scenario 1: H.R. 1 Plain-Language Estimate—30% Disenrollment Rate.** This scenario follows Manatt's baseline modeling approach, which assumed CMS would implement H.R. 1 Medicaid work requirements in close consistency with the plain language of the statute and the guidance it provided to states up until release of the IFR. The coverage loss assumption reflects the average experience/projections from state-

ii. Additional information specific to New Hampshire's implementation experience can be found here and here.

iii. Additional information specific to Arkansas' implementation experience can be found here and here.

iv. Additional information specific to Michigan's implementation experience can be found here and here.

v. For example, parents/caretakers of children aged 6–12 who were unable to secure child care were permitted to self-attest to meeting a good cause exemption.

vi. Coverage loss estimates for New Hampshire and Arkansas are rounded to nearest thousand.

vii. See Table 2 here.

viii. For total coverage loss, see Figure 1 here. For percentage coverage loss, see Table 2 here. Percentage estimates are based on the first month of reporting.

ix. See here. We calculate the 14% figure by dividing total projected coverage loss (100,000) by total Medicaid expansion enrollment (700,000).

level work requirement programs in New Hampshire, Arkansas, and Michigan, adjusted for differences between these states' approaches and H.R. 1. Specifically, Manatt assumed that 30% of individuals subject to work requirements in a given month would lose coverage.

Each of these states employed some amount of automation to determine compliance and exemptions, consistent with H.R. 1's requirement that states use administrative data where available for these purposes. Additionally, as described in Figure 2, two of the three states allowed for the broad use of self-attestation.

- **Scenario 2: CMS IFR Estimate—40% Disenrollment Rate.** To assess the impact of the IFR, we updated our assumptions to center on the experience of New Hampshire, which projected coverage loss of approximately 40% in the first month of reporting before the program was suspended by the state (and ultimately blocked in federal court). Unlike Arkansas and Michigan, which broadly permitted self-attestation for exemptions, New Hampshire accepted attestations only for certain good-cause exemptions and required qualifying documentation for most other exemptions, including medical frailty (which required providers to certify that patients had certain conditions). **This more restrictive approach most closely aligns with the IFR's narrower definition of medical frailty and use of self-attestation.**

### About Manatt Health's 50-State Medicaid Financing Model

During the 2025 Budget Reconciliation debate, Manatt Health developed a 50-state Medicaid Financing Model to estimate the expenditure and enrollment impacts of key policy proposals. The model estimates the impact of select provisions within H.R. 1 on Medicaid coverage and expenditures annually over a ten-year timeframe (FFY 2025–FFY 2034), with projections at the national and state levels. The model accounts for the interactive effects of specific H.R. 1 provisions including:

- Work reporting requirements for Medicaid expansion enrollees or other expansion-like programs;
- 6-month eligibility redetermination requirements for Medicaid expansion enrollees or other expansion-like programs; and
- New limitations on state-directed payments (SDPs) and provider taxes.

The model leverages data from several key sources, including the Medicaid Budget and Expenditure System (MBES), T-MSIS Analytic Files (TAF), the Congressional Budget Office, and publicly available SDP preprints, among others, to establish a state-specific enrollment and expenditure baseline by eligibility group.

Manatt has continued to update and maintain the Medicaid Financing Model regularly since passage of the law as new data become available and CMS issues rules implementing provisions of H.R. 1.

### Model Methodology: Medicaid Enrollment Baseline

The model's Medicaid enrollment baseline is calculated for each state based on publicly available **FFY 2025 average monthly enrollment data from MBES**, available through June 2025. This includes enrollment across states for six eligibility groups—children, expansion enrollees, other adults, aged, disabled, and limited benefit enrollees. Expansion enrollment is sourced directly from the MBES reports; however, because MBES does not report non-expansion enrollment by eligibility group, the model allocates non-expansion enrollees proportionally across eligibility groups using the distribution observed in the **FFY 2024 TAF data**. The enrollment baseline is then uniformly adjusted and trended forward through 2035 based on national Medicaid enrollment **projections from CBO's Medicaid baseline**. For states where Medicaid enrollment has declined substantially since FFY 2025, the model does not yet incorporate those declines into its baseline. Manatt continues to actively monitor Medicaid enrollment trends across states, and will make subsequent adjustments to the model baseline as needed.

# Key Findings: Medicaid Coverage Losses Will Grow Under CMS' Rule

## National Impact

- **Scenario 1: H.R. 1 Plain-Language Estimate**
  - Medicaid enrollment declines by an estimated **6.4 million people** on an average annual basis between FFY 2027-2034.[x] This represents a **7% reduction in total nationwide Medicaid enrollment** compared to expected enrollment prior to H.R. 1's enactment.
  - Average **enrollment losses in FFY 2027 are approximately 2.2 million, increasing gradually by month** as individuals go through their first eligibility renewal where they will be subject to work requirements.[xi] We assume that all states will choose to follow their existing renewal cadence in CY 2027, meaning some enrollees will not need to demonstrate compliance or an exemption until later in the year.[xii] This will mitigate coverage loss in CY 2027 relative to later years.
  - By FFY 2034, Medicaid enrollment is expected to decline by **7.2 million people** compared to the pre-H.R. 1 baseline.
- **Scenario 2: CMS IFR Estimate**
  - Under this scenario, Medicaid enrollment declines by an estimated **8.2 million people** on an average annual basis between FFY 2027–2034. This represents a nearly **10% reduction in total nationwide Medicaid enrollment**.
  - Average **enrollment losses in FFY 2027 are approximately 2.8 million, increasing gradually by month**. Here we apply the same assumptions regarding renewal cadence as under scenario 1.
  - By FFY 2034, Medicaid enrollment is expected to decline by **9.2 million people** compared to the pre-H.R. 1 baseline.
- Overall, an **additional 1.8 million people lose coverage under Scenario 2 relative to Scenario 1** on an average annual basis from FFY 2027–2034. This represents a nearly **30% increase** in the number of people losing coverage.

---

x. To calculate average annual coverage loss from FFY 2027–2034, Manatt calculates a simple average of projected coverage losses for each year in the range. For each individual year, the coverage loss figure represents the difference between expected enrollment at a given point in time during the year under H.R. 1 relative to baseline.

xi. Since we project coverage loss on a FFY basis, we assume no coverage loss during the first three months of FFY 2027 (i.e., October–December 2026), with losses ramping up in each month thereafter.

xii. In a State Medicaid Director Letter issued on March 6, CMS provided states with two options for how to transition to six-month renewal periods required under H.R. 1. One option allows states to implement the change as individuals come up for their already-scheduled renewals during CY 2027. The alternate option allows states to initiate certain renewals earlier in 2027 in order to shorten existing 12-month certification periods and move individuals more quickly onto a six-month cycle. We expect that most states will choose the first option to limit administrative burden.

## State Impacts

- Under both scenarios, enrollment reductions vary significantly by state. This is primarily driven by the size of each state's expansion group relative to the size of the overall program. States with the most significant coverage loss **(e.g., Nevada, Louisiana, and Oregon) could see enrollment reductions of 16% or more. These are the states in which Medicaid expansion represents the largest share of total program enrollment.**
- Other states like **Massachusetts, Minnesota, and Wisconsin** would see reductions of **7%** or less since their populations subject to work requirements are smaller relative to their overall Medicaid programs.

**Figure 3. Average Annual Percentage Reduction in Total Medicaid Enrollment from Baseline, Scenario 2, FFYs 2027–2034**




Source: Manatt 50-State Medicaid Financing Model. © GeoNames, Microsoft, TomTom.

**Table 1: Average Annual Medicaid Enrollment Impacts by State, FFYs 2027–2034**

| | **Scenario 1:** H.R. 1 Plain Language Estimate | | **Scenario 2:** CMS IFR Estimate | | **Difference:** Scenario 1 vs. 2 |
|---|---|---|---|---|---|
| **State** | **# Thousands** | **% From Baseline** | **# Thousands** | **% From Baseline** | **# Thousands** |
| **Total** | **(6,381)** | **-7%** | **(8,189)** | **-10%** | **(1,808)** |
| Alabama | — | 0% | — | 0% | — |
| Alaska | (22) | -10% | (29) | -12% | (6) |
| Arizona | (168) | -8% | (215) | -10% | (47) |
| Arkansas | (74) | -9% | (95) | -11% | (21) |
| California | (1,593) | -10% | (2,043) | -13% | (451) |
| Colorado | (120) | -10% | (154) | -12% | (34) |
| Connecticut | (100) | -9% | (129) | -12% | (28) |
| Delaware | (22) | -9% | (28) | -12% | (6) |
| District of Columbia | (24) | -9% | (31) | -11% | (7) |
| Florida | — | 0% | — | 0% | — |
| Georgia | — | 0% | — | 0% | — |
| Hawaii | (43) | -10% | (55) | -13% | (12) |
| Idaho | (28) | -8% | (36) | -10% | (8) |
| Illinois | (261) | -9% | (335) | -11% | (74) |
| Indiana | (176) | -9% | (225) | -12% | (50) |
| Iowa | (57) | -9% | (74) | -12% | (16) |
| Kansas | — | 0% | — | 0% | — |
| Kentucky | (148) | -11% | (190) | -14% | (42) |
| Louisiana | (243) | -13% | (312) | -16% | (69) |
| Maine | (31) | -8% | (40) | -10% | (9) |
| Maryland | (108) | -8% | (139) | -10% | (31) |
| Massachusetts | (115) | -6% | (148) | -7% | (33) |
| Michigan | (232) | -9% | (298) | -12% | (66) |
| Minnesota | (69) | -6% | (88) | -7% | (19) |
| Mississippi | — | 0% | — | 0% | — |
| Missouri | (110) | -9% | (141) | -11% | (31) |

| State | Scenario 1: H.R. 1 Plain Language Estimate | | Scenario 2: CMS IFR Estimate | | Difference: Scenario 1 vs. 2 |
|---|---|---|---|---|---|
| | # Thousands | % From Baseline | # Thousands | % From Baseline | # Thousands |
| Montana | (24) | -11% | (31) | -14% | (7) |
| Nebraska | (22) | -6% | (29) | -8% | (6) |
| Nevada | (92) | -12% | (118) | -16% | (26) |
| New Hampshire | (19) | -10% | (25) | -13% | (6) |
| New Jersey | (179) | -10% | (229) | -13% | (51) |
| New Mexico | (80) | -9% | (103) | -12% | (23) |
| New York | (632) | -9% | (811) | -11% | (179) |
| North Carolina | (225) | -7% | (289) | -9% | (64) |
| North Dakota | (8) | -7% | (10) | -9% | (2) |
| Ohio | (226) | -7% | (290) | -9% | (64) |
| Oklahoma | (75) | -7% | (96) | -10% | (21) |
| Oregon | (215) | -16% | (276) | -20% | (61) |
| Pennsylvania | (263) | -8% | (338) | -11% | (74) |
| Rhode Island | (24) | -8% | (31) | -10% | (7) |
| South Carolina | — | 0% | — | 0% | — |
| South Dakota | (10) | -7% | (12) | -9% | (3) |
| Tennessee | — | 0% | — | 0% | — |
| Texas | — | 0% | — | 0% | — |
| Utah | (26) | -7% | (34) | -10% | (7) |
| Vermont | (11) | -6% | (14) | -8% | (3) |
| Virginia | (205) | -11% | (264) | -14% | (58) |
| Washington | (192) | -10% | (247) | -13% | (54) |
| West Virginia | (54) | -10% | (69) | -13% | (15) |
| Wisconsin | (53) | -4% | (70) | -5% | (18) |
| Wyoming | — | 0% | — | 0% | — |

Note: Figures may not sum due to rounding.

## Table 2: Average Annual Medicaid Enrollment Impacts by State, FFYs 2027–2028

| | Scenario 1: H.R. 1 Plain Language Estimate | | | | Scenario 2: CMS IFR Estimate | | | |
|---|---|---|---|---|---|---|---|---|
| | 2027 | | 2028 | | 2027 | | 2028 | |
| State | # Thousands | % From Baseline | # Thousands | % From Baseline | # Thousands | % From Baseline | # Thousands | % From Baseline |
| **Total** | **(2,176)** | **-3%** | **(6,706)** | **-8%** | **(2,795)** | **-3%** | **(8,606)** | **-10%** |
| Alabama | — | 0% | — | 0% | — | 0% | — | 0% |
| Alaska | (8) | -3% | (24) | -10% | (10) | -4% | (30) | -13% |
| Arizona | (57) | -3% | (176) | -9% | (73) | -4% | (226) | -11% |
| Arkansas | (25) | -3% | (78) | -9% | (33) | -4% | (100) | -12% |
| California | (543) | -4% | (1,673) | -11% | (697) | -5% | (2,147) | -14% |
| Colorado | (41) | -3% | (126) | -10% | (52) | -4% | (161) | -13% |
| Connecticut | (34) | -3% | (106) | -10% | (44) | -4% | (135) | -12% |
| Delaware | (7) | -3% | (23) | -10% | (10) | -4% | (29) | -13% |
| District of Columbia | (8) | -3% | (26) | -9% | (11) | -4% | (33) | -12% |
| Florida | — | 0% | — | 0% | — | 0% | — | 0% |
| Georgia | — | 0% | — | 0% | — | 0% | — | 0% |
| Hawaii | (15) | -4% | (45) | -11% | (19) | -5% | (58) | -14% |
| Idaho | (10) | -3% | (30) | -8% | (12) | -4% | (38) | -11% |
| Illinois | (89) | -3% | (274) | -9% | (114) | -4% | (352) | -12% |
| Indiana | (60) | -3% | (185) | -10% | (77) | -4% | (237) | -13% |
| Iowa | (20) | -3% | (60) | -10% | (25) | -4% | (77) | -13% |
| Kansas | — | 0% | — | 0% | — | 0% | — | 0% |
| Kentucky | (50) | -4% | (156) | -11% | (65) | -5% | (200) | -14% |
| Louisiana | (83) | -4% | (255) | -14% | (106) | -6% | (327) | -17% |
| Maine | (11) | -3% | (33) | -9% | (14) | -4% | (42) | -11% |
| Maryland | (37) | -3% | (113) | -9% | (47) | -4% | (146) | -11% |
| Massachusetts | (39) | -2% | (121) | -6% | (51) | -3% | (156) | -8% |
| Michigan | (79) | -3% | (244) | -10% | (102) | -4% | (313) | -13% |
| Minnesota | (23) | -2% | (72) | -6% | (30) | -3% | (92) | -8% |
| Mississippi | — | 0% | — | 0% | — | 0% | — | 0% |

| State | Scenario 1: H.R. 1 Plain Language Estimate | | | | Scenario 2: CMS IFR Estimate | | | |
|---|---|---|---|---|---|---|---|---|
| | 2027 | | 2028 | | 2027 | | 2028 | |
| | # Thousands | % From Baseline | # Thousands | % From Baseline | # Thousands | % From Baseline | # Thousands | % From Baseline |
| Missouri | (38) | -3% | (116) | -9% | (48) | -4% | (148) | -12% |
| Montana | (8) | -4% | (25) | -12% | (10) | -5% | (32) | -15% |
| Nebraska | (8) | -2% | (24) | -7% | (10) | -3% | (30) | -9% |
| Nevada | (31) | -4% | (97) | -13% | (40) | -5% | (124) | -17% |
| New Hampshire | (7) | -4% | (20) | -11% | (9) | -5% | (26) | -14% |
| New Jersey | (61) | -4% | (188) | -11% | (78) | -5% | (241) | -14% |
| New Mexico | (27) | -3% | (84) | -10% | (35) | -4% | (108) | -13% |
| New York | (216) | -3% | (664) | -9% | (277) | -4% | (852) | -12% |
| North Carolina | (77) | -2% | (237) | -7% | (99) | -3% | (303) | -9% |
| North Dakota | (3) | -2% | (8) | -7% | (3) | -3% | (11) | -10% |
| Ohio | (77) | -2% | (237) | -8% | (99) | -3% | (305) | -10% |
| Oklahoma | (26) | -3% | (79) | -8% | (33) | -3% | (101) | -10% |
| Oregon | (73) | -6% | (226) | -17% | (94) | -7% | (290) | -22% |
| Pennsylvania | (90) | -3% | (277) | -9% | (115) | -4% | (355) | -12% |
| Rhode Island | (8) | -3% | (25) | -8% | (11) | -3% | (32) | -10% |
| South Carolina | — | 0% | — | 0% | — | 0% | — | 0% |
| South Dakota | (3) | -2% | (10) | -7% | (4) | -3% | (13) | -9% |
| Tennessee | — | 0% | — | 0% | — | 0% | — | 0% |
| Texas | — | 0% | — | 0% | — | 0% | — | 0% |
| Utah | (9) | -3% | (28) | -8% | (12) | -3% | (35) | -10% |
| Vermont | (4) | -2% | (11) | -7% | (5) | -3% | (15) | -9% |
| Virginia | (70) | -4% | (216) | -12% | (90) | -5% | (277) | -15% |
| Washington | (66) | -4% | (202) | -11% | (84) | -5% | (259) | -14% |
| West Virginia | (18) | -4% | (57) | -11% | (24) | -5% | (72) | -14% |
| Wisconsin | (18) | -1% | (57) | -4% | (24) | -2% | (75) | -6% |
| Wyoming | — | 0% | — | 0% | — | 0% | — | 0% |

## Acknowledgments

This paper was made possible through the generous support of the Commonwealth Fund and the California Health Care Foundation.

## About Vital Signs 50-State Tracking

H.R. 1 and other federal actions are driving historic health care cuts. Manatt Health is tracking state responses and analyzing the effects on coverage, affordability, and system stability. Vital Signs helps stakeholders understand near- and long-term impacts to inform policy, accountability, and collaboration.

## About Manatt Health

Manatt Health integrates legal and consulting services to better meet the complex needs of clients across the health care system.

Combining legal excellence, firsthand experience in shaping public policy, sophisticated strategy insight and deep analytic capabilities, we provide uniquely valuable professional services to the full range of health industry players.

Our diverse team of more than 200 attorneys and consultants from Manatt, Phelps & Phillips, LLP, and its consulting subsidiary, Manatt Health Strategies, LLC, is passionate about helping our clients advance their business interests, fulfill their missions and lead health care into the future. For more information, visit https://www.manatt.com/Health or contact:

**Patti M. Boozang**
Senior Managing Director
Manatt Health
212.790.4523
PBoozang@manatt.com

**Avi Herring**
Managing Director
Manatt Health
312.477.4768
AHerring@manatt.com

**Adam D. Striar**
Director
Manatt Health
202.585.6512
AStriar@manatt.com

**Elizabeth A. Scott**
Manager
Manatt Health
312.477.4795
EScott@manatt.com

© 2026 Manatt, Phelps & Phillips, LLP. All rights reserved.