**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al.<br><br>*Plaintiffs*,<br><br>v.<br><br>MEHMET OZ, M.D., in his official capacity as Administrator of the Centers for Medicare & Medicaid Services, et al.<br><br>*Defendants*. | Case No. 1:26-cv-12962-RGS |

# BRIEF OF AMICI CURIAE AMERICAN PUBLIC HEALTH ASSOCIATION, GRANTMAKERS IN HEALTH, THE JACOBS INSTITUTE OF WOMEN'S HEALTH, THE NATIONAL CENTER FOR MEDICAL-LEGAL PARTNERSHIP, LIBERTY HEALTH ALLIANCE, AND 161 DEANS, CHAIRS, AND PUBLIC HEALTH AND HEALTH POLICY SCHOLARS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

**Page**

INTERESTS OF AMICI CURIAE ........ 1
INTRODUCTION ........ 2
STATUTORY AND REGULATORY BACKGROUND ........ 4
ARGUMENT ........ 6
I. CMS IGNORED VAST EVIDENCE THAT ITS SIGNIFICANT-IMPAIRMENT TEST WILL CAUSE COVERAGE LOSSES FOR MILLIONS WHOM CONGRESS PROTECTED AND WEAKEN THE HEALTH CARE SYSTEM. ........ 7
A In Imposing a Significant-Impairment Test on the Medically Frail Population, CMS Ignored Its Own Evidence Showing Substantial Coverage Losses Among Individuals with Serious Health Conditions. ........ 7
B. CMS Failed to Account for the Harms to the Entire Health Care System from the Inevitable Coverage Losses. ........ 14
II. CMS FAILED TO CONTEND WITH THE EVIDENCE SHOWING THE ADDED TEST WILL MEAN LESS WORKFORCE PARTICIPATION, NOT MORE. ........ 16
CONCLUSION ........ 20

**INTERESTS OF AMICI CURIAE**

The American Public Health Association (APHA) is a non-partisan, non-profit organization that champions the health of all people and all communities; works to strengthen the profession of public health; shares the latest research and information; promotes best practices; and advocates for public health issues and policies grounded in scientific research.

Grantmakers In Health (GIH) is a nonprofit educational organization dedicated to helping foundations and corporate giving programs improve the health of all people. Through its longstanding work on Medicaid, health coverage, and access to care, GIH brings expertise on how federal policies affect low-income and underserved communities.

The Jacobs Institute of Women's Health at the George Washington University Milken Institute School of Public Health identifies and studies aspects of health care and public health, including legal and policy issues, that affect women's health at different life stages; fosters awareness of and facilitates dialogue around issues that affect women's health; and promotes interdisciplinary research, coordination, and information dissemination.

The National Center for Medical-Legal Partnership at the George Washington University Milken Institute School of Public Health leads education, research, and technical assistance efforts to help health organizations incorporate legal aid services into health care settings to help health care teams, providers, and systems address the root causes of poor health outcomes and costs.

Liberty Health Alliance is a national nonprofit organization dedicated to strengthening access to comprehensive, high-quality health care for medically underserved populations.

The 161 individual *amici*, listed in Exhibit 1, are distinguished deans, chairs, and scholars at the nation's leading academic institutions and research universities in the fields of health law, public health, health care policy and research, and national health reform. They join this brief in their individual capacities and not as representatives of their respective institutions.

**INTRODUCTION**

In July 2025, Congress added a new requirement that low-income adults age 19 to 64 whose eligibility is based on the Affordable Care Act (ACA) show that they work, volunteer, or are in school for at least 80 hours each month to be eligible for Medicaid. Cognizant of the difficulties that people with serious health conditions would face satisfying this new "community engagement" requirement, Congress created an exclusion from the 80-hour rule for those who are "medically frail or otherwise [have] special medical needs." Congress specifically enumerated five categories of serious health conditions that qualify a person as medically frail. Members of Congress repeatedly described the medical frailty exclusion as applying categorically to individuals with these serious health conditions, without any suggestion that they would also individually need to prove their inability to work.

Rather than follow Congress's directive, however, Defendant's agency, the Centers for Medicare & Medicaid Services (CMS), has adopted an interim final rule (IFR) that adds a requirement to the medical frailty exclusion found nowhere in the statute. Now, not only must individuals show they have one of the conditions Congress specified as establishing medical frailty, but they must also show that their "physical, mental, or other behavioral health condition *significantly impairs* the *individual's* ability to comply with the community engagement requirement." Medicaid Program; Community Engagement Requirement for Certain Individuals, 91 Fed. Reg. 33348, 33373 (June 3, 2026). On top of that, the IFR restricts what evidence can be used to show a significant impairment, restricting States to claims data no more than 12 months old, limiting reliance on individuals' attestations to their medical conditions, and prohibiting the use of claims data alone to make medical frailty determinations.

CMS's adoption of this extra-statutory "significant impairment" requirement is paradigmatic arbitrary and capricious agency action. CMS ignored the overwhelming evidence available to it, including evidence from its own prior work requirement experiments, showing that its new requirement, along with the agency's evidentiary restrictions, will impose substantial evidentiary and administrative burdens on working-age people who are in serious need of ongoing health care. As CMS was well aware, these burdens have repeatedly been shown to result in massive coverage loss among the very people Congress unequivocally intended to protect through the medical frailty exclusion. Instead, CMS relied on its own flawed analysis of cherry-picked studies, unfounded assumptions, and unsupported estimates of coverage losses. The evidence available to CMS showed not only that the loss of access to critical health care will harm these highly vulnerable people, but also that its unlawful and unjustifiable restrictions threaten the health care providers of essential care to low-income people—a consequence CMS entirely ignored. Furthermore, CMS baselessly claimed that jeopardizing health care access to low-income individuals with serious health conditions will increase workforce participation by fostering "self-sufficiency" and "independence" and even will improve health outcomes. But that runs counter to the wealth of evidence available to CMS (including many of its own studies)—as well as Congress's choice in designing the medical frailty exclusion—that demonstrates the obvious proposition that removing access to health care for individuals with serious health conditions will not improve their ability to work. Indeed, many of these individuals already work as they are able but may not be able to do so at a steady 80-hour monthly rate, so removing their access to health care may in fact *decrease* workforce participation.

In sum, CMS failed to consider the evidence demonstrating the dire consequences that will flow from its decision to impose an individualized significant-impairment test found nowhere in

the text of HR 1's medical frailty provisions and instead attempted to justify its rule using unfounded assumptions at odds with both the evidence and common sense. The IFR is thus arbitrary and capricious, and the Court should vacate the challenged portions of the rule.

## STATUTORY AND REGULATORY BACKGROUND

Medicaid provides health coverage for about one in five people in the United States.[1] Enacted with Medicare in 1965, Social Security Amendments of 1965, Pub. L. 89-97, 79 Stat. 286 (1965), Medicaid's stated purpose is "to furnish . . . medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals whose income and resources are insufficient to meet the costs of necessary medical services." 42 U.S.C. § 1396–1. It operates differently from other health insurance programs to promote coverage to people with serious health conditions who need it, when they need it. *Id.* § 1396a(a)(10). For example, Medicaid does not restrict enrollment to an open-enrollment period or specific qualifying events, and it makes coverage retroactive once a person is enrolled. 42 U.S.C. §§ 1396a(a)(8) (States must furnish medical assistance to eligible recipients with "reasonable promptness"), (a)(34) (States must apply coverage retroactively upon enrollment).

States' Medicaid programs must include certain mandatory populations, e.g., families with low-incomes, qualified pregnant women and children, and individuals receiving Supplemental Security Income. *See id.* § 1396a(a)(10). In 2010, the ACA expanded Medicaid eligibility to adults under 65 with incomes below 133% of the federal poverty line in States that choose to do so. *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 585 (2012). Hundreds of studies[2] have confirmed

---

[1] Robin Rudowitz et al., *Medicaid 101*, KFF (Oct. 8, 2025), https://www.kff.org/medicaid/health-policy-101-medicaid/?entry=table-of-contents-introduction (fig. 2).
[2] Caitlin Murphy et al., *How the Affordable Care Act's Medicaid Expansion Improved Coverage, Health Care Access, and Health: An Update*, Policy Issue Brief #75, Geiger Gibson Program in Community Health 3–4 (May 2026) https://geigergibson.publichealth.gwu.edu/sites/g/files/

that Medicaid expansion under the ACA has led to more coverage,[3] healthier individuals,[4] lower uncompensated care costs,[5] and increased workforce participation.[6] Nearly half (44%) of Medicaid expansion enrollees have at least one chronic medical condition, with that number increasing with age: for example, 60% of expansion enrollees ages 50–64 have at least one chronic condition.[7]

In 2025, Congress signed HR 1 into law, including Section 71119, which imposes an 80-hour per month community engagement (i.e., work, community service, or education) requirement for Medicaid eligibility for certain groups, including the new adult eligibility group in States that adopted the ACA's expansion. Pub. L. No. 119-21, § 71119 (codified at 42 U.S.C. § 1396a(xx)). The statute excludes certain populations from the community engagement requirement, including, as relevant here, an individual who is

> medically frail or otherwise has special medical needs (as defined by the Secretary), including an individual (aa) who is blind or disabled (as defined in section 1382c of this title); (bb) with a substance use disorder; (cc) with a disabling mental disorder; (dd) with a physical, intellectual or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living; or (ee) with a serious or complex medical condition.

42 U.S.C. § 1396a(xx)(9)(A)(ii)(V). Members of Congress explicitly stated at the time of passage that people with serious health conditions, like cancer, mental health conditions, and substance use

---

zaxdzs4421/files/2026-05/Medicaid%20Expansion%20Policy%20Brief_GG%20-%205.27.pdf (compiling studies).

[3] *See, e.g.*, Sarah Miller & Laura R. Wherry, *Four years later: Insurance coverage and access to care continue to diverge between ACA Medicaid expansion and non-expansion states*, AEA Papers & Procs. 327, 327 (2019).

[4] *See, e.g.*, Brian P. Lee et al., *Medicaid expansion and variability in mortality in the USA: A national, observational cohort study*, 7 Lancet Pub. Health e48, e48 (2022).

[5] *See, e.g.*, Fredric Blavin & Christal Ramos, *Medicaid Expansion: Effects On Hospital Finances And Implications For Hospitals Facing COVID-19 Challenges*, 40 Health Affs. 82, 85 (2021).

[6] *See, e.g.*, Jean P. Hall et al., *Medicaid expansion as an employment incentive program for people with disabilities*, 108 Am. J. Pub. Health 1235, 1236.

[7] Jessica Mathers et al., *5 Key Facts About Medicaid Expansion*, KFF (Apr. 25, 2025), https://www.kff.org/medicaid/5-key-facts-about-medicaid-expansion (fig. 4).

disorders, would unequivocally be excepted from the community engagement requirement, and that States could automatically verify that individuals qualify for the exclusion.[8]

CMS's IFR amended the Medicaid expansion eligibility regulations to implement the community engagement requirement at 42 C.F.R. §§ 435.550–435.563. *See* 42 C.F.R. § 435.119; *see also* IFR, 91 Fed. Reg. at 33353. In defining when a person is considered "medically frail," CMS added an extra condition completely absent from the statute itself: proof that the "condition *significantly impairs the individual's ability to comply* with the community engagement requirement." *Id.* at 33373 (emphasis added). Furthermore, despite knowing that Medicaid claims often are slow to be fully processed by States, the IFR further restricts States from considering data more than 12 months old when making these determinations, and it permits enrollees to self-attest to their qualifying condition only once in a continuous enrollment period. *Id.* at 33405–07.

## ARGUMENT

In adopting its novel, more restrictive definition of "medically frail," CMS failed to consider the overwhelming evidence—including evidence from *CMS's own* work requirement experiments—showing that the new standard will preclude millions of Americans from qualifying for the exclusion even though they demonstrably fall into a category Congress expressly identified as an excluded group based on their health conditions. The agency ignored the wealth of data and evidence before it, based its justifications on demonstrably flawed assumptions inconsistent with

---

[8] *See generally* Ctr. for Health L. & Pol'y Innovation (CHLPI), Harv. L. Sch., *A Shift Between Congressional Intent and Implementation: Work Requirements* (June 17, 2026) (collecting quotes), https://chlpi.org/wp-content/uploads/2026/06/HCIM_Congressional-Quotes_FINAL_6.17.26-1.pdf; *see also* Sen. Chuck Grassley, Senate President Pro Tempore, Floor Remarks on "Empowering Able-Bodied Adults to Work" (June 24, 2025), https://www.grassley.senate.gov/news/remarks/grassley-supports-common-sense-medicaid-work-requirements-for-able-bodied-adults ("We have reasonable exclusions for: . . . [i]ndividuals who are medically frail" and "[i]ndividuals who are blind, have [a] substance abuse disorder, a disabling mental disorder, a physical or intellectual disability that significantly impairs their ability to perform one or more activities of daily living or a serious, complex medical condition." (third alteration in original)).

the available evidence, and disregarded the severe harm its IFR will impose on a highly vulnerable population that Congress sought to protect, rendering the IFR arbitrary and capricious.

## I. CMS IGNORED VAST EVIDENCE THAT ITS SIGNIFICANT-IMPAIRMENT TEST WILL CAUSE COVERAGE LOSSES FOR MILLIONS WHOM CONGRESS PROTECTED AND WEAKEN THE HEALTH CARE SYSTEM.

Congress stated that the community engagement requirement in HR 1 only applies to "able-bodied adults who are choosing not to work."[9] Aware that the requirement may lead to coverage losses,[10] Congress put protections in HR 1 by categorically excluding certain categories of medically frail people who may struggle to meet the 80-hour a month requirement. *See* 42 U.S.C. § 1396a(xx)(9)(A)(ii)(V). In adding an atextual requirement to qualify for a medical frailty exclusion, CMS has upended that categorical protection. The vast body of evidence shows that this extra hurdle that individuals must clear will result in drastic coverage losses for a vulnerable population that Congress sought to shield, and it will disrupt the health care system as a whole by increasing providers' uncompensated care costs, jeopardizing access to care for everyone.

### A. In Imposing a Significant-Impairment Test on the Medically Frail Population, CMS Ignored Its Own Evidence Showing Substantial Coverage Losses Among Individuals with Serious Health Conditions.

The evidence that CMS had available to it—including its own data and the research presented to it while it was developing the IFR—makes clear that CMS's significant-impairment test will result in substantial coverage losses among people with serious health conditions, the very population Congress envisioned protecting. Yet, CMS failed to consider any of that available

---

[9] Comm. on Fin., U.S. Sen., *Working Families Tax Cuts*, https://www.finance.senate.gov/tax-reform-2025 (last visited Sep. 9, 2026).
[10] *See* Cong. Budget Off., *Public Law 119-21, to Provide for Reconciliation Pursuant to Title II of H. Con. Res. 14 Title VII, Finance, Subtitle B, Health, Chapter 1, Medicaid* 5–6 (Oct. 28, 2025), https://www.cbo.gov/system/files/2025-10/PL-119-21-Medicaid%20_0.pdf (predicting HR1 would cause 2.9 million enrollees to lose coverage for not meeting the eligibility requirements and another 2.8 million people to lose coverage due to the administrative burdens).

evidence, instead brushing it aside and adopting the test anyway. CMS's "fail[ure] to consider . . . important aspect[s] of the problem," *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983), the fact that its "explanation for its decision . . . runs counter to the evidence before the agency," *New York v. Trump*, 171 F.4th 1, 21 (1st Cir. 2026), and the fact that its significant-impairment standard "conflict[s] with the policy judgments that undergird the statutory scheme," *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 416 (D.C. Cir. 1994), makes CMS's IFR arbitrary and capricious.

The IFR creates an extra-statutory step for medical frailty determinations—not only must States determine that an individual has a qualifying diagnosis, but they must then determine whether the health condition significantly impairs that particular individual's ability to work or volunteer at least 80 hours per month. In adopting that new test, CMS disregarded the evidence showing that verifying whether a particular medical condition significantly impairs a specific individual's ability to work or volunteer at least 80 hours per month, particularly given CMS's evidentiary restrictions, will impose a high administrative burden on individuals and States, which will result in severe coverage losses among the very individuals Congress intended to exclude.[11]

To be sure, CMS's IFR purports to instruct States to verify whether an individual qualifies as medically frail using *ex parte* data, suggesting that States could rely on their own automated systems to identify relevant data, such as Medicaid claims data, to make individual medical frailty determinations. IFR, 91 Fed. Reg. at 33405. But, as CMS failed to consider, in reality, States will need to rely heavily on manual reporting by individuals to obtain documentation that is sufficient

[11] *See* Assistant Sec'y for Planning & Evaluation, U.S. Dep't of Health & Hum. Servs., Medicaid Demonstrations and Impacts on Health Coverage: A Review of the Evidence 1–3 (Mar. 11, 2021) https://aspe.hhs.gov/sites/default/files/private/pdf/265161/medicaid-waiver-evidence-review.pdf (explaining that a main contributor to expected coverage losses was "limited awareness among beneficiaries and low rates of reporting activities to the state").

to determine whether their conditions significantly impair their ability to meet the community engagement requirement. In the vast majority of cases, State databases will not contain information sufficient to make such a determination on an individualized basis.

Moreover, States lack the infrastructure to routinely conduct the types of functional assessments necessary to determine significant impairment on an individual basis—nor did Congress provide States with funding to create that infrastructure.[12] It will also be difficult to find a provider who can even furnish the necessary documentation, as health care records contain clinical evidence, not work evaluations; indeed, as shown by the Social Security disability system, proving an inability to work necessitates vastly more specialized occupational evidence—evidence that clinical health professionals rarely possess. *See, e.g.*, *Brown v. Astrue*, No. 09–40211–FDS, 2011 WL 3421556, at *2-3 (D. Mass. Aug. 3, 2011) (recounting the multi-year process for an individual seeking a Social Security disability determination). CMS's IFR compounds these burdens by restricting the types of data that can be used to prove significant impairment. Under the rule, States cannot rely on diagnosis alone, IFR, 91 Fed. Reg. at 33373; they cannot use any claims data more than 12 months old, 42 C.F.R. § 435.557(a)(vii), (f)(1); and they are substantially limited in using a beneficiary's self-attestation to make those determinations, *see* IFR, 91 Fed. Reg. at 33406.

CMS's failure to recognize the real-world implications of its new requirement is fatal to the rule because the evidence makes clear that manual reporting requirements create significant barriers to Medicaid coverage. These reporting requirements will mean that many applicants who qualify for Medicaid will not end up enrolled in the program, as CMS knows. For example, Georgia's Medicaid work requirement experiment similarly relies on a manual reporting system for

[12] Ian Hill et al., *New Hampshire's Experience with Medicaid Work Requirements*, Urban Inst. 14 (2020), https://www.urban.org/sites/default/files/publication/101657/new_hampshires_experience_with_medicaid_work_requirements_v2_0_7.pdf.

documenting compliance with the community engagement requirement or that someone qualifies for an exclusion from the requirement.[13] As of July 2026, only 19,397 individuals have successfully enrolled in Georgia's Medicaid program out of an estimated 240,000 estimated eligible uninsured people.[14] An interim evaluation of the demonstration found that the magnitude of difference between the state's projected enrollment and actual enrollment "suggests that many individuals who would be eligible. . . are not applying to the program" and that as many as 40% of people who started applications gave up and never submitted them.[15]

Similarly, manual reporting requirements mean that many individuals who are currently enrolled in Medicaid will ultimately lose coverage even if they would qualify for the exclusion under HR 1 based on their conditions. Studies show that manual reporting requirements result in substantially more people being deemed "noncompliant" and disenrolled compared to automated data-matching systems,[16] and that many of those who lose coverage should have qualified but were unable to provide the required documentation themselves.[17] Every added administrative hurdle increases the risk that an eligible individual will not obtain or lose coverage solely due to administrative burdens unrelated to their eligibility. This is particularly true for low-income people with serious health conditions, who have no means on their own to secure the type of inability-to-work evaluations that the IFR demands.[18]

---

[13] Morgan Henderson et al., *A Tale of Two States: Reconciling Medicaid Work Requirement Enrollment Impacts in Georgia and Arkansas*, 116 AEA Papers & Procs. 326, 326–30 (2026), https://doi.org/10.1257/pandp.20261089.
[14] Pl. States' Mem. in Supp. of Mot. for Partial Summ. J. Ex. 62, at 23 & n.108, Dkt. No. 106-62.
[15] *Id.* at 23 & n.106.
[16] Henderson, *supra* note 13 (noting a 98% noncompliance rate in Georgia).
[17] Pl. States' Mem. in Supp. of Mot. for Partial Summ. J. Ex. 62, at 22.
[18] *See* Pls' Mot. for Prelim. Inj. 12 & n.9, Dkt. No. 3.

Indeed, as CMS knows from its own data, States have long struggled with verifying whether individuals qualify for a medical frailty exclusion, even without a significant-impairment test. In Georgia, for example, 22% of application denials and 30% of disenrollments from its community engagement experiment were due to procedural barriers, such as missing forms.[19]

Thus, CMS's new significant-impairment construct inevitably will result in millions of individuals with significant health conditions losing or being denied Medicaid coverage. Researchers have estimated that CMS's restrictive definition of medically frail and its limitations on the permissible data for determining eligibility will cause nearly two million more people to lose Medicaid coverage than would lose coverage using HR 1's categorical medical frailty exclusion.[20] And those who lose coverage will not be limited to individuals who "choose[] not to work," as Congress intended.[21] People who undoubtedly qualify for the exclusion under HR 1's medical frailty exclusion will lose coverage under the IFR, and many who would meet CMS's significant-impairment standard will also lose coverage simply because they cannot provide the necessary documentation to demonstrate their significant impairment. The inevitable coverage losses to individuals with serious health conditions that will result from the IFR cannot be squared with Congress's intent to preserve Medicaid coverage for these very individuals when it designed the medically frail exclusion. *See Health Ins. Ass'n of Am., Inc.*, 23 F.3d at 416 (agency action is unreasonable if it

---

[19] *What Medicaid Leaders Think About H.R. 1: Themes Across Three AHIP Panels*, Fortuna Health (Mar. 30, 2026), https://www.fortunahealth.com/resources/what-medicaid-leaders-think-about-h-r-1-themes-across-three-ahip-panels; Leah Chan, *Pathways to Coverage: Looking Back Two Years and Into the Future*, Ga. Budget & Pol'y Inst. (Oct. 13, 2025), https://gbpi.org/pathways-to-coverage-looking-back-two-years-and-into-the-future/.

[20] Patricia M. Boozang et al., *CMS' Medicaid Work Requirements Rule: A 50-State Analysis of Additional Coverage Losses, FFY 2027–2034* (July 16, 2026), https://www.manatt.com/insights/white-papers/2026/cms-medicaid-work-requirements-rule-a-50-state-analysis-of-additional-coverage-losses-ffy-2027-2034 (estimating coverage losses rising from 6.4 to 8.2 million).

[21] Comm. on Fin., *supra* note 9.

"conflict[s] with the policy judgments that undergird the statutory scheme"); *Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1212 (D.C. Cir. 1996) (rejecting agency interpretation because it was "simply not a reasonable attribution of the intent of Congress"); *Page v. Pension Benefit Guar. Corp.*, 968 F.2d 1310, 1316 (D.C. Cir. 1992) (agency policy unreasonable where it "perpetuates the very weaknesses Congress sought to cure").

Moreover, all of this evidence demonstrating the significant-impairment standard would cause substantial coverage losses among individuals with serious health conditions was indisputably presented to the agency prior to its issuance of the IFR. *See, e.g.*, AR 4183–96 (explaining that States do not have processes to determine whether someone can work); AR 4330–34 (noting "the complexity of identifying people with mental health conditions" and other serious health conditions); AR 4462–67 (discussing physicians' administrative burdens); AR 4723–4730 (presenting data on how claims data can be used to identify someone as medically frail); AR 4784–87 (highlighting the harm that gaps in coverage could cause to people with serious health conditions). But the agency unreasonably failed to consider any of it when assessing the consequences of the IFR. *See New York*, 171 F.4th at 21 (OMB directive freezing federal financial assistance was arbitrary and capricious where agency took the action "without considering an obvious aspect of the problem"); *District of Columbia v. U.S. Dep't of Agric.*, 496 F. Supp. 3d 213, 226 (D.D.C. 2020) (rejecting USDA rule because "the agency failed adequately to respond to the 'considerable evidence'" weighing against its policy (citation omitted)).

Instead, CMS concocted a fanciful estimate of coverage losses that relies on assumptions that are not supported by, and in fact are contradicted by, the evidence. *See New York*, 171 F.4th at 21. Indeed, CMS failed to even consider whether its new significant-impairment standard might result in greater coverage losses than the statute's categorical approach. In the IFR, CMS estimates

that 10% of individuals who would otherwise be subject to the community engagement requirement should qualify for a medical frailty exclusion. But that estimate was based on a KFF issue brief that predated the IFR and therefore did not account for the effects of CMS's new restrictive standard and evidentiary restrictions, which as discussed, will substantially reduce the number of people who qualify for the medical frailty exclusion.[22] Even if that were not the case, however, CMS grossly misrepresents the utility of the 10% figure cited in that issue brief, which did not, as CMS asserts, estimate the total number of people who would qualify as medically frail, but rather measured only those who reported being unable to work *at all* over the prior year due to disability or illness. Thus, the study does not account for the many medically frail individuals who work but are unable to do so for 80 hours a month because of disability or illness.[23]

The same is true for the agency's estimate of the percentage of individuals who would be erroneously disenrolled or denied coverage for administrative reasons. The agency estimated the rate of those administrative errors to be approximately 7% of qualifying individuals. IFR, 91 Fed. Reg. at 33460. But the agency never explained how CMS's new significant-impairment standard or its restrictions on the documentation States can use to determine whether that standard is met might affect procedural disenrollment rates. *Id.* And, again, the evidence makes clear that CMS's new requirement means that the actual number of individuals who will be disenrolled or denied coverage for purely procedural reasons will be much higher than CMS estimates.[24]

---

[22] *Compare* IFR, 91 Fed. Reg. at 33458, *with* Jennifer Tolbert et al., *Understanding the Intersection of Medicaid and Work: An Update*, KFF (May 30, 2025), https://www.kff.org/medicaid/understanding-the-intersection-of-medicaid-and-work-an-update.

[23] Ex. 2, at 2 (Letter from Ari Ne'eman, PhD et al., Harvard T.H. Chan School of Public Health to Mehmet Oz, MD, Adm'r, CMS (July 31, 2026)).

[24] Boozang, *supra* note 20 (predicting nearly 2 million more people will be denied coverage or disenrolled under CMS's significant-impairment standard than HR 1 as drafted).

Congress was intentional in categorically excluding certain people with serious health conditions from the community engagement requirement in HR 1 because it recognized the importance of continued access to essential health care, the challenges they face navigating barriers, and how health care is critical to helping them work if they are able. CMS's IFR ignores the statutory language and congressional intent, it is contrary to the purpose of Medicaid, and it fails to reflect the vast evidence presented to the agency while it was considering the policies in the IFR showing that the very population that Congress intended to protect will be harmed by the policies CMS adopted in its IFR. For those reasons, the IFR is arbitrary and capricious.[25]

### B. CMS Failed to Account for the Harms to the Entire Health Care System from the Inevitable Coverage Losses.

The costs of the coverage losses due to CMS's added requirement will not only fall on vulnerable Medicaid recipients, but also on the health care system itself. The IFR will increase uncompensated care and administrative costs that will be borne by physicians and providers, individuals seeking health care, and States.[26] These consequences will reduce access to services in underserved and rural areas, particularly among providers who serve a disproportionate number of poor and underserved adults on Medicaid with high health needs.[27] CMS ignored evidence of these

[25] The IFR is also arbitrary and capricious because CMS failed to consider States' significant reliance interests in CMS's repeated statements in guidance documents, presentations, and on biweekly calls with States to provide implementation guidance to State Medicaid programs. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (requiring agencies changing positions to consider "serious reliance interests" engendered in the earlier policy); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (2016) (same).

[26] Leighton Ku, *Commentary: The Administration's Flawed and Misleading Claims About Medicaid Work Requirements*, Geiger Gibson Program in Cmty. Health, Milken Inst. Sch. of Pub. Health, Geo. Wash. Univ. (June 29, 2026), https://geigergibson.publichealth.gwu.edu/commentary-administrations-flawed-and-misleading-claims-about-medicaid-work-requirements.

[27] Randy Haught et al., *The Impact of Proposed Federal Medicaid Work Requirements on Hospital Revenues and Financial Margins*, Commonwealth Fund (Sep. 18, 2025), https://doi.org/10.26099/53k3-t446.

broader impacts from its own data, rendering the IFR arbitrary and capricious. *New York*, 171 F.4th at 21 (agency acted unreasonably failing to "consider[] an obvious aspect of the problem").

As discussed, CMS's significant-impairment test will cause individuals with serious health conditions to lose coverage. Meanwhile, a substantial body of evidence presented to, and in many cases created by, CMS shows that the ACA's Medicaid expansion increased coverage, improved population health, lowered uncompensated care costs to providers by more than 50%, and reduced costs to States.[28] It logically follows that coverage losses among that population will have the opposite effects of the coverage gains under the ACA. In other words, the greater the coverage losses to that population stemming from CMS's IFR, the greater the increase in uncompensated medical care and the greater the burden on providers' ability to provide quality services. Yet CMS wholly ignored these impacts. For example, community health centers, which are primarily funded through Medicaid, are critically important to aging patients with significant health conditions, providing them with treatment and ongoing management of serious or complex health conditions. As Medicaid enrollees lose coverage due to the significant-impairment requirement, these centers will likely be forced to lay off staff or close entirely,[29] to the detriment of some of the nation's most vulnerable, older patients.[30]

---

[28] Pl. States' Mem. in Supp. of Mot. for Partial Summ. J. Ex. 62, at 33–34.

[29] Megan B. Cole et al., *Medicaid Expansion and Community Health Centers: Care Quality and Service Use Increased for Rural Patients*, 37 Health Affs. 900 (June 4, 2018), https://doi.org/10.1377/hlthaff.2017.1542; *see also* AR at 4737 ("Medicaid is vitally important to CHCs, as half of all patients are covered by the program.").

[30] One estimate of the financial impact of HR 1 calculated that community health centers would lose $16–$32 billion in reimbursement over the next five years due to coverage losses; the actual impact under the IFR will likely be much higher due to increased coverage losses from CMS's regulatory addition of the significant-impairment requirement. Sara Rosenbaum et al., *Nearly 5.6 Million Community Health Center Patients Could Lose Medicaid Coverage Under New Work Requirements, with Revenue Losses Up to $32 Billion*, Commonwealth Fund (May 30, 2025), https://www.commonwealthfund.org/blog/2025/community-health-center-patients-medicaid-coverage-work-requirements.

Other providers will similarly face increases in uncompensated care costs from reductions in Medicaid reimbursement, which will in turn reduce access to services as providers are forced to reduce staffing or even close. Providers' administrative costs across the board will also go up under the significant-impairment requirement. Providers will be forced to spend more patient time completing paperwork for individuals who are seeking to be determined medically frail because verification will require individualized documentation.[31] States too will experience increased costs, both from higher rates of uncompensated care at public hospitals and because States will have to process and individually adjudicate every request for the medical frailty exclusion.

Notwithstanding all this evidence, nowhere in its discussion of the regulatory impact of its IFR did CMS consider these impacts on the health care system. CMS did not address how its rule would affect safety-net providers, how the rule could impact access to care, or how the rule would increase the administrative burden on States. CMS's failure to consider the "plain implications" of the IFR renders the IFR arbitrary and capricious. *New York*, 171 F.4th at 23; *see also Motor Vehicle Mfrs. Ass'n of the U.S.*, 463 U.S. at 43.

## II. CMS FAILED TO CONTEND WITH THE EVIDENCE SHOWING THE ADDED TEST WILL MEAN LESS WORKFORCE PARTICIPATION, NOT MORE.

Another predictable consequence of CMS's significant-impairment test is that it will make it harder for people with disabilities and serious health conditions to work, directly contrary to Congress's goal in HR 1. Once more, CMS ignored the vast evidence available to it—including its own data—and instead made the baseless assumption that taking health care away from individuals with serious health conditions would somehow increase their workforce participation. That

[31] *See* Pl. States' Mem. in Supp. of Mot. for Partial Summ. J. Ex. 62, at 34–35; *see also* Letter from Am. Med. Ass'n to Daniel Brillman, Director, Ctr. for Medicaid & CHIP Servs. & Deputy Admin., CMS, U.S. Dep't of Health & Hum. Servs. 4 (Mar. 9, 2026) (explaining that reporting requirements would "worsen physicians' administrative burdens, take time away from direct patient care, drive up administrative costs, and contribute to physician burnout"); AR at 4462, 4465.

assumption is counter to the available evidence and is yet another reason the IFR is arbitrary and capricious. *District of Columbia*, 496 F. Supp. 3d at 226 (arbitrary and capricious to fail to adequately respond to "considerable evidence" weighing against its policy (citation omitted)).

Experts have produced over 700 studies from 2014 to 2026—all available to CMS—that demonstrate the positive health and economic impacts of expanded Medicaid coverage to low-income individuals and society overall.[32] In particular, studies show that Medicaid coverage itself makes it possible for people to work and leads to greater workforce participation, particularly among people with chronic or complex medical or mental health conditions and disabilities. Specifically, the evidence shows that those who gained coverage through Medicaid expansion found it easier to look for work, to perform better at work, and to continue working once employed.[33] This is especially true among disabled individuals who are capable of working precisely because their Medicaid coverage gives them access to essential health care.[34] In fact, Medicaid expansion *increased* the number of disabled individuals who reported working or being self-employed from 41% to 47% between 2013 and 2017 and *decreased* the number of disabled individuals who could not work because of their disability from 34% to 27% over that same period.[35] Those findings are

---

[32] *See* Pl. States' Mem. in Supp. of Mot. for Partial Summ. J. Ex. 62, at 30; *see also* Ex. 3 at 3–4 (Letter from Sherry A. Glied, the Brookings Institution, to Mehmet Oz, M.D., Adm'r, Centers for Medicare & Medicaid Servs (July 31, 2026)); Madeline Guth & Meghana Ammula, *Building on the Evidence Base: Studies on the Effects of Medicaid Expansion, February 2020 to March 2021*, KFF (May 6, 2021), https://www.kff.org/affordable-care-act/building-on-the-evidence-base-studies-on-the-effects-of-medicaid-expansion-february-2020-to-march-2021; Madeline Guth et al., *The Effects of Medicaid Expansion Under the ACA: Studies from January 2014 to January 2020*, KFF (Mar. 17, 2020), https://www.kff.org/affordable-care-act/the-effects-of-medicaid-expansion-under-the-aca-updated-findings-from-a-literature-review/#Nationwide5.

[33] Pl. States' Mem. in Supp. of Mot. for Partial Summ. J. Ex. 62, at 29 (citing, *inter alia*, a Michigan study in which approximately 70% of enrollees who were already working said Medicaid coverage made it easier for them to do their jobs).

[34] Pl. States' Mem. in Supp. of Mot. for Partial Summ. J. Ex. 62, at 29.

[35] *Id.*

unsurprising; it is common sense that access to health care makes people with serious health conditions more capable of physical and mental activity and a lack of access makes them less so.

Despite that wealth of evidence, CMS assumed that the restrictive significant-impairment requirement might actually *help* individuals with serious medical or mental health conditions become more self-sufficient. To support that assumption, CMS relied on a handful of irrelevant studies, none of which are about work requirements in Medicaid programs, that found a correlation between work and health. *See* IFR, 91 Fed. Reg. at 33451. CMS concluded from those cherry-picked studies that the available research shows that "[e]mployment is recognized as an important factor in long-term beneficiary health and welfare" and that "the relationship between health and employment is intrinsic—and bidirectional in nature." *Id.* It further speculated that "participating in community engagement activities, such as employment, could potentially help [individuals with serious or complex medical conditions] escape isolation and dependency, build confidence, achieve self-sufficiency and prosperity, and improve health." *Id.* at 33376. The weight of the evidence shows the opposite to be true: that work requirements in Medicaid and other public benefit programs do not significantly increase employment or incomes.[36] As CMS knew, its own data from demonstration experiments in Arkansas and Georgia showed substantial coverage losses without any measurable increase in workforce participation.[37] CMS also failed to consider that many individuals with serious health conditions are already working, and that they are able to do so *because* they have Medicaid coverage, and thus removing their Medicaid coverage would only *decrease* workforce participation. *Id.* at 9–10.

[36] *See, e.g.*, Cong. Budget Off., *Work Requirements and Work Supports for Recipients of Means-Tested Benefits* (June 9, 2022), https://www.cbo.gov/publication/57702.
[37] *See* Ex. 3, at 4.

But Congress enacted the community engagement requirement in HR 1 for the express purpose of requiring "able-bodied adults who are choosing not to work" to work or volunteer to maintain Medicaid coverage, while preserving Medicaid coverage for those who most need it.[38] A key committee leader assured the public that "our bill couldn't be clearer" by including a "long list of exempted individuals," which "includes anyone who's blind, disabled, battling a chronic substance-use disorder or living with a serious and complex medical condition like cancer."[39] Congress made clear in the statutory text and the legislative history that it did not intend for the community engagement requirement to apply to individuals with serious health conditions, many of whom already work even if unable to work 80 hours every month. Nor is this protection surprising; Congress understood that it added this requirement to a program that contains a unique, public health feature not found in any other type of health insurance. Unlike other insurers that must guard against adverse selection, Medicaid enables people to qualify for coverage at a moment of great health need. This makes CMS's decision to impose an additional requirement on individuals with serious health conditions unreasonable as a matter of law and directly undermines Congress's goal of increasing community engagement when possible while at the same time protecting people who are already too sick to work 80 hours per month from losing coverage.[40] CMS's decision to adopt such a policy that so clearly frustrates what Congress sought to accomplish with HR 1 is quintessentially arbitrary and capricious agency action. *See Health Ins. Ass'n of Am., Inc.*, 23 F.3d at 416; *Page*, 968 F.2d at 1316; *Kennecott Utah Copper Corp.*, 88 F.3d at 1212.

---

[38] Comm. on Fin., *supra* note 9.

[39] Pl. States' Mem. in Supp. of Mot. for Partial Summ. J. Ex. 62, at 6.

[40] Ex. 2, at 10 (citing Heather Saunders et al., *Implications of Medicaid Work and Reporting Requirements for Adults with Mental Health or Substance Use Disorders*, KFF (June 23, 2025), https://www.kff.org/medicaid/implications-of-medicaid-work-and-reporting-requirements-for-adults-with-mental-health-or-substance-use-disorders/).

## CONCLUSION

In adopting its IFR, CMS ignored the wealth of data available to it showing its policy would lead to millions of vulnerable people with serious health conditions losing coverage, despite Congress's intent to exempt these individuals from the community engagement requirement. It failed to consider the adverse consequences its policy will have on the health care system as a whole. And CMS's assumptions that its policy will increase workforce participation are misguided and contradicted by available evidence, including its very own data. Thus, CMS's IFR is arbitrary and capricious. For these reasons, the Court should grant Plaintiffs' motion for summary judgment.

Dated: September 10, 2026

Respectfully submitted,

*/s/ Douglas Hallward-Driemeier*
Douglas Hallward-Driemeier
(BBO 627643)
Stephanie A. Webster
(*pro hac vice* pending)
Chetan A. Patil
(*pro hac vice* pending)
Garrett F. Mannchen
(*pro hac vice* pending)
ROPES & GRAY LLP
2099 Pennsylvania Avenue, NW
Washington, D.C. 20006-6807
t: (202) 508-4776
Douglas.Hallward-Driemeier@ropesgray.com

*Counsel for Amici Curiae*

# EXHIBIT 1

**List of Organizations, Deans, Chairs, and**
**Public Health and Health Policy Scholars**

**A. Public Health Organizations**

1. American Public Health Association (APHA)

2. Grantmakers in Health

3. Jacobs Institute of Women's Health

4. National Center for Medical-Legal Partnership

5. Liberty Health Alliance

**B. Public Health Deans**

1. Chandler, G. Thomas, MS, PhD, Distinguished Dean Emeritus, Professor, Environmental Health Sciences, Arnold School of Public Health, University of South Carolina

2. Ettner, Susan L., PhD, Dean Emerita of Graduate Education, Distinguished Professor, David Geffen School of Medicine, Division of General Internal Medicine and Health Services Research, Distinguished Professor, Fielding School of Public Health, University of California, Los Angeles

3. Fields, Sheldon D., PhD, RN, CRNP, FNP-BC, AACRN, FAANP, FNAP, FADLN, FAAN, Associate Dean for Equity and Inclusion, Research Professor, Ross and Carol Nese College of Nursing, The Pennsylvania State University, President National Black Nurses Association

4. Gusmano, Michael K., PhD, lacocca Chair, Professor of Health Policy, Associate Dean of Academic Affairs, College of Health, Lehigh University

5. Jain, Atul, MD, MS, Chair, Division of General Internal Medicine, Mayo Clinic in Arizona, Associate Dean, Mayo Clinic School of Continuous Professional Development, Director of Education Initiatives, Mayo Clinic and Arizona State University Alliance for Healthcare

6. LaVeist, Thomas A., PhD, Dean and Weatherhead Presidential Chair in Health Equity, Professor, Tulane University School of Public Health and Tropical Medicine

7. Marist, Carmen J., PhD, Executive Associate Dean for Faculty Affairs and Research Strategy, Rollins Distinguished Professor, Gangarosa Department of Environmental Health, Rollins School of Public Health, Emory University

8. McDonald, Katherine E., PhD, Associate Vice President for Research, Professor, Public Health, Syracuse University

9. Thorpe, Jane, JD, Professor and Sr. Associate Dean for Academic, Student & Faculty Affairs, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

10. Trapido, Edward, ScD, FACE, Dean, LSU School of Public Health – New Orleans

11. Vermund, Sten H., MD, PhD, Dean, Distinguished University Health Professor of Public Health and Pediatrics, College of Public Health, University of South Florida

12. Weber Buchholz, Susan, PhD, RN, FAANP, FAAN, Associate Dean for Research, College of Nursing, Michigan State University

**C. Public Health, Health Law, and Policy Scholars**

13. Abernathy, Alice, MD, MSHP, Assistant Professor of Obstetrics & Gynecology and Medical Ethics & Health Policy, Perelman School of Medicine, Senior Fellow, Leonard Davis Institute of Health Economics, University of Pennsylvania

14. Ahmed, Aziza, JD, MS, Professor of Law, Boston University School of Law

15. Akman, Jeffrey S., MD, Leon M. Yochelson Professor and Chair, Department of Psychiatry and Behavioral Health, School of Medicine and Health Sciences, The George Washington University

16. Bae, Jean JD MPH, Clinical Associate Professor, Department of Public Health Policy and Management, School of Global Public Health, New York University

17. Barkoff, Alison, JD, Harold and Jane Hirsh Associate Professor of Health Law and Policy, Director, Hirsh Health Law and Policy Program, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

18. Beckerman, Julia Zoe, JD, MPH, Teaching Professor and Vice Chair for Academics, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

19. Bender Ignacio, Rachel, MD, MPH, Associate Professor of Infectious Diseases, Department of Medicine; Adjunct Associate Professor of Epidemiology, University of Washington

20. Berlin-Lowe, Michelle, MD, MPH, Professor Emerita, Obstetrics & Gynecology, Oregon Health and Sciences University, Director (Former) Oregon Health and Sciences University Center for Womens Health

21. Bernard, Caitlin, MD, MSCI, Assistant Clinical Professor, Indiana University School of Medicine, Department of Obstetrics and Gynecology

22. Bettigole, Cheryl, MD, MPH, MA, Professor of Clinical Family Medicine and Community Health, Professor of Medical Ethics and Health Policy, and Executive Director, Center for Public Health, Perelman School of Medicine, University of Pennsylvania

23. Bhagat, Santi, MD, MPH, Founder and President, Physician-Parent Caregivers, The Invisible Wave

24. Blanchard, Janice, MD, PhD, Professor, Chief of Health Policy Section, Department of Emergency Medicine, School of Medicine and Health Sciences, The George Washington University

25. Boris, Eileen, PhD, MA, Distinguished Professor Emerita, Department of Feminist Studies, University of California, Santa Barbara

26. Braaten, Kari P., MD, MPH, Assistant Professor of Obstetrics, Gynecology, Harvard Medical School, Massachusetts General Brigham

27. Bratcher Goodwin, Michele, JD, LLM, SJD, Linda D. & Timothy J. O'Neill Professor of Constitutional Law and Global Health Policy, Faculty Director, O'Neill Institute for National and Global Health Law, Georgetown Law School

28. Brindis, Claire D., DrPH, Distinguished Professor of Health Policy, Emerita Director, Phillip R. Lee Institute for Health Policy Studies, Department of Pediatrics, School of Medicine University of California, San Francisco

29. Brown, Benjamin P., MD, MS, Mimi Pichey Assistant Professor of Obstetrics and Gynecology, Assistant Professor of Health Services, Policy, and Practice, Clinician Educator, Alpert Medical School and the School of Public Health, Brown University

30. Burke, Taylor, JD, LLM, Adjunct Professor of Health Law and Policy, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

31. Burris, Scott, JD, James E. Beasley Professor of Law, Center for Public Health Law Research, Temple University Beasley School of Law

32. Byrnes, Maureen, MPA, Teaching Instructor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

33. Calhoon, Claudia, DPH, MPH, Assistant Professor of Community and Public Health, Department of Health and Human Performance, CUNY York College

34. Cartwright-Smith, Lara, JD, MPH, Associate Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

35. Casoni, Maria, MPH, MSL, Research Scientist, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

36. Charo, R. Alta, JD, Knowles Professor Emerita of Law and Bioethics, University of Wisconsin Law and Medical Schools; Principal, Alta Charo Consulting LLC

37. Chavkin, Wendy, MD, MPH, Professor Emerita of Population and Family Health and Obstetrics-Gynecology, Mailman School of Public Health and College of Physicians and Surgeons, Columbia University

38. Cohen, Alan B., Sc.D., Research Professor (Retired), Markets, Public Policy and Law, Boston University Questrom School of Business, and Professor of Health Law, Policy, and Management (Retired), Boston University School of Public Health

39. Collins, Sara R., PhD, Senior Scholar and Vice President, Health Care Coverage and Access and Tracking Health Systems Performance, The Commonwealth Fund

40. Crays, Allyson, JD, Public Health Law and Policy Analyst, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

41. Crowley, Jeffrey, MPH, Distinguished Scholar & Director, Center for HIV and Infectious Disease Policy, O'Neill Institute for National and Global Health Law, Georgetown University Law Center

42. Cuello, Leonardo, JD, Research Professor, Center for Children and Families, Georgetown University McCourt School of Public Policy

43. Daniel, Clare, PhD, Senior Professor of Practice and Director of Research, Newcomb Institute of Tulane University

44. Dankwa-Mullan, Irene, MD MPH, Adjunct Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

45. Deeb-Sossa, Natalia, Professor, Chicana/o/x Studies, University of California, Davis

46. Degutis, Linda C., DrPH, MSN, Lecturer, Department of Chronic Disease Epidemiology, Yale School of Public Health, Past President, APHA, Former Director, National Center for Injury Prevention and Control, CDC

47. Delgado, Ana, CNM, MS, Clinical Professor and Midwife, Department of Department of Obstetrics Gynecology and Reproductive Sciences, University of California, San Francisco General Hospital Division

48. Doan, Alesha, PhD, Professor, School of Public Affairs & Administration, University of Kansas

49. Dorfman, Doron, JSD, JSM, LLM, LLB, Professor of Law, Seton Hall University School of Law

50. Dutta, Elizabeth Arend, DrPH, MPH, Professorial Lecturer, Department of Health Policy and Management, The George Washington University

51. Ecker, Jeffrey L., MD, Joe V. Meigs Professor of Obstetrics, Gynecology and Reproductive Biology, Harvard Medical School, Chair Emeritus, Department of Obstetrics and Gynecology, Massachusetts General Hospital

52. Eisenberg, David L., MD, MPH, FACOG, Professor and Chief, Division of Complex Family Planning and Gynecology, Department of Obstetrics & Gynecology, Washington University in St. Louis School of Medicine

53. Eskenazi, Brenda, MA, PhD, Jennifer and Brian Maxwell Distinguished Professor Emeritus of Maternal and Child Health and Epidemiology, School of Public Health, University of California Berkeley

54. Finkel, Adam M., ScD, CIH, Clinical Professor of Environmental Health Sciences, University of Michigan School of Public Health

55. Fleisher, Jonah, MD, MPH, FACOG, Associate Professor, Clinical Obstetrics and Gynecology, Director, Center for Reproductive Health, University of Illinois at Chicago

56. Frankford, David M., JD, Professor of Law, Rutgers Law School, Faculty Director at Camden, Center for State Health Policy, Rutgers University and Faculty, Institute for Health, Health Care Policy, and Aging Research, Rutgers University

57. Fredrick, Beth, Senior Associate, Population, Family and Reproductive Health Department, Johns Hopkins Bloomberg School of Public Health

58. Freed, Salama, PhD, Assistant Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

59. Friedman, Leonard H., PhD, MPH, FACHE, Professor and Director, MHA@GW Program, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

60. Gaba, Nancy D., MD, FACOG, Oscar I. and Mildred S. Dodek Professor and Chair, Department of Obstetrics and Gynecology, School of Medicine and Health Science, The George Washington University

61. Gable, Lance, JD, MPH, Interim Dean and Professor of Law, Wayne State University Law School

62. Ghosh, Mimi, PhD, MS, Associate Professor, Department of Epidemiology, Milken Institute School of Public Health, The George Washington University

63. Glied, Sherry, PhD, MA, Professor, Robert F. Wagner Graduate School of Public Service, New York University

64. Godfrey, Emily M., MD, MPH, FAAFP., Professor, Department of Family Medicine, University of Washington School of Medicine

65. Godzich, Micaela, MD, Clinical Professor, Residency Program Director, Vice Chair of Education, Department of Family and Community Medicine, University of California Davis Health

66. Goldberg, Randy, MD, MPH, FACP, FHM, Assistant Professor of Clinical Medicine, New York Medical College; Hospitalist and Chair of Clinical Ethics, Westchester Medical Center

67. Goldstein, Melissa M., JD, Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

68. Gordon, Sarah H., PhD, MS, Associate Professor, Health Law, Policy, and Management, Co-Director, BU Medicaid Policy Lab, Boston University School of Public Health

69. Gray, Elizabeth A., JD, MHA, Teaching Assistant Professor, Department of Health Policy and Management, Director, Undergraduate Public Health Program, Milken Institute School of Public Health, The George Washington University

70. Handler, Arden, DrPH, Professor Emeritus, Community Health Sciences, University of Illinois School of Public Health

71. Harrington, Amy R., MD, Associate Professor, Obstetrics & Gynecology, URMC Family Planning, University of Rochester Medical Center

72. Harris, Eva, PhD, Professor, Division of Infectious Diseases, Chair, Infectious Disease and Immunity Graduate Group, School of Public Health, Director, Center for Global Public Health, University of California Berkeley

73. Heinrich, Janet, DrPH, RN, FAAN, Research Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

74. Heled, Yaniv, JSD, Professor of Law, Center for Law, Health & Society, Georgia State University College of Law

75. Herring, Jordan, PhD, Assistant Professor, Department of Health Services Policy and Management, Arnold School of Public Health, University of South Carolina

76. Hodder, Lucy C., JD, Director, Health and Life Sciences Law Programs, Distinguished Visiting Professor of Law, UNH Franklin Pierce School of Law, University of New Hampshire

77. Hoffman, Sharona, JD, LLM, SJD, Distinguished University Professor, Professor of Bioethics, Edgar A. Hahn Professor of Jurisprudence , Co-Director, Law-Medicine Center, Case Western Reserve University School of Law

78. Hoffman, Allison K., JD, William Maul Measey Professor of Law and Health Sciences, Carey Law School, Professor of Medical Ethics & Health Policy, Perelman School of Medicine, University of Pennsylvania

79. Hoffmann, Diane E., JD, Jacob A. France Professor of Health Law, Director, Law & Health Care Program, University of Maryland Carey School of Law

80. Holtz, Timothy H., MD, MPH, FACP, FACPM, RDML (ret) US PHS, Redstone Chair & Director, Sumner M. Redstone Global Center for Prevention and Wellness, Professor, Department of Global Health & Department of Epidemiology, Milken Institute School of Public Health, The George Washington University

81. Horton, Katherine, RN, MPH, JD, Research Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

82. Huberfeld, Nicole, Edward R. Utley Professor of Health Law, Co-Director, BU Program on Reproductive Justice, Chair, BU Health Law Program, Boston University School of Law and School of Public Health

83. Ivey, Susan L., MD, MHSA, Adjunct Professor, Community Health Sciences, School of Public Health, Co-PI, Health Research for Action, University of California, Berkeley

84. Jacobs, Feygele, DrPH, MS, MPH, Professor and Director, Geiger Gibson Program in Community Health, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

85. Jordan, Jeanne A., PhD, HCLD(ABB), MT(ASCP), Professor Emerita, Department of Epidemiology, Milken Institute School of Public Health, The George Washington University

86. Jost, Timothy Stoltzfus, JD, Professor Emeritus, Washington and Lee University School of Law

87. Kalfoglou, Andrea, PhD, Associate Professor, Health Administration and Policy Program, Department of Sociology, Anthropology, & Health Admin and Policy, University of Maryland Baltimore County

88. Kapadia, Farzana, PhD, MPH, Professor of Epidemiology and Population, Deputy Editor, AJPH, New York University School of Global Public Health, New York University Grossman School of Medicine

89. Keating, Nancy L., MD, MPH, Professor of Health Care Policy and Medicine, Department of Health Care Policy, Harvard Medical School

90. Krieger, Nancy, PhD, Professor of Social Epidemiology, American Cancer Society Clinical Research Professor, Department of Social and Behavioral Sciences, Harvard T.H. Chan School of Public Health

91. Ku, Leighton, PhD, MPH, Professor, Department of Health Policy and Management, Director, Center for Health Policy Research, Milken Institute School of Public Health, The George Washington University

92. Kuhn, Randall, PhD, MA, Professor, Department of Community Health Sciences, University of California, Los Angeles Fielding School of Public Health

93. Lang, Valerie J., MD, MHPE, Professor of Medicine, Associate Chair for Medical Education Research and Scholarship, Department of Medicine; Rochester University School of Medicine & Dentistry

94. Lantz, Paula M, PhD, MS, Professor Emerita, School of Public Policy and School of Public Health, University of Michigan

95. Law, Sylvia A., JD, Elizabeth K. Dollard Professor Emerita of Law, Medicine and Psychiatry, NYU Law School

96. Levi, Jeffrey, PhD, Professor Emeritus, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

97. Leyser-Whalen, Ophra, PhD, Associate Professor, Sociology and Director of Women's Studies, University of Texas at El Paso

98. Lillie-Blanton, Marsha, DrPH, Adjunct Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

99. Magnus, Manya, PhD, MPH, Professor and Chair, Department of Epidemiology, Milken Institute School of Public Health, The George Washington University

100. Markus, Anne R., PhD, MHS, JD, Professor and Chair, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

101. Mason, Diana J., RN, PhD, FAAN, Senior Policy Service Professor, Center for Health Policy and Media Engagement, School of Nursing, The George Washington University

102. McConnell, K. John, PhD, Director, Center for Health Systems Effectiveness, Professor, Department of Emergency Medicine, Oregon Health & Science University

103. McDonnell, Karen A., PhD, Associate Professor, Department of Prevention and Community Health, Milken Institute School of Public Health, The George Washington University

104. McLemore, Monica R., RN, MPH, PhD, Professor and School of Nursing Endowed Chair for Health Promotion Professorship, School of Nursing Endowed Chair for Health Promotion Professorship, University of Washington, Professor, New York University

105. McNulty, Molly, JD, Associate Professor of Public Health Law and Policy, Undergraduate Program in Public Health, School of Arts and Sciences, University of Rochester; Department of Public Health Sciences, University of Rochester School of Medicine & Dentistry

106. Meckstroth, Karen, MD, MPH, Clinical Professor, Department of Obstetrics, Gynecology & Reproductive Sciences, University of California, San Francisco

107. Michaels, David, PhD, MPH, Professor, Department of Environmental and Occupational Health, Milken Institute School of Public Health, The George Washington University

108. Miller, Velvet G., PhD, FAAN, Adjunct Assistant Professor Ret., Obstetrics and Gynecology Department, Indiana University School of Medicine

109. Monahan, John T., JD, Professor, Department of Medicine, Senior Fellow, McCourt School of Public Policy, Senior Lecturer, Georgetown Law, Georgetown University

110. Morello-Frosch, Rachel, PhD, MPH, Professor, Environmental Health Sciences, Community Health Sciences, Department of Environmental Science, Policy and Management, UC Berkeley School of Public Health

111. Morrison, Jill C., JD, LLM, Visiting Professor of Law, Director, Women's Law and Public Policy Fellowship Program, Georgetown University Law Center

112. Murphy, Caitlin, MPP, Research Scientist, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

113. Nelson, Hilary, PhD, MPH, FNAP, FCPP; Director, MPH Program; Associate Professor of Biochemistry & Biophysics and Associate Professor of Family Medicine & Community, Perelman School of Medicine; Associate Professor of Pathobiology, School of Veterinary Medicine, University of Pennsylvania

114. Nicholas, Lauren Hersch, PhD, MPP, Professor, Department of Medicine, University of Colorado

115. Paltiel, A. David, PhD, Professor of Health Policy and Management, Yale School of Public Health

116. Perreira, Krista M., PhD, Professor, Department of Social Medicine, University of North Carolina School of Medicine

117. Peterson, Mark A., PhD, Professor of Public Policy, Political Science, Health Policy and Management, and Law, Meyer and Renee Luskin School of Public Affairs; Senior Fellow, Center for Health Policy Research, University of California, Los Angeles

118. Pittman, Patricia, PhD, Professor of Health Policy and Management, Director of Health Workforce Research Center, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

119. Poteat, Tonia, PhD, MPH, PA-C, Ruby L. Wilson Distinguished Professor, Duke University School of Nursing

120. Randall, Vernellia R., JD, MSN, Professor Emerita of Law, The University of Dayton School of Law

121. Regenstein, Marsha, PhD, Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

122. Reiss, Dorit R., PhD, LLB, Professor of Law, James Edgar Hervey Chair in Litigation, UC Law San Francisco

123. Rempe, Shannon, JD, MPH, Program Director, Advancing Public Health and Health Equity in the Courts, Center for Health Policy & Law, Northeastern University

124. Rocco, Philip, PhD, Associate Professor of Political Science, Marquette University

125. Rooke-Ley, Hayden, Assistant Professor, Associate Director, Health Law and Policy Lab, Brown University School of Public Health

126. Rosenbaum, Sara, JD, Professor Emerita, Health Law and Policy, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

127. Russo, Jennefer, MD, MPH, Associate Clinical Professor, UCLA, Section Chief, Complex Family Planning, Harbor-UCLA Medical Center

128. Satz, Ani B., JD, PhD, Professor of Law and Public Health, Director, Project on Health Law, Policy and Ethics, Affiliated Professor of Business, Senior Faculty Fellow, Center for Ethics, Faculty Fellow, Emory Global Health Initiative, Emory University

129. Sawicki, Nadia N., JD, M. Bioethics, Georgia Reithal Professor of Law, Beazley Chair in Health Law, Beazley Institute for Health Law and Policy, Loyola University Chicago School of Law

130. Schaler-Haynes, Magda, JD, MPH, Professor, Department of Health Policy and Management, Department of Population and Family Health, Mailman School of Public Health, Columbia University

131. Schwartz, Jason L., PhD, Associate Professor, Department of Health Policy and Management, Yale School of Public Health

132. Seidman, Dominika, MD, MA, Assistant Professor, Department of Obstetrics, Gynecology & Reproductive Sciences, University of California, San Francisco

133. Seiler, Naomi, JD, Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

134. Shachar, Carmel, JD, MPH, Assistant Clinical Professor of Law and Faculty Director of the Health Law and Policy Clinic, Center for Health Law and Policy Innovation, Harvard Law School

135. Shafer, Paul, PhD, Associate Professor, Department of Health Law, Policy, and Management, Boston University School of Public Health, Co-Director, Medicaid Policy Lab

136. Sharfstein, Joshua M., MD, Distinguished Professor of the Practice, Department of Health Policy and Management, Johns Hopkins Bloomberg School of Public Health

137. Silverman, Hannah, MPH, Senior Research Associate, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

138. Sinha, Michael S., MD, JD, MPH, FCLM, Associate Professor of Law, Center for Health Law Studies, Saint Louis University School of Law

139. Skinner, Daniel, PhD, Professor of Health Policy, Department of Social Medicine, Ohio University

140. Skuster, Patty, JD, MPP, Associate Director of Accreditation and Core Teaching Faculty, MPH Program, University of Pennsylvania Perelman School of Medicine

141. Squires, Allison, PhD, RN, FAAN, Professor, Rory Meyers College of Nursing, Research Associate Professor, Grossman School of Medicine, New York University

142. Strasser, Julia, DrPH, MPH, Director, Reproductive Health Workforce & Policy Research Center, Assistant Research Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

143. Suski, Emily, JD, LLM, MSW, Willoughby Professor of Advocacy and Public Justice & Faculty Director of the Carolina Health Advocacy Medico-Legal Partnership (CHAMPS), Joseph F. Rice School of Law, The University of South Carolina

144. Swartz, Katherine, PhD, MS, Professor of Health Policy and Management, Emerita, Harvard T.H. Chan School of Public Health, Harvard University

145. Swartzberg, John, MD, FACP, Emeritus Professor, Division of Infectious Diseases and Vaccinology, Chair, University of California, Berkley

146. Swenor, Bonnielin, PhD, MPH, Director, Disability Health Research Center, Endowed Professor of Disability Health and Justice, Johns Hopkins University

147. Thompson-Lastad, Ariana, PhD, Associate Professor, Bixby Center for Global Reproductive Health & Department of Family and Community Medicine, University of California San Francisco

148. Vertinsky, Liza, PhD, JD, Professor of Law, University of Maryland Francis King Carey School of Law

149. Vichare, Anushree, PhD, MBBS, MPH, Assistant Professor, Department of Health Policy and Management, Milken Institute School of Public Health, The George Washington University

150. Volmar, Karen, JD, MPH, Professor and Associate Chair for Academic Programs, Department of Health Policy and Management, the University of North Carolina-Chapel Hill

151. Waldman, Ronald, MD, MPH, Professor Emeritus of Global Health, Milken Institute School of Public Health, The George Washington University

152. Wallace, Maeve, PhD, MPH, Associate Professor, Department of Health Promotion Sciences, Mel and Enid Zuckerman College of Public Health, University of Arizona

153. Wasserman, Alan G., MD, MACP, Eugene Meyer Emeritus Professor of Medicine, Department of Medicine, The George Washington School of Medicine and Health Sciences

154. Watson, Sidney D., JD, Jane and Bruce Robert Professor of Law and Scholar in Residence, Center for Health Law Studies, Saint Louis University School of Law

155. Westmoreland, Timothy M., JD, Professor from Practice, Emeritus, Georgetown University School of Law

156. Wheatley, Catherine, MD, FACOG, Associate Professor of Obstetrics and Gynecology, Obstetrics and Gynecology Residency Program Director, Department of Obstetrics and Gynecology, College of Medicine, University of Illinois Chicago

157. Winch, Peter, MD, MPH, Professor, Social and Behavioral Intervention Program, Department of International Health, Johns Hopkins Bloomberg School of Public Health

158. Wisner, Katherine L., MD, MS, DLFAPA, Professor of Psychiatry and Pediatrics, Developing Brain Institute, Children’s National Hospital, Professor of Obstetrics and Gynecology, George Washington University School of Medicine

159. Wynia, Matthew, MD, MPH, FACP, Professor, University of Colorado School of Medicine and Colorado School of Public Health, Director, Center for Bioethics and Humanities, University of Colorado Anschutz Medical Campus

160. Yang, Y. Tony, DSc, LLM, MPH, Endowed Professor of Health Policy, The George Washington University

161. Young, Heather A., PhD, MPH, Vice Chair and Professor, Department of Epidemiology, Milken Institute School of Public Health, The George Washington University

# EXHIBIT 2

July 31, 2026

Mehmet Oz, MD, Administrator
Centers for Medicare & Medicaid Services

Attention: CMS-2454-IFC, P.O. Box 8016
7500 Security Boulevard
Baltimore, MD 21244

**Re: Medicaid Program; Community Engagement Requirement for Certain Individuals [CMS-2454-IFC, RIN 0938-AV98]** — *Submitted via https://www.regulations.gov/*

Dear Administrator Oz:

We are a group of researchers at the Harvard T.H. Chan School of Public Health and Brigham & Women's Hospital. Over the last year, we have been working closely with states to research state policy choices regarding the implementation of the One Big Beautiful Bill Act (OBBBA), with particular focus on the law's medical frailty exemption from community engagement requirements. This comment is intended to provide feedback on the interim final rule (IFR) issued on June 3, 2026 (RIN 0938-AV98) with the goal of informing CMS's work to implement community engagement requirements. The views reflected within it are our own, and do not represent the perspectives of Harvard University, the Harvard T.H. Chan School of Public Health, Harvard Medical School, Brigham & Women's Hospital, Arnold Ventures (which funded much of this work) or any other entities with which we are affiliated.

We note that we share the concerns raised by others regarding the IFR's introduction of the requirement – not present within the OBBBA statute – that persons qualifying for medical frailty be significantly impaired in their ability to comply with the community engagement requirement. However, as others have addressed this issue in greater detail, we have focused our comments primarily on 3 main issues regarding implementation of the medical frailty exemption criteria as articulated within the IFR, based on our data analysis, which we describe in further detail below:

1) **The IFR's regulatory impact analysis provides a marked underestimate of the likely size of the medically frail exempt population (even according to the IFR's restrictive criteria), which we estimate to be 20% to 32%, rather than the 10% cited by CMS.**

2) **The IFR's imposition of a 12-month lookback period for using medical claims for *ex parte* verification of medical frailty inappropriately excludes more than 1.5 million people who should qualify for a Medical Frailty Exemption. (§435.557)**

3) **The Medicaid beneficiaries above who are likely to be inaccurately excluded from the medical frailty exemption by the 12-month lookback period are significantly sicker than other Medicaid beneficiaries, with a more than 2.5-fold increase in mortality risk as compared to non-exempt individuals. (§435.557)**

We briefly summarize our data analyses and results supporting these conclusions below, and further details are available from us upon request.

1) **The IFR's regulatory impact analysis provides a marked underestimate of the likely size of the medically frail exempt population (even according to the IFR's restrictive criteria), which we estimate to be 20% to 32%, rather than the 10% cited by CMS.**

In the regulatory impact analysis (Table 37), CMS estimates that only 10% of the relevant Medicaid population would be a specified excluded individual based on the IFR-defined category of "medically frail or has other special medical needs" [§ 435.554(c)(5)]. To reach this figure, the analysis cites a KFF issue brief, which constructs an estimate using the March 2024 Current Population Survey ASEC Supplement, subsetting to "Medicaid covered adults (age 19-64) who do not receive benefits from Supplemental Security Income (SSI) or Social Security Disability Insurance (SSDI) and are not also covered by Medicare." However, CMS is inappropriately applying the KFF brief's estimate to the medically frail category; the KFF estimate reports the percentage who reported not working *at all* over the prior year due to disability or illness, rather than those who are unable to work 80 hours a month due to disability or illness.

Many people who are medically frail are working to the extent they are able — and may rely on their Medicaid coverage to keep them healthy enough to work at that capacity. In citing KFF's 10% estimate, the IFR fails to account for enrollees who are working part-time (below the 80-hour per month threshold); who are changing the amount of work due to their health or illness; or who may have worked over the prior year but were not working at time of survey. A substantial share of Medicaid-eligible persons thus may meet the IFR criteria for medical frailty while participating in the workforce to some extent but have capacity limitations that cause them to fall short of the 80-hour threshold.

To better characterize this population, we analyzed two nationally-representative data sources – the Survey of Income and Program Participation (SIPP) and the National Health Interview Survey (NHIS) – pooling across six years of data (2019-2024). We limited our primary sample in each survey to those likely subject to the community engagement requirements: Medicaid participants who are not on Supplemental Security Income (SSI) or Medicare. This information is reflected in **Table 1.**

We find that across both surveys over one fifth (21.1% - 26.6%) of those potentially subject to work requirements are limited in the kind or amount of work they can do OR unable to work entirely, due to disability or illness. These estimates are more than twice as high as CMS's estimate of how many people should be exempt from work requirements due to medical frailty under the IFR.

Indeed, in our analysis of NHIS and SIPP data, those reporting being unable to work *at all* represented just 39.1 to 49.6% of those who reported being limited or unable to work. In other words, medical frailty can be expected to *limit work hours among workers* more frequently than it prevents work entirely, which CMS's estimate fails to capture. Most of the population limited or unable to work (76% in both datasets) work fewer than 80 hours a month, with an average number of hours worked of 41.2 per month in the SIPP and 39.5 in the NHIS. These analyses are available to CMS upon request.

**Table 1:** Nationally-Representative Estimates of Work Limitations Among Adults (Ages 19-64) Potentially Subject to Medicaid Work Requirements

| | **SIPP Estimates (95% CI)** | | **NHIS Estimates (95% CI)** | |
|---|---|---|---|---|
| | Among Medicaid participants (19-64), not on SSI/Medicare | Among all adults (19-64) with family income <138% of the federal poverty level | Among Medicaid participants (19-64), not on SSI/Medicare | Among all adults (19-64) with family income <138% of the federal poverty level |
| % limited in kind or amount of work or unable to work due to health or disability | 21.1 (20.4, 21.8) | 30.5 (29.8, 31.3) | 26.6 (25.6, 27.5) | 32.3 (31.5, 33.2) |

*Source:* Authors' analysis of Survey of Income and Program Participation (SIPP) and National Health Interview Survey – Pooled 2019-2024 Data

Furthermore, relying on an estimate that focuses on current Medicaid enrollees may understate the share of people who are likely to be determined medically frail because it ignores those who are eligible for Medicaid, but not yet enrolled and could apply in the future. When we expand our analysis to include all working-age adults potentially eligible for Medicaid (making under 138% of the federal poverty level), more than 30% are limited or unable to work due to health or disability (Table 1).

Our estimates in Table 1 are supported by estimates from previous research articles, which are much higher than CMS's IFR estimate. For instance, estimates from a prior peer-reviewed study of Arkansas' work requirements found that 30-43% of those potentially eligible for Medicaid reported health-related work limitations in the states they surveyed (Sommers et al, 2019), while another analysis found that 19% of beneficiaries likely meet medical frailty criteria under Kentucky's previously proposed Medicaid work requirements (Venkataramani et al, 2019). While these results show a range of values, underscoring that variation by state in medical frailty rates should be expected, they are also consistent in demonstrating that the 10% statistic cited by CMS in the IFR is well below the actual prevalence of medical frailty in this population.

We must also note that these estimates should not be interpreted as an upper bound on any given states' ascertainment of medical frailty. The NHIS and the SIPP are designed to deliver representative estimates of national averages but do not produce reliable state-level estimates of smaller subpopulations. Differences in chronic disease burden, Medicaid enrollment patterns, and other factors across states may lead to very different results.

In summary, CMS's regulatory impact analysis seriously underestimates the size of the population that should qualify for a medical frailty exemption. We urge CMS to revise this and to clarify to states that the population that qualifies for a medical frailty exemption is substantially larger than reported in the IFR.

**2) The IFR's imposition of a 12-month lookback period for using medical claims for *ex parte* verification of medical frailty inappropriately excludes more than 1.5 million people who should qualify for a Medical Frailty Exemption. (§435.557)**

Our analyses of Medicaid claims data indicate that using an overly restrictive and arbitrary time period for analysis – which we refer to subsequently as a "lookback period" – will lead to avoidable coverage losses among many beneficiaries who would be eligible for the medical frailty exemption. We were pleased to have the opportunity to meet with members of your Medicaid leadership team on April 2, 2026, prior to the issuance of the IFR, at which time we shared our preliminary analysis (subsequently shared in writing in May 2026) showing that utilizing a shorter lookback period would substantially reduce the ability of states to automate medical frailty exemptions. We also highlighted the risk that the time lag in claims would present a serious barrier for states if the lookback period was too short.

Since that time, we have updated our methodology to account for the new requirements of the IFR, which include a narrower use of applicable diagnosis codes and the additional requirement of utilization metrics to indicate adequate severity to qualify for a medical frailty exemption. In doing so, we continue to find that a 12-month lookback (as required in the IFR) will omit more than 1.5 million seriously-ill or disabled individuals in Medicaid from the medical frailty exemption despite a high likelihood that such individuals meet frailty criteria as articulated within the IFR. This has the potential to result in devastating health consequences.

To briefly describe our current approach, we use a two-stage analysis – first identifying diagnoses potentially meeting the medical frailty exemption as described in the OBBBA and June 2026 IFR, then identifying what types of utilization would likely convey the severity or acuity necessary to justify an exemption for any of the qualifying diagnoses.

*Selection of Potentially Qualifying Diagnoses:* Our list of candidate diagnosis codes were drawn from two sources. First, we used the list of Chronic Conditions and Other Chronic Health, Mental Health, and Potentially Disabling Chronic Conditions Algorithms from the Centers for Medicare & Medicaid Services' Chronic Conditions Warehouse (CCW). The CCW was used primarily as a source of validated diagnosis groupings and condition definitions that may be relevant to medical frailty under the statute. Second, we used Alternative Benefit Plan (ABP) determination processes from states using medical frailty definitions in Medicaid that have been publicly released.[1] Additional ICD-10 codes found in at least two state ABP medical frailty definitions and not in the CCW were reviewed to determine whether each diagnosis (and relevant algorithm) would likely meet criteria to be exempt from Medicaid work requirements according to statute.

Two physicians independently reviewed each CCW diagnosis algorithm to determine whether it should be entirely included or entirely excluded based on statutory criteria for identifying medically frail individuals. ICD-10 codes (and in some cases Healthcare Common Procedure Coding System codes or National Drug Codes, when present in the CCW algorithm) were included if they were deemed:

[1] We reviewed ABPs from the following states: Indiana, Iowa, Kentucky, Michigan, Nebraska, New Mexico, North Dakota, Pennsylvania.

(1) likely to result in ongoing medical care needs and plausibly causing impairment (if accompanied by other indications of severity) that limits likelihood of employment, number of hours worked if employed, extent of community participation, or other aspects of economic self-sufficiency; AND

(2) likely to last 6 months or longer (either on their own or as a direct consequence – e.g., acute myocardial infarction and subsequent coronary artery disease);

AND

(3) are not easily curable with treatment

Conditions deemed not likely to meet statute requirements (mild, generally curable, lasting less than 6 months, etc.) were excluded, as were specific conditions explicitly listed in the IFR as not likely to satisfy the medical frailty requirements (e.g. simple anemia or hypothyroidism).

*Selection of Qualifying Procedure Codes:* Next, utilization measures were then identified from claims, using the American Medical Association's Current Procedural Terminology (CPT) codes. Medical frailty for this analysis required both a qualifying diagnosis code and either one inpatient utilization or at least 2 outpatient services of adequate severity (outpatient visits, emergency department visits, clinician-administered treatment, or diagnostic testing with procedure codes deemed by the evaluating clinicians to meet a criteria of moderate-to-high clinical intensity). Candidate outpatient CPT codes were drawn from the 500 most frequently billed CPT codes associated with our qualifying diagnosis list, for either a 12- or 24-month lookback period. Procedures outside the top 500 most commonly used codes were relatively uncommon, with none appearing in more than 0.32% of potentially exempt individuals identified using a 12-month lookback period.

Our timeframe for claims analysis (the "lookback period") was 12 months, in accordance with the IFR guidelines. However, we also analyzed a 24-month lookback period as a comparison to understand the implications of the IFR 12-month requirement.

We implemented this claims analysis using data from the Transformed Medicaid Statistical Information System (T-MSIS), restricting to non-elderly adults (ages 19-64) who qualify for Medicaid on the basis of program expansion under the Affordable Care Act. **Table 2** presents our results.

**Table 2:** National Prevalence of Frailty Estimates for Working-Age Expansion Enrollees Based on Lookback Period Applied

| 12-Month Lookback Period | 24-Month Lookback Period |
|---|---|
| 5,084,347<br>(24.13%) | 6,590,816<br>(31.28%) |

We find approximately 1.5 million persons who are not identified as medically frail under a 12-month lookback period who would be identified under a 24-month lookback period (**Figure 1**). These are individuals with serious, long-term medical conditions that should qualify for an exemption.

There are several potential reasons for individuals who should qualify for an exemption to only have evidence of medical frailty in older claims data rather than within the past 12 months: not all patients have regular access to medical care and/or may experience periods of gaps in their coverage ("churning") that lead to reduced claim frequency; patients with multiple conditions may not have all of those conditions reflected in diagnosis codes for any given visit addressing multiple problems simultaneously; and claims lag may mean more recent claims are incomplete in many states.

We note that a significant limitation of our analysis is our reliance on CPT codes as measures of utilization. States may use other credible information on medical care utilization not incorporated in the analysis presented here (data on prescription drug fills or site of care, for example) that would increase their ability to identify medically frail individuals. Additionally, the T-MSIS data we relied upon may not adequately capture all individuals with behavioral health conditions or substance use disorders, due to privacy protections related to 42 CFR Part 2. Therefore, our estimates are better understood as a "floor" than a "ceiling," in terms of the share of people likely to be identified as medically frail. Additionally, we report national estimates here, but in separate analyses we have documented broad state-level variation in the share of enrollees identified as medically frail using our framework. Nonetheless, we note that these results are in the ballpark of the survey-based estimates of medical frailty we report in Table 1 of this comment.

As discussed in the next section, despite the fact that these individuals' medical frailty is documented in older rather than more recent claims, our analysis reveals that they are a high acuity population with significant health risks.

3) **The Medicaid beneficiaries above who are likely to be inaccurately excluded from the medical frailty exemption by the 12-month lookback period are significantly sicker than other Medicaid beneficiaries, with a more than 2.5-fold increase in mortality risk as compared to non-exempt individuals. (§435.557)**

To assess the severity and health of our population identified as exempt, we examined receipt of home and community-based services (HCBS), nursing home admission, and subsequent mortality. These results are summarized in Figure 1.

**Figure 1:** Comparing Utilization and Mortality Between Working-Age Expansion Enrollees Identified vs. Not Identified for Medical Frailty Exemption, Depending on the Lookback Period and Timing of Exemption




*Notes:* RR = Relative Risk, compared to population not identified for exemption ("not id."). HCBS = Home and Community Based Services. NH = Nursing Home. MDS = Minimum Data Set.

Crucially, the population additionally identified under the 24-month lookback period has dramatically higher mortality than the non-exempt population in Medicaid. The sickest population is beneficiaries with recent claims evidence (months 1-12) of medical frailty, but persons only identified under the 24-month lookback period (i.e. with evidence of frailty in months 13-24) nonetheless have a markedly elevated mortality rate compared to the non-exempt population: these individuals who would be excluded from the medical frailty exemption under the IFR's 12-month lookback period are ***2.6 times more likely to die in the subsequent year*** than those Medicaid beneficiaries who are not identified in our analysis as medically frail. Furthermore, this population has substantially higher rates of long-term services and supports (2.3 times as likely to receive HCBS, and 3.2 times as likely to have a nursing home stay). Thus, a 24-month lookback period identifies enrollees who demonstrate higher-acuity health needs, who would be missed with the approach currently required by the IFR.

We urge CMS to revise its 12-month limitation on the use of adjudicated claims and encounter data, to permit a lookback period of at least 24 months.

**Conclusion:**

CMS's IFR implementing OBBBA's work requirements is premised on an inaccurately low estimate of how many people in Medicaid should qualify for the medical frailty exemption *even using the restrictive standard of the IFR itself,* and the imposition of a 12-month lookback period would lead to over 1.5 million chronically-ill Medicaid beneficiaries being inappropriately excluded from a qualifying exemption, despite having a mortality rate that is over 2.5 times higher than the rest of the Medicaid expansion population. We urge CMS to revise these aspects in any subsequent Final Rule.

We thank you for the opportunity to provide feedback on these important policy questions. Please do not hesitate to contact us at aneeman@hsph.harvard.edu if we can be of any further assistance to CMS in its deliberations.

Sincerely,

**Ari Ne'eman, PhD**
Assistant Professor of Health Policy and Management, Harvard T.H. Chan School of Public Health

**Adrianna McIntyre, PhD, MPH, MPP**
Assistant Professor of Health Policy and Politics, Harvard T.H. Chan School of Public Health

**Daniel L. Smithers, MD, MS**
Research Fellow in Medicine, Brigham & Women's Hospital / Harvard Medical School

**Benjamin D. Sommers, MD, PhD**
Huntley Quelch Professor of Health Care Economics, Harvard T.H. Chan School of Public Health, Professor of Medicine, Brigham & Women's Hospital / Harvard Medical School

# EXHIBIT 3

Center on Health Policy at BROOKINGS

July 31, 2026

Mehmet Oz, Administrator
Centers for Medicare and Medicaid Services
7500 Security Boulevard
Baltimore, MD 21244

**Re: Medicaid Program; Community Engagement Requirement for Certain Individuals [CMS-2454-IFC]**

Dear Administrator Oz,

Thank you for the opportunity to comment on the Centers for Medicare and Medicaid Services' (CMS) interim final rule with comment period (IFC) on the Medicaid Program: Community Engagement Requirement for Certain Individuals. Below, we offer comments on the Regulatory Impact Analysis: Coverage-Loss and Federal-Savings Estimates for the Medicaid Community Engagement Requirement and some key features of the exemption policy.

This analysis examines the Regulatory Impact Analysis (RIA) accompanying the IFC implementing Medicaid community engagement (work) requirements. Our comments address five aspects of the analysis.

1. The RIA assumes that the work requirement will lead 29% of those subject to it to begin working but offers no empirical justification for this assumption. This assumption is inconsistent with the findings of three separate, well-developed strands of research, which all imply that the requirement will cause little or no increase in employment.

2. This unsupported assumption of substantial increases in community engagement reduces predicted coverage loss associated with the work requirement. Achieving the IFC's assumed budgetary impact given this coverage loss estimate would require that CMS disenroll an implausibly high number of very high-cost Medicaid beneficiaries.

3. The RIA asserts that work makes people healthy. Specifically, it assumes that the increase in community engagement that is assumed to occur will generate benefits to those newly participating in community engagement activities. This assertion is based on correlational evidence that cannot establish causal linkages and fails to account for the substantial causal evidence that work does not consistently or uniformly improve health.

4. The RIA fails to address the costs to beneficiaries of coverage losses. A substantial literature now exists showing quantitatively large health benefits of the specific coverage gains that the work requirement will reverse through the IFC.

5. The IFC's exemption list fails to recognize the key features of behavioral health disorders (mental illness and substance use disorders) in the design of the exemptions.

The remainder of this comment letter examines each of these issues in turn.

**1. Employment effects will be close to zero**

The key parameter required to estimate the costs and benefits of Medicaid work requirements is an estimate of the effect of the requirement on employment. To make this estimate, CMS specifies four implementation scenarios, each reflecting different state policy choices; it uses actuarial judgment to assign weights to each scenario. For each scenario, CMS makes assumptions about how the implementation of the work requirement will affect the labor market and other community engagement outcomes. On average across the four scenarios, CMS assumes that around 29% of non-exempt beneficiaries will be moved into work by the requirement, with another 4% being moved into other forms of qualifying community engagement (Table 42). The subsequent estimates of effects on employment, hours worked, earnings, fiscal effects, and IFC benefits are all mechanical outgrowths of these assumed behavioral responses.

CMS offers no empirical basis for these assumed behavioral responses. This approach to modeling the effects of the IFC is inconsistent with the requirements of the Office of Management and Budget (OMB) Circular A-4, as it is not based on "best reasonably obtainable scientific, technical, and economic information available," and there are three distinct, well-developed strands of research that CMS could have used as a basis for predicting the effects of the community engagement requirements in the IFC:

*HHS/ASPE review of the literature*

There is an extensive literature on the impact of work promotion strategies in health and welfare programs. In June 2026, the Department of Health and Human Services (HHS) and the Office of the Assistant Secretary for Planning and Evaluation (ASPE) released an issue brief that synthesizes 132 rigorous studies (randomized controlled trials and quasi-experimental designs) drawn largely from the Pathways to Work Evidence Clearinghouse, sorted into nine distinct work-promotion strategies. The review's consensus estimate for welfare-to-work programs, the category with the largest impacts on work, was an increase in employment participation of approximately 4.2 percentage points, a figure achieved only in programs that paired the requirement with substantial work supports (childcare, transportation, case management) and conditioned cash assistance on work.

*Effects of Medicaid expansion*

The employment effects of adding work requirements to Medicaid should be similar to, but of opposite sign, as the employment effects of making Medicaid available without such requirements, as the Medicaid expansion under the Affordable Care Act (ACA) and several earlier policy reforms did. There is an extensive research literature on the employment effects of

the ACA Medicaid expansion and prior expansions. Table 1 summarizes the ACA literature. The results reported by studies identified in Table 1 center on the expansion having no impact on employment in the overall population or in key subpopulations. Reported results ranged from a 1.3 percentage point decrease to a 3-percentage point increase in employment.

**Table 1: Causal evidence on ACA Medicaid expansion and labor supply**

| Study | Population and design | Magnitude of estimated effect |
|---|---|---|
| **Hall, Shartzer, Kurth, and Thomas (2018)** | DiD using expansion-state variation among working-age adults with disabilities | No significant increase in employment among adults |
| **Callison and Sicilian (2018)** | DiD/DDD using expansion status and racial/ethnic subgroups | Employment increases of between **1 and 3 pp** |
| **Leung and Mas (2018)** | DiD using childless adults in expansion versus non-expansion states | Employment effect statistically indistinguishable from zero and small in magnitude |
| **Gooptu, Moriya, Simon, and Sommers (2016)** | DiD using CPS data, 2013 to 2014 | Effects of about **±1 pp** and statistically insignificant |
| **Garrett and Kaestner (2015)** | DiD using CPS/ACS-type national data | Effects generally **less than 1 pp a**nd statistically insignificant |
| **Kaestner, Garrett, Chen, Gangopadhyaya, and Fleming (2017)** | DiD and DDD among low-income and low-education adults | Estimates **0 to +1 pp** and statistically insignificant |
| **Buchmueller, Levy, and Valletta (2021)** | DiD and individual labor-market-transition models for unemployed adults | Estimate close to **zero** and insignificant |
| **Peng, Guo, and Meyerhoefer (2019)** | Border-county/distributed-lag design using QCEW data | Employment **−1.3% one year after expansion**, returning to baseline within two years |
| **Aslim (2019)** | DiD comparing low-educated adults ages 55 to 64 in expansion and non-expansion states | Retirement increased approximately **0.6 pp among childless women**; no significant effect for men |
| **Levy, Buchmueller, and Nikpay (2018)** | DiD using older adults and variation in ACA exposure | **<1 pp** and statistically insignificant average retirement effect |
| **Gustman, Steinmeier, and Tabatabai (2020)** | HRS-based DiD/model using access to employer and retiree insurance | Estimated effects are small and generally statistically insignificant |
| **Wood (2019)** | DiD/event study exploiting ACA implementation and differential exposure of near-elderly adults | **Decline of 2 pp** in labor force participation among newly-eligible near-elderly adults |
| **Duggan, Goda, and Li (2021)** | DDD using age, geography, and pre-ACA uninsurance to identify effects among near-elderly adults | **Effects of 0 to 1pp** on labor force participation and employment |
| **Clemens, Mahajan, and Sabia (2026)** | Pre-committed long-run extensions of DiD and DDD event studies, using ACS data through 2024 | Employment effects 7-10 years after expansion near zero (estimates lie between roughly **−1 and +1 pp)**. |

*Note: Difference-in-Differences (DiD); Difference-in-Difference-in-Differences (DDD); Current Population Survey (CPS); percentage points (pp); Quarterly Census of Employment and Wages (QCEW); Health and Retirement Study (HRS); American Community Survey (ACS); Affordable Care Act (ACA)*

Table 2 summarizes the literature on the employment effects of expansions that took place before the ACA. Many estimated effects are close to zero; the largest, at 5.2 percentage points, is about one-sixth as large as the assumed effect in the RIA.

**Table 2: Causal estimates of employment effects of pre-ACA Medicaid coverage changes (Percentage-point change in employment associated with gaining Medicaid coverage)**

| Study | Policy/population | Research design | Employment effect of Medicaid expansion (percentage points) |
|---|---|---|---|
| **Garthwaite, Gross, and Notowidigdo (2014)** | Tennessee TennCare rollback (2005); low-income working-age adults | DiD and DDD using CPS | **-2.5** (broad sample); **-4.6** (preferred childless-adult estimate) |
| **Ham and Ueda (2021)** | Reanalysis of TennCare rollback | Analyses of ACS, CPS and MCPS | **Approximately 0** |
| **DeLeire (2019)** | Reanalysis of TennCare rollback using SIPP | Longitudinal panel analysis | **Approximately 0** |
| **Baicker, Finkelstein, Song, and Taubman (2014)** | Oregon Medicaid lottery; uninsured low-income nondisabled adults | Randomized lottery | **-1.6** (not statistically significant) |
| **Dague, DeLeire, and Leininger (2017)** | Wisconsin expansion to poor childless adults | Administrative data; regression discontinuity and DiD | **-5.2** |
| **Bradley and Sabik (2019)** | State adult Medicaid expansions before the ACA | DiD | Little overall effect |

*Note: Difference-in-Differences (DiD); Difference-in-Difference-in-Differences (DDD); Current Population Survey (CPS); CPS March Supplement (MCPS); American Community Survey (ACS); Affordable Care Act (ACA); Survey of Income and Program Participation (SIPP)*

*Recent work requirement experience*

There is peer-reviewed research evidence on recent work requirements, very similar in nature to those in H.R. 1, from Arkansas, which implemented Medicaid work requirements under a waiver, as well as from recent Supplemental Nutrition Assistance Program (SNAP) work requirement provisions. Three distinct peer-reviewed studies of the Arkansas work-requirement waiver found no measurable impact on employment or hours worked (Sommers et al., 2019; Sommers et al., 2020; Gangopadhyaya and Karpman, 2025). A recent analysis of the Georgia Pathways program likewise found that work requirements under a Medicaid expansion did not increase employment in the state (Johnson et al., 2025). Similarly, Gray, Leive, Prager, Pukelis, and Zaki (2023) find no employment effects of recent SNAP work requirements. Preliminary results from a Randomized Controlled Trial (RCT) (Layton, Leive, and McIntyre, 2026) find that work requirements induce a 1 to 2 percentage point increase in employment.

In sum, three entirely distinct strands of research literature find that the employment effects of work requirements in programs similar to Medicaid are on the order of zero to 2 percentage points, with all Medicaid work requirement studies and many SNAP work requirement studies finding no significant effects. Even the largest estimates in the published literature, those from

Center on Health Policy at BROOKINGS

programs with cash benefits and work supports, are only around one-sixth as large as those assumed by the RIA.

2. **Achieving the IFC's assumed budgetary impact, given its coverage loss estimate, requires that CMS disenroll an implausibly high number of very high-cost Medicaid beneficiaries**

Building from the incorrect assumption that community engagement will increase substantially, the RIA's assumptions about Medicaid coverage loss (3.1 to 3.3 million beneficiaries annually) are well below those of other analysts, including the CBO (5.7 million). These estimates are far lower than the experience of Arkansas (Gangopadhyaya and Karpman, 2025). However, in Table 41, the IFC reports that the ten-year federal savings associated with the regulation will be $350.3 billion, substantially higher than CBO's federal savings estimate of $317 billion.

Federal savings under the rule are approximately equal to the number of people disenrolled multiplied by the average federal cost per disenrolled beneficiary, summed over the years in the budget window. Thus, the IFC must be assuming much larger federal savings per person disenrolled. Concretely, the IFC's estimates imply an average annual federal cost per disenrolled beneficiary of about $11,000, while CBO's estimate implies a much lower $5,600 figure.

This difference requires that the IFC and CBO make very different assumptions about who is likely to disenroll from the program under the work and administrative requirements. The IFC's $11,000 estimate is close to the projected average federal cost of the entire Medicaid expansion population, without taking into account any of the statutory exemptions or the short-term hardship exemption in H.R. 1. By contrast, CBO's estimate accounts for its assessment of the effects of these exemptions.

The difference in mean spending, however, understates the implausibility of the CMS assumption. The distribution of Medicaid spending (as of all health spending) is highly skewed. About 30% of beneficiaries subject to the requirement (or about 5 million beneficiaries, based on scaled calculations from the 2023 MEPS, without taking into account the statutory exemptions) have no or minimal Medicaid-paid spending at all in any given year. Fewer than 10% of those in this group have federal Medicaid expenses at or above $11,000. To achieve an average federal savings of $11,000 per beneficiary while assuming that only 3.1 to 3.3 million people will disenroll, CMS must believe that a large share of those who do not use their Medicaid benefits will be among the roughly 4 million the IFC assumes will begin working and will meet significant paperwork obligations because of the new work requirements. Conversely, CMS must assume that many of those in the highest cost 10% of spenders will fail to obtain exemptions and will be shifted off Medicaid.

It is not at all clear that there are enough such high expense people to disenroll, even under the restrictive frailty requirements in the rule, to generate the federal savings indicated.

3. **The RIA's assertion that work makes people healthy is not grounded in credible evidence**

As noted above, OMB Circular A-4 states that an RIA "should provide documentation that the analysis is based on the best reasonably obtainable scientific, technical, and economic information available." The IFC's claim that work requirements improve health also fails to meet this standard.

The IFC grounds this claim in studies that show that people who work are, on average, in substantially better health than those who do not. But this correlation between work and health may not be causal, both because poor health diminishes work prospects and because unobserved third factors may affect both work and health. The studies cited to make the case that work makes people healthy fail to account for these effects.

Gerdes et al. (2026) provide a systematic review of reviews, but the authors explicitly note that the studies they review do not provide evidence of a causal link between work and health. Virtanen et al. (2005) describe largely cross-sectional and observational studies and emphasize the challenges of occupational confounding and health selection. Kim and von dem Knesebeck (2016) summarize prospective studies, which can at least establish that work sometimes precedes improvements in health, but do not rule out situations where improvements in both employment and health are generated by some third factor, nor scenarios where an anticipated change in health spurs a change in labor market behavior. Indeed, they find that the estimated effects of unemployment on health are largest in those studies that make no effort to address selection. Han (2024) describes longitudinal patterns in health and employment, but lacks any basis for establishing causality and does not describe their estimates as causal. Zafar et al. (2024) likewise have no source of causal identification.

There are a small number of research studies that use exogenous variation in work unrelated to other benefit changes (mostly through changes in retirement rules) to examine the impacts of working on health (see Garrouste and Perdrix, 2022, for a summary). The results are inconsistent across studies, with a few finding short-term reductions in mortality from delaying retirement among older men (although these effects are often confounded by changes in health insurance coverage), while most studies find that health declines.

We emphasize that even if work did improve health, community engagement requirements would only improve health to the extent that they increase employment. However, as discussed above, a robust evidence base implies that there will be little or no increase in employment.

### 4. The RIA fails to address the health costs to beneficiaries of coverage losses

In contrast to the limited evidence establishing a causal relationship of employment on health, there is a large and robust literature documenting improvements in health from insurance coverage. This literature relies on changes in exactly the kind of coverage that beneficiaries will lose through the IFC's work requirement. Table 3 provides estimates of these impacts from multiple studies, including those that examine the ACA and those that examine other coverage settings. These estimates suggest that the loss of coverage will, on average, generate significant adverse health effects. This robust literature provides ample sources for monetizing the likely

Center on Health Policy at BROOKINGS

impact of losing Medicaid coverage on the health of beneficiaries. In conjunction with the much smaller impacts on employment and the limited impact of work on health, the costs associated with these adverse effects would likely greatly exceed any benefits of the requirements for enrollees, and, as such, should clearly be quantified in the RIA.

**Table 3: The effects of health insurance on health**

| Study | Intervention and identification | Magnitude of first stage | Health outcome (Effect) |
|---|---|---|---|
| **Panel A. Randomized experiments** | | | |
| RAND Health Insurance Experiment (Manning et al., 1987; Newhouse, 1993) | RCT; reduced patient cost-sharing | Cost-sharing ↓ substantially; utilization ↑ | Improved hypertension control and vision among low-income, high-risk participants |
| Oregon Health Insurance Experiment (Baicker et al., 2013) | Medicaid lottery | Medicaid coverage ↑ ≈25 percentage points | Depression ↓ (~9 percentage points) |
| Goldin, Lurie, and McCubbin (2021) | RCT; Mandate penalty outreach | Enrollment ↑ | Mortality ↓ |
| **Panel B. Medicaid expansions** | | | |
| Currie and Gruber (1996) | Medicaid eligibility expansions for children | Medicaid eligibility ↑ | Infant and child mortality ↓ |
| Sommers, Baicker, and Epstein (2012) | State Medicaid expansions | Medicaid enrollment ↑ | Adult mortality ↓ |
| Miller, Johnson, and Wherry (2021) | ACA Medicaid expansion | Medicaid coverage ↑ | Adult mortality ↓ |
| Wyse and Meyer (2025) | ACA Medicaid expansion | Medicaid enrollment ↑ ≈12 percentage points | Mortality ↓ (~2.5% overall; substantially larger among new enrollees) |
| **Panel C. Medicare** | | | |
| Card, Dobkin, and Maestas (2009) | Medicare eligibility at age 65 regression discontinuity | Medicare coverage ↑ sharply at age 65 | Mortality following emergency admissions ↓; treatment intensity ↑ |
| Goodman-Bacon, Lleras-Muney, Price, and Yue (working paper) | Introduction of Medicare | Medicare coverage ↑ | Life expectancy ↑ among older adults |
| **Panel D. Universal insurance** | | | |
| Hanratty (1996) | Provincial implementation of Canadian universal health insurance | Insurance coverage ↑ | Infant mortality ↓, particularly post-neonatal mortality |

*Note: Randomized Control Trial (RCT); Affordable Care Act (ACA)*

### 5. The behavioral health exemptions in the IFC fail to recognize the characteristics of these illnesses

One group that is particularly vulnerable to loss of coverage and worse health because of work requirements is those with behavioral health conditions (mental illnesses and substance use disorders (SUDs)). To address this possibility, Congress excluded people with certain behavioral health conditions, as part of a broader set of exclusions for people who are "medically frail."

Section II.E.5—"An Individual Who is Medically Frail or Otherwise has Special Medical Needs"—establishes administrative practices to implement these statutory exemptions, which are out of step with evidence on the fundamental characteristics of substance use disorders and disabling mental disorders. This begins with the Federal Register discussion of the specified excluded individual category for people who are medically frail or have special medical needs. CMS states that this category includes people with: SUD; disabling mental disorder; physical, intellectual, or developmental disability impairing activities of daily living; serious or complex medical condition; or blindness/disability under section 1614. CMS's key interpretive move is to require that a person must have a qualifying health condition *and* that condition must significantly impair the individual's ability to comply with the community engagement requirement. In contrast to the statute, diagnosis alone is not sufficient.

The nature of these conditions compounds the problem. Behavioral health conditions are often underdiagnosed or episodically treated—they are not simple binary states. Moreover, by their particular nature, they specifically impair a person's ability to document eligibility, respond to notices, keep appointments, and navigate state portals (Millan et al., 2012). Recognizing the fluctuating nature of these conditions and the need for continuous treatment, the statute establishes exemptions for these conditions defined by diagnosis alone. The state must verify both the qualifying condition and impairment in an individual's ability to comply. This makes the exemption as implemented through the IFC more restrictive than the statute intended.

This restrictive definition will have two major consequences. First, the exemption will tend to disadvantage those with untreated SUD, intermittent treatment, unstable housing, justice involvement, relapse, or poor continuity of care, who may be least likely to have the necessary documentation (Millan et al., 2012). People with recent, documented, coded encounters are more likely to meet the criterion, though their conditions may be inherently less serious. Second, it forces states and clinicians to make a functional-capacity judgment: not "Does this person have OUD, bipolar disorder, schizophrenia, major depression, PTSD, or alcohol use disorder?" but "Does this condition significantly impair compliance with 80 hours per month of work or equivalent activities, and can that be documented?" That turns the exemption into something closer to a mini-disability determination, but without the full procedural structure of Supplemental Security Income (SSI) or Social Security Disability Insurance (SSDI). This new extra-statutory provision will be quite costly to the states and threaten the ability to administer exemptions efficiently and fairly. The RIA's estimate of state administrative costs, which is based on information submitted by states prior to the IFC, fails to consider the new mini-disability-determination process states will need to establish.

A further challenge is that chronic recurring conditions, such as addiction and serious mental illness, do not fit six-month or annual administrative snapshots. The National Institute on Drug Abuse (NIDA) defines addiction as a chronic, relapsing disorder involving compulsive drug

seeking and use despite adverse consequences, with changes in reward, stress, and self-control circuits (NIDA, n.d.). Similarly, schizophrenia, bipolar disorder, recurrent major depression, PTSD, and co-occurring SUD often involve periods of relative stability interrupted by relapse, hospitalization, medication discontinuity, homelessness, incarceration, or functional deterioration. That creates a mismatch with the IFC's operational logic. A person may be stable enough to work part-time in March, relapse in May, miss reporting in June, and lose coverage by July. Or a person may be in remission but only because Medicaid is financing antipsychotics, medications for opioid use disorder (MOUD), therapy, case management, or peer support. Because regaining Medicaid is likely to be much more challenging than losing it under the IFC's conditions, errors of timing will lead to losses of coverage that persist. Treating current stability as evidence that the person does not need the exemption can be exactly backwards.

The symptoms of SUD and serious mental disorders, themselves, often impair executive functioning, memory, planning, attention, motivation, trust in institutions, and social stability. The rule's requirement to demonstrate such impairment—beyond diagnosis—may therefore select against the very people most impaired: those least able to obtain records, request an exemption, or persist through denials.

The administrative navigation challenges facing people with behavioral health problems are not incidental; they are part of the impairment, <u>so adding further hurdles, such as showing functional impairment, will be particularly debilitating</u>.

For this population, the ability to comply with a work requirement is not just the ability to perform paid work. It is the ability to understand notices, gather documentation, access online systems, maintain phone or internet access, respond within deadlines, coordinate with providers, and contest errors. Moreover, behavioral health conditions and the systems that treat them commonly display fluctuating levels of functional impairment, symptom severity, inconsistent diagnostic coding, variable engagement in care, and insufficient documentation in administrative datasets. Claims may lag weeks or months; managed-care encounter data may be delayed; claims disputes, denials, or bundled services may obscure diagnoses; and outdated state data systems may increase reliance on manual reporting. In Arkansas, data matching identified about two-thirds of enrollees as exempt or already compliant, leaving many people to navigate reporting themselves (Musumeci et al., 2018).

The administrative-burden problem will affect many of those people that the statute aimed to protect. Medicaid is a primary coverage pathway for people with behavioral health conditions: among Medicaid-covered adults with diagnosed SUD, 59% qualify through ACA expansion; among those with opioid use disorder (OUD), 61%; among those with any mental health disorder, 51%; and among those with serious mental illness, 45% (Saunders et al., 2025). That means the work-requirement machinery is aimed directly at a coverage pathway heavily used by people with these conditions.

These are especially important concerns because continuous Medicaid coverage supports ongoing treatment for mental health and SUD, and many adults with mild or moderate conditions

already work or engage in qualifying activities while relying on Medicaid-covered treatment to maintain employment (Saunders et al., 2025).

An alternative criterion for exemption proposed by the IFC is participating in SUD treatment. The IFC states that only care delivered by nonprofit treatment providers will count as qualifying treatment. There is no justification for this condition; it is contrary to over a decade of practice, and it will significantly compromise access to treatment. Currently, 45% of all SUD patients are treated by for-profit providers (SAMHSA, 2021), and the proportion is even higher among Medicaid beneficiaries and for those requiring methadone for treatment of OUD, of whom roughly 67% were for-profit organizations (Abraham et al., 2024). This provision is likely to be particularly problematic in rural areas, which have thinner provider networks, exacerbating existing inequities. Moreover, ownership is a poor proxy for quality of care. Quality would be better assured by applying quality- and access-based criteria such as Medicaid participation, use of FDA-approved medications for OUD where clinically indicated, low-barrier intake, care coordination, co-occurring disorder capability, harm-reduction linkage, retention metrics, and anti-patient-brokering safeguards across ownership forms.

*The biggest implementation risk: false negatives.*

The main practical risk is not that too many people with behavioral health conditions will be exempted. The bigger risk is false negatives: people who should qualify but are not identified or cannot prove it. Likely false-negative groups include people with untreated SUDs or serious mental disorders, people receiving harm reduction services, people relying on behavioral health services that do not generate Medicaid claims, people with intermittent treatment, people with cognitive impairments, and people who are unhoused or justice-involved.

The impact of work requirements depends critically on how they are implemented. The best implementation would make behavioral health exemptions as automatic, durable, and reversible as possible. States should use data matching first, including Medicaid claims, managed-care encounters, pharmacy data, MOUD prescriptions, behavioral health case management, crisis service use, hospital/emergency department records, Opioid Treatment Program (OTP) participation, residential treatment, and state behavioral health agency data. They should allow multiple proof pathways, including provider attestation, managed-care plan attestation, peer/case manager attestation, recent prescriptions, treatment plan records, crisis records, and self-attestation pending verification.

They should avoid a narrow "currently in treatment" rule. SUD and disabling mental disorders are chronic, recurring conditions. Medicaid coverage may be what keeps a person stable enough to work. They should build in rapid reinstatement and good-cause protection for relapses, hospitalization, incarceration transitions, homelessness, medication interruption, or documented inability to respond.

Bottom line: The SUD and disabling mental disorder exemptions are essential, but their value depends almost entirely on implementation. Because these are chronic, recurring, often under-documented conditions that directly impair administrative functioning, a system that requires

Center on Health Policy at BROOKINGS

beneficiaries to repeatedly prove both diagnosis and functional impairment will predictably miss many eligible people. The most defensible policy approach would be broad *ex parte* identification, no nonprofit-only treatment restriction, clinically realistic recognition of remission and relapse, low-burden provider or case-manager attestation, and rapid reinstatement when coverage loss results from the very illness the exemption is supposed to protect.

Thank you for your attention.

Sincerely,

Sherry A. Glied
Professor of Public Service
New York University
Nonresident Senior Fellow
The Brookings Institution

Richard G. Frank
Senior Fellow and Director, Center on Health Policy
The Brookings Institution

Center on Health Policy at BROOKINGS

## Sources Cited

Abraham, Amanda J., Samantha Harris, and Courtney R. Yarbrough. 2024. "Introduction of Medicare Coverage in Opioid Treatment Programs: Findings from the First Three Years." *Journal of Substance Use and Addiction Treatment* 158: 209247. https://doi.org/10.1016/j.josat.2023.209247.

Aslim, Erkmen G. 2019. "The Relationship between Health Insurance and Early Retirement: Evidence from the Affordable Care Act." *Eastern Economic Journal* 45(1): 112–140.

Baicker, Katherine, Amy Finkelstein, Jae Song, and Sarah Taubman. 2014. "The Impact of Medicaid on Labor Market Activity and Program Participation: Evidence from the Oregon Health Insurance Experiment." *American Economic Review* 104(5): 322–328.

Baicker, Katherine, Sarah L. Taubman, Heidi L. Allen, Mira Bernstein, Jonathan H. Gruber, Joseph P. Newhouse, Eric C. Schneider, Bill J. Wright, Alan M. Zaslavsky, and Amy N. Finkelstein. 2013. "The Oregon Experiment—Effects of Medicaid on clinical outcomes." *New England Journal of Medicine* 368(18): 1713–1722.

Bradley, Cathy J. and Lindsay M. Sabik. 2019. "Medicaid Expansions and Labor Supply among Low-income Childless Adults: Evidence from 2000 to 2013." *International Journal of Health Economics and Management* 19(3-4): 235–272.

Buchmueller, Thomas C., Helen G. Levy, and Robert G. Valletta. 2021. "Medicaid Expansion and the Unemployed." *Journal of Labor Economics* 39(S2).

Callison, Kevin, and Paul Sicilian. 2018. "Economic Freedom and the Affordable Care Act: Medicaid Expansions and Labor Mobility by Race and Ethnicity." *Public Finance Review* 46(2).

Card, David, Carlos Dobkin, and Nicole Maestas. 2009. "Does Medicare Save Lives?" *The Quarterly Journal of Economics* 124(2): 597–636.

Clemens, Jeffrey, Anwita Mahajan, and Joseph J. Sabia. 2026. "The Long-Run Effects of the Affordable Care Act: Evidence from a Partially Pre-Committed Research Design Over the COVID-19 Recession and Recovery" *National Bureau of Economic Research* Working Paper #35190.

Currie, Janet, and Jonathan Gruber. 1996. "Health Insurance Eligibility, Utilization of Medical Care, and Child Health." *Quarterly Journal of Economics* 111(2): 431–466.

Dague, Laura, Thomas DeLeire, and Lindsey Leininger. 2017. "The Effect of Public Insurance Coverage for Childless Adults on Labor Supply." *American Economic Journal: Economic Policy* 9(2): 124–154.

Center on Health Policy at BROOKINGS

DeLeire, Thomas. 2019. "The Effect of Disenrollment from Medicaid on Employment, Insurance Coverage, and Health and Health Care Utilization." A chapter in *Health and Labor Markets* 47: 155–194.

Duggan, Mark, Gopi Shah Goda, and Gina Li. 2021. "The Effects of the Affordable Care Act on the Near Elderly: Evidence for Health Insurance Coverage and Labor Market Outcomes." *National Bureau of Economic Research: Tax Policy and the Economy* 35(4): 179–223.

Finkelstein, Amy, Sarah Taubman, Bill Wright, Mira Bernstein, Jonathan Gruber, Joseph P. Newhouse, Heidi Allen, Katherine Baicker, and the Oregon Health Study Group. 2012. "The Oregon Health Insurance Experiment: Evidence from the First Year." *Quarterly Journal of Economics* 127(3): 1057–1106.

Gangopadhyaya, Anuj, and Michael Karpman. 2025. "The Impact of Arkansas Medicaid Work Requirements on Coverage and Employment: Estimating Effects Using National Survey Data." *Health Services Research* 60(5): e14624. https://doi.org/10.1111/1475-6773.14624.

Garrett, Bowen, and Robert Kaestner. 2015. "Recent Evidence on the ACA and Employment: Has the ACA been a Job Killer?" *Urban Institute*.

Garrouste, Clémentine, and Perdrix, Elsa. 2022. "Is There a Consensus on the Health Consequences of Retirement? A Literature Review." *Journal of Economic Surveys* 36(4): 841–879.

Garthwaite, Craig, Tal Gross, and Matthew J. Notowidigdo. 2014. "Public Health Insurance, Labor Supply, and Employment Lock." *The Quarterly Journal of Economics* 129(2): 653–696.

Gerdes, Ryan, Tanya D. Jackson, Richard Roberts, Ellina Lytvyak, Danika Deibert, Liz Dennett, A. Kim Burton, Douglas P. Gross, Charl Els, Alexander Doroshenko, Reidar Hagtvedt, and Sebastian Straube. 2026. "Associations between Employment and Health Outcomes: A Systematic Review of Reviews." *Journal of Occupational Rehabilitation*. https://doi.org/10.1007/s10926-025-10357-5.

Goldin, Jacob, Ithai Z. Lurie, and Janet McCubbin. 2021. "Health Insurance and Mortality: Experimental Evidence from Taxpayer Outreach." *The Quarterly Journal of Economics* 136(1): 1–49.

Goodman-Bacon, Andrew, Adriana Lleras-Muney, Joseph Price, and Dahai Yue. n.d. "The Impact of Medicare on Life Expectancy." Working paper.

Gooptu, Angshuman, Asako S. Moriya, Kosali I. Simon, and Benjamin D. Sommers. 2016. "Medicaid Expansion Did Not Result in Significant Employment Changes or Job Reductions in 2014." *Health Affairs* 35(1): 111–118.

Gray, Colin, Adam Leive, Elena Prager, Kelsey Pukelis, and Mary Zaki. 2023. "Employed in a SNAP? The Impact of Work Requirements on Program Participation and Labor Supply." *American Economic Journal: Economic Policy* 15(1): 306–341.

Gustman, Alan L., Thomas L. Steinmeier, and Nahid Tabatabai. 2019. "The Affordable Care Act as Retiree Health Insurance: Implications for Retirement and Social Security Claiming." *Journal of Pension Economics and Finance* 18(3): 415–449.

Hall, Jean P., Adele Shartzer, Noelle K. Kurth, and Kathleen C. Thomas. 2018. "Medicaid Expansion as an Employment Incentive Program for People with Disabilities." American Journal of Public Health 108(9):1235–1237.

Ham, John C., and Ken Ueda. 2021. "The Employment Impact of the Provision of Public Health Insurance: A Further Examination of the Effect of the 2005 TennCare Contraction." *Journal of Labor Economics* 39(S1): S199–S238.

Han, Wen-Jui. 2024. "How our Longitudinal Employment Patterns Might Shape our Health as we Approach Middle Adulthood—US NLSY79 cohort." *PLoS one* 19(4): e0300245.

Hanratty, Maria J. 1996. "Canadian National Health Insurance and Infant Health." *American Economic Review* 86(1): 276–284.

Huckfeldt, Peter J., Jeffrey C. Yu, Paul K. O'Leary, Ann S. Harada, Nicholas M. Pajewski, Chris Frenier, ... and Dana P. Goldman. 2023. "Association of Intensive Lifestyle Intervention for Type 2 Diabetes with Labor Market Outcomes." *JAMA internal medicine* 183(10): 1071-1079.

Johnson, Daniel Y., Stephen A. Mein, Lucas X. Marinacci, Michael Liu, and Rishi K. Wadhera. 2025. "Insurance Coverage and Employment after Medicaid Expansion with Work Requirements: Quasi-experimental Difference-in-differences Study." *BMJ* 390: e086792. https://doi.org/10.1136/bmj-2025-086792.

Kaestner, Robert, Bowen Garrett, Jiajia Chen, Anuj Gangopadhyaya, and Caitlyn Fleming. 2017. "Effects of ACA Medicaid Expansions on Health Insurance Coverage and Labor Supply." *Journal of Policy Analysis and Management* 36(3): 608–642. https://doi.org/10.1002/pam.21993.

Euhus, Rhiannon, and Jessica Mathers. 2025. "A Look at Variation in Medicaid Spending per Enrollee by Group and across States." *KFF*. https://www.kff.org/medicaid/a-look-at-variation-in-medicaid-spending-per-enrollee-by-group-and-across-states/

Kim, T. J., and O. von dem Knesebeck. 2016. "Perceived Job Insecurity, Unemployment and Depressive Symptoms: A Systematic Review and Meta-analysis of Prospective Observational Studies." *International Archives of Occupational and Environmental Health* 89(4): 561–573. https://doi.org/10.1007/s00420-015-1107-1.

Layton, Timothy, Adam Leive, and Adrianna McIntyre. 2026. "The Virginia Work Requirements Experiment." Paper presented at the AcademyHealth Annual Research Meeting, June 2026.

Leung, Pauline, and Alexandre Mas. 2018. "Employment Effects of the ACA Medicaid Expansions." *Industrial Relations: A Journal of Economy and Society* 57(2): 206–234.

Levy, Helen, Thomas C. Buchmueller, and Sayeh Nikpay. 2018. "Health Reform and Retirement." *Journals of Gerontology: Series B* 73(4): 713–722.

Manning, Willard G., Joseph P. Newhouse, Naihua Duan, Emmett B. Keeler, and Arleen Leibowitz. 1987. "Health Insurance and the Demand for Medical Care: Evidence from a Randomized Experiment." *American Economic Review* 77(3): 251–277.

Millan, Mark J., Yves Agid, Martin Brüne, Edward T Bullmore, Cameron S Carter, Nicola S Clayton, Richard Connor, Sabrina Davis, Bill Deakin, and Robert J DeRubeis. 2012. "Cognitive Dysfunction in Psychiatric Disorders: Characteristics, Causes and the Quest for Improved Therapy." *Nature reviews Drug discovery* 11 (2):141.

Miller, Sarah, Norman Johnson, and Laura R. Wherry. 2021. "Medicaid and Mortality: New Evidence from Linked Survey and Administrative Data." *The Quarterly Journal of Economics* 136(3): 1783–1829.

Musumeci, MaryBeth, Robin Rudowitz, and Cornelia Hall. 2018. "An Early Look at Implementation of Medicaid Work Requirements in Arkansas." *KFF*. https://www.kff.org/medicaid/an-early-look-at-implementation-of-medicaid-work-requirements-in-arkansas/.

National Institute on Drug Abuse (NIDA). n.d. "Drugs, Brains, and Behavior: The Science of Addiction—Drug Misuse and Addiction." Accessed July 29, 2026. https://nida.nih.gov/publications/drugs-brains-behavior-science-addiction/drug-misuse-addiction

Newhouse, Joseph P., and the Insurance Experiment Group. 1993. *Free for all? Lessons from the RAND Health Insurance Experiment*. Cambridge, MA: Harvard University Press.

Office of Management and Budget (OMB). 2003. *Circular A-4: Regulatory Analysis*. Washington, DC: Executive Office of the President. Reinstated as operative guidance by Executive Order 14192 (January 31, 2025) and OMB Memorandum M-25–15, which

revoked the November 9, 2023, revision. https://obamawhitehouse.archives.gov/omb/circulars_a004_a-4.

Office of the Assistant Secretary for Planning and Evaluation (ASPE). 2026a. "Technical Methodology for Comparing the Impact of Work Promotion Strategies in Health and Welfare Programs." Technical Appendix and Work Promotion Strategies Appendix Table, 132 studies. Washington, DC: U.S. Department of Health and Human Services. https://aspe.hhs.gov/appendix-medicaid-work-requirements-study.

Office of the Assistant Secretary for Planning and Evaluation (ASPE). 2026b. "Medicaid Work Requirements Should Incentivize Employment and Reduce Poverty." Washington, DC: U.S. Department of Health and Human Services. https://aspe.hhs.gov/reports/medicaid-work-requirements-should-incentivize-employment-reduce-poverty

Peng, Lizhong, Xiaohui Guo, and Chad D. Meyerhoefer. 2019. "The Effects of Medicaid Expansion on Labor Market Outcomes: Evidence from Border Counties." *Health Economics* 29(3): 245–260.

Saunders, Heather, Amaya Diana, Elizabeth Hinton, and Robin Rudowitz. 2025. "Implications of Medicaid Work and Reporting Requirements for Adults with Mental Health or Substance Use Disorders." *KFF*. https://www.kff.org/medicaid/implications-of-medicaid-work-and-reporting-requirements-for-adults-with-mental-health-or-substance-use-disorders/.

Schoenbaum, Michael, Jürgen Unützer, Daniel McCaffrey, Naihua Duan, Cathy Sherbourne, and Kenneth B. Wells. 2002. "The Effects of Primary Care Depression Treatment on Patients' Clinical Status and Employment." *Health Services Research* 37(5), 1145–1158.

Sommers, Benjamin D., Katherine Baicker, and Arnold M. Epstein. 2012. "Mortality and Access to Care among Adults after State Medicaid Expansions." *New England Journal of Medicine* 367(11): 1025–1034.

Sommers, Benjamin D., Lucy Chen, Robert J. Blendon, E. John Orav, and Arnold M. Epstein. 2020. "Medicaid Work Requirements in Arkansas: Two-year Impacts on Coverage, Employment, and Affordability of Care." *Health Affairs* 39(9): 1522–1530. https://doi.org/10.1377/hlthaff.2020.00538.

Sommers, Benjamin D., Anna L. Goldman, Robert J. Blendon, E. John Orav, and Arnold M. Epstein. 2019. "Medicaid Work Requirements—Results from the First Year in Arkansas." *New England Journal of Medicine* 381(11): 1073–1082. https://doi.org/10.1056/NEJMsr1901772.

Substance Abuse and Mental Health Services Administration (SAMHSA). 2021. *National Survey of Substance Abuse Treatment Services (N-SSATS): 2020*. Washington, DC: U.S.

Center on Health Policy at BROOKINGS

Department of Health and Human Services. https://www.samhsa.gov/data/sites/default/files/reports/rpt35313/2020_NSSATS_FINAL.pdf.

U.S. Centers for Medicare and Medicaid Services (CMS). 2026. "Medicaid Program; Community Engagement Requirement for Certain Individuals." Federal Register 91 (June 3): 33348. https://www.federalregister.gov/documents/2026/06/03/2026-11094/medicaid-program-community-engagement-requirement-for-certain-individuals.

Virtanen, Marianna, Mika Kivimäki, Matti Joensuu, Pekka Virtanen, Marko Elovainio, and Jussi Vahtera. 2005. "Temporary Employment and Health: A Review." *International Journal of Epidemiology* 34(3): 610–622. https://doi.org/10.1093/ije/dyi024.

Wang, Philip S., Gregory E. Simon, Jerry Avorn, Francisca Azocar, Evette J. Ludman, Joyce McCulloch, Maria Z. Petukhova, and Ronald C. Kessler. 2007. "Telephone Screening, Outreach, and Care Management for Depressed Workers and Impact on Clinical and Work Productivity Outcomes: A Randomized Controlled Trial." *JAMA* 298(12): 1401–1411. https://doi.org/10.1001/jama.298.12.1401.

Wood, Kevin. 2019. "Health Insurance Reform and Retirement: Evidence from the Affordable Care Act." *Health economics* 28(12): 1462-1475.

Wyse, Angela, and Bruce D. Meyer. 2025. "Saved by Medicaid: New Evidence on Health Insurance and Mortality from the Universe of Low-income Adults." *National Bureau of Economic Research*, Working paper #33719.

Zafar, Quratulain, Muhammad Ali Khan, Asif Zaheer Warsi, and Lyba Iqbal. 2024. "Economic Strain and Recovery Trajectories in Mental Health: The Role of Financial Stability in Mental Health Outcomes." *Review of Applied Management and Social Sciences 7*(4): 345-358.