**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF MASSACHUSETTS, STATE OF CALIFORNIA, STATE OF NEW JERSEY, STATE OF ARIZONA, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF HAWAIʻI, STATE OF ILLINOIS, OFFICE OF THE GOVERNOR ex rel. Andy Beshear, in his official capacity as Governor of the COMMONWEALTH OF KENTUCKY, STATE OF MAINE, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEW MEXICO, STATE OF NEW YORK, STATE OF NEVADA, STATE OF NORTH CAROLINA, STATE OF OREGON, JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, STATE OF WASHINGTON, STATE OF WISCONSIN,

*Plaintiffs*,

v.

MEHMET OZ, M.D., in his official capacity as Director of the Centers for Medicare & Medicaid Services; CENTERS FOR MEDICARE & MEDICAID SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health & Human Services; U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES,

*Defendants*.

Case No. 1:26-cv-12962-RGS

**[PROPOSED] BRIEF OF AMICI CURIAE AMERICAN MEDICAL ASSOCIATION, MASSACHUSTTS MEDICAL SOCIETY, AND NINE MEDICAL ASSOCIATIONS**
**<u>IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

## INTERESTS OF AMICI CURIAE

The *Amici Curiae*, led by the **American Medical Association** ("AMA"), are professional associations of physicians, fellows, residents, and medical students from across the country. *Amici*'s members know firsthand the grave consequences when people with serious medical conditions lose their health coverage. *Amici* are deeply concerned that millions of their patients who qualify as medically frail and, therefore, should be excluded from Medicaid work requirements under H.R.1[1] will, nevertheless, lose coverage if the Centers for Medicare & Medicaid Services ("CMS") unlawful interim final rule (the "Rule")[2] goes into effect.

The AMA is the largest professional association of physicians, fellows, residents, and medical students in the country. Through its House of Delegates, which includes state and specialty medical societies and other physician groups, the AMA includes representatives of nearly all physicians, residents, and medical students in the United States in its policy-making process. The AMA's core purposes remain—as they were at its founding in 1847—to promote the art and science of medicine and the betterment of public health.

The **Massachusetts Medical Society** ("MMS"), founded in 1781, is the oldest continuously operating medical society in the U.S. The MMS is dedicated to advancing medical knowledge, elevating the practice of medicine, improving patient care, and promoting public health.

The AMA and MMS file this brief in their own right and as representatives of the Litigation Center of the American Medical Association and State Medical Societies, which is a

[1] Pub. L. No. 119–21, tit. VII, §71119, 139 Stat. 72, 306-315 (July 4, 2025) (codified at 42 U.S.C. §1396a(xx)) ("H.R.1").
[2] Centers for Medicare & Medicaid Services, Medicaid Program; Community Engagement Requirement for Certain Individuals, 91 Fed. Reg. 33348 (June 3, 2026) (to be codified at 42 C.F.R. 435).

coalition of the AMA and the medical societies of each state and the District of Columbia formed to represent the interests of the medical profession and their patients in the courts.

Founded in 1947, the **American Academy of Family Physicians** (AAFP) is one of the largest national medical organizations, representing over 124,500 family physicians and medical students nationwide. AAFP seeks to improve the health of patients, families, and communities by advocating for the health of the public and by supporting its members in providing continuous comprehensive health care to all.

The **American Academy of Hospice and Palliative Medicine** (AAHPM) is the professional association for physicians, and other health care providers specializing in hospice and palliative care, representing approximately 5,000 members. Since 1988, AAHPM has worked to advance high-quality care for people with serious illness through education, professional development, community, and advocacy.

The **American Academy of Pediatrics** (AAP), founded in 1930, is an organization of 67,000 pediatricians, pediatric medical subspecialists, and pediatric surgical specialists committed to the optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults. To this end, the AAP has engaged in broad and continuous efforts to prevent harm to the health of infants, children, adolescents, and young adults caused by a lack of access to health coverage and care.

The **American College of Emergency Physicians** (ACEP) is the leading professional body for emergency physicians and sets the standard for emergency medical care. ACEP's mission is to promote the highest quality of emergency care and is the leading advocate for emergency physicians, their patients, and the public. Founded in 1968, ACEP represents more than 38,000 emergency physicians, emergency medicine residents, and medical students.

The **American College of Obstetricians & Gynecologists** (ACOG) is a professional membership organization representing more than 90% of board-certified obstetrician-gynecologists in the United States. ACOG maintains the highest standards of clinical practice and continuing education of its members, promotes patient education, and increases awareness of the changing issues facing women's healthcare. ACOG is committed to ensuring access to high-quality, safe, and equitable obstetric and gynecologic care for all patients, their families and communities.

The **American College of Physicians** (ACP) is the largest medical specialty organization in the United States with members in more than 172 countries worldwide. ACP membership includes 163,000 internal medicine physicians, related subspecialists, and medical students. Internal medicine physicians are specialists who apply scientific knowledge and clinical expertise to the diagnosis, treatment, and compassionate care of adults across the spectrum from health to complex illness.

The **American Society of Addiction Medicine** (ASAM) represents more than 8,000 physicians, clinicians, and other professionals who prevent, treat, and promote remission and recovery from the disease of addiction. ASAM's members advocate to increase access to and insurance coverage for high-quality addiction care, educate physicians and the public, and support addiction research.

The **American Society of Clinical Oncology** (ASCO) is the leading professional organization for physicians and oncology professionals who care for people with cancer, representing approximately 45,000 members worldwide. Founded in 1964, ASCO is committed to defeating cancer through research, education, and the promotion of high-quality, equitable patient care.

The **American Thoracic Society** (ATS) is the world's leading medical society dedicated to accelerating the advancement of global respiratory health through multidisciplinary collaboration, education, and advocacy. Core activities of the society's more than 20,000 members are focused on leading scientific discoveries, advancing professional development, impacting global health, and transforming patient care. Key areas of member focus include developing clinical practice guidelines, hosting the annual International Conference, publishing four peer-reviewed journals, advocating for improved respiratory health globally, and developing an array of patient education and career development resources.

The *Amici* medical associations submit this brief to emphasize the serious harm that their most vulnerable patients will suffer if the unlawful parts of the Rule go into effect.

## INTRODUCTION

The expansion of Medicaid under the Affordable Care Act allows 20 million Americans today to have access to the health care they need. Because the loss of access to care can have devastating consequences, the AMA, MMS, and other *Amici* have long maintained that those with significant medical conditions like cancer and multiple sclerosis must be protected from losing Medicaid coverage due to work requirements. Congress adopted that same principle in H.R. 1 by excluding medically frail individuals, including those "with a serious or complex medical condition" from the work requirements. Congress recognized that medically frail individuals should not lose Medicaid coverage due to work requirements, a point emphasized by the legislation's sponsors.

Under the Rule, however, millions of eligible patients stand to lose Medicaid coverage because CMS has imposed an additional requirement in the Rule that is not in the statute. The statutory language of H.R. 1 excludes medically frail individuals from Medicaid work

requirements, including everyone with a serious or complex medical condition or substance use disorder. But—contrary to the statute—CMS added the requirement that individuals prove their medical condition significantly impairs their ability to work. This additional requirement converts what Congress intended to be an exclusion based on one's medical status into an exclusion based on the individual's ability to work.

The statutes authorizing work requirements in the food stamps (SNAP) and welfare (TANF) programs further demonstrate that CMS does not have authority under H.R.1 to add a requirement to the medical frailty exception in the Rule. In both SNAP and TANF, the statutes tie the work requirements' medical exclusion to one's ability to work, not just their medical condition. But Congress included no comparable limitation for the medical conditions identified in H.R. 1, despite having demonstrated that it knows how to impose such a requirement when it intended to do so. On the contrary, the language in H.R. 1 demonstrates Congressional intent that the medical frailty exclusion would *not* depend on an individual's ability to comply with work requirements.

The result of the unlawful Rule is that patients will lose Medicaid coverage because they cannot satisfy this additional eligibility criterion imposed by CMS—either because they do not meet the Rule's extra-statutory standard or because they are unable to document compliance with it. This addition—that is nowhere in the statute and conflicts with a plain reading of the text—is likely to undermine patient-physician relationships, interfere with patient care, and unnecessarily add to the paperwork burden on patients and physicians. At a time when excessive administrative tasks are a leading contributor to gaps in patient care and physician burnout, these additional responsibilities create new burdens for medically frail patients and the physicians who care for them.

*Amici* and their members are deeply concerned that, without this Court's intervention, millions of Americans who remain eligible for Medicaid will lose coverage and access to necessary medical care, risking catastrophic health outcomes and inserting physicians into the burdensome process of making unnecessary determinations for this unlawful requirement.

## ARGUMENT

The Court should grant Plaintiffs' Motion for Summary Judgment and vacate the Rule's provisions that (1) impose an additional requirement on those who qualify for the medical frailty exclusion and (2) limit when states may exclude individuals based on the individual's attestation of their own medical condition.

### I. Medicaid Expansion Provides a Lifeline to Patients Who Are Medically Frail.

Twenty million Americans receive their health coverage through Medicaid expansion,[3] which Congress enacted as part of the Affordable Care Act in 2010. Forty states plus D.C. have implemented this option to cover adults with incomes below 133 percent of the federal poverty level, resulting in far lower rates of uninsurance in those states than in the ten states that did not expand Medicaid.[4] The work requirements in H.R. 1 apply to individuals in the expansion population, as well as individuals covered through expansion-like coverage pathways authorized under Section 1115 demonstrations. The Rule risks undoing the progress in improving access to care that has resulted from expanded access to Medicaid coverage.

All Americans benefit from ready access to medically necessary health care services. This is especially true for those with substance use disorders and individuals living with serious

[3] KFF, Medicaid Expansion Enrollment (June 2025), https://www.kff.org/medicaid/state-indicator/medicaid-expansion-enrollment.

[4] Madeline Guth et al., *The Effects of Medicaid Expansion under the ACA: Studies from January 2014 to January 2020*, KFF.org (Mar. 17, 2020), https://www.kff.org/affordable-care-act/the-effects-of-medicaid-expansion-under-the-aca-updated-findings-from-a-literature-review/ (collecting sources).

or complex medical conditions that may require active monitoring by specialists or swift medical intervention. The evidence shows that Medicaid expansion has been associated with reduced mortality rates overall among eligible adults.[5] Numerous studies document Medicaid expansion's impact on earlier treatment, improved outcomes, and increased survival for serious conditions like cancer, heart disease, opioid use disorder and liver disease.[6] These studies show what any practicing clinician can readily observe: when people with serious conditions lack health coverage, they are more likely to get sicker faster and die sooner.

## II. CMS's Rule Defies Congressional Intent to Protect Medically Frail Individuals from Coverage Losses and Burdensome Paperwork.

In H.R. 1, Congress excluded medically frail individuals from Medicaid work requirements and permitted states to allow individuals to certify themselves as qualifying for an exclusion without demanding the individuals provide verifying documents. Contrary to this

[5] Angela Wyse & Bruce D. Meyer, *Saved by Medicaid: New Evidence on Health Insurance and Mortality from the Universe of Low-Income Adults*, NBER Working Papers (May 2025), https://www.nber.org/papers/w33719.

[6] *Id*.; Ginger Y. Jiang et al., *Medicaid Expansion Under the Affordable Care Act and Association with Cardiac Care: A Systematic Review*, Circulation: 16 Cardiovasc. Qual. & Outcomes 411 (June 20, 2023), https://www.ahajournals.org/doi/10.1161/CIRCOUTCOMES.122.009753; Madeline Guth et al., *Building on the Evidence Base: Studies on the Effects of Medicaid Expansion, February 2020 to March 2021*, KFF (May 6, 2021), https://www.kff.org/affordable-care-act/building-on-the-evidence-base-studies-on-the-effects-of-medicaid-expansion-february-2020-to-march-2021; Brian P. Lee, et al., *Medicaid Expansion and Variability in Mortality in the USA: A National, Observational Cohort Study*, 7 Lancet Pub. Health E48 (Jan. 2022), https://www.thelancet.com/journals/lanpub/article/PIIS2468-2667(21)00252-8/fulltext; Kristin M. Primm et al., *Effect of Medicaid Expansion on Cancer Treatment and Survival Among Medicaid Beneficiaries and the Uninsured*, 13 Cancer Med. e7461 (July 6, 2024), https://doi.org/10.1002/cam4.7461; Miranda B. Lam et al., *Medicaid Expansion and Mortality Among Patients with Breast, Lung, and Colorectal Cancer*, 3 JAMA Network Open e2024366 (Nov. 5, 2020), https://doi.org/10.1001/jamanetworkopen.2020.24366; Anh P. Nguyen et al., *Health Plan Disenrollment and Mortality After Initiation of Medications for Opioid Use Disorder*, 83 JAMA Psychiatry 491 (May 1, 2026), https://pubmed.ncbi.nlm.nih.gov/41779402/; Leticia M. Nogueira et al., *Medicaid Expansion Under the Affordable Care Act and Early Mortality Following Lung Cancer Surgery*, J. Thoracic & Cardiovascular Surgery e2351529 (Jan. 2, 2024), https://pubmed.ncbi.nlm.nih.gov/38214932/.

clear, statutory directive, the Rule imposes an additional requirement that individuals must show to qualify for the medical frailty exclusion and, beginning in 2028, arbitrarily limits when individuals may certify their own qualification for the exclusion under penalty of perjury.

### A. The Rule Contradicts H.R.1's Exclusion of Medically Frail Individuals from Work Requirements Regardless of Their Ability to Work.

When Congress imposed work requirements on those in the Medicaid expansion population through H.R. 1, it specifically excluded any individual "who is medically frail or otherwise has special medical needs." 42 U.S.C. § 1396a(xx)(9)(A)(ii)(V). And H.R.1 specifies that the definition must "include[e] an individual" with one of five clinical conditions. *Id.*

The statutory language describing the five conditions makes clear that Congress did not intend that the medical frailty exclusion be limited to those with conditions that impair their ability to comply with the work requirements. While some of the conditions, by definition, entail some degree of impairment, e.g., 42 U.S.C. § 1396a(xx)(9)(A)(ii)(V)(aa) (incorporating the blindness and disability standards of the supplemental social security income program), others do not. *E.g.*, *id.* § 1396a(xx)(9)(A)(ii)(V)(bb) (substance use disorder); *id.* § 1396a(xx)(9)(A)(ii)(V)(ee) (serious or complex medical condition).

Furthermore, in subsection (dd), Congress provided that individuals are medically frail if they have a "a physical, intellectual or developmental disability that *significantly impairs their ability to perform 1 or more activities of daily living*" (emphasis added). *Id.* § 1396a(xx)(9)(A)(ii)(V)(dd). That Congress expressly references impairment in describing this qualifying clinical condition but not the others, strongly implies that Congress did not intend for impairment to be a factor in every qualifying condition.

This omission was not accidental. Congress understood the importance of avoiding coverage losses for people with conditions in the five specified categories. Due to the need to

navigate their health conditions, individuals in these categories already face significant fiscal, psychological, and/or physical burdens on a day-by-day basis, making it important to spare them and their families from the risk of coverage loss and from additional paperwork burdens to maintain vital access to health coverage.

In response to vigorous advocacy from physicians, other clinicians, and patient groups, members of Congress reassured the public that people with heightened medical needs would not lose Medicaid coverage under the work requirements policy. For example, House Energy & Commerce Chairman Guthrie wrote after the bill passed that, "This policy applies only to able-bodied, unemployed adults . . . Our bill couldn't be clearer about that . . . You're exempt if you're medically frail, which includes anyone who's blind, disabled, battling a chronic substance-use disorder or living with a serious and complex medical condition like cancer."[7] Other members of Congress repeated that the work requirements do not apply to those who are medically frail—expressly including complex medical conditions and substance use disorders—without indicating that they would also have to prove an inability to work.[8]

Despite the statute's clear language and Congress's public commitments, CMS added a new requirement that is absent from the statute: to qualify as medically frail, not only must an

[7] Brett Guthrie, *Don't Fall for the Lies about the GOP's Plan for Medicaid: We're Actually Strengthening It*, New York Post (June 22, 2025).
[8] *See, e.g.*, Chuck Grassley, Floor Remarks, Grassley Supports Common Sense Medicaid Work Requirements for Able-Bodied Adults, (June 24, 2025), https://www.grassley.senate.gov/news/remarks/grassley-supports-common-sense-medicaid-work-requirements-for-able-bodied-adults (highlighting exclusion for those with "complex medical conditions"); Dan Sullivan, Sullivan Shapes 'One Big Beautiful Bill' To Unleash Alaska's Economy, Create Good-Paying Jobs, Provide Historic Tax Cuts for Working Families, and Strengthen Health Care (July 1, 2025) https://www.sullivan.senate.gov/newsroom/press-releases/sullivan-shapes-one-big-beautiful-bill-to-unleash-alaskas-economy-create-good-paying-jobs-provide-historic-tax-cuts-for-working-families-and-strengthen-health-care (highlighting exclusions for "people with mental health and substance use disorders").

individual have a qualifying condition, but that condition must "significantly impair[] the individual's ability to comply" with work requirements. 42 C.F.R. § 435.554(c)(5)(i). This new requirement in the Rule—that someone with a substance use disorder (subsection (bb)) or serious or complex medical condition (subsection (ee)) only qualifies for the exclusion if their condition "significantly impairs" their ability to work—was invented out of whole cloth. While Congress allowed CMS discretion to clarify how the statutory categories are identified, such as by reference to clinical diagnoses, CMS cannot alter the meaning of the statute by adding a new requirement that individuals must meet to qualify for the medical frailty exclusion, as it has done in the Rule.

The statutes imposing work and time limit requirements on individuals participating in Supplemental Nutrition Assistance Program (SNAP) and Temporary Assistance for Needy Families (TANF) further support the conclusion that the discretion Congress provided to the agency to define the parameters of medical frailty and special medical needs does not extend to adding an entirely new requirement that someone be impaired in their ability to work. In both SNAP and TANF, Congress expressly limited the exclusions from work and time limit requirements to those individuals with medical conditions that *do* prevent the individual from working, making it clear that the purpose of the limitations was to protect only those whose condition affects their ability to work.

By contrast, in the Medicaid statute, Congress took a different path. It excluded those who are blind, have a substance use disorder, and those with a "serious or complex medical condition" from the work requirements without a reference to ability to work or fitness for employment. Only the agency—through the Rule and in spite of the statutory text—has sought to impose the additional requirement that Medicaid beneficiaries are excluded from the work

requirements only if their medical condition restricts their ability to work.

Specifically, Congress in SNAP exempted individuals from the three-month time limit within a 36-month time period on benefits for able-bodied adults who do not meet work requirements if they are "medically certified as physically or mentally unfit for employment." 7 U.S.C. § 2015(o)(3)(B). Congress similarly applied the broader SNAP work requirements only to those individuals who are "physically and mentally fit," 7 U.S.C. § 2015(d)(1)(A), expressly tying application of the work requirements to an individual's physical and mental fitness.

Likewise, TANF excludes families "with a disabled parent" from the most stringent work requirements applicable to two parent families. 42 U.S.C. § 607(b)(2)(C). Because the term "disabled" refers to the "inability to do any substantial gainful activity" due to a serious health condition,[9] the TANF statutory exclusion from work requirements necessarily implicates the individual's capacity to work, not just their medical condition. These provisions demonstrate that, when Congress intended health status to determine whether an individual is subject to work and time limit requirements in SNAP and TANF, it expressly connected that status to the individual's fitness for employment.

But in H.R. 1, Congress exempted individuals from the Medicaid work requirements who have a "serious or complex medical condition" or "substance use disorder" without any reference to a disability or fitness for employment. *See* 42 U.S.C. § 1396a(xx)(9)(A)(ii)(V)(bb) & (ee). Indeed, Congress expressly imposed a functional-impairment requirement in an adjacent provision, excluding individuals with a physical, intellectual, or developmental disability "that

[9] For purposes of the Social Security Act, the term "disability means the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d); 20 C.F.R. § 404.1505.

significantly impairs their ability to perform 1 or more activities of daily living," but included no comparable limitation for individuals with a substance use disorder or serious or complex medical condition. *Id.* § 1396a(xx)(9)(A)(ii)(V)(dd). If Congress intended to protect only those whose condition affected their ability to work, it knew how to do so. It instead opted to exclude all individuals living with complex and serious conditions and/or a substance use disorder from work requirements, presumably reflecting that losing health care coverage has extraordinarily serious consequences for such individuals regardless of their ability to work. As physicians, *Amici*'s members see the challenges for patients living with complex and serious conditions, and the serious consequences associated with loss of or interruptions in medical coverage. The Rule, therefore, exceeds the agency's authority because it limits the medical frailty exclusion to those whose condition "significantly impairs the individual's ability to comply" with the work requirements.

B. The Rule Arbitrarily Restricts States' Ability to Rely on Individuals' Self-Attestation of their Medical Frailty.

Consistent with longstanding Medicaid eligibility policies, H.R.1 directs states to verify compliance with work requirements—including via exclusions such as medical frailty—using "reliable information available to the State (such as … encounter data . . . and data on payments . . .) without requiring, where possible, the applicable individual to submit additional information." 42 U.S.C. §1396a(xx)(5). Where data is not available, Congress also allows that states "may elect to not require an individual to verify information," including information related to the medical frailty exclusion. *See* 42 U.S.C. § 1396a(xx)(3)(A) (applying this standard to those with medical frailty exclusion under subsection (9)(A)(ii)(V)).

The result is that, under a plain reading of the statute, if a state lacks reliable information on whether an individual qualifies for a medical frailty exclusion, the state could accept the

individual's attestation that they qualify for an exclusion, rather than require the individual to obtain documentation or other evidence to verify their medical condition. This use of self-attestation is consistent with existing CMS regulations that govern other aspects of Medicaid eligibility.[10]

In the Rule, however, CMS arbitrarily restricts when states may rely on individuals' self-attestation to certify that they qualify for the medical frailty exclusion without any reasoned explanation. Beginning in 2028, states may only accept an individual's self-attestation that they qualify for the medical frailty exclusion once each enrollment period. 42 C.F.R. § 435.557(f)(1)(ii). This means that as long as the individual continues to be enrolled in the Medicaid program and their qualification for the medical frailty exclusion is not evident from data the state has, the individual will need to submit documentation to support their eligibility every 6 to 12 months.[11]

The Rule's limit on the use of self-certification to once per enrollment cycle for medical frailty exclusions is arbitrary and inconsistent with Congress' intent. Any such restriction should reasonably reflect H.R. 1's emphasis on avoiding undue administrative burden and be carefully

[10] *See* 42 C.F.R. § 435.945(a) ("Except where the law requires other procedures (such as for citizenship and immigration status information), the agency may accept attestation of information needed to determine the eligibility of an individual for Medicaid…without requiring further information (including documentation) from the individual."); 42 C.F.R. § 435.952(c)(3) ("The agency must establish an exception to permit, on a case-by-case basis, self-attestation of individuals for all eligibility criteria when documentation does not exist at the time of application or renewal, or is not reasonably available, such as in the case of individuals who are homeless or have experienced domestic violence or a natural disaster.")

[11] Under the Rule, medical frailty status established through reliable data or documentation generally needs only be reverified every 12 months. By contrast, where medical frailty was established based solely on an individual's self-attestation, beginning January 1, 2028, the State must reverify that status at the individual's next regular eligibility renewal—effectively every six months for individuals subject to six-month renewals. See 42 C.F.R. § 435.557(f)(1)(ii)(A); 91 Fed. Reg. 33,348, 33,407 (June 3, 2026).

calibrated to ensure that patients who face challenges in obtaining documentation of a medical condition are not unduly burdened. By requiring individuals to prove that their medical condition impairs their ability to work, and then precluding states from accepting their self-certification of their inability to work, the Rule will impose an enormous paperwork burden on individuals that Congress sought to avoid, and ultimately cause eligible patients to lose Medicaid benefits, and impose administrative burdens on physicians and the entire health care system.

## III. This Unlawful Rule Will Cause Eligible Patients to Lose Coverage and Create Unnecessary Administrative Burdens for Both Patients and Physicians.

### A. <u>The Rule Will Cause Eligible People to Lose Coverage.</u>

The Rule's requirement that states establish that individuals are significantly impaired in their ability to work to qualify for the medical frailty exclusion and the limit on the use of self-attestation in 2028, will sharply increase the administrative burden on patients and physicians. The Rule promotes a process that relies on physicians, among others, to make individualized determinations about who can work and who cannot. As practicing physicians know well, Medicaid data generally are used to document the care that a physician has provided, record diagnoses, and facilitate payment. While these data are a useful tool for identifying who is medically frail, the data rarely convey significant information about a patient's ability to work. For example, Medicaid data may establish that someone has cancer, but ordinarily will not show whether symptoms, treatment demands, and medication side effects significantly impair their ability to comply with the work requirements. As such, CMS's decision to add the new requirement that individuals demonstrate an inability to work will make it much less likely that states can rely on existing data alone to determine exclusions, as Congress intended. Aside from the use of self-attestations in 2027 and once per enrollment in 2028, physicians or other clinicians will likely need to make such determinations.

As a result, the likely impact from the medical frailty provision is predictable: patients who should be excluded from the work requirements and remain eligible for Medicaid will, nevertheless, lose coverage. Experience from prior work requirement pilots in several states shows that administrative friction, rather than substantive ineligibility, causes many otherwise eligible individuals to lose coverage. Each additional document request, third-party assessment requirement, or delay in obtaining records increases the risk that applicants and beneficiaries will lose coverage for procedural rather than substantive reasons.

The Rule's limitation on states' use of self-attestation is likely to exacerbate the paperwork burden on patients and providers. To avoid loss of coverage, individuals are likely to need to contact their clinicians not only to prove that they are significantly impaired in their ability to work, but also to establish the basic fact that they have a condition that would allow them to qualify as medically frail where Medicaid data from the last year does not show their health condition.

One report estimates that of the 20.6 million people subject to work requirements in fiscal year 2027, approximately 6.4 million will lose coverage under a "plain language" reading of the statute.[12] If the Rule is implemented as written, however, estimated coverage losses will increase by 30 percent to 8.2 million, resulting in nearly 1 in 10 Medicaid enrollees nationwide losing coverage due to the work requirements**.**

[12] Manatt Health, CMS' Medicaid Work Requirements Rule: A 50-State Analysis of Additional Coverage Losses, FFY 2027-2034 (July 16, 2026), https://www.manatt.com/insights/white-papers/2026/cms-medicaid-work-requirements-rule-a-50-state-analysis-of-additional-coverage-losses-ffy-2027-2034.

B. The Rule Will Burden Patients and Providers with Administrative Tasks, Interfering with Patient Care and Treatment.

The Rule will also result in treating clinicians being tasked with making judgements about an individual's ability to satisfy Medicaid work requirements. Under the Rule, states may ask physicians to assess—without validated criteria or clear standards—whether a patient is too impaired to comply, i.e., whether that patient's medical condition "significantly impairs" their ability to meet the work requirements. Requiring clinicians to assess whether a patient's medical condition prevents them from satisfying the work requirements will require patients to schedule appointments solely to obtain Medicaid eligibility documentation, reducing appointment availability for all patients seeking medical care in an already overburdened system.

Most importantly, overreliance on physicians would come at the expense of patient care. Eligibility-related paperwork would consume limited time otherwise available for evaluating symptoms, developing treatment plans, counseling patients, and coordinating care. These administrative obligations will also create additional burdens for clinical support staff and health systems already operating under workforce and capacity constraints. The impact would be particularly significant for Medicaid patients, whose multiple and often complex medical, behavioral health, and social needs frequently must be addressed in a single visit.

Requiring physicians to determine whether a patient qualifies for the exclusion would also alter the patient-physician relationship that is the basis for effective care. Patients must be able to speak candidly about difficult and personal aspects of their lives, including pain, fatigue, psychiatric symptoms, cognitive limitations, substance use, trauma, and family responsibilities. If patients believe that those disclosures could affect whether they lose Medicaid coverage, they may be less willing to speak openly, chilling communication and eroding the trust necessary for sound diagnosis, treatment, and care planning.

That approach also places clinicians in the position of signing certifications that are key pieces of evidence in determining a patient's Medicaid eligibility and may be later audited, second-guessed, or challenged with respect to the patient's eligibility or the provider's reimbursement. Faced with the prospect of having their certification challenged in an administrative proceeding, physicians may hesitate to certify a patient as medically frail. This is especially true because the work requirements are a new and unfamiliar feature of the Medicaid program and the Rule provides very little guidance about when an individual's medical condition significantly impairs their ability to comply with the requirements. The result may be inconsistent application of the exclusion, with similarly situated individuals receiving different determinations based on how their physician assesses their ability to work.

Physicians also do not routinely determine whether a patient can meet work requirements. Completing work assessments is a special skill for which most U.S. physicians are not trained. Although many physicians complete routine forms documenting the need to miss work or school due to an appointment, injury or illness, few are trained to make vocational capacity assessments. Other federal disability programs, such as Social Security, rely on trained medical consultants for consultative examinations to assess a patient's ability to work when medical records are not available. By contrast, the Rule allows states to require treating clinicians to make high-stakes eligibility assessments about a patient's ability to satisfy Medicaid work requirements with no specific training. Without appropriate training and lacking clear guidance, physicians may inadvertently over- or under-assess an individual patient's ability to work.

## CONCLUSION

For the foregoing reasons, the court should grant the Plaintiffs' Motion for Summary Judgment and vacate the challenged provisions of the Rule, including the narrowed definition of medical frailty and limitation on use of self-attestation.

September __, 2026

Respectfully submitted,

___________________

Eric M. Gold, BBO #660393
MANATT, PHELPS & PHILLIPS, LLP
1 Beacon Street, 11th Floor
Boston, MA 02108
Tel: 617-646-1400
EGold@manatt.com

*Counsel for American Medical Association, Massachusetts Medical Society, American Academy of Family Physicians, American Academy of Hospice and Palliative Medicine, American Academy of Pediatrics, American College of Emergency Physicians, American College of Obstetricians & Gynecologists, American College of Physicians, American Society of Addiction Medicine, American Society of Clinical Oncology, and American Thoracic Society*

## CERTIFICATE OF SERVICE

I hereby certify that, on _____, 2026, I caused a true and correct copy of the foregoing to be filed via the Court's ECF system, which will send notice to all counsel of record.

___________________

Eric M. Gold