**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al.,<br>*Plaintiffs*,<br>v.<br>MEHMET OZ, M.D., et al.,<br>*Defendants*. | Case No. 1:26-cv-12962 |

**BRIEF FOR AMICI CURIAE MENTAL HEALTH ORGANIZATIONS IN SUPPORT OF PLAINTIFFS**

Aaron M. Panner (BBO #629935)
Bradley E. Oppenheimer (BBO #688330)
Justin D. Cole*
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
boppenheimer@kellogghansen.com
jcole@kellogghansen.com

*Counsel for Amici Curiae*

* Not admitted in the District of Columbia; practicing under the supervision of members of the Firm.

September 14, 2026

## CORPORATE DISCLOSURE STATEMENT

Amici curiae have no parent corporations and do not issue any stock.

## TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ..... i

TABLE OF AUTHORITIES ..... iii

INTEREST OF AMICI CURIAE ..... 1

ARGUMENT ..... 3

I. The IFR's Community-Engagement Requirement Threatens the Sustained Treatment Upon Which Recovery Depends for People with SUDs and DMDs ..... 6

II. The IFR's Documentation Requirements Are Not Administrable ..... 13

CONCLUSION ..... 18

APPENDIX ..... 19

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page

### CASES

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) .......... 3

*City of Arlington v. FCC*, 569 U.S. 290 (2013) .......... 5

*In re 229 Main Street Ltd. P'ship*, 262 F.3d 1 (1st Cir. 2001) .......... 4

*In re JPMorgan Chase Bank, N.A.*, 799 F.3d 36 (1st Cir. 2015) .......... 5

*Jama v. Immigr. & Customs Enf't*, 543 U.S. 335 (2005) .......... 4

*NLRB v. Health Care & Ret. Corp. of Am.*, 511 U.S. 571 (1994) .......... 5

*Public Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024) .......... 5

*United States v. Calamaro*, 354 U.S. 351 (1957) .......... 5

### STATUTES AND REGULATIONS

Act of July 4, 2025, Pub. L. No. 119-21, 139 Stat. 72 (H.R. 1) .......... 2

Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) .......... 1, 4

42 U.S.C.:

§ 1396a(a)(10)(A)(i)(VIII) .......... 4

§ 1396a(xx) .......... 3

§ 1396a(xx)(1) .......... 2

§ 1396a(xx)(9) .......... 2

§ 1396a(xx)(9)(A)(ii)(V) .......... 2, 4

§ 1396a(xx)(9)(A)(ii)(V)(bb) .......... 4

§ 1396a(xx)(9)(A)(ii)(V)(cc) .......... 4

§ 1396a(xx)(9)(A)(ii)(V)(dd) .......... 4

20 C.F.R.:

§ 416.919n....................................................................................................14

§ 416.920a....................................................................................................14

42 C.F.R.:

§ 435.554(c)(5)(i)....................................................................................2, 5, 6, 10, 13

§ 435.557(a) ........................................................................................13, 17

§ 435.557(a)(vii) ...........................................................................................17

§ 435.557(a)(viii) ..........................................................................................17

§ 435.557(b)(1) .............................................................................................10

§ 435.557(b)(2)(ii) .........................................................................................10

§ 435.557(c) ..................................................................................................10

§ 435.557(c)(1)(i)(A) .....................................................................................13

§ 435.557(d)...................................................................................................10

§ 435.557(f)(1) ......................................................................................13, 17

§ 435.557(f)(1)(i)............................................................................................17

§ 435.557(f)(1)(ii) ..........................................................................................17

§ 435.558(a)-(c) .............................................................................................10

§ 435.558(d)...................................................................................................10

**ADMINISTRATIVE MATERIALS**

Ctrs. for Medicare & Medicaid Servs., *Implementing Medical Frailty Under Community Engagement (Section 71119 of WFTC Legislation)* (Sept. 8, 2026), https://www.medicaid.gov/resources-for-states/working-families-tax-cut-legislation/community-engagement/ImplementingMedicalFrailtyDeck.pdf...........................................................13

Interim Final Rule, Medicaid Program; Community Engagement Requirement for Certain Individuals, 91 Fed. Reg. 33348 (June 3, 2026) ...................................2, 9, 10, 13

Soc. Sec. Admin., DI 24501.001, The Disability Determination Services Disability Examiner, Medical Consultant, and Psychological Consultant Team, and the Role of the Medical Advisor (eff. Mar. 6, 2024), https://secure.ssa.gov/poms.nsf/lnx/0424501001 ....................14

Substance Abuse & Mental Health Servs. Admin., *Substance Use Disorder Treatment for People With Co-Occurring Disorders* (updated 2020), https://library.samhsa.gov/sites/default/files/tip-42-sud-treatment-pep20-02-01-004.pdf....................16

U.S. Dep't of Health & Hum. Servs., Off. of Inspector Gen., *A Lack of Behavioral Health Providers in Medicare and Medicaid Impedes Enrollees' Access to Care* (Mar. 2024), https://oig.hhs.gov/documents/evaluation/9844/OEI-02-22-00050.pdf....................3

**OTHER MATERIALS**

Sirry M. Alang, *Mental Health Care Among Blacks in America: Confronting Racism and Constructing Solutions*, 54 Health Servs. Rsch. 346 (2019)....................15

Cory Caldwell, *Bridging the Gap: Examples of Medicaid Innovation Enhancing Health Care Access in Rural America*, Nat'l Ass'n of Medicaid Dirs. (June 4, 2025), https://medicaiddirectors.org/resource/bridging-the-gap-examples-of-medicaid-innovation-enhancing-health-care-access-in-rural-america/....................12

Ctr. for Health Law & Pol'y, *A Shift Between Congressional Intent and Implementation: Work Requirements* (June 17, 2026), https://chlpi.org/wp-content/uploads/2026/06/HCIM_Congressional-Quotes_FINAL_6.17.26-1.pdf....................4

Robert E. Drake & Michael A. Wallach, *Employment Is a Critical Mental Health Intervention*, 29 Epidemiology & Psychiatric Scis. e178 (2020)....................7

Thomas J. Gould, *Addiction and Cognition*, 5 Addiction Sci. & Clinical Prac. 4 (2010)....................9

Tanya Albert Henry, *AMA Outlines 5 Keys to Fixing America's Rural Health Crisis*, Am. Med. Ass'n (June 6, 2024), https://www.ama-assn.org/public-health/population-health/ama-outlines-5-keys-fixing-america-s-rural-health-crisis....................12

Katherine M. Keyes et al., *Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use and Abuse in the United States*, 104 Am. J. Pub. Health e52 (2014)....................15

Matt G. Kushner, *Seventy-Five Years of Comorbidity Research*, J. Stud. on Alcohol & Drugs, Suppl. No. 17, at 50 (Mar. 2014) ..........7

Stephen Magura & Tina Marshall, *The Effectiveness of Interventions Intended to Improve Employment Outcomes for Persons with Substance Use Disorder: An Updated Systematic Review*, 55 Substance Use & Misuse 2230 (2020) ..........7

Wanying Mao et al., *Predictors of Psychiatric Emergency Department Visits Following Inpatient Discharge: Secondary Analysis of a Stepped-Wedge Cluster Randomized Trial*, 10 J. Med. Internet Rsch. Formative Rsch. e79184 (Mar. 2026), https://pmc.ncbi.nlm.nih.gov/articles/PMC13035033/?utm ..........9

Natasha Martland et al., *Are Adult Stressful Life Events Associated with Psychotic Relapse? A Systematic Review of 23 Studies*, 50 Psych. Med. 2302 (2020) ..........8

MaryBeth Musumeci, Robin Rudowitz & Barbara Lyons, *Medicaid Work Requirements in Arkansas: Experience and Perspectives of Enrollees*, KFF (Dec. 18, 2018), https://www.kff.org/medicaid/medicaid-work-requirements-in-arkansas-experience-and-perspectives-of-enrollees/?utm ..........9

Amanda Palomin, *Challenges and Ethical Implications in Rural Community Mental Health: The Role of Mental Health Providers*, 59 Cmty. Mental Health J. 1442 (2023) ..........15

Miguel Pinedo, *A Current Re-Examination of Racial/Ethnic Disparities in the Use of Substance Abuse Treatment: Do Disparities Persist?*, 202 Drug & Alcohol Dependence 162 (2019) .......... 15-16

Eli Raver et al., *Rural-Urban Differences in Out-of-Network Treatment Initiation and Engagement Rates for Substance Use Disorders*, 59 Health Servs. Rsch. e14299 (2024) ..........15

Sivan Regev & Naomi Josman, *Evaluation of Executive Functions and Everyday Life for People with Severe Mental Illness: A Systematic Review*, Schizophrenia Research: Cognition (2020) ..........7

Rural Health Info. Hub, *Substance Use and Misuse in Rural Areas*, https://www.ruralhealthinfo.org/topics/substance-use ..........15

Thomas Santo Jr. et al., *Association of Opioid Agonist Treatment With All-Cause Mortality and Specific Causes of Death Among People With Opioid Dependence: A Systematic Review and Meta-analysis*, 78 JAMA Psychiatry 979 (2021) ..........11

Heather Saunders et al., *5 Key Facts About Medicaid Coverage for Adults with Mental Illness*, KFF (Feb. 21, 2025), https://www.kff.org/mental-health/5-key-facts-about-medicaid-coverage-for-adults-with-mental-illness/ ..........1

Heather Saunders et al., *Implications of Medicaid Work and Reporting Requirements for Adults with Mental Health or Substance Use Disorders*, KFF (June 23, 2025), https://www.kff.org/medicaid/implications-of-medicaid-work-and-reporting-requirements-for-adults-with-mental-health-or-substance-use-disorders/ .......... 1, 2

Rajita Sinha, *Stress and Substance Use Disorders: Risk, Relapse, and Treatment Outcomes*, 134 J. Clinical Investigation e172883 (2024) .......... 8

Benjamin D. Sommers et al., *Medicaid Work Requirements – Results from the First Year in Arkansas*, 381 New England J. Med. 1073 (2019) .......... 9-10

Aparna Soni & Justin Blackburn, *Health Characteristics of Adults Unable to Complete Medicaid Renewal During the Unwinding Period*, 6 JAMA Health Forum e250092 (2025) .......... 6

The Commonwealth Fund, *Understanding the U.S. Behavioral Health Workforce* Shortage (May 18, 2023), https://www.commonwealthfund.org/publications/explainer/2023/may/understanding-us-behavioral-health-workforce-shortage .......... 12, 15

U.S. Congressman Don Bacon, *From Bacon's Desk: The Truth About Medicaid Work Requirements* (July 15, 2025), https://bacon.house.gov/news/documentsingle.aspx?DocumentID=2732&utm .......... 4

Nora D. Volkow & Carlos Blanco, *Substance Use Disorders: A Comprehensive Update of Classification, Epidemiology, Neurobiology, Clinical Aspects, Treatment and Prevention*, 22 World Psychiatry 203 (2023) .......... 7, 8

## INTERESTS OF AMICI CURIAE[1]

Amici curiae are the American Psychiatric Association, the American Psychological Association, Mental Health America, the National Association for Behavioral Healthcare, and the National Council for Mental Wellbeing.

Amici anticipate that the provisions of the Interim Final Rule ("IFR") challenged by the States will have a devastating impact on individuals with substance use disorders ("SUDs") and disabling mental disorders ("DMDs"), as well as on the mental healthcare professionals and institutions that provide treatment for those conditions. Medicaid is the Nation's single largest payer of mental health and SUD services; nearly one in three adult Medicaid beneficiaries have a mental illness or SUD.[2] Moreover, the Medicaid expansion population – low-income, working-age adults who qualify for Medicaid under the Affordable Care Act's expansion of coverage and the group most directly affected by the community-engagement requirement in H.R. 1 – includes a substantial share of individuals with mental health disorders, including SUDs.[3] Among Medicaid-covered adults with a SUD, more than half qualify through the Medicaid expansion.[4] Although some individuals with DMDs may qualify for Supplemental Security Income ("SSI")

---

[1] Counsel for amici curiae certify that no counsel for a party authored this brief in whole or in part, and no person other than amici curiae, their members, or their counsel made a monetary contribution to the brief's preparation or submission. As stated in the accompanying motion for leave, the parties have consented to the filing of this brief. A brief description of each of the amici is included in an Appendix to this brief.

[2] *See* Heather Saunders et al., *5 Key Facts About Medicaid Coverage for Adults with Mental Illness*, KFF (Feb. 21, 2025), https://www.kff.org/mental-health/5-key-facts-about-medicaid-coverage-for-adults-with-mental-illness/.

[3] *See* Heather Saunders et al., *Implications of Medicaid Work and Reporting Requirements for Adults with Mental Health or Substance Use Disorders*, KFF (June 23, 2025) ("[A]mong Medicaid expansion enrollees . . . , 24% have a diagnosed behavioral health condition."), https://www.kff.org/medicaid/implications-of-medicaid-work-and-reporting-requirements-for-adults-with-mental-health-or-substance-use-disorders/.

[4] *See id.*

and thus also for Medicaid, most Medicaid enrollees in the expansion population do not qualify that way – especially because SUDs alone do not qualify an individual for SSI.[5]

As enacted, H.R. 1[6] requires States to impose a "community engagement" requirement "as a condition of eligibility for medical assistance for an applicable individual," including certain low-income, working-age adults.[7] But H.R. 1 excludes from the definition of "applicable individual" anyone "who is medically frail or otherwise has special medical needs," including, specifically, "an individual . . . with a substance use disorder" or "a disabling mental disorder."[8] Even before the Department of Health and Human Services ("HHS") adopted the IFR, analysts predicted that the burden of establishing exclusion from H.R. 1's community-engagement requirement – as well as uncertainty over which conditions would qualify as "disabling" – would lead to loss of Medicaid coverage for many qualified individuals.[9] But the IFR makes the situation far worse. Contrary to the express terms of the statute, the IFR overrides the categorical exclusion enacted by Congress and denies Medicaid coverage to individuals with SUDs and DMDs unless they are able to establish that they cannot work or otherwise comply with the community-engagement requirement.[10] Not only does this remove coverage from many individuals who have SUDs and DMDs and are able to comply with the requirement but it creates unrealistic administrative burdens for individuals who are *unable* to comply yet are

[5] *See id.*

[6] Act of July 4, 2025, Pub. L. No. 119-21, 139 Stat. 72.

[7] 42 U.S.C. § 1396a(xx)(1); *see id.* § 1396a(xx)(9).

[8] *Id.* § 1396a(xx)(9)(A)(ii)(V).

[9] *See* Saunders, *supra* note 3.

[10] *See* Medicaid Program; Community Engagement Requirement for Certain Individuals, 91 Fed. Reg. 33348, 33472 (June 3, 2026) (42 C.F.R. § 435.554(c)(5)(i)).

unable to meet the IFR's requirements to establish that fact. The consequences for the affected population will be disastrous.

The impact on the mental health community will be just as serious. Without Medicaid, many individuals with SUDs and DMDs will go without treatment, leading to relapse and worsening of conditions, potentially leading to hospitalization and the need for more resource-intensive treatment – treatment that the healthcare system is already unable to provide adequately. And the administrative burdens of the IFR's compliance regime exacerbate the problem, requiring mental healthcare professionals to devote time and attention to documenting eligibility for benefits rather than providing treatment. Individuals with SUDs and DMDs already face serious challenges in accessing care because of shortages in mental health professionals.[11] Diverting those scarce resources to documenting compliance with an extra-statutory eligibility requirement is as unjustifiable as it is unlawful.

Amici accordingly have a compelling interest in supporting the Plaintiff States' effort to enjoin the unlawful provisions of the IFR and in restoring the statute's categorical exclusion from H.R. 1's community-engagement requirement for individuals with SUDs and DMDs.

## ARGUMENT

H.R. 1 imposes sweeping changes to Medicaid, "a cooperative endeavor in which the Federal Government provides financial assistance to participating States to aid them in furnishing healthcare to needy persons."[12] Directing States to condition Medicaid eligibility on "community engagement,"[13] Congress for the first time in six decades effectively instituted

---

[11] *See* U.S. Dep't of Health & Hum. Servs., Off. of Inspector Gen., *A Lack of Behavioral Health Providers in Medicare and Medicaid Impedes Enrollees' Access to Care* (Mar. 2024), https://oig.hhs.gov/documents/evaluation/9844/OEI-02-22-00050.pdf.

[12] *Bowen v. Massachusetts*, 487 U.S. 879, 883 (1988).

[13] 42 U.S.C. § 1396a(xx).

a nationwide work requirement for certain adult Medicaid enrollees, specifically those covered by the expansion of Medicaid under the Affordable Care Act.[14] But Congress explicitly excluded from the community-engagement requirement the "medically frail,"[15] consistent with representations by the law's supporters that the requirement would apply only to able-bodied adults without heightened medical needs.[16]

As defined by the statute, the "medically frail" category "includ[es]" individuals with one of five conditions.[17] Some of these conditions are defined by reference to a particular degree of impairment.[18] But others are not – in particular, "substance use disorder"[19] and "disabling mental disorder."[20] That Congress incorporated impairment into some conditions but not others reflects a deliberate choice not to impose any generalized impairment requirement,[21] much less

[14] *See id.* § 1396a(a)(10)(A)(i)(VIII).

[15] *Id.* § 1396a(xx)(9)(A)(ii)(V).

[16] *See* Ctr. for Health Law & Pol'y, *A Shift Between Congressional Intent and Implementation: Work Requirements* (June 17, 2026) (collecting statements from members of Congress who voted in favor of H.R. 1), https://chlpi.org/wp-content/uploads/2026/06/HCIM_Congressional-Quotes_FINAL_6.17.26-1.pdf; *see also*, *e.g.*, U.S. Congressman Don Bacon, *From Bacon's Desk: The Truth About Medicaid Work Requirements* (July 15, 2025) ("Medicaid community engagement requirements . . . would NOT apply to individuals who are . . . medically frail"), https://bacon.house.gov/news/documentsingle.aspx?DocumentID=2732&utm.

[17] 42 U.S.C. § 1396a(xx)(9)(A)(ii)(V).

[18] *See*, *e.g.*, *id.* § 1396a(xx)(9)(A)(ii)(V)(dd) ("a physical, intellectual or developmental disability that *significantly impairs their ability to perform 1 or more activities of daily living*") (emphasis added).

[19] *Id.* § 1396a(xx)(9)(A)(ii)(V)(bb).

[20] *Id.* § 1396a(xx)(9)(A)(ii)(V)(cc).

[21] *See Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 341 (2005) ("We do not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and our reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest."); *see also*, *e.g.*, *In re 229 Main Street Ltd. P'ship*, 262 F.3d 1, 10 (1st Cir. 2001) (observing that "courts cannot limit legislation by cavalierly conjuring up qualifications that the legislature has . . . eschewed").

to allow a statutory exclusion from the community-engagement requirement to be converted into a vehicle for imposing one.[22]

Notwithstanding the statutory language, the Centers for Medicare & Medicaid Services ("CMS") issued the challenged IFR, which purports to modify the definition of "medically frail" to require someone who satisfies one of the statutory conditions also to show that such condition "significantly impairs the individual's ability to comply with the community engagement requirement."[23] Amici agree with the States that the IFR unlawfully imposes a requirement that contradicts the categorical exclusion that Congress adopted.[24] "Where Congress has established a clear line" – here, that the "medically frail" need not satisfy the community-engagement requirement – "the agency cannot go beyond it."[25] Yet that is precisely what the IFR does. By conditioning the medically frail exclusion on a showing that a condition "significantly impairs" an individual's ability to comply with the community-engagement requirement, the IFR narrows the exclusion to leave out millions of individuals in the very groups Congress placed squarely within it. But "including" is "a term of enlargement, and not of limitation": the conditions Congress articulated establish a floor below which the definition may not fall.[26] The agency has no power to overturn the clearly expressed terms of legislation adopted by Congress.

---

[22] *See NLRB v. Health Care & Ret. Corp. of Am.*, 511 U.S. 571, 573 (1994) ("[I]t is for Congress, not for us, to create exceptions or qualifications at odds with [a statute's] plain terms.").

[23] 42 C.F.R. § 435.554(c)(5)(i).

[24] *See In re JPMorgan Chase Bank, N.A.*, 799 F.3d 36, 42 (1st Cir. 2015) (observing that, "[w]here Congress has spoken with specificity, an agency may not promulgate regulations that are 'an attempted addition to the statute of something which is not there' ") (quoting *United States v. Calamaro*, 354 U.S. 351, 358-59 (1957)).

[25] *City of Arlington v. FCC*, 569 U.S. 290, 307 (2013).

[26] *Public Int. Legal Found., Inc. v. Bellows*, 92 F.4th 36, 48 (1st Cir. 2024).

The agency's failure to adhere to the terms of the statute is reason enough to enjoin enforcement of the challenged provisions of the IFR. Amici file this brief to emphasize the serious practical effects of the IFR on individuals excluded from the statute's community-engagement requirement under the "medical frailty" exclusion, in particular the exclusion for individuals with SUDs and DMDs. In making eligibility for Medicaid coverage turn not only on an individual's condition but also on the individual's ability to document an inability to work (or otherwise comply with the community-engagement requirement), the IFR both ignores the clinical reality of SUDs and DMDs and fails to reckon with the challenges of administering the requirements in practice. First, amici describe why imposing a community-engagement requirement on individuals with SUDs and DMDs undermines their treatment and recovery. Second, amici explain why the community-engagement requirement, as applied to these populations, will be effectively unadministrable, a conclusion strongly (and unfortunately) reinforced by the unreasonable limitations imposed on the evidence States are permitted to consider in connection with eligibility determinations.[27]

## I. The IFR's Community-Engagement Requirement Threatens the Sustained Treatment Upon Which Recovery Depends for People with SUDs and DMDs

The IFR's requirement that individuals in the expansion population with SUDs and DMDs establish that their condition "significantly impairs" their ability to comply with the community-engagement requirement as a condition of eligibility for Medicaid will undermine the very protection the statute expressly grants.[28] The statute's categorical exclusion from the

---

[27] Even with the statutory exclusion, individuals with behavioral health needs are likely to be at greater risk of coverage loss than the general population, most frequently for procedural reasons such as untimely completion of paperwork rather than a lack of eligibility. *See* Aparna Soni & Justin Blackburn, *Health Characteristics of Adults Unable to Complete Medicaid Renewal During the Unwinding Period*, 6 JAMA Health Forum e250092 (2025).

[28] 42 C.F.R. § 435.554(c)(5)(i).

community-engagement requirement ensures that a population at heightened risk of adverse health consequences will not lose coverage because of a lapse in eligibility. Many, if not most, individuals with SUDs and DMDs are able to work, and workforce participation can be an important component of recovery, contributing to improved functioning, quality of life, and other positive outcomes.[29] But SUDs and DMDs render individuals vulnerable to relapse and recurrence – often at unpredictable intervals.[30] Treatment for SUDs and other mental disorders is delivered on a continuum of care – treatment plans are more intensive when symptoms worsen, imposing scheduling and organizational demands.

Once developed, SUDs tend to be chronic in nature, "reflecting long-lasting changes in brain function," and "are exacerbated by the cumulative mental health and social consequences that they trigger."[31] Many individuals with SUDs alternate between periods of remission and relapse.[32] The same is true of DMDs.[33] To say that these conditions are chronic, however, is not to say that they are untreatable – it means that they require ongoing support and that interruptions in coverage threaten the stable care upon which sustained recovery depends.

---

[29] *See* Stephen Magura & Tina Marshall, *The Effectiveness of Interventions Intended to Improve Employment Outcomes for Persons with Substance Use Disorder: An Updated Systematic Review*, 55 Substance Use & Misuse 2230 (2020); Robert E. Drake & Michael A. Wallach, *Employment Is a Critical Mental Health Intervention*, 29 Epidemiology & Psychiatric Scis. e178 (2020).

[30] *See* Nora D. Volkow & Carlos Blanco, *Substance Use Disorders: A Comprehensive Update of Classification, Epidemiology, Neurobiology, Clinical Aspects, Treatment and Prevention*, 22 World Psychiatry 203 (2023); Sivan Regev & Naomi Josman, *Evaluation of Executive Functions and Everyday Life for People with Severe Mental Illness: A Systematic Review*, Schizophrenia Research: Cognition (2020).

[31] Volkow & Blanco, *supra* note 30, at 212.

[32] *See id.*

[33] *See* Matt G. Kushner, *Seventy-Five Years of Comorbidity Research*, J. Stud. on Alcohol & Drugs, Suppl. No. 17, at 50, 54 (Mar. 2014).

The cyclical nature of these disorders is precisely what makes a categorical exclusion necessary. Individuals with a SUD or DMD may go through extended periods during which they are able to work, engage in treatment, and function at a high level. But they remain vulnerable to relapse or recurrence of symptoms – sometimes triggered by the very stresses associated with maintaining employment – that may temporarily or permanently impair their ability to work.[34] When symptoms worsen, the standard of care requires escalation to more intensive levels of treatment – such as intensive outpatient programs, partial hospitalization, or residential care – each of which demands progressively greater commitments of time and attendance.[35] These treatment demands may prevent compliance with the community-engagement requirement. A system that conditions eligibility on compliance with the community-engagement requirement ignores these realities because it would require individuals to re-document their eligibility each time their condition recurs, at the precise moments they are least capable of navigating the necessary administrative demands.

SUDs and DMDs can interfere with executive functioning, the cognitive capacity to plan, organize, initiate, and follow through on goals. Indeed, deficits in executive functioning are often most acute during the very periods when sustained treatment is most critical. Individuals in the early stages of recovery from SUDs face an acute tension: even if they have become entirely abstinent, the neurological and behavioral changes caused by prolonged substance use do not resolve overnight. Cognitive function remains impaired, and the habits and social environments

---

[34] *See* Rajita Sinha, *Stress and Substance Use Disorders: Risk, Relapse, and Treatment Outcomes*, 134 J. Clinical Investigation e172883 (2024); Natasha Martland et al., *Are Adult Stressful Life Events Associated with Psychotic Relapse? A Systematic Review of 23 Studies*, 50 Psych. Med. 2302 (2020).

[35] *See* Volkow & Blanco, *supra* note 30, at 215-16.

that sustained the disorder remain present.[36] CMS itself has acknowledged that the likelihood of relapse is highest at this stage of recovery.[37] For individuals with DMDs, the period immediately following treatment presents comparable risks – not because treatment has failed, but because the transition from inpatient or residential care to less intensive levels of treatment – such as day programs, intensive outpatient care, or more frequent outpatient visits – or independent daily life is itself destabilizing.[38] Symptoms may accordingly re-emerge even as individuals continue treatment at a less intensive level – and the administrative demands of the community-engagement requirement compete directly with the time and structure that ongoing treatment requires.

Yet it is precisely during these periods that the IFR would require individuals to navigate the community-engagement requirement's administrative demands, which are onerous for even the most capable adults.[39] Under the IFR, an individual must document to the State her

[36] *See* Thomas J. Gould, *Addiction and Cognition*, 5 Addiction Sci. & Clinical Prac. 4, 4 (2010) ("The brain regions and processes that underlie addiction overlap extensively with those that support cognitive functions, including learning, memory, and reasoning. Drug activity in these regions and processes during early stages of abuse foster strong maladaptive associations between drug use and environmental stimuli that may underlie future cravings and drug-seeking behaviors.").

[37] *See* 91 Fed. Reg. at 33374 (CMS acknowledging that there is a higher likelihood of relapse at the early recovery stage).

[38] *See*, *e.g.*, Wanying Mao et al., *Predictors of Psychiatric Emergency Department Visits Following Inpatient Discharge: Secondary Analysis of a Stepped-Wedge Cluster Randomized Trial*, 10 J. Med. Internet Rsch. Formative Rsch. e79184, at 1 (Mar. 2026) (characterizing "[t]he period following discharge from psychiatric inpatient care" as "a critical transition phase marked by heightened vulnerability to relapse"), https://pmc.ncbi.nlm.nih.gov/articles/PMC13035033/?utm.

[39] *See* MaryBeth Musumeci, Robin Rudowitz & Barbara Lyons, *Medicaid Work Requirements in Arkansas: Experience and Perspectives of Enrollees*, KFF (Dec. 18, 2018) (identifying unawareness or confusion, difficulties setting up an online account, and complicated circumstances as factors making reporting difficult), https://www.kff.org/medicaid/medicaid-work-requirements-in-arkansas-experience-and-perspectives-of-enrollees/?utm; Benjamin D. Sommers et al., *Medicaid Work Requirements – Results from the First Year in Arkansas*, 381

satisfaction of the community-engagement requirement.[40] This may require gathering paystubs or obtaining written confirmation from a community service organization.[41] The State must verify compliance at application, renewal, and potentially additional intervals in between.[42] If the State cannot verify compliance through its own records, the individual receives a notice of noncompliance and has 30 days to assemble and submit documentation establishing that she has satisfied the requirement – or that she qualifies for the medically frail exclusion.[43] Failure to respond then results in disenrollment,[44] which is particularly problematic for individuals who are in residential or inpatient care and thus might not receive their notice. Each of these tasks requires the capacity to plan ahead, keep and obtain records, follow a schedule, and navigate bureaucratic systems – the very capacities that SUDs and DMDs compromise. And for individuals who do relapse, the situation becomes untenable: at the same time that an acute health crisis demands their full attention – and increased time and engagement for treatment from clinicians to manage the increased risk of overdose and death – the IFR requires that these individuals compile documentation that they can no longer comply.

These clinical realities underscore that Congress had reason to ensure Medicaid eligibility for individuals with SUDs and DMDs – and the IFR undermines that protection. As noted, many

---

New England J. Med. 1073, 1080 (2019) (concluding that work requirements had "substantially exacerbated administrative hurdles to maintaining coverage").

[40] *See* 42 C.F.R. § 435.557(b)(2)(ii).

[41] *See* 91 Fed. Reg. at 33395.

[42] *See* 42 C.F.R. § 435.557(c), (d).

[43] *See id.* §§ 435.557(b)(1), 435.558(a)-(c). Although in principle the medically frail determination precedes any assessment of compliance with the community-engagement requirement, the IFR's definition of medical frailty – which turns on whether a condition "significantly impairs the individual's ability to comply with the community engagement requirement," *id.* § 435.554(c)(5)(i) – effectively collapses the two inquiries into one.

[44] *See id.* § 435.558(d).

people with SUDs and DMDs are able to work but nonetheless remain vulnerable to relapse or recurrence that may interfere with participation in the workforce. A categorical exclusion allows them to maintain coverage regardless of the fluctuations in their conditions, which itself helps to promote access to the treatment that sustains their recovery. For individuals whose conditions render them unable to work, or otherwise satisfy the community-engagement requirement, demonstrating the inability to do so in addition to providing proof of the condition imposes an unrealistic administrative burden in light of their impairment (as discussed further below). The categorical approach chosen by Congress accounts for these circumstances, whereas the IFR's added community-engagement requirement comprehensively undermines protection.

As a result of the community-engagement requirement, individuals with SUDs and DMDs will lose Medicaid coverage not because they fall outside the statutory exclusion, but because their conditions make compliance with the requirement an insurmountable challenge at the very time coverage matters most. And once coverage is lost, regaining it is difficult: Medicaid enrollment and renewal processes often involve confusing State websites, lengthy telephone wait times, and bureaucratic delays that can cause reinstatement to take months.[45] During those months without coverage, individuals lose access to the treatment that helps them manage their conditions, increasing the likelihood of serious relapse and hospitalization.[46] The resulting strain also falls on an already-overburdened network of mental health professionals: clinicians, particularly those in underserved communities, will be forced to absorb the cost of

[45] *See supra* note 39.

[46] *See*, *e.g.*, Thomas Santo Jr. et al., *Association of Opioid Agonist Treatment With All-Cause Mortality and Specific Causes of Death Among People With Opioid Dependence: A Systematic Review and Meta-analysis*, 78 JAMA Psychiatry 979 (2021).

unreimbursed care or turn patients away.[47] This is no abstract concern. More than 160 million Americans already live in areas with mental health professional shortages, and approximately 65 percent of rural areas lack adequate primary care.[48] Disenrolling individuals who lose coverage due to the IFR's administrative demands will exacerbate the impact of these shortages, as clinicians who are already stretched thin face a growing population of uninsured patients with nowhere else to turn.

Interruptions in Medicaid coverage thus delay treatment, worsen health outcomes, and increase reliance on emergency and crisis services – leading to increased costs across the healthcare system. Far from promoting self-sufficiency, the IFR thus will initiate a vicious cycle in which vulnerable Medicaid enrollees are stripped of their coverage, experience worsening health outcomes, and become even less capable of satisfying the administrative demands that caused them to lose coverage in the first place. At the same time, an already-fragile healthcare system will be increasingly strained. Congress excluded the "medically frail" from the community-engagement requirement to mitigate these consequences. By superimposing such a requirement on a population the statute categorically excludes, the IFR has effectively nullified the protection Congress intended to provide.

---

[47] *See* The Commonwealth Fund, *Understanding the U.S. Behavioral Health Workforce Shortage* (May 18, 2023) (noting that, as of March 2023, "160 million Americans live in areas with mental health professional shortages"), https://www.commonwealthfund.org/publications/explainer/2023/may/understanding-us-behavioral-health-workforce-shortage.

[48] *See id.*; Tanya Albert Henry, *AMA Outlines 5 Keys to Fixing America's Rural Health Crisis*, Am. Med. Ass'n (June 6, 2024) (reporting that approximately 65 percent of rural areas face primary care shortages), https://www.ama-assn.org/public-health/population-health/ama-outlines-5-keys-fixing-america-s-rural-health-crisis; *see also* Cory Caldwell, *Bridging the Gap: Examples of Medicaid Innovation Enhancing Health Care Access in Rural America*, Nat'l Ass'n of Medicaid Dirs. (June 4, 2025) (discussing how ongoing rural hospital closures continue to erode access to healthcare and mental health services alike), https://medicaiddirectors.org/resource/bridging-the-gap-examples-of-medicaid-innovation-enhancing-health-care-access-in-rural-america/.

## II. The IFR's Documentation Requirements Are Not Administrable

The IFR's unlawful community-engagement requirement for individuals with SUDs and DMDs threatens yet more pernicious effects because of the unrealistic administrative burdens that the compliance regime creates. The IFR effectively requires clinicians to evaluate the functional capacity of Medicaid enrollees – determining whether a given individual's condition "significantly impairs" her ability to comply.[49] Under the IFR, the State "must attempt to verify" medical frailty "using reliable information available to the State," defined broadly to include claims and encounter data – that is, billing and treatment records – that originate with clinicians.[50] Only after exhausting these sources may the State request additional information from the individual.[51] As a practical matter, it is difficult to imagine how States will be able to verify that an individual satisfies the IFR's significant-impairment requirement without relying on mental healthcare professionals to evaluate whether their patients can work.[52]

This kind of assessment is foreign to clinical practice. Mental health clinicians are trained to diagnose conditions, develop treatment plans, and support recovery – not to adjudicate eligibility for government benefits. The closest existing analogue is the consultative-examination

---

[49] 42 C.F.R. § 435.554(c)(5)(i).

[50] *Id.* § 435.557(a), (f)(1).

[51] *Id.* § 435.557(c)(1)(i)(A).

[52] *See* 91 Fed. Reg. at 33373 (CMS stating that medical-frailty determinations cannot be "based solely on diagnosis or condition" but must also consider "the extent to which the condition impairs an individual's ability to engage in community engagement activities"). CMS has recently issued guidance suggesting that States could allow certain diagnoses to serve as the sole basis for a finding that a condition "significantly impairs" an individual's ability to comply with the community-engagement requirement. *See* Ctrs. for Medicare & Medicaid Servs., *Implementing Medical Frailty Under Community Engagement (Section 71119 of WFTC Legislation)* at 13 (Sept. 8, 2026), https://www.medicaid.gov/resources-for-states/working-families-tax-cut-legislation/community-engagement/ImplementingMedicalFrailtyDeck.pdf. But States are free to impose more restrictive methodologies, and the guidance envisions only a limited number of conditions as sufficient to establish medical frailty.

process used by the Social Security Administration to adjudicate disability claims, and that comparison is instructive precisely because it illustrates how resource-intensive such evaluations are.[53] SSA's disability-determination process relies on trained examiners and medical consultants who undergo extensive specialized training in applying a five-step sequential evaluation.[54] For mental health claims in particular, evaluators must apply SSA's Psychiatric Review Technique, which requires assessment across four broad functional areas and can involve reviewing years of medical records.[55] A single psychological examination takes at least an hour, with additional time for testing and preparation of a case history.[56] In the course of preparing a detailed written report, the disability examiner must "[o]btain evidence from the claimant, medical sources, entities that maintain medical sources' evidence, and nonmedical sources," "[c]ontact . . . appropriate parties for additional information," and "[c]onsult with" medical and psychological consultants.[57] Mental health professionals have neither the training nor the infrastructure to perform these assessments – and the IFR provides no mechanism for equipping them to do so. This process is time-consuming even for a trained examiner who specializes in performing these assessments; it would be prohibitively burdensome for mental health professionals who have no such training.

The time that clinicians would spend conducting these assessments is time taken directly from patient care, with serious consequences for a system already in crisis. As stated above,

[53] *See* SSA, DI 24501.001, The Disability Determination Services Disability Examiner, Medical Consultant, and Psychological Consultant Team, and the Role of the Medical Advisor (eff. Mar. 6, 2024), https://secure.ssa.gov/poms.nsf/lnx/0424501001.

[54] *See id.*

[55] *See* 20 C.F.R. § 416.920a.

[56] *See id.* § 416.919n.

[57] SSA, DI 24501.001, ¶ B.1.a.

more than 160 million Americans live in areas with mental health professional shortages.[58] Mental health professionals treating individuals with SUDs and DMDs already face crushing demand relative to supply. Diverting their limited time toward eligibility determinations will exacerbate existing access challenges, lengthen wait times, and reduce the frequency and duration of patient visits – each of which directly worsens outcomes for all patients, especially those for whom consistent engagement with treatment is essential to recovery.

The burdens of reporting fall hardest on the communities least equipped to absorb them. A disproportionate number of individuals with SUDs and DMDs live in rural areas, where clinician shortages are most acute and distances to treatment facilities are greatest.[59] Members of these communities already face long travel times, limited access to specialists, and cultural stigma that discourages them from seeking treatment for these conditions.[60] Requiring documentation from clinicians who are scarce – or entirely unavailable – in these areas is not a workable system for verifying eligibility; rather, it is a guarantee that eligible individuals will lose coverage. In a similar way, racial and ethnic minorities encounter systemic barriers including discrimination, a shortage of culturally competent clinicians, and limited access to treatment facilities that will complicate documentation.[61]

---

[58] *See* The Commonwealth Fund, *supra* note 47.

[59] *See* Rural Health Info. Hub, *Substance Use and Misuse in Rural Areas*, https://www.ruralhealthinfo.org/topics/substance-use (last visited Sept. 10, 2026); Katherine M. Keyes et al., *Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use and Abuse in the United States*, 104 Am. J. Pub. Health e52 (2014).

[60] *See* Eli Raver et al., *Rural-Urban Differences in Out-of-Network Treatment Initiation and Engagement Rates for Substance Use Disorders*, 59 Health Servs. Rsch. e14299 (2024); Amanda Palomin, *Challenges and Ethical Implications in Rural Community Mental Health: The Role of Mental Health Providers*, 59 Cmty. Mental Health J. 1442 (2023).

[61] *See* Sirry M. Alang, *Mental Health Care Among Blacks in America: Confronting Racism and Constructing Solutions*, 54 Health Servs. Rsch. 346 (2019); Miguel Pinedo,

The harm, moreover, extends beyond resource constraints. Requiring clinicians to serve as gatekeepers of their patients' Medicaid eligibility would compromise the relationship between patient and clinician on which effective behavioral treatment depends. Treatment for SUDs and DMDs requires patients to disclose deeply personal and often stigmatized information: the extent of their substance use, psychiatric symptoms, cognitive difficulties, trauma history, and the ways in which their conditions affect daily functioning.[62] This candor is possible only when patients trust that their disclosures will be used to further their treatment. If Medicaid enrollees come to believe that what they tell their clinician could result in a finding that they are not sufficiently impaired to qualify for the medically frail exclusion, the predictable result is that they will withhold information – or, worse, avoid treatment altogether.

The IFR thus creates a dilemma for many mental health professionals. Participation in work, education, and community activities is often a productive goal that clinicians incorporate into treatment plans as part of supporting recovery. But the IFR would require a clinician to certify that a patient cannot comply with the community-engagement requirement, a categorical determination that is at odds with the clinical reality that a patient's SUD or DMD may impair the ability to satisfy the requirement in *some* periods, but not others.

Two additional features of the IFR compound these problems of documentation and reporting. First, the IFR restricts the data that States may consider when evaluating a claim of medical frailty. Specifically, States may not rely on claims or encounter data – the billing and treatment records generated when an individual receives medical care – unless those records

---

*A Current Re-Examination of Racial/Ethnic Disparities in the Use of Substance Abuse Treatment: Do Disparities Persist?*, 202 Drug & Alcohol Dependence 162 (2019).

[62] *See generally* Substance Abuse & Mental Health Servs. Admin., *Substance Use Disorder Treatment for People With Co-Occurring Disorders* 31-67 (updated 2020), https://library.samhsa.gov/sites/default/files/tip-42-sud-treatment-pep20-02-01-004.pdf.

were generated within the preceding 12 months.[63] For individuals with SUDs and DMDs, which as described above are chronic conditions, this limitation is clinically indefensible. An individual with a permanent or long-term condition may not receive treatment specifically for that condition in a given 12-month window, even though the condition persists. A diagnosis of a SUD or DMD does not expire after 12 months simply because the individual has not generated a recent billing or treatment record.

Second, beginning in 2028, the IFR limits individuals to a single self-attestation of medical frailty per enrollment period.[64] A self-attestation is a signed statement, made under penalty of perjury, in which the individual declares that she has a qualifying condition.[65] A "period of enrollment" is a continuous period of Medicaid enrollment without disenrollment.[66] An individual with a SUD or DMD may attest to medical frailty, for example, at the beginning of enrollment and, after treatment, comply with the community-engagement requirement. Months later, she may experience a relapse or onset of a new condition and be unable to work. But if the individual has already made an attestation, she must instead produce independent documentation of medical frailty, at a time when her condition may make it impossible to do so. By the time the next enrollment period arrives, the individual may have already lost coverage.

The 12-month lookback and the self-attestation limitation compound the fundamental problem with the IFR's community-engagement requirement by ensuring that the individuals most likely to qualify for the medically frail exclusion are the least likely to be able to prove it. These provisions make the IFR's already-unworkable documentation demands worse.

---

[63] *See* 42 C.F.R. § 435.557(a)(vii), (a)(viii), (f)(1).

[64] *See id.* § 435.557(f)(1)(ii).

[65] *See id.* § 435.557(f)(1)(i).

[66] *See id.* § 435.557(a).

In sum, the IFR does not merely impose a substantial new burden upon already-overburdened medical professionals – rather, it transforms clinical encounters into eligibility evaluations, degrading the quality of care and deterring treatment. Rather than supporting recovery and self-sufficiency, the IFR ensures that clinicians have less time to treat their patients, that patients have less reason to trust their clinicians, and that the most vulnerable enrollees are less likely to receive the coverage and care they need. This perverse result is exactly the opposite of what Congress intended to protect through the medically frail exclusion.

## CONCLUSION

Plaintiffs' motion for summary judgment should be granted.

Respectfully submitted,

/s/ *Bradley E. Oppenheimer*
Aaron M. Panner (BBO #629935)
Bradley E. Oppenheimer (BBO #688330)
Justin D. Cole*
KELLOGG, HANSEN, TODD,
FIGEL & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900
apanner@kellogghansen.com
boppenheimer@kellogghansen.com
jcole@kellogghansen.com

*Counsel for Amici Curiae*

* Not admitted in the District of Columbia; practicing under the supervision of members of the Firm.

September 14, 2026

## APPENDIX

The American Psychiatric Association, with more than 39,000 members, is the Nation's leading organization of physicians who specialize in psychiatry. Its member physicians work to ensure access to quality mental healthcare and effective treatment for all persons with mental disorders, including substance use disorders. The American Psychiatric Association has participated frequently as an amicus curiae in the Supreme Court and in other federal courts, and its members have substantial knowledge and experience relevant to the issues in this case.

The American Psychological Association is the leading scientific and professional organization representing psychology in the United States, with approximately 190,000 members and affiliates. Among the American Psychological Association's major purposes are to advance psychology as a science and profession and to foster the application of psychological learning to important human concerns, thereby promoting health, education, and welfare. The American Psychological Association has a particular interest in ensuring that individuals with substance use disorders and mental health disorders retain access to evidence-based treatment, as psychological research and clinical practice are central to the treatment and management of these conditions.

Mental Health America ("MHA") is the Nation's leading nonprofit dedicated to promoting the mental health and well-being of all people living in the United States. With a network of 130 affiliates in 38 States, MHA works at both the national and the local levels to advance its mission through public education, research, advocacy and public policy, and direct service. Founded in 1909 by Clifford Beers, who suffered abuse in psychiatric facilities and advocated for reforms, MHA continues his legacy by educating policymakers on the impact of public policies on people with mental health conditions and substance use disorders.

The National Association for Behavioral Healthcare represents behavioral healthcare systems that provide mental and substance use disorder treatment across the entire continuum of care, including inpatient, residential treatment, and outpatient programs, including partial hospitalization, intensive outpatient, and Opioid Treatment Programs. Its membership includes behavioral healthcare providers in 49 States, Washington, D.C., and Puerto Rico.

The National Council for Mental Wellbeing is a membership organization representing more than 3,200 mental health and substance use treatment organizations and the more than 10 million children, adults, and families they serve nationwide.

**CERTIFICATE OF SERVICE**

I hereby certify that, on September 14, 2026, I caused to be filed electronically a copy of the foregoing document, which will electronically serve all counsel of record who have entered an appearance in the case.

/s/ *Bradley E. Oppenheimer*
Bradley E. Oppenheimer