**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF MASSACHUSETTS, *et al.*,

*Plaintiffs*,

v.

MEHMET OZ, M.D., in his official capacity as Administrator[1] of the Centers for Medicare & Medicaid Services, *et al.*,

*Defendants*.

No. 1:26-cv-12962

**DEFENDANTS' COMBINED MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

[1] Case captions in earlier documents docketed in this case erroneously referred to Administrator Oz as the "Director" of the Centers for Medicare & Medicaid Services. This document corrects this erroneous designation.

# TABLE OF CONTENTS


INTRODUCTION ........ 1

BACKGROUND ........ 1

I. The Medicaid Program ........ 1

II. The Community Engagement Requirement For Medicaid Eligibility ........ 2

A. The Community Engagement Requirement Does Not Apply To Individuals Who Are "Medically Frail" ........ 2

B. Implementation Of The Community Engagement Requirement ........ 3

III. The Interim Final Rule ........ 3

A. Definition of "Medically Frail" ........ 4

B. Verification And Timing Procedures For Community Engagement ........ 6

IV. This Lawsuit And Plaintiffs' Motion For Partial Summary Judgment ........ 8

STANDARD OF REVIEW ........ 9

ARGUMENT ........ 9

I. The IFR Is Lawful, Reasonable, And Constitutional ........ 9

A. The IFR Is Not Contrary To Law ........ 9

B. The IFR Satisfies The APA's Requirement Of Reasoned Decision-Making ........ 15

C. The IFR Comports With The Spending Clause ........ 29

II. Regardless, Plaintiffs' Requests For Relief Are Not Appropriate Here ........ 31

A. Vacatur Is Not Appropriate Here ........ 31

B. No Injunction Is Appropriate Here ........ 33

CONCLUSION ........ 35

## TABLE OF AUTHORITIES

### CASES

*Arkansas Dep't of Health & Human Servs. v. Ahlborn,*
547 U.S. 268 (2006) ........ 1

*Baptist Healthcare of Okla. v. Kennedy,*
No. 23-cv-625, 2025 WL 2643608 (D.D.C. Sept. 15, 2025) ........ 14

*Bowman Transp., Inc. v. Ark.-Best Freight,*
418 U.S. 281 (1974) ........ 15

*Bos. Redevelopment Auth. v. Nat'l Park Serv.,*
838 F.3d 42 (1st Cir. 2016) ........ 9

*California by & through Becerra v. Azar,*
950 F.3d 1067 (D.C. Cir. 2020) (en banc) ........ 20

*Cent. Me. Power Co. v. F.E.R.C.,*
252 F.3d 34 (1st Cir. 2001) ........ 32

*Dep't of Commerce v. New York,*
588 U.S. 752 (2019) ........ 19

*Doe v. R.I. Interscholastic League,*
137 F.4th 34 (1st Cir. 2025) ........ 34

*eBay Inc. v. MercExchange, LLC,*
547 U.S. 388 (2006) ........ 32

*FCC v. Prometheus Radio Project,*
592 U.S. 414 (2021) ........ 15

*FERC v. Elec. Power Supply Ass'n,*
577 U.S. 260 (2016) ........ 25

*Hincapie-Zapata v. Attorney Gen.,*
977 F.3d 1197 (11th Cir. 2020) ........ 12

*Loper Bright Enters. v. Raimondo,*
603 U.S. 369 (2024) ........ 9, 10, 14

*Massachusetts v. E.P.A.,*
549 U.S. 497 ........ 13

*Medina v. Planned Parenthood S. Atl.*,
606 U.S. 357, (2025) .......... 30

*Michigan v. EPA*,
576 U.S. 743 (2015) .......... 9

*Milner v. Dep't of Navy*,
562 U.S. 562 (2011) .......... 14

*Mundell v. Acadia Hosp. Corp.*,
92 F.4th 1 (1st Cir. 2024) .......... 14

*Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*,
675 F. Supp. 3d 28 (D. Mass. 2023) .......... 9

*National Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) .......... 31

*NLRB v. SW Gen., Inc.*,
580 U.S. 288 (2017) .......... 14

*Pennhurst State Sch. & Hosp. v. Halderman*,
451 U.S. 1 (1981) .......... 31

*Public Interest Legal Found. v. Bellows*,
92 F.4th 36 (1st Cir. 2024) .......... 12

*Rhode Island Latino Arts v. Nat'l Endowment for the Arts*,
800 F. Supp. 3d 351 (D.R.I. 2025) .......... 9

*River St. Donuts, LLC v. Napolitano*,
558 F.3d 111 (1st Cir. 2009) .......... 15

*Safer Chems., Healthy Families v. E.P.A.*,
943 F.3d 397 (9th Cir. 2019) .......... 14

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985) .......... 14

*South Dakota v. Dole*,
483 U.S. 203 (1987) .......... 31

*Stillwell v. Office of Thrift Supervision*,
569 F.3d 514 (D.C. Cir. 2009) .......... 29

*Teles de Menezes v. Rubio*,
156 F.4th 1 (1st Cir. 2025) .......... 9

*Town of Weymouth v. Mass. Dep't of Envtl. Prot.*,
961 F.3d 34 (1st Cir. 2020), *on reh'g*, 973 F.3d 143 (1st Cir. 2020) .......... 32

*United States v. Texas*,
599 U.S. 670 (2023) .......... 32

*Washington v. U.S. Dep't of Hous. & Urban Dev.*,
171 F.4th 473 (1st Cir. 2026) .......... 9

**STATUTES**

5 U.S.C. § 553 .......... passim

5 U.S.C. § 702 .......... 32

5 U.S.C. § 703 .......... 32, 34

5 U.S.C. § 706 .......... 1, 9, 15, 32

15 U.S.C. § 2602(4) .......... 14

42 U.S.C. § 1315 .......... 2

42 U.S.C. § 1382c .......... 3

42 U.S.C. § 1396 et seq .......... 1

42 U.S.C. § 1396-1 .......... 29

42 U.S.C. § 1396a .......... passim

42 U.S.C. § 1396b .......... 1, 4

42 U.S.C. § 1396c .......... 2

42 U.S.C. § 1396u-7(a)(2)(B)(vi) .......... 4

Pub. L. No. 119-21, 139 Stat. 72, 306–14 (2025) .......... 2–3, 33

**REGULATIONS**

42 C.F.R. § 435.554 .......... 5–6, 8, 11

42 C.F.R. § 435.556 .......... 15

42 C.F.R. § 435.557 .......... 7–9, 17, 23–27

42 C.F.R. § 440.315 .......... 4, 21

**OTHER SOURCES**

91 Fed. Reg. 33,348 (June 3, 2026) (Medicaid Program; Community Engagement Requirement for Certain Individuals) .......... *passim*

Fed. R. Civ. P. 56(a) .......... 9

H.R. Rep. No. 119-106, at 620 (2025) .......... 14

Merriam-Webster, Frail .......... 10

## INTRODUCTION

Plaintiffs, a group of State governments, challenge the Centers for Medicare & Medicaid Services' ("CMS") implementation of a significant reform to the Medicaid program enacted by Congress in July 2025. *See* 42 U.S.C. § 1396a(xx). They allege that three aspects of an interim final rule promulgated at Congress's direction, *see* Medicaid Program; Community Engagement Requirement for Certain Individuals, 91 Fed. Reg. 33,348 (June 3, 2026) ("IFR"), violate the Administrative Procedure Act ("APA") as either contrary to law, arbitrary and capricious, or both. These challenges fail. Congress broadly delegated to the Secretary of Health and Human Services ("Secretary") the authority to define which individuals are to be excluded from the community engagement requirement on the grounds that they are "medically frail or otherwise have special medical needs," and to define the types of evidence states could use to verify eligibility for coverage. 42 U.S.C. § 1396a(xx)(5), (9)(A)(ii)(V). The Secretary's exercise of this delegated power through CMS is only subject to review for reasonableness pursuant to § 706(2)(A) of the Administrative Procedure Act ("APA"), and the IFR easily satisfies that deferential form of review. Consequently, the Court should deny Plaintiffs' motion for summary judgment, grant the Defendants' cross-motion, and enter judgment in Defendants' favor on all counts.

## BACKGROUND

### I. The Medicaid Program

Enacted in 1965, Medicaid is a cooperative federal-state program in which the Federal Government supplies funding to states to assist them in providing medical assistance to specified categories of low-income individuals. 42 U.S.C. §§ 1396 *et seq*. Each state that elects to participate must submit a plan for approval to the Secretary, who generally exercises his authority under the Medicaid statute through CMS. *Id*. §§ 1396, 1396a; *Arkansas Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006). If the plan is approved, the state receives Medicaid funds from the federal government for a percentage of the money spent by the state in providing covered medical care to eligible individuals. 42 U.S.C. § 1396b(a)(1). If state programs do not comply with the requirements of sections 1396 and 1396a, the Secretary can initiate proceedings to deny federal

financial participation (FFP) in whole or in part "until the Secretary is satisfied that there will no longer be any such failure to comply." 42 U.S.C. § 1396c.

## II. The Community Engagement Requirement For Medicaid Eligibility

On July 4, 2025, President Trump signed into law H.R. 1, known colloquially as the One Big Beautiful Bill Act, which CMS often refers to as the Working Families Tax Cut ("WFTC") legislation. Pub. L. No. 119-21, 139 Stat. 72. As relevant here, the WFTC legislation contains a "community engagement requirement for certain individuals" in order to be eligible for Medicaid. *Id.* at 306–14 (section 71119). Paragraph (1) of the statute, encoded at 42 U.S.C. § 1396a(xx), requires the states and D.C. to "provide, as a condition of eligibility for medical assistance for an applicable individual, that such individual is required to demonstrate community engagement." 42 U.S.C. § 1396a(xx)(1), (9)(C) (definition of "State"). "Applicable individuals" are those made eligible for Medicaid by the Affordable Care Act—generally speaking, nonpregnant adults ages 19–64 with income under 138 percent of the federal poverty level, a group often referred to as the Medicaid "expansion population."[2] Paragraph (2) defines the community engagement requirement that must be met for at least one month prior to enrollment and during a review period. The requirement can be met in many ways, including part-time work, community service, or participation in a work or educational program. *Id.* § 1396a(xx)(2).

### A. The Community Engagement Requirement Does Not Apply To Individuals Who Are "Medically Frail"

Paragraph (9) of § 1396a(xx) includes definitions used throughout the community engagement statute. The statute defines "applicable individuals," as used in paragraph (1) and throughout the statute, both in terms of affirmative requirements and by carving out "specified excluded individuals" to whom the community engagement requirement does not apply. *Id.* § 1396a(xx)(9)(A)(i). "Specified excluded individual" means "an individual, as determined by the

[2] "Applicable individuals" also include those eligible for or enrolled in a demonstration project under 42 U.S.C. § 1315 that provides coverage that meets minimum essential coverage requirements and who are ages 19–64, not pregnant, and not entitled to or enrolled in Medicare Part A or B, and who are not otherwise eligible to enroll in Medicaid under the state plan.

State (in accordance with standards specified by the Secretary)," who falls in certain categories, including pregnant and postpartum women, inmates at public institutions, participants in certain treatment programs for drug addiction or alcoholism, disabled veterans, certain caregivers, and members of Indian tribes. *Id.* § 1396a(xx)(9)(A)(ii)(II), (III), (IV), (VII), (VIII), (IX).

"Specified excluded individual" also includes someone

> (V) who is medically frail or otherwise has special medical needs (as defined by the Secretary), including an individual—
> (aa) who is blind or disabled (as defined in [42 U.S.C. §] 1382c);
> (bb) with a substance use disorder;
> (cc) with a disabling mental disorder;
> (dd) with a physical, intellectual or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living; or
> (ee) with a serious or complex medical condition.

*Id.* § 1396a(xx)(9)(A)(ii)(V). No other category of "specified excluded individual" contains the parenthetical "as defined by the Secretary" that modifies the phrase "medically frail or otherwise has special medical needs" in subclause (V).

### B. Implementation Of The Community Engagement Requirement

Ordinarily, rules must be "published in the Federal Register" for public comment "through submission of written data, views, or arguments[.]" 5 U.S.C. § 553(b), (c). But these requirements do not apply to CMS's implementation of the community engagement requirement. Section 71119(d) of the WFTC legislation directed CMS to "promulgate an interim final rule for purposes of implementing the provisions of, and the amendments made by, this section," such that notice and comment was not required to issue a legally effective rule. 139 Stat. at 314. It further states that "[a]ny action taken to implement the provisions of, and the amendments made by, [§ 71119], shall not be subject to the provisions of [§ 553]." *Id.*

## III. The Interim Final Rule

Congress directed CMS and the states to implement the community engagement requirement no later than January 1, 2027. *See* 42 U.S.C. § 1396a(xx)(1). To meet this deadline, Congress directed CMS to "promulgate an interim final rule for purposes of implementing the provisions of, and the amendments made by," the WFTC legislation by June 1, 2026. 139 Stat. at

314, § 71119(d). CMS did so, making an interim final rule available for inspection on June 1 that appeared in the Federal Register on June 3.[3]

**A. Definition of "Medically Frail"**

Prior to the WFTC legislation, states were required to provide coverage to a significant subset of individuals subject to the community engagement requirement (*i.e.*, individuals eligible for or enrolled in the adult expansion population at 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII)) through an alternative benefit plan, or ABP. *See generally* 42 U.S.C. §§ 1396a(k)(1), 1396b(i)(26), 1396d(y). *See* 91 Fed. Reg. at 33,372–77. The ABP statute and its implementing regulations provide protections related to enrollment in ABPs for those who are "medically frail or otherwise an individual with special medical needs (as identified in accordance with regulations of the Secretary)." *Id.* § 1396u-7(a)(2)(B)(vi).

The relevant regulation created to implement § 1396u-7(a)(2)(B)(vi), 42 C.F.R. § 440.315, limits a state's ability to define "medically frail or an individual with special needs" as follows:

> For these purposes, the State's definition of individuals who are medically frail or otherwise have special medical needs must at least include [certain individuals under the age of 19], individuals with disabling mental disorders (including children with serious emotional disturbances and adults with serious mental illness), individuals with chronic substance use disorders, individuals with serious and complex medical conditions, individuals with a physical, intellectual or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living, or individuals with a disability determination based on Social Security criteria or in States that apply more restrictive criteria than the Supplemental Security Income program, the State plan criteria.

42 C.F.R. § 440.315(f).

Although the language of this regulation has surface similarities to § 1396a(xx)(9)(A)(ii)(V), there are no explicit references to § 1396u-7(a)(2)(B)(vi) or to its corresponding regulation in the text of the WFTC legislation. While § 440.315(f) authorizes states to add categories of "medically frail" persons, subclause (V) empowers CMS to "define" the

[3] The Secretary signed the IFR, *see* 91 Fed. Reg. at 33,482, and references to him and CMS herein are generally used interchangeably since, as noted above, the Secretary administers Medicaid through CMS.

phrase. The text of the subclause deviates from § 440.315(f) in numerous ways. For example, item (bb) removes the limitation that "substance use disorders" be "chronic" found in the ABP regulation, and the catch-all provision of item (ee) was rewritten to clarify it applies to "a serious *or* complex medical condition" (emphasis added). As such, CMS exercised its definitional authority to create "a separate but similar definition of medically frail for community engagement purposes" rather than adopting the definition used for ABPs verbatim. 91 Fed. Reg. at 33,373.

In considering how to exercise its discretion, CMS did "not identif[y] any other populations that we believe could reasonably be considered medically frail outside of the five categories identified" in the statute. *Id.* It also expressed concern "that there may be more of an incentive for some states to include individuals who would not reasonably be considered medically frail." *Id.* As such, the new "community engagement" rules define "medically frail or otherwise has special needs" to reflect the "distinct[ions]" between the community engagement requirement and the restrictions on ABPs, in two ways. *Id.* at 33,372.

First, the IFR limits the exclusion to individuals whose "physical, mental, or other behavioral health condition significantly impairs the individual's ability to comply with the community engagement requirement," regardless of which subpart the individual falls under. 42 C.F.R. § 435.554(c)(5)(i). CMS concluded that "[t]he best reading of the statutory phrase 'medically frail or otherwise has special medical needs' is one that considers not only the presence of a particular diagnosis or condition, but also the extent to which the condition impairs an individual's ability to engage in community engagement activities (including but not limited to work)." 91 Fed. Reg. at 33,373. Congress authorized CMS to exercise reasoned discretion in defining "medically frail or otherwise has special medical needs" two times over: in § 1396a(xx)(9)(A)(ii), which authorizes CMS to set "standards" by which states determine which individuals are excluded; and in subclause (V) by reinforcing CMS's ability to "define[]" "who is medically frail or otherwise has special medical needs" for purposes of the exclusion. And for all the reasons set out in the IFR, it was reasonable for CMS to clarify that individuals who, despite

their condition, are not significantly impaired from meeting the community engagement requirement should not be excluded from compliance with this requirement.

Second, the IFR further refines the statutory definitions of two of the five categories of "medically frail or otherwise has special medical needs." CMS excluded individuals in "stable recovery" from a substance use disorder from claiming "medical frailty" status, "since their SUDs are unlikely to significantly impair their ability to comply with the community engagement requirement." 91 Fed. Reg. at 33,374. And it defined the conditions that could be considered a "serious or complex medical condition" by relying on a report the Institute of Medicine (now the National Academy of Medicine) prepared in response to a request from the Health Care Financing Administration (now CMS). That report proposed a nuanced definition of what it means for a medical condition to be "serious and complex," and acknowledged that the determination may be dynamic, as "conditions may be serious and complex at some points during [a patient's] disease or disability," but may not be "serious and complex for all patients at all times." *Id.* at 33,375–76 & n.74. The IFR provides a list of conditions that the agency "believe[d] it would be reasonable for States to consider . . . serious or complex, when such conditions significantly impair an individual's ability to comply with the community engagement requirement," as well as conditions that would typically not qualify. *Id.* at 33,376. Nonetheless, CMS did not provide an "exhaustive list" of conditions, giving room for the states to implement the exclusion with fidelity to the regulation and statute. *Id.* The IFR charges the states with developing "a list of diseases, diagnoses, disorders, or other health conditions to identify individuals" who may meet the definition of "medically frail or otherwise has special medical needs." 42 C.F.R. § 435.554(c)(5)(ii). It also mandates that states create "reasonable processes and criteria" for individuals "to request consideration for the exclusion" if they believe they qualify but do not meet the standard criteria. *Id.* § 435.554(c)(5)(ii)(C).

**B. Verification And Timing Procedures For Community Engagement**

The other IFR provisions relevant to the parties' dispute concern information states may use to verify an individual's compliance with, or exception or exclusion from, the community

engagement requirement. Section 1396a(xx)(5) creates a norm of "*ex parte* verifications"—*i.e.*, verifications that do not "require[e] . . . the applicable individual to submit additional information"—in order to reduce burdens on individuals. It instructs states, "in accordance with standards established by the Secretary," to "establish processes and use reliable information available to the State . . . without requiring, where possible, the applicable individual to submit additional information." 42 U.S.C. § 1396a(xx)(5).

The IFR provides an extensive definition of what sort of information is "reliable" for *ex parte* verification purposes, with eight illustrative examples of "reliable" sources. 42 C.F.R. § 435.557(a)(i)–(viii). Two of those sources, "claim(s) relevant to the individual that have been adjudicated" and "encounter data," include only information from "the preceding 12 months." *Id.* § 435.557(a)(vii)–(viii). With respect to the "medical frailty" exclusion, the IFR provides further direction. states are to "attempt to verify that an individual is a specified excluded individual" on medical frailty grounds by "using reliable information available to the State, including claim(s) relevant to the individual that have been adjudicated in the preceding 12 months." *Id.* § 435.557(f)(1). Although this definition is intended to be inclusive, the IFR explains elsewhere that claims data older than a year should be excluded when verifying "medical frailty" "because older information may not reflect the individual's current condition." 91 Fed. Reg. at 33,405. But the IFR allows states to look to other forms of reliable information to determine "medical frailty."

Moreover, the absence of data appropriate for *ex parte* verification does not mean an individual will not be classified as "medically frail." States are directed to establish procedures to gather additional information from the individual for purposes of determining whether or not they are "medically frail." *Id.* § 435.557(f)(1); 91 Fed. Reg. at 33,406. These procedures allow states to determine someone is medically frail through a statement or other documentation provided to the state under penalty of perjury, with the goal of eventually transitioning to *ex parte* verification through claims data once the individual begins to receive Medicaid-covered services. 91 Fed. Reg. at 33,406. Beginning in 2028, states may accept these alternate forms of proof only once during a

period of enrollment when there is otherwise no reliable data for states to rely upon as to an enrollee's condition. 42 C.F.R. § 435.557(f)(1)(ii).

## IV. This Lawsuit And Plaintiffs' Motion For Partial Summary Judgment

Plaintiffs filed the complaint on June 29, 2026, ECF No. 1 ("Compl.") along with a motion for a preliminary injunction. ECF No. 3. The Complaint made three types of challenges to the IFR, two of which arise under the APA and the third under the Constitution: a contrary to law claim (Count I), an arbitrary and capricious claim (Count II), and a Spending Clause claim (Count III). After briefing and a hearing, the Court denied the motion. *See* ECF No. 94. The Court then ordered the parties to "submit a proposed summary judgment briefing schedule[.]" ECF No. 95. In their brief, Plaintiffs "seek judgment only as to Counts I and II of their Complaint" and purport to "reserve the right to pursue Count III." Pls.' Br. at 7 n.2. Plaintiffs also appear to narrow their arguments under Counts I & II of the Complaint to omit reference to their "challenge[ to] CMS's rules regarding short-term hardship exceptions, see Complaint ¶¶ 213, 220(e)." Pls.' Br. at 6 n.1.

As to Count I, Plaintiffs press a single argument. Namely, they allege the IFR improperly limited the medical frailty exclusion, 42 U.S.C. § 1396a(xx)(9)(A)(ii)(V), to include only individuals whose condition "significantly impairs the[ir] . . . ability to comply with the community engagement requirement." Compl. ¶ 212 (emphasis omitted) (citing 42 C.F.R. § 435.554(c)(5)(i)); *see also* Pls.' Br. at 7–17. As to Count II, Plaintiffs aver that three provisions of the IFR are arbitrary and capricious. Pls.' Br. at 17–28. These arguments target the "medical frailty" definition already discussed; a provision instructing states to rely on claims and encounter data that are up to 12 months old in order to complete mandatory verifications, *see* 42 C.F.R. § 435.557(a)(vii) & (viii), (f), and a provision allowing states, starting on January 1, 2028, to rely on self-attestations to verify medically frail status once per beneficiary per period of enrollment to complete mandatory verifications, *see* 42 C.F.R. § 435.557(f)(1)(ii). Pls.' Br. at 17–28; *see also* Compl. ¶¶ 220.a, 220.c, & 220.d. Plaintiffs ask the Court to vacate these three provisions, permanently enjoin CMS from enforcing them against Plaintiffs, and enjoin CMS from penalizing Plaintiffs for any delays in complying with the IFR for six months. Pls.' Br. at 28–30.

## STANDARD OF REVIEW

Ordinarily, summary judgment is properly granted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, when agency action is challenged under the APA, "'a motion for summary judgment is simply a vehicle to tee up a case for judicial review and, thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains but, rather, to determine whether the agency action' violates the APA." *Rhode Island Latino Arts v. Nat'l Endowment for the Arts*, 800 F. Supp. 3d 351, 361 (D.R.I. 2025) (quoting *Bos. Redevelopment Auth. v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016)); *accord, e.g.*, *Nantucket Residents Against Turbines v. U.S. Bureau of Ocean Energy Mgmt.*, 675 F. Supp. 3d 28, 52 (D. Mass. 2023).

## ARGUMENT

### I. The IFR Is Lawful, Reasonable, And Constitutional

#### A. The IFR Is Not Contrary To Law

Plaintiffs challenge the IFR's definition of "medically frail or otherwise has special medical needs" as "contrary to law." *See* 5 U.S.C. § 706(2)(C). "As usual, when tasked with interpreting a statute, we 'must start with the text of the statute itself,' aiming as best we can 'to effectuate congressional intent.'" *Washington v. U.S. Dep't of Hous. & Urban Dev.*, 171 F.4th 473, 490 (1st Cir. 2026) (quoting *Teles de Menezes v. Rubio*, 156 F.4th 1, 12 (1st Cir. 2025)). "In a case involving an agency . . . the statute's meaning may well be that the agency is authorized to exercise a degree of discretion" in implementation. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394 (2024). "When the best reading of a statute is that it delegates discretionary authority to an agency, the role of the reviewing court" is to "recognize" the delegation and affirm the agency action if it falls within the bounds of the delegation. *Id.* at 394–95. The task of "ensuring the agency has engaged in 'reasoned decisionmaking' within those boundaries" is reserved for "arbitrary and capricious" review. *Id.* (quoting *Michigan v. EPA*, 576 U.S. 743, 750 (2015)).

This case is squarely governed by Congress's delegations to Secretary, which he exercised through CMS's promulgation of the IFR. Section 1396a(xx) does not say what it means for

someone to be "medically frail or otherwise have special medical needs"; what it means to have a "substance use disorder"; what makes a "mental disorder" "disabling" or not; how much impairment of an activity of daily living is "significant"; or what a "serious or complex medical condition" is. And Congress "appreciated the meaning of the[se] statutory term[s]" might not be "self-evident." *Batterton v. Francis*, 432 U.S. 416, 428 (1977) (concluding statute that directed states to determine whether a parent was "unemployed" "in accordance with standards prescribed by the Secretary" gave "the Secretary . . . the primary responsibility for interpreting the statutory term") (cited in *Loper Bright*, 603 U.S. at 394). It therefore empowered CMS to "specif[y]" the "standards" by which states "determine[]" whether an individual meets one of the categories of "specified excluded individual" for purposes of the community engagement requirement. 42 U.S.C. § 1396a(xx)(9)(A)(ii). And with respect to the "medically frail" exclusion, Congress went a step further: it expressly delegated authority to define that term of art to the Secretary and, by extension, to CMS. 42 U.S.C. § 1396a(xx)(9)(ii)(V).

CMS exercised its delegated authority to conclude that "the best reading of the statutory phrase 'medically frail or otherwise has special medical needs' is one that considers not only the presence of a particular diagnosis or condition, but also the extent to which the condition impairs an individual's ability to engage in community engagement activities." 91 Fed. Reg. at 33,373. "Frail," after all, means "easily broken or destroyed," or "physically weak." Merriam-Webster, *Frail*, https://www.merriam-webster.com/dictionary/frail (last accessed Sept. 17, 2026). An interpretation of this term of art that did not consider functional impairment would result in persons with a substance use disorder related to nicotine, or individuals with a well-controlled but "serious" condition such as asthma or diabetes, being completely excused from the community engagement requirement. CMS's reading not only falls within Congress's delegation of authority to CMS; it also reflects the best reading of this text by avoiding these counterintuitive results.

Of course, Congress's instructions to "include" five discrete categories of individuals within the definition of this term circumscribes CMS's definitional authority to a degree. CMS could not, for instance, deny the exclusion to everyone with a "substance use disorder," since the

definition "includ[es]" such persons. 42 U.S.C. §1396a(xx)(9)(A)(ii)(V)(bb). But setting limits on these categories is perfectly consistent with the statute's instructions. As a matter of plain meaning, to say that a defined term of art must "include" a category does not mean that it must include every possible object within that category, no matter how inconsistent that object is with the text and context of the statute as a whole. Take Plaintiffs' analogy, in their brief, to grocery shopping. Pls.' Br. at 10. If one spouse asks another to "get whatever we need from the grocery store, including milk and eggs," as Plaintiffs posit, the spouse doing the shopping should not omit eggs and milk entirely. But no one would understand the instruction to mean he is to buy *all* the eggs and milk or even *every kind* of milk and eggs on offer. Rather, the instruction is best understood as a call to exercise reasoned judgment as to what to purchase, such as two dozen brown, pasture-raised chicken eggs and a gallon of organic whole cow's milk. That understanding would be correct even in the absence of an explicit delegation to the spouse to determine "need," a point Plaintiffs' hypothetical elides. But Congress went one step further than the spouse in Plaintiffs' hypothetical by explicitly delegating definitional authority to the Secretary and, by extension, CMS.

Following that instruction, CMS limited the scope of the five items under subclause (V) in two ways: by circumscribing what it means to have a "substance use disorder" or a "serious or complex medical condition," and by requiring that applicants and beneficiaries have a condition that "significantly impair[s] [their] ability to comply with the community engagement requirement," regardless of which item their condition falls under. 42 C.F.R. § 435.554(b)(V)(i). Not even Plaintiffs challenge this first category of definitional limits on the items under subclause (V). They attempt to sidestep this hole in their argument by arguing that the "Significant Impairment Provision that Plaintiffs challenge is not part of CMS's definition of the statutory sub-categories," and they are not challenging the sub-categories. Pls.' Br. at 16. But both sets of limitations circumscribe the scope of the items under subclause (V), and Plaintiffs' inability to identify a principled difference between the two demonstrates that their interpretation is untenable before one even reaches their affirmative arguments.

Turning to those arguments, Plaintiffs contend that the five items found under subclause (V) are a "floor" for the "medically frail" exclusion because they are to be "include[ed]" in the term, and that CMS is not authorized to further interpret or define the language describing those categories. Pls.' Br. at 9. That crabbed reading of the statute would only leave CMS with a limited authority to add further "medically frail" categories to the five items found under subclause (V). It would result in CMS having *less* discretion over subclause (V) than over the other community engagement exclusions that CMS was not expressly authorized to define. That result cannot be squared with the plain meaning of the text or Congress's delegations of interpretive authority.

Plaintiffs try to make this interpretive edifice stand entirely on the word "including," but they make the term bear more weight than it can carry. They cite a number of cases interpreting the term, *see* Pls.' Br. at 9–11, but no statute discussed in these cases pairs the word "including" with an express grant of definitional authority to an agency, much less suggests that the agency lacks authority to give meaning to broad categories in an open-ended list like the one at issue here. For instance, in *Public Interest Legal Foundation v. Bellows*, 92 F.4th 36, 48 (1st Cir. 2024), although the First Circuit acknowledged that "[t]he word 'includes' is usually a term of enlargement," the case did not deal with a statute pairing "including" with an express grant of definitional authority. Rather, it found the phrase "shall include" to be "by no means exhaustive," such that what follows those words does not close off the possibility that other categories beyond those specifically listed may also be part of the definition. *Id.* As one of Plaintiffs' cited authorities explains, "the use of 'including' does not always mean that 'anything that *follows*' it 'must necessarily be a subset of whatever *precedes* it," such as when "the listed examples 'are broader than the general category' and need to be 'limited in [the] light of that category.'" *Hincapie-Zapata v. Attorney Gen.*, 977 F.3d 1197, 1200–02 (11th Cir. 2020) (quoting *Massachusetts v. E.P.A.*, 549 U.S. 497, 556–57 (2007) (Scalia, J., dissenting)) (alteration in original).

Plaintiffs make other arguments geared at narrowing Congress's categorical delegation of authority to CMS to define "medically frail or otherwise has special medical needs," but none has merit. They first argue that the term should be limited to the meaning given it in the ABP context.

But as discussed, *see supra* Background § III.A., although Congress may have borrowed language from the ABP framework, it did not expressly incorporate the ABP standards by reference into the medical frailty context, or expressly direct CMS to use the ABP definition. Instead, it delegated to CMS the authority to further define the term, and modified the ABP definition in several material ways. CMS was authorized to deviate from the ABP definition by imposing the "substantial impairment" limitation on the five items following subclause (V).

Plaintiffs rely on a grab-bag of other arguments in favor of their construction of the statutory text: the *exclusio unius* interpretive canon, a purported "[s]ubstantive canon" of interpretation that counsels a "liberal[]" interpretation of the Social Security Act, and recourse to legislative history. Pls.' Br. at 11–15. None has merit.

The canon of *expressio unius est exclusio alterius* provides that the express mention of a thing in one place implies its exclusion in others. The argument fails here because the necessary express reference is missing. None of the items in subclause (V) contain the precise requirement that individuals in the categories described therein must be significantly impaired from complying with the community engagement requirement, as the IFR imposes, such that one could draw the inference that the other items should not be read to impose that precise requirement. Besides, CMS was delegated the authority to interpret the statute, and it was not unlawful for them to impose an overarching and distinctive functional requirement for medical frailty, even though some of the items in subclause (V) already contain a different type of functional requirement.

The "liberal" construction canon purportedly applicable to the Social Security Act fares no better. No such rule of construction exists in the text of the community engagement statute or the Social Security Act. And even if it did, it would "only serves as an aid for resolving an ambiguity; it is not to be used to beget one." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 492 n.10 (1985). No principle of liberal construction can overcome Congress's explicit delegations to the Secretary.

Likewise, legislative history is "meant to clear up ambiguity, not create it." *Mundell v. Acadia Hosp. Corp.*, 92 F.4th 1, 22 (1st Cir. 2024) (quoting *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011)). Section 1396a(xx)(9)(A)(ii)(V) unambiguously accords CMS the power to define

"medically frail or otherwise has special medical needs," as explained above. Thus, no ambiguity needs clearing up here. The committee report cited does not pass on CMS's statutory authority to define the phrase "medically frail or otherwise has special medical needs." *See* H.R. Rep. No. 119-106, at 620 (2025). Statements by individual lawmakers, *see* Pls.' Br. at 14 (citing statements by a single U.S. representative and three U.S. senators), are similarly unhelpful. *See NLRB v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017) ("[F]loor statements by individual legislators rank among the least illuminating forms of legislative history.").

Finally, Plaintiffs are also wrong to understand the items under subclause (V) as imposing a constraint on its ability to draw reasonable boundaries around the five items that fall within subclause (V). Pls.' Br. 15–16. CMS has not read items (aa)–(ee) out of § 1396a(xx)(9)(A)(ii)(V). Rather, it has simply placed limits on those categories, as Congress authorized it to do. *Safer Chemicals, Healthy Families v. E.P.A.*, 943 F.3d 397 (9th Cir. 2019), is not to the contrary. There, Ninth Circuit was tasked with interpreting a statute that defined the term "conditions of use" to mean: "the circumstances, as determined by the Administrator, under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of." *Safer Chems.*, 943 F.3d at 422–23 (quoting 15 U.S.C. § 2602(4)). EPA erred, in the Ninth Circuit's judgment, because it attempted to define what uses were, and were not, covered by the statute, when its delegation was limited to determining the "conditions" of use. By contrast, Congress "'expressly delegate[d]' to the Secretary 'the authority to give meaning to'" the term of art at issue here, without limitation. *Baptist Healthcare of Okla. v. Kennedy*, No. 23-cv-625, 2025 WL 2643608, at *11 (D.D.C. Sept. 15, 2025) (interpreting the phrase "as defined by the Secretary") (quoting *Loper Bright*, 630 U.S. at 394–94).

For these reasons, the best reading of § 1396a(xx)(9)(A)(ii)(V) gives CMS the authority to define what it means to be "medically frail," and CMS acted within its statutory boundaries when it linked medical frailty determinations with functional ability to meet the community engagement requirement. Plaintiffs' contention that this choice was contrary to law should be rejected.

### B. The IFR Satisfies The APA's Requirement Of Reasoned Decision-Making

Plaintiffs' arbitrary and capricious claim[4] pursuant to 5 U.S.C. § 706(2)(A) also fails. "[R]eview under [this] standard is deferential," requiring a "court simply [to] ensure[] that the agency has acted within a zone of reasonableness and … reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021); *see also River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009) (agency actions are presumed to be valid under arbitrary and capricious review). Such deference is especially apt here. When Congress enacted the WFTC legislation, it directed CMS to issue an interim final rule no later than June 1, 2026, in light of a January 1, 2027 implementation date for § 1396a(xx), and exempted CMS from compliance with standard notice-and-comment rulemaking procedures. The Court should be mindful of these limits on CMS's rulemaking process in applying the "narrow" arbitrary and capricious standard, which requires courts to affirm decisions of even "less than ideal clarity if the agency's path may reasonably be discerned" from the record. *Bowman Transp., Inc. v. Ark.-Best Freight*, 418 U.S. 281, 286 (1974) (reversing conclusions of district court that an ICC order was arbitrary and capricious).

#### 1. CMS Appropriately Explained The Grounds For The "Medically Frail" Standard

Plaintiffs raise at least four bases for concluding the "medically frail" definition is arbitrary and capricious. Pls.' Br. at 17–24. None has merit.

First, Plaintiffs argue CMS's explanation for its definition is "circular" and "essentially say[s] that reading the statu[t]e without CMS's requirement risks sweeping in individuals who do not meet CMS's requirement." *Id.* at 18. This fails to fairly state the concerns that led CMS to its definition. CMS explained that "automatic classification as medically frail or otherwise having special medical needs based solely on diagnosis or condition would risk sweeping in individuals

[4] Aside from the arguments discussed in their opening brief, as narrowed therein, Plaintiffs also initially challenged as arbitrary and capricious a provision and preamble language that they alleged imposed "[u]nreasonable time limits on the renewal process," Compl. ¶ 220.2, 221 (citing 42 C.F.R. § 435.556(a)(2)(i) and 91 Fed. Reg. at 33,411–12), but they do not press that argument in their opening brief. The argument is therefore waived.

whose conditions do not significantly impair their functional capacity." 91 Fed. Reg. 33,373. As discussed above, Plaintiffs' "subclause (V) is a floor" interpretation of the statute would render CMS powerless to deem any individual outside the "medically frail" exclusion if that individual had a diagnosis that satisfied one of the items under subclause (V) on its face. CMS properly rejected that construction, which had the potential to classify as "medically frail" many individuals even if they are able to engage with their communities on at least a part-time basis. Instead, relying on its delegated authority from Congress, it reasoned that "[t]he phrase 'medically frail or who otherwise has special medical needs' connotes diminished functional capacity that significantly impairs an individual's ability to meet ordinary demands. In this context, the relevant demand is meeting the community engagement requirement." 91 Fed. Reg. 33,373. And, later in the preamble, it explained "that if individuals with a serious or complex medical condition do not have significantly impaired ability to comply with the community engagement requirement[,] participating in community engagement activities, such as employment, could potentially help them escape isolation and dependency, build confidence, achieve self-sufficiency and prosperity, and improve health." *Id.* at 33,376. As a result, CMS interpreted "the statutory phrase 'medically frail or otherwise has special medical needs' [to be] one that considers not only the presence of a particular diagnosis or condition, but also the extent to which the condition impairs an individual's ability to engage in community engagement activities[.]" *Id.* at 33,373. These statements, which Plaintiffs fail to acknowledge, do not assume a conclusion. Rather, they offer premises supporting CMS's conclusion that, in this context, it was reasonable to define medical frailty in functional terms.

This approach is also consistent with feedback CMS received while it was developing the IFR. *See, e.g.*, AR 3804 (advocating for "a functional analysis" rather than "rely[ing] on a simple list of conditions to determine medically frail status"); 3885 (noting that "the employment rate for working age people with disabilities [is] []37.4%," indicating that some individuals who might fit into one of the subcategories of § 1396a(xx)(9)(A)(ii)(V) can demonstrate community engagement); 4038 (arguing that "medically frail" and "special medical needs" "[s]hould cover

anyone whose health or functional limitations *interfere with meeting requirements*" (emphasis added)); 4802 (arguing "[c]lear guidance from CMS can help states both identify individuals who should be exempt due to significant functional impairments and support those who are able to participate in community engagement activities"). It is also consistent with "draft state work requirements policies that [would have] require[d] an individual who falls within one or more of the five listed categories to show that they are also unable to work," AR 4001, although it stops short of requiring a showing of inability to work in favor of a significant impairment standard. *See also* AR 3985 (describing a South Dakota Medicaid waiver that defined "Medically frail individuals" as "individuals *unable to work* due to cancer or other serious or terminal illness" (emphasis added)). And it is also consistent with medical frailty logic proposed by a healthcare technology company that would base medical frailty determinations on the presence of a "medical condition or disorder," an "indicator of frailty," and an "active pharmaceutical treatment," not simply "[t]he presence of a single diagnosis or procedure code[.]" AR 4417 (emphasis omitted). Plaintiffs may not agree with CMS's explanation for its preferred approach, but they cannot legitimately claim that it was unexplained or unsupported by record evidence.

Second, Plaintiffs argue CMS had to consider how the IFR's definition of medically frail would affect "the ability of medically vulnerable Medicaid members to obtain necessary treatment for their complex medical conditions." Pls.' Br. at 18–20. In assessing this argument, the overall goals of the IFR must be kept in view. The IFR gives beneficiaries an initial opportunity to confirm that they satisfy the "medical frailty" standard through self-attestation. 42 C.F.R. § 435.557(f)(1)(i)–(ii). The goal of limiting self-attestation is to "motivate individuals to access care." 91 Fed. Reg. 33,406. "[A]ccess[ing] appropriate services for which they are entitled to coverage" is in "beneficiaries' best interest and may lower future, downstream costs to Medicaid that could result from delaying receipt of necessary care." *Id.* And once coverage (and claiming) begins, the states will have reliable claims data at hand that will enable them to "reverify [the individual's] continued qualification for the medical frailty exclusion (as applicable) on an ex parte basis using information contained in State systems." *Id.*at 33,407. And for those whose conditions

improve with treatment, the community engagement requirement serves as motivation to "escape isolation and dependency." *Id.*at 33,374.

Verification requirements are a necessary adjunct of this system and everyone agrees they are not costless, but CMS appropriately weighed those costs. 91 Fed. Reg. at 33,459–60. CMS included the impact of state agencies being unable to verify an individual's medical frailty status *ex parte* both in the context of burdens on the beneficiaries and the potential for procedural disenrollments. 91 Fed. Reg. at 33,434, 33,457–60. Plaintiffs insist CMS had to go even further by separately analyzing the impact of the "substantial impairment" test and assessing its effect separate from the effects of the IFR itself, Pls.' Br. at 19, but they point to no case or other source of law that required CMS to break down which portion of the total projected disenrollment was attributable to each part of the IFR and explain why those increases are justified. Such a demand would not be consistent with the deferential standards for arbitrary and capricious review, which merely ensures "the agency has acted within a zone of reasonableness." *Prometheus*, 592 U.S. at 423. CMS satisfied the APA's demands by assessing the costs and benefits of its implementation of the community engagement requirement.

Plaintiffs contend that in light of evidence in the record that "the Work Requirement generally, and the Challenged Provisions specifically," would likely lead to some individuals losing benefits, "CMS was required to explain how the choice to promulgate the Challenged Provisions . . . carried a countervailing benefit." Pls.' Br. 19–20. CMS identified the benefit of the definition it chose, as noted above. 91 Fed. Reg. at 33,376. As to the downsides of that choice, Congress made 5 U.S.C. § 553 inapplicable to this rulemaking, and it was not unlawful for CMS to choose not to explicitly address every scrap of evidence that was sent, unsolicited, to CMS in the run-up to the IFR's issuance. Moreover, as Plaintiffs acknowledge, the "administrative burdens" that concern them arise substantially from "the Work Requirement generally" which requires all beneficiaries to demonstrate "community engagement." Pls.' Br. 21. Congress imposed these requirements, not CMS. And CMS explained that the "substantial impairment" limitation

was necessary to ensure that Congress's goals in enacting the statute were met. That weighing of competing values is sufficient for purposes of the APA.

Plaintiffs also fault CMS for underestimating the level of disenrollment the medical frailty definition will cause. Pls.' Br. at 19 n.8 (citing studies). CMS was not obliged to explicitly differentiate these studies, but none of them renders the IFR arbitrary and capricious. One of the studies, *see* ECF No. 106-71, is extra-record evidence dated July 2026 (after the IFR) that is not appropriately considered in this APA case, *see Dep't of Commerce v. New York*, 588 U.S. 752, 780 (2019) ("[I]n reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record."). The other study is outside the administrative record and its authors conceded that "[s]ignificant uncertainty surrounds states' implementation of the [Medicaid] community engagement requirements in section 71119" because its estimates of the impact of those requirements were based on the experience of just two states that adopted materially different community engagement requirements from the one Congress enacted, ECF No. 106-70 at 7–8 ("CBO Report"). As the CBO Report admits, "[t]o the extent that those states do not represent any practices that will be adopted by other states, the number of people losing Medicaid could be higher *or lower* than estimated." *Id.* at 8 (emphasis added). Plaintiffs may not agree with CMS's decision not to rely on these state programs as benchmarks in its own estimates of disenrollments, but CMS acknowledged these experiences and explained why it was not relying on them, which is all that the APA requires. 91 Fed. Reg. 33,456.

In the same vein, amici argue that CMS ignored other things it should have considered in developing the IFR, namely harms to the entire healthcare system specifically stemming from the challenged IFR provisions and evidence indicating the IFR's definition of medical frailty would tend to reduce workforce participation rather than increasing it. ECF No. 113 at 16–21. These criticisms also miss the mark. On the first point, the harms amici focus on are increases in uncompensated care costs and speculation about the impact of those increases. *Id.* at 16–18. But those costs are downstream from decreases in Medicaid enrollment that, as noted, CMS explicitly weighed in promulgating the IFR. Amici do not explain why CMS was separately bound to

consider these downstream effects in the IFR; the central issue is disenrollment, and CMS has adequately grappled with that central issue. Moreover, CMS did consider costs associated with uncompensated care in the IFR. *See* 91 Fed. Reg. at 33,468 (Table 47: Accounting Statement; factoring into the government effects subtotals transfers from the federal and state governments to "beneficiaries and relevant entities," including "State or local jurisdictions that reimburse providers for otherwise-uncompensated care"). As for evidence regarding how the IFR's definition of medical frailty would impact workforce participation, amici admit that CMS relied on evidence supporting its predictive judgment that the IFR on the whole would tend to increase workforce participation. ECF No. 113 at 20 (citing 91 Fed. Reg. at 33,451). And they premise this argument on the faulty and unexplained assumption that the IFR would "remov[e] . . . Medicaid coverage" from "many individuals with serious health conditions [who] are already working," ECF No. 113 at 20, even though such individuals would, by the very description amici offer, likely satisfy the community engagement requirement. And to the extent that amici are referring to procedural disenrollment, that issue is one CMS has clearly grappled with here. *See* 91 Fed Reg. 33,460.

Plaintiffs' other points in service of this argument fare no better. They cite 42 U.S.C. § 18114(1) for support, Pls.' Br. at 19, but the IFR's definition of medically frail "does not implicate § [18114]" because that definition "places no substantive barrier on individuals' ability to obtain appropriate medical care or on doctors' ability to communicate with clients or engage in activity within a [government grant] project[.]" *California by & through Becerra v. Azar*, 950 F.3d 1067, 1095 (D.C. Cir. 2020) (en banc). Any effect that definition has on someone's ability to access medical care is ancillary and downstream of its direct effects on Medicaid coverage and thus is not the type of a "barrier" to anyone "obtaining appropriate medical care" that § 18114(1) references.

Third, Plaintiffs argue that CMS failed to consider the administrative burden states faced in implementing the IFR's definition of medical frailty, relying for support in particular on (1) informal presentations CMS shared with states that tentatively took a different approach to medical frailty than the IFR eventually did, ECF No. 106-15 at 24–59, and (2) extra-record communications from states that arrived days before the IFR's release, *see* ECF Nos. 106-2 at 23–

28 (email from California dated May 27, 2026), 106-11 at 27–28 (letter from Massachusetts dated May 29, 2026), 106-66 at 2–4 (letter from six states dated May 29, 2026). Pls.' Br. at 20–23.

Plaintiffs' arguments about the informal technical presentations that preceded the IFR's issuance mirror arguments they made at the preliminary injunction stage about reliance interests. These arguments fare no better here than they did at the preliminary injunction stage. Plaintiffs complain that the June 2026 release of the IFR "too late to stay on track for timely implementation," Pls.' Br. At 22, but Congress required that release date, not CMS. CMS was not "changing the definition" of "medical frailty" in June 2026, *id.*; it was promulgating that definition for the very first time, as authorized by Congress. CMS repeatedly stated that comments at these meetings constituted "CMS' preliminary policy, systems, and operational considerations"; that "all information described here is preliminary and subject to change"; and that information was "intended only to be a general informal summary of technical legal standards." CMS, Implementing Section 71119 of the Working Families Tax Cut Legislation, ECF No. 1-1 at 5 (Nov. 19, 2025). These slides also state that CMS's engagement with stakeholders prior to the IFR's issuance was "[p]re-decisional and iterative," with "[a]ll policies and requirements are subject to change." Id. at 11. As to medical frailty specifically, CMS stated only that its "intention" was to use a definition "similar to" that at 42 C.F.R. § 440.315(f), not an identical one. *Id.* Nebraska's decision to implement the verification requirements ahead of an IFR was done in advance of CMS's formal approval, and therefore does not represent a fixed prior policy, either. Plaintiffs are sophisticated entities who routinely deal with CMS and the federal regulatory process. They understood that the IFR, not CMS's presentations, would set the governing legal standards. CMS did not commit legal error by not explicitly addressing Plaintiffs' purported reliance interest in these pre-decisional discussions in the IFR.

The extra-record communications from the states that objected to changes to the "medical frailty" definition just before the IFR's release are also not a basis for vacating it. Again, Congress exempted this rulemaking from the notice-and-comment requirements of § 553. As such, states' belated attempts to communicate with CMS at the end of May, just days before the IFR was

published online, were properly excluded from the administrative record, and failure to respond to them was not a violation of the APA's requirement of reasoned decision-making. Plaintiffs' argument also ignores that CMS conducted detailed estimates of the burdens states faced as a result of the information collection and verification requirements of the IFR, as well as a complete estimate of total costs of implementation. 91 Fed. Reg. at 33,425–49. It considered alternative compliance procedures and, "where permitted . . . allow[ed] States to implement these requirements in a manner tailored to their specific needs." *Id.* at 33,465–66. When possible, it "aligned definitions of compliance activities as closely as possible with existing statutory and regulatory requirements across Medicaid and/or other Federal benefit programs to minimize disruption" of existing systems and capabilities. 91 Fed. Reg. at 33,465. Plaintiffs may have preferred CMS to strike a different balance. But CMS explained that it reached its definition to avoid "sweeping [into the exception] individuals whose conditions do not significantly impair their functional capacity." 91 Fed. Reg. at 33,373. Having acknowledged the potential costs of its implementation strategy—costs which, to a significant degree, inhere in the policy Congress told CMS to implement—CMS chose to proceed, and the reasons it gave for doing so satisfied the APA's deferential review standard.

Finally, Plaintiffs argue that the IFR failed to consider that the "States cannot rely solely on records of 'the presence of a particular diagnosis or condition'" in their systems to deem an individual "medically frail." *See* Pls.' Br. at 23–24. They suggest, but do not directly argue, that the IFR violates § 1396a(xx)(5), which directs states to rely on "reliable" information available to them, "where possible," to confirm specified excluded individual status. But subsection (5), like subsection (9), includes a broad delegation to CMS to "establish[]" the "standards" by which the states engage in *ex parte* verification of excluded individual status.

It therefore fell to CMS to determine when *ex parte* information suffices to make this determination, and when it does not. Consistent with subsection (5), the IFR directly requires states in the first instance to "attempt to verify that an individual is a specified excluded individual" based on medical frailty "using reliable information available to the State," 42 C.F.R. § 435.557(f)(1).

Elsewhere in the IFR, CMS explained that "States may use an approach that relies on lists of qualifying diagnosis codes combined with utilization data and other factors, such as severity of conditions, to determine medical frailty or otherwise having special medical needs." 91 Fed. Reg. at 33,406. In addition, states "should have access" to, among other things, other forms of relevant information from federal, state, or local agencies; the state's eligibility system; the individual's case record; payroll data; and encounter data, from which a finding of impairment could be made. 42 C.F.R. § 435.557(a). This permits states to verify medical frailty status *ex parte* in conformity with 42 U.S.C. § 1396a(xx)(5), contrary to Plaintiffs' erroneous assertions, *see* Pls.' Br. at 23–24. CMS was aware that not every beneficiary would be capable of being verified *ex parte*, and it extensively considered the burden of information requests on Plaintiffs (as well as those on current enrollees and new applicants and enrollees). *See* 91 Fed. Reg. at 33,435. Ultimately, the statute makes it CMS's responsibility to establish standards governing when it is "possible" to verify eligibility without relying on information provided by the beneficiary, and when it is not. CMS's explanation of its choice easily satisfies the APA's standards.

Plaintiffs may disagree with the policy CMS chose, but CMS reasonably considered the burdens of implementation on states, applicants, and beneficiaries in deciding how to implement the statute. Its choices were reasonable and not arbitrary and capricious.

**2. CMS Appropriately Explained The Use Of A One-Year Claim Lookback Period For Determining Applicability Of The Medical Frailty Exclusion**

Generally speaking, the IFR permits data from claims adjudicated in the last year to be used in verifying "medical frailty" because "older information may not reflect the individual's current condition." 91 Fed. Reg. at 33,405. This is consistent with feedback CMS received while it was developing the IFR. For example, one vendor proposing logic for system determinations of medical frailty suggested that even "[p]ermanent conditions" trigger "a 12-month cadence during which the [Medicaid beneficiary] remains exempt . . . with automated extension if qualifying evidence is observed *in the subsequent year*." AR 4417. Plaintiffs aver that Defendants committed

legal error by not giving stronger consideration to a two-year lookback for claims data. Studies that are part of the administrative record weighed the impact of lookback windows of as short as three months and as long as two years. AR 4728. Of course, expanding the time window increases the likelihood of finding a diagnostic code consistent with medical frailty by a few percentage points. But as the time window grows, so do the odds that a particular diagnostic code no longer reflects a condition that substantially impairs the individual's ability to complete the community engagement requirement. If there have been no claims relevant to a potentially serious diagnostic code for a long period of time, it could mean the person is no longer very sick or is not availing themselves of the treatment CMS is encouraging them to receive. Plaintiffs would have preferred a rule that scoped in claims data as old as twenty-four months, but CMS reasonably drew a line at twelve months in order to balance competing interests in verifying status *ex parte* where possible with the desire to avoid making designations based on stale data.

Excluding older "claims data" does not necessarily mean an individual will not be designated as "medically frail." For starters, it is not the only form of "reliable information available to the State" that may be used to verify "medical frailty" on an ex parte basis. The illustrative definition of this term in 42 C.F.R. § 435.557(a) encompasses eight different forms of data. For instance, if a quadriplegic receives SSDI and seeks exclusion under item (aa), they have already demonstrated in an administrative setting that they are unable to engage in "substantial gainful activity." That would constitute a form of "reliable information" as explained in § 435.557(a). So even if there is no data on claims processed within the last twelve months for a particular individual, a state may still be able to verify his or her status *ex parte*. Moreover, if a state cannot verify an applicant's or beneficiary's information through *ex parte* data sources, that does not mean he or she will not be found medically frail. Rather, the regulations require the state to seek further documentation or, under certain circumstances, attestation or other information from the beneficiary in order to verify their exclusion from the community engagement requirement. 42 C.F.R. § 435.557(f). At bottom, by drawing a line as to what type of claims data would, and would not, be scoped into the medical frailty determination, CMS struck a reasonable

balance between allowing states to use past data to verify medical frailty *ex parte* in some circumstances and requiring them to seek out additional information to verify medical frailty to ensure medical frailty exemptions are fully documented and legitimate.

Plaintiffs offer several arguments against the reasonableness of CMS's chosen lookback period for claims and encounter data. None persuades. They start by arguing that any data can get stale at any time, even at a month old, yet CMS only placed limits on claims and encounter data, not other sources of data. *See* Pls.' Br. at 24–25. But this argument proves too much and has no limiting principle—on Plaintiffs' view, CMS would have to allow states to look at *any* claims and encounter data, no matter how old. Plaintiffs, in advocating for a two-year lookback rule, concede that some restriction on this data set is reasonable and necessary to avoid designating individuals as medically frail based on out-of-date information. The one-year restriction Defendants chose was a reasonable one.

Plaintiffs next argue that CMS did not consider "data in the administrative record indicating that a one-year claims period—as opposed to a two-year claims period—would result in denying the medical frailty exclusion to at least two million people with serious conditions." Pls.' Br. at 25 (citing AR 4728–30). Even if a two-year lookback would be reasonable, CMS was not required to adopt that specific period because a one-year lookback period was also reasonable. *See FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016) (noting the arbitrary and capricious standard "is narrow" and, under it, "[a] court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives"). Plaintiffs' arguments also fail because, as already noted, the cited study (which was part of the administrative record) looked only at claims data, not other categories of data that states must (or at least may) consider in verifying medical frailty. AR 4727–28. So that study does not prove anything about how many people, if any, might not be classified as medically frail as a result of CMS's chosen lookback period.

Plaintiffs then argue that CMS's one-year lookback is inconsistent with (1) "the statute's direction . . . that States should, to the greatest extent possible, verify compliance with and exclusion from the Work Requirement 'without requiring' Medicaid members 'to submit additional

information'" and (2) "CMS's own direction that States 'must consider such factors as the administrative costs associated with establishing and using the data match compared with the administrative costs associated with relying on documentation, and on program integrity in terms of the potential for ineligible individuals to be enrolled and for eligible individuals to be denied coverage.'" Pls.' Br. at 25–26 (quoting 91 Fed. Reg. 33,394). The first argument fails on its face because what is "possible" in this context directly turns, in part, on CMS's judgment about what "standards" should apply to state determinations about what constitutes "reliable information available to the State," a judgment Congress delegated to CMS. 42 U.S.C. § 1396a(xx)(5). There is no inconsistency with the statute here. And similarly, there is no inconsistency with CMS's direction to states, because the language Plaintiffs quote does not apply to the categories of "reliable information available to the State" explicitly defined by the IFR. The IFR does not limit that definition to the categories explicitly defined; to the contrary, it requires states to "identify data sources that provide reliable information relevant" to determining whether someone complied, is deemed to have complied, or is excluded from complying with the community engagement requirement. 42 C.F.R. § 435.557(b)(1)(i). The quoted language directs states to consider those factors in deciding whether "establishing a connection to or process to obtain information from a data source would not be effective[.]" *Id.* § 435.557(b)(1)(ii).

Plaintiffs conclude by arguing that CMS "failed to consider" that the one-year lookback would impose "additional costs on [them.]" Pls.' Br. at 26. This argument is misplaced because, as already discussed, CMS thoroughly considered the costs to states of implementing the community engagement requirement through the IFR. *See supra* Argument § I.B.1.

#### 3. CMS's Standards Allowing States To Accept Self-Attestations To Verify Medical Frailty Are Reasonable And Reasonably Explained

CMS received feedback urging it to exercise its authority to entirely prohibit states from relying on self-attestation, AR 4753–58, which is how Guam's process for identifying medically frail individuals in the ABP context works, AR 4053 ("Guam does not accept self-attestation, instead requiring that individuals wishing to be identified as medically frail submit a 'Medically

Frail Certification' form with a certification from a medical provider that they meet the medically frail standard."); *see also* AR 4077–78. CMS did not go that far. As CMS explained, "for individuals who are newly applying for Medicaid, and for enrolled beneficiaries who are newly attesting to specified excluded individual status based on medical frailty or otherwise having special medical needs, there may not be reliable information available to the State." 91 Fed. Reg. at 33,406. CMS's approach gives beneficiaries some time from enrollment to seek and obtain healthcare services for their conditions, and thereby generate claims or encounter data that could facilitate their continued qualification for medically frail status, making further self-attestation unnecessary. CMS explained "that requiring verification of medical frailty to confirm an individual's specified excluded status using data or other documentation after the State has verified that exclusion using a statement or other information provided under penalty of perjury (such as a screening tool) will motivate individuals to access care." *Id.* Consequently, it only allowed states to rely on self-attestations about medical frailty once per beneficiary per period of enrollment, starting January 1, 2028. 42 C.F.R. § 435.557(f)(1)(ii).[5] This reasonable approach amply satisfies the APA's requirements.

CMS's approach to self-attestations for medical frailty also balanced concerns about "abdication of the determination to the very person whose eligibility is at issue," AR 4753, with concerns, provided in other feedback, that prohibiting self-attestations entirely could put new or newly medically frail applicants "in a Catch-22," unable to generate supporting clinical data without coverage and rendering them unable to prove Medicaid eligibility, AR 4794. *See also, e.g.*, AR 3888 (arguing that self-attestation can help medically frail people "to enroll in Medicaid and get the diagnoses and health care they need"), 3939 (same but specific to "individuals with serious behavioral health conditions"), 4450 (advocating for self-attestation for, *inter alia*, "new Medicaid

[5] To accommodate states that might need to make "system and process changes" needed to implement new documentation requirements, 91 Fed. Reg. at 33,407, CMS allowed states to rely on self-attestation "to verify an applicant or beneficiary is medically frail or otherwise has special medical needs, each time the State verifies an individual's medical frailty" prior to January 1, 2028. 42 C.F.R. § 435.557(f)(1)(i).

beneficiaries"), 4775 (advocating for "[a]llowing self-declaration" for "people with serious health conditions" who are "newly applying for Medicaid"); 4785 ("Attestations and screeners will allow programs to identify individuals with medical frailty who are not yet formally captured in other data sources."); 4797 (advocating for use of self-attestation "for the first year of implementation" of the CE requirement, which the IFR allows). This is an eminently reasonable balance to strike.

In the face of this sensible explanation, Plaintiffs insist the IFR's provisions concerning self-attestation are arbitrary and capricious. Pls.' Br. at 26–28. Their insistence is premised on a misunderstanding of CMS's authority here. Plaintiffs' arguments on this score all rest on the presumption that CMS was required to allow states to rely on self-attestations from applicants and beneficiaries without limitation unless it affirmatively justified limitations on that reliance. *See id.* Plaintiffs have it backwards. The statute empowers CMS to "specif[y]" the "standards" by which states "determine[]" whether an individual is a "specified excluded individual" for purposes of the community engagement requirement. 42 U.S.C. § 1396a(xx)(9)(A)(ii).[6] CMS exercised this authority here to set the standards by which states may accept self-attestations, and, as explained, it set reasonable standards supported by a sensible explanation.

Even considered more granularly, the states' arguments here fail. They complain first about a lack of evidence that requiring data or other documentation to verify medical frailty after an initial self-attestation "will make Medicaid members more likely to access available care," Pls.' Br. at 27, but "[t]he APA imposes no general obligation on agencies to produce empirical evidence." *Stillwell v. Office of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009). And CMS gave a "reasoned explanation" for its conclusion. *Id.* If an individual has claimed under penalty of perjury to be medically frail, but knows that will not suffice in the future, that will naturally motivate them to get treatment and generate claims and encounter data that can be used to verify their condition in the future.

[6] Plaintiffs initially alleged CMS's standards for allowing self-attestations to verify medical frailty were contrary to law, Compl. ¶ 214, but that assertion lacks merit. It was not pressed in the motion for a preliminary injunction or in this summary judgment motion. As such, Plaintiffs should be deemed to have abandoned it.

Plaintiffs next argue that the agency failed to grapple with the impacts CMS's standards concerning medical frailty self-attestations would have on the resources of providers and the government (both state and federal). *Id.* This is a red herring. Those standards do not *force* anyone to access care, let alone care they do not need. And it is surprising that Plaintiffs would characterize as a burden Medicaid beneficiaries accessing care they do need, which is what CMS anticipates its self-attestation standards will motivate. Of course, that care will cost the government money and take providers' time and energy, but the desire is that this care will help at least some medically frail individuals obtain independence and self-sufficiency without needing government assistance.

Plaintiffs finally argue that the agency did not consider "evidence in the administrative record" suggesting it may be difficult for some Medicaid beneficiaries "to obtain documentation from a provider confirming that they qualify for a work requirement exclusion" and suggesting self-attestations can be reliable and "less burdensome to states" than other alternatives. Pls.' Br. at 27–28. But CMS *allowed* for self-attestations; it just does not allow for them at all times and under all circumstances. Moreover, the goal of this policy is to motivate people to receive treatment and thereby generate the type of data both parties to this litigation would prefer CMS uses to verify medical frailty: recent claims and encounter data from the beneficiary that can be used to verify status *ex parte*. 91 Fed. Reg. at 33,406–07. Limiting self-attestation is therefore important in developing a system that does not require beneficiaries to re-certify their eligibility. Plaintiffs do not argue or otherwise offer any reason to think CMS was required to expound on every single edge case that might result from its chosen standards. CMS analyzed the burdens on beneficiaries and states in detail in the IFR, 91 Fed. Reg. at 33,425–49.

### C. The IFR Comports With The Spending Clause

Plaintiffs do not pursue their Spending Clause claim from Count III of the Complaint. *Compare* Compl. ¶¶ 222–28 *with* Pls.' Br. at 7 n.2. Nonetheless, Defendants now move for summary judgment on this claim, which fails as a matter of law.

Plaintiffs allege that CMS has violated the Spending Clause because the IFR does not provide adequate notice of the states' obligations and "exercises Congress's spending clause power

in an unconstitutional manner." Compl. ¶¶ 225–27. This fails to even state a cogent constitutional objection. The Spending Clause, part of Article I of the Constitution, is an enumerated power of Congress; it does not limit the authority of the Executive Branch. Thus, the only constitutional question is whether Congress can, consistent with the Spending Clause, make Medicaid spending contingent on a community engagement requirement with a medical frailty exclusion subject to CMS's discretionary authority to define that term. The answer to that question is "yes."

"Medicaid offers States 'a bargain.' In return for federal funds, States agree 'to spend them in accordance with congressionally imposed conditions.'" *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 362–63 (2025) (citations omitted). As relevant here, the WFTC legislation added a new condition to states' receipt of federal Medicaid funds: they must apply the community engagement requirement to applicable individuals applying to enroll or newly or currently enrolled in Medicaid in accordance with § 1396a(xx). Included within the terms of that condition is the exclusion of "specified excluded individual[s]" from the universe of "applicable individual[s]." 42 U.S.C. § 1396a(xx)(9)(A)(i), (ii). States determine who is a specified excluded individual "in accordance with standards specified by the Secretary," *id.* § 1396a(xx)(9)(A)(ii), and within the universe of specified excluded individuals are those who are "medically frail or otherwise ha[ve] special medical needs (as defined by the Secretary)," *id.* § 1396a(xx)(9)(A)(ii)(V). Under the plain language of the statute, as already explored fulsomely above, *see supra* Argument § I.A., Congress gave CMS authority to define who is medically frail and prescribe standards by which states may determine who is medically frail. States must comply with this clear condition, among many others, to continue receiving federal Medicaid funds.

Nothing about this scheme offends the Spending Clause. *See, e.g.*, *Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (observing that Spending Clause permits Congress to impose unambiguous conditions on federal grants). Medicaid is replete with provisions that make the financial obligations of the states dependent upon discretionary exercises of authority by CMS. To the extent the states claim unconstitutional coercion because the Secretary has discretion

to define a statutory term, *see* Compl. ¶ 227, that argument would call into question many sections of the U.S. Code that turn to agencies to define statutory terms that impact funding.

Meanwhile, the cost of compliance with the IFR provisions at issue is not even arguably of such a magnitude as to render it coercive. Consider that in *National Federation of Independent Business v. Sebelius*, 567 U.S. 519, 575 (2012) ("*NFIB*"), Congress "threaten[ed] to withhold all of a State's Medicaid grants" to induce acceptance of expanded Medicaid. Indeed, the remedy in *NFIB* was to permit states to decline the expansion funding. By any measure the fiscal impacts Plaintiffs speculate about in this case—including increased administrative costs, implementation burdens, and expenditures on medical care due to lower Medicaid enrollment—are orders of magnitude smaller than what was at issue in *NFIB*, the only occasion on which the Supreme Court has recognized this sort of claim of coercion. *See also South Dakota v. Dole*, 483 U.S. 203, 211 (1987) (no Spending Clause claim for loss of small fraction of highway funding). Accordingly, summary judgment for Defendants on Count III is warranted.

## II. Regardless, Plaintiffs' Requests For Relief Are Not Appropriate Here

Because CMS followed the statute and the APA's requirement of reasoned decisionmaking, the Court need not reach the issue of proper remedy and should instead enter judgment upholding the IFR's lawfulness in all the particulars on which Plaintiffs challenge it. But even if this Court were to decide otherwise, it should provide much more limited relief than Plaintiffs request, for several reasons. The Court should not enter any declaratory relief, but if it does, such relief should be limited to match the scope of the other relief granted by the Court, if any.

### A. Vacatur Is Not Appropriate Here

First, while relevant circuit caselaw identifies vacatur as an available remedy for a successful APA challenge to a regulation, *Town of Weymouth v. Mass. Dep't of Envtl. Prot.*, 961 F.3d 34, 58–59 (1st Cir. 2020), *on reh'g*, 973 F.3d 143 (1st Cir. 2020), the APA itself does not reference vacatur, instead remitting Plaintiffs to traditional equitable remedies like injunctions, 5 U.S.C. § 703. There is no indication that Congress intended to create a new and radically different remedy in providing that courts reviewing agency action should "set aside" agency

"action, findings, and conclusions." *Id.* § 706(2); *see United States v. Texas*, 599 U.S. 670, 693–702 (2023) (Gorsuch, J., concurring in the judgment) (detailing "serious" arguments that "warrant careful consideration" as to whether the APA "empowers courts to vacate agency action").

Second, even under applicable circuit precedent, vacatur is not automatic. *Cent. Me. Power Co. v. F.E.R.C.*, 252 F.3d 34, 48 (1st Cir. 2001). Indeed, the APA is explicit that its provisions do not affect "the power or duty of the court" to "deny relief on" any "equitable ground," 5 U.S.C. § 702, and equitable relief does not "automatically follo[w] a determination" that a defendant acted illegally, *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 392–93 (2006). "Whether to vacate an agency's flawed decision or remand without vacatur is within [the] discretion [of] the reviewing court, and 'depends *inter alia* on the severity of the errors, the likelihood that they can be mended without altering the order, and on the balance of equities and public interest considerations.'" *Town of Weymouth*, 961 F.3d at 58 (quoting *Cent. Me. Power Co.*, 252 F.3d at 48).

Vacatur is not appropriate here because all factors weigh against it. As already explained, the IFR is fully consistent with the statute and is not undermined by any fatal logical flaws. The remainder of Plaintiffs' critiques of the challenged IFR provisions go to how fulsome CMS's deliberation about, and explanation for, them was. And while CMS concedes no errors in its deliberation or explanation, even if the Court agreed with Plaintiffs and found fault with either, any such faults would be fixable on remand without necessitating changes in the IFR and thus would not be severe enough to warrant vacatur.

Furthermore, the balance of the equities and public interest tip decisively against vacatur. The community engagement requirement must be implemented by January 1, 2027. 42 U.S.C. § 1396a(xx)(1). Congress set this deadline alongside the June 1, 2026 deadline it set for CMS to promulgate an interim final rule implementing the community engagement requirement and the waiver of the agency's general rulemaking obligations under 5 U.S.C. § 553 (including the requirements to afford notice and comment and delay implementation of substantive regulations past their publication date) that invariably tend to delay agency rulemaking, 139 Stat. at 314, § 71119(d), evincing Congress's clear preference for expedited rulemaking and implementation.

All relevant states, including Plaintiffs and many others, have been working for months already, in close consultation with CMS, to develop systems to implement it in accordance with the IFR. Declaration of Sara Vitolo ¶ 11. Vacatur of the challenged IFR provisions would upend that development process minutes to midnight and stymie CMS and states from complying with Congress's will. *Id.* Particularly disruptive would be vacatur of any IFR provisions that the agency may ultimately restore on remand in further rulemaking (i.e., speaking hypothetically only, any IFR provisions this Court might consider vacating for any reason that does not conclusively foreclose their eventual re-promulgation). *Id.* ¶ 12. It would also cost tens of millions of dollars for states and CMS to comply and would likely cause "significant and ongoing confusion among beneficiaries, states, and other stakeholders" and "inappropriate disenrollments," effects only magnified by the short timetable states and CMS would face to comply. *Id.* ¶¶ 13–14.

Up against these weighty interests on the Government's side is Plaintiffs' putative interest in marginally more process and explanation of lawful policy choices. Even if the Court credits this interest, it does not outweigh the equities favoring the government or the public interest, set by Congress, in timely implementation of the statute. The Court should thus decline to vacate any portions of the IFR, even if it orders a remand for further consideration of certain issues.

**B. No Injunction Is Appropriate Here**

While the APA specifically contemplates injunctions as a remedy, *see* 5 U.S.C. § 703, in order to obtain one here, Plaintiffs "must show (1) 'actual success on the merits of its claims;' (2) that [they] 'would be irreparably injured in the absence of injunctive relief;' (3) that the harm suffered 'from the defendant's conduct would exceed the harm to the defendant from the issuance of an injunction;' and (4) that 'the public interest would not be adversely affected by an injunction.'" *Doe v. R.I. Interscholastic League*, 137 F.4th 34, 40 (1st Cir. 2025). They have not shown any of these factors exist here. And injunctive relief against the IFR provisions Plaintiffs specifically challenge here would be inappropriate for the same balance-of-equities and public-interest reasons vacatur is inappropriate here, regardless of whether Plaintiffs succeed on the merits of their claims or face irreparable harm. If the Court agrees that vacatur is not appropriate,

injunction would be all the more inappropriate since CMS would need to seek relief from an injunction to pursue its otherwise-lawful policy after remand.

The Court should also reject Plaintiffs' still more inappropriate request that it "enjoin CMS from penalizing Plaintiffs for a period of six months for any delays in complying with the IFR." Pls.' Br. at 29. This relief would apply indiscriminately to all Plaintiffs even though they admit some of them will, in fact, be able to comply with the IFR by the deadline (January 1, 2027), *see id.* at 30. They thus have not shown they would be irreparably injured absent this specific type of injunction. And, similar to their request for a preliminary injunction, the purported injuries they complain about here, *see id.* at 29–30 (citing ECF No. 105 ¶¶ 227–45) arise not from the IFR itself but from the timeline to implement it, which, as this Court already observed, "was set by Congress in H.R. 1, not by CMS in the challenged IFR." ECF No. 94 at 4.

Meanwhile, the harm to CMS from such an injunction is manifest—injunction against enforcement of the entire IFR for six months against Plaintiffs would significantly hamper CMS's ability to ensure that they comply with § 1396a(xx) by the statutory deadline. And this injunction would injure the public interest, as Congress determined it. Congress required states to comply with this condition on continued Medicaid funding by January 1, 2027, subject only to a possible exemption "from compliance with [§ 1396a(xx)]" for states that request it and show, to CMS's satisfaction, that they are making "a good faith effort to comply with [§ 1396a(xx)]." 42 U.S.C. § 1396a(xx)(11)(A). No such exemption has been issued, and Plaintiffs have not challenged the absence of such an exemption in this case. Congress directed CMS to consider a variety of factors in making this good-faith effort determination, limited the maximum duration of an exemption, allowed CMS to terminate the exemption early for states that do not continue their good-faith compliance efforts, and required states to submit quarterly progress reports and other relevant information to enable CMS oversight of those continued efforts. *Id.* § 1396a(xx)(11)(B)–(D). A court order "enjoin[ing] CMS from penalizing Plaintiffs for a period of six months for any delays in complying with the IFR" would not be subject to any of those requirements or limitations.

Plaintiffs style this request as a return to "the pre-litigation status quo," but that is not at all what this would be. The pre-litigation status quo would involve Plaintiffs complying with the statute and IFR by January 1, 2027, unless they persuaded CMS to issue an exemption as provided for by Congress. At best, they would be exempt from compliance with any provisions the Court vacated (though none should be, as already discussed), but they would need to comply with the remaining provisions. Their requested specific injunction here would create an entirely new enforcement regime that would de-fang, for six months, the only way the IFR may be effectively enforced. Aggravating matters, it would give Plaintiffs special treatment vis-à-vis non-plaintiff states who would still be affected by universal vacatur of any of the IFR's challenged provisions, even though, as noted, Plaintiffs have not even shown that all of the Plaintiffs require this solicitude. Such an injunction would plainly run against the public interest, and under no circumstances should the Court issue it here.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that summary judgment be entered in favor of the Government. In the alternative, the Court should remand this case to the agency for further proceedings in accordance with this Court's decision without vacating any aspect of the IFR or otherwise enjoining its enforcement in any way.

Dated: September 18, 2026

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: *_/s/ Michael J. Gerardi_*
MICHAEL J. GERARDI
DC Bar No. 1017949
Deputy Associate General Counsel, Office of General Counsel, U.S. Dep't of Health & Human Services
Special Assistant U.S. Attorney

STEPHEN M. RICHMOND
DC Bar No. 1033701
Senior Attorney, Office of General Counsel, U.S. Dep't of Health & Human Services,
Special Assistant U.S. Attorney

200 Independence Ave., SW
Mailstop 443F.23
Washington, D.C. 20201
Phone: (202) 619-3620
E-Mail: Michael.Gerardi@hhs.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 18, 2026, the foregoing pleading was filed electronically through the CM/ECF system, which causes all parties or counsel to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

*/s/ Michael J. Gerardi*
Michael J. Gerardi
Special Assistant U.S. Attorney