**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>MEHMET OZ, M.D., in his official capacity as Administrator of the Centers for Medicare & Medicaid Services, *et al.*,<br><br>*Defendants*. | No. 1:26-cv-12962 |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

## I. The Medicaid Program

1. Enacted in 1965, Medicaid is a cooperative federal-state program in which the Federal Government supplies funding to states to assist them in providing medical assistance to specified categories of low-income individuals. 42 U.S.C. §§ 1396 *et seq*.

2. Each state that elects to participate must submit a plan for approval to the Secretary, who generally exercises his authority under the Medicaid statute through CMS. 42 U.S.C. §§ 1396, 1396a; *Arkansas Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006).

3. If the plan is approved, the state receives Medicaid funds from the federal government for a percentage of the money spent by the state in providing covered medical care to eligible individuals. 42 U.S.C. § 1396b (a)(1).

4. If state programs do not comply with the requirements of sections 1396 and 1396a, the Secretary can initiate proceedings to deny federal financial participation (FFP) in whole or in part "until the Secretary is satisfied that there will no longer be any such failure to comply." 42 U.S.C. § 1396c.

## II. The Community Engagement Requirement For Medicaid Eligibility

5. On July 4, 2025, President Trump signed into law H.R. 1, known colloquially as the One Big Beautiful Bill Act, which CMS often refers to as the Working Families Tax Cut ("WFTC") legislation. Pub. L. No. 119-21, 139 Stat. 72.

6. The WFTC legislation contains a "community engagement requirement for certain individuals" in order to be eligible for Medicaid. *Id.* at 306–14 (section 71119).

7. Paragraph (1) of the statute, codified at 42 U.S.C. § 1396a(xx), requires the states and D.C. to "provide, as a condition of eligibility for medical assistance for an applicable individual, that such individual is required to demonstrate community engagement." 42 U.S.C. § 1396a(xx)(1), (9)(C) (definition of "State").

8. "Applicable individuals" are those made eligible for Medicaid by the Affordable Care Act—generally speaking, nonpregnant adults ages 19–64 with income under 138 percent of the federal poverty level, a group often referred to as the Medicaid "expansion population."

9. "Applicable individuals" also include those eligible for or enrolled in a demonstration project under 42 U.S.C. § 1315 that provides coverage that meets minimum essential coverage requirements and who are ages 19–64, not pregnant, and not entitled to or enrolled in Medicare Part A or B, and who are not otherwise eligible to enroll in Medicaid under the state plan.

10. Paragraph (2) of section 1396a(xx) defines the community engagement requirement that must be met for at least one month prior to enrollment and during a review period.

11. The requirement can be met in many ways, including part-time work, community service, or participation in a work or educational program. *Id.* § 1396a(xx)(2).

### A. The Community Engagement Requirement Does Not Apply To Individuals Who Are "Medically Frail"

12. Paragraph (9) of § 1396a(xx) includes definitions used throughout the community engagement statute.

13. The statute defines "applicable individuals," as used in paragraph (1) and throughout the statute, both in terms of affirmative requirements and by carving out "specified excluded individuals" to whom the community engagement requirement does not apply. *Id.* § 1396a(xx)(9)(A)(i).

14. "Specified excluded individual" means "an individual, as determined by the State (in accordance with standards specified by the Secretary)," who falls in certain categories, including pregnant and postpartum women, inmates at public institutions, participants in certain treatment programs for drug addiction or alcoholism, disabled veterans, certain caregivers, and members of Indian tribes. *Id.* § 1396a(xx)(9)(A)(ii)(II), (III), (IV), (VII), (VIII), (IX).

15. "Specified excluded individual" also includes someone

> (V) who is medically frail or otherwise has special medical needs (as defined by the Secretary), including an individual—
> (aa) who is blind or disabled (as defined in [42 U.S.C. §] 1382c);
> (bb) with a substance use disorder;
> (cc) with a disabling mental disorder;
> (dd) with a physical, intellectual or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living; or
> (ee) with a serious or complex medical condition.

*Id.* § 1396a(xx)(9)(A)(ii)(V).

16. No other category of "specified excluded individual" contains the parenthetical "as defined by the Secretary" that modifies the phrase "medically frail or otherwise has special medical needs" in subclause (V).

**B. Implementation Of The Community Engagement Requirement**

17. Section 71119(d) of the WFTC legislation directed CMS to "promulgate an interim final rule for purposes of implementing the provisions of, and the amendments made by, this section," such that notice and comment was not required to issue a legally effective rule. 139 Stat. at 314.

18. It further states that "[a]ny action taken to implement the provisions of, and the amendments made by, [§ 71119], shall not be subject to the provisions of [§ 553]." *Id.*

## III. Pre-IFR Feedback

19. CMS received a substantial amount of unsolicited comments from the public concerning or relevant to how to implement the community engagement requirement.

20. An August 17, 2017 letter, from Simon & Co., LLC, advocated for states to perform "a functional analysis" rather than "rely[ing] on a simple list of conditions to determine medically frail status." AR 3804.

21. An October 20, 2025 letter from several disability and aging organizations noted that "the employment rate for working age people with disabilities [is] []37.4%," AR 3885, and elsewhere argued that self-attestation can help medically frail people "to enroll in Medicaid and get the diagnoses and health care they need," AR 3888.

22. A November 10, 2025 letter from the President & CEO of the Association for Behavioral Health and Wellness argued that "[a]ttestation . . . should be [a] key component[] of the medically frail determination process" because "[m]any individuals with serious behavioral health conditions lack recent claims data or formal diagnoses due to barriers such as limited access to care, stigma, or prior coverage disruptions." AR 3939.

23. A November 17, 2025 spreadsheet from the Center for Health Law and Policy Innovation described a South Dakota Medicaid waiver that defined "Medically frail individuals" as "individuals *unable to work* due to cancer or other serious or terminal illness." AR 3985 (emphasis added).

24. A November 19, 2025 letter from two senior attorneys from the National Health Law Program described "draft state work requirements policies that [would have] require[d] an individual who falls within one or more of the five listed categories to show that they are also unable to work." AR 4001.

25. A December 3, 2025 letter from Michael Lewis of the American Association of People with Disabilities argued that "medically frail" and "special medical needs" "[s]hould cover anyone whose health or functional limitations *interfere with meeting requirements*." AR 4038 (emphasis added).

26. A December 4, 2025 report from the National Health Law Program noted that, with respect to Guam's process for identifying medically frail individuals in the context of alternative benefit programs, "Guam does not accept self-attestation, instead requiring that individuals wishing to be identified as medically frail submit a 'Medically Frail Certification' form with a certification from a medical provider that they meet the medically frail standard." AR 4053; *see also* AR 4077–78.

27. A February 14, 2026 proposal for medical frailty logic from Gainwell Technologies, a healthcare technology company, proposed to base medical frailty determinations on the presence of a "medical condition or disorder," an "indicator of frailty," and an "active pharmaceutical treatment," not simply "[t]he presence of a single diagnosis or procedure code" and also suggested that even "[p]ermanent conditions" trigger "a 12-month cadence during which the [Medicaid beneficiary] remains exempt . . . with automated extension if qualifying evidence is observed *in the subsequent year*." AR 4417 (emphasis omitted)

28. A February 24, 2026 letter from the Chair of the Board of the Association for Clinical Oncology advocated for self-attestation for, *inter alia*, "new Medicaid beneficiaries." AR 4450.

29. A March 20, 2026 slide show summarizing a study from researchers at the Harvard T.H. Chan School of Public Health looked at how medical frailty determinations would be impacted by lookback windows for medical claims data of as short as three months and as long as two years, though it looked only at claims data, not other categories of data that states must (or at least may) consider in verifying medical frailty. AR 4727–30.

30. A March 27, 2026 legal memorandum from the Foundation for Government Accountability expressed concerns that allowing individuals enrolling or enrolled in Medicaid to self-attest to medically frail status would amount "abdication of the determination to the very person whose eligibility is at issue" and otherwise urged CMS to exercise its authority to entirely prohibit states from relying on self-attestation. AR 4753–58.

31. An April 17, 2026 letter from the Advocacy Director of #MEAction advocated for "[a]llowing self-declaration" for "people with serious health conditions" who are "newly applying for Medicaid." AR 4775.

32. An April 17, 2026 Viewpoint paper published in the JAMA Health Forum argued, "Attestations and screeners will allow programs to identify individuals with medical frailty who are not yet formally captured in other data sources." AR 4785.

33. A May 26, 2026 news article published by Sigi Ris of IWP News reported on concerns expressed by the Senior Advisor on Medicaid Policy at Families USA that prohibiting self-attestations entirely could put new or newly medically frail applicants "in a Catch-22," unable to generate supporting clinical data without coverage and rendering them unable to prove Medicaid eligibility. AR 4794.

34. A May 28, 2026 email from the Senior Director for Federal Advocacy at the American Cancer Society advocated for use of self-attestation "for the first year of implementation" of the CE requirement. AR 4797.

35. A letter from the Executive Director of the National Association of State Head Injury Administrators and the President & CEO of the Brain Injury Association of America argued that "[c]lear guidance from CMS can help states both identify individuals who should be exempt due to significant functional impairments and support those who are able to participate in community engagement activities." AR 4802.

## IV. The Interim Final Rule

36. Congress directed CMS and the states to implement the community engagement requirement no later than January 1, 2027. *See* 42 U.S.C. § 1396a(xx)(1).

37. To meet this deadline, Congress directed CMS to "promulgate an interim final rule for purposes of implementing the provisions of, and the amendments made by," the WFTC legislation by June 1, 2026. 139 Stat. at 314, § 71119(d).

38. CMS did so, making an interim final rule available for inspection on June 1 that appeared in the Federal Register on June 3.[1]

### A. Definition of "Medically Frail"

39. Prior to the WFTC legislation, states were required to provide coverage to individuals eligible for or enrolled in the adult expansion population at 42 U.S.C. § 1396a(a)(10)(A)(i)(VIII) through an alternative benefit plan, or ABP. *See generally* 42 U.S.C. §§ 1396a(k)(1), 1396b(i)(26), 1396d(y). *See* 91 Fed. Reg. at 33,372–77.

40. The ABP statute and its implementing regulations provide protections related to enrollment in ABPs for those who are "medically frail or otherwise an individual with special medical needs (as identified in accordance with regulations of the Secretary)." *Id.* § 1396u-7(a)(2)(B)(vi).

41. The relevant regulation created to implement § 1396u-7(a)(2)(B)(vi), 42 C.F.R. § 440.315, limits a state's ability to define "medically frail or an individual with special needs" as follows:

> For these purposes, the State's definition of individuals who are medically frail or otherwise have special medical needs must at least include [certain individuals under the age of 19], individuals with disabling mental disorders (including children with serious emotional disturbances and adults with serious mental illness), individuals with chronic substance use disorders, individuals with serious and complex medical conditions, individuals with a physical, intellectual or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living, or individuals with a disability determination based on Social Security criteria or in States that apply more restrictive criteria than the Supplemental Security Income program, the State plan criteria.

42 C.F.R. § 440.315(f).

42. The text of the WFTC legislation contains no explicit references to § 1396u-7(a)(2)(B)(vi) or to its corresponding regulation.

[1] The Secretary signed the IFR, *see* 91 Fed. Reg. at 33,482, and references to him and CMS herein are generally used interchangeably since, as noted above, the Secretary administers Medicaid through CMS.

43. While § 440.315(f) authorizes states to add categories of "medically frail" persons, subclause (V) empowers CMS to "define" the phrase.

44. The text of the subclause deviates from § 440.315(f) in numerous ways.

45. For example, item (bb) removes the limitation that "substance use disorders" be "chronic" found in the ABP regulation, and the catch-all provision of item (ee) was rewritten to clarify it applies to "a serious or complex medical condition."

46. As such, CMS exercised its definitional authority to create "a separate but similar definition of medically frail for community engagement purposes" rather than adopting the definition used for ABPs verbatim. 91 Fed. Reg. at 33,373.

47. In considering how to exercise its discretion, CMS did "not identif[y] any other populations that we believe could reasonably be considered medically frail outside of the five categories identified" in the statute. *Id.*

48. It also expressed concern "that there may be more of an incentive for some States to include individuals who would not reasonably be considered medically frail." *Id.*

49. As such, the new "community engagement" rules define "medically frail or otherwise has special needs" to reflect the "distinct[ions]" between the community engagement requirement and the restrictions on ABPs, in two ways. *Id.* at 33,372.

50. The IFR limits the exclusion to individuals whose "physical, mental, or other behavioral health condition significantly impairs the individual's ability to comply with the community engagement requirement," regardless of which subpart the individual falls under. 42 C.F.R. § 435.554(c)(5)(i).

51. CMS concluded that "[t]he best reading of the statutory phrase 'medically frail or otherwise has special medical needs' is one that considers not only the presence of a particular diagnosis or condition, but also the extent to which the condition impairs an individual's ability to engage in community engagement activities (including but not limited to work)." 91 Fed. Reg. at 33,373.

52. Section 1396a(xx)(9)(A)(ii) authorizes CMS to set "standards" by which states determine which individuals are excluded, and subclause (V) authorizes CMS to "define[]" "who is medically frail or otherwise has special medical needs" for purposes of the exclusion.

53. The IFR further refines the statutory definitions of two of the five categories of "medically frail or otherwise has special medical needs."

54. CMS excluded individuals in "stable recovery" from a substance use disorder from claiming "medical frailty" status, "since their SUDs are unlikely to significantly impair their ability to comply with the community engagement requirement." 91 Fed. Reg. at 33,374.

55. CMS also narrowed the conditions that could be considered a "serious or complex medical condition" by relying on a report the Institute of Medicine (now the National Academy of Medicine) prepared in response to a request from the Health Care Financing Administration (now CMS).

56. That report proposed a nuanced definition of what it means for a medical condition to be "serious and complex," and acknowledged that the determination dynamic, as "conditions may be serious and complex at some points during [a patient's] disease or disability," but may not be "serious and complex for all patients at all times." *Id.* at 33,375–76 & n.74.

57. The IFR provides a list of conditions that the agency "believe[d] it would be reasonable for States to consider . . . serious or complex, when such conditions significantly impair an individual's ability to comply with the community engagement requirement," as well as conditions that would typically not qualify. *Id.* at 33,376.

58. CMS did not provide an "exhaustive list" of conditions. *Id.* at 33,376.

59. The IFR charges the states with developing "a list of diseases, diagnoses, disorders, or other health conditions to identify individuals" who may meet the definition of "medically frail or otherwise has special medical needs." 42 C.F.R. § 435.554(c)(5)(ii).

60. The IFR also mandates that states create "reasonable processes and criteria" for individuals "to request consideration for the exclusion" if they believe they qualify but do not meet the standard criteria. *Id.* § 435.554(c)(5)(ii)(C).

### B. Verification And Timing Procedures For Community Engagement

61. The statute creates a norm of "*ex parte* verifications"—*i.e.*, verifications that do not "requir[e] . . . the applicable individual to submit additional information"—in order to reduce burdens on individuals. It instructs states, "in accordance with standards established by the Secretary," to "establish processes and use reliable information available to the State . . . without requiring, where possible, the applicable individual to submit additional information." 42 U.S.C. § 1396a(xx)(5).

62. The IFR provides an extensive definition of what sort of information is "reliable" for *ex parte* verification purposes, with eight illustrative examples of "reliable" sources. 42 C.F.R. § 435.557(a)(i)–(viii).

63. Two of those sources, "claim(s) relevant to the individual that have been adjudicated" and "encounter data," include only information from "the preceding 12 months." *Id.* § 435.557(a)(vii)–(viii).

64. With respect to the "medical frailty" exclusion, the IFR provides further direction. States are to "attempt to verify that an individual is a specified excluded individual" on medical frailty grounds by "using reliable information available to the State, including claim(s) relevant to the individual that have been adjudicated in the preceding 12 months." *Id.* § 435.557(f)(1).

65. Although this definition is intended to be inclusive, the IFR explains elsewhere that claims data older than a year should be excluded when verifying "medical frailty" "because older information may not reflect the individual's current condition." 91 Fed. Reg. at 33,405.

66. The IFR allows states to look to other forms of reliable information to determine "medical frailty."

67. The absence of data appropriate for *ex parte* verification does not mean an individual will not be classified as "medically frail."

68. The IFR directs States to establish procedures to gather additional information from the individual for purposes of determining whether or not they are "medically frail," with the goal

of eventually developing reliable claim and encounter data that can be used to verify a beneficiary's condition. *Id.* § 435.557(f)(1); 91 Fed. Reg. at 33,406.

69. The above-mentioned procedures allow states to determine someone is medically frail through a statement or other documentation provided to the State under penalty of perjury, with the goal of eventually transitioning to *ex parte* verification through claims data once the individual begins to receive Medicaid-covered services. 91 Fed. Reg. at 33,406.

70. Beginning in 2028, states may accept these alternate forms of proof only once during a period of enrollment when there is otherwise no reliable data for states to rely upon as to an enrollee's condition. 42 C.F.R. § 435.557(f)(1)(ii).

## V. Plaintiffs' Requested Relief Would Be Highly Disruptive

71. Determining who is medically frail is an integral part of implementing the community engagement requirement because individuals who are determined to be medically frail are excluded from the community engagement requirement altogether. Declaration of Sara Vitolo ("Vitolo Decl.") ¶ 10.

72. If states' systems and processes for making medical frailty determinations are not built around the legally effective definition of medical frailty and the applicable evidentiary standards contained in the IFR, they would effectively be unable to make medical frailty determinations due to the risk they may erroneously apply the community engagement requirement to, and possibly even disenroll or deny enrollment to, individuals who should otherwise be excluded from that requirement as medically frail. Vitolo Decl. ¶ 10.

73. If the Court were to vacate the IFR provisions that Plaintiffs challenge or otherwise block CMS from enforcing them, it would cause significant upheaval in the process of implementing the community engagement requirement. Vitolo Decl. ¶ 11.

74. It would also make it impossible for many states, including some plaintiff and non-plaintiff states alike, to implement the requirement by the implementation deadline Congress set in the WFTC legislation, January 1, 2027. Vitolo Decl. ¶ 11.

75. States have been working to implement those provisions through systems changes and build-outs, operational changes, expanded staffing and outreach, and other activities that would enable them to conduct the assessments and verifications needed to implement the challenged IFR provisions and the community engagement requirement more broadly. Vitolo Decl. ¶ 11.

76. Court action instituting a different definition of medical frailty and/or different evidentiary standards than those contained in the IFR would render those changes obsolete and require, on an even more extreme timeline to meet the January 1, 2027 implementation deadline, new systems and operational changes in accordance with any orders from the Court, including updates to state regulations, worker manuals, and training materials. Vitolo Decl. ¶ 11.

77. Before implementation, states will also need to reflect policy changes to medical frailty in application and renewal forms and screens, notices, outreach, website and call center language, and internal and external communications materials. Vitolo Decl. ¶ 11.

78. The foregoing negative impacts of Court relief would be especially magnified if the Court were to vacate or otherwise block enforcement of any of the challenged IFR provisions while leaving open the possibility that CMS could reinstitute them in the future. Vitolo Decl. ¶ 12.

79. States would face the possibility of severe whiplash and wasted resources resulting from changes in the medical frailty definition and applicable evidentiary standards if the Court were to institute the more permissive standards Plaintiffs seek, effective immediately, only for CMS to later reinstitute the IFR's standards in accordance with the Court's decision. Vitolo Decl. ¶ 12.

80. In addition to the disruptions, major systems and operational changes would cost affected states and the federal government tens of millions of dollars, most of which would be paid by CMS to states as federal matching funds for states' administrative expenses. Vitolo Decl. ¶ 13.

81. Last-minute changes to the medical frailty definition and standards regarding claims and encounter data are also likely to generate significant and ongoing confusion among

beneficiaries, states, and other stakeholders with respect to requirements as the community engagement policy and other changes take effect. Vitolo Decl. ¶ 14.

82. States have been conducting outreach for months on a variety of changes under the WFTC legislation that take effect by January 2027, including updates to eligibility for noncitizens and redetermination timelines. Vitolo Decl. ¶ 14.

83. The multiple and complex changes will be challenging for the average beneficiary to understand and meet and for states to message effectively. Vitolo Decl. ¶ 14.

84. Revisions to the policy with insufficient time for effective communication risk introducing further confusion and increasing the likelihood of inappropriate disenrollments. Vitolo Decl. ¶ 14.

Dated: September 18, 2026

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:___/s/ Michael J. Gerardi__________
MICHAEL J. GERARDI
DC Bar No. 1017949
Deputy Associate General Counsel, Office of General Counsel, U.S. Dep't of Health & Human Services
Special Assistant U.S. Attorney

STEPHEN M. RICHMOND
DC Bar No. 1033701
Senior Attorney, Office of General Counsel, U.S. Dep't of Health & Human Services,
Special Assistant U.S. Attorney

200 Independence Ave., SW
Mailstop 443F.23
Washington, D.C. 20201
Phone: (202) 619-3620
E-Mail: Michael.Gerardi@hhs.gov

*Attorneys for Defendants*