**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, *et al.*<br><br>*Plaintiffs*,<br><br>v.<br><br>MEHMET OZ, M.D., in his official capacity as Administrator of the Centers for Medicare & Medicaid Services, *et al.*<br><br>*Defendants*. | No. 1:26-cv-12692 |

**DECLARATION OF SARA VITOLO**

I, Sara Vitolo, declare as follows:

1. I am Deputy Director of the Center for Medicaid and CHIP Services ("CMCS") at the Centers for Medicare & Medicaid Services ("CMS"). I have served in this position since March 2023.

2. CMCS is responsible for administering the Medicaid program in partnership with states, territories, and the District of Columbia (D.C.). Among other things, CMCS serves as CMS's focal point for assistance with formulation, coordination, integration, and implementation of all national program policies and operations related to Medicaid, and it works in partnership with states to assist state agencies in successfully carrying out their responsibilities for effective program administration and beneficiary protection, and, as necessary, supports states in correcting problems and improving the quality of their operations.

3. I make this declaration based upon my personal knowledge and information available to me in my official capacity as Deputy Director of CMCS.

4. I am familiar with the subject matter of the above-captioned lawsuit, in which a group of 25 states and D.C. have challenged several aspects of the interim final rule entitled Medicaid Program; Community Engagement Requirement for Certain Individuals, 91 Fed. Reg. 33,348 (June 3, 2026) ("IFR"), specifically the IFR's provisions defining medical frailty, specifying the claims and encounter data on which states may rely in conducting *ex parte* verifications, and allowing states to accept and rely on self-attestations in verifying medical frailty once per beneficiary per period of enrollment beginning January 1, 2028.

5. Recent novel and significant changes in the law, enacted July 4, 2025, and referred to by CMS as the Working Families Tax Cut ("WFTC") legislation, that generally take effect January 1, 2027, condition Medicaid eligibility for certain individuals on their demonstration of community engagement, as those terms are defined by statute. *See* 42 U.S.C. § 1396a(xx). Those changes have required CMCS and states (including D.C.), who work collaboratively to administer Medicaid, to do a substantial amount of work on extremely tight timelines to ensure compliance with Congress's directions.

6. Among the many and varied implementation tasks facing CMCS and the states is the task of standing up systems and operations to implement the exclusion of certain categories of individuals, termed "specified excluded individual[s]" in the statute, *id.* § 1396a(xx)(9)(A)(ii), from the definition of "applicable individual," *id.* § 1396a(xx)(9)(A)(i), and thus from compliance with the community engagement requirement.

7. One category of specified excluded individuals, the category at issue in the above-captioned lawsuit, comprise those "who [are] medically frail or otherwise ha[ve] special medical needs (as defined by the Secretary), including an individual—(aa) who is blind or disabled (as defined in [42 U.S.C. §] 1382c . . . ); (bb) with a substance use disorder; (cc) with a disabling

mental disorder; (dd) with a physical, intellectual or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living; or (ee) with a serious or complex medical condition[.]" *Id.* § 1396a(xx)(9)(A)(ii)(V).

8. The Secretary, acting through CMS, exercised his statutory authority to define medical frailty in the IFR. *See* 91 Fed. Reg. at 33,472 (codified at 42 C.F.R. § 435.554(c)(5)). The IFR defines it to comprise "an[y] individual whose physical, mental, or other behavioral health condition significantly impairs the individual's ability to comply with the community engagement requirement" as long as the individual also falls into one of the five categories further defined in the IFR, which align with the five categories delineated in the statute (e.g., those who are blind or disabled as defined in 42 U.S.C. § 1382c, those with a disabling mental disorder, etc.).

9. Since the IFR was promulgated, CMCS has been working closely with states to implement all aspects of it, including the challenged IFR provisions. CMCS recently released a slide deck entitled "Implementing Medical Frailty Under Community Engagement (Section 71119 of WFTC Legislation)," *available at* https://tinyurl.com/37r6ycjr, that provides a general informal summary of the technical legal standards contained in the IFR related to medical frailty and provides an example of how states may, pursuant to the IFR, identify individuals who are medically frail using a tiered medical frailty framework. States have been working diligently to implement this aspect of the IFR, among many others, and CMCS has been meeting with states regularly to provide technical assistance to support implementation.

10. Determining who is medically frail is an integral part of implementing the community engagement requirement because individuals who are determined to be medically frail are excluded from the community engagement requirement altogether. If states' systems and processes for making medical frailty determinations are not built around the legally effective

definition of medical frailty and the applicable evidentiary standards contained in the IFR, they would effectively be unable to make medical frailty determinations due to the risk they may erroneously apply the community engagement requirement to, and possibly even disenroll or deny enrollment to, individuals who should otherwise be excluded from that requirement as medically frail.

11. If the Court were to vacate the IFR provisions that Plaintiffs challenge or otherwise block CMS from enforcing them, it would cause significant upheaval in the process of implementing the community engagement requirement. It would make it impossible for many states, including some plaintiff and non-plaintiff states alike, to implement the requirement by the implementation deadline Congress set in the WFTC legislation, January 1, 2027. States have been working to implement those provisions through systems changes and build-outs, operational changes, expanded staffing and outreach, and other activities that would enable them to conduct the assessments and verifications needed to implement the challenged IFR provisions and the community engagement requirement more broadly. Court action instituting a different definition of medical frailty and/or different evidentiary standards than those contained in the IFR would render those changes obsolete and require, on an even more extreme timeline to meet the January 1, 2027 implementation deadline, new systems and operational changes in accordance with any orders from the Court. These would include updates to state regulations, worker manuals, and training materials. Before implementation, states will also need to reflect policy changes to medical frailty in application and renewal forms and screens, notices, outreach, website and call center language, and internal and external communications materials.

12. The foregoing negative impacts of Court relief would be especially magnified if the Court were to vacate or otherwise block enforcement of any of the challenged IFR provisions while

leaving open the possibility that CMS could reinstitute them in the future. States would face the possibility of severe whiplash and wasted resources resulting from changes in the medical frailty definition and applicable evidentiary standards if the Court were to institute the more permissive standards Plaintiffs seek, effective immediately, only for CMS to later reinstitute the IFR's standards in accordance with the Court's decision.

13. In addition to the disruptions, major systems and operational changes would cost affected states and the federal government tens of millions of dollars, most of which would be paid by CMS to states as federal matching funds for states' administrative expenses.

14. Last-minute changes to the medical frailty definition and standards regarding claims and encounter data are also likely to generate significant and ongoing confusion among beneficiaries, states, and other stakeholders with respect to requirements as the community engagement policy and other changes take effect. States have been conducting outreach for months on a variety of changes under the WFTC legislation that take effect by January 2027, including updates to eligibility for noncitizens and redetermination timelines. The multiple and complex changes will be challenging for the average beneficiary to understand and meet and for states to message effectively. Revisions to the policy with insufficient time for effective communication risk introducing further confusion and increasing the likelihood of inappropriate disenrollments.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief. 28 U.S.C. § 1746. Executed this 18th Day of September, 2026.

SARA M. VITOLO -S
Digitally signed by SARA M. VITOLO -S
Date: 2026.09.18 10:25:44 -04'00'

Sara Vitolo
Deputy Director
Center for Medicaid and CHIP Services
Centers for Medicare & Medicaid Services