UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, et al.<br>Plaintiffs,<br><br>v.<br><br>MEHMET OZ, M.D., et al.<br><br>Defendants. | Case No. 1:26-cv-12962 |

**PLAINTIFF STATES' RESPONSE TO DEFENDANTS' STATEMENT OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

1. Enacted in 1965, Medicaid is a cooperative federal-state program in which the Federal Government supplies funding to states to assist them in providing medical assistance to specified categories of low-income individuals. 42 U.S.C. §§ 1396 *et seq*. **Plaintiffs' Response: Undisputed for purposes of Summary Judgment.**

2. Each state that elects to participate must submit a plan for approval to the Secretary, who generally exercises his authority under the Medicaid statute through CMS. 42 U.S.C. §§ 1396, 1396a; *Arkansas Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006). **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

3. If the plan is approved, the state receives Medicaid funds from the federal government for a percentage of the money spent by the state in providing covered medical care to eligible individuals. 42 U.S.C. § 1396b (a)(1). **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

4. If state programs do not comply with the requirements of sections 1396 and 1396a, the Secretary can initiate proceedings to deny federal financial participation (FFP) in whole or in part "until the Secretary is satisfied that there will no longer be any such failure to comply." 42 U.S.C. § 1396c. **Plaintiffs' Response: Undisputed for purposes of summary**

**judgment.**

5. On July 4, 2025, President Trump signed into law H.R. 1, known colloquially as the One Big Beautiful Bill Act, which CMS often refers to as the Working Families Tax Cut ("WFTC") legislation. Pub. L. No. 119-21, 139 Stat. 72. **Plaintiffs' Response: Undisputed.**

6. The WFTC legislation contains a "community engagement requirement for certain individuals" in order to be eligible for Medicaid. *Id.* at 306–14 (section 71119). **Plaintiffs' Response: Undisputed that H.R. 1 includes Section 71119, titled "Requirement for States to Establish Medicaid Community Engagement Requirements for Certain Individuals."** ***Id.*** **at 306–14.**

7. Paragraph (1) of the statute, codified at 42 U.S.C. § 1396a(xx), requires the states and D.C. to "provide, as a condition of eligibility for medical assistance for an applicable individual, that such individual is required to demonstrate community engagement." 42 U.S.C. § 1396a(xx)(1), (9)(C) (definition of "State"). **Plaintiffs' Response: Undisputed that 42 U.S.C. § 1396a(xx)(1) states that "[e]xcept as provided in Paragraph (11), . . . subject to the succeeding provisions of this subsection, a State shall provide, as a condition of eligibility for medical assistance for an applicable individual, that such individual is required to demonstrate community engagement under paragraph (2)-- . . . ." Pub. L. No. 119-21, 139 Stat. 72, 306–307 (42 U.S.C. § 1396a(xx)(1)).**

8. "Applicable individuals" are those made eligible for Medicaid by the Affordable Care Act—generally speaking, nonpregnant adults ages 19–64 with income under 138 percent of the federal poverty level, a group often referred to as the Medicaid "expansion population." **Plaintiffs' Response: Undisputed for purposes of summary judgment that "Applicable individuals" include, but are not limited to, individuals who are "eligible to enroll (or [are] enrolled) under the State plan under subsection (a)(10)(A)(i)(VIII)"—Medicaid expansion. Pub. L. No. 119-21, 139 Stat. 72, 311 (42 U.S.C. §1396a(xx)(9)(A)). Further, an individual who is eligible to enroll under subsection (a)(10)(A)(i)(VIII) is excluded from the definition of "applicable individual" if that individual is a "specified**

**excluded individual.”** ***Id.***

9. “Applicable individuals” also include those eligible for or enrolled in a demonstration project under 42 U.S.C. § 1315 that provides coverage that meets minimum essential coverage requirements and who are ages 19–64, not pregnant, and not entitled to or enrolled in Medicare Part A or B, and who are not otherwise eligible to enroll in Medicaid under the state plan. **Plaintiffs’ Response: Undisputed for purposes of summary judgment that “applicable individuals” include the individuals described above, other than those individuals who qualify as a “specified excluded individual.” Pub. L. No. 119-21, 139 Stat. 72, 311 (42 U.S.C. §1396a(xx)(9)(A)).**

10. Paragraph (2) of section 1396a(xx) defines the community engagement requirement that must be met for at least one month prior to enrollment and during a review period. **Plaintiffs’ Response: Undisputed that 42 U.S.C. § 1396a(xx)(2) describes the conditions for determining whether an applicable individual demonstrates community engagement for a month. 42 U.S.C. § 1396a(xx)(1) addresses the requirement to demonstrate community engagement in a given month prior to enrollment or during a review period.**

11. The requirement can be met in many ways, including part-time work, community service, or participation in a work or educational program. *Id.* § 1396a(xx)(2). **Plaintiffs’ Response: Undisputed that there are multiple ways an individual can demonstrate community engagement for a month. 42 U.S.C. § 1396a(xx)(2)(A)–(G).**

12. Paragraph (9) of § 1396a(xx) includes definitions used throughout the community engagement statute. **Plaintiffs’ Response: Undisputed that Paragraph (9) of § 1396a(xx) includes definitions used in 42 U.S.C. § 1396a(xx).**

13. The statute defines “applicable individuals,” as used in paragraph (1) and throughout the statute, both in terms of affirmative requirements and by carving out “specified excluded individuals” to whom the community engagement requirement does not apply. *Id.* § 1396a(xx)(9)(A)(i). **Plaintiffs’ Response: Undisputed for purposes of summary judgment.**

14. “Specified excluded individual” means “an individual, as determined by the

State (in accordance with standards specified by the Secretary)," who falls in certain categories, including pregnant and postpartum women, inmates at public institutions, participants in certain treatment programs for drug addiction or alcoholism, disabled veterans, certain caregivers, and members of Indian tribes. *Id.* § 1396a(xx)(9)(A)(ii)(II), (III), (IV), (VII), (VIII), (IX). **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

15. "Specified excluded individual" also includes someone

> (V) who is medically frail or otherwise has special medical needs (as defined by the Secretary), including an individual—
> (aa) who is blind or disabled (as defined in [42 U.S.C. §] 1382c);
> (bb) with a substance use disorder;
> (cc) with a disabling mental disorder;
> (dd) with a physical, intellectual or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living; or
> (ee) with a serious or complex medical condition.

*Id.* § 1396a(xx)(9)(A)(ii)(V). **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

16. No other category of "specified excluded individual" contains the parenthetical "as defined by the Secretary" that modifies the phrase "medically frail or otherwise has special medical needs" in subclause (V). **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

17. Section 71119(d) of the WFTC legislation directed CMS to "promulgate an interim final rule for purposes of implementing the provisions of, and the amendments made by, this section," such that notice and comment was not required to issue a legally effective rule. 139 Stat. at 314. **Plaintiffs' Response: Undisputed that H.R. 1 directed CMS to "promulgate an interim final rule for purposes of implementing the provisions of, and the amendments made by, [Section 71119]." Pub. L. No. 119-21, 139 Stat. 72, 314. Further undisputed that H.R. 1 exempts the interim final rule from the provisions of 5 U.S.C. § 553, which include notice and comment procedures. Pub. L. No. 119-21, 139 Stat. 72, 314.**

18. It further states that "[a]ny action taken to implement the provisions of, and

the amendments made by, [§ 71119], shall not be subject to the provisions of [§ 553].” *Id.* **Plaintiffs’ Response: Undisputed for purposes of summary judgment that Section 71119 of H.R. 1 states that “[a]ny action taken to implement the provisions of, and the amendments made by, [§ 71119], shall not be subject to the provisions of [5 U.S.C. § 553].”**

19. CMS received a substantial amount of unsolicited comments from the public concerning or relevant to how to implement the community engagement requirement. **Plaintiffs’ Response: Undisputed for purposes of summary judgment.**

20. An August 17, 2017 letter, from Simon & Co., LLC, advocated for states to perform “a functional analysis” rather than “rely[ing] on a simple list of conditions to determine medically frail status.” AR 3804. **Plaintiffs’ Response: Disputed. The letter did *not* advocate that states perform a functional analysis *rather than* relying on conditions. Instead, the letter encouraged states to use the most expansive means of determining medical frailty, including functional analysis and lists, among other methods that were each independently sufficient to make a medically frail determination. AR, 003804–05. To the extent this statement suggests that this letter advocated a certain approach to determining “medically frail status” within the context of H.R. 1 and the Interim Final Rule, this letter, dated August 17, 2017, addresses the phrase “medically frail” in the context of exemptions from waivers allowing states to eliminate a “mandatory [Nonemergency Medical Transportation] benefit for their Medicaid expansion populations.” AR, 003795.**

21. An October 20, 2025 letter from several disability and aging organizations noted that “the employment rate for working age people with disabilities [is] []37.4%,” AR 3885, and elsewhere argued that self-attestation can help medically frail people “to enroll in Medicaid and get the diagnoses and health care they need,” AR 3888. **Plaintiffs’ Response: Undisputed for purposes of summary judgment that the letter stated as follows: “It is well-established that many people with health and functional impairments face substantial barriers to work. In 2024, the employment rate for working age people with disabilities (37.4%) was just over half the rate of nondisabled people in the same group (74.9%).” AR, 003885. The**

**letter also stated, "As CMS considers implementation of these exemptions, we urge you to make clear to states that the exemptions related to health and functional status are intended to protect people who face additional barriers to work, but these exemptions are clearly <u>not</u> contingent on people showing they are <u>unable</u> to work. The statutory language related to the medically frail and special medical needs exemptions does not require someone to show inability to work as a criterion to qualify."** ***Id.*** **(emphasis in original). The letter also stated, "we strongly urge CMS to encourage states to accept self-attestation as verification for the medically frail exemption. This protection would enable individuals to enroll in Medicaid and get the diagnoses and health care they need with minimal administrative burden to themselves or to the state," AR, 003888. Disputed to the extent this statement misstates or mischaracterizes the record.**

22. A November 10, 2025 letter from the President & CEO of the Association for Behavioral Health and Wellness argued that "[a]ttestation . . . should be [a] key component[] of the medically frail determination process" because "[m]any individuals with serious behavioral health conditions lack recent claims data or formal diagnoses due to barriers such as limited access to care, stigma, or prior coverage disruptions." AR 3939. **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

23. A November 17, 2025 spreadsheet from the Center for Health Law and Policy Innovation ("CHLPI") described a South Dakota Medicaid waiver that defined "Medically frail individuals" as "individuals *unable to work* due to cancer or other serious or terminal illness." AR 3985 (emphasis added). **Plaintiffs' Response: Undisputed that a November 17, 2025 spreadsheet from the Center for Law and Policy Innovation quoted the following text from a South Dakota "Work Waiver Trump 1 (approved or submitted)": "The following individuals will be exempt: . . . Medically frail individuals (e.g., individuals unable to work due to cancer or other serious or terminal illness)." AR, 003985. CHLPI's submission begins by noting that "This resource is not intended to be a complete review of all possible sources of definitions," and "this resource is not intended to imply that any of the**

**definitions below should be used to define medically frail or special medical needs under the new Medicaid work requirements statute." AR, 003974. The CHLPI submission identified multiple states that allowed "self-identification." AR, 003974-89. CHLPI noted Michigan "agrees that beneficiaries with complex chronic conditions may have difficulty meeting the workforce engagement requirement. As part of the Medically Frail Identification Process, MDHHS has provided multiple methods of identifying individuals who meet medically frail exemption criteria, including a beneficiary's self-identification or via an exemption form." AR, 003980. Disputed to the extent this statement misstates or mischaracterizes the record.**

24. A November 19, 2025 letter from two senior attorneys from the National Health Law Program described "draft state work requirements policies that [would have] require[d] an individual who falls within one or more of the five listed categories to show that they are also unable to work." AR 4001. **Plaintiffs' Response: Undisputed that a November 19, 2025 letter from two senior attorneys from the National Health Law Program stated the following: "Before addressing the meaning of several of these categories, we want to raise an overarching concern that CMS should consider in issuing guidance and an IFR. We have already seen draft state work requirements policies that require an individual who falls within one or more of the five listed categories to show that they are also unable to work. CMS should make clear to states that the plain language for the statute prohibits such policies for each of the categories other than 'an individual who is . . . disabled (as defined in section 1614).'" AR, 004001; *see also* ECF 138-3, ¶¶110, 111. Disputed to the extent this statement misstates or mischaracterizes the record.**

25. A December 3, 2025 letter from Michael Lewis of the American Association of People with Disabilities argued that "medically frail" and "special medical needs" "[s]hould cover anyone whose health or functional limitations *interfere with meeting requirements*." AR 4038 (emphasis added). **Plaintiffs' Response: Undisputed that a December 3, 2025 letter from Michael Lewis of the American Association of People with Disabilities stated, in a**

**recommendation titled "Define 'medically frail' and 'special medical needs' broadly,": "Should cover anyone whose health or functional limitations interfere with meeting requirements—regardless of whether they meet disability-eligibility criteria." AR, 004038. The letter stated, on the same page, "[p]rohibit states from using 'ability to work' or employment data to deny exemptions" and "[h]aving a disability or medical condition that qualifies for an exemption is not inconsistent with work."** ***Id.*** **The letter went on to say "States should: (a) Automatically reverify exemptions using existing Medicaid data. (b) Use disability and chronic condition indicators already in the system. (c) Avoid requiring repeated or burdensome documents from enrollees. (d) Emphasize that unnecessary paperwork leads to <u>eligible people losing coverage</u>, not increased compliance. AR, 4038-39. And later, "CMS should… Identify best practices and allow states to go beyond minimum statutory protections." AR 4039. And "(1) To prevent coverage disruptions, CMS should allow <u>good-faith temporary exemptions or delays</u> during implementation. (2) Stress that even short lapses in coverage can cause severe harm for people dependent on ongoing supports."** ***Id.*** **(emphasis in original). Disputed to the extent this statement misstates or mischaracterizes the record.**

26. A December 4, 2025 report from the National Health Law Program noted that, with respect to Guam's process for identifying medically frail individuals in the context of alternative benefit programs, "Guam does not accept self-attestation, instead requiring that individuals wishing to be identified as medically frail submit a 'Medically Frail Certification' form with a certification from a medical provider that they meet the medically frail standard." AR 4053; *see also* AR 4077–78. **Plaintiffs' Response: Undisputed for purposes of summary judgment. Plaintiffs respond further that the letter also said of the ABP regulation upon which the medically frail definition in H.R. 1 was based, "[t]his definition is a floor: states may adopt more expansive definitions of medical frailty, but they must include <u>at least</u> the individuals described in the regulation." AR, 004050 (emphasis in original). The letter also identified "9 expansion states and territories operating at least 1 non-aligned ABP to serve**

**their expansion populations." AR, 004052. Of those nine states and territories, Guam was the only one that did not accept self-attestation. AR, 004052-53.**

27. A February 14, 2026 proposal for medical frailty logic from Gainwell Technologies, a healthcare technology company, proposed to base medical frailty determinations on the presence of a "medical condition or disorder," an "indicator of frailty," and an "active pharmaceutical treatment," not simply "[t]he presence of a single diagnosis or procedure code" and also suggested that even "[p]ermanent conditions" trigger "a 12-month cadence during which the [Medicaid beneficiary] remains exempt . . . with automated extension if qualifying evidence is observed *in the subsequent year*." AR 4417 (emphasis omitted) **Plaintiffs' Response: Undisputed for purposes of summary judgment. Plaintiffs respond further that the proposal refers to a "2 Year Look Back." AR, 004416.**

28. A February 24, 2026 letter from the Chair of the Board of the Association for Clinical Oncology advocated for self-attestation for, *inter alia*, "new Medicaid beneficiaries." AR 4450. **Plaintiffs' Response: Undisputed for purposes of summary judgment. Plaintiffs respond further that the letter went on, "it is essential to preserve sufficient clinical capacity in Medicaid and to avoid unintended consequences that jeopardize access for patients with cancer. CMS guidance has the power to prevent inappropriate coverage loss as states begin implementing community engagement requirements." AR, 004451.**

29. A March 20, 2026 slide show summarizing a study from researchers at the Harvard T.H. Chan School of Public Health looked at how medical frailty determinations would be impacted by lookback windows for medical claims data of as short as three months and as long as two years, though it looked only at claims data, not other categories of data that states must (or at least may) consider in verifying medical frailty. AR 4727–30. **Plaintiffs' Response: Undisputed for purposes of summary judgment. Plaintiffs respond further that the research also showed that using a one-year lookback rather than two-year lookbook reduces the number of people identified as "medically frail" by at least two million individuals. ECF 138-3, ¶131.**

30. A March 27, 2026 legal memorandum from the Foundation for Government Accountability expressed concerns that allowing individuals enrolling or enrolled in Medicaid to self-attest to medically frail status would amount "abdication of the determination to the very person whose eligibility is at issue" and otherwise urged CMS to exercise its authority to entirely prohibit states from relying on self-attestation. AR 4753–58. **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

31. An April 17, 2026 letter from the Advocacy Director of #MEAction advocated for "[a]llowing self-declaration" for "people with serious health conditions" who are "newly applying for Medicaid." AR 4775. **Plaintiffs' Response: Undisputed that an April 17, 2026 letter from the Advocacy Director of #MEAction stated: "The simplest and most accurate way to identify people with ME/CFS, Long COVID, other infection-associated chronic conditions for medical frailty exemptions is to allow people <u>applying for or enrolled</u> in Medicaid to self-identify that they have a serious or complex medical condition that meets exemption criteria. States should accept this declaration as sufficient verification as permitted under federal law and consistent with current practices for other eligibility categories in many states. Allowing self-declaration is important because people with serious health conditions like ME/CFS and Long COVID may not have information on these health conditions in their claims data or they may struggle to access medical or other formal records, <u>especially if they are newly applying</u> for Medicaid and do not have access to medical care after losing employment due to serious illness." AR, 004775 (emphasis added). The letter continued, "Individuals who are episodically disabled by chronic illness should not be required to show that they cannot work to qualify as medically frail so as not to disincentive community engagement when it is intermittently possible." AR, 004776. Disputed to the extent this statement misstates or mischaracterizes the record.**

32. An April 17, 2026 Viewpoint paper published in the JAMA Health Forum argued, "Attestations and screeners will allow programs to identify individuals with medical frailty who are not yet formally captured in other data sources." AR 4785. **Plaintiffs' Response:**

**Undisputed for purposes of summary judgment. Plaintiffs respond further that the letter also stated in a section titled "States Should Define Medical Frailty Based on Clinical Risk, Rather Than the Ability to Work," "the statute also further recognizes exemptions on a clinical basis, including for people who have a serious or complex medical condition. The ability to work is not included in this section of the statute; rather, this category focuses on clinical risk. Accordingly, states should ensure that this category encompasses individuals for whom coverage disruption would lead to clinical destabilization. Evidence from prior Medicaid eligibility changes demonstrates that coverage interruptions are associated with reduced access to care and medication discontinuity. For an adult who has undergone a kidney transplant, for example, uninterrupted access to immunosuppressive medications is essential to prevent organ rejection even if they could work without functional impairments. Brief lapses in coverage could result in missed doses and acute rejection, with serious consequences for both clinical outcomes and health care costs." AR, 004784-85.**

33. A May 26, 2026 news article published by Sigi Ris of IWP News reported on concerns expressed by the Senior Advisor on Medicaid Policy at Families USA that prohibiting self-attestations entirely could put new or newly medically frail applicants "in a Catch-22," unable to generate supporting clinical data without coverage and rendering them unable to prove Medicaid eligibility. AR 4794. **Plaintiffs' Response: Undisputed for purposes of summary judgment. Plaintiffs respond further that the article also stated, "[t]his change in the definitions here [for] medical frailty would not only exclude many, many vulnerable individuals from the exemption, but also set up an enormous administrative process for states to go through to determine eligibility and determine work ability on top of that, and that's just one that states are not prepared for, and they haven't been preparing for over the last year"; and "[h]aving the ability to self-attest is really paramount for people who would meet the medical frailty exemption but just don't have the paperwork to document their health status." ECF 138-3 ¶172.**

34. A May 28, 2026 email from the Senior Director for Federal Advocacy at the

American Cancer Society advocated for use of self-attestation "for the first year of implementation" of the CE requirement. AR 4797. **Plaintiffs' Response: Undisputed that a May 28, 2026 email from the Senior Director of Federal Advocacy at the American Cancer Society wrote that "[a]llowing individuals to self-attest to medical frailty and other criteria—including exemptions and qualifying activities—is an important and practical tool, <u>especially</u> for the first year of implementation." AR, 004797 (emphasis added). Disputed to the extent this statement misstates or mischaracterizes the record.**

35. A letter from the Executive Director of the National Association of State Head Injury Administrators and the President & CEO of the Brain Injury Association of America argued that "[c]lear guidance from CMS can help states both identify individuals who should be exempt due to significant functional impairments and support those who are able to participate in community engagement activities." AR 4802. **Plaintiffs' Response: Undisputed for purposes of summary judgment that the referenced letter includes the quoted language. Disputed to the extent this statement suggests that the letter advocated consideration of functional impairment alone to determine qualification for the medically frail exclusion. The letter advocated consideration of functional impairment in order to expand applicability of the medically frail exclusion, stating as follows: "We also recommend that CMS encourage the use of health-based screening tools to supplement data-driven approaches. However, these screeners must go beyond diagnosis-based questions. Many individuals with brain injury, particularly those without formal diagnoses, may not respond affirmatively to questions such as 'have you ever been diagnosed with a brain or head injury.' Instead, screeners should incorporate functional and behavioral indicators, including history of lifetime exposure to brain injury (regardless of formal diagnosis), limitations in instrumental activities of daily living, cognitive or behavioral impairments, and other factors associated with increased risk of institutionalization. Incorporating these elements will improve identification of individuals whose impairments may not be otherwise captured." AR, 004803. The letter also noted the limitations of relying on claims data alone, stating, "A key**

**challenge in identifying this population is that many individuals with brain injury do not fit neatly into traditional medical or diagnostic categories. Some individuals may lack claims history, while others may have claims that do not fully capture the extent of their impairments. Additionally, many individuals do not have formal documentation of their injury, are not enrolled in waiver programs due to documentation barriers, or have secondary or tertiary diagnoses that obscure the presence of brain injury. As a result, reliance on traditional claims-based identification methods alone may fail to identify individuals who meet medical frailty criteria. To address these challenges, we recommend that CMS provide guidance encouraging states to use multiple data sources to identify individuals who may qualify for medical frailty exemptions."** ***Id.***

36. Congress directed CMS and the states to implement the community engagement requirement no later than January 1, 2027. *See* 42 U.S.C. § 1396a(xx)(1). **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

37. To meet this deadline, Congress directed CMS to "promulgate an interim final rule for purposes of implementing the provisions of, and the amendments made by," the WFTC legislation by June 1, 2026. 139 Stat. at 314, § 71119(d). **Plaintiffs' Response: Undisputed for purposes of summary judgment that Congress directed the Secretary of Health and Human Services to "promulgate an interim final rule for purposes of implementing the provisions of, and the amendments made by" Section 71119 of H.R. 1 "[n]ot later than June 1, 2026." 139 Stat. 72, 314, § 71119(d). Disputed that the purpose of this direction was to "meet this deadline," as Defendants fail to support this assertion with a citation to the record as required by Fed. R. Civ. P. 56(c) and L.R. 56.1.**

38. CMS did so, making an interim final rule available for inspection on June 1 that appeared in the Federal Register on June 3.[1] **Plaintiffs' Response: Undisputed for**

[1] The Secretary signed the IFR, *see* 91 Fed. Reg. at 33,482, and references to him and CMS herein are generally used interchangeably since, as noted above, the Secretary administers Medicaid through CMS.

**purposes of summary judgment.**

39. Prior to the WFTC legislation, states were required to provide coverage to individuals eligible for or enrolled in the adult expansion population at 42 U.S.C.§ 1396a(a)(10)(A)(i)(VIII) through an alternative benefit plan, or ABP. *See generally* 42 U.S.C. §§ 1396a(k)(1), 1396b(i)(26), 1396d(y). *See* 91 Fed. Reg. at 33,372–77. **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

40. The ABP statute and its implementing regulations provide protections related to enrollment in ABPs for those who are "medically frail or otherwise an individual with special medical needs (as identified in accordance with regulations of the Secretary)." *Id.* § 1396u-7(a)(2)(B)(vi). **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

41. The relevant regulation created to implement § 1396u-7(a)(2)(B)(vi), 42 C.F.R. § 440.315, limits a state's ability to define "medically frail or an individual with special needs" as follows:

> For these purposes, the State's definition of individuals who are medically frail or otherwise have special medical needs must at least include [certain individuals under the age of 19], individuals with disabling mental disorders (including children with serious emotional disturbances and adults with serious mental illness), individuals with chronic substance use disorders, individuals with serious and complex medical conditions, individuals with a physical, intellectual or developmental disability that significantly impairs their ability to perform 1 or more activities of daily living, or individuals with a disability determination based on Social Security criteria or in States that apply more restrictive criteria than the Supplemental Security Income program, the State plan criteria.

42 C.F.R. § 440.315(f). **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

42. The text of the WFTC legislation contains no explicit references to § 1396u-7(a)(2)(B)(vi) or to its corresponding regulation. **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

43. While § 440.315(f) authorizes states to add categories of "medically frail" persons, subclause (V) empowers CMS to "define" the phrase. **Plaintiffs' Response: Disputed. That § 440.315(f) authorizes states to add categories of "medically frail" is a conclusion of**

**law that is not appropriately included in a statement of material facts under Fed. R. Civ. P. 56 or L.R. 56.1. Whether and how "subclause (V) empowers CMS to 'define' the phrase" is a question of law at issue in this litigation, and is likewise not appropriately included in Defendants' statement of material facts.**

44. The text of the subclause deviates from § 440.315(f) in numerous ways. **Plaintiffs' Response: Undisputed for purposes of summary judgment, with the understanding that "the subclause" refers to 42 U.S.C. § 1396a(xx)(9)(A)(ii)(V).**

45. For example, item (bb) removes the limitation that "substance use disorders" be "chronic" found in the ABP regulation, and the catch-all provision of item (ee) was rewritten to clarify it applies to "a serious or complex medical condition." **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

46. As such, CMS exercised its definitional authority to create "a separate but similar definition of medically frail for community engagement purposes" rather than adopting the definition used for ABPs verbatim. 91 Fed. Reg. at 33,373. **Plaintiffs' Response: Disputed. That "CMS exercised its definitional authority" is a conclusion of law that is not appropriately included in a statement of material facts under Fed. R. Civ. P. 56 or L.R. 56.1.**

47. In considering how to exercise its discretion, CMS did "not identif[y] any other populations that we believe could reasonably be considered medically frail outside of the five categories identified" in the statute. *Id.* **Plaintiffs' Response: Disputed. The cited page of the IFR does not discuss whether or how CMS was "considering how to exercise its discretion" and whether CMS has "discretion," and to what extent, is a question of law that is not appropriately addressed in a statement of material facts under Fed. R. Civ. P. 56 or L.R. 56.1. Undisputed that the IFR states "we have not identified any other populations that we believe could reasonably be considered medically frail outside of the five categories identified at section 1902(xx)(9)(A)(ii)(V) of the Act." 91 Fed. Reg. 33,373.**

48. It also expressed concern "that there may be more of an incentive for some

States to include individuals who would not reasonably be considered medically frail." *Id.* **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

49. As such, the new "community engagement" rules define "medically frail or otherwise has special needs" to reflect the "distinct[ions]" between the community engagement requirement and the restrictions on ABPs, in two ways. *Id.* at 33,372. **Plaintiffs' Response: Undisputed that the IFR states as follows: "We are not adopting the ABP medically frail definition for purposes of the community engagement medically frail exclusion for the reasons stated in this section of the preamble. While the medically frail exclusions for purposes of ABP and community engagement both apply to individuals eligible under the adult group, they are distinct from each other in that they are in two different sections of the statute that apply to different aspects of the Medicaid program." *Id.* at 33,372.**

50. The IFR limits the exclusion to individuals whose "physical, mental, or other behavioral health condition significantly impairs the individual's ability to comply with the community engagement requirement," regardless of which subpart the individual falls under. 42 C.F.R. § 435.554(c)(5)(i). **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

51. CMS concluded that "[t]he best reading of the statutory phrase 'medically frail or otherwise has special medical needs' is one that considers not only the presence of a particular diagnosis or condition, but also the extent to which the condition impairs an individual's ability to engage in community engagement activities (including but not limited to work)." 91 Fed. Reg. at 33,373. **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

52. Section 1396a(xx)(9)(A)(ii) authorizes CMS to set "standards" by which states determine which individuals are excluded, and subclause (V) authorizes CMS to "define[]" "who is medically frail or otherwise has special medical needs" for purposes of the exclusion. **Plaintiffs' Response: Disputed. These assertions constitute conclusions of law that are not appropriately included in a statement of material facts under Fed. R. Civ. P. 56 or L.R.**

**56.1**

53. The IFR further refines the statutory definitions of two of the five categories of "medically frail or otherwise has special medical needs." **Plaintiffs' Response: Undisputed for purposes of summary judgment that the Interim Final Rule adds language to the following statutory categories of "medically frail" individuals: "substance use disorder" and "serious or complex medical condition."** ***Compare*** **42 U.S.C. §1396a(xx)(9)(A)(ii)(V),** ***with*** **42 C.F.R. § 435.554(c).**

54. CMS excluded individuals in "stable recovery" from a substance use disorder from claiming "medical frailty" status, "since their SUDs are unlikely to significantly impair their ability to comply with the community engagement requirement." 91 Fed. Reg. at 33,374. **Plaintiffs' Response: Undisputed that CMS stated that it is "excluding individuals in stable recovery from th[e] definition [of the medically frail exclusion] since their SUDs are unlikely to significantly impair their ability to comply with the community engagement requirement." 91 Fed. Reg. 33,374.**

55. CMS also narrowed the conditions that could be considered a "serious or complex medical condition" by relying on a report the Institute of Medicine (now the National Academy of Medicine) prepared in response to a request from the Health Care Financing Administration (now CMS). **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

56. That report proposed a nuanced definition of what it means for a medical condition to be "serious and complex," and acknowledged that the determination dynamic, as "conditions may be serious and complex at some points during [a patient's] disease or disability," but may not be "serious and complex for all patients at all times." *Id.* at 33,375–76 & n.74. **Plaintiffs' Response: Undisputed that the report by the Institute of Medicine cited in the IFR stated that "conditions may be serious and complex for some patients at some points during the course of their disease or disability" but may not "necessarily be serious and complex for all patients at all times." 91 Fed. Reg. 33,376. Further undisputed that the**

**report provided criteria that could be used to describe medical conditions as serious or complex. *Id.* Disputed that these criteria constitute a "nuanced definition," as the cited materials do not support this assertion.**

57. The IFR provides a list of conditions that the agency "believe[d] it would be reasonable for States to consider . . . serious or complex, when such conditions significantly impair an individual's ability to comply with the community engagement requirement," as well as conditions that would typically not qualify. *Id.* at 33,376. **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

58. CMS did not provide an "exhaustive list" of conditions. *Id.* at 33,376. **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

59. The IFR charges the states with developing "a list of diseases, diagnoses, disorders, or other health conditions to identify individuals" who may meet the definition of "medically frail or otherwise has special medical needs." 42 C.F.R. § 435.554(c)(5)(ii). **Plaintiffs' Response: Undisputed that the IFR requires states to develop "a list of diseases, diagnoses, disorders, or other health conditions to identify individuals who meet the criteria" set out by the IFR for determining who is "medically frail or otherwise has special medical needs." 42 C.F.R. § 435.554(c)(5)(ii).**

60. The IFR also mandates that states create "reasonable processes and criteria" for individuals "to request consideration for the exclusion" if they believe they qualify but do not meet the standard criteria. *Id.* § 435.554(c)(5)(ii)(C). **Plaintiffs' Response: Undisputed that the IFR mandates that states have "reasonable processes and criteria in place for" individuals "to request consideration for the exclusion" if that "individual does not have a disease, diagnosis, disorder, or health condition" on the list developed by a State to identify individuals who meet the medically frail criteria. 42 C.F.R. § 435.554(c)(5)(ii)(C).**

61. The statute creates a norm of "*ex parte* verifications"—*i.e.*, verifications that do not "requir[e] . . . the applicable individual to submit additional information"—in order to reduce burdens on individuals. It instructs states, "in accordance with standards established by the

Secretary," to "establish processes and use reliable information available to the State . . . without requiring, where possible, the applicable individual to submit additional information." 42 U.S.C. § 1396a(xx)(5). **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

62. The IFR provides an extensive definition of what sort of information is "reliable" for *ex parte* verification purposes, with eight illustrative examples of "reliable" sources. 42 C.F.R. § 435.557(a)(i)–(viii). **Plaintiffs' Response: Undisputed that the IFR defines "reliable information available to the State," a term that is used throughout the IFR, and that the definition includes, but is not limited to, eight categories of information. 42 C.F.R. § 435.557(a)(i)–(viii). Disputed that the definition is "extensive," as Defendants cite no basis for this assertion.**

63. Two of those sources, "claim(s) relevant to the individual that have been adjudicated" and "encounter data," include only information from "the preceding 12 months." *Id.* § 435.557(a)(vii)–(viii). **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

64. With respect to the "medical frailty" exclusion, the IFR provides further direction. States are to "attempt to verify that an individual is a specified excluded individual" on medical frailty grounds by "using reliable information available to the State, including claim(s) relevant to the individual that have been adjudicated in the preceding 12 months." *Id.* § 435.557(f)(1). **Plaintiffs' Response: Undisputed that the IFR requires states to "attempt to verify that an individual is a specified excluded individual on the basis that the individual is medically frail or otherwise has special medical needs as defined at § 435.554(c)(5) using reliable information available to the State, including claim(s) relevant to the individual that have been adjudicated in the preceding 12 months." 42 C.F.R. § 435.557(f)(1). Disputed that this requirement constitutes "further direction" to the States, as it merely incorporates the definitions discussed in paragraphs 63 and 64 above. *Id.***

65. Although this definition is intended to be inclusive, the IFR explains elsewhere that claims data older than a year should be excluded when verifying "medical frailty" "because older information may not reflect the individual's current condition." 91 Fed. Reg. at 33,405.

**Plaintiffs' Response: Disputed that this definition is intended to be inclusive, as the cited material does not address CMS's intent in drafting the definition of "reliable information available to the State." 42 C.F.R. § 435.557(f)(1). Undisputed that CMS stated that "States may not consider information older than 12 months when verifying medical frailty or other special medical needs, because older information may not reflect the individual's current condition." 91 Fed. Reg. 33,405.**

66. The IFR allows states to look to other forms of reliable information to determine "medical frailty." **Plaintiffs' Response: Undisputed for purposes of summary judgment. *See* 42 C.F.R. §§ 435.557(a)(i-viii), (f).**

67. The absence of data appropriate for *ex parte* verification does not mean an individual will not be classified as "medically frail." **Plaintiffs' Response: Undisputed that the IFR establishes procedures for classifying an individual as "medically frail" if a State is unable to do so on an *ex parte* basis. 42 C.F.R. § 435.557(f).**

68. The IFR directs States to establish procedures to gather additional information from the individual for purposes of determining whether or not they are "medically frail," with the goal of eventually developing reliable claim and encounter data that can be used to verify a beneficiary's condition. *Id.* § 435.557(f)(1); 91 Fed. Reg. at 33,406. **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

69. The above-mentioned procedures allow states to determine someone is medically frail through a statement or other documentation provided to the State under penalty of perjury, with the goal of eventually transitioning to *ex parte* verification through claims data once the individual begins to receive Medicaid-covered services. 91 Fed. Reg. at 33,406. **Plaintiffs' Response: Disputed that the "above-mentioned procedures allow states to determine someone is medically frail through a statement or other documentation provided to the State under penalty of perjury" without qualification, as the procedures limit states' use of statements after January 1, 2028. 42 C.F.R. § 435.557(f)(1).**

70. Beginning in 2028, states may accept these alternate forms of proof only once

during a period of enrollment when there is otherwise no reliable data for states to rely upon as to an enrollee's condition. 42 C.F.R. § 435.557(f)(1)(ii). **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

71. Determining who is medically frail is an integral part of implementing the community engagement requirement because individuals who are determined to be medically frail are excluded from the community engagement requirement altogether. Declaration of Sara Vitolo ("Vitolo Decl.") ¶ 10. **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

72. If states' systems and processes for making medical frailty determinations are not built around the legally effective definition of medical frailty and the applicable evidentiary standards contained in the IFR, they would effectively be unable to make medical frailty determinations due to the risk they may erroneously apply the community engagement requirement to, and possibly even disenroll or deny enrollment to, individuals who should otherwise be excluded from that requirement as medically frail. Vitolo Decl. ¶ 10. **Plaintiffs' Response: Undisputed as to the importance of state systems and processes being built around the legally effective definition of medical frailty and potential risk of erroneous applications of the community engagement requirement, *see* ECF 138-3, ¶¶241-242, and disputed as to the remainder of the assertion.**

73. If the Court were to vacate the IFR provisions that Plaintiffs challenge or otherwise block CMS from enforcing them, it would cause significant upheaval in the process of implementing the community engagement requirement. Vitolo Decl. ¶ 11. **Plaintiffs' Response: Disputed. The cited declaration from CMS references only burdens experienced by the States, not CMS, and therefore relies on out-of-court statements being offered to prove the truth of the matter asserted, which do not fall under any recognized exception or exclusion to the prohibition on admission of hearsay. Fed. R. Evid. 801-803, 901.**

74. It would also make it impossible for many states, including some plaintiff and non-plaintiff states alike, to implement the requirement by the implementation deadline Congress set in the WFTC legislation, January 1, 2027. Vitolo Decl. ¶ 11. **Plaintiffs' Response:**

**Undisputed as to the difficulty of implementation of the IFR provisions by the congressionally set deadline of January 1, 2027, *see* ECF 138-3, ¶¶237-245, and disputed as to the remainder of the assertion.**

75. States have been working to implement those provisions through systems changes and build-outs, operational changes, expanded staffing and outreach, and other activities that would enable them to conduct the assessments and verifications needed to implement the challenged IFR provisions and the community engagement requirement more broadly. Vitolo Decl. ¶ 11. **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

76. Court action instituting a different definition of medical frailty and/or different evidentiary standards than those contained in the IFR would render those changes obsolete and require, on an even more extreme timeline to meet the January 1, 2027 implementation deadline, new systems and operational changes in accordance with any orders from the Court, including updates to state regulations, worker manuals, and training materials. Vitolo Decl. ¶ 11. **Plaintiffs' Response: Undisputed for purposes of summary judgment. States have been preparing for implementation of H.R. 1 since at least November 2025, *see* ECF 138-3, ¶234, and would return to their pre-IFR approaches to implementation.**

77. Before implementation, states will also need to reflect policy changes to medical frailty in application and renewal forms and screens, notices, outreach, website and call center language, and internal and external communications materials. Vitolo Decl. ¶ 11. **Plaintiffs' Response: Undisputed for purposes of summary judgment. States have been preparing for implementation of H.R. 1 since at least November 2025, *see* ECF 138-3, ¶234, and would return to their pre-IFR approaches to implementation.**

78. The foregoing negative impacts of Court relief would be especially magnified if the Court were to vacate or otherwise block enforcement of any of the challenged IFR provisions while leaving open the possibility that CMS could reinstitute them in the future. Vitolo Decl. ¶ 12. **Plaintiffs' Response: Disputed. The cited declaration from CMS references only**

**negative impacts on the States, not CMS, and therefore relies on out-of-court statements being offered to prove the truth of the matter asserted, which do not fall under any recognized exception or exclusion to the prohibition on admission of hearsay. Fed. R. Evid. 801-803, 901.**

79. States would face the possibility of severe whiplash and wasted resources resulting from changes in the medical frailty definition and applicable evidentiary standards if the Court were to institute the more permissive standards Plaintiffs seek, effective immediately, only for CMS to later reinstitute the IFR's standards in accordance with the Court's decision. Vitolo Decl. ¶ 12. **Plaintiffs' Response: Disputed. The cited declaration from CMS references only burdens experienced by the States, not CMS, and therefore relies on out-of-court statements being offered to prove the truth of the matter asserted, which do not fall under any recognized exception or exclusion to the prohibition on admission of hearsay. Fed. R. Evid. 801-803, 901.**

80. In addition to the disruptions, major systems and operational changes would cost affected states and the federal government tens of millions of dollars, most of which would be paid by CMS to states as federal matching funds for states' administrative expenses. Vitolo Decl. ¶ 13. **Plaintiffs' Response: Undisputed as to the financial burden resulting from disruptions, major systems and operational changes that have already been incurred by States in their attempts to comply with the Challenged Provisions on an expedited timeline, *see* ECF 138-3, ¶¶234, 237-240. States have been preparing for implementation of H.R. 1 since at least November 2025, *see* ECF 138-3, ¶234, and would return to their pre-IFR approaches to implementation.**

81. Last-minute changes to the medical frailty definition and standards regarding claims and encounter data are also likely to generate significant and ongoing confusion among beneficiaries, states, and other stakeholders with respect to requirements as the community

engagement policy and other changes take effect. Vitolo Decl. ¶ 14. **Plaintiffs' Response: Undisputed as to the significant and ongoing confusion caused by the Challenged Provisions, *see* ECF 138-3, ¶234, 237-240, notwithstanding states' work to prepare for and deploy the new process by January 1, 2027. States have been preparing for implementation of H.R. 1 since at least November 2025, *see* ECF 138-3, ¶234, and would return to their pre-IFR approaches to implementation.**

82. States have been conducting outreach for months on a variety of changes under the WFTC legislation that take effect by January 2027, including updates to eligibility for noncitizens and redetermination timelines. Vitolo Decl. ¶ 14. **Plaintiffs' Response: Undisputed for purposes of summary judgment.**

83. The multiple and complex changes will be challenging for the average beneficiary to understand and meet and for states to message effectively. Vitolo Decl. ¶ 14. **Plaintiffs' Response: Undisputed that the changes will be challenging for the average beneficiary to understand and for states to message effectively within the required time frame, *see* ECF 138-3, ¶¶239-240. States have been preparing for implementation of H.R. 1 since November 2025, *see* ECF 138-3, ¶234, and would return to their pre-IFR approaches to implementation.**

84. Revisions to the policy with insufficient time for effective communication risk introducing further confusion and increasing the likelihood of inappropriate disenrollments. Vitolo Decl. ¶ 14. **Plaintiffs' Response: Undisputed that confusion around the Challenged Provisions could increase the likelihood of inappropriate disenrollments, *see* ECF 138-3, ¶¶245, 250, 252-253, 255-257. States have been preparing for implementation of H.R. 1 since November 2025, *see* ECF 138-3, ¶234, and would return to their pre-IFR approaches to implementation.**

Dated: September 28, 2026

Respectfully submitted,

**ANDREA JOY CAMPBELL**
*Attorney General of Massachusetts*

By: */s/ Nita Kumaraswami Klunder*
Nita K. Klunder (BBO No. 689304)
*State Trial Counsel*
Ethan W. Marks (BBO No. 690746)
*Deputy Chief, Health Care Division*
Katherine D. Kearns (BBO No. 707105)
Julia S. Canney (BBO No. 717328)
*Assistant Attorneys General*
One Ashburton Place
Boston, MA 02108
(617) 963-2394
nita.klunder@mass.gov
*Attorneys for the Commonwealth of Massachusetts*

**ROB BONTA**
*Attorney General for the State of California*

By: */s/ Anna Rich*
Neli N. Palma*
*Senior Assistant Attorney General*
Kathleen Boergers*
*Supervising Deputy Attorney General*
Anna Rich*
Ketakee Kane*
*Deputy Attorneys General*
1515 Clay Street
Oakland, CA 94612
510-879-0296
Anna.Rich@doj.ca.gov
*Attorneys for the People of the State of California*

**JENNIFER DAVENPORT**
*Attorney General of New Jersey*

By: */s/ Shankar Duraiswamy*
Shankar Duraiswamy*
*Deputy Solicitor General*
Samuel Dolinger*
*Assistant Attorney General*
Geoffrey McGee*
Jake Mazeitis*
*Deputy Attorneys General*
124 Halsey St.
Newark, NJ 07101
(609) 649-1019
Shankar.Duraiswamy@njoag.gov
*Attorneys for the State of New Jersey*

**KRISTIN K. MAYES**
*Attorney General of Arizona*

By: */s/ Joshua A. Katz*
Joshua A. Katz*
*Assistant Attorney General*
2005 N. Central Ave.
Phoenix, AZ 85004
(602) 542-8053
Joshua.Katz@azag.gov
*Attorney for the State of Arizona*

**PHILIP J. WEISER**
*Attorney General for the State of Colorado*

By: */s/ Ryan Lorch*
Ryan Lorch*
Sarah H. Weiss*
*Senior Assistant Attorneys General*
1300 Broadway, 10th Floor
Denver, CO 80203
(720) 508-6000
Ryan.Lorch@coag.gov
Sarah.Weiss@coag.gov
*Attorneys for the State of Colorado*

**WILLIAM TONG**
*Attorney General of Connecticut*

By: */s/ Patricia E. McCooey*
Patricia E. McCooey*
*Assistant Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5210
Patricia.McCooey@ct.gov
*Attorney for State of Connecticut*

**KATHLEEN JENNINGS**
*Attorney General of the State of Delaware*

By: */s/ Vanessa L. Kassab*
Ian R. Liston*
*Director of Impact Litigation*
Robin L. Jacobs
*Assistant Attorney General*
Vanessa L. Kassab*
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov
*Attorneys for the State of Delaware*

**BRIAN L. SCHWALB**
*Attorney General of the District of Columbia*

By: */s/ Nicole S. Hill*
Nicole S. Hill*
*Assistant Attorney General*
Office of the Attorney General for the District of Columbia
400 Sixth Street NW
Washington, D.C. 20001
(202) 727-4171
Nicole.Hill@dc.gov
*Attorney for District of Columbia*

**ANNE E. LOPEZ**
*Attorney General for the State of Hawai'i*

By: */s/ Kaliko'onālani D. Fernandes*
Kaliko'onālani D. Fernandes*
Solicitor General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorney for the State of Hawai'i*

**KWAME RAOUL**
*Attorney General of Illinois*

By: */s/ Katharine Roller*
Katharine Roller*
Complex Litigation Counsel
Emily Hirsch*
Assistant Attorney General
115 S. LaSalle St
Chicago, IL 60603
773-519-1842
Katharine.roller@ilag.gov
Emily.hirsch@ilag.gov
*Attorneys for the State of Illinois*

**OFFICE OF THE GOVERNOR ex rel. ANDY BESHEAR**
*In His Official Capacity as Governor Of The Commonwealth Of Kentucky*

/s/ S. Travis Mayo
S. Travis Mayo*
*General Counsel*
Sam Flynn*
*Chief Deputy General Counsel*
Laura C. Tipton*
*Deputy General Counsel*
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
sam.flynn@ky.gov
laurac.tipton@ky.gov
*Attorneys for the Office of the Governor*

**AARON M. FREY**
*Maine Attorney General*

By: /s/ Katherine W. Thompson
Katherine W. Thompson*
*Special Counsel*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Kate.thompson@maine.gov
*Attorney for the State of Maine*

**ANTHONY G. BROWN**
*Attorney General of Maryland*

/s/ Michael Drezner
Michael Drezner*
*Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6959
Mdrezner@oag.state.md.us
*Attorney for the State of Maryland*

**DANA NESSEL**
*Attorney General of Michigan*

By: /s/ Neil Giovanatti
Neil Giovanatti*
*Assistant Attorney General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov
*Attorney for the State of Michigan*

**KEITH ELLISON**
*Attorney General of Minnesota*

By: */s/Katherine Bies*
Katherine Bies*
*Assistant Attorney General*
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us
*Attorney for the State of Minnesota*

**AARON D. FORD**
*Attorney General of Nevada*

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland*
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
(702) 486-8727
kireland@ag.nv.gov
*Attorney for the State of Nevada*

**RAÚL TORREZ**
*Attorney General Of New Mexico*

By: */s/ Anjana Samant*
Anjana Samant*
*Deputy Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, NM 87501
(505) 270-4332
asamant@nmdoj.gov
*Attorney for the State of New Mexico*

**LETITIA JAMES**
*Attorney General for the State of New York*

By: */s/ Morenike Fajana*
Morenike Fajana*
*Special Counsel*
Rabia Muqaddam*
*Chief Counsel for Federal Initiatives*
28 Liberty Street
New York, NY 10005
(347) 931-3187
Morenike.fajana@ag.ny.gov
*Attorneys for the State of New York*

**JEFF JACKSON**
Attorney General of North Carolina
By: */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
*Associate Deputy Attorney General*
Laura Howard
*Chief Deputy Attorney General*
114 W. Edenton St.,
Raleigh, NC 27603
(919) 716-6026
dmosteller@ncdoj.gov
*Attorneys for the State of North Carolina*

**DAN RAYFIELD**
*Attorney General of Oregon*

By: */s/ Scott P. Kennedy*
Scott P. Kennedy*
*Senior Assistant Attorney General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Scott.Kennedy@doj.oregon.gov
*Attorney for the State of Oregon*

**JOSH SHAPIRO**
*Governor of the Commonwealth of Pennsylvania*

By: */s/ Jacob B. Boyer*
Jennifer C. Selber
*General Counsel*
Jacob B. Boyer*
*Deputy General Counsel*
Office of General Counsel
30 North Street, Suite 200
Harrisburg, PA 17101
717-460-6786
jacobboyer@pa.gov
*Attorneys for the Governor of the Commonwealth of Pennsylvania*

**PETER F. NERONHA**
*Attorney General of Rhode Island*

By: */s/ Lee Staley*
Lee B. Staley*
*Chief, Health Care Unit*
150 South Main Street
Providence, RI 02903
Phone: (401) 274-4400
Fax: (401) 222-2995
lstaley@riag.ri.gov
*Attorney for the State of Rhode Island*

**CHARITY R. CLARK**
*Attorney General for the State of Vermont*

By: */s/ Ryan Patrick Kane*
Ryan Patrick Kane*
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-3171
Ryan.kane@vermont.gov
*Attorney for the State of Vermont*

**JAY JONES**
*Attorney General for the Commonwealth of Virginia*

/s/ *Megan C. Keenan*
Megan C. Keenan*
*Deputy Solicitor General*
202 North Ninth Street
Richmond, Virginia 23219
(804) 997-5222
mkeenan@oag.state.va.us
*Attorney for Commonwealth of Virginia*

**NICHOLAS W. BROWN**
*Attorney General State of Washington*

By: */s/ Tyler Roberts*
Tyler Roberts*
*Assistant Attorney General*
William McGinty*
*Deputy Solicitor General*
Washington Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206)-464-7744
Tyler.Roberts@atg.wa.gov
William.McGinty@atg.wa.gov
*Attorneys for State of Washington*

**JOSHUA L. KAUL**
*Attorney General for the State of Wisconsin*

By: */s/ Faye Hipsman*
Faye Hipsman*
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
faye.hipsman@wisdoj.gov
*Attorney for State of Wisconsin*

*pro hac vice granted

**CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system and will be sent electronically to the registered participants as identified in the Notice of Electronic filing (NEF).

/s/ Nita K. Klunder
Nita K. Klunder (BBO #689304)
*State Trial Counsel*
1 Ashburton Pl.
Boston, MA 02108
617.963.2394
Nita.klunder@mass.gov
*Counsel for the Commonwealth of Massachusetts*