**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

COMMONWEALTH OF
MASSACHUSETTS, *et al.*,

*Plaintiffs*,

v.

MEHMET OZ, M.D., in his official capacity as Administrator of the Centers for Medicare & Medicaid Services, *et al.*,

*Defendants*.

No. 1:26-cv-12962

**DEFENDANTS' REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS


INTRODUCTION ..... 1

ARGUMENT ..... 1

I. The IFR Is Lawful, Reasonable, And Constitutional ..... 1

  A. The IFR Is Not Contrary To Law ..... 1

  B. The IFR Satisfies The APA's Requirement Of Reasoned Decision-Making ..... 4

  C. The IFR Comports With The Spending Clause ..... 12

II. Regardless, Plaintiffs' Requests For Relief Are Not Appropriate Here ..... 13

CONCLUSION ..... 15

# TABLE OF AUTHORITIES

**Cases**


*Assoc. Fisheries of Maine, Inc. v. Daley*,
127 F.3d 104 (1st Cir. 1997) .................... 5

*Atieh v. Riordan*,
797 F.3d 135 (1st Cir. 2015) .................... 5

*Becerra v. Empire Health Found.*,
597 U.S. 424 (2022) .................... 5

*Bowe v. United States*,
607 U.S. 13 (2026) .................... 4

*Braintree Lab'ys., Inc. v. Citigroup Glob. Mkts. Inc.*,
622 F.3d 36 (1st Cir. 2010) .................... 15

*Cent. Me. Power Co. v. FERC*,
252 F.3d 34 (1st Cir. 2001) .................... 13

*George v. McDonough*,
596 U.S. 740 (2022) .................... 3

*Greater Bos. Legal Servs. v. DHS*,
No. 21-cv-10083,2025 WL 1725826 (D. Mass. June 20, 2025) .................... 5

*Int'l Union, United Mine Workers of Am. v. MSHA*
920 F.2d 960 (D.C. Cir. 1990) .................... 14

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024) .................... 3

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) .................... 6

*NFIB v. Sebelius*,
567 U.S. 519 (2012) .................... 12, 13

*Perez v. Mortg. Bankers Ass'n*,
575 U.S. 92 (2015) .................... 6

*DHS v. Regents,*
591 U.S. 1 (2020). .................... 6, 8

*Safer Chems., Healthy Fams v. E.P.A.*,
943 F.3d 397 (9th Cir. 2019) .......... 2

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985) .......... 3

*Stilwell v. Off. of Thrift Supervision*,
569 F.3d 514 (D.C. Cir. 2009) .......... 6, 10, 11

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
435 U.S. 519 (1978) .......... 6

**Statutes**

5 U.S.C. § 553 .......... 6, 14

15 U.S.C. § 2602(4) .......... 2

42 U.S.C. § 1396a(xx)(5) .......... 11

42 U.S.C. § 1396a(xx)(9)(A)(ii)(V) .......... 1

42 U.S.C. § 1396a(xx)(11)(A)–(B) .......... 15

42 U.S.C. § 1396c .......... 13

**Rules**

Fed. R. Evid. 403 .......... 9

**Regulations**

42 C.F.R. § 435.554(c)(5)(i) .......... 1, 3

42 C.F.R. §§ 430.10–430.20 .......... 12

42 C.F.R. § 445.557(a) .......... 8

91 Fed. Reg. 33348 (June 3, 2026) .......... *passim*

## INTRODUCTION

Defendants' opening brief ("Defs.' Br.") established that the provisions of the interim final rule ("IFR") promulgated by the Secretary on behalf of the Centers for Medicare & Medicaid Services ("CMS") are lawful, reasonable, and constitutional, such that final judgment in Defendants' favor on all counts of the Complaint should follow. It also established that Plaintiffs' preferred forms of relief—vacatur, an injunction, or a stay of the enforcement date—are not viable; a remand of the challenged IFR provisions to CMS without vacatur is the most the Court could order here. Plaintiffs' opposition and reply brief ("Pls.' Opp.") does not disturb these conclusions, cycling through arguments that have already been shown to lack merit. Accordingly, the Court should grant Defendants' cross-motion for summary judgment, deny Plaintiffs' motion for summary judgment, and enter final judgment on behalf of Defendants.

## ARGUMENT

### I. The IFR Is Lawful, Reasonable, And Constitutional

#### A. The IFR Is Not Contrary To Law

Defendants previously established that Congress delegated to the Secretary authority to define "medically frail or otherwise have special medical needs" 42 U.S.C. § 1396a(xx)(9)(A)(ii)(V), and 42 C.F.R. § 435.554(c)(5)(i) falls comfortably within that delegated authority. Defs.' Br. at 9–11. The definition CMS adopted accords with "the best reading of the statutory phrase." *Id.* at 10 (quoting 91 Fed. Reg. 33,348, 33,373 (June 3, 2026)). It respects the limits Congress set on the definition while ensuring eligibility for the exclusion is in harmony with the overall statutory context. And Defendants showed why Plaintiffs' alternative reading of those categories as establishing a "floor" on eligibility for the exclusion, with no limitation, flies in the face of statutory text, context, and applicable precedent. *Id.* at 12–14. Plaintiffs' efforts to rebut this interpretation lack merit.

Plaintiffs press their theory that the word "including" should be read to virtually eliminate Congress's delegation of authority to the Secretary to define the phrase "medically frail or otherwise has special medical needs." Pls.' Opp. at 2–7. Defendants already explained why that

word cannot bear the weight Plaintiffs place on it and is not compelled by a "plain meaning" reading of the statute. Defs.' Br. at 11–12. The delegation, not the word "including," is the key feature of the statutory text at issue here. Plaintiffs continue to rely upon the Ninth Circuit's *Safer Chemicals* decision, *see* Pls.' Opp. at 2–3 & n.1, a case Defendants already distinguished, *see* Defs.' Br. at 14, as it interprets a different, less categorical delegation ("the circumstances, as determined by the Administrator . . .") arising in a different statutory scheme. *Safer Chems., Healthy Fams. v. EPA*, 943 F.3d 397, 407 (9th Cir. 2019) (quoting 15 U.S.C. § 2602(4)).

Plaintiffs try to salvage their interpretation of "including" by arguing it "gives CMS discretion to include 'other categories beyond those specifically listed' as 'part of the definition' of medically frail." Pls.' Opp. at 5. But Plaintiffs do not identify what those categories are. CMS already considered this issue and did not identify any additional categories worth adding to the exclusion. 91 Fed. Reg. 33,373. That makes sense. "Serious" conditions and "complex" conditions are already part of Congress's definition, such that Plaintiffs' definition would leave no room for discretion by CMS in defining "medical frailty." By contrast, Plaintiffs' rigid understanding of the statute would excuse many individuals who are not "frail," and whose medical needs are ordinary and routine, from compliance with the community engagement requirement. CMS properly used its delegated authority to craft a definition that avoids such outcomes.

Plaintiffs next warn the Court of the "logical implications of CMS's argument," asserting that CMS might "add countless other requirements before considering someone with a statutory condition to be medically frail." Pls.' Opp. at 4. These concerns are entitled to little weight. CMS is constrained by Congress's identification of specific categories of medically frail individuals, which the IFR dutifully includes in its definition. As the parties' discussion of grocery shopping demonstrated, *see* Defs.' Br. 12–13, an instruction to "include" broad categories of individuals is not best understood as a command to include *all* individuals who could conceivably fall within the category, particularly in a context where there is a delegation of authority to define a term of art that encompasses the categories. And while Congress's delegation gives CMS broad authority to define the scope of the "medically frail" exclusion, CMS's definition still has to satisfy the APA's

requirement of "reasoned decisionmaking," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024), as well as overarching legal standards (such as the Constitution) that restrain the conduct of the Executive Branch. CMS acted well within those legal bounds here.

Plaintiffs' other arguments fare no better. Regarding their "old soil" argument, the "principle" underlying that argument "is that when Congress employs a term of art, that usage itself suffices to adopt the cluster of ideas that were attached to each borrowed word *in the absence of indication to the contrary*." *George v. McDonough*, 596 U.S. 740, 753 (2022) (cleaned up) (emphasis added). Contrary to Plaintiffs' assertions, *see* Pls.' Opp. at 5, CMS pointed to such indications: Congress not only did not "expressly incorporate the [alternative benefit plan, or] ABP standards by reference"; it also did not "expressly direct CMS to use the ABP definition," it "delegated to CMS the authority to further define the term" "medically frail or otherwise has special medical needs," and it "modified the ABP definition in several material ways." Defs.' Br. at 13. Similarly, Plaintiffs' *exclusion unius* argument fails. It is Plaintiffs, not Defendants, who are "factually wrong" that the category in item (aa) of subclause (V) contains a "substantively identical" impairment requirement, Pls.' Opp. at 5. That category refers to an *inability* to engage in substantial "gainful work," which is decidedly different from the "significantly impairs" standard as to the broader concept of "community engagement" set forth in the IFR. 42 C.F.R. § 435.554(c)(5)(i). Finally, even if this Court were bound to a "liberal construction" canon in interpreting the Social Security Act, that canon cannot be used to "beget" an ambiguity in Congress's explicit delegation to CMS. Defs.' Br. at 13 (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 492 n.10 (1985)).

Plaintiffs end their statutory argument where they started by misconstruing Defendants' argument about CMS's statutory authority to limit the scope of (1) the phrase "medically frail or otherwise has special medical needs" itself in subclause (V) and (2) the specifically listed categories in items (aa)–(ee) that follow. *See* Pls.' Opp. at 6. CMS did not "not[e] that the statute *separately* authorizes the agency to define the meaning of the statutory conditions listed at subclause (V)," as Plaintiffs claim. *Id.* CMS's authority to do both stems from the same sources—

the delegation to set "standards" for state medical frailty determinations of "specified excluded individuals," 42 U.S.C. §1396a(xx)(9)(A)(ii), and the delegation to "define[]" the phrase "medically frail or otherwise has special medical needs," *id.* § 1396a(xx)(9)(A)(ii)(V). Plaintiffs never dispute that CMS has authority to define each category within items (aa)–(ee), and given CMS's undisputed authority to define the term of art "medically frail or otherwise has special medical needs," it follows *a fortiori* that CMS has the authority to do what it did in the IFR.

Finally, Plaintiffs' fallback to statutory purpose and Congressional intent to overcome clear statutory language, *see id.* at 6 fails, as the cases they rely on demonstrate, *see id.* at 7 (quoting *Bowe v. United States*, 607 U.S. 13, 41 (2026)). Congress delegated to CMS the authority to define the "medically frail" exclusion, within certain bounds CMS followed. No canon of construction prevented CMS from settling on the definition it ultimately chose.

For these reasons, the Court should enter judgment for Defendants on Plaintiffs' contrary to law claim with respect to the "medically frail" exclusion.

### B. The IFR Satisfies The APA's Requirement Of Reasoned Decision-Making

#### 1. The "Medically Frail" Standard Is Reasonable And Reasonably Explained

Defendants' opening brief demonstrated that CMS appropriately explained the IFR's medical frailty definition. Defs.' Br. at 15–23. CMS adopted that definition on its understanding that the phrase "medically frail or otherwise has special medical needs" "connotes diminished functional capacity that significantly impairs an individual's ability to meet ordinary demands. In this context, the relevant demand is meeting the community engagement requirement." 91 Fed. Reg. at 33,373. It also explained "that if individuals with a serious or complex medical condition do not have significantly impaired ability to comply with the community engagement requirement[,] participating in community engagement activities, such as employment, could potentially help them escape isolation and dependency, build confidence, achieve self-sufficiency and prosperity, and improve health." *Id.* at 33,376. It was reasonable for CMS to conclude that individuals who have, for example, a serious or complex medical condition that does not

significantly impair their ability to engage in their communities should not be excluded from the statute's requirement to do so. Such individuals may reap the benefits of participating in their communities, just as hundreds of millions of Americans do every day. 91 Fed. Reg. at 33,451.

Plaintiffs, no doubt, would write a different rule. But Congress made the Secretary responsible for the policy judgments required to implement the community engagement requirement, not Plaintiffs. And because the Court owes "great deference to agency decisionmaking," which is presumed to be valid, its authority to override those judgments is "narrow." *Assoc. Fisheries of Maine, Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997). Indeed, "[i]f the agency's decision is supported by *any* rational view of the record, a reviewing court must uphold it." *Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (emphasis added). Viewed through this lens, Plaintiffs' arguments in support of their arbitrary and capricious claim fall well short of demonstrating the IFR is unsupported by any rational view of the record.[1]

Plaintiffs start with the observation that "Defendants' principal 'explanation' for the [IFR's definition of medical frailty] is that it is the best reading of the statute," which "defies credulity" because it was allegedly reached late in the process. Pls.' Opp. at 8 (citing Defs.' Br. at 15–17 and 91 Fed. Reg. at 33,373). But the fact that the definition CMS adopted was not the first definition thought of, *see id.*, is irrelevant. *See, e.g.*, *Becerra v. Empire Health Found.*, 597 U.S. 424, 432, 434 (2022) (holding that 2004 CMS regulation "correctly construes the statutory language at issue"); *see also id.* at 446 (Kavanaugh, J., dissenting) (explaining that the 2004 interpretation deviated from the agency's longstanding interpretation (citation omitted)). CMS amply explained why its interpretation was "best," which drew on the context of the statute as a whole and the

---

[1] Plaintiffs also ask the Court to risk legal error by relying on unspecified assertions in their statement of material facts instead of the administrative record. Pls.' Opp. at 9 n.4. As one of the cases Plaintiffs cite in their response-reply brief notes, *see id.*, the usual summary judgment standard "does not apply" to APA cases, and it is the administrative record that ultimately governs the case. *Greater Bos. Legal Servs. v. DHS*, No. 21-cv-10083, 2025 WL 1725826, at *1 n.1 (D. Mass. June 20, 2025) (noting, after defendant did not respond to statement of material facts, that Court considered "all facts proffered by the parties which are neither inconsistent with the facts proffered by the other party nor inconsistent with the administrative record").

agency's conviction, supported by a sizable body of literature, that "community engagement" drives better health outcomes. 91 Fed. Reg. 33,373; *see also id.* at 33,349–50 & nn. 6–20. Plaintiffs ignored this evidence even though CMS was not obligated to provide it. *See Stilwell v. Off. of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009). Taken in full, CMS's explanation was perfectly reasonable and supported its choices here.

Plaintiffs also give inordinate weight to CMS's alleged failure to consider consequences "downstream" from Medicaid disenrollment, such as uninsured individuals imposing greater costs on the healthcare system or failing to obtain treatment they would seek out if covered. Pls.' Opp. at 5–6. But the APA does not require CMS "to explore 'every alternative device and thought conceivable by the mind of man'" in justifying its course of action. *Dep't of Homeland Sec. v. Regents*, 591 U.S. 1, 33 (2020) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978)). Far from ignoring that disenrollment is an "important aspect of the problem" when eligibility requirements are at issue, *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), CMS directly evaluated disenrollment and calculated a "combined estimated disenrollment rate of approximately 15 percent of total adult group enrollment," impacting federal and state healthcare expenditures, 91 Fed. Reg. 33,460–61, including costs borne by the states of "reimburs[ing] providers for otherwise-uncompensated care," *id.* at 33,468 (footnote to Table 47). It is widely understood that such estimates are fraught with uncertainty. *Id.* at 33,456; *see also* Cong. Budget Off., *Supplemental Cost Estimate* 6–7, https://www.cbo.gov/system/files/2025-10/PL-119-21-Medicaid%20_0.pdf (Oct. 28, 2025). The IFR does not fail rationality review because its estimates differ from those Plaintiffs favor.

Plaintiffs elsewhere assert that the APA requires an agency to "consider[] feedback it receives," Pls.' Opp. at 9, but they never seriously grapple with the fact that Congress suspended 5 U.S.C. § 553 for purposes of implementing this statute and affirmatively authorized CMS to proceed with an IFR without first soliciting public comment, *see* Defs.' Br. at 3 (quoting 139 Stat. at 314). They call CMS's reference to § 71119 "bizarre," Pls.' Opp. at 10 n.5, without explaining why. To be sure, the waiver of notice and comment in the community engagement legislation does

not absolve CMS from promulgating a rule rationally supported by the record before it. CMS met that requirement here. But notice and comment implies an obligation to "consider and respond to significant comments received during the period for public comment" that is only required for some forms of informal rulemaking. *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). CMS was not subject to that constraint in issuing the IFR.

Plaintiffs make a flurry of attacks on CMS's analysis of the costs and impacts of the IFR, Pls.' Opp. at 10–12, but they do not stick. To start, they say that "CMS did not evaluate the costs of the Challenged Provisions, it only evaluated the costs of H.R. 1's [Community Engagement] Requirement overall," *id.* at 10, but CMS examined the impact of community engagement requirement as implemented by the IFR, not the statute itself. *See, e.g.*, 91 Fed. Reg. at 33,450 ("We have examined the impacts of *this rule*" (emphasis added).). And, as CMS already explained, it did its own estimate of the IFR's direct impact on enrollment, rather than relying on outside studies it was not obliged to consider. *See* Defs.' Br. at 18 (citing 91 Fed. Reg. at 33,434, 33,457–60). CMS did not "ignore[]" the problem of Medicaid beneficiaries losing coverage; rather, it directly acknowledged the problem. Pls.' Opp. at 11 (citation omitted). As already shown, Defs.' Br. at 17–20, CMS considered all important aspects of the problem it faced. Plaintiffs offer their own studies estimating different enrollment impacts than CMS's study estimates, but they again cite no law or precedent demanding CMS rely on outside studies rather than its own when considering the impact of its rulemakings, or that would make the rationality of the rule hinge on disagreements between experts about estimates.

Plaintiffs also fail to acknowledge the totality of CMS's analysis of the costs and impacts of the IFR. For example, they claim CMS "fail[ed] to consider the burden the [so-called] Significant Impairment Provision places on States," Pls.' Opp. at 12, even though CMS conducted a detailed analysis of the costs states face in implementing the IFR, *see, e.g.*, 91 Fed. Reg. at 33,453–54 (summary table), including uncompensated care costs Plaintiffs inaccurately accuse CMS of ignoring, *compare* Defs.' Br. at 19–20 (citing 91 Fed. Reg. at 33,468 (footnote to Table 47)) *with* Pls.' Opp. at 12 (asserting "CMS admittedly ignored" "uncompensated care costs"). They

also inaccurately assert that CMS "changed" the "pre-IFR definition and the IFR definition" of medical frailty. Pls.' Opp. at 12. As Defendants have already pointed out, Defs.' Br. at 21, there was no pre-existing definition of medical frailty applicable to the community engagement requirement before the IFR. Elsewhere, in a footnote, Plaintiffs assert that CMS had to "consider reliance interests" because of its "admission that the [Community Engagement] Requirement was 'an entirely new factor of eligibility[.]'" Pls.' Opp. at 12 n.6 (citation omitted). But Plaintiffs offer no explanation why *Congress* enacting a new Medicaid eligibility requirement required *CMS* to consider reliance interests, as required when an agency changes binding legal norms it previously established. *See Regents*, 591 U.S. at 30. Finally, there is no contradiction between the record evidence that vacating or enjoining the IFR shortly before Congress's mandated January 1, 2027 implementation date would be highly disruptive and the legal argument that Plaintiffs' pre-IFR "reliance" concerns are not cognizable under the relevant precedents. Pls.' Opp. at 12.

Plaintiffs conclude with criticism of CMS's explanation for how states can conduct *ex parte* verifications of medical frailty by relying on various approaches and information. *See id.* at 12–13. They misleadingly focus on "payroll data" only, *id.*at 13, despite CMS articulating numerous other types of reliable information available to states for *ex parte* verification, *see* Defs.' Br. 22–23. Payroll data is just one of the many categories of reliable information available to states to use when verifying compliance with or exception or exclusion from the community engagement requirement. *See* 42 C.F.R. § 445.557(a).

Overall, Plaintiffs ignore the ways in which the IFR directly addresses the important questions raised by CMS's interpretation of the "medical frailty" exclusion. They have raised no errors in that interpretation or CMS's explanation of it that would warrant reversal under the APA's deferential standard for rationality review. The Court should reject Plaintiffs' arbitrary and capricious claim as to the definition of "medically frail or otherwise has special medical needs."

### 2. The One-Year Lookback Period For Claims And Encounter Data Is Reasonable And Reasonably Explained

Defendants previously established that it was reasonable for CMS to adopt, and that CMS appropriately explained, the one-year lookback period for claims and encounter data used to verify medical frailty. Defs.' Br. at 23–26. As Defendants noted, CMS adopted that lookback period out of concern that "older information may not reflect the individual's current condition," 91 Fed. Reg. at 33,405, and in so doing balanced concerns from various stakeholders who submitted feedback while CMS was developing the IFR. Defs.' Br. at 23–24. As Defendants also noted, that lookback period still leaves states the ability to use qualifying claims and encounter data, along with many other data sources, to conduct *ex parte* verifications of medical frailty or, in situations where *ex parte* verification is not feasible, to attempt to verify medical frailty by seeking further documentation or, under certain circumstances, attestation or other information from the applicant or beneficiary. *Id.* at 24–25. Defendants refuted Plaintiffs' opening arguments, *id.* at 25–26, and their arguments in opposition fail, too. The Court should hold the IFR's 12-month lookback period for claims and encounter data used to verify medical frailty is not arbitrary and capricious.

Plaintiffs acknowledge that CMS chose a 12-month lookback period for claims and encounter data based on its concern that "older information may not reflect the individual's current condition." Pls.' Opp. at 13. Yet they still assert that "CMS has identified no downside to allowing State Medicaid agencies" to access claims and encounter data more than a year old. *Id.* CMS stated what the downside was in plain terms. Under the APA, it did not have to do more. The fact that some older claims and encounter data may have "probative value," *id.* at 13, is beside the point—any line-drawing exercise has the potential to exclude relevant evidence, and decision-makers often exclude relevant evidence when "its probative value is substantially outweighed" by other considerations (unfair prejudice, confusion, etc.). *See, e.g.*, Fed. R. Evid. 403. These are not sound reasons to reject the line CMS drew.

Plaintiffs' other arguments are similarly meritless. They continue to rely on a study about the impact of different cut-off dates for claims data on eligibility for exclusions that Defendants

already addressed. *Compare* Pls.' Opp. at 14 *with* Defs.' Br. at 25. They cite it as "evidence that at least two million more people would maintain their coverage with the additional year lookback." Pls.' Opp. at 14. But they do not respond to, and thereby concede the validity of, Defendants' argument that the study they cite "looked only at claims data, not other categories of data that states must (or at least may) consider in verifying medical frailty" and thus "does not prove anything about how many people, if any, might not be classified as medically frail as a result of CMS's chosen lookback period." Defs.' Br. at 25. Nor do they account for the burdens and costs of parsing twice the amount of claims data to make exclusion determinations, despite Plaintiffs' overall concerns about the alleged burdensomeness of the IFR on their state health agencies. Plaintiffs' references to tools, like audits, available for CMS to use to police fraudulent or otherwise erroneous medical frailty determinations, Pls.' Opp. at 14, are also beside the point. Plaintiffs cite no authority requiring CMS to rely solely on retrospective compliance tools. *See Stilwell*, 569 F.3d at 519 ("[A]gencies can, of course, adopt prophylactic rules to prevent potential problems before they arise. An agency need not suffer the flood before building the levee."). Finally, their assertion that CMS "failed to consider" a longer lookback period (e.g., two years), *id.*, is again belied by CMS's stated rationale for adopting the one-year lookback: "older information," including information that is more than a year old but less than two, "may not reflect the individual's current condition," 91 Fed. Reg. at 33,405.

At bottom, CMS was not bound to allow states to rely on unlimited claims and encounter data in verifying medical frailty, and CMS's chosen line on what claims and encounter data they may rely on was reasonable and reasonably explained. Plaintiffs have not shown otherwise.

**3. CMS's Standards For Self-Attestations To Verify Medical Frailty Are Reasonable And Reasonably Explained**

Defendants previously established CMS's approach to self-attestations in the medical frailty context were reasonable and reasonably explained. Defs.' Br. at 26–29. The IFR allows for an initial self-attestation by beneficiaries, and gives beneficiaries time to obtain care for their conditions that will "thereby generate claims or encounter data that could facilitate their continued

qualification for medically frail status" without the need for further self-attestations. *Id.* at 27 (citing 91 Fed. Reg. at 33,406). These standards also balanced concerns, raised in feedback CMS received while developing the IFR, that pointed in opposite directions regarding whether to allow self-attestations in the medical frailty context at all and how much it should allow states to rely on them in making medical frailty determinations. *Id.* at 26–28.

Plaintiffs' opening arguments regarding CMS's standards in this area lacked merit, *see id.* at 28–29, as do their arguments in opposition. There is no dispute that CMS has authority to impose a limit on self-attestation. Defs.' Br. at 28 n.6. But unlike their claims-data argument, which at least suggested possible reasonable alternatives (albeit alternatives CMS was not compelled to adopt under the APA), Plaintiffs' arguments admit no grounds on which CMS could ever limit self-attestation. Plaintiffs contend that CMS's response overlooks the possibility that claims data might not match an individual's condition, requiring self-attestation. Pls.' Opp. 15. But the speculative scenario of an individual with a serious condition (such as cerebral palsy) only generating medical claims data for a host of minor ailments (like ear infections), and a state health agency not having any other means of determining the person's eligibility for the exclusion, is not presented in this facial challenge to the IFR. Nor does it overcome the logic of CMS imposing a limit on self-attestation in order to create reliable data for *ex parte* verifications, which Plaintiffs prefer and the statute presumptively favors, *see* 42 U.S.C. § 1396a(xx)(5)). Likewise, it would be difficult to find a stronger acknowledgment in the IFR of Plaintiffs' concerns about the difficulties of obtaining provider documentation than CMS's decision to permit self-attestation, albeit in a more limited form than Plaintiffs would prefer. CMS was not required to adduce "data" that would support the reasonable middle ground it chose. *See Stilwell*, 569 F.3d at 519.

Plaintiffs disagree with CMS's decision to limit self-attestation, but Congress empowered CMS to determine whether, and how much, self-attestation would be permitted, and it made a reasonable (and reasoned) choice on both fronts. The Court should reject Plaintiffs' arbitrary and capricious claim as to self-attestation.

### C. The IFR Comports With The Spending Clause

Defendants also established their entitlement to summary judgment on Count III of the Complaint, which raises a meritless claim that the IFR provisions Plaintiffs challenge violate the Spending Clause. Defs.' Br. at 29–31. As Defendants explained, the Spending Clause is an enumerated power of Congress, not a limitation on Executive Branch discretion exercised within the constraints Congress provides. The community engagement statute delineates conditions states must meet to receive federal Medicaid funds and empowers the Secretary to set standards and define terms in order to implement the various exclusions from the requirement. *Id.* at 29–30. Defendants exercised that authority in compliance with the APA. And as Defendants further explained, nothing about the statute or the IFR rises to the level of "coercion." *Id.* at 30–31. Plaintiffs did not move for summary judgment on this meritless claim, and their attempts in opposition to save it for another day fall short.

To start, Plaintiffs point to no binding precedent saying the Spending Clause applies to the Executive, instead relying on non-binding precedent that does not cogently explain why an enumerated power of Congress listed in Article I serves as an Article II constraint. Pls.' Opp. at 15–16. If the Court agrees with Defendants that the IFR provisions Plaintiffs challenge comport with the APA and a statute Plaintiffs do not contend comports with the Spending Clause, there simply is no basis for the Court to strike those provisions as contrary to the Spending Clause. Plaintiffs' concerns about supposed clear notice problems with the IFR, *id.* at 15–17, reduce to a claim that they were surprised CMS exercised its delegated authority the way it did, a claim not cognizable under the Spending Clause when the statute put them on notice that CMS had such authority in the first instance. And to the extent Plaintiffs' assertions go to questions about precise requirements for operationalizing the IFR's provisions, such questions are not new to the Medicaid context, and an established regulatory framework exists to work out those requirements. *See* 42 C.F.R. §§ 430.10–430.20. The Spending Clause is not implicated by these processes.

As for Plaintiffs' complaints about supposed coercion, they point to traditional tools available to CMS for enforcing compliance with a host of Medicaid rules. Pls.' Opp. at 17 (pointing

to Payment Error Rate Management regulations and 42 U.S.C. § 1396c). Their theory that the availability of those tools amounts to unconstitutional "economic dragooning," *id.* (quoting *NFIB v. Sebelius*, 567 U.S. 519, 582 (2012) (Roberts, C.J.)), cannot be correct, as it would render almost any Medicaid rule unconstitutional. Precedent supports Defendants, not Plaintiffs here—there are no "factual questions," *id.*, about whether the community engagement requirement or the IFR effect a "shift in kind" here, *NFIB*, 567 U.S. at 583. Congress added a new condition of eligibility to a program already marked by numerous conditions of eligibility, and CMS fleshed out the parameters of that condition in accordance with statutory authority Congress granted it, including the APA's requirement of reasoned decisionmaking. *NFIB*, by contrast, dealt with a historic expansion of the Medicaid program that a majority of the Court found amounted to a "new health care program." *Id.* at 584; *see also id.* at 671–689 (Scalia, J., dissenting). It was in that context that the Court determined even the threatened withholding of all federal funding under the traditional Medicaid program for states that did not participate in that new program was unconstitutionally coercive. *Id.* at 579–86. Nothing of that magnitude has occurred here. Accordingly, Defendants are entitled to summary judgment on this claim.

## II. Regardless, Plaintiffs' Requests For Relief Are Not Appropriate Here

As explained above, CMS had authority to define the term "medically frail or otherwise has special medical needs" in a manner that comported with the best reading of the statutory text, and it provided sound reasoning for the judgment calls it made to effectuate the statute Congress passed. Because the IFR complies with § 71119, the APA, and the Constitution, the Court should enter summary judgment in CMS's favor, and no relief should issue. Should the Court disagree, in whole or in part, it should be appropriately limited in whatever relief it confers respecting the challenged provisions. As explained below, remand without vacatur—as opposed to vacatur, an injunction, or a court-imposed stay of the effective date of the rule—would be appropriate here if the Court finds that the agency's reasoning does not sufficiently explain the challenged provisions.

Remand without vacatur is appropriate where "a preliminary assessment suggests that the errors at issue can probably be mended" through further agency action, such as additional

explanation of the grounds for the agency's conclusions. *Cent. Me. Power Co. v. FERC*, 252 F.3d 34, 48 (1st Cir. 2001) (remanding an agency's orders without vacatur). The decision of whether to set aside an inadequately explained order "rests in the sound discretion of the reviewing court; and it depends *inter alia* on the severity of the errors, the likelihood that they can be mended without altering" the agency action at issue, "and on the balance of equities and public interest considerations." *Id.* In this case, all of these factors counsel in favor of remand without vacatur.

First, any purported errors are unlikely to be of such severity that the IFR must be enjoined in the interim. The relevant legal test here looks to the scope of the challenged action's flaws in reasoned decision-making, not the policy impact or gravity of the underlying rule. *See Int'l Union, United Mine Workers of Am. v. Fed. Mine Safety & Health Admin.*, 920 F.2d 960, 965–66 (D.C. Cir. 1990) (describing, in the context of a regulation on mine safety, various failure-to-explain errors that the court remanded to the agency for further explanation). Viewed properly, the purported shortcomings of the IFR in terms of what Plaintiffs believe CMS did not properly consider are marginal. They stem primarily from unsolicited materials submitted to CMS that it was not under a legal obligation to consider or respond to due to the suspension of 5 U.S.C. § 553 by Congress and Congress's directive to issue an IFR to implement the statute. Remand without vacatur would be an appropriate way for CMS to provide further explanation of the IFR's lawful requirements, while complying with Congress's desire for expeditious implementation of the IFR, including the provisions challenged here.

Second, deficiencies in reasoned decision-making could be addressed without changing the challenged provisions, and Plaintiffs' speculation that CMS would "likely" reach a different policy if the IFR were vacated, Pls.' Opp. at 18, is baseless. In fact, the record supports the opposite conclusion. CMS has told the public its construction of the medical frailty exclusion is the "best reading of the statutory phrase," and the policy concerns Plaintiffs raise do not speak to the conclusion the agency reached on that legal question. 91 Fed. Reg. 33,373. Moreover, the agency is already empowered by statute to make changes to the rules implementing the community engagement requirement without notice and comment. If it were likely that CMS would reach a

different result after considering additional evidence, it is already empowered to make those changes.

Third, the balance of equities leans heavily in favor of CMS. Enjoining the challenged provisions solely on a failure-to-explain rationale would prevent CMS from fully implementing provisions Congress authorized CMS to adopt by the January 1, 2027 deadline Congress chose. That is a substantial interference with Congress's express directives, and therefore a serious affront to the public interest. Plaintiffs complain about the burdens and costs on their public health agencies of implementing the IFR, suggesting it would be better to enjoin the rule now and give administrative grace to "any non-Plaintiff State [that] has short-term difficulty complying with the IFR after the Challenged Provisions are vacated," Pls.' Opp. 19, but it would surely be better to ask CMS to bolster its explanation while leaving the IFR intact. If the Court vacates the challenged provisions of the IFR, CMS is likely to reimpose them by issuing a supplemental IFR that resolves any purported shortcomings in the agency's process of reasoned decision-making. That regulatory back-and-forth, not CMS's proposal, is most likely to lead to confusion and disruption at this stage of implementation. *See* Vitolo Decl. ¶¶ 11–14.

Plaintiffs' alternative proposal of a "six-month enforcement stay" fares no better. What Congress authorized in enacting § 71109 was a limited legal authority for the Secretary to grant "good faith" implementation exceptions on a state-by-state basis. *See* 42 U.S.C. § 1396a(xx)(11)(A)–(B). A general jubilee from the requirements would be tantamount to an injunction and contrary to Congress's intentions. A six-month stay would also fail to restore the "status quo," as Plaintiffs suggest, Pls.' Opp. at 20. Rather, the "last uncontested status which preceded" this case, *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts., Inc.*, 622 F.3d 36, 41 n.5 (1st Cir. 2010), was the expectation of Congress and the public that the IFR released on June 1, 2026, would become effective on January 1, 2027, with any exceptions to be administered by the Secretary. Plaintiffs present no cogent reason for deviating from that status quo.

## CONCLUSION

The Court should grant Defendants' cross-motion and deny Plaintiffs' motion.

Dated: October 7, 2026

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By: */s/ Michael J. Gerardi*
MICHAEL J. GERARDI
DC Bar No. 1017949
Deputy Associate General Counsel, Office of General Counsel, U.S. Dep't of Health & Human Services
Special Assistant U.S. Attorney

STEPHEN M. RICHMOND
DC Bar No. 1033701
Senior Attorney, Office of General Counsel, U.S. Dep't of Health & Human Services,
Special Assistant U.S. Attorney

200 Independence Ave., SW
Mailstop 443F.23
Washington, D.C. 20201
Phone: (202) 619-3620
E-Mail: Michael.Gerardi@hhs.gov

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 7, 2026, the foregoing pleading was filed electronically through the CM/ECF system, which causes all parties or counsel to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

*/s/ Michael J. Gerardi*
Michael J. Gerardi
Special Assistant U.S. Attorney